IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ESTATE OF ALVIN COLE, by and through its Special Administrator, Tracy Cole; TRACY COLE, individually; ALBERT COLE, individually; | Case No: _____ |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| JOSEPH MENSAH in his individual capacity, BARRY WEBER, in his individual capacity, CITY OF WAUWATOSA, CITIES AND VILLAGES MUTUAL INSURANCE COMPANY, and ABC INSURANCE COMPANY, | |
| Defendants. | |

## COMPLAINT

Plaintiffs, by and through their attorneys Kimberley Cy. Motley, E. Milo Schwab, and Nathaniel Cade, Jr., respectfully allege for their Complaint and Jury Demand as follows:

## I.    INTRODUCTION

This is the story of one of the deadliest police officers in American history. Between July 16, 2015 and February 2, 2020, Joseph Mensah, a police officer for the City of Wauwatosa, killed three young men of color in three separate incidents. This Complaint tells the story of Joseph Mensah's third victim and a culture of policing in Wauwatosa which championed his indifference for life, callousness towards killing, and racially discriminatory policing towards Black people.

## II.    JURISDICTION AND VENUE

1.    This action arises under the Fourth and Fourteenth Amendments to the United States

Constitution and the laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

2. Jurisdiction for Plaintiffs' supplemental state law claims, brought under Wisconsin state law, is conferred by 28 U.S.C. § 1367.

3. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b). All events alleged herein occurred within Milwaukee County.

### III. PARTIES

At all times pertinent to the subject matter of this litigation, the decedent, Alvin Cole ("Mr. Cole"), was a juvenile citizen of the United States who was a resident and domiciled in Milwaukee County, in the State of Wisconsin. Tracy Cole, the decedent's mother, was named as the Special Administrator of the Estate of Alvin Cole on July 1, 2021.

4. Plaintiff Tracy Cole is Alvin Cole's biological mother. At all times relevant to the subject matter this Complaint, Mrs. Cole was a citizen of the United States of American and a resident of and domiciled in Milwaukee County, in the State of Wisconsin.

5. Plaintiff Albert Cole is Alvin Cole's biological father. At all times relevant to the subject matter of this Complaint, Mr. Cole was a citizen of the United States of American and a resident of and domiciled in Milwaukee County in the State of Wisconsin.

6. Defendant City of Wauwatosa ("Wauwatosa"), with offices of its executive at 7725 W. North Avenue, Wauwatosa, WI 53213, is and was at all times material hereto, a Municipal Corporation organized under the laws of the State of Wisconsin. Wauwatosa established,

operated and maintained the Wauwatosa Police Department ("WPD") at all times material hereto; Wauwatosa is ultimately responsible for the training, supervising, and discipline of the WPD employees and the creation and implementation of its policies and procedures through, former Chief of Police Barry Weber, hereinafter referred to as "Weber" and had ultimate control and authority over WPD and all Defendants, and pursuant to Wis. Stat. § 895.46, is obligated to indemnify all Defendants in this action.

7. Defendant Barry Weber was the Police Chief of the Wauwatosa Police Department at all times relevant to this action. In his official capacity he oversaw the WPD. By law, custom, de-facto or otherwise, and/or delegation, he has policymaking authority over the police department for all actions at issue in this case. He is responsible for ensuring that the policies and practices of the WPD comply with federal and state requirements for the treatment of citizens like the Plaintiff. He is being sued in his individual capacity. At all times relevant to this action, Weber was acting under color of law and within the scope of his employment with the WPD and Wauwatosa.

8. Defendant Joseph Anthony Mensah hereinafter referred to as "Mensah" is an adult citizen and resident of the State of Wisconsin. He is being sued in his individual capacity. Defendant Mensah was an officer with the WPD at all times relevant to this action and was acting under color of law and within the scope of his employment with the Wauwatosa Police Department for the City of Wauwatosa. Mensah was hired by the WPD on January 2, 2015.

9. Defendant Cities and Villages Mutual Insurance Company ("CVMIC") is a domestic insurance corporation authorized and licensed to do business in the State of Wisconsin for purposes of issuing insurance coverage policies, with Thomas E.

Mann as its registered agent, doing business at offices located at 9898 West Bluemound Road Wauwatosa, Wisconsin 53226. Upon information and belief, CVMIC issued a policy of liability insurance to the City of Wauwatosa, and all their employees and/or agents thereof. By the terms of said policy, CVMIC agreed to pay any and all sums for which Wauwatosa and/or their agents and employees might be held legally liable for injuries or damages caused by Wauwatosa and/or their employees and agents. Upon information and belief, said CVMIC insurance policy was in full force and effect during all time periods relevant here. Pursuant to Wis. Stat. § 803.04, CVMIC is a proper party to this action.

10. Defendant ABC Insurance Company, upon information and belief, is a domestic insurance company duly conducting business in the State of Wisconsin and is engaged in the business, among other things, of issuing policies of insurance within the State of Wisconsin. Upon information and belief, prior to and including all relevant times herein, ABC issued a policy of liability insurance to the City of Wauwatosa and all its employees and/or agents thereof. By the terms of said policy, ABC agreed to pay any and all sums for which Wauwatosa and/or its agents and employees might be held legally liable for injuries or damages caused by Wauwatosa and/or its employees and agents. Upon information and belief, said ABC insurance policy was in full force and effect during all time periods relevant here. Pursuant to Wis. Stat. § 803.04, ABC Insurance Company is a proper party to this action.

## IV. BACKGROUND

### a. The Wauwatosa Police Department Embraces and Promotes Racism

11. From 1920 through at least the 1950's Wauwatosa was known as a restrictive zoning city in which African-Americans were not welcome.[1] Even well into the 1960s it was not uncommon to see signs in Wauwatosa excluding Black people or seeing property deeds which explicitly "excluded non-whites from purchasing, owning, leasing or occupying."[2]

12. Starting in 1919, the Washington Highlands subdivision included covenants that prohibited people of color from owning or occupying residential property within the subdivisions' boundaries.[3]

13. In seven Wauwatosa subdivisions developed between 1945 and 1949, African-American families were excluded.

14. In the 1950s, even after the Supreme Court ruled that government enforcement of racially restrictive covenants violated the Equal Protection clause of the 14th Amendment, two new subdivisions inserted twenty-year prohibitions against Black ownership or occupancy of homes in those subdivisions.

15. Approximately half of all residential land in Wauwatosa was subject to racially restrictive covenants over its history.

16. Some of these restrictions reached into the 1980s.

17. In the summer of 2020, documents from "Whites of Wauwatosa" were distributed stating that "Together we can keep Wauwatosa white. Together we can keep Wauwatosa safe."

18. During a period in the late 1980s and early 1990s several members of the WPD, including several officers who would serve in leadership roles until their retirement only several years

---

[1] https://www.jsonline.com/story/news/solutions/2019/06/18/centuries-old-racism-haunts-efforts-treat-milwaukee-traumaepidemic/2580146002/
[2] *Id.*
[3] "Racially Restrictive Covenants: The Making of All-White Suburbs in Milwaukee County" Metropolitan Integration Research Center, 1979, at 2.

ago and who were promoted shortly after by Defendant Weber while these parties were investigated , organized parties which they called "MLK parties."

19. During these parties, members of the WPD dressed in black face while wearing names tags bearing the names of people of color.

20. These parties were advertised, including in WPD buildings, using pictures of minorities arrested by the Wauwatosa Police.

21. At these parties, there was literature from the Ku Klux Klan and other white supremacist organizations.

22. When these parties were investigated, Barry Weber was the Wauwatosa Chief of Police.

23. No officer who attended these parties, which numbered at least thirteen, was properly disciplined for their racist conduct.

24. **The Wauwatosa Police Department never instituted any policy, training, or any of action to confront the deep-seated racism pervasive throughout its ranks.**

25. Instead, during the investigation into these racist parties, black face WPD participants and officers such as John Bozicevich, who hosted these parties at his house, were promoted by Defendant Weber.

26. A whistleblower clerk complained about the racism within the WPD and the MLK parties thrown and attended by many WPD officers. These allegations were brought to the attention of the municipality and the Fire and Police Commission.

27. The investigation revealed that WPD Officers Howard Bacon, David Breitlow, James Zalewski, John Bozicevich, Mark Tebo, Mark Presper, Roger Martens, Thomas Simon, Fred Carsky, Michael Reagles, Jeffrey Pruss, and Daniel Collins attended and/or hosted the racially divisive MLK parties.

28.   The clerk also complained that even Defendant Weber caused problems for him.

29.   Instead of addressing the custom of racism within the WPD, these officers were protected and promoted by the municipality and Defendant Weber.

30.   Howard Bacon, a WPD officer and a guest at the MLK parties fired a revolver next to the clerk's head inside the WPD building, of which only later would he learn that the bullets had been blanks.

31.   This was done in retaliation for the clerk's complaints about the racism that Bacon and his fellow officers displayed.

32.   After Mr. Bacon retired in 2021, Defendant Weber rehired him until sometime in 2021 when he was asked to leave for asking a civilian community service officer to perform a sexual act on him.  .

33.   Mr. Bacon's recent actions of misconduct in 2021 was never brought to the attention of the municipality or the Fire and Police Commission by Defendant Weber.

34.   This is consistent with a culture, custom, and practice of closing ranks and protecting their own.

35.   This failure to discipline, and policy of promoting officers associated with racially insensitive actions , only emboldened racist policing in Wauwatosa.

36.   In 2018, the City of Wauwatosa's population was reported as  being only 5.3% Black, yet in 2018, 83% of arrests were of Black people and 64% of traffic stops were of Black people.

37.   And when Wauwatosa police officers stop Black people, they conduct on average a stop that is 16% longer than stops of white people.

38.   It is not only the data which backs up the fact that Wauwatosa treats Black people differently than they treat white people.

39.    It is known by Black people throughout the Milwaukee metropolitan area to avoid driving through Wauwatosa because a police officer will find a reason to pull Black people over.

40.    The WPD devalues people of color which is reflective in their over policing of Black people.

41.    The WPD approaches Black and brown people as inherently suspicious.

42.    And the WPD is more likely to use force on Black and brown people.

**b.    Joseph Mensah is Rewarded for Two Killings**

43.    In his first four years and seven months as a police officer, Joseph Mensah killed three young men of color.

44.    Mensah was not fit to be a police officer for Wauwatosa.

45.    This brief period made Joseph Mensah one of the deadliest cops in American history.

46.    Prior to hiring Joseph Mensah, the WPD never conducted any psychological evaluations and did not thoroughly investigate his background.

47.    The WPD had no indication of whether Mensah could deal with high stress situations.

48.    In fact, Wauwatosa was informed that Defendant Mensah viewed situations as more dangerous than they in fact were.

49.    Only seven months into his time as a police officer, Mensah killed his first victim.

50.    On July 16, 2015, Mensah responded to a call about an intoxicated individual, Antonio Gonzales, threatening his boyfriend with a knife.

51.    Antonio's boyfriend informed the WPD that Antonio was extremely drunk. This information was conveyed to Mensah.

52.  By the time Mensah arrived at the scene, Antonio's boyfriend was safe. In fact, no one was being threatened nor at risk of injury.

53.  Nonetheless, Mensah immediately pulled out his gun.

54.  When Antonio came out of his house, Mensah claimed he was holding a decorative samurai sword and coming towards him.

55.  Mensah claimed that he shouted to Antonio to drop the sword.

56.  Within seconds, Mensah fired his weapon eight times at Antonio, which included one shot to the head and one shot to the back.

57.  At no time was Mensah's safety at risk.

58.  At no time was any other person's safety at risk.

59.  For Mensah, the simple failure to follow an order related to a purported weapon gave Mensah carte blanche permission to kill.

60.  Mensah failed to follow training related to dealing with and approaching individuals with an edged weapon.

61.  Instead of making efforts to maintain distance, Mensah instead closed the gap between him and Gonzalez.

62.  Mensah had either received training that he should always use deadly force at the first sight of a weapon or had failed to receive training consistent with the Fourteenth Amendment.

63.  After this first killing, Mensah was placed on administrative leave.

64.  Mensah never underwent a fitness for duty evaluation after he killed Antonio Gonzales. Instead, Chief Weber simply decided that Mensah was fine and let him come back to work.

65. WPD never had a fitness for duty policy nor any other policy to deal with officer involved shootings from July 16, 2015 through February 2, 2020.

66. WPD failed to conduct an internal investigation of Antonio's shooting before he killed Jay Anderson, Jr.

67. In 2016, because the Milwaukee District Attorney's Office decided against filing criminal charges, Weber decided that the killing did not violate any policies; that the killing was justified; and that Mensah was fine to return to duty.

68. To Weber, the inability of the District Attorney to disprove self-defense beyond a reasonable doubt meant that Mensah required no further evaluation, no training, no investigation, and no consideration that Mensah had violated the constitutional rights of Mr. Gonzales.

69. The Wauwatosa Police Department has an informal policy that so long as an officer is not charged with a crime, their conduct needs no review and their mental state requires no evaluation before they are allowed back on the streets.

70. On June 23, 2016 Mensah shot and killed Jay Anderson, Jr. who was sleeping in his car.

71. Mensah failed to follow numerous training procedures in his interactions with Jay Anderson.

72. Mensah failed to turn on his audio recording as required by his training.

73. Mensah failed to turn on his video camera as required by his training.

74. Mensah failed to follow proper safety protocol as required by his training.

75. Instead, apparently bored on his shift, Defendant Mensah went looking for action, finding Mr. Anderson asleep in his car in a city park parking lot.

76. Mensah left his lights off and got out of his car to wake Mr. Anderson.

77. Mensah claims that he saw a gun on the passenger seat of the vehicle and because Mr. Mensah sees danger and reacts in fear where others do not, Mensah immediately killed Jay Anderson.

78. Jay Anderson, Jr. had his hands up and was complying with Mensah's order when they interacted with one another.

79. Despite Jay Anderson, Jr. never touching a weapon in his interaction with Mensah, he was shot at six times and killed.

80. Mensah shot Jay Anderson, Jr. in the head four times. The two remaining bullets lodged in the headrest and broke a window behind Jay Anderson, Jr.'s head.

81. Jay Anderson, Jr. was committing no crime when Mensah shot him.

82. Jay Anderson, Jr. was a danger to no individual, including Defendant Mensah, when Mensah shot him in the head.

83. No amount of force was reasonable at the time Mensah aimed for Jay Anderson, Jr's head and shot him repeatedly, killing him instantaneously.

84. Mensah had also shot Mr. Gonzales in the head.

85. While Mensah was under investigation by the Milwaukee District Attorney for killing Jay Anderson, Jr.. Weber awarded Mensah with a medal of valor for killing Gonzales.

86. As Weber would later recount, the courage was based on how Mensah conducted himself during that incident in protecting only himself.

87. Defendant Weber confirmed to Mensah that shooting to kill was not only justified, but that it was valorous.

88. Defendant Mensah discharged his weapon nineteen times within a four year and seven month time period as a full-time active duty law enforcement officer with the Wauwatosa

11

Police Department.  Defendant Weber gave Mensah an award for killing seventeen year old Alvin Cole.

89.     Defendant Weber confirmed to Mensah that shooting to kill a kid was not only justified but that it was valorous

90.     Defendant Mensah is responsible for approximately 12% of all deaths by police shootings in Milwaukee County from 2013 through October 4, 2020.

91.     Defendant Mensah is responsible for 100% of all deaths by police shootings in the city of Wauwatosa since at least January 2011.

92.     This case tells the story of Joseph Mensah's third killing in less than  five years as a Wauwatosa police officer.

**B.     EXCESSIVE USE OF FORCE AGAINST MR. ALVIN COLE**

93.     On February 2, 2020, at approximately 6:00p.m. Defendant Joseph Mensah and other Wauwatosa Police Officers were dispatched to Mayfair Mall located at 2500 North Mayfair Road, Wauwatosa, Wisconsin.

94.     Police were called by Mayfair's security force after receiving a report that there was a verbal dispute in the mall.

95.     At the time Mensah and other Wauwatosa Police Officers arrived on the scene, it was unclear whether Mr. Cole had committed a crime.

96.     Upon arriving at Mayfair Mall, Officers Shamsi, Schleis, Johnson, Olson, and Mensah chased after multiple persons across the Mayfair mall parking lot.

Case 2:22-cv-00856   Filed 07/28/22   Page 12 of 35   Document 1

97.  Mr. Cole who exited the mall from the east end of the building through Nordstrom's, was chased by police and ran over 1/3 of a mile towards the parking lot south of the Cheesecake Factory.







98.  When Mr. Cole arrived at the parking lot south of the Cheesecake Factory, he accidently shot himself in the left forearm.

99.  He immediately fell to the ground and dropped his gun.

100.  Mr. Cole was then kneeling with both hands on the ground and this gun was not in his hands.

101.  While in the parking lot near the Cheesecake Factory, Mr. Cole was given conflicting commands to "drop his gun," and "throw his gun," by Officers Olson and Shamsi.

102. Officer Olson stood to the west of Mr. Cole on his right. Officer Shamsi was to Mr. Cole's north behind him.

103. For ten (10) full seconds after Mr. Cole shot himself and while he was prone on all fours, Officers Shamsi and Olson controlled the situation, knowing that use of deadly force was not warranted.

104. Mr. Cole was attempting to comply with their orders and was no threat to them or any other person.

105. Ten seconds after Mr. Cole's gun discharged and was empty, Mensah ran up to the scene, and without giving any verbal directions shot Mr. Cole five times.

    *The first gunshot can be heard at 1:22, while the following shots can be heard at 1:32.*[4]

106. Defendant Mensah shot Mr. Cole midstride.

107. Mensah had no opportunity to assess the situation, to provide orders, or to otherwise determine whether deadly force was justified.

108. He simply killed Mr. Cole without justification.

109. Mensah was the only officer who discharged a weapon on February 2, 2020 against Alvin Cole.

110. At all times during the shooting Mr. Cole was on the ground in some way.

111. The first two shots by Mensah at Mr. Cole he was on his knees. And for the last three shots Mr. Cole was lying face down on the ground.

112. In the ten seconds between the time Mr. Cole's gun accidentally discharged and Mensah's shots, Mr. Cole was disabled, had fallen to the ground and did not pose a threat of physical harm to the officers).

---

[4] https://www.youtube.com/watch?v=sSs1AZ7Gc_c&feature=emb_title

113. At the time of the shooting, Mensah did not know Mr. Cole.

114. Mensah was the only officer who fired his weapon despite the fact that three other Wauwatosa Police officers were at the scene, at least one who was closer to Mr. Cole than Mensah.

115. As Mensah was shooting Mr. Cole, Officer Shamsi yelled at Mensah to "Stop! Stop!"

116. In the moment, Shamsi did not understand why Mensah was shooting Mr. Cole as Mr. Cole was not a threat to any individual and Shamsi had control of the situation without resorting to deadly force.

117. After Mensah had shot Mr. Cole five (5) times including three (3) times while he lay on the ground, Mensah simply strutted off.

118. He offered no medical attention to his victim.

119. He made no effort to obtain the gun or detain or arrest Mr. Cole.

120. He walked away as if he was the hero in his own movie, knowing that he had killed Mr. Cole and not simply used force which could be deadly.

121. The complete and utter disregard for human life as shown in the video is damning.

122. In the City of Wauwatosa, Mensah has shot and killed three males of color in less than a five-year time period, firing his weapon nineteen times.

123. Mensah is the only Wauwatosa police officer who has fatally shot and killed anyone for nearly a twelve year time period in the City of Wauwatosa.

124. Defendant, Mensah has a mentality on policing where he looks for confrontation with the expectation that he will use deadly force.

125. Mensah approaches interactions with individuals expecting a life and death situation

and understands non-deadly interactions as deadly.

126. On July 28, 2020 Mensah was interviewed on the Dan O'Donnell Show. He stated in

relevant part:

"when you have proactive officers, and I'm not trying to sit here and brag, and say I'm
the most proactive, go getter officer out there in the world, but when you have officers,
who go out there and they actually try to look, look for crime, uh stop crime, be out in the
community and try to keep it safe, it's just a matter of time, before you end up, um
trying– you end up having an interaction with someone that's a criminal, that is out there
to do um harm, whether it's to an officer or somebody else. It just happens."

127. On May 12, 2021 Weber awarded Mensah with a medal of valor for killing

seventeen year old Alvin Cole.

128. Defendant Weber believes that Mensah shooting to kill Mr. Cole was not only

justified, but that it was valorous.

V.     CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment**
**Excessive Force**
**(Plaintiff Estate of Alvin Cole. against Defendants Joseph Mensah, Berry Weber, and
City of Wauwatosa)**

129. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

130. At all times relevant to the allegations in this Complaint, the above-named Defendants were

"persons" for purposes of 42 U.S.C. § 1983, were acting under color of state law, and were

acting within the scope of their official duties and employment in their capacities as officers

of the WPD.

131. Defendant Mensah's use of deadly force, as described herein, was objectively unreasonable

and excessive in light of the facts and circumstances confronting him at the time.

132. Mr. Cole was not a threat to any individual as evidenced by the multiple other officers controlling the situation without resorting to any use of force.

133. Under the application of the specific facts and totality of circumstances as described herein, Mensah violated Mr. Cole's clearly established constitutional rights.

134. Any reasonable law enforcement officer knew or should have known of these clearly established rights at the time of Mr. Cole's death.

135. Defendant Mensah engaged in the use of deadly force that was objectively unreasonable in light of the facts and circumstances, violating Mr. Cole's Fourth Amendment rights.

136. Defendant Mensah's excessive force caused Mr. Cole to be unlawfully seized and thereby caused his death.

137. The acts of Mensah were pursuant to the customs, practices, policies, and/or training of Defendant Wauwatosa and Defendant Weber.

138. As alleged in detail above, Defendant Wauwatosa and Defendant Weber have a custom, policy, and practice of encouraging, condoning, tolerating, ratifying, and even rewarding the use of excessive force by Defendant Mensah. This is manifested through, among other things, WPD's grossly inadequate training, supervision, and lack of discipline of Defendant Mensah relating to the use of excessive force.

139. Defendants Weber and Wauwatosa were on notice of WPD's defective customs, policies, and/or practices before Mensah's excessive use of force against Mr. Cole.

140. The need for adequate mental health evaluations, effective policies related to officer involved shootings, adequate hiring procedures, additional and effective use of force policies, training, and/or supervision was obvious and Defendants Wauwatosa and Weber exhibited deliberate indifference to the known and substantial risk of harm to Mr. Cole and

others by failing to create adequate mental health evaluation policies, effective policies related to officer-involved shootings, adequate hiring procedures, adequate less than lethal force policies, adequate use of force policies and/or to adequately train or supervise WPD officers in the use of force.

141. Defendants Weber and Wauwatosa's failure to create and implement adequate use of force policies and/or to adequately train and/or supervise WPD officers in the use of force was substantially certain to cause WPD officers to violate the constitutional rights of individuals like Mr. Cole to be free from excessive force and these Defendants consciously or deliberately chose to disregard this risk in failing to change the use of force policies and/or adequately train and/or supervise WPD officers in the use of force. These acts and/or omissions constituted a deliberate choice by Weber and Wauwatosa among several alternatives to pursue a course of action regarding creating and implementing policies, training, and supervision in the area of use of force.

142. Defendants Weber and Wauwatosa set in motion a series of events they knew would cause Mr. Cole, or an individual in a similar situation as Mr. Cole, to be deprived of his constitutional right to be free from excessive force.

143. But for the above acts or omissions of Weber and Wauwatosa, Mensah would not have violated Mr. Cole's constitutional rights, and such a deprivation was a natural and foreseeable consequence of Defendants Weber and Wauwatosa's acts and omissions.

144. The herein described acts or omissions of the Defendant Wauwatosa, Weber, and Mensah were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Cole's death, the physical and mental pain and anguish Mr. Cole suffered before and during his death, the loss of Mr. Cole's

relationship and companionship with his family and friends, the loss of Mr. Cole's constitutional rights, his loss of enjoyment of life, and other compensatory and special damages including but not limited to Mr. Cole's permanent lost earnings and earnings capacity, medical bills, and funeral expenses.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment
### Failure to Train and Supervise
**(Plaintiff Estate of Alvin Cole Against Defendant City of Wauwatosa and Defendant Weber)**

145. Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

146. Defendant Mensah violated Mr. Coles' constitutional right to be free from excessive force resulting in death, as set forth in the First Claim for Relief.

147. Defendant Weber was, at all times relevant, a policymaker or final delegated decision-maker for the Wauwatosa Police Department, and in that capacity established policies, procedures, customs, and/or practices for the same.

148. At all times relevant hereto, it was known to Defendant that it was highly probable that Wauwatosa law enforcement officers would encounter citizens suffering from mental illness or intoxication, and that citizens suffering from such disorders are at a highly elevated risk of death from ordinary law enforcement use of force methods to restrain non-compliant persons.

149. Defendant was required to implement policies and train their officers with respect to dealing with persons who are mentally ill, emotionally disturbed, or intoxicated, including but not limited to: requesting backup from people with experience; training not to unreasonably agitate or excite the person; to contain the person; to respect the person's

comfort zone; to use nonthreatening communications, and; to employ the passage of time to their advantage.

150.    Upon information and belief, at all times material hereto, Defendant did not have specific policies, procedures and training governing law enforcement response to citizens suffering from such mental conditions and did not train all of their law enforcement officers on what uses of force with respect to such citizens were reasonable and constitutional and were, therefore, deliberately indifferent to the constitutional rights of such medically and/or mentally impaired citizens.

151.    Defendant also knew that absent the adoption of specific policies, procedures and tactics governing law enforcement response to citizens suffering from mental illness, and absent training of law enforcement officers in such policies, procedures and tactics, it was highly predictable that such failures to train would lead to law enforcement officers' violation of the Fourth Amendment Rights of citizens, and could likely result in the otherwise avoidable death of such citizens.

152.    This deliberately indifferent training and supervision resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant.

153.    In light of the duties and responsibilities of those police officers that participate in interactions, arrests, or other dealings with mentally ill or emotionally disturbed individuals, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional rights in these recurring situations, that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

154. Defendant knew or should have known that the police employees would use unreasonable force when dealing with mentally ill, emotional disturbed individuals, or highly agitated individuals.

155. Defendant was deliberately indifferent to the constitutional rights of mentally disturbed individuals in the public, knowing that dangerous and potentially fatal consequences could be suffered by such individuals (including Mr. Cole) by failing to properly train and supervise his employees. Defendant could have and should have pursued reasonable methods for the training and supervising of such employees, but failed to do so.

156. The reckless and deliberately indifferent acts and omissions of Defendant in the training and supervision of its officers, it's as described herein, were moving forces in the predictable deprivation of Plaintiff's constitutional. Had the officers been properly trained in the fundamental principles of maintaining a covered position and trying to communicate with emotionally upset persons with weapons rather than approaching them loudly with threatening commands, Mr. Cole would be alive.

157. Defendant also ratified the conduct of Defendant Mensah and all these officers in concluding that that their conduct was consistent with the policies, procedures, and training of the Wauwatosa Police Department.

158. As a proximate result of Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Antonio Cole, entitling it to recover his compensatory and special damages, including loss of constitutional rights, pain and suffering during this event, lost earnings, permanent lost earnings and earnings capacity for the expected productive working lifetime of Antonio Cole under the mortality tables, all in amounts to be proven at trial.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment
### Denial of Equal Protection
### (Estate of Alvin Cole against All Defendants)

159. Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

160. At all times relevant to the allegations in this Complaint, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983, were acting under color of state law, and were acting within the scope of their official duties and employment in their capacities as officers of the WPD.

161. At the time of the events at issue, Mr. Cole had the clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

162. Mr. Cole's race was a motivating factor in Mensah's decision to use excessive force against him. Mensah acted with the intent or purpose of depriving Mr. Cole of the equal protection and benefits of the law, and equal privileges and immunities under the law, in violation of the Fourteenth Amendment.

163. Defendant Mensah treated Mr. Cole less favorably—and with unreasonable force—than his similarly situated White counterparts, wholly or in part because he was Black.

164. There was no rational basis for Mensah's discriminatory actions and inactions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

165. Defendant Mensah seized and used excessive force against Mr. Cole without reasonable suspicion or probable cause to believe that Mr. Cole had committed a crime, posed a threat of harm to any other person, or was a flight risk that would legally justify the force used. The lack of any such reasonable suspicion or probable cause, along with WPD's long

history of racially biased policing, are evidence that the seizure of Mr. Cole by Mensah's use of force against him was motivated in whole or in part because of Mr. Cole's race.

166. WPD officers' history and disproportionate use of excessive force against Black people provide evidence of discriminatory intent. WPD's clear pattern of disproportionate use of excessive force against Black people is unexplainable on grounds other than race.

167. WPD Defendants intentionally, willfully, unreasonably, and wantonly seized Mr. Cole by using excessive force against him, and/or failing to intervene in the use of excessive force against him, wholly or in part because of his race.

168. Defendants Wauwatosa and Weber failed to properly train, supervise, and/or discipline its employees regarding the constitutional requirement not to engage in racially biased policing, resulting in the Mensah's unlawful seizure via the use of excessive force against Mr. Cole. Defendants Wauwatosa and Weber particularly failed to properly train, supervise, and/or discipline its employees regarding the use of excessive force against Black people, and the prohibition on using race as a motivating factor in taking police actions, including the use of force.

169. Considering the duties and responsibilities of personnel of Defendant Wauwatosa — who must police and interact with Black people regularly—and the frequency with which such law enforcement personnel will confront Black people while discharging their duties as law enforcement officers as described herein, the need for specialized training, supervision, and discipline regarding such decisions was so obvious, and the inadequacy of training and/or supervision was so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Wauwatosa is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

170. Such failure to properly train, supervise, and/or discipline was a moving force behind and proximate cause of Mensah's racially biased treatment of Mr. Cole, and makes up an unconstitutional policy, procedure, custom, and/or practice.

171. Wauwatosa exonerated Mensah for his racially biased conduct under Wauwatosa's municipal customs, policies and/or actual practices described herein. Such decision to exonerate racially discriminatory conduct was made deliberately and pursuant to Wauwatosa's longstanding customs and practices. The decision sends a clear message that Mensah acted pursuant to the customs, practices, and policies of Defendant Wauwatosa.

172. Defendant Wauwatosa's failure to adequately train and/or supervise, as well as the failure to take appropriate disciplinary or remedial action on past instances of similar unconstitutional conduct, as described herein, was a legal and proximate cause of Mr. Cole's death.

173. As a direct and proximate result of Defendants' actions, Mr. Cole lost his life and Plaintiff Estate has been and continues to be damaged by Mensah's racially motivated seizure via unreasonable use of excessive force. Mr. Cole endured physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, loss of consortium with his family and friends, and sense of security and individual dignity, and tragically the loss of his life at the age of 17.

174. The herein described acts or omissions of Defendant Wauwatosa Weber, and Mensah, were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Cole's death, the physical and mental pain and anguish Mr. Cole suffered before and during his death the loss of Mr. Cole's relationship and companionship with his family and friends, the loss of Mr. Cole's constitutional rights,

his loss of enjoyment of life, and other compensatory and special damages including but not limited to Mr. Cole's permanent lost earnings and earnings capacity, medical bills, and funeral expenses.

175. Defendants' intentional actions or inactions as described herein intentionally deprived Mr. Cole of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## FOURTH CLAIM FOR RELIEF – MONELL CLAIM
### Plaintiffs v. City of Wauwatosa

176. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

177. The acts of Mensah, including shooting and killing Mr. Cole without any justification or reasonable suspicion, was done in accordance with the Wauwatosa and its Police Department's de-facto policy, regulation, decision or custom condoning excessive force, failing to have an officer involved shooting protocols especially as it relates to psychological assessments, failure to adequately discipline and failure to properly train Mensah for such violations. That these respective de-facto policies were officially adopted, expressly or implicitly, or promulgated or practiced or ratified by Wauwatosa, through its police department, and as such constitute a de-facto governmental custom in such department, even though such custom may not have received written formal approval by the City, and even though such de-facto policies are inconsistent with or even violate WPD's written policies.

178. This official or de facto policy or custom of utilizing excessive force, lethal force, and/or violating person's equal all in malicious or reckless disregard or with deliberate

indifference to Mr. Cole's Fourth and Fourteenth Amendment Rights by, among others, the Defendant Chief Weber's failure to adequately discipline Mensah for his unlawful conduct and for Defendant Weber's continued failure to adequately supervise Mensah.

179. That this official or de-facto policy and custom of utilizing excessive force, lethal force, and/or violating person's equal protection rights arose and/or was allowed to continue as a result of, among others, Wauwatosa and the WPD's failure to adequately supervise, discipline, and/or train its employees namely Defendant Mensah. Upon information and belief, the individual Defendant had used excessive lethal force particularly resulting in the death of an Antonio Gonzales who he shot at eight times killing him on July 16, 2015 after having been on the WPD's force for only seven months.

180. Upon information and belief, the individual Defendant Mensah had used excessive lethal force twice before killing Alvin Cole, particularly resulting in the death of a Jay Anderson, Jr. who he shot at six times killing him on June 23, 2016. Eleven months after he killed Antonio Gonzales on July 16, 2015 and after having been on the WPD's force for only eighteen months.

181. That the described conduct on the part of all the Defendant's was a cause of the plaintiff's injuries, losses and damages as set forth herein.

182. The misconduct described in this count was objectively unreasonable and was undertaken intentionally with malice and knowing disregard for Plaintiffs constitutional rights.

183. That the Defendant's conduct constituted a violation of the Fourteenth Amendment and/or Plaintiffs' equal protection rights guaranteed by that same Amendment.

184. While acting under color of law, Defendant deprived Plaintiffs of their Fourteenth Amendment rights for which Plaintiffs are entitled to damages proximately caused thereby.

185. Unless restrained by this Court, a real and immediate threat exists that the Fourteenth Amendment rights of the Plaintiffs' will be violated by WPD officers in the future and that Defendants will continue to engage in the unconstitutional and illegal conduct alleged herein, or other similar unconstitutional or illegal conduct, causing irreparable harm to Plaintiffs.

## FIFTH CLAIM FOR RELIEF – DELIBERATE INDIFFERNCE
### 42 U.S.C. 1983 - Deliberate Indifference
### All Plaintiffs v. Defendants City of Wauwatosa and Barry Weber

186. Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

187. Mensah shot and killed Antonio Gonzales on July 16, 2015 and Jay Anderson, Jr. on June 23, 2016, who were both subjected to excessive force.

188. Defendant Weber and Wauwatosa knew of Mensah's violent and objectively unreasonable conduct of using excessive force and condoned, approved, and helped facilitate his violent behavior, which resulted in him also shooting and killing Alvin Cole.

189. Defendant City of Wauwatosa and Weber, by their actions and inactions, directly and indirectly approved and condoned Mensah's objectively unreasonable use of excessive force.

190. As chief of police, Defendant Weber had an obligation to address these constitutional violations in anticipation of future violence that Mensah would be impart and failed to address.

191. Defendant Weber and Wauwatosa knew about Mensah prior objectively unreasonable violent conduct against Antonio Gonzales and Jay Anderson, Jr. and acted with deliberate, reckless indifference to the constitutional rights of Alvin Cole, which resulted in Mensah shooting and killing Cole.

192. Defendant's actions caused, directly and proximately, Plaintiffs to suffer damages.

## SIXTH CLAIM FOR RELIEF
### Wisconsin Statute Section 895.46
### Indemnification against Wauwatosa
### (All Plaintiffs v. All Defendants)

193.    Plaintiffs reallege and incorporate by reference the allegations of all the preceding paragraphs.

194.    At all times material hereto, Defendant Mensah was carrying out his duties as a WPD officer, and was acting within the scope of his employment with Wauwatosa.

195.    The conduct of Mensah, as set forth in the preceding paragraphs resulted in the death of Alvin Cole.

196.    Wauwatosa is liable, pursuant to Wisconsin Statute Section 895.46 for any judgment entered against Defendant Mensah in this action because at all times material hereto, Mensah was carrying out his duties as a WPD officer, and was acting within the scope of his employment with Wauwatosa.

197.    Defendant's Weber investigation and lack of any disciplinary actions were not complete and incompetent and/or constitute an attempted cover up Defendants Mensah's unlawful conduct.

198.    The acts of the Mensah, including shooting and killing Mr. Cole without any justification or reasonable suspicion, was done in accordance with the Wauwatosa and its Police Department's de-facto policy, regulation, decision or custom condoning excessive force in executing arrests, false arrests, and/or otherwise violating person's equal protection rights, including by the City's or in this case to date, Defendant Weber and Wauwatosa's, failure to adequately discipline Mensah for such violations. That these respective de-facto policies were officially adopted, expressly or implicitly, or promulgated or practiced or ratified by

the Wauwatosa, through its Chief of Police Weber, and as such constitute a de-facto governmental custom in such department, even though such custom may not have received written formal approval by the City, and even though such de-facto policies are inconsistent with or even violate WPD's written policies.

199. This official or de facto policy or custom of utilizing excessive force, lethal force, and/or violating person's equal all in malicious or reckless disregard or with deliberate indifference to Mr. Cole's Fourth and Fourteenth Amendment Rights by, among others, the Defendant Weber's failure to adequately discipline Mensah for his pattern and practice of using objectively unreasonable excessive force and for his unlawful conduct Defendant Weber continued failure to adequately supervise Mensah.

200. That this official or de-facto policy and custom of utilizing excessive force, lethal force, and/or violating person's equal protection rights arose and/or was allowed to continue as a result of, among others, Wauwatosa and the WPD's failure to adequately supervise, discipline, and/or train its employees namely Defendant Mensah. Upon information and belief, the individual Defendant Mensah had a pattern and practice of using deadly force. Mensah used excessive lethal force particularly resulting in the death of twenty-nine (29) year old Antonio Gonzales who he shot at eight times killing him on July 16, 2015 after having been on the WPD's force for only seven months. On June 23, 2016 Mensah shot six times and killed twenty-five (25) year old Jay Anderson, Jr. after waking him up from his sleep. And on February 2, 2020 Mensah shot five times and killed 17 year old Alvin Cole.

201. That the described conduct on the part of all the Defendants, including the former chief of Police for the WPD Defendant Weber was a cause of the plaintiff's injuries, losses and damages as set forth herein.

202. That such conduct was intended to cause Mr. Cole and was unnecessary and severe physical, psychological, and emotional injuries that resulted in his death.

203. That such conduct on the part of all the individual Defendants was a cause of the Mr. Cole's death and causing also severe psychological and emotional damages, suffered by the petitioners.

204. At all times material hereto, the individual Defendants acted maliciously and/or with reckless disregard and/or with deliberate indifference towards Mr. Cole or in an intentional disregard of his rights, his life and as such all Defendant's should be liable for any and all punitive damages suffered by petitioners.

The Defendant Wauwatosa is liable pursuant to Wis. Stat. § 895.46 for payment of any judgment entered against this individual employee Defendant in this action because said Defendant was acting within the scope of his employment when he committed the acts described above.

## SEVENTH CLAIM FOR RELIEF
### Direct Action Statute – Wis. Stat. § 632.24
### (Against Defendant Insurance Companies)

205. Plaintiffs incorporates by reference all of the allegations set forth in the preceding paragraphs as if fully stated and alleged herein.

206. At all material times and upon information and belief, all non-insurance defendants had in full force and effect one or more policies of insurance that provided coverage to each of them, insuring them against liability for their negligence and

31

the negligence of their agents and employees, and agreeing to pay any and all amounts that Defendants and their agents and employees may become legally obliged to pay for the aforementioned damages.

207. Pursuant to Wis. Stat. §803.04, Defendants Cities and Villages Mutual Insurance Company and ABC, DEF, GHI and JKL are proper parties to this action.

208. Pursuant to Wisconsin's Direct-Action Statute, Wis. Stat. §632.24, Plaintiffs are allowed to maintain this lawsuit directly against Defendants CVMIC, ABC, DEF, GHI and JKL.

**EIGHTH CLAIM FOR RELIEF**
**42 U.S.C. 1983 – Fourth Amendment**
**Loss of Society and Companionship**
**(Plaintiffs Tracy Cole and Albert Cole Against all Defendants)**

209. Plaintiffs reallege and incorporate by reference the allegations of all the preceding paragraphs.

210. At all times relevant to the allegations in this Complaint, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983, were acting under color of state law, and were acting within the scope of their official duties and employment in their capacities as officers of the WPD.

211. The killing of Alvin Cole was a violation of his constitutional right under the Fourth and Fourteenth Amendments.

212. At the time of the killing, Tracy Cole and Albert Cole had a constitutional interest and right in the familial relationship with their child.

213. In killing Alvin Cole, Defendants have denied Tracy Cole and Albert Cole the opportunity to spend time with their child.

214. As a direct and proximate result of Defendants' actions, Tracy Cole and Albert Cole have suffered significant and irreparable injury.

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally, as follows:

a. Against Defendant Joseph Mensah in his individual capacity, for compensatory damages, for the violation of Mr. Cole's rights, as set forth above, in an amount to be determined at a trial of this matter;

b. Against Defendant Chief Barry Weber, in his official capacity, for compensatory damages for the violation of Mr. Cole's rights, as set forth above, in an amount to be determined at a trial of this matter;

c. Against Defendant Mensah for punitive damages for the violation of Mr. Cole's rights, as set forth above, in an amount to be determined at a trial of this matter;

d. Against Defendant Weber for punitive damages for the violation of Mr. Cole's rights, as set forth above, in an amount to be determined at a trial of this matter;

e. Against Defendant City of Wauwatosa for punitive and compensatory damages and for its liability pursuant to Wis. Stat. § 895.46 to indemnify the individual Defendants in an amount to be determined at a trial of this matter;

      f.      For all costs, disbursements and actual attorneys' fees pursuant to 42 U.S.C.A. § 1988, and for such other relief as the Court deems just and equitable.

PLAINTIFF HEREBY DEMANDS A JURY TRIAL OF THIS MATTER ON ALL ISSUES SO TRIABLE.

Dated this 28th day of July, 2022.

Respectfully Submitted:

**MOTLEY LEGAL SERVICES**
s/ Kimberley Cy. Motley (SBN #1047193)
PO Box 1433
Matthews, N.C. 28106-1433
Telephone: (704)763-5413
Email: kmotley@motleylegal.com

**ASCEND COUNSEL**
E. Milo Schwab (CO. SBN #47897)
2401 S. Downing Street
Denver, CO 80210
(303) 888-4407
milo@ascendcounsel.co

**CADE LAW GROUP LLC**
Nathaniel Cade, JR. (SBN# 1028115)
Antonique C. Williams (SBN #1051850)
Annalisa Pusick (SBN# 1116379)
PO Box 170887
Milwaukee, WI 53217
Telephone (414) 255-3802
Fax: (414) 255-3804
Email: nate@cade-law.com
antonique@cade-law.com
annalisa@cade-law.com

**ATTORNEYS FOR PLAINTIFFS**

35