1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF WISCONSIN

3   --------------------------------------------------------

4   ESTATE OF ALVIN COLE,                )
                                         )
5                    Plaintiffs,         )     Case No. 22-CV-856
                                         )     Milwaukee, Wisconsin
6        vs.                             )
                                         )     May 5, 2025
7   JOSEPH MENSAH,                       )
                                         )     **VOLUME 1**
8                    Defendant.          )
                                         )
9   --------------------------------------------------------

10            **EXCERPT TRANSCRIPT OF JURY TRIAL**
              BEFORE THE HONORABLE LYNN ADELMAN
11         UNITED STATES DISTRICT JUDGE, and a jury.

12   APPEARANCES:

13   For the Plaintiff
     ESTATE OF ALVIN COLE:         Cade Law Group LLC
14                                 By: Nathaniel Cade, Jr & Annalisa
                                   Pusick
15                                 PO Box 170887
                                   Milwaukee, WI 53217
16                                 Ph: 414-255-3802
                                   Fax: 414-255-3804
17   For the Defendant             nate@cade-law.com
     JOSEPH MENSAH:
18                                 Wirth & Baynard
                                   By: Joseph M Wirth & Jasmyne M
19                                 Baynard
                                   9898 W Bluemound Rd - Ste 2
20                                 Wauwatosa, WI 53226
                                   Ph: 414-291-7979
21                                 Fax: 414-291-7960
                                   Jmw@wbattys.com
22

23   U.S. Official Reporter:       SUSAN ARMBRUSTER, RPR, RMR, FCRR
     Transcript Orders:            Susan_Armbruster@wied.uscourts.gov
24

      Proceedings recorded by computerized stenography,
25   transcript produced by computer aided transcription.

1

```
                    T-R-A-N-S-C-R-I-P-T   I-N-D-E-X
```

```
                                                    Page

                              WITNESSES
ALL WITNESSES:

For the Plaintiffs:

   Albert Cole

   Direct Examination by Ms. Motley:            3

   Matthew Johnson

   Direct Examination by Ms. Pusick:            14
   Cross Examination by Ms. Baynard:            26

   David Shamsi

   Direct Examination by Mr. Cade:              27
   Cross Examination by Mr. Wirth:              61
   Redirect Examination by Mr. Cade:            70
   Recross Examination by Mr. Wirth:            76
   Re-Redirect Examination by Mr. Cade:         78

   John Rawlings

   Direct Examination by Ms. Pusick:            81
   Cross Examination by Mr. Wirth:              90
   Redirect Examination by Ms. Pusick:          99
   Recross Examination by Mr. Wirth:            100

   Dexter Schleis

   Direct Examination by Mr. Cade:              101
   Cross Examination by Ms. Baynard:            119
   Redirect Examination by Mr. Cade:            136
   Recross Examination by Ms. Baynard:          143
   Re-redirect Examination by Mr. Cade:         144
```

1               P R O C E E D I N G S

2        (Excerpt transcript.)

3               MR. CADE:  Call to the stand Albert Cole.

4               Albert Cole, being first duly sworn to tell the truth,

5        the whole truth, and nothing but the truth, testified as

6        follows:

7               MR. COLE:  Yes, I do.

8               THE COURT:  State your name for the record.

9               THE WITNESS:  Albert Cole.

10       **DIRECT EXAMINATION BY MS. MOTLEY:**

11       Q.  Mr. Cole, good morning.

12       A.  Good morning.

13       Q.  Could you please share with the Court your relationship or

14       your relation to Alvin Cole.

15       A.  Alvin was my son.

16       Q.  And are you currently married?

17       A.  Yes, I've been married for 32 years by law, no refund.  I

18       got to keep her.

19       Q.  Who is your lovely wife?

20       A.  Tracey Cole.

21       Q.  And she is the mother of Alvin Cole, correct?

22       A.  Yes, all my kids.

23       Q.  All right.  And do you have any children?

24       A.  Yes.

25       Q.  How many children do you have?

1    A.   I have five kids.

2    Q.   And where was Alvin Cole in the order of your children?

3    A.   He was the youngest one.

4    Q.   He was the baby?

5    A.   Yes, the baby one.

6    Q.   And what are some of the things that you liked to do with

7    Alvin and your kids growing up?

8    A.   Oh man.  First, Kim, can I say this?  When Alvin was a

9    child, my wife named Alvin that name.  And to me, it was, like,

10   a chipmunk name.  You know, we agreed to the name.  His first

11   word was da da.  All my kids first words was dad.

12   Q.   Okay.  And I'd like to show you a photograph.

13            MS. MOTLEY:  Your Honor, may I approach the witness?

14            THE COURT:  Sure.

15   Q.   Do you remember taking that photograph?

16   A.   Yeah, it was tooken.

17            MS. MOTLEY:  Your Honor, I ask to publish the

18   photograph to the jury.

19            THE COURT:  Sure.  What's the exhibit number, counsel?

20            MS. MOTLEY:  Let's see.  Exhibit Number 92.

21            THE CLERK:  Thank you, ma'am.

22            THE COURT:  Go ahead.

23   Q.   Now, could you please explain to the Court what's happening

24   in this picture.

25   A.   I was in the kitchen doing my homework and Alvin came.  Da

1  da, can I give you a kiss?  So I leaned like this, give me a

2  kiss on my head, man.  So that's what this picture was about.

3  Q.  And do you recall who took this picture?

4  A.  Had to be somebody, my wife or one of the girls.

5  Q.  Okay.  And you were at your house when you took this

6  picture?

7  A.  Yes, yes it was.

8  Q.  And Alvin's birthday was January 17th, correct?

9  A.  Yes.

10  Q.  And so January 17th, did you guys do anything special with

11  him?

12  A.  The wife rented a hotel for them to go to, like, a pool

13  party, so that's what he wanted.

14  Q.  This was his golden birthday, right?

15  A.  Yes.

16  Q.  Did Alvin enjoy swimming and things like that?

17  A.  Yes, he did.

18  Q.  And did you enjoy taking him swimming or anything?

19  A.  Yes, took all my kids swimming, skating, Chucky Cheese, even

20  took them kite flying.  You know, that's what kids wanted.

21  Q.  Dad time, right?

22  A.  Yes.

23  Q.  Okay.  And we're going to now turn to February 2, 2020,

24  okay.  Do you remember seeing your son that day?

25  A.  Yes.

1   Q.  Can you tell us about that.

2   A.  I remember getting up that morning.  Alvin came to me said

3   pops, can you take me over to a friend's house so I can go to

4   the mall?  I said, all right, I can do that before I go to work.

5           THE COURT:  Maybe you should get a little closer to

6   the mic.  It will be easier to hear.  You can move it around,

7   the mic.

8           THE WITNESS:  All right, Your Honor.  I said, yes, I

9   will be able to take you there before I go to work, so I dropped

10  him off at a friend's house.  And before I did that, I said, you

11  know, your mother, she's cooking nachos because his favorite

12  meal was tacos, nachos.  I said, son, you coming back tonight?

13  He said, yeah.  I dropped him off, and I proceeded to work.

14  Q.  And was that the last time that you saw Alvin?

15  A.  Yes.

16  Q.  Now, later that day at some point, you were --  you learned

17  about something that was happening at Mayfair Mall.  Can you

18  please tell us about that.

19  A.  My wife had got some phone call saying we need to go to the

20  mall, and she was going on with our son.  Nobody called us or

21  nothing, so I got the keys, and we drove down there as a family,

22  and all we seen was yellow tape around, I guess, the Cheesecake

23  Factory.

24  Q.  You saw yellow tape around the Cheesecake Factory?

25  A.  Yes, yes.  They was telling us to stay outside of the tape,

1  and there was no information.  My wife asked them, what's going

2  on?  So she said, let's go to the police station, the Wauwatosa

3  Police Station.  And some guy gave us a card there and said that

4  we'll get back to ya'll.  He was, like, you know what's going

5  on?

6  Q.  Did anyone at the police station tell you what happened?

7  A.  They couldn't say nothing to us.  They didn't say anything

8  to us.  They gave us a card and said we'll get back in contact

9  with ya'll.

10  Q.  After you left the police station, where did you go?

11  A.  My wife wanted to go back to the factory just to look

12  around, and then she said let's go downtown to the city morgue,

13  so we entered down there.  Family members came down there.

14          So I went to the front desk and a lady gave me a

15  picture of Alvin like this and asked me, is this your son?  I

16  broke down, looked at the picture.  I said, yes.  I turned

17  around, looked at my wife, and I could just see the tears in her

18  eyes, the hurt and pain that she had to see her son like that.

19  Q.  I'm so sorry.  Mr. Cole, please take your time.

20  A.  We was called in a room to see two detectives.  I don't

21  remember they names, but they had gave me a card, and they said

22  that we the ones investigating Wauwatosa.  And they said they

23  would get back with us, but they never have.

24  Q.  Did he ask you any questions, provide you with any

25  information?

1  A.  That's all I remember.

2  Q.  You later learned that your son had shot himself with a gun,

3  right?

4  A.  That's what they say.

5  Q.  And if Alvin had or if the police had called you and said

6  that, you know, your son is here at the police station, you need

7  to come get him he had a gun, what would you have done?

8  A.  Alvin would not have wanted to come home that night because

9  his consequences would have been worser than that gun.  I was

10  always strict on my kids, him.

11  Q.  You were always strict on him?

12  A.  Yes.

13  Q.  And just so it's clear for the record, you stated that when

14  you found out about Alvin, you were down at the city morgue; is

15  that correct?

16  A.  Yes.

17  Q.  Now, as a father of five kids, what kind of dreams or what

18  did you hope for Alvin's future?

19  A.  To be a father, to provide for his kids, to teach them self

20  worth, to grow up to be responsible.  That is all I wanted for

21  my boys, to listen.

22  Q.  Is that what your other kids are doing?  Do you have any

23  grandchildren?

24  A.  Yes, I do.  I have about seven of them, one grand daughter.

25  She's the spoiled one.

1   Q.   Is she the baby like Alvin?

2   A.   Yeah.

3   Q.   And could you please share with us what it has been like for

4   you for the last five years since this happened to Alvin?

5   A.   I became antisocial.  I became to myself, didn't want to be

6   around people, nobody.  Me and my wife haven't did nothing for

7   five years.  I mean, you know, not what you all thinking, but we

8   haven't went out to dinners, to the mall, you know, things we

9   used to go to.

10          We haven't been to Wauwatosa for five years.  We used

11  to go to David & Busters, Red Lobster, sit down and have dinners

12  and stuff.  When we go out to get our food, we go right home.

13          But me, the hurt.  Have you ever lost something that

14  you couldn't find it?  That hurt that was inside of me.  It was

15  gone.  I just felt that pain.  Where is he?

16          MS. MOTLEY:  Thank you, Mr. Cole.  I have no other

17  questions.

18          MS. BAYNARD:  Judge, we do have some cross

19  examination, but I believe that we would like to be heard

20  outside the presence of the jury to get your approval or

21  guidepost on that.

22          THE COURT:  You want to have a sidebar?

23          (Sidebar in chambers.)

24          MS. BAYNARD:  Your Honor, as we outlined in one of our

25  motions in limine, we believe the testimony has gone outside the

1    bounds of just the parents' loss of society and companionship.

2    He's brought into question their relationship, and I would like

3    to be able to cross examine Mr. Cole on a service call between

4    him and the City of Milwaukee Police Department that I heard

5    June of 2019 where he called Milwaukee Police Department and

6    requested that an officer show up because his son was attacking

7    him.

8           MS. MOTLEY:  Your Honor, I disagree.  I did not open

9    the door to that testimony at all.  We just talked generally

10   about Mr. Cole and his --  his relationship, his hopes and

11   dreams for his son.  We didn't get into anything with regard to

12   the police or anything with regards to that.  And also in

13   addition to that, we never received these records until frankly

14   days ago.  Discovery has been closed for months and months.  We

15   just received it.

16          MS. BAYNARD:  To the second part of that argument,

17   one, this is rebuttal evidence, so there were subpoenas they

18   moved to quash.  We produced the records we got in response to

19   subpoenas, including school records.  We went and got not all of

20   them but some juvenile court records and then MPD calls for

21   service.

22          The fact that discovery is disclosed does not preclude

23   us from preparing for trial.  So Mr. Cole has brought into

24   question his relationship with his son.  I guess we don't have a

25   jury instruction decided yet on loss of society and

1    companionship, but it talks about the character, the affection,

2    and love between a parent and a child.  And among the kind of

3    calls for service or whatever, I believe this one is relevant to

4    that relationship.

5            It's specifically the father calling the police and

6    saying, I want someone to come here because of the way my son is

7    acting.  I think one of the things he said was if Alvin -- if he

8    would have found out he had a gun, the punishment at home would

9    have been more significant than him getting shot.

10           There are numerous --  There are records that

11   demonstrate that the parents knew that Alvin had possessed guns

12   in the past.  He was arrested for armed robbery.  Some of his

13   social media presence is posting with guns.  So to suggest to

14   the jury that if he would of had a gun and I would have known

15   about it, his punishment would have been worse than what

16   occurred has suggested or called into question whether he even

17   had a good --

18           MS. MOTLEY:  This is extremely inflammatory,

19   prejudicial.  The defense has an on-going duty to supplement

20   their discovery.  We asked for records for years that they

21   provide to us regarding Alvin Cole.  They never provided this to

22   us until Thursday on a hard drive.  This is brand new evidence,

23   number one.

24           Number two, just because Alvin Cole may have used a

25   weapon in other situations does not mean that his father knew

11

1   about them.  There has been no testimony from Albert Cole

2   regarding --  This is a stretch regarding the relationship.  And

3   to open the door to this supposed police call, call to the

4   police, and those records also haven't been authenticated.

5         MR. CADE:  Judge, there's one other thing.  What

6   Albert Cole said was the consequences would be worse than the

7   gun.  The consequences.  The fact that the police may have shown

8   up in June of '19, eight months earlier, doesn't mean that there

9   weren't consequences.  That's a different thing than saying

10   calling about myself because he's being a knuckle head, a

11   16-year old boy mouthing off to his father.  I've got one in the

12   courtroom right now.

13         MS. BAYNARD:  The call wasn't that he was mouthing

14   off.  It was he was attacking him, and he was trying to restrain

15   him.  I think that's a little bit different.  I think that goes

16   and that's a call for service that is --

17         THE COURT:  I'll be back in a minute.

18         (Brief recess.)

19         (Back on the record.)

20         THE COURT:  Well, it is arguably relevant, but I think

21   403 -- I think it's -- The dangers of 403 violation are too

22   great.  It's not really about guns.  It's about something that

23   happened at home.  And the testimony of the plaintiff is pretty

24   general or the father was pretty general.  This gets -- I don't

25   think that it really created and opened the door for this

1    testimony, so I'm not going to allow it.

2              MR. WIRTH:  At one of the breaks, we'll make an offer

3    of proof.

4              THE COURT:  All right.

5              MR. CADE:  Judge, I know Sue mentioned she's starting

6    to float.  In terms of timing, maybe lunch?

7              THE COURT:  How much longer are we going to be?

8              MR. WIRTH:  We may not have cross given the ruling,

9    but I don't know.

10             THE COURT:  Tell me.

11             MS. BAYNARD:  It will be under three minutes or we're

12   going to be ready to break.

13             THE COURT:  We'll finish, and we'll break.

14             (Back in the courtroom.)

15             MS. MOTLEY:  Your Honor, I have no further questions.

16   Thank you.

17             MS. BAYNARD:  Nothing from the defense.

18             THE COURT:  Okay.  You're excused for the moment.

19   Let's take a break for lunch.  Why don't we come back at 1:15.

20   And don't talk about the case to anybody.  And all the rules

21   still apply.  So don't talk about the case, keep an open mind.

22   We'll see you in an hour.

23             BAILIFF: All rise.

24             (Jury excused.)

25             (Lunch recess taken.)

1          (Back on the record.)

2          THE COURT:  Let's bring in the jury.

3          BAILIFF: All rise for the jury.

4          (Jury enters.)

5          THE COURT:  Call your next witness plaintiffs.

6          MS. PUSICK:  Plaintiffs call Matthew Johnson.

7          Matthew Johnson, being first duly sworn to tell the

8    truth, the whole truth, and nothing but the truth, testified as

9    follows:

10         MR. JOHNSON:  Yes, sir.

11         THE COURT:  State your name for the record.

12         THE WITNESS:  Matthew Johnson, J-O-N-H-S-O-N.

13   **DIRECT EXAMINATION BY MS. PUSICK:**

14   Q.  Good afternoon, Mr. Johnson.  Thank you for being here.

15   A.  Yes.

16   Q.  Where do you currently work?

17   A.  I work for the Wisconsin State Patrol.

18   Q.  And what is your job title?

19   A.  I am a crash reconstructionist assigned to the Technical

20   Reconstruction Unit.

21   Q.  How long have you been doing that for?

22   A.  Been a trooper since 2000, promoted to the Technical

23   Reconstruction Unit 2006.

24   Q.  As a trooper, what are your general job responsibilities and

25   duties?

14

1   A.  My duties are to respond to and reconstruct major crash

2   events and crime scene events.

3   Q.  So as a trooper, that is your sole obligation?  That's your

4   sole job.  You're not out on patrol or anything like that?

5   A.  In a perfect world, that would be true.  Sometimes we do get

6   diverted.  95 percent of my time is reconstruction.

7   Q.  As a member of the TRU, you are accredited with a

8   certification or something like that, a training, correct?

9   A.  Yes, I've been through crash reconstruction, hundreds and

10  hundreds of hours of advanced training and reconstruction, and

11  I'm also accredited through the Reconstruction Association.

12  Q.  And as this TRU member, what jurisdictions are you allowed

13  to work within the State of Wisconsin?

14  A.  In the State of Wisconsin.

15  Q.  Just any county that calls you in?

16  A.  Yes.

17  Q.  And while your reconstruction -- Well, I guess I'll back up.

18  Can you describe the different types of reconstructions that can

19  occur?

20  A.  Yes.  We do mostly crash-scene reconstructions, and then we

21  do crime-scene reconstructions for forensic-mapping purposes.

22  Q.  So while you're reconstructing an area, are you also

23  investigating it?  And if so, what are those duties like?

24  A.  So it does differ.  If we're doing crash reconstruction, it

25  will depend if we're the lead agency or if we're supplementing

1   another agency's investigation.  A lot of departments don't have

2   the resources to have a full crash-reconstruction team, so we

3   will often come in and supplement their investigation by doing a

4   crash reconstruction but not actually investigating the

5   behind-the-scenes stuff that's going on.  We'll just do the

6   crash reconstruction.

7           For crime-scene reconstructions, we're there to

8   supplement usually the crime laboratory and the investigating

9   agency.  We don't actually get involved in the investigative

10  side of it.  We just do the forensic mapping.

11  Q.  So for purposes of this case, do you recall what occurred on

12  February 2nd of 2020?

13  A.  Yes.

14  Q.  Were you considered the lead agency on scene, or were you

15  working in tandem were other agencies then?

16  A.  We were working for other agencies.

17  Q.  When you are called to a scene and you are working with

18  other agencies, how does that process work?  How do you know

19  whose taking lead and what duties are happening at what times?

20  A.  So we'll get notified through our dispatch that a call has

21  come in.  They'll usually give us information on who the lead

22  investigative agency is.  And most of the time, we're

23  supplementing what the crime laboratory is doing, so we'll work

24  with the crime laboratory while the other agencies go off and do

25  officer interviews and that type of stuff.  So most of the time,

16

1  99 percent of the time, we're working with the crime lab.

2  Q.  Okay.  How many individuals would you estimate that includes

3  when you're working with other agencies?

4  A.  It would depend on the scope of the investigation.  A lot of

5  times, the officer-involved shootings will have many, many

6  officers from many, many different jurisdictions.

7  Q.  Okay.  In general, in any reconstruction, whether it's a

8  crash scene or something else, what type of tools are you using

9  to create the materials, the diagrams or scene mappings?

10 A.  We use a Trimbolestic Robotic Station.  And in this scene,

11 we use the FARO 330.  We don't use those anymore.  We've kind of

12 moved on to the new generation of forensic mapping, but that's

13 what we used at that time.

14 Q.  Okay.  How many total reconstructions do you think that

15 you've done in your time?

16 A.  Crash and crime-scene together?

17 Q.  All of them.

18 A.  Thousands.

19 Q.  How many of them were done for officer-involved fatal

20 shootings?

21 A.  Maybe 100.

22 Q.  And can you -- So thousands between hundreds is kind of a

23 large discrepancy.  Can you describe the differences in those

24 two procedures and how you might go about the scenes

25 differently?

1    A.  For crash reconstruction when we're the lead investigators

2    trying to figure out what the root causes of the crash where

3    it's much more in-depth.  We're analyzing roadway evidence

4    ourselves.  We're measuring the data, we're photographing that.

5    We're taking evidence and sending it to the crime lab to be

6    analyzed much more in-depth.

7            In an investigation like this, we're supplementing

8    what the investigators are doing.  So, like, in a case like

9    this, our scope is limited to just measuring what has been

10   identified, producing a diagram for that agency so that they can

11   use those in officer interviews, and that pretty much -- Unless

12   they ask for more work, that is the scope of our involvement.

13   Q.  When you're saying you're producing these diagrams, is it a

14   standard amount of diagrams, or can you kind of fluctuate with

15   the tools and things you used to produce more or less?

16   A.  It does fluctuate.

17   Q.  Okay.  So we're still kind of talking about the February 2,

18   2020.  So you recall being requested to the scene on that night,

19   correct?

20   A.  I recall the event.  I don't recall the specifics of how I

21   was requested.  But yes, I was requested to go to it.

22   Q.  Is it typical to arrive to a scene immediately after it

23   happens?

24   A.  No, we're usually long after the scene has been stabilized.

25   Q.  I guess describe what that means, what is long after?

18

1  A.  Usually, it is an hour or more after the scene has occurred

2  that we'll be called in.

3  Q.  And so for purposes of this case, you were called on

4  February 2nd of 2020, correct?

5  A.  Yes.

6  Q.  Do you recall about what time you arrived?

7  A.  I believe like 8:00 p.m.

8  Q.  At that point, Alvin Cole's body had been moved, correct?

9  A.  I did not see a body.

10  Q.  Okay.

11  A.  I don't recall a body.

12  Q.  Okay.  So we know that three diagrams were created as a

13  result of your reconstruction.  I just want to walk through

14  those.  There was a 3D model and two, 2D models?

15  A.  I believe the 2D model is the same diagram.  It's just

16  zoomed in to 2D level.

17  Q.  That is what I suspected, so we'll go through that.  So

18  while we're waiting for this, we're pulling up Plaintiffs'

19  Exhibit 7.  Can you describe the process of creating a 2D model,

20  the tools you use and how you arrive at that?

21  A.  Sure.  For a 2D we use -- we call it an orthogonal.  You are

22  looking straight down, like, if you were 300 feet in the air

23  looking straight down.  If you were looking down at the scene,

24  we use a Trimbolestic Robotic Total Station.  The station itself

25  is robotic, so no one needs to be operating that.  There's a

1   prism and a data collector on the prism.  And the person that's

2   collecting the evidence or collecting data points will walk

3   around and register the points.

4   Q.  Okay.  And so on this diagram here, we're looking at what

5   you recall as being the scene on February 2nd of 2020, correct?

6   A.  Yes.

7   Q.  Okay.  Can you identify what the red markers are toward the

8   bottom of the parking structure area?

9   A.  So those would be evidence markers that the Milwaukee Police

10  Department and/or the crime lab would have identified as

11  evidence, and I just measured those evidence markers that were

12  present.

13  Q.  And so you did not personally put those red markers on the

14  scene.  You are just depicting what was already there, correct?

15  A.  Correct.

16  Q.  Okay.  And about how many pieces of evidence do you think

17  were there at the time?

18  A.  About 14.

19  Q.  Okay.  Also at the bottom, there's a scale, kind of a ruler.

20  Can you describe that, kind of checkered looking?

21  A.  So how the total station measures, it is measuring

22  horizontal and vertical angles related to your station versus

23  your back sight.

24          Your back sight is establishing a point out of your

25  scene that you're trying to reference to.  So what it's doing is

1    it's measuring the angles of the measurements we're trying to

2    take off of that zero-degree angle.  So anything off of that

3    would have an angular or horizontal and vertical.  And then, the

4    total station interprets that data, reduces it down.  It gives

5    us a northern and eastern and elevation data, which is then

6    brought into a coordinate table and a CAD diagram, and that's

7    what you're seeing here is the evidence just placed there.

8    Q.  Okay.  So let's simplify that.

9    A.  All right.

10   Q.  Can you pick a dot, say the one closest to Mayfair Road,

11   there's a red dot.  Can you kind of describe how that ruler at

12   the bottom would impact where that dot is or how that went into

13   creating the diagram?

14   A.  Yeah.  You can take that ruler, create that scale, and then

15   measure off of that.  So let's just say that the distance

16   between that marker and one of the other markers was that full

17   100-foot distance.  That would be 100 feet in the scaled

18   diagram.

19   Q.  Okay.  So as a rough estimate, we're looking at that far dot

20   and the one closest to the right.  What would the distance be

21   according to your scale?

22   A.  Maybe, approximately, 50 feet.

23   Q.  Okay.  So half of that ruler?

24   A.  Yeah.

25   Q.  Okay.

21

1          MS. PUSICK:  Let's pull up Plaintiffs' Exhibit 8,

2   please.

3   Q.  Okay.  You stated before pulling up these exhibits that

4   Exhibit 7, the one we were just looking at and now Exhibit 8,

5   are pretty much the same diagram.  This one is just zoomed in?

6   A.  Correct.  What happens as you pull out in the CAD diagram,

7   it kind of distorts the placard so you can't read them anymore.

8   So what I did in this case is zoom in a little bit so you can

9   identify some of the markers and get a frame of reference.

10  Q.  Okay.  And while you're doing this, are you aware of what

11  each of these I guess ten areas, you know, the numbers, do you

12  know the corresponding exhibit that it is or the item?

13  A.  Sometimes we do.  I mean, obviously, if you're -- For

14  example, I don't know what they are in this case.  But if you're

15  measuring ten and there's a hat there, you know, that ten is a

16  hat.

17          But for the most part, our job is limited to evidence

18  that's already been identified by either the crime lab or a

19  police department, that corresponding number, and not so much

20  the actual evidence that's there.  That's kind of outside the

21  scope of our involvement.

22  Q.  So when you arrive, you're not necessarily also

23  investigating to make sure all of the evidence is there.  This

24  is just what was marked as significant.  You are there to simply

25  diagram it, not assess it, correct?

1   A.  That's right.

2   Q.  And so looking at eight and one, the markers there, that

3   appears really close.  So based on your scale, I mean what's the

4   distance between that and that black barrier there?

5   A.  I didn't do that analysis.

6   Q.  Okay.  Based on your estimate right now looking at it, what

7   would you say?

8   A.  I don't know, maybe 15 feet.

9   Q.  Okay.  And that black barrier is what if you recall?

10   A.  So if I remember correctly, it was a construction zone

11   there.  So they were building something to the south of the

12   parking lot, so that was, like, a wall, a delineator between the

13   parking lot and the construction zone.

14   Q.  Thank you.

15        MS. PUSICK:  Can we pull up Plaintiffs' Exhibit 5.

16   Q.  Next, we're going to show the 3D diagram that you also

17   created on this day.  We'll play the whole thing, and then I'll

18   ask questions later.

19   A.  Sure.

20        (Whereupon video is played.)

21        THE COURT:  Counsel, these exhibits, don't you want to

22   move them into evidence?

23        MS. PUSICK:  I was planning to do that.

24        THE COURT:  Why don't do you that before you publish

25   them.

1          MS. PUSICK:  Sure, I can do that.  So I've used 7 and

2     8 of Plaintiffs.  I'd like to move them into evidence, please.

3          THE COURT:  Without objection, so ordered.

4          MS. PUSICK:  Thank you.  I will also move Exhibit 5

5     that we're viewing now.

6          THE COURT:  Same ruling.

7          MS. PUSICK:  Thank you.

8          (Whereupon tape is played.)

9     Q.  So was it typical that videos like this, there is no sound?

10    A.  There is no sound.  All this is is snapshots in time that's

11    created with an MP4 program, I believe.  I didn't create this

12    myself.  Traditionally how it's done is you have 14 scans.

13    Those register together.  What the scanner is doing, each

14    individual scan is 360 degrees.  It's shooting out hundreds of

15    thousands of beams, of laser beams, and those are coming back to

16    create the topography of the scene.

17         At the same time, it's taking photographs, and it's

18    trying to assign those points to the photographs.  So that's

19    kind of what you're seeing here.  You're seeing points.  That's

20    why it looks like a road, it looks like a parking lot, it looks

21    like paver markings cause that's the photograph that it's

22    taking.

23    Q.  So if we look at kind of the middle bottom of the screen,

24    you can see where the shooting had occurred.  That looks really

25    I guess more clear.  Would that be a photo versus more of that

24

1   shooting beams?

2   A.   It looks clearer because there was more scans done in that

3   immediate area.  As you go further to the north, it kind of

4   drowns out a little bit.  That's because there's -- Yeah, back

5   in that area where it kind of whitewashes.

6   Q.   Also, you can see officers kind of in the distance and

7   different police personnel trucks and things like that?

8   A.   Correct.  If you zoom in back kind of where you just were,

9   you can kind of see those disk -- weird looking disk shapes.

10  Q.   The cones?

11  A.   Those are actual station positions, so that's why it kind of

12  looks weird.  It's not getting that same area in the scan where

13  it's sitting over it because it can't see below it.  But as soon

14  as you move the scanner to a different position, then it's

15  filling that area in so it doesn't have quite the same density.

16  Q.   Okay.  How many scanners total were used on February 2nd?

17  A.   Just one scanner.

18  Q.   Okay.  After these diagrams are completed, who receives

19  them?  How are they distributed?

20  A.   Traditionally, what we'll do is send the 2D diagrams to the

21  investigating agency as soon as we can get it done cause they

22  like to use them for officer interviews.  There's only 14 of us.

23  Sometimes based on our case load, we are a little bit longer

24  than what we'd like to be.  But, at least, within two weeks, we

25  like to have the 2D diagram off to the agency.

25

1    Q.  What about the 3D diagram?

2    A.  That all depends on who is doing it, what their case load

3    is.  Sometimes it's a quick turnaround, sometimes it's not.

4    Q.  What would you say is the largest risk in creating a 3D

5    diagram of a post-scene situation?

6              MS. BAYNARD:  Object to the form.

7              MS. PUSICK:  He's done plenty of scene diagrams.

8              THE COURT:  Say that again.

9              MS. PUSICK:  He's done plenty of scene reconstructions

10   to know if there are risks in conducting them.  The objection

11   was to form.

12             THE COURT:  Overruled.

13             MS. PUSICK:  You can answer.

14             THE WITNESS:  So the only thing about scene

15   reconstruction is, obviously, we've touched on it earlier.

16   You're not going to have -- It's not the same scene as it was.

17   So we do the best we can with the evidence that's there when

18   we're there, but you're never going to have the full scene you

19   have when it immediately happened.

20             MS. PUSICK:  Thank you.  Those are my questions.

21             MS. BAYNARD:  I have a few.

22   **CROSS EXAMINATION BY MS. BAYNARD:**

23   Q.  To be clear, Trooper Johnson, can you tell us --

24             THE COURT:  Can you get closer to the mic?  Thank you.

25   Q.  You saw some evidence markers down on the ground, correct?

26

1  A.  Yes.

2  Q.  And you cannot tell us what those evidence placards

3  correspond with, correct?

4  A.  Correct.

5  Q.  Because you didn't put them down, true?

6  A.  That's true.

7          MS. BAYNARD:  I have nothing else.

8          THE COURT:  You are excused.  Next witness.

9          (Witness excused.)

10          MR. CADE:  Next witness, Your Honor.  Call agent David

11  Shamsi.

12          David Shamsi, being first duly sworn to tell the

13  truth, the whole truth, and nothing but the truth, testified as

14  follows:

15          MR. SHAMSI:  I do.

16          THE COURT:  Have a seat.  State your name for the

17  record.  The microphone, you have to talk pretty close to it.

18  You can move it around.  Go ahead.

19          THE WITNESS:  David Shamsi.

20          MR. CADE:  Thank you, Your Honor.

21  **DIRECT EXAMINATION BY MR. CADE:**

22  Q.  Agent Shamsi, how are you currently employed?

23  A.  Currently employed by the FBI.

24  Q.  And you were subpoenaed to appear today?

25  A.  Yes.

1    Q.  Where did you previously work prior to the FBI?

2    A.  At the Wauwatosa Police Department.

3    Q.  I'll come back to that in a moment.  With regards to your

4    background, any military training?

5    A.  Yes.  I've been in the military for 24 years.

6    Q.  You're still active?

7    A.  In reserves.

8    Q.  Reserves.  Current rank, sir?

9    A.  Major.

10   Q.  Major.  Any specialized training or any particular

11   assignments within the military?

12   A.  I spent a lot of time as an infantry officer and then

13   switched to civil affairs currently, which is my current job.

14   Q.  Sure.  Air borne and ranger training?

15   A.  Correct.

16   Q.  Do you have your tabs?

17   A.  I do.

18   Q.  In combat?

19   A.  Yes.

20   Q.  Let's turn to Wauwatosa.  How long were you with the

21   department?

22   A.  About two and-a-half years.

23   Q.  And, approximately, when did you leave?

24   A.  It was January of 2021.

25   Q.  January of '21, okay.  So are you familiar with this

1  particular incident that occurred February 2nd of 2020?

2  A.  Yes.

3  Q.  It's a weird question.  What type of weaponry does Wauwatosa

4  carry, 9-millimeter?

5  A.  It was a 9-millimeter, correct.

6  Q.  And the bullets, do you recall the type?

7  A.  Can you specify?

8  Q.  Sure.  Let's back up.  Bullets normally have what's called

9  grain assigned to them, essentially it is, like, a weight,

10  correct?

11  A.  Correct.

12  Q.  And the bullets that were assigned for Wauwatosa officers,

13  was there a standard issue?

14  A.  There was, but I don't recall what that was.

15  Q.  And can you briefly just explain grain size?

16  A.  Grain size is basically the weight of the bullet.  I'm not

17  --  I'm not overly aware of all of that but --

18  Q.  Grain similar like wheat, like measurement of wheat?

19  A.  Correct.

20  Q.  You've been with the FBI since January of '21?

21  A.  Correct.

22  Q.  Couple other questions.  On that particular day, do you

23  recall your assignment number or I should say your officer

24  number?  So when you radioed in, was there a particular number

25  that you used?

1    A.  There was a particular number that I used, but I don't

2    remember what it was.

3    Q.  If I told you it was 230, would you have any reason to

4    dispute me?

5    A.  No, that sounds correct.

6    Q.  I want to turn for a brief moment, Agent Shamsi, to training

7    that you had to be a police officer.  Prior to joining Wauwatosa

8    so if my math is correct, if you were there two and-a-half

9    years, that essentially suggests you joined June or July of

10   2017.  Would that be correct?

11   A.  I believe so, yes.

12   Q.  And in order to become a police officer, can you indicate

13   where you did your training at?

14   A.  I went through the police academy at Waukesha Technical

15   College.

16   Q.  WCTC?

17   A.  Correct.

18   Q.  Fair to say all officers go through the exact same training

19   in the State of Wisconsin?

20   A.  Yes, it is a standardized program.

21   Q.  As part of the standardized program, you had training in

22   DAAT, Defense Arrest & Tactics?

23   A.  Yes.

24   Q.  So if I refer to that as DAAT, D-A-A-T, you'll know what I

25   mean?

1    A.  Yes.

2    Q.  I want to talk for a brief amount about deadly force in your

3    training.  And essentially for DAAT, there are five levels of

4    force, correct?

5    A.  Correct.

6    Q.  I'm not going to go through all of them, but the first level

7    is mere presence.  You're wearing a uniform or something, and

8    you're just present.  That's the first level, correct?

9    A.  Correct.

10   Q.  And then you go up from there from your voice.  I'm an

11   officer, stop, I want to talk to you, whatever.  That's the next

12   level, correct?

13   A.  I believe so.  I'm going off memory.  I haven't had to deal

14   with that in quite a bit.

15   Q.  Sure.  We get to the final level, which is the use of deadly

16   force?

17   A.  Correct.

18   Q.  And just so I'm clear, in order to use deadly force from

19   your training, the standardized training, the officer has to be

20   under imminent threat, correct?

21   A.  The officer or others, correct.

22   Q.  So, for example, if I -- Officer Shamsi, if you confronted

23   me and I have a gun in my hand to my side, that standing alone

24   is not imminent threat, fair?

25           MR. WIRTH:  Judge, I object to form, foundation.

31

1          THE COURT:  Overruled.

2          THE WITNESS:  I think you having a gun poses as a

3     deadly threat because you're introducing a gun into a situation.

4     So a gun introduced in a situation where there's an altercation

5     would indicate a deadly force threat.

6     Q.  I didn't say altercation yet.  I want to be very, very

7     clear, Officer Shamsi.  If I just have a weapon -- Wisconsin is

8     an open carry state, correct?

9     A.  Correct.

10    Q.  People can walk around with guns in Wisconsin, right?

11    A.  Correct.

12    Q.  So someone walking with a gun standing alone, an officer

13    can't say deadly threat and go up and shoot, right?

14    A.  I think that's contextual then.

15    Q.  Correct.  All I'm saying if I have a gun on my side and

16    you're an officer, that standing alone is not imminent threat,

17    correct?

18    A.  It would actually depend on the situation.

19    Q.  So if I raise up, if I kind of make a movement, that then

20    changes the scenario, right?

21    A.  Correct.

22    Q.  Now, that's in the calculus of the officer's head of do I

23    think that's a threat because they are starting to make a

24    movement, right?

25    A.  Correct.

32

1    Q.  But just standing down -- What do you call it when it is

2    just at the side, low ready, or is there a term for that?

3    A.  Sure, low ready.

4    Q.  Okay.  Just at the low ready, that standing alone is not

5    imminent danger, correct?

6    A.  For me I think it would be danger because it would really

7    depend on the situation that I am walking into it.  Any time I

8    see a gun, I am a little bit more alerted, I am a little bit

9    more amped up of the situation because you don't just see people

10   with guns in their hands.  It's very abnormal.

11   Q.  Absolutely, and I'm not saying you shouldn't be amped up.

12   But my point, though, is because it is an open carry state and

13   someone can, unless there are certain buildings.  You can't

14   bring them to a federal building, schools, things like that.

15          But if someone is out in public with a gun in the low

16   ready standing, no other factors, you can't say deadly force,

17   right, and shoot?

18   A.  Correct.

19   Q.  That's all.  That's not deadly force.  That doesn't give you

20   the right to use deadly force, right?

21   A.  Again, it's situationally based.

22   Q.  So what I'd like to do is I'm going to show a video, Agent

23   Shamsi.  While I get a couple things ready.  It will pop up on

24   your screen.

25          THE COURT:  If you present something, admit it first.

33

1          MR. CADE:  This has already been admitted from before,

2     Exhibit 5.  Scroll towards the back.

3     Q.  You've seen this parking lot before, correct?

4     A.  Correct.

5     Q.  What I'd like you to do, Agent Shamsi, is I'm going to show

6     you a blow up.  It's a screen shot of the parking lot.  If you

7     would come down.  And what I'd like you to do -- What color

8     would you like to be?  Black, green, blue or red?

9     A.  We can go blue.

10    Q.  Come down, Agent Shamsi.

11         MR. WIRTH:  Judge, I am going to object to foundation.

12    There's been no testimony that Agent Shamsi has ever seen these

13    before or is capable of marking with a marker whatever the

14    question may be.

15         MR. CADE:  I think wait for the question before the

16    objection.

17         THE COURT:  Let's see what happens.

18    Q.  So Agent Shamsi, come on this side.  Make sure -- I don't

19    need a microphone.  I've never been told I'm quiet.  Make sure

20    you speak up.  We've just had testimony from a trooper that this

21    black area here on the other side of the fence is the

22    construction site for the hotel that was going up there at

23    Mayfair.  You're familiar with that area?

24    A.  Yes.

25    Q.  And what we have here is, we've got cones on the parking

34

1  lot.  Do you see that?

2  A.  I do.

3  Q.  And we have another cone that's over here on the far right.

4  Do you see that?

5  A.  I do.

6  Q.  Okay.  And you can see a little bit, it's hard to tell.

7  This is February 2nd.  That is snow that is right there, do you

8  see that?

9  A.  I do.

10  Q.  Okay.  And you were -- We've seen the video.  I'll show you

11  your squad video in a moment, but you were chasing Alvin Cole,

12  correct?

13  A.  Correct.

14  Q.  And at the point in time that Mr. Cole was on the ground,

15  what I'd like to try to establish is where you were standing.

16  A.  Okay.

17  Q.  Giving you a blue marker.  If you draw a little circle in

18  the area where you were standing at the time that he went down

19  on the ground.

20  A.  Just confirm Mayfair Road.

21  Q.  Correct.  Mayfair Road is on the right-hand side.  On the

22  other side of the construction project is North Avenue.

23  A.  So this would have been Alvin Cole.

24  Q.  This is where the body is, sir.

25  A.  If this is where Alvin Cole is laying, then I would have

1  been, approximately, right here.

2  Q.  You've placed an X on the third parking spot, correct?

3  A.  Yeah, that's approximate.  I don't remember exactly which

4  parking spot I was in.

5  Q.  I understand.  It's been five years.

6  A.  Sure.

7  Q.  What I'd also like you to do is give you an orange Sharpie.

8  At the time of the shooting when Officer Mensah -- You were

9  present when Officer Mensah shot, correct?

10  A.  Correct.

11  Q.  At the time you first noticed Officer Mensah when he started

12  shooting, if you would put a marking as to where he's at.

13  A.  Again, this is approximate because I was focused, but I

14  believe he came in about right here.

15  Q.  Okay.  Yours is fading a lit bit.  See if I can fix that.

16  Thank you.  You can take a seat.  While we're pulling up the

17  video, Agent Shamsi, I want to make sure I understand.  After

18  the shooting, Milwaukee Police Department came, and they were

19  the lead investigative agency, correct?

20  A.  Correct.

21  Q.  You gave an interview that day to the Milwaukee Police

22  Department, correct?

23  A.  Correct.

24  Q.  There was no delay.  You spoke and told them what you saw?

25  A.  Correct.

1    Q.  Everything was fresh in your mind?

2    A.  I think yes fresh, correct.

3    Q.  So what I'd like to do, Agent Shamsi, is I'm going to show

4    you a video, Exhibit 1.

5            MR. CADE:  And Your Honor, I'd like to move this into

6    evidence, Exhibit 1, Plaintiffs' Exhibit 1.

7            THE COURT:  Without objection, so ordered.

8            MR. WIRTH:  Well, what is Exhibit 1?

9            MR. CADE:  The video.

10           MR. WIRTH:  An enhanced one?

11           MR. CADE:  It has not been enhanced.  It's the one we

12   received from the Milwaukee County District Attorney's Office.

13           MR. WIRTH:  So it's the one that's combined, the two

14   audios?

15           MR. CADE:  The two audios are combined, correct.

16           MR. WIRTH:  No objection.

17           (Whereupon tape is played.)

18   Q.  Okay.  You've seen this video I'm sure, Agent Shamsi,

19   several times, correct?

20   A.  Correct.

21   Q.  What I'm going to do is I want to show it again.  I want to

22   make sure that we are hearing the specific words that are being

23   said in identifying individuals.

24   A.  Sure.

25   Q.  All right.

1          (Whereupon tape is played.)

2  Q.  Just so we're clear, we just saw a male African American run

3  in front of your car, correct?

4  A.  Correct.

5  Q.  That is you and your car basically deciding to stop and give

6  chase?

7  A.  Correct.

8          (Whereupon tape is played.)

9  Q.  Pause.  Someone just ran in front of the screen.  Who was

10  that?

11  A.  I believe that was Officer Johnson.

12  Q.  Johnson or Schleis?

13  A.  It's either Johnson or Schleis.  I was unaware.

14          (Whereupon tape is played.)

15  Q.  Pause.  That's a security guard, correct?

16  A.  Correct.

17          (Whereupon tape is played.)

18  Q.  Pause.  Is that you?

19  A.  That's me.

20          (Whereupon tape is played.)

21  Q.  Pause.  That's Officer Mensah right here on the middle

22  screen, correct?

23  A.  Correct.

24  Q.  And then who is on the left side of the screen?

25  A.  I think that's Johnson.

38

1    Q.  So then the first individual was Dexter Schleis?

2    A.  Correct.

3            (Whereupon tape is played.)

4    Q.  So the gun is out, the gun is out is being shouted, correct?

5    A.  Sounds like it.

6    Q.  Okay.  What does that mean, the gun is out?  What's the

7    parlance for that?

8    A.  That's announcing to anybody who might not see that the

9    subject has a gun.

10   Q.  That a gun is visible?

11   A.  Correct.

12           (Whereupon tape is played.)

13   Q.  And you may need to come here, Agent Shamsi.  I can't do it

14   on your screen.  Where I have the beam, that's Officer Mensah

15   that's firing, okay.  And right there there's an individual.  Is

16   that you?  We can go back a half second or a second.  Pause.  So

17   there's an individual right there.  We see a head, and we see

18   Officer Mensah, right there.  Do you see that?

19   A.  Uh-huh.

20   Q.  You are already in position.  The shot has already gone off,

21   correct?

22   A.  Which shot?

23   Q.  The shot -- Alvin Cole shot himself with a weapon, correct?

24           MR. WIRTH:  Object to form.

25   A.  I was unaware of that.

1           THE COURT:  Overruled.

2    Q.  You still don't know.  What I'd like you to do when my

3    colleague hits play, watch and see.  That's Officer Mensah.  We

4    can see his silhouette?

5    A.  Correct.

6    Q.  Just to the side that would be you, correct?

7    A.  Correct.

8           (Whereupon tape is played.)

9    Q.  So while Officer Mensah is shooting, he is -- If you turn

10   towards the jury.  If Alvin Cole is in front of you, Officer

11   Mensah is off to your side, correct?

12   A.  Correct.

13   Q.  He's not in front of you shooting.  He was off to your side

14   shooting, correct?

15   A.  Correct.  My recollection is that he kind of looped around.

16   So he was in front of me and looped by my side.

17   Q.  Once he started shooting, he looped.  Is that what you're

18   saying?

19   A.  Correct.

20   Q.  But at the time of the shooting, you were as far as you know

21   the closest individual to Alvin Cole, to the body?

22   A.  Prior to knowing that anybody else was with me there, yes,

23   correct.

24   Q.  You may take your seat.  You at the time of the shot -- You

25   heard a shot, correct?

1    A.  Correct.

2    Q.  You didn't know where that shot came from, the initial shot,

3    correct?

4    A.  Correct.

5    Q.  Did you ever see Alvin Cole as he's running, turn around and

6    point in your direction as you were running?

7    A.  I did not.

8    Q.  How far away were you running?

9    A.  I don't recall, maybe 20, 30 feet.

10   Q.  Twenty, 30 feet.  Was it closer to 20 or closer to 30?

11   A.  I really don't recall.

12   Q.  You'll see this is a 100-foot tape measure.  You see the 100

13   there.  You take that.  That's 20 feet right here.  That

14   distance or more?

15   A.  I'd say a little bit more.  I think when we were running, he

16   had a pretty large lead on me.

17   Q.  At the time the shot went off, how far away was he?

18   A.  The initial shot?

19   Q.  Yes.  That was my question, the initial shot.

20   A.  He would have been pretty far ahead of me.  I guess 25 feet.

21   Q.  Twenty-five feet.  That would be how far he was?

22   A.  Yes.

23   Q.  Your eyesight is what?

24   A.  20/20.

25   Q.  20/20 eyesight?

1    A.   Yep.

2    Q.   Twenty-five feet.  You were watching him run, correct?

3    A.   Uh-huh.

4    Q.   Yes?

5    A.   Yes.

6    Q.   You didn't see him turn around, point a weapon in your

7    direction, did you?

8    A.   I did not.

9    Q.   And then when you heard the shot go off, you didn't know

10   whether that was a subject shooting someone, one of the other

11   individuals, or even an officer who had fired a shot, correct?

12   A.   Correct.

13   Q.   When you heard the shot go off, what did you do?

14   A.   I continued chasing and continued trying to catch up to

15   Alvin Cole as quick as I could.

16   Q.   When you heard the shot, what did you observe Alvin Cole do?

17   A.   Soon after the shot -- To be honest with you, I don't

18   remember if it was before the shot or after, but Alvin Cole went

19   down onto the ground, got onto his knees and was on the ground.

20   Q.   Just so we're clear, Alvin Cole could have been going to the

21   ground at the time you heard the shot, correct?

22   A.   Correct.

23   Q.   Okay.  So he's running.  And as he's running, did he stop?

24   I'm an old man.  So for me, did he get down on my hands and

25   knees or was it a falling motion?

1    A.  I did not see how he went down to the ground.

2    Q.  You just saw he went from he was running to all of a sudden

3    he's down on the ground?

4    A.  By the time I caught up to him, I could see he had gone down

5    to the ground.  I didn't see the specifics of how you went to

6    the ground.

7    Q.  Okay.  Once he was on the ground, where were you in terms of

8    proximity to him?

9    A.  Within ten to 15 feet.

10   Q.  Ten to 15 feet? If we had 25 here, ten to 15 would be,

11   approximately, here, correct?

12   A.  Correct.

13   Q.  And were you directly behind him?  You know in Top Gun and

14   the other movies, I am on your six.  That means directly behind,

15   right?

16   A.  Correct.

17   Q.  Were you directly behind on his six, or were you at a

18   different angle?

19   A.  I -- Off my memory, I believe I was off to his right.

20   Q.  Off to his right.  So that would put you more, like, at the

21   5 o'clock of the clock?

22   A.  Correct.

23   Q.  I imagine you had your gun out?

24   A.  Correct.

25   Q.  I imagine you had your gun pointed at him?

1    A.  Correct.

2    Q.  So you were out at his 5 o'clock.  You're trained on him,

3    correct?

4    A.  Correct.

5    Q.  And what happened next?

6    A.  I gave commands for him to drop the gun.  I saw he had the

7    gun in his hand.  I was watching his gun, and I was telling him

8    to drop the gun, let go of the gun.

9    Q.  Did he move while you were giving the commands?

10   A.  I was focused primarily on the gun, so I wasn't really

11   watching his body.  I can't say if his body was moving for

12   whatever he was, but he was not letting go of the gun.

13   Q.  You did not see him pull the gun out of the fanny pack,

14   correct?

15   A.  I did not.

16   Q.  But while he's down on the ground, he's on his hands and

17   knees, right?

18   A.  Yes.

19   Q.  Officer Shamsi, I'd like to show you Exhibit 3, which is

20   part of a video.  My colleague here has slowed it down and did a

21   screen shot.  There's a red circle.  See how well it blows up.

22              MR. WIRTH:  You have to quit publishing before they

23   are moved in. The objection remains, the enhanced videos are

24   purportedly enhanced videos.  They have to be identified and

25   moved into evidence before they are published.

44

1          MR. CADE:  I will move on, Judge.

2          THE COURT:  I'm sorry?

3          MR. CADE:  I will move on.

4          THE COURT:  Okay.

5   Q.  So Agent Shamsi, you're at, approximately, the 5 o'clock

6   position watching Mr. Cole?

7   A.  Correct.

8   Q.  He has -- In his hand, he's got the gun in his hand, right?

9   A.  Correct.

10  Q.  Approximately 15 feet?

11  A.  Correct.

12  Q.  He's on his hands and knees, correct?

13  A.  Correct.

14  Q.  And you said you're focused on his hand, correct?

15  A.  Correct.

16  Q.  You weren't really looking at the rest of the body, but

17  you're focused on the hand, right?

18  A.  Correct.

19  Q.  You were tunnel vision on that hand you said?

20  A.  I was.

21  Q.  So did you ever see the hand move?

22  A.  I did not.

23  Q.  Did you ever see the hand go up before the shooting, before

24  Officer Mensah shot?

25  A.  I did not see the hand go up.  I think there's a potential

1    it could have elevated.  But from where I was standing would

2    have been hard to see in the dark even though I had a flashlight

3    trained on his hand.  I was watching specifically the gun.

4    Q.  So you had a flashlight.  You had a hand flashlight or one

5    on the weapon?

6    A.  On my weapon.

7    Q.  So you're over here.  You've got the 5 o'clock, you have a

8    flashlight trained on him?

9    A.  Correct.

10   Q.  We also saw in the video Officer Olson had a flashlight as

11   well, correct?

12   A.  Correct.

13   Q.  His flashlight looked brighter than yours.  Is there a

14   reason for that?

15   A.  I think his flashlight was training directly on my squad

16   cam.  Mine was shining south.

17   Q.  He's got a flashlight that's illuminating.  You have a

18   flashlight that's illuminating.  You're focused on the hand, and

19   you're at the 5 o'clock, tunnel vision, and you never saw it

20   move, correct?

21   A.  Correct.

22   Q.  Is there a chance you closed your eyes somehow?  And while

23   you had your eyes closed, he tucked under?

24   A.  I wouldn't have closed my eyes.  I think if you are asking

25   me to speculate, the only thing that could have happened is my

46

1    attention my have changed to move off of my left.  If I would

2    have looked to my left, I would have missed whatever happened

3    for that split second.

4    Q.  So the movement off to your left was Officer Mensah coming

5    into purview, correct?

6    A.  Correct.

7    Q.  You don't even know Officer Mensah is there at all, do you?

8    A.  No, I did not.

9    Q.  Officer Mensah never announced himself at the mall?

10   A.  Once I got out of my car, I wasn't really paying attention

11   to the radio too much.

12   Q.  Right.  Before you got out of your car because we have the

13   radio traffic, Officer Mensah doesn't say hey guys, I'm at the

14   mall, right?

15   A.  I think pretty much everyone was going to the mall.

16   Q.  Everyone going to the mall and everyone being at the mall is

17   different, fair?

18   A.  My understanding, everyone working was going to the mall.

19   Q.  My question was when everybody is going to the mall and I

20   check it is only a handful.  If someone is actually there and

21   announcing is two different things, true?

22   A.  True.

23   Q.  You don't know, first of all, where Officer Mensah is in the

24   scheme of things, right?

25   A.  Correct.

1    Q.  You know that you've got Officer Johnson running alongside,

2    correct?

3    A.  Right.

4    Q.  You've got Officer Schleis going in front of your car

5    chasing the suspect, correct?

6    A.  Correct.

7    Q.  On the mound over on Mayfair, did you know that was Officer

8    Olson?

9    A.  I did not.  I just knew there was a squad car over there.

10   Q.  You knew there was a squad car and you saw a light, correct?

11   A.  Correct.

12   Q.  So while you're in this position trained on that hand

13   because you saw a gun, your attention did not deviate, fair?

14   A.  Fair.

15   Q.  And the entire time you were giving commands to Mr. Cole to

16   drop the weapon, correct?

17   A.  Correct.

18   Q.  He didn't respond to any of your commands, right?

19   A.  He did not.

20   Q.  Did you consider that he could have been injured, and that's

21   why he didn't respond to your commands?

22   A.  I did not consider that.

23   Q.  The reason I asked earlier have you been in combat, you've

24   seen individuals shot in combat, right?

25   A.  I have.

1    Q.   Thank you for your service.  And having seen individuals

2    shot in combat, people react differently when they've been shot,

3    fair?

4    A.   Fair.

5    Q.   Some people are dazed and disoriented, correct?

6    A.   Correct.

7    Q.   Somebody might have a concussion, right?

8    A.   Potentially depending on the injury or how they fell.

9    Q.   Having seen somebody shot if you ever had to be in proximity

10   to them?

11   A.   Yes.

12   Q.   You are saying are you okay, what's going on.  Is it fair to

13   say once they've been shot, all bets are off in terms of how

14   they respond, true?

15   A.   Definitely.  It depends on the person.

16   Q.   Right.  And as you said, Alvin Cole could have fallen first

17   before the shot went off, right?

18        MR. WIRTH:  Objection, which shot?

19   Q.   The first shot.  The four shots or the -- Officer Mensah

20   fired five times, correct?

21   A.   I think so, correct.

22   Q.   I'll tell you he fired five times.  There's going to be no

23   dispute to that.  He fired five times.  All five shots Alvin

24   Cole was on the ground, correct?

25   A.   Correct.

49

1   Q.   On his hands and knees with his hand facing towards Mayfair

2   Road with the gun, correct?

3           MR. WIRTH:   Object, mischaracterized the testimony.

4           MR. CADE: I'll rephrase, Judge.

5   Q.   He had his hand on the gun, right?

6   A.   Yes.

7   Q.   You're at the 5 o'clock so right position wise?

8   A.   Correct.

9   Q.   About 15 feet?

10  A.   Correct.

11  Q.   And this way is west, correct?

12  A.   Correct.

13  Q.   On our map, that's Mayfair Road?

14  A.   Correct.

15  Q.   He's got his hand on his gun.  He's on his hands and knees.

16  The gun is facing Mayfair Road, right?

17  A.   Correct.

18  Q.   Okay.  So the first shot that you heard -- I'll tell you

19  there's no dispute.  Alvin Cole shot himself.  That first shot,

20  you don't recall whether Alvin was going down first before the

21  shot went or after the shot went, fair?

22  A.   Correct, I do not recall.

23  Q.   Now, while you were giving instructions to Alvin Cole to

24  drop the weapon, he was again not responding, correct?

25  A.   Correct.

1    Q.  In fact, you had in your head because he had a weapon and he

2    was not moving, you had started to think I might have to pull

3    the trigger, correct?

4    A.  Correct.

5    Q.  But you didn't pull the trigger?

6    A.  I did not.

7    Q.  And you didn't consider whether he was unconscious or dazed

8    or anything else at that point in time while you're -- right

9    before Officer Mensah shot, correct?  You didn't consider that?

10   A.  I did not.  Every time that I've seen somebody get shot

11   while they're running, they fall in the direction of travel.  He

12   pivoted completely perpendicular to the travel.  He was facing

13   westbound and was facing southbound.

14          So in my head, that never registered that he was

15   injured or unconscious because he was laying in a completely

16   different way than the direction he was running.

17   Q.  Right.  If he was falling first before he shot, he's got the

18   gun and he trips and he shoots himself.  You can't say which way

19   the body is going to go, right?

20   A.  It would be awkward for him to make a left-hand turn while

21   falling.

22   Q.  Going from a full --

23   A.  A full sprint one way.  It would be hard for me to stop full

24   sprint and fall the other way.

25   Q.  You saw him stop and turn?

1  A.  I did not.  That would be an awkward fall.  That's why in my

2  mind, it did not register that he was injured or unconscious.

3  Q.  Let's not introduce stuff that's not there.  Did you not see

4  him do a full sprint, shoot and do a 90, right?

5  A.  Correct.

6  Q.  Okay.  So you saw him running?

7  A.  I did.

8  Q.  You heard the shot, right?

9  A.  Correct.

10 Q.  And at some point right before or right after you heard the

11 shot, he started to fall, and he fell down on his hands and

12 knees?

13 A.  Correct.

14 Q.  I will have them play that again in a moment.  But after the

15 shots are fired, we hear on audio stop, stop.  Who was yelling

16 stop?

17 A.  I don't recall.

18 Q.  Well, it would be you possibly, correct?

19 A.  I never yelled stop.

20 Q.  You didn't yell stop?

21 A.  I was not yelling stop.

22 Q.  And Officer Mensah while he's shooting is not yelling stop,

23 correct?

24 A.  Correct.

25 Q.  So the only other officers in close proximity would be Olson

52

1  and possibly Johnson, correct?

2  A.  Correct.

3  Q.  And how far away is Johnson?

4  A.  I do not recall that at all.

5  Q.  He's off to your side.  You can't see him, right?  If you're

6  at the 5 o'clock, he's somewhere over there, right?

7  A.  Correct.

8  Q.  You don't even know that he's running at the time, right?

9  A.  Right.

10  Q.  So if not Johnson than it's Olson logically?

11  A.  Correct.

12  Q.  And how far away was Olson from when his flashlight comes

13  on?  You saw the flashlight go on, right?

14  A.  Yes.

15  Q.  When you saw the flashlight, you know that's a police

16  officer, correct?

17  A.  Correct.

18  Q.  So when you saw that flashlight light goes on, you've got

19  your light on, was your light only -- I'm sorry, was your light

20  on first or did Olson illuminate first?

21  A.  I do not recall that.

22  Q.  So we've got two people with lights on.  And when you see

23  his light go off, how far, Agent Shamsi, was he?

24  A.  That's hard to say.  Thirty feet.

25  Q.  Thirty feet, okay.  So I don't need to break out the tape

1  measure.  If this is 25, 30 feet brings us basically this

2  distance, right?

3  A.  Correct.

4  Q.  Okay.  And when you say 30 feet, is that 30 feet from you or

5  30 feet from Alvin Cole?

6  A.  I guess from me.  Maybe both.

7  Q.  Again, if I'm Alvin Cole, approximately, 15 feet, right?

8  Olson is in the direction where the Judge is, correct?

9  A.  Correct.

10  Q.  So from you to Olson you believe was, approximately,

11  30 feet, correct?

12  A.  Correct.

13  Q.  You can't say whether that's 30 feet from Olson to Alvin

14  Cole, correct?

15  A.  Correct.

16  Q.  We can get your triangle and we can do angles and go back to

17  A squared plus B squared is C squared.  But you basically think

18  it was about 30 feet?

19  A.  Approximately.

20  Q.  Just so I'm clear, were you -- When you went to the mall,

21  were you specifically told by dispatch to go to the mall?

22  A.  I don't recall, but I don't think so.

23  Q.  But while you were there, you announced that squad 230 or

24  2030, you would announce that you were present, correct?

25  A.  That would be protocol.  I believe that I did.

54

1  Q.  The protocol, the reason is officers want to know where

2  everybody is approximately, right?

3  A.  Correct.

4  Q.  Because especially when you have a building or construction

5  site or something and you're running this way, you don't want an

6  officer coming out of the dark and you don't know who the hell

7  it is, right?

8  A.  Correct.

9  Q.  Because you might mistake somebody for being a bad guy when

10  really it is a fellow police officer, right?

11  A.  Correct.

12  Q.  So protocol, you're not -- Not only at the academy but in

13  Wauwatosa, the protocol was you're supposed to announce where

14  you're at.  If you're in one location and go somewhere else, you

15  announce I am leaving the scene, I am going somewhere else,

16  right?

17  A.  Correct.  If I had not done that, it would have been

18  stressful.  And I forgot, but protocol is to do that.

19  Q.  So give me one second, Agent Shamsi.  Exhibit 59, we're not

20  going to publish it.  I will hand you.  It says Shamsi 20 on it.

21  This was from your deposition.  Take a moment and look that

22  over, sir.  You recall giving a statement like I had asked you

23  earlier to a Detective Lori Rom, R-O-M, of the Milwaukee Police

24  Department?

25  A.  I did.  It was her and her partner, I believe.

1  Q.  Sure.  If you would turn to the second page of that

2  document, sir.  Do you have that?

3  A.  I do.

4  Q.  And in that document, I mean this was literally -- According

5  to this report, she responded.  I am trying to see if there was

6  a timestamp.  I don't see a timestamp.  You do recall meeting

7  with her?

8  A.  I do.

9  Q.  In that report, Detective Rom specifically notes PO Shamsi.

10  That would be Police Officer Shamsi, correct?

11  A.  Correct.

12  Q.  PO Shamsi stated as he is chasing the subject, he is

13  shouting, "stop, police multiple times.  PO Shamsi believes he

14  was about five to ten feet behind the subject as the subject

15  goes forward with his knees bent."  Do you see that?

16  A.  I do.

17  Q.  PO Shamsi described a position, I mean Detective Rom,

18  recognizes a person in a crouched position.  PS Shamsi stated

19  that at this point in time, he first observed the subject with a

20  handgun in the right hand, in his right hand.  Correct?

21  A.  Correct.

22  Q.  Okay.  So then it says a little bit later.  PO Shamsi stated

23  he was directly behind the subject ten feet while shouting

24  commands.  Did I read that correctly?

25  A.  Yes.

1   Q.  So ten feet is a little bit different than five feet, right?

2   Correct?

3   A.  Correct.

4   Q.  Ten feet is a little bit different than 15 feet, I

5   apologize.

6   A.  I think it is all approximate.  It is going off that night,

7   even that night.

8   Q.  You were the one who gave -- Right away you gave a

9   statement?

10  A.  Correct.

11  Q.  You didn't wait a couple of days, didn't think about it.

12  You gave the statement so it was fresh in your head?

13  A.  Correct.

14  Q.  Just so I'm clear.  Whether you were ten feet, 15 feet or

15  even 20 feet as you were chasing Alvin Cole, you were focused on

16  him running, right?

17  A.  Correct.

18  Q.  You didn't turn around and say, oh, Cheesecake Factory, the

19  parking lot looks full.  You didn't do any of that, right?

20  A.  No.

21  Q.  You didn't say, I am wondering who is winning the super

22  bowl?

23  A.  Right.

24  Q.  You were focused on him running?

25  A.  Yes.

1    Q.  And while you were doing that, he's running from you.

2    Whether that's ten feet, 15 feet or even 20 feet, you never saw

3    him make any sort of turn towards you, correct?

4    A.  I did not.

5    Q.  That would be something that that night when you gave a

6    statement, you would recall and tell Detective Rom, right?

7    A.  Right.

8    Q.  That's a pretty big deal to see a subject with a gun turn

9    towards an officer, right?

10   A.  Correct.

11   Q.  And we saw in the video you've got the security guard and

12   you are both running parallel -- I'm sorry, almost in tandem.

13   He's right in front of you?

14   A.  Right.

15   Q.  He wasn't blocking your view of Alvin Cole, was he?

16   A.  I don't recall that, but they were both ahead of me.

17   Q.  You could see both of them is what I'm saying?

18   A.  Correct.

19   Q.  It wasn't like you're behind the security guard and he's

20   such a large individual that he somehow covered up Alvin Cole

21   that you couldn't see Alvin Cole, right?

22   A.  Correct.

23   Q.  You saw the security guard.  You saw Alvin Cole.  You could

24   see both of them clearly, correct?

25   A.  It was dark outside, so I didn't see them clearly, but I saw

1    them running.

2    Q.  Clear enough that if someone had a gun or someone had turned

3    toward you, you would have a recall that night and tell

4    Detective Rom, correct?

5    A.  Correct.

6    Q.  You would also have a recall that night if Alvin Cole was on

7    his hands and knees if he lifted that gun that you were so

8    focused on and reached under or reached over, correct?

9    A.  If I had noticed that, yes.

10   Q.  Have you ever -- Off the subject.  Have you ever broken an

11   arm or hand or anything?

12   A.  I have not.

13   Q.  Any broken bones?

14   A.  No.

15   Q.  Fair enough.  Give me one second.  You were not in the

16   courtroom when the defense was giving their opening statement,

17   correct?

18   A.  I was not.

19   Q.  So it's fair to say you never saw Alvin Cole pointing a gun

20   at you, right?

21   A.  No.

22   Q.  No.  I am incorrect or no, I am correct?

23   A.  I did not see him point a gun at me.

24   Q.  When Alvin Cole went down to the ground when you saw him

25   fall, whether before or after of the shot, did he just go down?

1   So again, you're at the 5 o'clock.  Did he just go down?  Did he

2   go down, and was he crawling and moving?

3   A.  I did not see him crawling and moving.

4   Q.  You were close enough that if he was crawling, you would

5   have seen that, correct?

6   A.  Correct.

7   Q.  Again, that's something that you would have remembered to

8   tell Detective Rom, oh, and by the way when he went down, he was

9   crawling, correct?

10  A.  Correct.

11  Q.  And the fact that you didn't tell Detective Rom that night,

12  fair to say that did not happen, true?

13  A.  I did not notice him crawling that night.

14  Q.  And one of the things that I just want to make sure.  That

15  under DAAT Training at the time as a police officer, two

16  and-a-half years experience, it's fair to say that every officer

17  as they are going through their head, deadly force or what have

18  you, each officer is responsible for their own actions, true?

19  A.  True.

20  Q.  Right.  You're not responsible for Olson.  You're not

21  responsible for Mensah.  You're responsible for you, right?

22  A.  Correct.

23          MR. CADE:  Those are my questions, Your Honor.

24          MR. WIRTH:  As we agreed, Judge, should we proceed

25  with our questioning?

1          THE COURT:  Yes, please.

2     **CROSS EXAMINATION BY MR. WIRTH:**

3     Q.  I want to talk about some of the questions that Attorney

4     Cade just asked you, and I'll go through your actions that

5     night, okay.  You were asked by Attorney Cade whether you had

6     your eyes closed from your tunnel vision of Alvin Cole and a gun

7     and missed him turn towards Joseph Mensah.  Do you remember that

8     question?

9     A.  I do.

10    Q.  You replied that your eyes were not closed, but you may have

11    been temporarily distracted to your left.  Do you remember that

12    question and answer?

13    A.  I do.

14    Q.  What did you mean by you may have been temporarily

15    distracted to your left?

16    A.  I think he was referring to whether or not I closed my eyes,

17    which I would not have closed my eyes to miss that, but there

18    was a lot of movement to my left.  Had I taken my eyes off for a

19    second and looked left, I might have missed what could have

20    potentially been happening with regards to the gun.

21    Q.  For instance, Joseph Mensah's arrival to your left?

22    A.  Correct.

23    Q.  Joseph Mensah's arrival to your left may have distracted you

24    from watching what Alvin Cole did while he was on the ground?

25    A.  Correct.

1   Q.   What I'm going to do, Agent Shamsi, is I'm going to play the

2   first three minutes of the dash cam from your car, so that you

3   can take a look at it.  Just to tell the jury that that is, in

4   fact, the genuine reproduction of the dash cam from your squad,

5   okay.

6           In keeping with what we're doing here, we intend to

7   show the dash cam video marked as Exhibit 1026.  We would move

8   that into evidence.

9           THE COURT:  No objection.  So ordered.

10          MR. WIRTH:  Permission to publish, Your Honor?

11          THE COURT:  Yes.

12          (Whereupon tape is played.)

13  Q.   Is that Officer Johnson's squad that you see in the video?

14  A.   Yes.

15  Q.   Is that Alvin Cole?

16  A.   Yes.

17  Q.   That was Officer Johnson running by?

18  A.   Correct.

19  Q.   Pause it for a second.  At that time, was Officer Dexter

20  Schleis in the area?

21  A.   He was just pulling up.

22  Q.   Behind you?

23  A.   Correct.

24  Q.   So we don't see him in this video?

25  A.   Correct.

1   Q.  Sound should be on by now.

2         (Whereupon tape is played.)

3   Q.  When you were chasing that evening, did you hear that

4   gunshot?

5   A.  I did.

6   Q.  Did you know it to be a gunshot?

7   A.  I assumed it was a gunshot.  It didn't register as to what

8   it was.  It was a single shot.  I did not see Alvin Cole shoot,

9   so I did not register what it was.

10   Q.  Upon hearing the gunshot, what was your next maneuver?

11   A.  I was continuing to catch up to Alvin Cole.

12   Q.  Did you withdraw your weapon?

13   A.  Shortly after that.

14   Q.  Do you know who yelled shots fired?

15   A.  I do not.

16         (Whereupon tape is played.)

17   Q.  That represents, at least, several minutes of the dash cam

18   video from your squad car?

19   A.  Correct.

20   Q.  Now, after the shooting occurred, what was the next thing

21   you did?

22   A.  I walked up with PO Olson to disarm Alvin and then to

23   conduct life-saving measures.

24   Q.  After the shooting had stopped, was the gun still in or near

25   Alvin Cole's possession?

63

1   A.  It was.

2   Q.  Where did you see it?

3   A.  The gun was still in his hand.

4   Q.  And what happened to the gun then after that?

5   A.  PO Olson moved up while I covered Cole and PO Olson kicked

6   the gun away from Alvin Cole's hand.

7   Q.  Is that standard procedure?

8   A.  Correct.

9   Q.  Your position was to continue monitoring Mr. Cole?

10  A.  Yes.

11  Q.  And Police Officer Olson then kicked the gun out of his

12  hand?

13  A.  Correct.

14  Q.  That evening, February 2, 2020, what was your duty

15  assignment that evening?

16  A.  I was in the Mayfair Road area.  I don't exactly remember

17  what the sector was, but I was scheduled to be in that area for

18  that day.

19  Q.  And shortly before this occurred roughly 6 o'clock in the

20  evening, what was your shift?

21  A.  I don't fully remember, but I had been extended.  I think I

22  was about to get off at 6:00 or I had been --  I was actually

23  driving back to the police department before the call came.

24  Q.  What occurred after that?

25  A.  The call from Mayfair came out that there was a subject with

1   a gun.  And typically when that happens, everybody goes in the

2   vicinity of that area just to be available.  So I moved to the

3   mall to watch an exit to see if that subject, who was reported

4   to have a gun inside the mall, was to come out because there was

5   already police officers inside looking for him inside the mall.

6   Q.  Is that what officers refer to as floating?

7   A.  I believe so.

8   Q.  Now, with respect to I think you just testified that you set

9   up in a corner of the parking lot so to speak?

10  A.  I was outside of one of the main entrances at the mall.

11  Q.  What did you hear over the radio in terms of dispatch calls?

12  A.  I initially heard that there was a subject in the mall that

13  had --  that was involved in an altercation that had flashed a

14  gun.  I'm going off memory.

15  Q.  Sure.

16  A.  So then I think at that point, there was just other calls

17  coming in that were updating based on interviewing people at the

18  mall.  And then Officer Johnson, whatever exit he was at, said

19  he had a group of individuals, one of which matched the

20  description of the individual with the gun inside the mall.

21  Q.  And the dispatch calls even if they were between squads, do

22  all cars tune into that channel hear them?

23  A.  Correct.

24  Q.  After you hear Officer Johnson call that he believes he's

25  identified the group that contained Alvin Cole, what did you do

1    next?

2    A.   I started to make my way towards Officer Johnson.

3    Q.   When we see in the video your squad kind of pull up to a

4    parking structure, is that where you were headed?

5    A.   Correct.

6    Q.   How did you learn the things, like, the description of Alvin

7    Cole that he flashed a gun, his general area, how did you learn

8    those things?

9    A.   Over -- From the dispatch call.

10   Q.   As you pulled up, is that when the foot chase began?

11   A.   Right as I was pulling up.  At first, I remember seeing a

12   group of individuals, and Officer Johnson was getting out of his

13   car to engage the individuals and right -- I think as he was

14   about to start talking to them, they ran.

15   Q.   Would you tell the jury the significance of an incident

16   turning into a foot chase?

17   A.   Any time there's a foot chase, all squads go toward the foot

18   chase to assist the officers in the foot chase, but also to set

19   up a perimeter so the foot case can either run into a perimeter

20   or be contained because any foot chase can be extremely

21   dangerous.

22   Q.   With respect to the foot chase in this instance, did the

23   information that you heard over the radio contribute at all to

24   your evaluation of the situation?

25   A.   It did.  Any subject with a gun that ends up running in a

1    foot chase creates a bad situation because that individual could

2    be running to gain a position of advantage or even, depending on

3    the foot chase, can place himself where he becomes barricaded or

4    any escalated incident.

5    Q.  What about the concept from the police officer's

6    perspective?  From your perspective as a Wauwatosa Police

7    Officer when you were back there, what about the concept just

8    let them go?

9    A.  I don't think any police officer would just let anybody go,

10   especially if there was a report of somebody having a gun

11   because then that person who has a gun when they were not

12   supposed to have a gun will take that into society or

13   potentially if they are amped up and running can be running into

14   another situation where they might hurt somebody, so we do our

15   best to not let anybody go.

16   Q.  When a foot chase begins, do you become duty bound to see it

17   through?

18   A.  Absolutely, yes.

19   Q.  Was Mayfair Mall within your patrol area?

20   A.  It was.  It was in the sector that I was assigned to.

21   Usually we have a couple squads that are assigned specifically

22   to Mayfair Mall.  But most times, those officers were there as

23   kind of the quickest response.  Whoever is assigned to the

24   Mayfair area will also assist at the mall when necessary.

25   Q.  Once you join the foot chase, did you testify that there

1    were others ahead of you?

2    A.   There was the security guard ahead of me, correct.

3    Q.   And the security guard was between you and Mr. Cole?

4    A.   Correct.

5    Q.   I think you told Attorney Cade that it was dark?

6    A.   It was dark.

7    Q.   That the security guard didn't necessarily block your

8    ability to see where Alvin Cole was running, but he was between

9    you and Alvin Cole; is that correct?

10   A.   He was, correct.

11   Q.   You were also asked by Mr. Cade that you didn't pull the

12   trigger, correct?

13   A.   Correct.

14   Q.   Do you remember those questions?

15   A.   I do.

16   Q.   What were you doing with your trigger as you stood there on

17   the evening of February 2, 2020?

18   A.   So for me, anytime I pull my gun, it is a deadly force

19   situation.  So I had my gun pulled.  I was giving commands for

20   Alvin Cole to drop the gun, anything to show that he was going

21   to comply and let go of the gun.  And while that was happening,

22   I was watching the gun to make sure that it wasn't going to be

23   pointed at me.  I was pulling the slack out of my trigger so I

24   had less time to shoot.  I was afraid that he would have the

25   beat on me because he was going to make the decision before I

1  did.

2  Q.  You had already begun essentially pulling the trigger?

3  A.  Correct.

4  Q.  Why did you make that decision?

5  A.  Because it was a deadly force situation, and he had a gun

6  that could have pointed back at me.

7  Q.  If you draw your firearm, are you prepared to use deadly

8  force?

9  A.  Correct.

10  Q.  You were asked some questions by Mr. Cade whether the

11  positioning of a gun, open carry state, represents an imminent

12  deadly harm.  Do you remember those questions?

13  A.  I do.

14  Q.  I believe your answers were that it was situational?

15  A.  Correct.

16  Q.  Is pointing a gun in the direction of another officer a

17  situation that could represent imminent deadly harm?

18  A.  Yes.

19  Q.  After the gunshot had been fired once, does that represent

20  an imminent deadly harm?

21  A.  Yes.

22          MR. WIRTH:  Judge, I don't have anything further.

23          MR. CADE:  Redirect, Your Honor?

24          THE COURT:  Yes.

25  **REDIRECT EXAMINATION BY MR. CADE:**

69

1  Q.  Just so I'm clear, Agent Shamsi, you weren't temporarily

2  distracted that day, correct?  Between Alvin Cole going down and

3  Joseph Mensah shooting five times, you were not temporarily

4  distracted, were you?

5  A.  As far as -- I don't remember being temporarily distracted,

6  no.

7  Q.  You still have up there Lori Rom's report?

8  A.  I do.

9  Q.  I'd like to turn again to the second page, Exhibit 53.  Turn

10 to the bottom of the second page.  PO Shamsi stated he focused

11 on the firearm and believes the subject had the firearm away

12 from his body.  Away from his body, correct?

13 A.  Correct.

14 Q.  It wasn't like tucked close to his body, was it?  It was

15 away?

16 A.  Correct, it was away.

17 Q.  PO Shamsi stated the firearm would have been in a western

18 direction in front of subject allowing him to be able to

19 visually see the handgun.  PO Shamsi stated he was focused on

20 the firearm and did not see the police officer directly on the

21 other side of the subject with the gun.  That would be Olson,

22 correct?

23 A.  Correct.

24 Q.  PO Shamsi stated he did not see the subjects that officer --

25 that officer was taking into custody as the focus was on the

1  subject with the gun.  Did I read that correctly?

2  A.  Yes.

3  Q.  The third page.  PO Shamsi stated he hears a gunshot from

4  his left rather about his seven or 8 o'clock position, correct?

5  A.  Correct.

6  Q.  Left rear not left side, left front, left rear, correct?

7  A.  Correct.

8  Q.  That means that you were closer than Officer Mensah when you

9  heard those gunshots, correct?

10  A.  I believe so.  I was also canted to my left.

11  Q.  I understand.  It was in the seven or 8 o'clock, hears

12  gunshots from his left rather about a seven or 8 o'clock

13  position, correct?

14  A.  Correct.

15  Q.  PO Shamsi stated this would be the same time that the

16  subject had the firearm pointed in a westerly direction,

17  correct?

18  A.  Correct.

19  Q.  So the shots had already gone off, and you're still watching

20  the gun, correct?

21  A.  Correct.

22  Q.  Because the very next line, according to Detective Rom, PO

23  Shamsi stated he glanced to that area, meaning where the shots

24  came from, and observed a police officer but didn't recognize

25  who it was.  Did you see that?

71

1    A.   Correct.

2    Q.   It is not a question of Joseph Mensah coming in your

3    periphery causing you to look away for a second.  You're

4    watching the gun the entire time.  It is only after the shots

5    that you turn, like, who fired that, correct?

6    A.   Correct.

7    Q.   You weren't distracted, fair?

8    A.   Fair.

9    Q.   Okay.  Again, this is -- You gave your statement, what,

10   within two hours of the shooting, give or take?

11   A.   I did which was still extremely stressful and amped up.  I

12   did.

13   Q.   But you know being an FBI agent and going through training,

14   that the closer in time you get to something meaning if I

15   interview you as soon as the event, the more likely it is you

16   are going to recall specific details, correct?

17   A.   I think that is dependent.

18   Q.   You're not saying that if you have time to think about it,

19   you start saying what about this, what about that, you're not

20   making things up in your head?

21   A.   That would speculate either way.

22   Q.   Would you have any reason to disbelieve or disprove that

23   between the time that Alvin Cole shot himself in the forearm and

24   whether he went down right before he shot himself or immediately

25   right afterward and the time that Joseph Mensah started

1   shooting, you wouldn't dispute that is a little more than -- It

2   is less than 11 seconds, more than ten seconds, correct?

3   A.  It was very fast.

4   Q.  You have no reason to dispute me if I told you.  Would you

5   like to see the timer?  We can show it?

6   A.  No.

7   Q.  Okay.  It's fair to say that running from the police with a

8   firearm in a fanny pack does not equate to being shot and

9   killed, correct?

10  A.  Correct.

11  Q.  You said Mayfair was in your sector.  Wauwatosa was divided

12  into sectors, correct?

13  A.  Correct.

14  Q.  Do you recall how many sectors there are or were?

15  A.  I believe there are four.

16  Q.  Four sectors.  So what's the furthest sector away?

17  A.  I don't remember.

18  Q.  If someone is in that sector when you hear the term

19  floating, it means someone who is the furthest away kind of

20  shimmies over towards the middle, right?  So they are in the far

21  sector.  They come in the middle so they can handle two sectors

22  if need be, right?

23  A.  Correct.

24  Q.  So in floating if Joseph Mensah was in the furthest sector

25  away or supposed to be, so he's supposed to be all the way over

1  here guarding this area of Wauwatosa, if he's floating, that

2  means he's kind of coming towards the middle half in this

3  sector, half in the other sector, right?

4  A.  Again, that is situationally dependent.  If the situation --

5  If I was the furthest one away, I would have went to the mall.

6  Q.  You would have announced you were going to the mall,

7  correct?

8  A.  I would have, yeah.

9  Q.  When you heard the term gun's out, gun's out, you didn't

10 need anyone to announce the gun is out because you actually saw

11 the gun that was out, correct?

12 A.  Correct.

13 Q.  And in the position that the gun was in while it was out was

14 not a danger to anyone at that time that very moment, correct?

15 A.  Any time a gun is out not being let go, it is a danger.  It

16 was a danger.

17 Q.  It is in his hand, and he didn't move, correct?

18 A.  I did believe he was a danger to me.

19 Q.  You didn't shoot being in danger, correct?

20 A.  I did not.

21 Q.  So you had said in your head if he moves, I will shoot,

22 correct?

23 A.  Correct.

24 Q.  Right.  Showing a gun to a police officer, that's a danger

25 no matter what, right?

1   A.  Correct.

2   Q.  Even if I have a concealed carry, I'm carrying a weapon on

3   me.  When I am near a police officer, I should say officer, by

4   the way, I have a gun on me, correct?  That's the courteous

5   thing to do.

6   A.  Correct.

7   Q.  You at least let the officer know, hey, before you do a pat

8   down or see a bulge, I have a weapon?

9   A.  Correct.

10   Q.  Even if I had a holster and the gun is out, you can visibly

11   see the gun.  Standing alone, you don't say, oh my God, that is

12   a danger, I am going to shoot, right?

13   A.  Correct.

14   Q.  It is only if the person has the holster, gun is visible,

15   that means the gun is out.  It is visible, right?

16   A.  Gun out means it is out of the holster, correct.

17   Q.  So if you see the gun if I you're standing in front of me

18   and I start to pull on it in your direction, that changes the

19   scenario, right?

20   A.  Correct.

21   Q.  But if I got it in my hand, I am on the ground and I am not

22   moving, the scenario has not changed from the moment you saw the

23   gun in the hand until Joseph Mensah shot, there was no movement,

24   true?

25   A.  True.

75

1          MR. CADE:  Those are my questions, Your Honor.

2          MR. WIRTH:  Judge, I have a little more on recross

3     then.

4          THE COURT:  All right.

5     **RECROSS EXAMINATION BY MR. WIRTH:**

6     Q.  Any time when you were pursuing Alvin Cole or stationed

7     behind Alvin Cole, did he comply with any of your orders?

8     A.  He didn't comply at all.

9     Q.  Agent Shamsi, if you take a look at what's been handed to

10    you as Exhibit Number 53 and repeatedly referred to as your

11    statement.  This isn't your statement, is it?  This is a

12    narrative authored by whoever it is that authored it, Lori Rom,

13    correct?

14    A.  Correct.

15    Q.  This isn't a recording of your conversation, true?

16    A.  Correct.

17    Q.  You gave additional narratives to police detectives after

18    this, did you not?

19    A.  I did.

20    Q.  I'm going to show you what's been marked as Plaintiffs'

21    Exhibit 54.  I will not be publishing it.  Can you identify what

22    Exhibit 54 is?

23    A.  This is a narrative from the Milwaukee County District

24    Attorney's Office.

25    Q.  And a narrative, that follows questioning of whom?

76

1    A.   Me.

2    Q.   If you go to page 2 of the narrative, that's -- Strike that.

3    When was that narrative interview taken?

4    A.   July 16, 2020.

5    Q.   Approximately five months then after your first narrative

6    was taken?

7    A.   Correct.

8    Q.   What was the circumstances or what were the circumstances of

9    the first narrative that was recorded of you?

10   A.   The one that was the night of?

11   Q.   The night of.

12   A.   I believe they wanted to start interviews that evening, so I

13   got pulled out to go be interviewed pretty quickly.

14   Q.   Where were you interviewed?

15   A.   In the back of a squad car.

16   Q.   In July of 2020, do you recall that interview?

17   A.   I do.

18   Q.   If you take a look at page -- I don't want to belabor this,

19   so I'll help.  If you take a look at page 2 of Plaintiffs'

20   Exhibit 54.  Can you tell me what you said in July of 2020 about

21   whether Alvin Cole pointed the weapon?

22   A.   He was extending his right arm out in a horizontal fashion

23   in a westbound direction.  Officer Shamsi stated the suspect was

24   holding in his right hand a handgun that was pointed in the

25   direction of a Wauwatosa Officer Evan Olson who was standing in

1   the south portion of the parking lot of Mayfair Road.

2           MR. WIRTH:  That's all the questions I have.

3           MR. CADE:  Couple questions.  I will be brief.  Can

4   you give him that exhibit back, Plaintiffs' 54.

5   **RE-REDIRECT EXAMINATION BY MR. CADE:**

6   Q.  Second page.  After you had some time to think about it, you

7   stated to the district attorney's office, to the investigators

8   on the first line, Officer Shamsi stated as he was pursuing the

9   subject, Alvin Cole, he was, approximately, six feet behind him,

10  correct?

11  A.  Correct.

12  Q.  Now, you got closer.  Originally, you were maybe 20 feet.

13  Today 15 feet, ten feet.  Now, you're six feet?

14  A.  Correct.

15  Q.  So six feet.  You're close enough that if there's a flash of

16  a muzzle, you're going to see it, right?

17  A.  Correct.

18  Q.  Officer Shamsi stated when a single gunshot occurred, he,

19  Officer Shamsi, immediately removed his duty handgun.  Do you

20  see that?

21  A.  I do.

22  Q.  Officer Shamsi stated he turned on his light, correct?

23  A.  Correct.

24  Q.  Then, I want to move a little bit further.  Give me one

25  second.  You then state in the fourth paragraph, officer Shamsi

1   stated he maintained his focus on the subject -- I'm sorry --

2   the suspect, Alvin Cole, and Cole never gave up possession of

3   the handgun in his right hand.  Do you see that?

4   A.  I do.

5   Q.  Officer Shamsi, he then heard multiple shots coming from the

6   east of his location.  And as he looked over his left shoulder,

7   he observed Officer Joseph Mensah back pedalling in a northwest

8   direction, correct?

9   A.  Correct.

10  Q.  So you're watching him.  You then hear the shots, and then

11  you see Joseph Mensah, correct?

12  A.  Correct.

13  Q.  You were the closest to Alvin Cole when he fell before

14  Mensah fired, right?

15  A.  Correct.

16  Q.  Let me ask you this.  If Alvin Cole is six feet away, right

17  about six feet, correct, and you've got your duty weapon and

18  you're focused on him, correct, and you've got Joseph Mensah who

19  is off to the seven or 8 o'clock but behind you, right, if he

20  shoots and he's moving, there's a chance he could have hit you,

21  correct?

22  A.  That Joseph Mensah could have hit me?

23  Q.  Yeah.

24  A.  No, I don't think so.

25  Q.  Why not?

1   A.  We're taught to create a T.  Where he was shooting from, he

2   makes sure he was at a safe position.

3   Q.  Right.  He was also moving as he was firing?

4   A.  Correct.  We train that way.

5   Q.  You train to shoot someone on their hands and knees?

6          MR. WIRTH:  Objection, argumentative.

7          THE WITNESS:  That's not what I said.  You asked if he

8   was shooting while he was moving, and I was answering a

9   question.

10  Q.  You said you were trained.  You are trained to shoot a

11  person presumably on the ground?

12  A.  You said if we are trained to shoot when he was moving.

13  Joseph Mensah was moving, and he was trained to shoot that way

14  while he was moving.

15         MR. CADE:  Those are my questions.

16         THE COURT:  Thank you.  You are excused, officer.

17  Let's take a five minute break, ten minutes.

18         BAILIFF:  All rise.

19         (Jury excused.)

20         THE COURT:  Ready for the jury.

21         (Jury enters.)

22         THE COURT:  When you come in, you don't have to wait

23  for anybody to say be seated.  Everybody is standing up because

24  of you.  So you have to sit down as soon as you come in.  Who is

25  the witness?

80

1          MS. PUSICK:  Plaintiff calls John Rawlings.

2          John Rawlings, being first duly sworn to tell the

3     truth, the whole truth, and nothing but the truth, testified as

4     follows:

5          MR. RAWLINGS:  Yes.

6          THE COURT:  Have a seat.  State your name for the

7     record, and you have to talk into the mic pretty close.

8          THE WITNESS:  John Rawlings.

9     **DIRECT EXAMINATION BY MS. PUSICK:**

10    Q.  Good afternoon, Mr. Rawlings.  How are you?

11    A.  Ready to go back home.

12    Q.  That's fair.  Home for you right now is Illinois?

13    A.  Yeah, two hours from here.

14    Q.  Got it.  Okay.  So before moving to Illinois, you lived here

15    in Milwaukee, correct?

16    A.  Yes.

17    Q.  How long did you live in Milwaukee?

18    A.  Fifteen years.

19    Q.  Where about did you live?

20    A.  I lived in West Allis, Milwaukee.

21    Q.  Okay.  I want to talk to you about February 2nd of 2020.

22    And in a general sense, do you recall this day?

23    A.  Bits and pieces because it has been a while.

24    Q.  Sure.  My plan is to kind of walk through, you know, what

25    had occurred.  But in a general sense, one to two sentences,

81

1   what did you witness on February 2nd of 2020?

2   A.   I witnessed a young man getting shot, people running through

3   a parking lot.  You want me to start from the beginning?

4   Q.   If that's okay for you.  To be clear, your testimony is that

5   you personally observed the shooting that occurred on

6   February 2nd of 2020, correct?

7   A.   Yes.

8   Q.   At the time though, you didn't know who the individuals

9   involved were, who the officers were.  You were just an

10  observer?

11  A.   Yes.

12  Q.   Let's start from the beginning.  Where you driving in the

13  late afternoon of February 2nd?

14  A.   I was on the main road driving home.

15  Q.   And which direction or which road were you on?

16  A.   Towards West Burleigh.

17  Q.   Which road were you on?

18  A.   I forgot what that road was.

19  Q.   If I tell you Mayfair, would that be correct?

20  A.   Yeah, Mayfair.  100 I think they call it.

21  Q.   You were traveling on Mayfair Road you said toward

22  Bluemound?

23  A.   Burleigh.

24  Q.   Excuse me, sorry.  While you were on Mayfair, what happened

25  next while you were driving?

1    A.  The light was red further ahead and traffic was backing up,

2    so I started slowing down.  And we could see -- When I say we,

3    me and my child were also in the vehicle.  Generally when I

4    clarify and say we, you understand there's two of us.

5    Q.  Of course.

6    A.  As we are driving down, I noticed just a group running down

7    the side basically across the parking lot.  And me being nosey,

8    I pulled in.  That's when -- As I pulled in, that's when I heard

9    the first shot.  I don't know who took the first shot.  I don't

10   know, but I heard it.

11   Q.  Okay.

12   A.  At that time I'm pulling in, I'm backing in and parking, and

13   that's when everything just basically in my eyes just lost

14   control.

15   Q.  Let's start in the beginning.  So you're at a red light?

16   A.  No, the light was turning red up ahead.

17   Q.  Okay.  You were turning into which parking lot?  You said

18   you backed into a parking lot.  Was that near the Cheesecake

19   Factory?

20   A.  Yeah.

21   Q.  You stated there was a group of people.  What did they look

22   like?  What were you observing at the time of these people?

23   A.  Well, the ones that were in the front looked like they

24   were -- One to two of them up in the front, and you could see

25   the officers in the back.  From my point of view if the incident

1  happened right here where this board is, and I am sitting over

2  here, you could see an officer on the left and an officer on the

3  right.  And I don't know if the young man was shot that was in

4  the hoodie, the gray hoodie.  I guess that is what he was

5  wearing.  It looked like gray to dark black.  And at that

6  moment, the officer on the left is the one that opened fire on

7  the one that was over here off to the right.

8  Q.  Do you see that officer in the courtroom today?

9  A.  Yes.

10  Q.  Who is it?

11  A.  Over there.

12  Q.  So you're pointing to the defense table, correct?

13  A.  Yes.

14  Q.  And to the defendant?

15  A.  Yeah.

16  Q.  I want to --

17  A.  I keep hearing videos.  I don't know anyone's names.  I just

18  know of Alvin Cole's name.  This is all I've heard of who was

19  shot.

20  Q.  Sure.  Again at the time, you didn't know who Alvin Cole

21  was.  You didn't know who Joseph Mensah was?

22  A.  No.

23  Q.  You just, in your words, were nosey and you pulled in?

24  A.  Yeah.

25  Q.  Okay.  I want to talk about where you parked your vehicle in

84

1   the Cheesecake Factory.  Can you describe your movement when you

2   pulled in and where you ended up parking?

3   A.  It's a little blurry, but I was close to Mayfair Road.

4   Q.  Okay.

5   A.  That's where I was parked.

6   Q.  And did you park facing toward the Cheesecake Factory or

7   facing toward Mayfair Road?

8   A.  I backed in so my back end would be towards the road.

9   Q.  Toward Mayfair Road?

10  A.  My front end would be towards --  Well, the Cheesecake

11  Factory would be over a little bit to the left.

12  Q.  What was the parking lot like that night?

13  A.  Hectic.

14  Q.  Were there other vehicles in the parking lot?

15  A.  Like a few to -- I'm, like, it is all blurred but, yes,

16  there were other cars there, but there was no one on the right

17  side of me where I was sitting.

18  Q.  Okay.  So from your vantage point sitting -- You were

19  driving, correct?

20  A.  Yes.

21  Q.  You were in the driver's seat of your vehicle?

22  A.  Uh-huh.

23  Q.  Where was your son?

24  A.  In the back seat.

25  Q.  Okay.  So from where you were sitting in your vehicle with

1  your rear of the vehicle towards Mayfair Road, which window of

2  your car were you looking out of to observe what happened?

3  A.  My passenger.

4  Q.  Okay.  You were to your right?

5  A.  Yeah.

6  Q.  Okay.  And from that distance of where you were seated to

7  Mr. Cole or where the situation was occurring or unfolding, from

8  how far of a distance was that?

9  A.  It's hard to say.  But if that's the incident, that back

10  wall is the incident, you could probably say from there to about

11  where the Judge is sitting maybe.

12  Q.  Okay.  So roughly the length of the courtroom?

13  A.  Yeah.

14  Q.  Okay.  So as you're sitting there, what occurs next?

15  A.  That's when I seen the officer on the left shoot the young

16  man in the lot.  What I don't understand, it also, like, was

17  another person as well.  I only saw the one get shot, shot at.

18  Q.  Okay.  Could you hear anything?

19  A.  Everything was faint because the windows were up, but you

20  could hear the gunshots clear, anywhere between four to five

21  pops, and they were loud.

22  Q.  Okay.  So I want to back up a little bit.  Earlier you said

23  when you were pulling in, you heard one gunshot?

24  A.  I heard, yes.

25  Q.  You didn't see where that came from?

1    A.  I did not see.

2    Q.  And this other cluster of gunshots, about how long after

3    that first did you hear those?

4    A.  It was short.  I can't really pinpoint five to 20-minute

5    time zone.  Everything is real at the time.  So it wasn't really

6    taking time in-between the shots.

7    Q.  Okay.  So --

8    A.  You know shortly after everything happened, I could have

9    probably given, like, a one to two-minute window.  But now I

10   can't pinpoint exactly about how long it was between them

11   because it has been so long since that happened.

12   Q.  That makes sense.  It has been five years.  I understand,

13   that's okay.  After hearing the first gunshot, did you observe

14   any movements from any of the individuals that were running?

15   A.  No.  Everybody was just, like, stopped right there.  When I

16   parked, everyone was stopped right there.

17   Q.  Okay.  So at some point, did you see anyone falling?

18   A.  The one in the gray hoodie.

19   Q.  What did that appear like to you?

20   A.  I don't even remember.

21   Q.  Okay.  So after the cluster of gunshots, what did you

22   observe next?

23   A.  Um, I saw the two officers run up and it looked like -- I

24   don't know what was going on.  It looked like they were

25   wrestling him.  But from my view and back facing me, I can't see

87

1  what went on really.  I don't know if he was wrestled.  I don't

2  know what went on from that point.

3  Q.  From your vantage point in the front seat of your vehicle,

4  could you see -- We now know it is Alvin Cole in the gray

5  sweatshirt.  At the time you didn't, I understand that.  Did you

6  see anything in his hand when he was running?

7  A.  I didn't see anything.

8  Q.  When he fell, did it appear that he looked injured or hurt

9  as he fell?

10 A.  It looked like he may have been injured, yes.

11 Q.  Why is that?

12 A.  I took assumption of hearing the first pop that he was shot.

13 Q.  Did you observe him fall?

14 A.  I observed, like, the last bit of him hitting the ground,

15 but I did not see him start to fall.

16 Q.  And once he was on the ground, what was his position like?

17 A.  On the ground?  I can't recall if he was twisted,

18 upsidedown, face forward.

19 Q.  Sure.  Did he stay on the ground the entire time that you

20 were watching?

21 A.  Yeah, it didn't look like he was getting back up.

22 Q.  How would you describe him hitting the ground?

23 A.  I really don't have a description beyond he went down.

24 Q.  Okay.  Again, he never got back up?

25 A.  That I recall, no.

88

1  Q.  You testified that you didn't see anything in his hands.

2  Did he move or do any sudden movements?

3  A.  I didn't see any movements.  The only movement I saw is when

4  the officer got up to him, but I don't know --  I can't say.

5  I'm thinking about it.  From what I seen, it looked like he was

6  moving.  I don't know if the officers moved him because they

7  were moving him to arrest him.

8  Q.  To be clear, that was after the shots had already happened?

9  A.  Yeah.

10  Q.  That was afterwards, okay.  Could you estimate how many

11  officers were around him at the time the shooting occurred?

12  A.  I only saw, like, two to three.  It's been so long since.

13  It's very, very faint.  I just remember the basic two.

14  Q.  Okay.  And how long did you stay in the parking lot after

15  observing this?

16  A.  I really didn't want to stick around too long so I left

17  because I had my child with me.  And I figured if guns were

18  going off, I didn't want my son hurt.

19  Q.  Of course.  Did any of the officers approach you or how were

20  you able to get out of the parking lot?

21  A.  I drove out.  There was a guidance of an officer guiding

22  people out, and that is the way I went out, and I was gone.  I

23  was, like, that's the end of this.  I really didn't want

24  anything -- To be honest, I really didn't want anything to do

25  with the case.  But if it brings justice what I have to say,

1    then here I am.

2    Q.  Did any of the officers stop you as you were going in that

3    single file to leave the Cheesecake Factory parking lot?

4    A.  I was not really stopping, but people were stopping me.  You

5    could say from what I saw and talking to him, but I wasn't there

6    to talk.  I was there to be noisy.

7    Q.  Okay.  Is there anything else that you can recall about what

8    you observed?

9    A.  Just that's really all faint.

10   Q.  Okay.  Thank you.

11   A.  I honestly really don't, like, to try to remember it.

12   Trying to remember it, it got brought back up.

13   Q.  It is a traumatic situation that you observed?

14   A.  Yeah.

15          MS. PUSICK:  Thank you.  Those are my questions.

16   **CROSS EXAMINATION BY MR. WIRTH:**

17   Q.  Mr. Rawlings, my name is Joseph Wirth.  I am the attorney

18   for Joseph Mensah.  Can you tell me what kind of car you were

19   driving that night?

20   A.  I am not sure if it was mine or my roommates.  I drive --

21   Back then I drove a forest green Ford Escape, which looked more

22   black at night.  We may have been driving my roommate's vehicle,

23   which is a black Dodge.

24   Q.  Do I understand you correctly that you remember details of

25   the shooting, but don't remember what kind of vehicle you were

1 driving?

2 A.  No.  It has been so long.  I have been through so many

3 vehicles.

4 Q.  Either way in February of 2020, you would have been driving

5 either a forest green Ford Escape or a black -- What was the

6 second one?

7 A.  Dodge.

8 Q.  Now, you've described for the jury that you first noticed

9 something happen while you were on the road approaching a red

10 light; is that correct?

11 A.  Up ahead.

12 Q.  So as you were and your recollection is that you were on

13 Mayfair Road?

14 A.  Yes.

15 Q.  And the light that you were envisioning, was that the light

16 that controls traffic into the mall?

17 A.  No, I wasn't envisioning it.  It was there up ahead going

18 towards Burleigh.  The traffic was starting to back up on

19 Burleigh.  Not Burleigh, Mayfair right there.

20 Q.  You were already well past the mall?

21 A.  No.

22 Q.  You're describing a traffic light at Burleigh.  Do you know

23 how far Burleigh is from the Cheesecake Factory?

24 A.  Not too far.

25 Q.  If I tell you that it is over a mile, does that change your

1    recollection?

2    A.  No.

3    Q.  It's your testimony --

4    A.  I do remember seeing a light there.

5    Q.  Okay.  And were you -- Had you gone through the intersection

6    of North Avenue and Mayfair?

7    A.  I'm not clear on streets.  The only reason why I know

8    Mayfair and Burleigh, those are the two streets I had to use to

9    go to my house.

10   Q.  You weren't backed up in traffic for a mile, were you?

11   A.  I don't think it was a mile.

12   Q.  But in any event while you were heading, that would be

13   northbound on Mayfair Road, correct?

14   A.  I don't know my north from the south.

15   Q.  As you were driving on Mayfair Road, was Mayfair Road on

16   your left or on your right?

17   A.  Right.

18   Q.  Was the Cheesecake Factory on your left or on your right?

19   A.  It's going to be on the right.  It's in the same parking lot

20   as the Mayfair Mall.

21   Q.  Correct.  So your first knowledge of anything was that you

22   heard a gunshot while you were still on Mayfair Road?

23   A.  No.

24   Q.  When is it --  Why would you turn onto Mayfair Road if you

25   haven't heard a gunshot?

92

1  A.  Like I said earlier, I saw people running.  That is when

2  nosiness kicked in.

3  Q.  So your nosiness kicks in when you see people running where?

4  A.  Towards Mayfair away from the mall.  When I pulled in you

5  got the Cheesecake Factory right there, but I'm busy driving so

6  I did not focus on them running anymore.  That's when I heard

7  the pop, but I continued to park my vehicle.

8  Q.  Okay.  So you don't know what the first shot -- who fired

9  the first shot?

10  A.  Like I said to her, no.

11  Q.  Okay.  You don't know any of the circumstances of how much

12  time expired between the first shot and the second shots?

13  A.  Like I said to her as well, I can't give a set time on that.

14  Q.  Okay.

15  A.  It would be unjustified.

16  Q.  What you testified is you couldn't say five minutes or

17  20 minutes.  But maybe back at the time, it would be one minute

18  or two minutes.  This was a couple of minutes past --

19          MS. PUSICK:  Object.  That misstates his testimony.

20          THE COURT:  Doesn't sound exactly like --

21          MR. WIRTH:  I will rephrase, Judge.

22  Q.  Was it a couple minutes between when you heard the shot and

23  you saw what had you saw?

24  A.  Like I said, I can't go back on that.  I can't remember.

25  It's been, you know --  I've been here in --  I live in Illinois

1   now.  When this all happened, I tried to forget about what

2   happened.

3   Q.  Sure.

4   A.  When you see people getting shot, you tend to try to forget

5   these types of things.  So the questions you're throwing at me

6   I've answered with her.  I am not trying to be the mean person

7   here, but I'm ready to go home.  This is something I did not

8   want to replay in my head.  I also have my child with me.

9   Q.  I understand all that.  But you have to understand that in

10  this system, both sides get an opportunity to ask questions.

11  A.  I completely understand.  I was a juvenile growing up.  I

12  know all about the court system.

13  Q.  Okay.  And growing up in the juvenile system, then you know

14  that both lawyers get to ask questions?

15  A.  Yeah.

16  Q.  It certainly -- Between the first shot and the second shot

17  was more than ten seconds, wasn't it?

18          MS. PUSICK:  Objection.

19          MR. WIRTH:  This is cross examination.

20          MS. PUSICK:  If it is a misstatement, he didn't know

21  the time.  He didn't testify to a time.

22          MR. WIRTH:  He did testify, but this is a different

23  question, Judge.

24          THE COURT:  All right.  Ask the question.

25  Q.  It was certainly more than ten seconds, wasn't it?

94

1    A.   Like I said, it probably was, probably wasn't.  I heard one

2    shot.  I was still driving.  I didn't sit there and count one

3    Mississippi, two Mississippi, three Mississippi, four before

4    hearing anything else.

5    Q.   You were still driving when you heard the first shot?

6    A.   I was getting ready to park.  I was backing in.

7    Q.   So then you got down to your spot, and you decided to back

8    into the spot?

9    A.   Uh-huh.

10   Q.   Is that a yes?

11   A.   Yes.

12   Q.   You backed into the spot then.  And did you put the car in

13   park?

14   A.   Yeah.

15   Q.   And I believe you testified that the nose of your car was

16   facing the Cheesecake Factory?

17   A.   Yes.

18   Q.   And that in order to see after you finished pulling into the

19   lot, backed your car in.  As you were finished -- Strike that.

20   Let me ask it a different way.  As you were beginning to park

21   your car, you heard the shot, and you continued to park your car

22   by backing into the space, put it in park and were able to look

23   through your passenger window?

24   A.   No.

25   Q.   What was incorrect about that?

95

1  A.  I was not in the middle of the park when the first shot went

2  off.  I said I was pulling into the parking lot.

3  Q.  Okay.  I'm sorry, I apologize, sir.  You were pulling into

4  the parking lot when you heard the first shot?

5  A.  Yes.

6  Q.  You then would go down one of the parking aisles to find a

7  parking spot?

8  A.  Yeah.

9  Q.  And then?

10 A.  I am very faint on how I pulled in.  Like I said, I am not

11 trying to remember these things.

12 Q.  So you choose one of the parking lanes to come in.  You pull

13 and find a parking spot.  Yes?

14 A.  Uh-huh.

15 Q.  Is that a yes?  Those come up uh on the transcript.  You

16 decide to park into the parking space, correct?

17 A.  Yes.

18 Q.  Put your car in park?

19 A.  Yes.

20 Q.  And then how soon after that did do you observe this volley

21 of gunfire that you are talking about?

22 A.  I can't give a timeframe in-between.  It still revolves

23 around the same question of when the first bullet went off.

24 Q.  I'm not even putting -- tying it to the first shot.  I am

25 tying it to you've entered the parking lot.  You've come down

1   the parking aisle.  You backed your car in.  You parked your

2   car.  You've now had an opportunity to look out the passenger

3   window.  How long after you look out the passenger window did

4   this volley of shots occur?

5   A.  Approximately a minute or two.

6   Q.  Now, with respect to where you parked, is there or was there

7   cars parked between you and what you were witnessing?

8   A.  There were cars on the left.

9   Q.  So you were kind of tucked into a series of cars?

10  A.  No, I was parked.  The last car would be right here.  I was

11  right here.

12  Q.  You were the last car?

13  A.  Yeah.  From what I remember, yeah.  This is the Cheesecake

14  Factory right there.  The incident happened over there.  I am

15  sitting right here.  I am basically kiddy-corner with the

16  incident happening over here.  I am looking out the corner of my

17  passenger side window towards where -- So if this is the mirror

18  on the side and this is my passenger window right here, I'm

19  looking right out here basically where that frame comes down of

20  my window.

21  Q.  Okay.  And there is no car parked to the right of your

22  vehicle?

23  A.  I don't recall seeing one there when I backed in, no.

24  Q.  And what you have testified is that you have witnessed

25  officers shooting a man in a gray hoodie?

97

1    A.  Officer --

2    Q.  Shooting a man in a gray hoodie?

3    A.  Yes.

4    Q.  And you testified that there were two officers at that

5    point; is that correct?

6    A.  Yes, it looked like there were two or three.

7    Q.  Where would the third have been?

8    A.  Either -- Like I said, everything is faint.  I remember the

9    one on the left, the one on the right.  And I don't know, there

10   may have been one behind the one on the right running behind him

11   as well, but I clear as daylight remember the two.

12   Q.  And after what you described as the shooting, some kind of

13   what looked to you wrestling went on between the officers and

14   the man on the ground?

15   A.  It looked like it.  I don't know if it was wrestling or them

16   flipping him to arrest him or what not.  At that point,

17   everybody is bunched up.

18   Q.  And so if there were video that shows the Cheesecake Factory

19   parking lot, we would expect to see your forest green Ford

20   Escape or black Dodge at the end of the aisle, correct?

21   A.  It wasn't an aisle.

22   Q.  It wasn't an aisle?

23   A.  Those parking spots stop so, yeah.

24   Q.  The last parking spot at the beginning?

25   A.  From what I can recall, yes.

98

1          MR. WIRTH:  I don't have anything further.

2          MS. PUSICK:  Just a few.

3  **REDIRECT EXAMINATION BY MS. PUSICK:**

4  Q.  Were you in the parking lot of the Cheesecake Factory?

5  A.  Correct.

6  Q.  It is your testimony that you personally observed the

7  shooting of Alvin Cole?

8  A.  Yes.

9  Q.  It is also your testimony that you were roughly 50 feet

10  away?

11  A.  It would be more than 50 feet, yeah, an approximate.  At the

12  time, that is what it felt like.

13  Q.  If I have my colleague pull out the tape measure, and you

14  can get an estimate and confirm what that looks like.

15  A.  Yeah, that would be great.

16  Q.  Awesome.  Attorney Cade will hand you the end.  He will walk

17  the 50, and we can determine how that feels.

18          MR. CADE:  44 feet.

19  Q.  Does that feel accurate?  That is close?

20  A.  That is close, but I may have been a little bit further.

21  Like I said, it was from where that Judge is.

22  Q.  Looks close-ish?

23  A.  It would be around probably 50 to 75 feet then.

24  Q.  Okay.  You can see Attorney Cade back there, correct?

25  A.  Yeah.

99

1  Q.  You didn't have anything obstructing your view on the night

2  that you saw Alvin Cole get shot?

3  A.  No.  Things are now actually blurry.  I have to have surgery

4  done on my eyes.  They are more blurry now.

5          MR. WIRTH:  I have one recross, Your Honor.

6  **RECROSS EXAMINATION BY MR. WIRTH:**

7  A.  If we're playing a video, I don't want to recall anything.

8  Q.  I understand that.  I am putting up a still from one of the

9  videos.  Do you see it on the screen.

10 A.  Somewhat.

11 Q.  Okay.  Do you see the lettering of the Cheesecake Factory?

12 A.  No.

13 Q.  On the building in red?

14 A.  This is a blur.

15 Q.  Burry?

16 A.  This is blurry.

17 Q.  Are either of those two white cars yours?

18 A.  Where?

19          MR. WIRTH:  May I approach, Judge?

20          THE COURT:  Yeah, sure.

21          THE WITNESS:  All of this is dark colored to me.  No.

22          MR. WIRTH:  Nothing further, Judge.

23          THE COURT:  You are excused.  Thank you.  Next

24 witness.

25          (Witness excused.)

100

1          MR. CADE:  Dexter Schleis, Your Honor.

2          THE COURT:  Okay.

3          Dexter Schleis, being first duly sworn to tell the

4    truth, the whole truth, and nothing but the truth, testified as

5    follows:

6          MR. SCHLEIS:  I do.

7          THE COURT:  State your name for the record.  And you

8    have to talk close to that mic.  You can move it around if you

9    want, but you have to stay pretty close to it.

10   A.  Okay.

11         THE WITNESS:  My name is Dexter Schleis, D-E-X-T-E-R,

12   S-C-H-L-E-I-S.

13   **DIRECT EXAMINATION BY MR. CADE:**

14   Q.  Officer Schleis, how are you currently employed?

15   A.  As a police officer with the City of Wauwatosa.

16   Q.  How long have you been a police officer with the City of

17   Wauwatosa?

18   A.  Approximately, seven and-a-half years.

19   Q.  So if my math is correct, roughly June, July of 2017?

20   A.  August 1st of 2017.

21   Q.  Okay.  Was that the same time that David Shamsi came on the

22   force?

23   A.  I don't believe so.

24   Q.  Were you before or after him?

25   A.  Before him.

1  Q.  I want to talk for a moment first about, you are familiar

2  with what's known as DAAT, Defense and Arrest Tactic Training?

3  A.  Correct.

4  Q.  I apologize, I'm skipping.  Wauwatosa, all the officers have

5  to carry the exact same weapon?

6  A.  Correct.

7  Q.  And you're using the same bullets?

8  A.  Correct.

9  Q.  What is the grain, G-R-A-I-N, of the bullets?

10 A.  That I do not --

11 Q.  Do you know the approximate size?

12 A.  Nine-millimeter caliber.

13 Q.  Sure.  9-millimeters.  My research says it is between 115 to

14 about 160, generally in there.  Do you have any idea where it

15 stands?

16 A.  No.

17 Q.  Okay.  With regards to DAAT Training, it's fair to say that

18 an officer may not use deadly force unless there's an immediate

19 or imminent threat, correct?

20 A.  Could you repeat that?

21 Q.  Sure.  In order to use deadly force, there has to be an

22 imminent threat, correct?

23 A.  Or threat has already been displayed.

24 Q.  Sure.  An example I gave earlier, you recall David Shamsi,

25 correct?

102

1    A.  Correct.

2    Q.  The example I gave to Mr. Shamsi, if you and I were

3    together, if I have a gun in the low ready on my side, that is

4    not an imminent threat all else being equal?

5    A.  Can you repeat that?  I'm sorry.

6    Q.  Sure.  If I have a gun to my low ready down to my side, all

7    else being equal, that standing alone is not imminent threat,

8    correct?

9    A.  It could still be an imminent threat.

10   Q.  It would be if I said I am going to shoot you.  That coupled

11   with the gun, that is a different issue, correct?

12   A.  Correct.

13   Q.  Because Wisconsin is an open carry, right?

14   A.  Yes.

15   Q.  So I could have a gun on me displayed obviously not in the

16   courtroom, but I could walk around and say, hey officer, I could

17   have a gun.  That doesn't give you the right to use deadly force

18   under DAAT Training, true?

19   A.  Depending on how the gun is carried or on that person.

20   Q.  Right, yeah.  If I have it down here.  Hey officer, that's

21   different than pointing at you, correct?

22   A.  I don't believe so.  I do not believe so.

23   Q.  Having it down in the low ready is the same as pointing it

24   at you?

25   A.  There is a weapon in a subject's hand, that needs to be

103

1  addressed.

2  Q.  So if you see somebody with a gun and it is down in the low

3  ready, you're saying right then and there in the City of

4  Wauwatosa, they've trained you to take a shot?

5  A.  We are also told in DAAT there's the theory of action versus

6  reaction in terms of we're unable to predict what this person

7  will do with a weapon in their hand such as a firearm.

8  Q.  So shoot first, ask questions later?

9  A.  That's not what I said.

10  Q.  Action versus reaction.  I haven't said anything to you.  I

11  have it down at the low ready.  I haven't made statements.  You

12  are saying that is as much of a threat as if I point it to you?

13         MS. BAYNARD:  Objection, asked and answered.

14         THE COURT:  Overruled.

15  Q.  So shoot first, ask questions later?

16  A.  There are several factors that would go into how a situation

17  should be handled regarding a firearm.  I can't correctly answer

18  that question without further details regarding this question.

19  Q.  What other details do you know?  You and I, there's a

20  distance between us, 20-25 feet, maybe a little bit more.  I've

21  got a gun.  It's not pointed at you, right.  I haven't made a

22  statement.  I haven't said anything.  I haven't moved.

23         Do you in that instant under your DAAT Training having

24  been employed for the City of Wauwatosa for seven and-a-half

25  years, do you have the right to shoot?

104

1   A.   There is also another DAAT term called earlier warning signs

2   where if somebody is just standing there with a firearm

3   conspicuously ignoring me as one of these factors, it could

4   potentially lead to a deadly force situation.

5   Q.   I'm not ignoring you.  I said a moment ago, hello officer.

6   That is as friendly as I can be.

7   A.   Okay.

8   Q.   So how is that early warning?  What have I done to have you

9   decide that I get shot for having a gun in a low ready?

10  A.   I can't say I would say --

11  Q.   You said it is the same thing as if I pointed at you?

12  A.   Pointing is different.

13  Q.   I wanted to make sure.  So you -- At the time of the

14  shooting of Alvin Cole by Joseph Mensah, you were not a witness

15  itself to the shooting, correct?

16  A.   Correct.

17  Q.   Did you hear the gunshot go off?

18  A.   I heard several gunshots go off.

19  Q.   You didn't know who was shooting at whom at the time you

20  heard shots, correct?

21  A.   Correct.

22  Q.   We've already heard testimony.  We've got video.  There was

23  a single gunshot and then multiple gunshots, doesn't matter who

24  was shooting.  You have no idea who was pulling the trigger,

25  correct?

1   A.   Correct.

2   Q.   Okay.  If I have -- Under DAAT Training if I have a gun and

3   it's in my hand and you're behind me or slightly askant ajar to

4   me, if I don't turn towards you, my back is to you.  Under DAAT

5   standing alone, that's the information you have, I don't have a

6   right to shoot, correct?

7   A.   Like I said, it depends on the situation presented in front

8   of me.

9   Q.   Sure.  I gave you the situation.  I'm behind you.  I'm down

10  on my hands and knees.  The gun is clearly focused in a

11  different direction.  You are behind me, maybe even off to the

12  side a little bit, seven or 8 o'clock position.  I have it

13  turned towards you.  I haven't made any statements of threat to

14  you.  I am just down on the ground not moving.  At that point in

15  time, do you have a right to shoot?

16  A.   I'm behind you?

17  Q.   You are behind me.

18  A.   Could you just repeat that?  That was a pretty long

19  scenario.

20  Q.   I will relay the hypothetical again.  Ten feet, 15 feet,

21  some distance here.  You're behind me maybe slightly to the

22  side.  Are you with me so far?

23  A.   Yes.

24  Q.   Gun in my right hand.  I am on my hands and knees.  Are you

25  with me so far?

1    A.   Yes.

2    Q.   I am not verbalizing a single thing to you.  I don't make a

3    threat.  I don't say I'm going to shoot officers, I have had a

4    bad day.  I don't say anything.  Are you with me so far?

5    A.   Yes.

6    Q.   At that point in time down on my hands and knees and I'm not

7    moving, making no threats, do you have a right to shoot under

8    your DAAT Training?

9    A.   No.

10            MR. CADE:  We're going to show Exhibit 1, Your Honor.

11   It has already been admitted.

12   Q.   I'm going to instruct my colleague to pause, Officer

13   Schleis, once she knows part of it.  While we are trying to

14   figure out the technical difficulty, Officer Schleis, you were

15   assigned to go to the mall specifically on this particular

16   night?

17   A.   As a backup squad, correct.

18   Q.   Well, when you say backup, that means there was a different

19   officer who was assigned, and then they said, oh, by the way

20   Schleis, you're backup, correct?

21   A.   Along those lines, yeah.

22   Q.   Yeah.  Generally when you're backup, you know you're backup,

23   right?

24   A.   Yes.

25   Q.   It's not you saying, pick me, I want to be backup.  Dispatch

1  has made the decision based on where everybody is supposed to be

2  of whose going to be assigned, who is the backup?

3  A.  Correct.  It is based off your geographical location of

4  where the call for service is dispatched to.

5  Q.  Right.  They knew Officers, Schleis, were closest to the

6  mall for at least being the backup, correct?

7  A.  Correct.

8  Q.  At the time you were tasked to go to Mayfair Mall as backup,

9  do you have knowledge that Officer Mensah was at the mall or

10  going to be at the mall?

11  A.  I don't recall.

12  Q.  Do you recall him announcing, hey guys, I'm going to be at

13  the mall?

14  A.  I don't recall.

15  Q.  In fact, protocol if an officer is moving to a location,

16  they announce themselves so everybody else knows someone else is

17  going to be at that location, fair?

18  A.  It is situation dependent depending on radio chatter, but

19  squads may begin floating towards a specific call for service.

20  Q.  Sure.  The idea of alerting folks is so that if you confront

21  a situation and you potentially see someone running or with a

22  gun or whatever else and you don't recognize, hey, that's my

23  fellow officer, you may accidentally shoot, correct?

24  A.  My fellow officer?

25  Q.  Yeah.  The point of announcing you going to a location is so

1    that everybody else knows, oh yeah, Schleis is going to the

2    mall, oh yeah, Shamsi is going to the parking lot, oh yeah,

3    Officer Johnson is going to be somewhere.  You are announcing it

4    so that everybody else hears it, and they are not surprised,

5    fair?

6    A.   In my seven and-a-half years of policing, I never had an

7    issue with identifying another police officer who was not

8    announced there on scene.

9    Q.   You never had an issue with an officer not announcing?

10   A.   Given the scenario you presented to me, I never had the --

11   I've never had an issue identifying another police officer on

12   scene without them announcing they were on the scene.  They were

13   uniformed police officers driving either a marked squad car or

14   unmarked squad car.

15   Q.   What if they are out of the squad car and they are running?

16   A.   They are wearing a uniform.

17   Q.   What if they are behind you while you're running?  You don't

18   know they are there, right?

19   A.   That's fair.

20   Q.   Right.  You're running.  This scenario you have to be -- I

21   am running maybe chasing a suspect, and I don't know you're

22   behind me, right, unless I announce myself.  Let me rephrase.

23   I'm running chasing a suspect.  Are you with me?

24   A.   Yes.

25   Q.   And you don't announce whether over the radio or over your

109

1    microphone or while you were running that you're behind me.  Are
2    you with me so far?
3    A.  Yes.
4    Q.  And I have a dangerous situation, and I hear something
5    behind me.  Are you following me so far?
6    A.  Yes.
7    Q.  There's a very good chance by not announcing myself that I
8    am concerned someone could be behind me and I turn and shoot,
9    right?  That's a legitimate bad-scene scenario?
10   A.  If I am chasing the suspect, I wouldn't believe there was a
11   suspect behind me.
12   Q.  Not a suspect.  It could be anybody.  You don't know who is
13   behind you, right?  That's the point.  You're at the mall.  You
14   don't have any idea, correct?
15   A.  Correct.
16   Q.  Okay.  Because in this scenario -- Have you seen the video?
17   A.  The --  Depends on the video.  I'm not sure which video.
18   Q.  There is a video of Alvin Cole being shot by Officer Mensah,
19   shows you running.  We can show the video.
20   A.  Yes, I've seen that video.
21   Q.  We'll show it.
22           (Whereupon tape is played.)
23   Q.  That's you running, right?
24   A.  Yes.
25   Q.  Okay.  So we see in the foreground, we see an individual

110

1   running, correct?

2   A.  Yes.

3   Q.  Okay.

4           MR. CADE:  Go ahead and hit play.

5           (Whereupon tape is played.)

6   Q.  We see another individual wearing a vest of some sort, mall

7   security guard running, correct?

8   A.  Yes.

9           (Whereupon tape is played.)

10  Q.  We have Officer Shamsi.  He's running, correct?

11  A.  Correct.

12          (Whereupon tape is played.)

13  Q.  Now, we've got Officer Mensah.  Do you see Officer Mensah?

14  A.  Yes.

15  Q.  You've got Shamsi, and you've got Mensah running behind him,

16  correct?

17  A.  Correct.

18  Q.  Now, Shamsi was here earlier.  Did you say hi to him?  Did

19  you see him?

20  A.  I did.

21  Q.  You didn't hear his testimony, right?

22  A.  No.

23  Q.  So he doesn't know Mensah is behind him.

24  A.  Okay.

25  Q.  The scenario I gave you of you running, chasing a suspect

1  and someone being behind you -- February 2, 2020 that happened,

2  right?

3  A.  I guess.

4          MR. CADE:  Hit play.

5          (Whereupon tape is played.)

6  Q.  We've got another officer.  That's Johnson, right?

7  A.  Yes.

8  Q.  People don't know -- Shamsi is so far ahead, he doesn't know

9  where Johnson is when he's running, correct?

10 A.  Could be possible, yes.

11 Q.  Okay.  So the whole point of announcing yourself, whether

12 it's over the squad radio, whether it's over --  What do you

13 have, a microphone?

14 A.  A lapel radio.

15 Q.  When you run, you grasp it and say running, correct, or I am

16 moving to this location or you announce something, right?

17 A.  As the primary officer in a foot pursuit, you give updates

18 to the best of your ability.

19 Q.  Let me ask you this.  While you are running and you're

20 giving updates, are you --  Are you right handed or left handed?

21 A.  Right handed.

22 Q.  So it's fair to say, right hand would be your 9-millimeter,

23 correct?

24 A.  Correct.

25 Q.  On the left side, you probably have a taser?

112

1    A.  Correct, toward the front of my body.

2    Q.  And they do that dominant hand -- with the non-dominate hand

3    with the taser so theoretically you don't mix the two up?

4    A.  We are actually taught --  Let me rephrase.  At Wauwatosa,

5    they encourage a cross-draw technique for the taser.  So not

6    necessarily dominant hand but non-dominant side, dominant side.

7    Q.  My point.  Thank you for correcting me.  My point was right

8    hand -- If you're right-hand dominant, you know, immediately

9    your gun, your 9-millimeter, is closest to you.  You get to it

10   fastest, right?

11   A.  Yes.

12   Q.  And to cross draw, you know, if I want to use a taser, I

13   have to reach across my body.  That is drilled into you, right?

14   A.  Yes.

15   Q.  The point being is the taser is on the left and the gun is

16   on the right.  When you pull the taser, you are meant to pull

17   the taser.  When you pull the gun, you are meant to pull the

18   gun, fair?

19   A.  Fair.

20   Q.  While you are running, you have the lapel on your left

21   shoulder.  Are you going to announce with your left hand or with

22   your right hand?

23   A.  With my left hand.

24   Q.  So you're trained to run and press on the microphone to

25   announce, correct?

1  A.  Not necessarily trained.  That's just how I operate.

2  Q.  Okay.  So when you -- We saw you pull in front of Officer

3  Shamsi's car.  You arrested a single subject, correct?

4  A.  Correct.

5  Q.  You put that subject in the car?

6  A.  Correct.  After he was placed into custody, yes, I placed

7  him in that squad.

8  Q.  By placing him in custody, you handcuff, right, behind, and

9  then you do a pat down?

10  A.  I did a quick search.

11  Q.  Correct.  You wanted to make sure he doesn't have a weapon

12  or something he can grab?

13  A.  Yes.

14  Q.  You place him in Shamsi's squad car, correct?

15  A.  Correct.

16  Q.  And your squad car was back somewhere else.  So you decided

17  to drive Shamsi's squad car forward?

18  A.  Correct.

19  Q.  And at some point you after you heard the shots, you saw

20  them starting to do -- The other officers, they were starting to

21  do CPR on Alvin Cole, fair?

22  A.  They were rendering medical aid, correct.

23  Q.  And someone said they needed the AED, the defibrillator?

24  A.  Yes.

25  Q.  You got Shamsi's car.  So theoretically, every squad car has

114

1   one in the trunk?

2   A.  Yes.

3   Q.  You retrieved that?

4   A.  Yes.

5   Q.  And then did you go over and render aid?

6   A.  I attempted to get the AED turned on and ready, and I don't

7   recall if I placed the pads on Mr. Cole's chest or if another

8   officer there did.

9   Q.  How long was or how many times -- Do you know, did they

10  shock Alvin Cole?

11          MS. BAYNARD:  Objection, Your Honor, relevance.

12          THE COURT:  I'll allow it.

13          THE WITNESS:  From what I recall, the AED advised no

14  shock.

15  Q.  Like don't shock him at all?

16  A.  Correct.

17  Q.  Meaning there was a heart beat or there wasn't a heart beat?

18  A.  I don't know the specific or the technology in the AED on

19  when it advices for a shock to go through or when it does not.

20  All I recall is that the AED advised no shock.

21  Q.  Okay.  I presume Alvin Cole -- Prior to you taking the AED

22  device out of Shamsi's car and over to where they were providing

23  medical assistance, was he was handcuffed?  That's standard

24  protocol, correct?

25  A.  It is protocol, but I do not recall if he was handcuffed at

1    that time.

2    Q.  While they were working medically on Alvin Cole, what was he

3    doing?

4    A.  May I ask who?

5    Q.  I apologize.  I will rephrase.  What was Alvin Cole doing?

6    What was the body doing?  Was he making noise?  Was he saying

7    words?  Was he gurgling?  Was he coughing?

8    A.  I don't recall.  I just remember him laying on his back.

9    Q.  Bleeding?

10   A.  Yes.

11   Q.  How long did they render aid?

12   A.  I can't accurately give an answer to that.  It all happened

13   in a quick flash from what I recall with it being over five

14   years ago.

15   Q.  Sure.  But you are trained to kind of have a sense of time

16   as an officer, true?

17   A.  To a certain capacity I guess.

18   Q.  To that capacity, how long were they rendering aid?

19           MS. BAYNARD:  Objection, asked and answered.

20           THE COURT:  If he has any idea, he can answer.

21           THE WITNESS:  I don't recall.

22   Q.  More than ten minutes, less than ten minutes?

23   A.  I don't know.

24   Q.  Okay.  You didn't shoot your gun that day, correct?

25   A.  No, I did not.

1    Q.   Would it be fair to say that your car number, just so we're

2    clear, was 235 at that time.  Not your car number, your ID

3    number?

4    A.   Correct.

5    Q.   So that ID number whenever you went, you would say 235 to

6    the mall, 235 Mayfair, whatever.  That's letting dispatch know

7    that Dexter Schleis is moving from one location or in a

8    different point, right?

9    A.   To a certain degree, yes.

10   Q.   What is the other degree?  What part of that am I wrong?

11   A.   The numbering system is based off of where you're going to

12   be patrolling or where you're assigned to for your shift.  For

13   instance, the three stands for Sector 3, which Mayfair Mall

14   falls under.

15   Q.   Okay.  What is the five?

16   A.   So any number five and greater, it dictates what time you

17   start.  First, second and third shift have two different start

18   times.  So numbers zero through four indicate you start at the

19   2:00 p.m. start whereas five up to nine means you were the

20   3:00 p.m. start.  So it is an early start or late start for your

21   shift.

22   Q.   Okay.  And roughly, how many officers are on any given

23   shift?

24   A.   For day shift, the minimum staffing level between the hours

25   of 6:00 and 10:00 are seven.  From the hours of 10:00 to 2

1  o'clock, they are at nine.  I don't recall what the shift

2  minimums were at the time for second shift back in 2020.  But as

3  of now, the shift minimums for early shift are at 11 throughout

4  the whole shift.  And late shift, I believe -- I don't recall

5  the exact number.  It could be the same that I described for the

6  day shift with the staffing is at the minimum staffing level is

7  nine between the hours of 10:00 and 12:30 where then 12:30 to

8  6:00 would be the seven.

9  Q.  Sure.  And you said three in the middle number, three digit.

10  So 235, the three signifies Mayfair Mall?

11  A.  It signifies the sector in which Mayfair Mall is located.

12  There's four different patrol sectors in the City of Wauwatosa.

13  On early shift, which is second shift, there is a fifth patrol

14  sector, which is Mayfair Mall exclusively.

15  Q.  So everybody is a two, is that correct, second shift?

16  A.  Correct.

17  Q.  So two, second shift.  And then is it one, two, three, four,

18  five for the middle number?

19  A.  Correct.

20  Q.  And then the last number is just start time, correct?

21  A.  Correct.

22  Q.  So if I'm two, one something, where is Sector 1?

23  A.  East end of the city.

24  Q.  Where is Sector 2?

25  A.  The southeast end of the city.

1    Q.   Sector 3.  Where is Sector 4?

2    A.   The north end of the city.

3    Q.   Which sector is the farthest away from Mayfair Mall?

4    A.   At the time, I don't recall because our shift sectors -- I'm

5    sorry, our department sectors have changed, and I don't recall

6    at the time whether Sector 2 used to span from the south end of

7    the city from Hawley Road all the way to 124th up to Watertown

8    Plank.

9         At that time, I don't recall if that's what Sector 2

10   was.  I am going based off how it is now.  Based on how it is at

11   the current time, Sector 2 would be the farthest.

12        MR. CADE:  Thank you.  Those are my questions.

13   **CROSS EXAMINATION BY MS. BAYNARD:**

14   Q.   Officer Schleis, I want to talk about DAAT.  I believe you

15   gave the definition for or when you're permitted to use deadly

16   force.  Can you just --  If I showed you the definition, would

17   you recognize the definition of when you're allowed to use

18   deadly force?

19   A.   Yes.

20        MR. CADE:  I am going to object, Your Honor.  If we

21   can have a brief sidebar on that.  She is getting ready to show

22   something.

23        MS. BAYNARD:  There's been a lot of conversation about

24   DAAT.  I am putting up the DAAT manual that Attorney Cade has

25   been citing to.

1           MR. CADE:  That is the basis for my objection, Your

2      Honor.

3               (Sidebar discussion in chambers.)

4           MR. CADE:  So my objection, Your Honor, is Joseph

5      Mensah did not testify in his deposition that he had concern for

6      anybody else but himself.  Every scenario that I have given each

7      of these officers is their concern for themselves.  Did you

8      have -- In this scenario, if you see a weapon and if it's

9      pointed at you, not pointed at you, do you have a right to

10     shoot?

11              They are now going to try saying, oh well, if there's

12     another officer, you can shoot or if there's someone in the

13     general public, you can shoot, but that's not what Joseph Mensah

14     said, so now they're trying to change it.  And right before you

15     come in, Attorney Wirth is totality of the circumstances.

16     Totality is no where written anywhere when you're dealing --

17              MR. WIRTH:  In DAAT.

18              MR. CADE:  In 1983 in excessive force, it is not

19     totality.  There are three scenarios.

20              MR. WIRTH:  You are objecting to the DAAT definition.

21              MR. CADE:  I am objecting to any testimony that

22     doesn't confirm that what he had a concern with because that now

23     presents a confusing set of information for the jury.  They

24     hear, oh, there was another officer, of course he can shoot.

25     The question is, did Joseph Mensah at the time he pulled the

1    trigger, was the gun pointed at him?

2         MS. BAYNARD:  That's not the question the jury is

3    going to be asked.

4         MR. CADE:  Did he use excessive force?

5         MS. BAYNARD:  Did he use unreasonable force?  We had

6    the same conversation at the pretrial.  Joseph Mensah testified,

7    I will go get his deposition transcript.  He said at the moment

8    that you shot, Cole had the gun pointed at me.  Mr. Cade said,

9    you didn't shoot him.  To say he got the gun, pointed at Shamsi

10   or I am protecting Shamsi, he said I don't know who the gun was

11   pointed at.  I shot because the gun was pointed at me.

12        The totality of the circumstances we're talking about

13   here, it is a dangerous situation.  Joe Mensah testified as I

14   ran up, I told the security guard to get out of the way because

15   they are unarmed, and we're chasing after an armed suspect.

16        So plaintiffs have gotten in with the other witnesses,

17   asked them about DAAT Training.  They posed these hypotheticals.

18   Again, now I want to ask him about their DAAT Training, and I

19   want to pose hypotheticals, and the plaintiffs are objecting to

20   me being able to do that.  I am not sure what the difference is.

21        THE COURT:  The hypothetical you are proposing --

22        MS. BAYNARD:  He suggested a hypothetical.  If the gun

23   is just at your hip, you can't shoot.  Okay, I should be able to

24   ask the witness then based on your training if somebody has a

25   gun in their hand and they are not dropping it and they point

121

1    it, should you be allowed to shoot?  If plaintiffs are allowed

2    to get up there and ask these -- how they perceive the incident

3    happened and ask the witnesses to accept that their training

4    says they cannot shoot in certain situations, then I should be

5    able to get up and ask the exact same questions.

6            MR. CADE:  That hypothetical they just gave, I have no

7    objection to that hypothetical.  I will follow up.  She will put

8    the definition up there that suggests if another officer is

9    nearby or a member of the public is here which an officer can

10   shoot, and that's not what we're confronted with here.

11           If she wants to give her hypothetical, hey, you are

12   confronted with someone who won't drop their gun, that's

13   perfectly fine, I'm okay.  We don't need to flash the

14   definition.  That's my objection.

15           MS. BAYNARD:  Here is the thing.  The definition of

16   subject behavior that justifies an officer's use of deadly force

17   is behavior which causes or imminently causes threat or great

18   bodily harm to you or another person.  I am not sure what --  I

19   didn't bring up DAAT.  Attorney Cade brought up DAAT with the

20   officers.

21           MR. CADE:  If you want to read the definition and cut

22   off other person, that's fine.  We were not dealing with other

23   people.

24           MS. BAYNARD:  That's your closing statement, your

25   closing statements.  If you have to believe that Joseph Mensah

1    only felt fear for himself, the Court has not made that ruling.

2         MR. CADE:  The Court did make a ruling on summary

3    judgment.

4         MR. WIRTH:  This has application for the experts that

5    are coming tomorrow.

6         THE COURT:  Hold on, well I'm going to let it in, but

7    I think you have to be pretty careful how you phrase it because

8    there's a real fact issue.  And the fact issue really has to do

9    with -- One of the fact issues has to do with why --  What was

10   Mensah's focus in shooting?

11        As I recall the testimony, and I probably said it in

12   my opinion, that Mensah said that he was, you know, concerned

13   only really about himself at the time.  So you can mention the

14   law is that he could shoot somebody out of concern for another

15   person not only himself, but the plaintiffs can -- You know,

16   they can go and try to undermine that with the testimony of

17   Mensah, so they can say that wasn't the case, but I think I

18   can't just shut you off completely for this.

19        MR. WIRTH:  The other concern that we discussed while

20   you were out of the room is the expert testimony absolutely is

21   going to mention the definition of DAAT.

22        THE COURT:  Let's see what happens.  We will have

23   another fight then.

24             (Back in the courtroom.)

25        (By Ms. Baynard.)

1    Q.  Officer Schleis, I am showing you what's marked as a defense

2    exhibit or a portion of it 106, and I will represent to you it

3    is a portion of the DAAT manual.  Do you recognize this

4    definition in front of you as being the, I guess, behavior that

5    justifies an officer's use of deadly force?

6    A.  Yes.

7    Q.  And you agree with me that based off of DAAT and your

8    training and basically -- not basically, every police officer in

9    the State of Wisconsin is trained on DAAT, correct?

10   A.  Yes.

11   Q.  Okay.  And you'll agree with me that the definition -- So a

12   subject behavior that justifies an officer's use of deadly force

13   is behavior which has caused or imminently threatens to cause

14   death or great bodily harm to you or another person.  Do you

15   agree?

16   A.  Yes.

17   Q.  That's what you're trained on, true?

18   A.  Yes.

19   Q.  Okay.  Attorney Cade got up and did some examples.  Are you

20   required, based on your DAAT Training and now seven and-a-half

21   years experience as a police officer, are you required to wait

22   until a subject shoots you before you shoot them?

23   A.  No.

24   Q.  Okay.  And this word imminent.  So you have it on your

25   screen.  Can you read to the jury the definition of imminent?

124

1    A.   Imminent means about to happen.

2    Q.   Okay.  Keep going.

3    A.   An imminent threat is an immediate threat for subjects.

4    Would you like --

5    Q.   That's okay.  Would you agree with me that an armed subject

6    who has been involved in a disorderly conduct who is refusing to

7    drop their weapon could pose an imminent threat?

8    A.   Yes.

9    Q.   Okay.  And would you agree with me that an armed subject

10   whose refusing to drop their weapon and point it at an officer

11   would pose a deadly threat?

12   A.   Yes.

13   Q.   When you're talking about -- We've talked about DAAT in the

14   abstract and your training.  When you are assessing whether or

15   not officers are permitted to use deadly force, you'd agree with

16   me it is a totality of the circumstance assessment, true?

17   A.   Yes.

18   Q.   You're not just focusing on the immediate.  You are focusing

19   on, I guess, information that's leading up to this event, true?

20   A.   Yes.

21   Q.   Now, we've talked about protocol.  Have you -- Are you

22   trained when you're involved in a pursuit that all the officers

23   should be yelling out their presence on the scene so the

24   situation -- We just watched a video.  If we don't hear officers

25   yelling, Officer Shamsi, Officer Mensah, Officer Johnson, is

125

1  that unusual to you?

2  A.  Unusual for every officer to announce?

3  Q.  To be simultaneously yelling out their names as you are

4  chasing someone?

5  A.  It is unusual.

6  Q.  Would you agree that somebody bringing a gun to a mall is a

7  dangerous situation?

8  A.  Yes.

9  Q.  And on February 2nd, I believe you were assigned to Mayfair

10 as your squad area, true?

11 A.  I was assigned as Sector 3 car, which was the backup to any

12 calls at Mayfair Mall.

13 Q.  Okay.  And why do you respond?  What is the information

14 you're responding to on February 2nd?

15 A.  I was responding to either it was dispatched as a domestic

16 incident or disorderly conduct incident with a firearm involved.

17 Q.  And Wisconsin is an open-carry state.  Did you know at the

18 time that Alvin Cole was 17?

19 A.  No.

20 Q.  Okay.  Are 17-year olds allowed to open carry in Wisconsin?

21 A.  No.

22 Q.  Is anybody allowed to bring firearms to the mall?

23 A.  No.

24 Q.  And --

25          MR. CADE:  Judge, objection.  There is a motion in

1    limine.  Move to strike the last question, Your Honor.

2           THE COURT:  I will strike the last question pursuant

3    to our last discussion regarding preliminary proceedings.

4           MS. BAYNARD:  Okay.

5    Q.  Officer Schleis, is the report of a gun at the mall a

6    high-priority call?

7    A.  Yes.

8    Q.  Why is that?

9    A.  It is a very busy location, and there are no -- Based on my

10   experience with working for the City of Wauwatosa as a police

11   officer, there have been -- I've been a part of at least one

12   incident at the mall prior to this --  prior to the February

13   case we're discussing today with a firearm being shot off at the

14   mall.

15   Q.  And do you specifically recall -- Strike that.  The

16   information that you are receiving about the call, how is that

17   coming to you?

18   A.  Could you repeat?

19   Q.  Yeah.  So you get dispatched or you hear over dispatch that

20   there is an incident going on at the mall, correct?

21   A.  Yes.

22   Q.  How is that information being relayed to you?

23   A.  It's being relayed to me through dispatch as essentially

24   respond to the mall for an incident involving a firearm between

25   two parties.

1   Q.  And at some point, you do respond to the mall, true?

2   A.  Yes.

3   Q.  Okay.  And when you respond to the mall, it is still an

4   active investigation, right?

5   A.  Yes.

6   Q.  What is your role or what steps do you take once you get to

7   the mall?

8   A.  I was advised -- I don't recall who advised me, but to go

9   speak with the victim of this incident.

10  Q.  Okay.  What information did you gather from the victim?

11  A.  I gathered that the victim stated the suspect regarding this

12  investigation was a younger male black subject wearing a gray

13  sweatshirt and was wearing a cross-chest satchel.

14  Q.  When you get this, you meet with the victim of the

15  disorderly conduct, and you get a description of who we now know

16  to be Alvin Cole, true?

17  A.  Yes.

18  Q.  What do you do when you get the description of the subject

19  of the domestic violence while armed or disorderly conduct while

20  armed?

21  A.  I immediately radioed the description of the subject

22  regarding this investigation so any assisting -- any other

23  assisting cars that might have floated toward the mall were

24  aware of who the subject was described as and what he was

25  wearing.

128

1  Q.  Okay.  And at some point while you're speaking with the

2  victim, does he tell you that the armed subject or the subject

3  in this pulled a gun?

4          MR. CADE:  Objection, Your Honor.  This is part of the

5  motion in limine, and it is hearsay.

6          THE COURT:  Can you rephrase it?

7  Q.  At some point, is it reported to you that Alvin Cole flashed

8  a gun?

9          MR. CADE:  Objection, Your Honor.  Motion in limine.

10         MS. BAYNARD:  Let's sidebar.  I'm not sure what motion

11  in limine we are talking about.

12         (Sidebar taken.)

13         (Back on the record.)

14  Q.  Officer Schleis, when you're speaking with the victim and

15  just so we're getting back to where we are.  You learn a

16  description of the armed subject who we now know to be Alvin

17  Cole, and you broadcast that information, correct?

18  A.  Yes.

19  Q.  How are you broadcasting that information?

20  A.  Through my radio.

21  Q.  Okay.  With the information you are broadcasting go to all

22  the other officers?

23  A.  Correct.

24  Q.  And that is kept in I guess --  Would you be able to

25  identify or what was your squad number then?

129

1    A.   235.

2    Q.   So you are meeting with the victim.  You're investigating

3    this incident.  You get a description.  And at some point, you

4    learn that Mr. Cole flashed the rear end of a gun out of the

5    fanny pack during his altercation with the victim, true?

6    A.   Yes.

7    Q.   You broadcast that to all the other officers, true?

8    A.   Yes.

9    Q.   In response to the broadcast of the brandishing of a gun,

10   does your supervisor decide to add himself to the call?

11   A.   I believe so, yes.

12   Q.   Now, after you get this information, what are the next steps

13   in your investigation?

14   A.   I'm sorry, could you repeat?

15   Q.   Yeah.  You've gotten the information out.  We have a

16   description of the armed subject, Alvin Cole.  We have

17   confirmation or a report that he brandished a gun during the

18   altercation.  What do you do next?  After broadcasting that

19   information, what do you do next?

20   A.   I finished talking with the victim regarding this incident,

21   and I began conducting an area check while Officer Albiter, who

22   is the primary officer investigating this complaint, went to the

23   mall security command center to review video as well.

24   Q.   Is Mayfair Mall a pretty big property?

25   A.   Yes.

1   Q.  It is large.  So after you go and you're looking at videos,

2   are you trying to locate the armed subject?

3   A.  I did not review video.  From what I recall, I remember

4   hearing or and I'm not sure if it was Mayfair Mall security or

5   another officer checking the area, but I was advised that the

6   subjects and Mr. Cole were walking outside.

7   Q.  Okay.  And once you got -- At some point, do you get eyes or

8   make contact with the armed subject who we now know to be

9   Mr. Cole?

10  A.  Yes.

11  Q.  Where does that occur?

12  A.  I am going to try my best to explain this.  It was on the

13  eastern side parking lot of Mayfair Mall toward -- and on the

14  south end of the Nordstrom parking deck.

15          MS. BAYNARD:  I'd like to show the witness an aerial

16  overview of Mayfair Mall that's been marked as Defense

17  Exhibit 1033.

18          MR. CADE:  No objection.

19  Q.  You may need to step down, Officer Schleis.  I will ask you

20  to step down and speak up.

21  A.  Yep.

22  Q.  Can you point to the jury where you first encountered the

23  armed subject in the gray hooded sweatshirt?

24  A.  Just give me a moment.

25  Q.  You're pointing to near the east parking garage?

131

1   A.   Correct.

2   Q.   And you can get back on the stand.  When you make contact

3   with this armed subject, I guess what happens next?  So what

4   happens when you attempt to make contact with the armed subject?

5   A.   They fled on foot.

6   Q.   Okay.  And did you get out of your car and pursue them?

7   A.   Yes.

8   Q.   Were you yelling stop, police?

9   A.   Yes.

10  Q.   And at this point, are you -- Do you observe or during your

11  pursuit, do you have a focus -- Initially of your pursuit, which

12  subject are you focused on?

13  A.   I was focused on the subject wearing the gray sweatshirt,

14  and I could tell that this was the subject that we were mostly

15  interested in because I could see black across the top on his

16  back indicating this was the subject with the satchel across his

17  chest with the firearm involved in this.

18  Q.   When you're chasing, you start somewhere over here.  Can you

19  just point to where the pursuit -- where you end?

20  A.   At the end of my pursuit?

21  Q.   Yes.

22  A.   Approximately somewhere over here in the Cheesecake Factory

23  parking lot driveway somewhere, over here between these two

24  buildings.

25  Q.   And you end your pursuit of the armed subject because you go

1    after an individual in a blue sweatshirt, true?

2    A.   I'm sorry, can you repeat?

3    Q.   So you stop your pursuit of the armed subject because you

4    see an individual with a blue sweatshirt that you go after?

5    A.   Correct.

6    Q.   At any point from backup when you made contact with Mr. Cole

7    where the beginning of the pursuit starts, are there other

8    officers there?

9    A.   Yes.

10   Q.   Would you say that you have them surrounded by police cars?

11   A.   Yes.

12   Q.   Clearly marked police cars?

13   A.   Yes, with their emergency lights activated.

14   Q.   You're ordering them to stop?

15   A.   Yes, over the squad's PA system.

16   Q.   Does Mr. Cole stop?

17   A.   No.

18   Q.   When you're chasing them from the east parking garage to the

19   area where you peeled off and got the subject in the blue

20   sweatshirt, does Mr. Cole ever stop?

21   A.   No.

22   Q.   Does he put his hands up?

23   A.   No.

24   Q.   Does he do anything to indicate that he's going to comply?

25   A.   No.

1  Q.  And when the foot pursuit first starts, do you hear over the

2  radio, foot pursuit westbound through the lot?

3  A.  Yes.

4  Q.  Do you recall dispatch saying all squads foot pursuit

5  through the west lot?

6  A.  Yes, as it is our department policy for all squads to

7  respond to the foot route location.

8  Q.  Why is that?

9  A.  Safety reasons.

10  Q.  What is -- I guess what makes foot pursuits unsafe?

11  A.  A number of factors can make it unsafe.  A sudden assault of

12  an officer if a subject that -- an officer is in foot pursuit

13  with decides to turn around a blind corner and that officer runs

14  past, it could be an element of surprise for a suspect to do an

15  element of surprise on the officer to get away.

16  Q.  Does a foot pursuit -- Does somebody fleeing from you

17  demonstrate that they intend to comply?

18  A.  No, it demonstrates active resistance.

19  Q.  At some point during this pursuit, we see you kind of peel

20  off, and I believe you are taking into custody I am going to say

21  blue sweatshirt.  Do you recall doing that?

22  A.  Yes.

23  Q.  And at the point when you get up to blue sweatshirt, does he

24  stop?

25  A.  Yes.

134

1    Q.  Is he compliant?

2    A.  Yes.

3    Q.  And when you hear -- At some point, you hear a gunshot,

4    true?

5    A.  Yes.

6    Q.  What are you doing when you hear that gunshot?

7    A.  At that time, I was placing the subject in the blue

8    sweatshirt into custody.

9    Q.  Okay.  And when you hear that gunshot, what do you do?

10   A.  So while I was taking the subject into -- the subject with

11   the blue sweatshirt into custody, he was laying down with his

12   head pointing north.  I was directly on top of him also facing

13   north.  I heard a single gunshot, and I made -- ducked to cover

14   to protect myself and the subject.

15   Q.  So how far do you or -- Strike that.  So at the time that we

16   hear Cole's first shot, you are covering with your body blue

17   sweatshirt.  Okay.  Now, at some point after the shooting or you

18   hear a second volley of shots, true?

19   A.  Yes.

20   Q.  If -- We talked a little bit about standard protocol, et

21   cetera.  In your law enforcement career training experience, et

22   cetera, do you ever deviate from a standard protocol if there's

23   an emergency?

24   A.  I'm sorry, could you repeat the question?

25   Q.  I will ask a better question.  Are there any bright-line

1   rules in policing?

2   A.  Depends on the situation.

3   Q.  Would you say that most situations are going to be, you

4   know, fact determinative?

5   A.  Yes.

6   Q.  Would you agree with me that an officer's actions are

7   largely dictated by a suspect's actions?

8   A.  Yes.

9           MS. BAYNARD:  I have nothing else.  Thanks, Officer

10  Schleis.

11          MR. CADE:  Redirect, Your Honor.

12  **REDIRECT EXAMINATION BY MR. CADE:**

13  Q.  There was a definition that was thrown up, Officer Schleis,

14  and I want to talk about that for a moment.  When we talk about

15  imminent danger, et cetera, if an officer testifies that the

16  only danger that they are concerned with is a suspect pointing a

17  gun at them, are you with me so far?

18  A.  Yeah, I am paying attention.  I am listening.

19  Q.  If an officer says the only thing that I'm concerned about,

20  I'm not concerned about other people, I'm not concerned about

21  other officers, I'm only concerned for myself.  Are you with me?

22  And that officer says, the person pointed a gun at me, and

23  that's why I used deadly force.  Under DAAT Training if a gun

24  was pointed at them, they could use deadly force, right?

25  A.  Yes.

136

1    Q.  But if the officer's only concern is for them self, they're

2    not aware of anybody else and the gun was never pointed at them,

3    they could not use deadly force, correct?

4    A.  Could you repeat the last part?

5    Q.  Sure.  First scenario I don't know of anybody else.  I just

6    know about me, and I'm in danger because they pointed a gun at

7    me.  That's deadly force or the use of deadly force is

8    available, correct?

9    A.  Yes.

10   Q.  Same scenario except the gun is never pointed at them.

11   Deadly force cannot be used in that scenario, correct?

12   A.  Based upon this specific hypothetical scenario, I really

13   can't answer.  I'm not there to --

14   Q.  Sure, let's go back.  We're talking about Joseph Mensah.

15   Now, Mr. Mensah said in his deposition, he will being cross

16   examined.  You won't be here, though.  I am sorry, page 224,

17   line 9.  Okay.  Me questioning.  "So I just want to make

18               sure when you fired, you didn't see any other

19               officers.  This was solely he's got, the gun

20               pointed at me.  That's why I am engaging."

21               Answer:  "Correct."

22               Question:  "Okay, you weren't starting to

23               say hey, he's got it pointed at Shamsi, so I'm

24               going to shoot to protect Shamsi?"

25               Answer:  "I don't know who else he pointed it at.

137

1    I just know at one point, he pointed at me."

2  Are you with me so far?

3  A.  Yes.

4  Q.  Okay.  Now, we're in that scenario.  Officer Mensah -- You

5  are Shamsi.  The jury got to hear from Shamsi, okay?  Yes?

6  A.  Yeah.

7  Q.  Officer Mensah is off to the 7 o'clock, 8 o'clock and behind

8  Shamsi.  Are you with me so far?

9  A.  From what I am imagining, I believe so, yes.

10  Q.  You're Shamsi.  Mensah is here, seven or 8 o'clock?

11  A.  Yep.

12  Q.  The subject, Cole, is six feet as many as 15 feet in front

13  of Shamsi, okay?

14  A.  Okay.

15  Q.  Mensah is further away, seven or 8 o'clock, yes?

16  A.  Yes.

17  Q.  Okay.  Mensah says, I'm concerned for nobody but me because

18  he pointed the gun at me.  Are you with me?  And Mensah says,

19  while he's on his hands and knees or the testimony will be from

20  Shamsi and everyone else that he curled up and pointed at

21  Mensah.  Are you with me in that scenario?

22  A.  Yes.

23  Q.  If, in fact, Alvin Cole on his hands and knees curls under

24  and points a gun at Joseph Mensah, you would agree with me

25  deadly force is permitted, yes?

138

1   A.   From what I am envisioning in my head, yes.

2   Q.   Right.  He's pointing a gun, deadly force, right?

3   A.   Yes.

4   Q.   But if he's still on his hands and knees and he never points

5   the gun at Joseph Mensah and Mensah's only concerned for himself

6   in that scenario, Joseph Mensah does not get to shoot and use

7   deadly force, right?

8   A.   Going back, it is the totality of the circumstances.

9   Q.   I understand.  Again, if the gun is not pointed at him,

10  Mensah is not concerned about anybody else, any other

11  circumstance other than himself, if it is pointed at him, he

12  gets to shoot.  If it is not pointed at him, he doesn't get to

13  shoot, true?

14  A.   I'm sorry, could you repeat?

15  Q.   Sure.  If the totality is Mensah's only concerned for

16  himself, he's not thinking about any other circumstances, any

17  other person.  If the gun is pointed at him, he can shoot.  If

18  it is not pointed at him, he cannot shoot, right?

19  A.   I didn't see any of that.  I can't answer that question

20  fully.

21  Q.   You answered the question with the definition, sir.  I'm

22  just following up.  Under your training for DAAT, right, if I'm

23  down on my hands and knees --

24          MS. BAYNARD:  Your Honor, object.

25  Q.   I have a gun pointed --

139

1          THE COURT:  Sorry what?

2          MS. BAYNARD:  So what I am objecting to, this is

3    improper hypothetical.  The totality of the circumstances, there

4    is not a definition of it.  He is talking about it in the

5    abstract, the totality of the circumstances.

6          MR. CADE:  I can question him on it, Your Honor.

7          THE COURT:  Yeah, I'll allow this line of questioning

8    to a certain extent.

9    Q.  So Officer Schleis, whether I'm six feet away or 15 feet

10   away if I'm down on my hands and knees and you're behind me at

11   my 7 o'clock and I don't move -- gun in my hand, but I don't

12   move and Joseph Mensah says the only thing I was concerned with

13   was me, not Shamsi, not anybody else.  If Alvin Cole tucked

14   under and pointed the gun, you'd agree with me deadly force was

15   available?

16   A.  Yes, at that point.

17   Q.  And if Alvin Cole never moved with Mensah being behind him,

18   did not move at all, the gun didn't flinch, he didn't do

19   anything, he did not move, deadly force is not available in that

20   scenario, correct?

21   A.  At that point, Mr. Cole has already displayed a weapon,

22   intent, and he has a delivery system to fire that weapon.

23   Q.  So you're saying he's on the ground.  He's not moving.  He's

24   not pointing at the officer.  The officer's only concerned for

25   himself.  You are saying I can shoot?  That's what you're

1  saying?

2  A.  At that point, Officer Mensah, I believe, was defending his

3  life.

4  Q.  Without a gun pointed at him he's defending his life?

5  A.  The weapon was just fired in his direction seconds prior to

6  that.

7  Q.  We've had testimony -- No one knows who fired a weapon.  So

8  I didn't bring that up as a hypothetical in any part of it,

9  right?  Did you hear me say that he's fired his weapon?

10         MS. BAYNARD:  Objection, Your Honor.  This misstates

11 the prior testimony, and it is an improper hypothetical.  He

12 gave his answer.

13 Q.  Did you hear me say Alvin Cole is on the ground having fired

14 his weapon?  Did you hear those words coming out of my mouth?

15 A.  No.

16 Q.  Let's take that out of your head.  Again, the only thing

17 Joseph Mensah is concerned with is himself.  So if he doesn't

18 point a gun, the gun is not pointed at Mensah, Alvin Cole is in

19 front of me.  He's not turning, he's not moving, deadly force at

20 that moment in time is not available, right?

21 A.  I'm just having trouble --  I wasn't there.  I didn't see

22 where the firearm was pointed at.

23 Q.  Absolutely.  But you answered the question with the

24 definition, right?  It was up there and you said, oh yeah, I can

25 use deadly force.  I am asking you the exact same thing, but I'm

141

1  actually giving you facts.

2  THE COURT:  Mr. Cade, I think they are having trouble

3  with the hypothetical.

4  Q.  The only thing I'm changing -- Officer Schleis, the only

5  thing is if Joseph Mensah's concerned for himself, Alvin Cole is

6  on the ground, Alvin Cole is not moving.  If he points the gun

7  at Mensah, you agree deadly force is available, true?

8  A.  Yes.

9  Q.  Okay.  So all I'm asking if the gun is not pointed at Joseph

10  Mensah and he's not concerned about any other thing as part of

11  the totality of circumstances, deadly force is not available at

12  that time, right?  You can say it?

13  A.  Only based off of the testimony you've given and what is on

14  record, I am forced with no other option here.

15  Q.  That I am correct, if the gun is not pointed at him based on

16  everything, he cannot fire?

17  A.  Can you repeat that?

18  THE COURT:  I think we pushed enough on this, counsel,

19  and I don't think the officer is an expert on police procedure.

20  MR. CADE:  I am not asking him to it be an expert.  He

21  was asked -- That's why we had a sidebar about DAAT Training.

22  If the gun is not pointing, he doesn't have a right to shoot

23  under those specifics facts.

24  THE COURT:  You made your argument.

25  MR. CADE:  Thank you, Your Honor.

142

1          THE COURT:  Move on, please.

2          MR. CADE:  Those are my questions, Your Honor.

3          MS. BAYNARD:  Quickly, Your Honor.

4   **RECROSS EXAMINATION BY MS. BAYNARD:**

5   Q.  When you're talking about the totality of circumstances,

6   whether you use deadly force, that's based on information you

7   have available to you at the time you decide to use deadly

8   force, true?

9   A.  Yes.

10  Q.  So would that information include information that came in

11  about the initial call?

12  A.  I'm sorry, could you repeat?

13  Q.  Yeah.  Would that include -- So when we're talking about the

14  totality of the circumstances, would that include information

15  that you learn from dispatch?

16  A.  Yes.

17  Q.  Would that include information that a subject brandished a

18  firearm?

19  A.  Yes.

20  Q.  Would that include information that the subject fled from

21  police?

22  A.  Yes.

23  Q.  Would that include information that a subject was refusing

24  to drop a firearm?

25  A.  Yes.

1  Q.  We're talking about a totality.  That's everything, true?

2  A.  True.

3          MS. BAYNARD:  I have nothing else.

4          MR. CADE:  Just follow up briefly, Mr. Schleis.

5  **RE-REDIRECT EXAMINATION BY MR. CADE:**

6  Q.  If you report in that there's a gun at the mall and you've

7  talked to the other party and up to the shooting, that's what

8  five, six, seven minutes later?

9  A.  I don't recall the timeframe of this investigation.

10  Q.  We've shown a bunch of videos that are three minutes showing

11  females coming out of the mall.  We see Johnson's car and have

12  Shamsi's video.  It is three minutes until the shooting, okay?

13  A.  Yep.

14  Q.  Okay.  You clearly have reported all of this minutes before

15  that, right?

16  A.  I don't recall the exact time I spent with the victim

17  regarding this.

18  Q.  You spent -- But whether you spent a minute or two minutes

19  or three minutes, that plus three minutes on video is more than

20  five, right?

21  A.  Matthew Johnson particularly, yes.

22  Q.  So during that entire totality if Joseph Mensah says the

23  only thing I'm concerned with is me and he pointed a gun at me,

24  not he had a gun, not he was running, not anything else because

25  he's on the ground.  If that is it at that point in time under

1    the totality and he's not pointing a gun, he doesn't have a

2    right to shoot, correct?

3    A.  I can't answer this question totally.

4    Q.  Officer Schleis, you're answering the question for the

5    defense.

6         MR. CADE:  No further questions, Your Honor.  I think

7    it has been made.

8         THE COURT:  Officer, you're excused.

9         THE WITNESS:  Thank you.

10        (Witness excused.)

11        THE COURT:  I think it is time to call it a night.  I

12   appreciate you're listening.  We're making good time.  At least,

13   I think so.  I can't swear to it.  I think we're making good

14   time, so you're excused.  See you tomorrow at 8:30.  Don't talk

15   about the case, and we'll keep moving fast I hope.

16        BAILIFF:  All rise.

17        (Jury excused.)

18        THE COURT:  I have a question for the lawyers.

19        MS. BAYNARD:  My question or where I think we need

20   clarification is this idea of what this ruling that plaintiffs

21   believe the Court made that Joseph Mensah was only concerned for

22   himself or could only testify to his concern for himself.

23   Because I think going forward when Officer Mensah testifies,

24   there's plenty of experts that will talk about DAAT.  While I

25   agree that they are allowed to on cross, their closing statement

145

1    will be that he engaged because he was protecting himself.  It

2    is completely blowing past the testimony when he says I knew he

3    was armed, I told the mall security guard to get out of the way

4    because we have an armed subject who is fleeing from us.  And

5    so --

6                THE COURT:  You're going to bring that out.

7                MS. BAYNARD:  I agree we're going to draw an objection

8    every single time.

9                THE COURT:  Let's not draw an objection every time.

10   It gets a little bit too many objections.

11               MR. CADE:  We're familiar with your ruling, Your

12   Honor, and we'll act accordingly.

13               MS. BAYNARD:  That has not been the ruling.

14               THE COURT:  Well, I think I'll let you explore the

15   issues.

16               MS. BAYNARD:  I agree.  Plaintiffs keep saying, Judge,

17   you already ruled, you already ruled.  That's where I am, like,

18   what ruling are we talking about?

19               THE COURT:  Ask Mr. Cade.  I have another question

20   and; that is, since our fruitful phone conference last week

21   about settlement, is there any further discussions?

22               MR. CADE:  No, Your Honor.

23               MS. BAYNARD:  No.

24               THE COURT:  Why not?

25               MR. CADE:  They have our phone number, Your Honor.

146

1  They have not called anybody.  No phone, no text, no smoke

2  signal.  You asked me the number.  I provided it.  Joseph Wirth

3  said I have to talk to the insurance company, I have to talk to

4  Wauwatosa.  Silent.

5       THE COURT:  I think that your demands such as it was I

6  think maybe was a little more than he could deal with.

7       MR. CADE:  That's fine, Judge.

8       THE COURT:  I don't know.

9       MR. CADE:  Judge, there's an old adage.  You don't bid

10  against yourself.  If that shocked them --

11       THE COURT:  Mr. Wirth or Ms. Baynard, any interest?

12       MS. WIRTH:  I did relay the demand, and I think the

13  Court has accurately assessed that it was --  it was so out of

14  line that they didn't know a counter would be productive.  I can

15  always ask again but --

16       MR. CADE:  We're good, Judge.

17       THE COURT:  I brought up the idea of something

18  around --

19       MS. BAYNARD:  It was one fifth of what they asked for.

20       MR. CADE:  I understand.  We're not near there.

21       THE COURT:  You're not near there?

22       MR. CADE:  No thank you, Judge.

23       THE COURT:  I tried.

24       MR. CADE:  We appreciate it.  Just so you know, we've

25  got two officers tomorrow.  We also have a citizen witness.  She

147

1    cannot be here before 10:30, so I don't know the timing for the

2    officer.  So if we finish the two officers early, we'll have a

3    bit of a break because in the afternoon at 1:15, the medical

4    examiner is coming by subpoena, and I've already cleared that

5    with Milwaukee County Corporation Counsel.  That's the time she

6    was told.

7              She is a professional.  Rather than having her sit,

8    you know, we told her 1:15 give or take just in terms of timing.

9              THE COURT:  So you have two cops in the morning and

10   then you got --

11             MR. CADE:  A citizen witness.  We may have another

12   citizen witness.

13             THE COURT:  When is your expert coming?

14             MR. CADE:  The expert will be Wednesday, testifying on

15   Wednesday, Judge.  He might be Tuesday afternoon.  The medical

16   examiner will be quite some time.  We're making time, Judge.

17             MS. BAYNARD:  I want to make sure if the medical

18   examiner is done tomorrow, do you have another witness after

19   her?  I know we have the two officers.

20             MR. WIRTH:  Olson at 8:30.

21             MR. CADE:  We may or may not call Joseph Mensah

22   depending on the timing of the medical examiner.

23             THE COURT:  I would plan on it.  Doesn't sound like

24   you have a full day of testimony.

25             MR. CADE:  I know.

148

1          THE COURT:  I think you can probably plan on calling

2     the defendant if you're going to call him.

3          MR. CADE:  Absolutely.

4          THE COURT:  And then --

5          MR. WIRTH:  Experts on Wednesday.

6          THE COURT:  Well, I don't know.  If they are available

7     tomorrow, maybe we can finish testimony.

8          MR. CADE:  I don't think we'll finish tomorrow, Judge.

9     We still have to hear from Tracy Cole.  She'll be testifying.

10    The plaintiff will definitely be done Wednesday.  It is just a

11    question of whether Wednesday at 10:00 or Wednesday at noon, but

12    the plaintiff will be done by then if not sooner.  That much I

13    can advice the Court.

14         THE COURT:  Let's do it sooner.

15         MR. CADE:  I think that's pretty quick, Judge.

16         THE COURT:  You have to fill up the time.  I don't

17    want to sit around.

18         MR. CADE:  I understand, Your Honor.

19         THE COURT:  Thanks everybody.

20         BAILIFF:  All rise.

21         (Whereupon proceeding was concluded.)

22

23

24

25

149

1                    C E R T I F I C A T E

2

3          I, SUSAN ARMBRUSTER, RPR, RMR, FCRR, Official Court

4   Reporter for the United States District Court for the Eastern

5   District of Wisconsin, do hereby certify that the foregoing

6   pages are a true and accurate transcription of my original

7   machine shorthand notes taken in the aforementioned matter to

8   the best of my skill and ability.

9

10  Signed and Certified May 19, 2025.

11  /s/Susan Armbruster

12  Susan Armbruster

13

14                  Susan Armbruster, RPR, RMR, FCRR
                    United States Official Reporter
15                  517 E Wisconsin Ave., Rm 200A,
                    Milwaukee, WI 53202
16                  Susan_Armbruster@wied.uscourts.gov

17

18

19

20

21

22

23

24

25

150