UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

ESTATE OF ALVIN COLE,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Plaintiffs,⠀⠀⠀)⠀⠀⠀Case No. 22-CV-856
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Milwaukee, Wisconsin
⠀⠀⠀⠀vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀March 19, 2025
JOSEPH MENSAH,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀**VOLUME 3**
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
----------------------------------------------------------------

**EXCERPT TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff
ESTATE OF ALVIN COLE:⠀⠀⠀⠀⠀⠀⠀Cade Law Group, LLC
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀By: Nathanial Cade, Jr. & Annalisa
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Pusick
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀PO Box 170887
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Milwaukee, WI 53217
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Ph: 414-255-3802
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Fax: 414-255-2804
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀nate@cade-law.com]

For the Defendant
JOSEPH MENSAH:⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀WIRTH & BAYNARD
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀By: Joseph M Wirth & Jasmyne M
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Baynard
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀9898 W Bluemound Rd- Ste 2
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Wauwatosa, WI 53226
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Ph: 414-291-7979
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Fax: 414-290-7960
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Jmw@wbattys.com

U.S. Official Reporter:⠀⠀⠀SUSAN ARMBRUSTER, RPR, RMR, FCRR
Transcript Orders:⠀⠀⠀⠀⠀⠀Susan_Armbruster@wied.uscourts.gov

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.

```
               T-R-A-N-S-C-R-I-P-T   I-N-D-E-X
```

Page

### WITNESSES

ALL WITNESSES:

For the Plaintiffs:

Joseph Mensah

```
Direct Examination by Mr. Cade:                4
Cross Examination by Ms. Baynard:             66
Redirect Examination by Mr. Cade:             88
```

Lori Rom

```
Direct Examination by Mr. Cade:               94
Cross Examination by Mr. Wirth:               99
```

Ricky Burems

```
Direct Examination by Ms. Motley:            100
Cross Examination by Mr. Wirth:              118
Redirect Examination by Ms. Motley:          130
```

For the Defendant:

Sarah Hopkins

```
Direct Examination by Ms. Baynard:           137
Cross Examination by Mr. Cade:               146
Redirect Examination by Ms. Baynard:         160
```

Davion Beard

```
Direct Examination by Ms. Baynard:           161
Cross Examination by Ms. Motley:             175
Redirect Examination by Ms. Baynard:         183
```

Michael Knetzger

```
Direct Examination by Mr. Wirth:             186
Cross Examination by Mr. Cade:               200
Redirect Examination by Mr. Wirth:           215
Recross Examination by Mr. Cade:             217
```

P R O C E E D I N G S

1

2       (Excerpt transcript.)

3       THE COURT:  Ready.

4       MR. CADE:  Plaintiff is, Judge.

5       MR. WIRTH:  Judge, there was a motion filed this

6  morning that apparently seeks to dismiss one of the plaintiffs.

7  That may affect the testimony here today.  Our only concern is

8  the proposal to dismiss it without prejudice, and if we're going

9  to dismiss it, let's be done with it.

10       MR. CADE:  That was a typo.  It is with prejudice.

11       MS. BAYNARD:  We'll stipulate to the dismissal of that

12  claim.

13       THE COURT:  All right.  Well, I'll consider it.  In

14  the meantime, let's go.  Is the jury ready?

15       BAILIFF:  All rise for the jury.

16       (Jury enters.)

17       THE COURT:  Good morning.  Thanks for being on time.

18  I appreciate your attention.  We are a little late.  It wasn't

19  my fault today.  I don't want to put any blame on anybody.

20  We're going pretty good here.  I think we're making descent

21  time.  And motions come up during trial, motions that are

22  matters of law that are really outside the purview of the jury.

23  Sometimes those take a little time.  But Mr. Cade, want to call

24  your next witness.

25       MR. CADE:  We do, Judge.  At this time, we're going to

1  call Joseph Mensah to the stand.

2          THE COURT:  Okay.

3          Joseph Mensah, being first duly sworn to tell the

4  truth, the whole truth, and nothing but the truth, testified as

5  follows:

6          MR. MENSAH:  Yes.

7          THE COURT:  State your name for the record.  And you

8  have to talk close to the mic.  Move the mic around.

9          THE WITNESS:  Joseph Mensah.

10          THE COURT:  Go ahead.

11          MR. CADE:  Thank you, Judge.

12  **DIRECT EXAMINATION BY MR. CADE:**

13  Q.  Mr. Mensah, let's take -- First, you were previously a

14  police officer with the City of Wauwatosa?

15  A.  Correct.

16  Q.  Where are you employed now?

17  A.  The Waukesha County Sheriff's Department.

18  Q.  And how long have you been with Waukesha?

19  A.  About four years.

20  Q.  And how long were you a police officer in Wauwatosa?

21  A.  Six or seven.  I think it was about five actually.

22  Q.  The vehicle that you were assigned on the evening that Alvin

23  Cole was shot, you were 221, correct?

24  A.  That was my squad number, yes.

25  Q.  What I'd like to do, we're going to talk about the evening.

1  I's like a basic map of Wauwatosa.  Nothing to this map.  If you

2  could explain what area you were assigned for that evening with

3  221 was supposed to do?  Okay.  What we have here on the screen,

4  Mr. Mensah, is a map of the City of Wauwatosa, do you see that?

5  A.  I do.

6  Q.  Okay.  And based on your number 221, that tells me second

7  shift, second sector, correct?

8  A.  Correct.

9  Q.  And at the time of the shooting February 2nd of 2020, what

10  was your assigned area, what was Sector 2?

11  A.  Sector 2 is the southern half of the city.  I don't remember

12  if it was south of Walnut or south of Watertown Plank, but it is

13  pretty much the southern half of the city.

14  Q.  Would it be fair that the southern half is -- There is

15  Highway 100.  Is it south of that Highway 100 line or north of

16  the Highway 100?

17  A.  Highway 100 runs north and south.  There's a freeway if you

18  see it.  Just below the 100, that is North Avenue.

19  Q.  I'm using the 100, Highway 100, just as are you.  I know

20  Highway 100 is north/south, but is Walnut Street -- I am not

21  familiar with that street.  Is it south of where that number 100

22  would be or north of that?

23  A.  South of where the number 100 is.

24  Q.  How much further south?

25  A.  I'd say it's roughly where if you can see where that freeway

1    line is underneath.

2    Q.  What freeway line, sir?

3    A.  There is a freeway.  So there is a freeway.  If you can see

4    it, it is gray line right here.

5    Q.  Okay.

6    A.  Walnut is roughly around here.

7    Q.  So the freeway, that's 41, correct?

8    A.  Correct.

9    Q.  And right where there's Water and Park in that area, that's

10   Walnut, correct?

11   A.  Somewhere around here.

12   Q.  Somewhere in that area.  We won't hold you to that.  Where

13   is Mayfair Mall then?

14   A.  Mayfair Mall is right here.

15   Q.  And you had patrol --  Do you have the entire southern

16   portion of Wauwatosa or did you have, like, one quadrant of the

17   southern portion?

18   A.  I don't recall.  Sector 2 can be split up between multiple

19   officers.  I don't know if I had an assist officer that day.

20   Q.  You're not saying Sector 2 is the area here and the other

21   sectors are being the rest of the area?

22   A.  I am.

23   Q.  The entire southern portion you were responsible for that

24   evening?

25   A.  Correct.

1   Q.  You can have a seat.  How many other officers were also

2   assigned on your shift to Sector 2?

3   A.  That night I don't recall.

4   Q.  So let's start with some basics.  You were -- That evening,

5   you were not assigned or you were not dispatched to go to

6   Mayfair Mall, correct?

7   A.  Correct.

8   Q.  Over the radio, you heard that there was a disturbance at

9   the mall, and you decided to go yourself to the mall, correct?

10   A.  Correct.

11   Q.  You did not announce -- Prior to leaving Sector 2 --  Let me

12   back up.  It's fair to say that to go to the mall, you had to

13   leave your sector?

14   A.  Correct.

15   Q.  It's fair to say that to go to the mall, the rest of Sector

16   2 would be left abandoned.  There would be no Wauwatosa police

17   officers, correct?

18   A.  If I was the only one working then, yes, that's correct.

19   Q.  If you're the only one working or if the other Sector 2

20   officer was assigned to go to the mall and you weren't, the fact

21   that you left means Sector 2 was abandoned, right?

22   A.  If there was a second Sector 2 officer that was assigned.

23   I'm not sure if there was a second Sector 2 officer assigned to

24   the mall.

25   Q.  So you abandoned Sector 2 to go to the mall, right?

1    A.   I wouldn't call it abandoned, yes.

2    Q.   You did not inform dispatch 221 is going to the mall,

3    correct?

4    A.   Correct.

5    Q.   When you get to the mall, did you inform dispatch 221 is

6    present?

7    A.   No.

8    Q.   How long were you present at the mall the first time?  There

9    were two times.  You went, you left and came back, right?

10   A.   Correct.

11   Q.   The first time you went, how long were you there at the

12   mall?

13   A.   I'd say, if I remember, about 15-20 minutes.

14   Q.   So 15-20 minutes Sector 2, there's no officer.  You're at

15   the mall.  You don't tell dispatch, correct?

16   A.   Correct.

17   Q.   When you leave the mall, did you inform dispatch by the way,

18   I'm heading back to Sector 2?

19   A.   I don't think I did.

20   Q.   So you leave the mall, you cross back into Sector 2, and you

21   start patrolling again?

22   A.   Correct.

23   Q.   How long were you patrolling in Sector 2 before going back?

24   A.   I don't remember.

25   Q.   Five minutes, 20 minutes?

1    A.   I honestly don't recall.

2    Q.   And then the other officers, I believe maybe it was Johnson

3    indicates, hey, we think we see the suspects, right?

4    A.   I don't know if it was Johnson or if it was the mall channel

5    we're scanning.  I don't know if it was dispatch something -- I

6    heard something over the radio about how they had visual of the

7    suspects by, I believe, it was Nordstrom.

8    Q.   Okay.  So the individuals that they were looking for have

9    now left the congested mall, correct?

10   A.   Correct.

11   Q.   There's definitely more people in the mall than outside the

12   mall in the parking lot all else given, right?

13   A.   I believe so.

14   Q.   Okay.  So they've left the congested mall.  They've stepped

15   out.  You hear something over the radio and then decide I'm

16   going to leave Sector 2 and go back.

17   A.   Yes.

18   Q.   And when you make that decision to leave Sector 2 again and

19   go back to the mall, did you tell dispatch, I'm on my way?

20   A.   I don't think I did.

21   Q.   And, you know, you've heard --  You've been here the entire

22   time.  You heard Shamsi and your other officers, it's good

23   habit, good practice, to announce where you are so everybody

24   knows whose where at any given time, right?

25   A.   No.  That was mistaken or misstated, I guess.  For one, at

1    the time Officer Shamsi had only a couple years on.  He was a

2    fairly new officer.  But either way, it's honestly situation

3    dependent.  And the whole theory of sectors, why we have sectors

4    instead of districts, districts were pretty much set.  Your

5    district was your district.  We had six districts, and you

6    stayed in your area.

7            With sectors, the whole idea behind it is you put more

8    officers where there's more calls for service.  There's more

9    higher traffic, different things.  So it wouldn't be uncommon

10   for at the start of a shift a sergeant might not even assign

11   anyone to Sector 2 because Sector 2 is the, I guess, the least

12   busiest is the best way to say it.  That's the calmest sector if

13   you want to call it.  It's common that sometimes there's never

14   an officer assigned to Sector 2.

15   Q.  That day there was an officer assigned to Sector 2, that was

16   you?

17   A.  Correct.

18   Q.  As you said, it is the calmest meaning there wasn't much

19   action happening in Sector 2 at that time, right?

20   A.  I wouldn't call it action, but there wasn't a call for

21   service or anything going on.

22   Q.  There was no need in Sector 2 for you to provide assistance,

23   issue a ticket, cat out of a tree, whatever.  There was nothing

24   going on in Sector 2, right?

25   A.  At that moment, no.  I should say there was nothing going on

1   that was superseding the more serious incident going on at the

2   mall.

3   Q.   In fact, when I deposed you and I asked you, you indicated

4   there was nothing else going on at the time, right?  So it's not

5   a question of superseding, there's nothing going on.

6   A.   I wouldn't say there's nothing going on.  It is impossible

7   for me to know what's going on in the sector.  Sector 2 is very

8   large, so I can't say for absolutely certain nothing is going

9   on.  If I did, I misspoke.

10  Q.   In the sense there was nothing for dispatch saying, hey, we

11  might need a squad car to go over here and check on somebody or

12  do anything like that, right?

13  A.   Not that I recall.

14  Q.   Okay.  So the second time you go -- And you mentioned

15  Shamsi.  You said he was a newer officer.  So he had only been

16  with Wauwatosa for a short period?

17  A.   Correct.

18  Q.   You know he actually had been in the military for years,

19  correct?

20  A.   I believe so, yes.

21  Q.   And so Shamsi, you're not suggesting that somehow he made up

22  protocol for you to announce where you're supposed to be, are

23  you?

24  A.   I am not saying he made it up.  He misspoke.  That was not

25  the protocol to announce every time you leave the sector.  That

1  is the whole idea behind sectors.  The sectors are kind of

2  fluid.  You float around the sectors on what the call for

3  service is.

4          If you're assigned to Sector 4, for example, and

5  there's a lot of cars being broken into in Sector 3, you name

6  it, any kind of incident, you can float to another sector to

7  assist.  You don't have to announce I'm leaving my sector to go

8  to this sector.  You're responsible for yours.  But at the same

9  time, it's fluid.  It's not a set line that you have to leave.

10          You don't have to announce over the radio, I'm

11  crossing this street to go to this sector.  That's not how it

12  works.

13  Q.  I'm not saying you're leaving the sector and the minute you

14  step over the line you have to radio in, hey, I'm in Sector 3,

15  no, I'm back in Sector 2.  What I'm saying, though, is you

16  leaving a sector open and no one -- Dispatch does not know that

17  the entire southern portion that's boring and nothing is going

18  on, they don't know there's not an officer there.  You go to the

19  mall -- The mall is not --  Let me rephrase.  The mall is

20  literally not -- There is a line Sector 2 and you step over and

21  you're at the mall, correct?

22  A.  Correct.

23          MS. BAYNARD:  Objection to the form of the question.

24          THE COURT:  It is getting kind of --

25          MR. CADE:  I will rephrase.

1    Q.   You don't step over a line at Walnut you say and go into a

2    different sector and it is the mall, right?

3    A.   Correct.

4    Q.   You actually have to drive a bit to get to the mall,

5    correct?

6    A.   It's only a few blocks, correct.

7    Q.   It's more than a flew blocks, right, half a mile?

8    A.   I believe Walnut is roughly the 2900-block.  Mayfair Mall is

9    the 2500-block.  It's only a few blocks.

10   Q.   Okay.  That's only a few blocks going north/south, but you

11   also got to go east/west, right?

12   A.   Correct.

13   Q.   You've got to go east/west.  You also have stop lights,

14   correct?

15   A.   Okay.  Maybe I'm misunderstanding.  Are you saying from --

16   You said from Sector 2 to the mall, correct?

17   Q.   Right.  What I'm saying, you don't know where in Sector 2

18   you were exactly when you decided to join in looking for the

19   subjects, correct?

20   A.   That's incorrect.

21   Q.   Okay.  Where were you?

22   A.   When I heard the call that they had eyes on, I was at

23   Mayfair and Bluemound.

24   Q.   That's south of Walnut, correct?

25   A.   Correct.

1    Q.  So it's not just a few blocks.  You were further away?

2    A.  When you asked the question you said Sector 2 is --  You

3    asked the distance between Sector 2 and the mall, and I said

4    Sector 2 is only a few blocks away from the mall.

5    Q.  You didn't call dispatch to tell not only dispatch but your

6    fellow officers you're joining in, right?

7    A.  Correct.

8    Q.  The sergeant on duty didn't turn around and say, Joseph

9    Mensah, you're in charge.  Joseph Mensah gets to the scene,

10   you're going to be in charge of this investigation, did he?

11   A.  No, he did not.

12   Q.  They didn't broadcast over the radio Joseph Mensah because

13   you've got five years experience and you're the most senior

14   person in a car, go to the mall, right?

15   A.  Correct.

16   Q.  I'm going to show a video.  While they are getting that

17   ready, Mr. Mensah, you have seen numerous times the video from

18   Officer Shamsi's squad car, correct?

19   A.  I have.

20   Q.  There's nothing on the video that hasn't been identified.

21   We can see Schleis.  We can see Johnson.  We can see Shamsi.  We

22   can see you, correct?

23   A.  I believe so.

24         MS. BAYNARD:  Can we sidebar before this is shown to

25   the jury?

1              THE COURT:  Okay.

2              (Sidebar discussion.)

3              (Back on the record.)

4  Q.  Mr. Mensah, we were informed we misidentified the exhibit.

5  It is not Exhibit 4.  It's Exhibit 1A.  This video, you can see

6  is a blown-up version of Shamsi's squad video, correct?

7  A.  Correct.

8  Q.  You were present yesterday when it was shown to Ms. Staten

9  Jordan, correct?

10  A.  Correct.

11  Q.  And what I'm going to do is I'm going to play this 29 second

12  clip once through without stopping, and we're going to play it

13  again, and I'd like to ask you some questions, fair?

14  A.  Correct.

15  Q.  Please.

16              (Whereupon tape is played.)

17  Q.  Now, before we play it again, there's a few things I'd like

18  to go through.  We can see on the right-hand side of the screen

19  that would be where that yellow arrow is pointing, correct?

20  A.  Correct.

21  Q.  We can see there are what appears to be two lights, correct?

22  A.  Yes.

23  Q.  Two white things, right?

24  A.  Correct.

25  Q.  So what that is is your weapon.  While you were firing, you

1  have the light on, correct?

2  A.  Correct.

3  Q.  So Alvin Cole while he's on the ground was fully illuminated

4  by your flashlight, right?

5  A.  Yes.

6  Q.  He was fully illuminated, at least, visibly by Officer

7  Olson's flashlight, correct?

8  A.  I believe so.

9  Q.  And Shamsi, Agent Shamsi, also testified he also had a light

10 on Mr. Cole, correct?

11 A.  Correct.

12 Q.  So the two white dots are your gun.  It is showing where

13 your gun is and also displaying on the ground, fair?

14 A.  Fair.

15 Q.  So while we're getting this ready, we have -- We've already

16 seen the video of you running full speed from Agent Shamsi's

17 video, correct?

18 A.  Correct.

19 Q.  First shot goes off.  When the first shot goes off, you

20 clearly are pulling your gun, correct?

21 A.  Correct.

22 Q.  You're trained to do that, right?

23 A.  Essentially, yes.

24 Q.  I'm sorry?

25 A.  Essentially, yes.

1  Q.  Essentially yes.  Okay.  You've got your gun.  At the moment

2  you pulled your gun when you heard that first shot, what was the

3  distance between you and Alvin Cole?

4  A.  I don't recall.

5  Q.  You've lived with this for five years, correct?

6  A.  Correct.

7  Q.  In your head, you've played over and over and over again

8  what took place, right?

9  A.  At times, yes.

10  Q.  You are the central cast in this thing.  You knew that after

11  the shooting, not only would there be an investigation, there

12  would be potential civil, correct?

13  A.  Correct.

14  Q.  So you're telling me in this five years, you still don't

15  have a recall of the distance between hearing that first shot,

16  pulling your weapon, and the distance to Alvin Cole?

17  A.  As I stated, I don't recall.

18  Q.  Okay.  It is fair to say, though, were you in full sprint

19  though, right?

20  A.  Yes.

21  Q.  You've got the weapon, you're in full sprint running towards

22  Alvin Cole, right?

23  A.  Towards the direction of the shot, but yes.

24  Q.  You saw Alvin Cole on the ground, right?

25  A.  Eventually.

17

1  Q.  Eventually.  Did you see him fall?

2  A.  No.

3  Q.  So he shoots.  You heard Agent Shamsi say it was either

4  right before the shot or right after the shot Alvin Cole goes

5  down, correct?

6  A.  I heard what he said.

7  Q.  Okay.  So we know you're on video.  Shot goes, you pull your

8  weapon essentially as you're trained, and the person closest

9  sees him on the ground, right?

10         MS. BAYNARD:  Objection to the form of the question.

11         MR. CADE:  I will rephrase.

12  Q.  The person closest to the ground sees him.  You pull your

13  gun as you're essentially taught, trained, but you don't know

14  he's on the ground at that moment.  Is that what you're saying?

15  A.  I'm saying when the gunshot went off, I pulled my gun.  I

16  don't remember when he went to the ground.

17  Q.  My question is a little more specific.  The person who is

18  closest, Agent Shamsi, the less-experienced officer is closest,

19  and he says Cole is down right before or right after that shot.

20  So as you pull your gun, you don't see Alvin Cole on the ground

21  at that moment, right?  Is that what you're saying?

22         MS. BAYNARD:  Objection to the form of the question,

23  misstates Shamsi's testimony.

24         THE COURT:  Sustained.

25         THE WITNESS:  I can't speak to officer --

1   Q.   So as you pull your gun, when is the first time that you see

2   Alvin Cole on the ground?

3   A.   Either right before or as soon as when I got up to the

4   scene.  I don't remember exactly.  It was some point between

5   when the shot went off and when I was close to him.  I don't

6   remember exactly when I first saw him.

7   Q.   Well, we know there's ten seconds -- just over ten seconds

8   between the shot going and you discharging your weapon, correct?

9   A.   Correct.

10  Q.   Okay.  So in that ten seconds, how far do you traverse with

11  your weapon drawn before you see Alvin Cole and fire?

12  A.   I don't have a distance.  We've seen the video.  I don't

13  have the exact distance.

14  Q.   Time.  How long?  I don't say how far.  How long?  Shot,

15  draw weapon, run, get to Alvin Cole, shot.  We know there's ten

16  seconds.  How long in that ten seconds before you get up there

17  and recognize Alvin Cole is on the ground?

18  A.   I'm not sure.  I don't know how to answer to be honest.

19  Q.   You're the only person that can answer this.  Shamsi

20  testified you heard him.  He didn't know you were there until

21  you started shooting, right?  That's what he said.  So I'm

22  trying to figure out you, you're the one running -- Look over at

23  me, not at counsel table.  Look at me.  Now running --

24          MS. BAYNARD:  Objection, Your Honor.  Argumentative.

25          THE COURT:  Yeah, I agree.  Sustained.

1   Q.  As you're running and you get there, does it take you five

2   seconds to get up to Alvin Cole, seven seconds, nine seconds?

3   How long does it take?

4   A.  The entire situation was very fluid.  I cannot recall the

5   exact number of seconds at any point during this.

6   Q.  Okay.  So shot fired one, two, three, four, five, six,

7   seven, eight, nine, ten, shoot, shoot, shoot, shoot, shoot.  You

8   don't know how long that took?

9           MS. BAYNARD:  Objection, asked and answered.  Form of

10  the question.

11          THE COURT:  Sustained.  Sustained.

12  Q.  All right.  So when you get to Alvin Cole, he's on the

13  ground, right?

14  A.  I wouldn't necessarily say he's on the ground, but I

15  guess -- How do you mean on the ground?

16  Q.  Well, you testified that he was on his hands and knees,

17  correct?

18  A.  Correct.

19  Q.  Not only did you testify in a deposition and you gave

20  interviews that he was on his hands and knees, you also

21  indicated that as you're running up, he crawled three to five

22  yards, correct?

23  A.  I'd have to look at my -- at the report or my statement.

24  Q.  I am going to hand you a copy of your deposition transcript,

25  sir.  What I'd like you to do is turn to page 217.  When you get

20

1   there, let me know.

2   A.  I'm there.

3   Q.  All right.  On page 217, I'd like you to look -- Start at

4   the top.  Just read.  It's really only 25 lines.  I'll have

5   several questions.

6   A.  I'm sorry, where do you want me to start?

7   Q.  Start at the top.  Actually, let's rephrase that.  Let's

8   start at 215.  At 215 I ask you about distance, correct?

9   A.  I assume so.  There's something about a distance on here.

10  Q.  Seventy-five feet -- The question 75 feet -- I'm sorry --

11          "75 feet, 20 yards.  What did you see at that

12          point?"

13          Your answer.  "I saw the subject that matched

14          the description go down to all fours and start

15          crawling towards the construction site."

16  Do you see that?

17  A.  I do.

18  Q.  Later on page 216, I ask you -- Page 26, line 26.

19          "You had indicated that he was down on all

20          fours, yes?"

21          Then your answer, line 24.  "Prior to -- It

22          was like a slow, I don't know if it's a bear

23          crawl or not but it's really a slow just, yeah."

24  Then, I ask you on 217 starting at line 7.  "So was

25          Mr. Cole in a bear crawl, or was he on his

1          knees crawling?"

2          You say:  "Knees and hands."

3          Question:  "So his knees were physically

4          engaged to the ground?"

5          Answer:  "Correct."

6          Question:  "And he's crawling?"

7          Answer:  "Correct."

8          Question:  "And he's on all fours?"

9          Answer:  "Correct."

10         Question:  "And how far away from him are

11         you when you observe him on his knees

12         crawling?"

13         Answer: "Five yards or so.  Five, ten yards,

14         maybe."

15         Question:  "Well, there is -- "

16         Answer:  "I'm not sure."

17         Question:  "There's a difference between

18         five yards and ten yards."

19         Answer:  "I would say it's really about

20         approximately five yards, three to five yards.

21         I don't remember the exact distance."

22   Later on you start describing that you actually saw him traverse

23   on his hands and knees crawling, right, as you come up on him,

24   yes?

25   A.  Can I have a second to review it?  There was a lot of

1  talking.

2  Q.  Sure, take your time.

3  A.  Could you repeat the question?

4  Q.  Sure.  So first when you gave your deposition at least to

5  me, this was June 26th of 2023, correct?

6  A.  Correct.

7  Q.  At the time, that was three years after the incident, right?

8  A.  Yes.

9  Q.  Now, we're another two years later.  So at the time, you

10  testified that you saw Alvin Cole go down, right?

11  A.  Yes.

12  Q.  Okay.  So as you see him go down after the first shot, you

13  then indicate that you are coming up on him three to five yards,

14  correct?

15  A.  Correct.

16  Q.  So yesterday with Shamsi, I measured out 15 feet, about this

17  far away, correct?

18  A.  I believe so.

19  Q.  Once he's on the ground and you watch him go down, you then

20  say he's crawling now, correct?

21  A.  Yes.

22  Q.  And then you testified in your deposition that while he's

23  crawling, he turns and tucks and points the gun in your

24  direction, correct?

25  A.  I don't remember if I used the word tucked.  Yes, he pointed

23

1   the gun towards me.  He did.

2   Q.  Well, which way did he point?  Did he point under his left

3   arm at you or did he point over his left shoulder at you?

4   A.  I don't recall.

5   Q.  This incident when it happened and you had --  You didn't

6   give an official statement until a few days later, correct?

7   A.  Correct.

8   Q.  So you had time to think, and you still don't have a recall,

9   even only a few days after, whether he was reaching under or

10  reaching over at you?

11  A.  I don't recall.

12  Q.  Okay.  Now, you also testified that you did not know the

13  person you were chasing had a weapon, fair?

14  A.  That's fair.

15  Q.  You then say I saw a flash of light, true?

16  A.  I'd have to check the --

17  Q.  Page 206.  Do you have that?

18  A.  I do.

19  Q.  206.  Question:  "Okay, what did you see at that

20          point?"

21          Answer, line one.  Answer, line two:  "So

22          as we are running, there are other officers

23          in front of me.  I saw the mall security

24          guard in front of me, and then I saw some

25          kind of flash, and I heard a gunshot.  I

24

1          called out shots fired, shot fired, and I

2          removed my gun from my holster."

3   Do you see that?

4   A.  I do.

5   Q.  Later on in your interview, turn to 224.  In your interview

6   with Detective Lori Rom, you recall meeting with Detective Rom

7   after the shooting?

8   A.  Vaguely.

9   Q.  Vaguely.  Okay.  Well, I'll help.  I am going to hand you

10  Exhibit 51 as well.  So in your deposition, if you turn to

11  page 242.

12  A.  I'm there.

13  Q.  Okay.  On 242.  Question:  "Okay."  It also says --

14          meaning Detective Rom's, report Exhibit 51.

15          It also says, "PO Mensah stated he was not

16          aware who fired the shot, and he did not

17          see any muzzle flash."

18  Do you see that?

19  A.  I do.

20  Q.  Then, I go on.  Today, you are telling me that you did see a

21  muzzle flash.  Do you recall what you told Detective Schroeder

22  at that time?  Detective Schroeder was also present with

23  Detective Rom, correct?

24  A.  Correct.

25  Q.  Okay.  Your answer:  "I don't, and I don't know

1          if it's really just a combination of having

2          to keep telling the story over and over or

3          just seeing the video that maybe that might

4          put it in my head.  I'm not sure."

5    Do you see that?

6    A.  I do.

7    Q.  So you gave your interview -- Let's make sure we get our

8    times straight.  Shooting was on Sunday, February 2nd.  You gave

9    your interview on Thursday, February 6th, correct?

10   A.  Correct.

11   Q.  Four days later.  And four days later, you never

12   mentioned -- You never said in the interview to either Detective

13   Rom or Detective Schroeder that you saw a muzzle flash, right?

14   A.  That's correct.

15   Q.  Okay.  But then three years later while you're sitting at a

16   deposition for me, you say I've watched the video so many times,

17   I told it in my head, I thought about it, I saw a muzzle flash?

18        MS. BAYNARD:  Object to the form of the question,

19   argumentative and misstates testimony.

20        THE COURT:  Sustained.

21   Q.  Three years later, you make a determination now I see a

22   muzzle flash, right?

23   A.  I didn't make a determination.  That's now how this works.

24   Q.  Did you ever consider the possibility even remotely that the

25   light that you saw was Shamsi putting his light on the subject

26

1  because he's closest?

2  A.  That was five years ago.  I don't recall.

3  Q.  Well, two years ago when you gave your deposition, you said,

4  oh, it's really a muzzle flash.  And I'm asking rather than it

5  being a muzzle flash that you say you saw, is there a

6  possibility that it was just Shamsi's light?

7  A.  There's a lot of possibilities what it could be.

8  Q.  Okay.  And you would agree with me that if you had said four

9  days later when you were being interviewed after the shooting

10  that if you saw a muzzle flash, you would agree with me that's

11  something that probably would have been written in the

12  Schroeder/Rom report, Exhibit 351, correct?

13  A.  I can't speak to what she would or would not have put in the

14  report.

15  Q.  That would have been a pretty important detail?

16  A.  It's really an important detail.  I can't speak to what she

17  would or would not put in her report.

18  Q.  Sure.  You as an officer, you are trained.  And of the

19  things they teach you, you go through training and everything

20  else.  You've written reports, correct?

21  A.  I have.

22  Q.  You've investigated things, correct?

23  A.  I have.

24  Q.  And there are certain things that are important, would you

25  not agree?

27

1   A.   I do.

2   Q.   So what you had for lunch at 12 o'clock may not matter at

3   6 o'clock, right?

4   A.   Depends on the context.

5   Q.   Right.  If you said, hey, I took Tylenol or I took some

6   medication, that might be important, correct?

7   A.   In what context?

8   Q.   Well, it might slow your reaction time, it might speed your

9   reaction time, it might make you groggy, it might make you more

10  alert.  There can be interaction.  A drug, for example, would be

11  an important detail, yes?

12  A.   In what context?

13  Q.   As you're writing this report after a shooting or after an

14  investigation of a major event, that would be an important

15  detail, correct?

16  A.   Is the person writing the report?  I'm sorry, I'm confused

17  what you're asking.

18  Q.   Sure.  You were interviewed.  Let's go through part of the

19  report.  Pull the microphone a little closer to you.  So in the

20  third paragraph of the report, page 1, Exhibit 51.

21  A.   Which page again?

22  Q.   First page, third paragraph.  If you look at the third

23  paragraph.  "On the night of Sunday, February 2, 2020, PO Mensah

24  was assigned to squad 221, squad car P-236, and was a one-man

25  squad.  PO Mensah was assigned to work the hours of 2:00 p.m. to

28

1    10:24 p.m.  I began the interview by asking PO Mensah did he

2    work on the day of Saturday, February 1, 2020, the day before.

3    PO Mensah responded that he worked the hours of 2:00 p.m. to

4    10:24 on the Saturday 02-01-2020.  PO Mensah stated he went home

5    after work and slept for about seven hours.  PO Mensah stated he

6    normally sleeps six to seven hours a night.  PO Mensah stated he

7    had a regular morning on Sunday, 02-02-2020, prior to his work

8    shift.  PO Mensah stated he is not on any medication and did not

9    consume any alcohol the night prior, meaning Saturday.  PO

10   Mensah said he felt fit for duty and worked the shift as usual."

11   Do you see that?

12   A.  I do.

13   Q.  They are putting down important details because if you had

14   said, I just pulled an all nighter, that would impact how you

15   reacted to this situation, right?

16   A.  That's correct.

17   Q.  If you had consumed alcohol the night before, that would

18   impact how you handled the situation, correct?

19   A.  Not necessarily.

20   Q.  But they would have written it down because they said you

21   didn't have any alcohol?

22   A.  That's correct.

23   Q.  So it's not like you raised your hand and said, hey, guys

24   guess what, I just shot and killed somebody, but I didn't have

25   any alcohol the night before.

29

1          MS. BAYNARD:  Objection, form of the question.

2          THE COURT:  Can you rephrase it?

3  Q.  Sure.  You didn't volunteer I didn't have any alcohol.  The

4  reason it is in there is because they asked you, did you consume

5  alcohol, correct?

6  A.  I don't recall.

7  Q.  The point of the report and the point I'm trying to make is

8  important details get put in there.  What you had for lunch,

9  what you watched Saturday night when you got home, whether you

10 watched cartoons in the morning or English premier football,

11 whatever, those details don't necessarily affect your

12 performance on that night, correct?

13 A.  Correct.

14 Q.  So stuff that's important like, hey, I saw a muzzle flash

15 or, hey, I saw him pull a gun, those are important details,

16 true?

17 A.  Correct.

18 Q.  Okay.  And you're not suggesting these detectives somehow

19 had, I don't know, less time on the job than you did, they were

20 inexperienced?

21 A.  I am not suggesting that.

22 Q.  Okay.  So let's go back to Cole and how he went down.  If

23 you need to refer, want to go to page 212 of your deposition.

24 Do you have that?

25 A.  Not yet.  I have it.

1  Q.  Okay.  So on 212, you also indicate there that he went down,

2  so I want to ask a few questions.  As Alvin Cole is going down,

3  do you now have any recall of testifying that you actually

4  witnessed him go down to the ground?

5  A.  Yes.

6  Q.  Okay.  So as you witness him go down to the ground, how did

7  he go down to the ground?  Did he stop and get down on his knees

8  and then get down on his hands?

9           MS. BAYNARD:  Objection to the form of the question.

10          THE COURT:  Can't you just ask him what happened?

11  Q.  What happened?

12  A.  Again, this was five years ago, so I don't remember every

13  single step being second by second.  I just remember at one

14  point in time there was the gunshot, and he went from one

15  position to another, and I saw him on his hands and knees near

16  the, I guess, the construction barrier.  How exactly he got

17  there second by second, I don't recall.

18  Q.  You clearly testified previously you saw him crawling with

19  the gun, right?

20  A.  Yes.

21  Q.  So you see him go down.  You don't recall how he goes down.

22  He's now crawling a distance with the gun.  And you come up on

23  him and you say, I don't recall whether he was under or over

24  with the gun.  You saw the gun, correct?

25  A.  Correct.

31

1    Q.  You saw Agent Shamsi there, did you not?

2    A.  Yes.

3    Q.  You saw Agent Shamsi with his gun drawn, correct?

4    A.  I don't remember if his gun was drawn, but he was there.

5    Q.  Agent Shamsi clearly was in front of you and six to nine

6    feet in front of Alvin Cole, right?

7    A.  I wouldn't say he was in front of me.

8    Q.  Well, if you're running -- On the video, you clearly are

9    behind Agent Shamsi, correct?

10   A.  Correct.

11   Q.  It is not like you're saying I caught up to Agent Shamsi,

12   and I was in front of him on the video, right?

13   A.  I'm not saying during the foot pursuit.  I am saying by the

14   time I caught up to Alvin Cole, I was ahead of Agent Shamsi.

15   Q.  Shot goes off, you clearly on video are behind Agent Shamsi,

16   correct?

17   A.  Correct.

18   Q.  You come along.  Agent Shamsi is there with his flashlight

19   on his gun, correct?

20   A.  Correct.

21   Q.  The only way the flashlights come on the gun is the gun has

22   to be out, correct?

23   A.  That's true.

24   Q.  I mean, it's really not like if the gun is in a holster and

25   there's light in front.  The gun has to be out, and you have to

1  flip a switch to turn the gun on, right?

2  A.  Correct.

3  Q.  So as you approach Agent Shamsi, you're behind him running.

4  Even if you catch up, even if you get in front of him, you'd

5  agree that the fact there's a light on him from Agent Shamsi

6  means Agent Shamsi has a gun on him, right?

7  A.  Not necessarily cause he could have a regular flashlight

8  out.

9  Q.  So you're not saying Agent Shamsi didn't hear the shot?

10  A.  I can't speak to what Agent Shamsi heard or didn't hear.

11  Q.  So as you approach, you see -- You run in front of Agent

12  Shamsi.  Is that what you're saying?

13  A.  I wouldn't say I was in front of him.  It was more I was

14  closer to Alvin Cole than Shamsi was.

15  Q.  At the time you started shooting?

16  A.  Correct.

17  Q.  Well, if you're cognisant to be able to determine that

18  you're closer at the time you started shooting than Agent

19  Shamsi, you're saying I wasn't aware if he had his gun out or

20  not, correct?

21  A.  That's true.

22  Q.  He may have just had a flashlight on.  Is that what you're

23  saying?

24  A.  I am saying I don't know what the light source was as far as

25  what Agent Shamsi had.

33

1  Q.  And at the time you fired, you indicated that Alvin Cole

2  was -- words you use was butt and back pointed towards you,

3  correct?

4  A.  Which page is that?

5  Q.  219.  Are you there?

6  A.  Yes, I'm reading it.

7  Q.  Let me know when you're finished.

8  A.  I see it.

9  Q.  Okay.  I'll start with line start at the top.

10              Answer: "Right before I fired.  Instead of

11              being four hands, it was three, and there

12              was a gun pointed right at me."

13              Question:  "Okay.  Describe that."

14              Answer:  "So either over his left shoulder

15              or right under it, I could see the gun pointed

16              directly at me."

17              Question:  "So let's unpack that.  When

18              you saw him on his hands and knees, was

19              Mr. Cole facing you or facing away from

20              you?"

21              Answer:  "He was facing away."

22              Question:  "So it's almost as if his butt

23              and back are pointed towards you?"

24              Answer:  "Correct."

25              Question:  "So his butt and back are pointed

1          to you.  He's on all fours.  And at some point,

2          you see you said over or under the shoulder,

3          you don't recall, you saw the weapon?"

4          Answer:  "Correct.  Well, I saw the

5          weapon in his hands before then, and we

6          kept telling him to drop the gun, drop

7          the gun, and he wasn't dropping it."

8          "Okay, do you recall which hand of his

9          that you saw?"

10         Answer:  "It was in his right hand."

11  Did I read that correctly?

12  A.  You did.

13  Q.  Okay.  So now you're saying, just so we're clear, in this

14  ten seconds shots fired, gun drawn, you're running.  You come up

15  on him.  You see him go down, he's on all hands, he's now

16  crawling.  How far did he crawl?

17  A.  I don't recall.

18  Q.  Do you recall saying that he crawled about ten feet?

19  A.  Are you asking if I recall saying that?

20  Q.  Yes.

21  A.  I don't recall.

22  Q.  So he's crawling.  And you then see him.  You come up on

23  him.  And according to your testimony, you were telling him,

24  along with Shamsi, drop the gun, drop the gun, correct?

25  A.  I'm sorry, the jury has a question.

1    THE CLERK:  Jury would like a recess for the restroom.

2    THE COURT:  We'll take a break for the restroom.

3    BAILIFF:  All rise.

4    (Brief recess taken.)

5    (Back on the record.)

6    THE COURT:  Ready for the jury.

7    (Jury enters.)

8    THE COURT:  Let's continue.

9    MR. CADE:  Thank you, Judge.

10   Q.  So Officer Mensah, before we took our break, I was asking

11   you a question.  Better yet, I won't do it any justice.  I will

12   have the reporter, if she wouldn't mind, read back the short

13   portion.

14   (Question read by reporter.)

15   Q.  As you come up on him, you were now saying that you were

16   uttering the words drop the gun, drop the gun, correct?

17   A.  Correct.

18   Q.  Okay.

19   MR. CADE:  Can we switch it over to the other video,

20   first.

21   (Whereupon tape is played.)

22   Q.  So you're saying now that as you're running and your gun is

23   drawn, you said drop the gun, drop the gun?

24   A.  I recall saying it, that I was giving commands as I was

25   running.

1  Q.  Someone says the gun was out, the gun was out.  Was that

2  you?

3  A.  I believe so.

4  Q.  After you say the gun is out, the gun is out, you start

5  shooting, correct?

6  A.  I think, yes.

7  Q.  So explain to me how that could be that you have to announce

8  the gun is out but right before that announcement you are

9  announcing drop the gun, drop the gun?

10  A.  It's more of two commands at once.  Me saying the gun is

11  out, the gun is out, I see the gun.  I'm letting all the

12  officers know, everyone around me pretty much know that, A,

13  there is a gun out.  From my understanding, there was a gun

14  inside of a fanny pack.  Well, that gun is not in the fanny pack

15  anymore.  I can see there's a gun right here.  I'm letting

16  everybody know, A, the gun is out.  At the same time, I am

17  trying to give commands to Mr. Cole to drop the gun.

18  Q.  I understand that completely.  Where I'm having the

19  disconnect and help me is why are you yelling drop the gun?  You

20  don't know he's got the gun, right?  You have no idea who has a

21  gun, correct?

22  A.  As I said, like, when I'm seeing the gun, I see it in his

23  hand, I'm saying drop the gun.

24  Q.  So you're saying drop the gun, drop the gun and, oh, by the

25  way, the gun is out, the gun is out?

37

1    A.  I'm saying both at the same time.  I'm giving multiple

2    commands.  I'm making announcements.  I'm saying different

3    things so everybody knows what's going on.

4    Q.  So you're saying it's better to say drop the gun first

5    instead of announcing the gun is out to your fellow officers?

6    A.  I'm not saying what is better or what is first.  This is a

7    very fluid, quick incident.  I can't say this is the first thing

8    you should say or this is the second and this is the third.

9    This is a very fluid thing.  I'm just doing my best to handle

10   the situation the best I can.

11   Q.  So you're saying now I yell drop the gun, drop the gun, oh,

12   the gun is out, the gun is out.  Let's rephrase.  What's the

13   point of saying drop the gun?  If you're saying drop the gun,

14   doesn't that signify to at least Shamsi that there's a gun

15   because I'm telling this guy to drop the gun, right?

16   A.  It could.

17   Q.  So if you already said twice you've uttered drop the gun,

18   there's no need to say at that point then if you did say drop,

19   the gun is out twice, correct?

20          MS. BAYNARD:  Object to the form of the question.

21   Argumentative.

22          THE COURT:  Sustained.

23   Q.  There's no reason to say --

24          THE COURT:  It has been asked and answered.

25   Q.  After you say the gun is out --

38

1          MR. CADE:  Can you scroll back just to that point,

2     Kim.  Give me one second.

3     Q.  When you say drop the gun, Alvin Cole is already on the

4     ground crawling, right?

5     A.  I'm not 100 percent sure.  I'm trying my best to remember

6     and answer the questions.  I'm sorry, this is just --  The

7     incident itself, it's emotional.  I'm trying my best to keep my

8     composure now, but I'm honestly trying my best to answer your

9     questions the best I remember them.

10    Q.  Okay.  So drop the gun, drop the gun, and then you yell

11    twice the gun is out.

12          MR. CADE:  Let's just -- That point, Kim.  Hit play

13    until the shooting starts.

14          (Whereupon tape is played.)

15    Q.  You were still running towards Alvin Cole when you said the

16    gun is out, the gun is out?

17    A.  Correct.

18    Q.  You hadn't even gotten stationary.  You're running.  The gun

19    is out, the gun is out, and you start shooting, correct?

20          MS. BAYNARD:  Object to the form of the question.

21          THE COURT:  Sustained.

22    Q.  You're still running.  And as you come up to him as you're

23    running, you start shooting, correct?

24    A.  That's incorrect.

25    Q.  You paused and took a position?

1  A.  Correct.  I paused and I was assessing what was going on

2  before I shot.  I didn't start shooting right away.

3  Q.  Well, how long did it take for Alvin Cole as you say to

4  either go under or over his shoulder with the gun?

5  A.  It wasn't very long.

6  Q.  Was it while you were assessing the situation?  Was it

7  before you assessed?

8  A.  So as I see him going to the ground and as I am walking up

9  to him, I see him in that position, and I get up there.  I'm

10 assessing everything.  I'm assessing the officers next to me.

11 I'm assessing the officers around me, the other people that were

12 running around.  I see Alvin Cole.  And at one point, the gun

13 was pointed at me.  At that point, I kind of, as explained

14 before in Officer Olson's testimony, there is a series of

15 factors you have to go through, like, a mental checklist.  You

16 have the criteria for deadly force, which is the weapon, the

17 intent, the delivery system.  You also have the target

18 identification, isolation, acquisition.

19         So at one point once the gun was pointed at me, I

20 could see Alvin.  The gun is pointed at me.  And at that point,

21 I'm pretty much focusing on two things at once.  One, kind of

22 feeling and preparing my body to get shot at the same time that

23 I'm identifying my target, and I don't mean target to be

24 insensitive in anyway.  That's the terminology as far as what

25 we're trained in firearms.

1          But once I see that and I have the intent, the weapon

2    is there, the delivery system is there, he has the intent

3    pointed at me, I start focusing on preparing my body to

4    physically get shot as I'm trying to move out the way, and

5    that's when I start shooting.

6    Q.  Okay.  Turn to page 224 -- I'm sorry, 223.  Starting with

7    line 16.  Are you there?

8    A.  I'm there.

9    Q.  Question:  "At the time that you engaged and fire

10                your weapon, did you have any other or could

11                you visualize anyone else in proximity to you?"

12                Answer:  "I just knew there were other officers

13                around."

14   So when you say you're visualizing, you didn't know who was who.

15   You just knew there were other officers in the area, right?

16   A.  I knew there were other police officers in close proximity

17   to me.

18   Q.  Question:  "Okay and when you say you knew, it was just

19                because you had all been running or did you

20                have, like, out of the corner of your eye

21                visualization, like, they were present?"

22                Answer:  "That and they were saying drop the

23                weapon as well.  They were right -- essentially

24                not right next to me.  They were in close

25                proximity to me saying drop the weapon, drop the

1           weapon."

2           Question:  "Sure.  Obviously, it's difficult to

3           see on video what's going on because, you know,

4           we are looking at one of the squad cams.  You

5           were not equipped with body cam, correct?"

6           Answer:  "Correct."

7           "Okay.  So I just want to make sure when you

8           fired, you didn't see any other officers.

9           This was solely he's got the gun pointed at me,

10          that's why I'm engaging."

11          Answer:  "Correct."

12          Question:  "Okay, you weren't shooting to say,

13          hey, he's got it pointed at Shamsi, so I'm going

14          to shoot to protect Shamsi?"

15          Answer:  "I don't know who else he pointed at.

16          I just know at one point he pointed at me."

17          Question:  "Okay.  So and you were just you said

18          three to five yards in distance?"

19          "Yes."

20          Question:  "Was your light on your weapon now

21          active or turned on?"

22          Answer:  "I don't remember."

23          MS. BAYNARD:  Your Honor, if he's going to read

24  deposition transcript, I ask there is a question before it.

25  Q.  I will rephrase.  You now see on video you clearly had your

1   light engaged?

2   A.  Correct.

3   Q.  So it's not a question of you shot, and then as you're

4   walking away, you turned on your flashlight.  You had it on

5   before hand, correct?

6   A.  That's correct.

7   Q.  Okay.  Getting back to the other officers in proximity.

8   It's fair to say you never saw the gun, Alvin Cole's -- the gun.

9   You never saw it until he was on the ground, correct?

10  A.  Correct.

11  Q.  And you never saw Shamsi with his weapon drawn, correct?

12  A.  I don't recall.  I don't.

13  Q.  You never saw Alvin Cole look back towards you while both of

14  you were running, correct?

15  A.  No.

16  Q.  No, I'm correct or no?

17  A.  I'm sorry, no.  I don't recall him looking back towards me.

18  Q.  Now, there was a question about shots fired.  Were you the

19  one that said shots fired?

20  A.  I was.

21  Q.  Turn again to Exhibit 51.  Actually 241 of your deposition.

22  Start there.  I want to go to 241 and 242.  So line 17 on 242.

23  Read that.

24          MS. BAYNARD:  Are you asking him to read your

25  question?

1        MR. CADE:  I am refreshing his recollection to ask him

2   a question.

3   Q.  Do you have that, sir?

4   A.  Line 17.

5   Q.  Starting on line 17.  So if Exhibit 51, which was the report

6   from Rom and Schroeder, you indicated you don't know who yelled

7   shots fired, correct?  Do you want a moment?

8   A.  On Exhibit 51?

9   Q.  Yep, second page, last paragraph.

10  A.  Sorry.  I see it.

11  Q.  "PO Mensah stated as he's gaining on the subject, he

12          hears a single gunshot.  PO Mensah stated

13          the gunshot was to the west of him, which

14          would be closer to Mayfair Road.  PO Mensah

15          stated, "shots fired" is broadcasted over

16          the police radio.  PO Mensah stated he was

17          not aware of who fired the shot, and he did

18          not see any muzzle flash."

19  Correct?

20  A.  Correct.

21  Q.  It doesn't say on there you broadcast shots fired.  Someone

22  broadcast shots fired over the radio, correct?

23  A.  Correct.

24  Q.  And I've looked at this report multiple times.  I don't see

25  anywhere on here that you're saying the gun is out.  If you want

44

1   to make a moment to look, see if you see it.  Do you believe me

2   that I looked at it multiple times?

3           MS. BAYNARD:  Object to the form and foundation.

4   Officer Mensah did not draft this report.

5   Q.  I would have loved a report from Officer Mensah.  I would

6   have loved a taped interview.

7           MS. BAYNARD:  Move to strike.

8           THE COURT:  Sustained.

9   Q.  Officer Mensah, at any point during your interview, did you

10  ever tell -- four days later did you ever tell Detective

11  Schroeder and Rom that you yelled the gun is out, the gun is

12  out?

13  A.  I don't recall that I did.

14  Q.  And in fact, you further indicated starting on page 2 at the

15  very bottom of that report, PO Mensah stated he observed this

16  subject, meaning Alvin Cole?

17  A.  I'm sorry, where are you?

18  Q.  Bottom of page 2 where it says PO Mensah stated he observed

19  this subject, Alvin Cole, to have a black handgun in his right

20  hand.  PO Mensah stated either PO Shamsi or PO Johnson shouted

21  drop the gun several times to the subject, meaning Cole.  No

22  where on there does it say Mensah was yelling drop the gun,

23  right?

24  A.  That's correct.

25  Q.  Getting back to my earlier series of questions.  That's a

1    pretty important fact that you clearly articulated to Alvin

2    Cole, drop the gun.  You would agree that's an important fact?

3    A.  It is.

4    Q.  You would agree that you would have an expectation that

5    important fact would be in the report that you would have been

6    the one uttering that, true?

7    A.  That's not true.  So I think it's also important to remember

8    that this is four days after an incredibly traumatic event.

9    From my own personal experience, I've been a detective for four

10   years.  It's very common that when people are going through

11   something traumatic, they don't remember every single detail.

12          MR. CADE:  Judge, move to strike.  If he's going to

13   talk about traumatic and what his experience tells him, it has

14   nothing to do with what occurred.

15          THE WITNESS:  This has everything to do with what

16   occurred.

17          THE COURT:  He can finish his answer.

18          THE WITNESS:  This is an incredibly traumatic and

19   stressful incident.  The brain works in mysterious ways.  And

20   again, my own professional experience and my own experience from

21   this specific event, there are certain things that I remember or

22   certain things that I didn't remember.  And in the days, the

23   weeks, the months, the years later, I remember certain things.

24   Some things I forgot.  Some things I remember.  Some things I

25   remember based off of video.  Some things I remember based off

1    of hearing what the radio logs and the transcripts were.  At the

2    time of the shooting that night, I don't remember very specific

3    things that were later brought to my attention that, oh, I

4    didn't remember that.  I didn't recall that happening.

5    Q.  Were you a detective when this took place?

6    A.  I was not.

7    Q.  So this was your -- This was a traumatic experience, right?

8    A.  It was.

9    Q.  This was your first traumatic experience?

10   A.  In life?

11   Q.  No, as an officer?

12   A.  This is a traumatic experience.

13   Q.  Then, you go on to indicate that he moved, Alvin Cole, on

14   his hands and knees, is crawling about three yards, correct?

15   A.  Where is that?

16   Q.  Page 3.

17   A.  Of the police transcript?

18   Q.  Yes, police transcript right after you say Shamsi and

19   Johnson are yelling drop the gun.  PO Mensah stated while the

20   subject, Cole, was on his left hand and knees, he proceeded to

21   move forward about three yards.

22   A.  Correct.

23   Q.  So even though you didn't announce it or tell them during

24   the interview, you said it was Johnson or Shamsi that announced

25   that.  I'm sorry, strike that.  Shots fired, three and-a-half

1  years later when I'm doing your deposition, you then say, well,

2  I was the one who said shots fired, right?

3  A.  Correct.

4  Q.  Let's turn for a moment at this time to the shooting.  As

5  you approached Alvin Cole and you say you saw the weapon, you

6  were only concerned about yourself at that moment, correct?

7  A.  That's incorrect.

8  Q.  Do you recall in your deposition, do you recall indicating

9  that you were only focused on yourself at that moment because

10 the gun was pointed in your direction?

11 A.  I don't recall saying I was only concerned about myself or

12 focused on myself.

13 Q.  224 of your deposition.  Again, line 9.  Okay, so I just

14 want to make sure.

15 A.  Just a second, sorry.  Okay.

16 Q.  Question: "Okay.  So I just want to make sure

17             when you fired, you didn't see any other

18             officers.  This was solely he's got the

19             gun pointed at me, that's why I'm engaging."

20             Answer: "Correct."

21             Question: "Okay.  You weren't starting to

22             say hey, he's got it pointed at Shamsi, so

23             I'm going to shoot to protect Shamsi."

24             Answer:  "I don't know who else he pointed

25             at.  I just know at one point he pointed at

1               me."

2    Correct?

3    A.   Correct.

4    Q.   So you were focused when you fired, you were focused on

5    Joseph Mensah, correct?

6               MS. BAYNARD:   Object, asked and answered.

7               THE COURT:   We've gone over this so many times.

8    Please move on.

9               MR. CADE:   I will, Judge.

10   Q.   You also indicate in your deposition that the other officers

11   did not shoot because they were young and you had more tactical

12   experience?

13              MS. BAYNARD:   Objection.   If he wants to ask him what

14   he remembers before referring to his deposition, that should be

15   the process in asking the questions, so object to the form of

16   the question.

17              THE COURT:   Sustained.

18   Q.   Do you know why the other officer, Shamsi, didn't shoot?

19   A.   I don't.

20   Q.   You testified in your deposition Shamsi didn't shoot because

21   you had more tactical experience and he was new?

22   A.   Where is that?   Can I see that in a deposition?

23   Q.   Give me one second.   236, line 8.

24              MS. BAYNARD:   Just for completeness, I ask if he reads

25   it, he starts with the entire answer that starts at line 4.

49

1    Q.   That's fine.  Do you have that, sir?

2    A.   I do.

3    Q.   The Witness:  "I don't know what's going through

4              their minds other than Evan Olson, the other

5              officer was -- They were very young.  They were

6              very new officers, no tactical experience.

7              Yeah, I had years of experience.  At that

8              point in time I was about eight years into

9              my law enforcement career.  I was on a SWAT

10             team.  I had a lot more years in training

11             experience than him.  Yeah, I don't know

12             why else why they didn't though."

13      Correct?

14   A.   That's correct.

15   Q.   Because -- but we know Shamsi not only was in the military,

16   not only had gone through ranger training and got the tab and

17   everything, Shamsi actually was in combat, right?

18   A.   That's correct.

19   Q.   You're not suggesting somehow that the mean streets of

20   Wauwatosa gave you more tactical experience than a soldier

21   having been in combat, are you?

22          MS. BAYNARD:  Objection to the form of the question.

23   Argumentative and irrelevant.

24          THE COURT:  I'll allow him to answer.  It is

25   argumentative.

50

1          THE WITNESS:  I can answer.  So again, just from my

2    experience, I have been on SWAT for about six years.  It's very

3    common, very common that people with several years of combat

4    years don't even make the SWAT team.  Not to mention, yes,

5    Officer Shamsi was in the military.  He was a police officer.

6    But if you want to go -- I don't have his records in front of

7    me, but he was a very young police officer.  Tactical

8    experience, military experience does not equate to being --

9    does not equate to law enforcement.  It just doesn't.  The

10   things we have to go through, the testing, the field training,

11   that doesn't mean anything especially in a situation like this.

12   Q.  You'd agree with me that in order to use deadly force in

13   your head, you're making that decision, you have to be

14   committed, and there is an intent to shoot, correct?

15   A.  The intent is based on I guess if you want to call it the

16   offender not so much the officer.

17   Q.  Well, let's rephrase.  When you decide to shoot, it's not a

18   question of I'm just going to pull the trigger.  You have to in

19   your mind say, I am intentionally taking a shot because of

20   factors, correct?

21   A.  Correct.

22   Q.  There's not a question of when you intentionally take that

23   shot, you are mistaken, right?  It's either I meant to shoot, or

24   I didn't mean to shoot, correct?

25   A.  Correct.

1    Q.  You must intend to pull the trigger with deadly force.  In

2    your head, I've cleared, I've gone through my mental checklist,

3    I intend to pull the trigger, right?

4    A.  Correct.

5    Q.  I'm going to play --  We've got a squad car here,

6    Exhibit 28.  Before we hit play and just so we're clear, at the

7    time in Wauwatosa, there were not body cams, correct?

8    A.  Correct.

9    Q.  Your vehicles are equipped with outside cameras and interior

10   audio, correct?

11   A.  Yes.

12   Q.  And we've seen it a couple times.  Just to be clear, the

13   audio normally does not turn on until either one of two events,

14   three events.  One, you flip a switch, correct?

15   A.  Correct.

16   Q.  Two, the car exceeds, I think you told me in a deposition,

17   70 miles an hour?

18   A.  Something like that, 70 or 80.

19   Q.  You are going excessive speed, it comes on like something is

20   going on?

21   A.  Correct.

22   Q.  Or the squad lights are activated?

23   A.  Yes.

24   Q.  One of those three events audio starts.  The video goes.  It

25   is continuously recording, but it really starts 30 seconds

1  beforehand, and we got to wait for that 30 seconds to catch up

2  for the audio to turn on?

3  A.  Correct.

4  Q.  If the lights are activated in a squad car, it's got audio

5  that can pick up from the microphones, correct?

6  A.  Yes.

7  Q.  And it also has audio from inside the squad car, right?

8  A.  Yes.

9  Q.  Okay.  So I'm going to play first one time through.  I want

10  to you listen, Olson's interior squad, okay.

11         (Whereupon tape is played.)

12  Q.  The F word.  Someone yells that.  Was that you?

13  A.  That was me.

14  Q.  And then you say, I can't believe I shot somebody, correct?

15  A.  That's incorrect.

16  Q.  Let's do the one from inside.  You also have squad video?

17  A.  I do.

18  Q.  There was audio recorded from inside your squad?

19  A.  I don't know because I had an unmarked squad.  I don't think

20  audio is in the unmarked squads.

21  Q.  Okay.

22  A.  I can elaborate if you want.

23  Q.  No, we'll play it.

24         (Whereupon tape is played.)

25  Q.  That is your squad car, correct?

53

1  A.  I don't know.  This might be Shamsi.  It is 236.  It could

2  be mine.

3  Q.  That was you screaming, hey?

4  A.  Yes.

5          (Whereupon tape is played.)

6  Q.  That is you running, correct?

7  A.  Correct.

8          (Whereupon tape is played.)

9  Q.  So that's you.  What are you saying?

10 A.  That sounds like someone saying shots fired.

11 Q.  No, the F word?

12 A.  That was me saying that.

13 Q.  Afterwards someone I hear I can't believe I shot somebody?

14 A.  I'm not hearing that.

15          MR. CADE:  Back up just a little bit.  Turn up the

16 volume.

17 A.  This is the first time I'm ever hearing this.

18 Q.  That's okay.

19          (Whereupon tape is played.)

20 Q.  So if, in fact, that is you picked up in the squad because

21 you'd agree with me that we don't hear other than what's

22 broadcast the shots fired, we clearly hear that picked up in

23 your car, correct?

24 A.  Yes.

25 Q.  We don't hear drop the gun picked up in your squad car,

54

1    correct?

2    A.  Correct.

3    Q.  We don't hear the gun is out picked up in your squad car,

4    correct?

5    A.  Correct.

6    Q.  And it's fair to say some of that is distance between your

7    microphone and the vehicle.  It may not pick everything up,

8    right?

9    A.  If I recall, my microphone wasn't working that night.

10   Everything you're hearing is the actual squad radio or, like,

11   the dispatch radio.  You're not hearing anything off my mic.

12   Q.  So you are on the radio holding the button screaming fuck?

13   A.  Yes.

14   Q.  And after you say that, who is saying those other words

15   afterwards?

16   A.  So directly after the shooting, again, I was overwhelmed

17   with emotions.  I got on the radio.  As you're trained, you are

18   supposed to give updates.  I didn't --  I didn't know what to

19   say, didn't know what to do.  I screamed it, I yelled it.  I

20   don't know why I did.  Again, I was overwhelmed with emotions.

21   I honestly don't know why I said it.  And then after that what

22   you're hearing, that is people talking on the video, various

23   people talking on the radio.  That's not my squad mic.  That's

24   just my lapel mic.

25   Q.  Sure.  If that, in fact, is you after the word F is yelled

55

1    and if that is you, the jury can listen all they want.  If that

2    is you saying, I can't believe I shot somebody?

3              MS. BAYNARD:  Objection to the form of the question,

4    foundation.  He said that's not what he said.  To preface a

5    question with that --

6              MR. CADE:  I am impeaching him.

7              THE COURT:  Well, rephrase it, please.

8    Q.  If it is you who says after the F word, I can't believe I

9    shot somebody, you would agree with me that would suggest that

10   as you pulled the trigger, you did not have the intent as we

11   talked a moment ago for deadly force, right?

12             MS. BAYNARD:  Objection, form of the question,

13   argumentative.

14             THE COURT:  He may answer.

15             THE WITNESS:  So I don't know where you're getting

16   this from.  That's not what's being said.  I said the F word,

17   yes, I did.  After that, I got off the radio.  The next time

18   that you hear anyone speak is another officer or somebody else

19   saying something that I can hear of them repeating shots fired.

20   I don't know where you're hearing about anything you said about

21   I can't believe I just shot somebody.  I don't hear that.

22   That's not me talking.  The next person you hear is somebody

23   getting on the radio saying shots fired, but I don't know what

24   you're talking about.

25   Q.  Officer Mensah, you said I have not seen this.  I have not

1    heard this in five years, right?

2    A.  I have not heard someone say anything about someone saying

3    the comments you made.

4    Q.  You said I have not heard this, correct?

5    A.  I've heard this.  I think we're kind of misunderstanding two

6    different things.  I've seen this specific video of my squad.

7    I've heard the video.  I've heard the audio.  The audio is of

8    the dispatch radio.  You hear me say -- It's only when an

9    officer ques up the mic.  That is not a radio mic or a lapel mic

10   synched to a camera.  That is dispatch audio only.

11   Q.  So?

12   A.  All the audio you're hearing in P-236 is dispatch radio.

13   It's not microphone audio.  It's two completely different

14   things.

15   Q.  So Officer Mensah, did you actually watch this video, the

16   full video, not at that clip, all the way through after the

17   shooting, after the state troopers get there, after all that.

18   Did you listen to any of that?

19   A.  At what point?

20   Q.  At any point in the last five years other than you getting

21   out of your car running, hey, have you done any of that,

22   correct?

23   A.  Have --

24   Q.  Let's back up.  Let's back up.  Your squad clearly picked up

25   you yelling hey, correct?

57

1    A.   Yes.

2    Q.   Okay.  You were out of the car.

3    A.   Yes.

4    Q.   You weren't holding your microphone yelling hey, right?

5    A.   So if you're in close proximity --

6    Q.   Is that a yes or no?

7    A.   Repeat the question.

8    Q.   You weren't yelling hey and holding the microphone, correct?

9    A.   Correct.

10   Q.   Okay.  The microphones pick up you at different points,

11   correct?

12   A.   Other people's microphones have but not mine.

13   Q.   So if you were the one that yelled shots fired while you

14   were running, it would have picked you saying shots fired,

15   right?

16   A.   That's incorrect.  I'm trying to explain it to you.

17   Q.   If you're on the microphone yelling shots fired, you just

18   said my squad car would pick that up.  That's not going over

19   broadcast?

20   A.   I'm trying to explain this as best as I can.  I'm really

21   trying to do it the best I can.  So you have a lapel mic on your

22   shoulder.  You have a microphone that's synched to your car.

23   What I'm saying is either my microphone that was synched to my

24   car was either malfunctioning or was left inside the car.  I was

25   not wearing a microphone that was synched to my car that could

1    pick up any audio.  Cause you would have heard everything from

2    me breathing.  You would have heard all of my commands.  You

3    would have heard everything, but you don't hear any of that.

4            The only thing that you hear is the dispatch audio

5    because there is a radio inside of the squad car that will

6    broadcast audio.  So the only audio you will hear inside of the

7    car is that if my microphone is inside of the car if you can

8    hear something maybe on the other side of the glass or close

9    proximity, you will hear that.  You'll hear dispatch audio.  You

10   will hear people talking on the radio, but you won't hear

11   anything from mic because I have left the car.  You don't hear

12   me.  You would hear me running.  You would hear all that stuff,

13   but you don't hear that because my microphone either

14   malfunctioned or was in the car.  But that's why you don't hear

15   me saying anything else on that.  You only hear me talk on the

16   lapel mic when I push the button or someone else pushes their

17   button and it dispatches over the audio inside of the car.

18   Q.  If you have so much tactical experience over these younger

19   junior officers, why aren't you wearing your microphone?

20   A.  It has nothing to do with tactical experience.

21   Q.  You're saying, I'm the most senior guy out there.  You

22   didn't have on a microphone knowing it is a chaotic -- Again,

23   right before this scenario, you had gone to the mall, correct?

24   A.  Correct.

25   Q.  Okay.  So you're at the mall.  You're waiting there.  You

59

1  leave the mall to go back and come back.  You're not wearing

2  your microphone?

3  A.  So the microphones that we used back then, it was Panasonic.

4  It's an older system and half the time they don't work.  So

5  there's a charging station inside of the car.  If there is a

6  traffic stop or something, sometimes it just is what it is.  We

7  are human.  We forget.  You forget to take it out, plug it back

8  in.  Things have gotten a lot better with Axon and body cams and

9  stuff.  The old system was you could leave it in the car to

10 charge and something happens, you can pop it in.

11         But in very traumatic, chaotic situations, my concern

12 is not my microphone.  My concern is the safety of the public,

13 the officers, and everybody else involved.  That was my concern,

14 not make sure my microphone is on, just make sure the people are

15 where they need to be and handle the situation.

16 Q.  You're saying for a traffic stop, you wouldn't put the

17 microphone on?  Isn't a traffic stop one of the most dangerous

18 points for an officer?

19 A.  I wouldn't say that specific.  I know going to the traffic

20 stop, I am going to do a traffic stop.  I'm not amped up.  I'm

21 not anxious.  There is not an emergency going on.  I can

22 remember, take this out, plug it in. I'm saying in the middle of

23 a foot pursuit and an emergency when an officer's life is in

24 jeopardy, I might not remember, oh, wait a minute, let me grab

25 my microphone.  All I'm concerned about is the safety of the

1  officer and the people being pursued and the general public.

2  Q.  So you were amped up?

3  A.  A little bit, yes.

4  Q.  The night of the shooting, the policy normally is to be

5  separated, correct?

6  A.  I don't remember what the policy is.  I know there is --

7  Q.  Hold on.  Starting line 254 of your deposition.  I'm sorry,

8  page 254, starting at line 23.  Let me know when you get there.

9  A.  Page 254, I'm there.

10  Q.  Page 254 line 23.  Question: "Okay.  After the shooting,

11      did you have discussions with the other officers

12      present in terms of what each saw, how they

13      saw it, things of that nature?"

14      Answer: "No."

15      Question:  "Okay and is that because of your

16      training?"

17      Answer:  "Yes.  You are not supposed to discuss

18      incidents and especially before an investigation

19      or before we give our statements.  We don't want

20      to obviously confuse or, like you said, your mind

21      will block stuff out, and you don't want to put

22      that stuff in there that's not supposed to be.

23      So we don't talk to each -- So we don't talk

24      to other people about the specific incident."

25  Do you see that?

1    A.   I do.

2    Q.   And after the incident, in fact, you were in a squad car.

3    You were pared with Evan Olson, Officer Olson, who testified

4    yesterday, correct?

5    A.   Correct.

6    Q.   Officer Olson also was a witness to the shooting, correct?

7    A.   Yes.

8    Q.   There were how many officers that responded at that point in

9    time just from Wauwatosa?

10   A.   I don't recall.

11   Q.   There were other officers that responded from Greenfield,

12   from other places that you know.  There were more than a dozen

13   officers, correct?

14   A.   Like as far as mutual aid after the shooting or the

15   investigation or what part?

16   Q.   Right.  After the shooting, mutual aid.  Brookfield showed

17   up, Greenfield showed up.  There were several other

18   non-Wauwatosa agencies that were all present, correct?

19   A.   Approximately.  I don't remember them.  I'm also positive

20   that is exactly what it was.

21   Q.   Yet that night, you were pared up in a squad car with no

22   microphone with Evan Olson, right?

23   A.   Yes.

24   Q.   You still are in contact with Evan Olson to this day.  You

25   guys are friends?

1  A.  Correct.

2  Q.  This is not work bros where you see each other at work, hi,

3  how you doing, you talk a little bit and go in your car.  This

4  is you guys after the fact, and you're no longer at Wauwatosa.

5  You still talk and hang out, right?

6  A.  Correct.

7  Q.  My final two series of questions.  If we would put up the

8  photos.

9          THE CLERK:  Which number?

10         MR. CADE:  Eighty-one.

11  Q.  So I'm going to show you a photograph, go through a couple

12  of those, Officer Mensah.  This one will be 81A as in alpha.

13  And you see these cones, sir?

14  A.  Yes, I do.

15  Q.  You've got cones three, four and five, correct?

16  A.  Correct.

17  Q.  And by cone three, do you see there's a bullet fragment?

18  A.  I do.

19         MR. CADE:  Kim, can you zoom in on that.

20  Q.  You can see that it's a deformed bullet, correct?

21  A.  I do.

22  Q.  So you know as an officer, that's a bullet that has struck

23  something else, probably the ground or the concrete, maybe the

24  barrier and has deformed it, correct?

25  A.  Correct.

63

1    Q.  81B.  We see on the ground the same bullet.  We also see

2    potentially the ground that it has impacted.  Do you see that?

3    A.  I see the bullet, yes.

4    Q.  Next one.  Officer Mensah, while you worked for Wauwatosa,

5    do you recall the size grain of the 9-millimeter bullets?

6    A.  I do not.

7    Q.  If I told you it was a 247 grain, would you have any reason

8    to dispute that?

9    A.  I wouldn't.

10   Q.  147 not 247.

11   A.  I'm not good with grains.  I have no reason to dispute you.

12   Q.  They come in certain sizes.  9-millimeters are as little as

13   115-grain, right?

14   A.  I believe so.  Again, I'm not familiar with grains but --

15   Q.  And then, one more.  I'm going to show you 81C, Charlie.

16   You see number four.  There is another fragment.  Do you see

17   that, sir?

18   A.  I do.

19   Q.  So we know you fired five times, right?

20   A.  Correct.

21   Q.  We know that Dr. Tlomak has indicated -- You were here for

22   her testimony, correct?

23   A.  I was.

24   Q.  She indicated that there were two bullets that she

25   recovered, one that entered through the side, correct?

64

1    A.  Correct.

2    Q.  That was 238-grain.  She also got one --

3            MS. BAYNARD:  Objection.  Misstates his prior -- You

4    are misstating the medical examiner's testimony.

5    Q.  138-grain, I'm sorry.  One through the side that was

6    138-grain she testified to, correct?

7    A.  I have no reason to dispute the grains, but yeah.

8    Q.  Another one in the back that was 146-grain, correct?

9    A.  Correct.

10   Q.  There was one that went through the body, so there was no

11   recovery, correct?

12   A.  Correct.

13   Q.  And then she indicated there was a fragment in the front,

14   right?

15   A.  Correct.

16   Q.  So we know three full bullets.  Side, through the back, into

17   the back, correct?

18   A.  Correct.

19   Q.  And we know there's a fragment, right?

20   A.  Correct.

21   Q.  So if you fired five times -- I've shown you two bullet

22   fragments, correct?

23   A.  On the pictures?

24   Q.  Yes.

25   A.  Two different bullet fragments.

1   Q.  You were the only one that fired that night, correct?

2   A.  Well --

3   Q.  You were the only officer who fired that night, correct?

4   A.  Correct.

5   Q.  Finally, I just want to make sure to clarify.  When you did

6   give your initial interview with Officers Schroeder or Detective

7   Schroeder and Rom, you were present with an attorney by the name

8   of Cermele?

9   A.  Correct.

10          MR. CADE:  Those are my questions, Your Honor.

11          MS. BAYNARD:  This will be a good time for a break.

12          MR. CADE:  We'll take a break, Judge.

13          THE COURT:  We'll take five minutes.

14          BAILIFF:  All rise.

15          (Brief recess taken.)

16          (Back on the record.)

17          THE COURT:  Okay.

18          (Jury enters.)

19          THE COURT:  Mr. Mensah, you're still under oath.  Go

20   ahead.

21   **CROSS EXAMINATION BY MS. BAYNARD:**

22   Q.  Detective Mensah, where did you grow up?

23   A.  I grew up in Milwaukee and Wauwatosa.

24   Q.  And have you lived in the Milwaukee area your whole life?

25   A.  Most of it.  About three years in Madison.

66

1    Q.   Why did you decide to become a police officer?

2    A.   A combination of things.  One, seeing I guess the trouble

3    some of my friends got into in high school.  And two, seeing, I

4    guess, more like a desire to actually help people who are truly

5    in need.

6    Q.   This incident happened five years ago, correct?

7    A.   It did.

8    Q.   Since that time, have you gotten married?

9    A.   I have.

10   Q.   Got a new baby?

11   A.   I do.

12   Q.   I want to --  I know we kind of talked about it a little

13   bit, so I'll go over a thumbnail sketch of your background in

14   law enforcement.  When did you graduate from the police academy?

15   A.   May of 20 -- Sorry, not May.  Summer of 2012.

16              THE COURT:  Ms. Baynard, you have a soft voice.  Keep

17   close to the mic.

18   Q.   You spent some time at Wauwatosa, true?

19   A.   Correct.

20   Q.   And now you are a detective with the Waukesha County

21   Sheriff's Department?

22   A.   Correct.

23   Q.   Any other careers in law enforcement or law enforcement

24   adjacent from the time that you graduated the police academy to

25   now?

1  A.  I think the specific agencies or just general?

2  Q.  Why don't you start with your first job that you had in

3  policing.

4  A.  All right.  So if you want to start with the first job, I

5  guess it was -- I was actually a reserve police officer for

6  Wauwatosa starting in 2009.  If is one of the few if only I

7  recall reserve units in the State of Wisconsin to have sworn

8  officers.  So even though you are a reserve officer, it's

9  volunteer.  You still have arrest powers.  It's one of the

10  oldest reserve units in the State of Wisconsin.

11        I did that for a few years, got hired by Dane County

12  in 2012, worked in the jail and transferred to UW Madison PD for

13  a couple years.  So in total about three years out of Madison

14  and came back home to Wauwatosa mainly for family reasons and

15  stayed there until fall of 2020, and then got hired by the

16  Waukesha County Sheriff's Office in 2021.

17  Q.  I want to talk a little bit about the training that you

18  received prior to becoming a police officer.  I want to keep it

19  specifically to DAAT.  I'm sure you've had a lot of other

20  training.  When I say DAAT, are you familiar with what I am

21  speaking about?

22  A.  I am.

23  Q.  Can you just describe that training in a few sentences for

24  the jury?

25  A.  DAAT is essentially it stands for Defense and Arrest

1  Tactics, but it is pretty much a training where you learn how to

2  --  There's different levels of force, but you're pretty much

3  trained to use alternatives to gain voluntarily compliance.

4  Q.  And when you receive DAAT Training, is that something you

5  get in the police academy?

6  A.  Initially, yes.

7  Q.  And do you receive -- I guess do you have yearly

8  recertifications, or do you have recertification trainings on

9  DAAT?

10  A.  You have in-service.  So throughout the year, it will be

11  different portions of DAAT.  DAAT covers a lot of different

12  things, so it depends.  But throughout the year, you'll have

13  different not necessarily remedial but different additional

14  training that covers DAAT.

15  Q.  I'm going to jump to the incident that we're here for today.

16  We've heard a lot of questions about announcing yourself to

17  dispatch.  Back in 2020 when you were employed by Wauwatosa

18  Police Department, were the squads equipped with GPS?

19  A.  They were.

20  Q.  So did the GPS -- Describe what that looked like from the

21  inside of the squad.

22  A.  Inside of the squad car, there's a map.  And on the map, you

23  can see pretty much where every squad car is in the city.  The

24  GPS is linked to the car, not to the officer itself.  Each car

25  has a GPS or the map shows where every car and squad is in the

69

1   city.

2   Q.  Okay.  Is that something that you just have up on the screen

3   or you can check at any time while you're on patrol?

4   A.  Yes.

5   Q.  You've been asked a lot about why you go to the call.  You

6   don't, I guess, alert dispatch, put yourself onto the call.

7   Would you agree that probably would have been the best thing to

8   do?

9   A.  Put myself on the call?

10  Q.  Let dispatch know where you were?

11  A.  Yes and no.  It is kind of two fold.  One, yes, you can let

12  other officers know.  But at the same time how -- Again, we went

13  from districts to sectors.  With districts no matter what if a

14  call came out in District I, only the District 1 officer would

15  be assigned.  If there's another officer available, then they

16  might pick somebody else.

17          With sectors, it doesn't matter which sector you're in

18  or sector you're from.  If you are assigned to Sector 2 but a

19  call comes out in Sector 4 and you're closest to the call, it

20  doesn't matter if you are not in Sector 4, you'll get assigned

21  the call.

22          The issue is that as the day goes on and there is a

23  call for service, it can only select people who are available

24  for calls.  So if you put yourself at the mall, every officer

25  that's assigned to the mall is no longer available.  They are no

1  longer to answer calls anywhere else the city.  So a lot of us

2  there float to an area but won't assign ourselves to the

3  specific call just in case another call for service comes out,

4  dispatch knows, okay, these are the squads that are still in

5  service, I can pick one of them to go to this call.

6  Q.  You're talking very fast, so have you slow down so the court

7  reporter can take down what you're saying.  In February -- So if

8  my math is correct, on February 2nd of 2020, you had been about

9  eight years out of the police academy?

10  A.  Correct.

11  Q.  And what shift were you working that day?

12  A.  Second shift.

13  Q.  What is second shift?

14  A.  Second shift for early cars is 2:00 p.m. to 10:24 p.m..

15  Late cars is 3:00 p.m. to 11:24 p.m.

16  Q.  And we've already talked about the area that you were

17  responsible for.  That was Sector 2; however, I guess you're

18  allowed to or you can float between sectors based on the need

19  for service, true?

20  A.  Correct.

21  Q.  Would you say that when Wauwatosa switched from districts to

22  sectors, it was a more collaborative response to the needs of

23  the city?

24        MR. CADE:  Your Honor, she's complaining about me

25  testifying.  Now, she's testifying.  She can ask him a question

1   as opposed to putting it in.

2           THE COURT:  Okay.

3   Q.  I'll move on.  Why do you respond to Mayfair Mall on

4   February 2, 2020, the first time?

5   A.  The first time was due to the nature of the call.  There was

6   a call for some type of domestic involvement, someone with a

7   gun.  I floated that way even though I wasn't assigned to the

8   mall.  I pretty much was kind of taking a step back as more of

9   see if I was needed anywhere, see if I can have eyes on.  If

10  they needed my assistance, whether inside the mall or outside

11  the mall, I would be available if need be.

12  Q.  While you floated over to the mall sector, are you still

13  monitoring your sector or traffic if you hear a call in your

14  sector?

15  A.  Yes.

16  Q.  And since you didn't, you know, put yourself onto the call

17  at that point at the mall, could you still have received a call

18  for service in your sector?

19  A.  Yes.

20  Q.  At some point, you're at the mall, and are you listening for

21  information?

22  A.  I am.

23  Q.  Okay.  And you leave at some point?

24  A.  Yes.

25  Q.  Start to head back to your sector?

1   A.  Correct.

2   Q.  Is -- when you responded to the mall the very first time,

3   did you respond lights and sirens?

4   A.  I did not.

5   Q.  The initial report was some kind of domestic or potential

6   for a firearm or possibly someone saw a firearm was the initial

7   call, true?

8   A.  True.

9   Q.  Would you agree that a report of a firearm at the mall is a

10  high-priority call?

11  A.  It is.

12  Q.  It is a high enough priority call where you would float to

13  that sector to see if you were needed for anything?

14          MR. CADE:  Same objection, Judge.  She can ask him the

15  question rather than telling him what to say.

16          THE COURT:  Try to avoid leading as best you can.

17  Q.  Okay.

18          THE COURT:  Although this is background in a way.

19  Q.  Okay.  I will jump to what information prompts you to

20  head -- Strike that.  We talked a little bit about or you were

21  played a video.  I believe it was Exhibit 1A.  I'm going to play

22  a video.  I want to talk to you a little bit about what happened

23  that day, and I am going to play Plaintiffs' Exhibit 1 for you

24  all the way through, and then I'm going to ask you some

25  questions.

1                    (Whereupon tape is played.)

2    Q.  Officer Mensah, you were asked -- You were played -- The

3    version that you were played, that Attorney Cade played for you,

4    was a slowed-down version of this event, correct?

5    A.  Correct.

6    Q.  Do you know how long you were actually discharging your

7    firearm for?

8    A.  A few seconds.

9    Q.  When you arrive on scene, what -- When you park your car,

10   you arrive on scene and you park your car, what do you do?

11   A.  I get out my car, and I start running westbound through the

12   parking lot.  I see a mall security supervisor, and I was pretty

13   much screaming at him to tell his guys to get out of there.

14   Q.  Why are you telling him to get the security officers out of

15   there?

16   A.  It's a call for pretty much an armed subject at that point.

17   I mean, we had at least up until this point the updates that we

18   got, we had a subject involved in a disturbance at the mall,

19   possibly armed, ran from the police, continues to run from the

20   police.  We have a subject that we are, at least, going to

21   arrest or can arrest for several crimes, and that person is

22   possibly armed.  Mall security is not armed.  They don't have

23   bullet-proof vests.  They don't have body armor.  It's very

24   dangerous for anyone that is not able to protect themselves.

25   Q.  I want to talk about the information that I think you said,

1    updates you were getting.  When you -- From the time you leave,

2    and I'm not going to hold you to exact times.  What additional

3    information do you receive about this incident at Mayfair Mall?

4    A.  So from the time that I left, I don't remember exactly when

5    I heard different things, but I heard description.  I heard the

6    clothing description, what he was wearing or what he was

7    carrying as well as who we're specifically looking for.  Is it

8    only one person.

9           And then eventually, it was the call that someone gave

10   over the radio.  I don't remember if it was dispatch or another

11   officer that there was a group of individuals by the Nordstrom

12   parking deck or something along those lines.

13   Q.  So I want to break that down.  You receive a report or

14   dispatch information that there's a disorderly incident at the

15   mall, true?

16   A.  True.

17   Q.  And then you receive updated information of a description of

18   the individual that is going to be the subject of that

19   disorderly incident?

20   A.  True.

21   Q.  And you receive information that this individual --  Do you

22   hear over the radio that and you've been in court while it has

23   been said that that individual pulled out a gun during the

24   interaction or altercation?

25   A.  True.

75

1  Q.  Okay.  And is brandishing a firearm different than having a

2  firearm on your hip?

3  A.  Yes.

4  Q.  Is there a difference between and difference in escalation

5  between somebody who has a gun concealed in a fanny pack and

6  someone who removes it from a fanny pack?

7  A.  Yes.  And anyone can conceal a weapon.  Obviously, as law

8  enforcement, we have to depending on when we can kind of decide

9  if they have a concealed carry or anything like that.  But just

10  possessing it, concealing in and of itself isn't -- necessarily

11  makes it more dangerous.  But once you start introducing an

12  incident where one person is letting another person know that

13  they have a gun and then showing it to them, yeah, that makes

14  things a lot more dangerous.

15  Q.  And then the next information you hear is this call out for

16  a foot pursuit?

17  A.  Yes.

18  Q.  And you've been in court and heard testimony.  When you hear

19  the foot pursuit over the radio, are you also dispatched in that

20  all-squad dispatch?

21  A.  Yes.  It's kind of two things.  One, once foot pursuit hits

22  the radio, you don't have to wait for dispatch to send all

23  squads.  The common practice in how we're trained is once foot

24  pursuit happens, all squads go.  Doesn't matter where you are,

25  doesn't matter if you're in the city or not.  If you're on duty,

1    you need to respond.

2    Q.  Why is that?

3    A.  Because it can be incredibly dangerous from the moment the

4    pursuit starts to the end for various factors, officer/subject

5    factors, the level of training, fatigue, the end of the foot

6    pursuit which can be violent for both the person being chased

7    and the officer.  You can hurt and fall during it.  So for those

8    reasons and others, yeah.

9    Q.  And why was this specific foot pursuit dangerous?

10   A.  This one specific is dangerous because we believe the person

11   being chased was armed.

12   Q.  And the person that --  When you get out of your car and

13   start running, who are you focussing on?

14   A.  I am focusing on or trying to acquire the subject in the

15   gray hoodie with the fanny pack.

16   Q.  And we see everybody, kind of bodies running through the

17   Cheesecake Factory parking lot.  Once the foot pursuit starts,

18   why not just let them run away?

19   A.  For several reasons, and it's been stated in court, too.

20   One of the main reasons is he's armed.  He's shown that even

21   without being amped up, any kind of emotions involved, he's

22   willing to get involved in some kind of incident.  And while

23   he's involved in that incident, he displayed the weapon.  He was

24   stopped by the police.  He ran.  There's continued resistance,

25   and now he's running toward a busy six-lane highway.  It's at

77

1    night.  Without headlights on, it's dangerous.  If he gets into

2    the highway, he can be hit by a car.  He can find a position of

3    cover, he can retrieve the firearm and fire it.  For the

4    community or everyone involved, we can't just let it go.

5    Q.  And on February 2, 2020, are you aware that there are other

6    police officers involved in the chase, other Wauwatosa Police

7    Officers involved in the chase?

8    A.  Yes.  Before the foot pursuit got called out, I knew that

9    Johnson and I believe it was Schleis was there.  I knew Johnson

10   because he is the one that called out foot pursuit.  Based on

11   the map, I can see that there are other officers at the mall.  I

12   think I heard Evan Olson saying that he was heading that way.  I

13   knew other officers were there.

14   Q.  When you park your squad and get out, I believe you said you

15   saw security, the supervisor for the security officers?

16   A.  Correct.

17   Q.  And you told him to get his guys back?

18   A.  Yes.

19   Q.  So I guess were you aware that there were security officers

20   in the area as well?

21   A.  I was.  I knew they were in the area.  I knew they were at

22   the mall.  I did not know they were directly involved in the

23   foot pursuit.  That's not common.  It happens every now and

24   then, but I worked at the mall.  I was mall security at one

25   point.  We were instructed unless it is an absolute emergency or

1    you are being instructed by a police officer, you don't get

2    yourself involved in foot pursuits or use of force unless you're

3    defending someone else.  With firearms involved, they are not

4    supposed to be involved.

5    Q.  And you see the video and you know there's a security

6    officer chasing Mr. Cole?

7    A.  Yes.

8    Q.  We talked a little bit about the commands that were being

9    issued.  I'm going to play.

10            (Whereupon tape is played.)

11   Q.  Now, Officer Mensah, do you hear yourself on that audio

12   clip?

13   A.  Just that I heard --  I said shots fired.

14   Q.  Okay.  Do you hear the gun is out, the gun is out?

15   A.  I do.

16   Q.  Do you hear other people yelling things as well?

17   A.  I do.

18   Q.  Do you hear other people yelling to drop the gun?

19   A.  I hear drop the gun, get on the ground, show me your hands.

20   I'm hearing all that.

21   Q.  On February 2, 2020, did you hear other people regardless if

22   you knew who the officer was or not issuing commands to

23   Mr. Cole?

24   A.  I did.

25            (Whereupon tape is played.)

79

1    Q.  While you're pursuing, you hear a gunshot, true?

2    A.  True.

3    Q.  And which direction is the gunshot coming from?

4    A.  From my west.

5    Q.  And on February 2nd when you hear the gunshot, did you know

6    who fired it at that time?

7    A.  I did not.

8    Q.  Okay.  And what do you do then after hearing the gunshot?

9    A.  I immediately unholster my gun.

10   Q.  Your gun is not unholstered until you hear a gunshot?

11   A.  Correct.

12   Q.  Why do you unholster your gun in response to a gunshot?

13   A.  Because I don't know --  I don't know who shot.  I don't

14   know where the shot is going, where the rounds are going.  But

15   either way, somebody did it.  So I don't know if I was getting

16   shot at, if another officer was getting shot at, if officers

17   were shooting.  I didn't know.

18   Q.  And at some point, okay, so you hear the gunshot.  You

19   unholster, and then what do you do next?

20   A.  I start pretty much assessing and scanning.  One, do I see

21   anything immediately in front of me?  And two, where is the

22   subject that we're chasing?  I knew that the gunshot came right

23   from the direction of the same person that we were chasing, so I

24   kind of infer that that person was involved.  Whether they were

25   shooting or getting shot at, they were directly involved, so I

1  kind of focused my attention on that or that person.

2  Q.  So after you hear the gunshot, you focus your attention.

3  And we now know the gunshot came from Alvin Cole.  You pull your

4  firearm, and did you say you were scanning or processing?

5  A.  Yes.

6  Q.  At some point, do you see Mr. Cole with the gun?

7  A.  I do.

8  Q.  And you've been in court and there's been testimony about

9  potentially Mr. Cole shooting himself with this gunshot.  Did

10 you hear that testimony?

11 A.  I have.

12 Q.  Do you know if Mr. Cole shot himself?

13 A.  No.  At that point, I did not.

14 Q.  When you heard that first gunshot and you see Mr. Cole, is

15 he -- Do you hear him yell anything?

16 A.  No, that was part of the scanning.  Like, no one was

17 yelling, no one was screaming.  No one was immediately saying

18 I'm shot, I'm hit, I'm hurt.  No one was rolling around.  That

19 is part of why I was trying to figure out what is going on

20 because no one is saying anything once the shot went off.

21 Q.  You didn't hear Mr. Cole say my arm?

22 A.  No.

23 Q.  After that --  When you are pursuing and I'm not sure if

24 this is --  Let me show you a different exhibit.  Hold on a

25 second.  I'm going to show you what's been marked as Plaintiffs'

1    Exhibit 5.  It's an overhead scan.  You've been in court when we

2    played this video; is that accurate?

3    A.  That's accurate.

4         (Whereupon tape is played.)

5    Q.  So when you get out of your car and you are in this pursuit,

6    are you running up against this concrete barricade that -- Do

7    you see this concrete --  Do you have it on your computer

8    screen?

9    A.  I see it.

10   Q.  You see the concrete barrier.  During the pursuit, are you

11   running up against the concrete barrier?

12        JUROR:  I can't hear.

13   Q.  So during the pursuit, are you up against the concrete

14   barrier?

15   A.  No.

16   Q.  I am not going to hold you to exact distances.  But would

17   you be able to point to kind of where the line of people -- Is

18   it -- We will go car lengths off the wall.  I don't need you to

19   tell me how far up or how far back but car lengths from the

20   concrete wall.

21   A.  Including I guess if you want to call it half or partial car

22   lengths that's right next to that concrete barrier, I'd say

23   about two to three.

24   Q.  Two to three?

25   A.  Yes.

1    Q.   Okay.  At some point -- When is the first time that you

2    observe Mr. Cole with a gun in his hands?

3    A.   As I was pretty much getting up close to him.

4    Q.   And at some point, do you start to believe that Mr. Cole is

5    the one that fired?

6    A.   Yes.

7    Q.   And what is that based on?

8    A.   Based on the fact that a shot just went off and Alvin Cole

9    was right there when that shot went off, and now I see someone

10   on the gun -- I'm sorry someone on the ground with the gun, and

11   it matches the same description with the person that was

12   involved in the disturbance at the mall.  We have a description

13   of someone at the mall with a gun, foot pursuit of that person,

14   shot goes off right next to that person, and now that person is

15   on the ground with the gun.  So I can pretty much infer that

16   this is the person who shot.

17   Q.   You're not 100 percent certain that Mr. Cole is the one that

18   shot, true?

19   A.   Not 100 percent, no.

20   Q.   When you heard the first gunshot, you just knew it came from

21   his direction?

22   A.   Yes.

23   Q.   Based on your observations and what you knew on the scene,

24   when you get up to him and he has a gun, you're thinking that

25   Mr. Cole is the one that fired the first time?

83

1  A.  Yes.

2  Q.  Okay.  What happens -- We talked about this ten second time

3  period.  I want you to explain if you can -- I'm not going to

4  hold you to seconds, but from the first gunshot to your shots

5  where you're located.  And if you need to get -- I can zoom out

6  or if you need to get down or think you can describe without a

7  map, that's fine with me.

8  A.  I can get down.  All right.  I'd say the foot pursuit was

9  pretty much going this way.  And what was the other part of the

10  question?  I'm sorry.

11  Q.  I wanted to know what happened from the time you heard Cole

12  shot to you shooting, where your location is?

13  A.  So again, I was kind of in the line with them running this

14  way once the shot happened, and then he started going this way

15  so I kind of veered off here, and I was -- I'm not again -- This

16  is just the debris.  If he was around here, I probably came

17  about right here-ish.

18  Q.  Okay.  When you get up to Mr. Cole, is his arm bleeding?

19  A.  I did not see any bleeding.

20  Q.  You had -- There's lights on him?

21  A.  Correct.

22  Q.  You can sit back down.  And when you get up to him, he's not

23  yelling anything about his arm being injured or anything like

24  that?

25  A.  No, no complaints, no visible signs that he was hurt or

1    distraught or in distress or anything.

2    Q.  And you've been in court, and you've heard the testimony.

3    You see him.  At some point, he's on his hands and knees.  Does

4    it appear that he can't keep himself up with his own arms?

5            MR. CADE:  Objection, Your Honor.  No foundation for

6    him to be able to identify whether someone could or could not

7    hold themselves up.

8            MS. BAYNARD:  I will rephrase.

9    Q.  Based on your observations, does it appear that Mr. Cole is

10   having a hard time holding his body weight up?

11   A.  Based on my observations, no.

12   Q.  At some point, Mr. Cole turned and pointed the firearm at

13   you.  Can you describe that sequence.  And if you need to go a

14   couple seconds before, that's fine.

15   A.  Yes.  So as I got closer and I saw that the gun was out, I

16   let the other officers know that I saw the gun out.  He was in

17   that, like, I call it a three point, four-point stance while

18   still kind of moving.  And at some point and I see the gun.

19   It's in his right hand.  And at some point, it moves.  Like, the

20   gun starts moving and his body kind of shifts and turns toward

21   me.  It wasn't a drastic turn around.  It was, like, his body

22   and upper body was kind of shifting toward his left, and the gun

23   either --  It is not so much, like, over the shoulder like this.

24   It was either --

25   Q.  You're going to have to stand up.  We can't see you.

1   A.   So I know in court it's been said it was more of, like, an

2   over the shoulder like this.   No.   It was more of either as he

3   was turning, like, either this or this.   I am not actually sure

4   which one.   Once I saw the -- One second.   Once I saw the gun

5   pointed at me, I didn't know if it was pointing at anybody else.

6   But in that moment, I saw it was pointed directly at me.   And at

7   that point, again, going through that mental checklist, have a

8   subject who has a weapon.   He has the intent by pointing at me.

9   He has the delivery system by being able to, one, I can

10   articulate I believe he had just fired it, and now it's pointing

11   at me.   So within, I don't know, that split second of actually

12   seeing it, I started to prepare myself to get shot, so I started

13   moving to my right and kind of, I guess, backing as I was

14   starting to shoot, and I kept shooting until the threat was

15   stopped.   It was dark.   It was at night.   And it's not like a

16   video game.   It's not like TV.   I don't get to pause and go to

17   his point of view and wait to see, okay, exactly who are you

18   pointing at?   Are you pointing at me?   Are you pointing at

19   Shamsi or Johnson?   I don't get that luxury in the fraction of a

20   fraction of a second.

21          At the same time instead of focusing, I'm trying not

22   to be insensitive to the family.   I'm not focusing on the gun

23   anymore.   I'm focusing on what I need to do to stop the threat.

24   So you're focusing pretty much on the sights of the gun.   It's

25   dark, it's at night.   Regardless of what the lights are, it

1  doesn't change the fact that your sight fixture on a firearm is

2  different.  And once you start firing, you're pretty much --

3  Kind of what you're looking at is kind of washed out by the

4  lights and by the flash and all that.  So you're focusing on the

5  front sight, stopping the threat.  Once the threat was stopped,

6  I stopped shooting.

7  Q.  And you were in court and you saw -- Were you in court when

8  Officer Olson said --  Do you need a minute?

9  A.  I'm okay.

10  Q.  That the firearm at one point he sees it pointed out to the

11  west towards him.  Did you hear that?

12  A.  I did.

13  Q.  You didn't see it pointed in the west towards Officer Olson?

14  A.  I did not.

15  Q.  Officer Mensah, did you shoot Alvin Cole for no reason?

16  A.  No, I didn't want to.

17  Q.  And we're going to talk about these --  So then why do you

18  decide to discharge your firearm?

19  A.  I didn't want to get shot.

20  Q.  How much time do you think you had to make that evaluation?

21  A.  A fraction of a fraction of a second.  Walking up to him, I

22  thought he would give up and surrender and give up and be the

23  end of it.

24  Q.  Is that what you were hoping for?

25  A.  Yes.  At the end of the day, this wasn't the most serious

1  offense at the mall.  I mean, disorderly conduct while armed is

2  not --  is not a life in prison sentence.  Yes, you can get

3  arrested, you go to jail.  It might be a felony.  I don't even

4  know.  But once it's done, it's contained, and that's the end of

5  it.  There's no need to shoot your way out of it.

6         MS. BAYNARD:  I don't have anything else.

7         MR. CADE:  Brief rebuttal, Your Honor?

8         THE COURT:  Yes.

9  **REDIRECT EXAMINATION BY MR. CADE:**

10  Q.  Officer Mensah, is Agent Shamsi a liar?

11  A.  I am not calling him a liar.

12  Q.  You've known him for a few years.  Do you believe he is a

13  liar?  Yes or no?

14  A.  No.

15  Q.  So Agent Shamsi never saw movement or anything towards you.

16  You'd agree that he's got to be wrong for you to be right,

17  correct?

18         MS. BAYNARD:  Object to the form of the question.

19         THE WITNESS:  I'd say --

20         THE COURT:  I'll allow it.

21         THE WITNESS:  I'd say based on the situation that we

22  had, I believe he was mistaken.  I believe this was a very

23  stressful thing for him as it was for all of us.  I can't

24  speculate to what he did or didn't see.  But again, from my

25  training and experience, I've had countless investigations where

88

1  people will be literally right next to each other and two

2  witnesses, two victims will have completely different stories.

3  It's common.  It happens.  Again, when you go through something

4  traumatic and you go code black or you're too stressed out, you

5  might focus on one thing, and that's all you can see.  Your

6  recollection of what happened, it might not be accurate at all.

7  Q.  But you just said a moment ago, it might be stressful for

8  Officer Shamsi.  He was in combat.  You've never been in combat?

9          MS. BAYNARD:  Objection.  Asked and answered.

10         THE COURT:  Sustained.

11 Q.  You indicated as you were discharging your weapon, you were

12 saying you used the word process and scan.  Do you recall that?

13 A.  Yes.

14 Q.  You were listening for sounds.  Do you recall that?

15 A.  Yes.

16 Q.  So you clearly had time to process as you approached,

17 correct?

18 A.  There was time.  I don't know how much.

19 Q.  Right.  My question is --

20 A.  Correct.

21 Q.  It wasn't like boom, I got to shoot.  You had time to

22 process, correct?

23 A.  Yes.

24 Q.  You had time to look at Cole and figure out what he's doing,

25 right?

89

1  A.  Yes.

2  Q.  And Alvin Cole, the gun wasn't pointed in your direction for

3  all five shots, was it?

4  A.  I wouldn't know.

5  Q.  You just started shooting?

6  A.  Like I said, it was pointed at me.  There was a threat, and

7  I shot until the threat was stopped.  That's how we're trained.

8  Q.  I should ask this.  Do you think Olson is a liar?

9  A.  No.

10  Q.  Olson never saw it pointed directly at you, did he?

11       MS. BAYNARD:  Objection to the form of the question.

12  Argumentative.

13       THE COURT:  Yeah, sustained.

14  Q.  Let me ask you this.  You made the statement about the GPS.

15  Is the GPS in the squad cars, is it on the entire time you're

16  driving around?

17  A.  Yes.

18  Q.  So you've got GPS on a computer, and you've got other things

19  on a computer, like, when you pull over a car, and you're

20  looking up license plates and things like that?

21  A.  You can pick what you want on your scene, but yes.

22  Q.  So you've got to decide whether you want the GPS up or not?

23  A.  Yes.

24  Q.  So other officers -- The fact that you're on GPS doesn't

25  mean they know or they have GPS up on their screen, right?

1    A.  That's correct.

2    Q.  Okay.  You briefly talked about you were a reserve police

3    officer, right?

4    A.  Yes.

5    Q.  In Wauwatosa?

6    A.  Yes.

7    Q.  So you were -- As a reserve, you were a sworn officer.  You

8    couldn't carry a weapon, but you had arrest powers?

9    A.  Yes.

10   Q.  That was pretty cool, huh?

11         MS. BAYNARD:  Objection to the form of the question.

12         THE COURT:  Sustained.

13   Q.  You indicated that you only had a few seconds or your

14   discharge was only for a few seconds in response to Officer

15   Baynard -- Strike that.  Let me ask you this question instead.

16   Can you --  Can you come down?  And on what we have on the

17   screen, can you show me, Officer Mensah, if you can see it where

18   you were when you first heard the shot?

19   A.  It's hard to gauge distances.  The only recollection I have

20   as far as where I was was based on the video where I could see

21   my back and running away from the camera, so I'm not honestly

22   not sure.  I can try my hardest.  It was roughly, I'd say,

23   around here maybe.

24   Q.  When you first heard the shot?

25   A.  Yes.

1    Q.  Right about there?

2    A.  Sure.

3    Q.  Okay.  And we've got a car length, correct?

4    A.  Yes.

5    Q.  About 20 feet for a car length?

6    A.  Yes.

7    Q.  About eight and-a-half, nine feet wide, 20 feet long,

8    correct?

9    A.  Correct.

10   Q.  So we've got, approximately, 20, would you agree?

11   A.  Between me and --

12   Q.  No, no, 20 for just this point?

13   A.  Yes.

14   Q.  Remember, a car has to back out.  It is pretty much a full

15   length for a car too?

16   A.  Yes.

17   Q.  So we've got 20 and roughly another 20, correct?

18   A.  Yes.

19   Q.  So 40 feet this way and eight and-a-half, nine feet.  So

20   that's just under 20 feet, correct?

21   A.  Yes.

22   Q.  So going back to trigonometry, A squared plus B squared,

23   this is about 22, 20 -- I'm sorry, 45 to 50 feet?

24   A.  Yes.

25   Q.  Thank you.  Finally, you would agree that as an officer, you

1    have immense power.  You have immense power because you can

2    decide to arrest somebody, correct?

3    A.  Correct.

4    Q.  You have immense power because you can decide to pull over a

5    car, correct?

6    A.  Correct.

7    Q.  You have immense power because you can make decisions

8    whether you radio them in, you put them in a report, anything,

9    even how you testify as an officer, correct?

10   A.  That's correct.

11   Q.  You also have immense power because you have the right to

12   discharge your firearm, right?

13   A.  Correct.

14   Q.  And again, if you --  Would you agree there's a possibility

15   that you could have been wrong on that night?

16   A.  No.

17           MR. CADE:  Those are my questions, Your Honor.

18           THE COURT:  Thank you.  You are excused.  Next

19   witness.

20           (Witness excused.)

21           MR. CADE:  Your Honor, we're going to call Lori Rom

22   briefly.  This will be very, very short.

23           Lori Rom, being first duly sworn to tell the truth,

24   the whole truth, and nothing but the truth, testified as

25   follows:

1          MS. ROM:  Yes, I do.

2          THE COURT:  Have a seat.  State your name for the

3     record, and you have to talk close to the mic.

4          THE WITNESS:  Okay.  It is Lori Rom, L-O-R-I, R-O-M.

5     **DIRECT EXAMINATION BY MR. CADE:**

6     Q.  And you are a detective with the Milwaukee Police

7     Department?

8     A.  Yes, I am.

9     Q.  What is your current assignment?

10    A.  I am a detective down at our Fusion Center.

11    Q.  What does that mean, Fusion Center?

12    A.  The Fusion Center is kind of, like, the hub for the

13    department where everything is needed.  I personally work on all

14    the NIBN cases, which is a machine that basically puts the fired

15    casings into a machine, plus the firearms, and they test them.

16    And then they come to my desk if they are related to numerous

17    different incidences, and I kind of figure out who did it or if

18    I can find out any information regarding connecting all the

19    cases.

20    Q.  Okay.  Back in February 2020, do you have a recollection of

21    being involved with regards to Alvin Cole's shooting at Mayfair

22    Mall?

23    A.  Yes.

24    Q.  What was your involvement?

25    A.  My involvement was to interview the other officers that were

1    at the scene of the location on that day.

2    Q.  And you did do interviews?

3    A.  I did.

4    Q.  Did you do the interviews alone, or were you partnered with

5    someone?

6    A.  No, I had my partner Detective William Schroeder.

7    Q.  In front of you is Exhibit 51.  Do you see that?

8    A.  I do.

9    Q.  Does that appear to be a report that either you or Detective

10   Schroeder may have drafted?

11   A.  Yes, he did.

12   Q.  Okay.  Were you involved -- It appears as the second

13   paragraph as a report from February 6th of 2020, were you

14   involved and present that day?

15   A.  Yes, I was.

16   Q.  In fact, the report notes that you were present, correct?

17   A.  Yes.

18   Q.  Detective Rom, is there other than -- Let me back up.  You

19   and Detective Schroeder were writing down when you did these

20   interviews what people were telling you, correct?

21   A.  That is correct.

22   Q.  Is there a reason why the interviews were not recorded?

23   A.  Typically with the Milwaukee Police Department, we do not

24   record those interviews, and this was with his attorney, so it

25   was not recorded.

1    Q.   Okay.  And what gets written down during these interviews?

2    A.   Whatever is being said by the person who is involved.

3    Q.   We've had some discussions before you got in the room.  I

4    would imagine what they had for lunch, for example, may not be

5    relevant and recorded down, fair?

6    A.   Fair.

7    Q.   If an officer had pulled a double shift or had been up with

8    a young child or anything like that, would that get written

9    down?

10   A.   Yes, it would.

11   Q.   Why?

12   A.   Because it goes into the officer's mental state at that

13   point.  If they were over tired or they were aware or so we try

14   to start the interviews as far as the night before and how much

15   sleep they got.

16   Q.   Same thing, for example, if they had consumed alcohol or

17   taken over-the-counter medication?

18   A.   Correct.

19   Q.   So during the interview, you are trying to do what?

20   A.   Basically see what the mental state of that person was in at

21   the time of the incident.

22   Q.   Okay.  Is it fair to say you're writing down important

23   things?

24   A.   Yes.

25   Q.   With regards to an officer-involved shooting, detective, is

1   it important if the officer said, I saw a muzzle flash?

2   A.  Yes.

3   Q.  Is it important if the officer said, I saw a gun?

4   A.  Yes.

5   Q.  Is it important if the officer made a statement of the

6   suspect's on the ground, and they are crawling, for example?

7   A.  Yes.

8   Q.  So would I be correct in that if it's important, you or

9   Detective Schroeder would have written that down?

10  A.  Correct.

11  Q.  At the time in February 2020, how long had you been a police

12  officer?

13  A.  In 2020 so five years ago, 13 years.

14  Q.  Thirteen years.  How long as a detective since that time?

15  A.  I was a detective since 2015, five years.

16  Q.  Congratulations.  How many shootings or -- Let me back up.

17  How many times have you had to have this process where you're

18  interviewing police officers?

19  A.  I would say, at least, ten times minimum.

20  Q.  Fair to say that you've gotten pretty good at the rhythm of

21  writing things down?

22  A.  Yes.

23  Q.  Fair to say that you had gotten, at least you thought,

24  pretty accurate in terms of what you recorded?

25  A.  Yes.

1   Q.  Have your reports at this point, have they ever been

2   challenged as if, you know, you didn't write something down, I

3   clearly said it or alternatively you wrote something down, and I

4   never said that?

5   A.  Not that I recall.

6   Q.  If you would turn to the last page or second to last page.

7   Third page, page 117 or 137.  At the bottom of that paragraph,

8   PO Mensah stated his squad car is equipped with a camera but was

9   uncertain if the unit was synched with his radio.  Do you see

10  that?

11  A.  I do.

12  Q.  If Officer Mensah had told you that his microphone did not

13  work or he had equipment in the vehicle that was not working,

14  would that be important?

15  A.  Yes.

16  Q.  So if he said the microphone is broken, that's something

17  that would be listed in the report?

18  A.  Yes.  I'm not sure how my partner -- I don't remember the

19  exact wording from that day.  Just from reading this, it just

20  sounds like PO Mensah had just told us he didn't know if it was

21  synched.  Whether it was broken or not broken, I can't say.  I

22  don't know.

23  Q.  Before the report was issued, you had an opportunity to

24  review it, I would imagine?

25  A.  Are you talking about his body cam?

1    Q.  No, this report.

2    A.  Yes, I did review this report today.

3    Q.  Right.  Before today when Officer Schroeder drafted it, did

4    he just draft it and say the report or would you have looked it

5    over and said, hey, there is a typo or he said yes, it really

6    was no, that type of thing?

7    A.  He typically just writes his report.  I don't review his

8    reports.

9    Q.  Looking over the report, is there anything in the report

10   that appears to be inaccurate?

11   A.  No.

12   Q.  If Officer Mensah had indicated he made a statement, drop

13   the gun, would that be important to go in there?

14   A.  I would think so, yes.

15   Q.  If Officer Mensah made the statement the gun is out, would

16   that be important to be in your report?

17   A.  Yes.

18           MR. CADE:  Those are my questions, Your Honor.

19           MR. WIRTH:  Judge, I have very few.

20   **CROSS EXAMINATION BY MR. WIRTH:**

21   Q.  Detective, the statements that we're talking about are not

22   recorded statements, correct?

23   A.  Correct.

24   Q.  And you anticipate that the interviewee will answer those

25   questions that you are asking them?

1   A.  Correct.

2   Q.  When you do these, do you anticipate the interviewee will

3   answer questions that are not asked of him?

4   A.  Not typically.

5   Q.  And these are not transcripts?

6   A.  That's correct.

7           MR. WIRTH:  That's all I have.

8           THE COURT:  You are excused.  Thank you.  Next

9   witness.

10          MR. CADE:  Judge, it's 11:53.

11          THE COURT:  I know what time it is, Mr. Cade.

12          MR. CADE:  Then, we'll call Ricky Burems to the stand.

13          Ricky Burems, being first duly sworn to tell the

14  truth, the whole truth, and nothing but the truth, testified as

15  follows:

16          MR. BUREMS:  Yes, Your Honor.  I do.

17          THE COURT:  Have a seat.  State your name for the

18  record.  And you have to talk close to the mic.  You can move

19  the mic around, but you have to stay close to it.

20          THE WITNESS:  I am Ricky Burems, R-I-C-K-Y.  Last name

21  is B as in boy U-R-E-M-S.

22  **DIRECT EXAMINATION BY MS. MOTLEY:**

23  Q.  Good morning, Mr. Burems.  Thank you for being here.

24  A.  Good morning, counselor.

25  Q.  Now, Mr. Burems, could you please share with the jurors a

100

1    little bit about your professional background.

2    A.  Yes, I can.  I was on Milwaukee Police Department from 1982

3    until 2014 for a total of 32 years.  I began my first eight

4    years in uniform patrol, and I worked at District III, very,

5    very busy.  I was very active.  I was very interested in

6    learning police work because when you first start, you don't

7    know what's going on.  You're kind of a spectator, and more

8    experienced officers will start to teach you the job.

9          And then as you learn the job, you will probably get

10   your zone squad.  I got my own squad eventually.  At one point,

11   I became a field training officer for about three years.  Again,

12   we were very busy.  We handled, approximately, ten to 15

13   assignments per shift, assignments.  That ranged from family

14   trouble, neighbor troubles, shootings, batteries, robberies, so

15   it was a pretty wide variety of assignments.

16   Q.  And Mr. Burems, you mentioned that you worked for the

17   Milwaukee Police Department; is that correct?

18   A.  Yes.  Please let me continue.

19   Q.  Sorry.  So after my first eight years in uniform, I then

20   worked three years plain clothes drug enforcement where we had a

21   lot of autonomy.  We worked in concert with the vice squad, and

22   we worked out of the district.  And the people would call with

23   drug complaints, and we would respond immediately to handle the

24   complaints.

25          During that time, we would encounter drug dealers,

101

1    gang members people involved in dealing drugs.  I also want to

2    mention just because of the nature of what's going on here, that

3    there were numerous times that we encounter people with guns or

4    weapons.

5            When I was an officer, I was commended twice with

6    people with weapons, and I was able to talk them out of it, so I

7    was commended.  As an officer, I was stabbed.  And as a result

8    of me being stabbed, I was awarded the officer of the year

9    award.

10           After and I am kind of moving around a little bit.  So

11   eight years in uniform, three years plain clothes.  And then in

12   1993, I was promoted to detective.  I was a detective for

13   21 years.  I have gang squad experience as a detective, violent

14   crimes experience.  And then I was ten years in homicide.  The

15   thing about being a detective and I think probably the biggest

16   difference between being a detective and an officer is that as a

17   detective, you learn to dissect cases.  You learn to consider

18   witness statements, evidence, circumstances and even video to

19   kind of determine what happened.

20           You're under a lot of scrutiny from other detectives.

21   You're under scrutiny from your supervisors.  You have sometimes

22   some pretty large cases, and you prepare cases for the district

23   attorney's office.  You evaluate them for what's called

24   prosecutorial merit, determining whether or not there's enough

25   to charge somebody or whether or not somebody should be

1  released.

2  Q.  Okay.  And I'm actually going to turn around here.

3  A.  Can I just add one more thing?

4  Q.  Sure, go ahead.

5  A.  I just wanted to make sure that you understand that also the

6  City of Milwaukee is very busy.  As a detective, we -- I'm

7  sorry, the City of Milwaukee, we probably handle about 600

8  shootings per year and average about 115 homicide per year.  So

9  again, I was very involved, very busy during the course of my

10  career.

11          I've been probably involved in probably 1,000 homicide

12  investigations.  I've interviewed thousands of suspects,

13  thousands of witnesses and evaluated thousands of cases.

14  Q.  Okay.  Thank you, Detective Burems.

15  A.  You're welcome.

16  Q.  Sorry to keep interrupting you.  So as a homicide detective

17  you said for ten years, correct?

18  A.  Yes.

19  Q.  Did you ever investigate homicides?

20  A.  Yes, I did.

21  Q.  Could you just explain a little bit about that process for

22  everyone.

23  A.  Well, when there's a homicide, there's an initial uniform

24  response.  So homicide occurs, somebody calls the police,

25  uniform squads respond.  They determine that there was a

103

1    homicide.  Then, the detective bureau is notified.  And because

2    homicides are considered probably among the most serious cases

3    because loss of life is involved, and I just want to add that to

4    be a homicide detective, I think --  I mean, detectives have to

5    be very motivated.  But a homicide detective is the next step

6    up.  And I'm not trying to brag, but you have to be very

7    motivated, have to spend a lot of time at work.  I probably

8    worked 16 to 20 hours a day.  You have to be objective.  You

9    have to be determined.  It is just another level of police work.

10          So you get to the scene and you start to dissect the

11    scene.  You separate and interview witnesses.  You look at the

12    evidence.  You confer with other detectives, and you try to make

13    a determination of what happened, and you --  you again pull

14    everything apart, put it back together.  And now remember even

15    in homicide at the beginning of every shift, there's a meeting.

16    At the end of shift, there's a meeting.  So at least two or

17    three meetings a day on homicide investigations.

18    Q.  Okay.  Thank you.  And with regards to your work as a sworn

19    law enforcement officer, have you ever investigated police

20    officers who were involved in shootings?

21    A.  Yes.  Not as a police officer.  But as a detective because

22    of the serious nature of police shootings, I investigated, I

23    would say, about 20 police-related shootings.

24    Q.  Okay.  And so in those investigations, was it your job to

25    determine whether or not the shootings by the police officers

1    were justified or not justified; is that correct?

2    A.  That is correct.

3    Q.  Okay.  And with those investigations, did you ever determine

4    that the police were not justified with regards to your training

5    as a detective?  You said that now, where do you work?

6    A.  I work at Milwaukee Area Technical College.  I am an

7    investigator in the public safety department.  I also deal with

8    crimes and, you know, probably everything that I dealt with at a

9    police department, just not to the frequency.  And one of the

10   other major differences is that Milwaukee Area Technical College

11   public safety is not armed, at least not armed with firearms.

12   We have batons, pepper spray, and we are working on getting our

13   tasers up and going.

14   Q.  And as a Milwaukee Police Department officer, did you ever

15   work in collaboration with the Wauwatosa Police Department?

16   A.  Yes, I did.

17   Q.  Okay.  And you're familiar with --  You've been trained as

18   an officer, correct?

19   A.  Yes, I have.

20   Q.  And have you been trained in DAAT Training, the Defense and

21   Arrest Tactics Training?

22   A.  DAAT Training is something that you're innidiated with in

23   the police academy.  And then every year, there is a refresher

24   course of 16 hours.  In fact, even since I've been at MATC,

25   which has been -- this is the 11th year -- I still have that

105

1    training.  So I've had DAAT Training for the last 42 plus years.

2    And that training is something that is incorporated in the way

3    that we deal with the public, whoever that we're dealing with.

4    I think it was mentioned earlier by other witnesses that DAAT

5    stands for Defense and Arrest Tactics.

6    Q.  Okay.  And so with regards to DAAT Training, there's also --

7    You're also trained on when you can use --  when you're

8    permitted by law to use deadly force; is that correct?

9    A.  Yeah.  And again --

10   Q.  Let me --

11   A.  I'm sorry.

12   Q.  We'll get into more specifics.  With regards to use of

13   deadly force or being permitted to use deadly force according to

14   the law, are you trained on that also at the police academy as

15   we've heard Joseph Mensah has been?

16   A.  Yes.

17   Q.  Were you also trained on that with regards to in-services

18   and yearly certifications as well?

19   A.  Yes.

20   Q.  Okay.  So let's talk a little bit about your DAAT Training

21   as it relates to being permitted to use deadly force.  Could you

22   please share with us -- Let me back up.  So you've been asked to

23   be here today by the plaintiffs, correct?

24   A.  Yes.

25   Q.  And with regards to this matter, you have reviewed squad

1  videos, correct?

2  A.  Yes, I have.

3  Q.  You've reviewed the scene photographs, correct?

4  A.  Yes, I have.

5  Q.  You've reviewed the witness interviews as well, correct?

6  A.  Yes.

7  Q.  You've reviewed the audio of any calls that were made,

8  correct?

9  A.  Yes.

10  Q.  And so you've looked at this case pretty extensively.  Is

11  that accurate to say?

12  A.  Yes, I have.

13  Q.  As a trained officer, you have completed investigations

14  involving police -- with police that were involved in shootings,

15  right?

16  A.  Yes.

17  Q.  And with those investigations for pretty much most of them,

18  you've determined that they were justified; is that correct?

19  A.  Can you repeat that, please?

20  Q.  Let me rephrase.  So you've testified for the district

21  attorney's office, correct?

22  A.  Yes, I have.

23  Q.  And so you have worked on behalf of the district attorney's

24  office in making sure or helping to make sure that charges are

25  brought forward against people, correct?

107

1    A.  Yes, I have.

2    Q.  And with regards to your DAAT Training, could you please

3    talk to us a little bit about your training as it relates to the

4    use of deadly force.

5    A.  DAAT Training related to the use of deadly force.  I just

6    want to explain that again it is Defense and Arrest Tactics, and

7    it is designed to set up parameters for officers as to when it

8    is proper to use deadly force, but it's also designed to protect

9    citizens from excessive force.

10           I just want to make that clear, and there's --  The

11   first component in regards to force is just the presence of a

12   uniform officer, and that if someone is doing something that

13   they are not supposed to be doing and there's an officer present

14   in uniform, just their mere presence should be a deterrent or

15   affect their behavior.

16           Secondly, then there's the verbalization.  If a

17   uniform officer sees you doing something that you should not be

18   and they tell you to stop, you know, because that is a uniform

19   officer telling you to stop, you should stop.

20           Then, there's the empty hand component where an

21   officer may, you know, put their hands on you if you're not

22   correcting your behavior.  And then after that, there is the --

23   You have the nondeadly weapon such as your baton, your pepper

24   spray, your taser, even physical force, fists, elbows, and

25   lastly is deadly force.

1           And deadly force is only to be used and when there is
2    no other alternative when you can't negotiate, when you can't
3    run away, when your other weapons are not effective, when you
4    are in a situation that if you do not use deadly force, then
5    someone will take your life.  That is the only time that you are
6    allowed to use deadly force according to DAAT.  You can't use
7    deadly force if you're mad, if you're scared, if you want
8    revenge.  That is not proper under DAAT.
9    Q.  So is it fair to say that with regards to this matter, you
10   can use deadly force if you're in imminent danger; is that
11   correct?
12   A.  Yeah, and that --  Imminent danger is when you have no other
13   choice.  When you absolutely if I don't use deadly force, then
14   deadly force is going to be used against me.  That is what is
15   meant by imminent danger.  It's coming if I don't use deadly
16   force to stop it.
17   Q.  You've also been listening to the testimony throughout this
18   matter, correct?
19   A.  Yes.
20   Q.  And it's fair to say that with regards to this matter, that
21   Joseph Mensah can only use deadly force if his life was in
22   imminent danger; is that correct?
23   A.  That is correct.
24           MR. WIRTH:  I'll object to form.
25           THE COURT:  Sustained.

109

1  Q.  Now, when you -- When an officer makes a decision to shoot

2  their weapon in this situation, according --  Let me just back

3  up one second.  You said you were a field training officer,

4  correct?

5  A.  Yes, I was.

6  Q.  And as part of being a field training officer, did you also

7  train other officers on excessive force?

8  A.  Yes, I have.

9  Q.  Could you please talk a little bit about that.

10  A.  Well, again you know, like I mentioned earlier, when you

11  first become a police officer, you don't know anything.  And as

12  a field training officer, you're shaping the culture, the

13  attitude, the actions of a younger officer who does not know

14  everything.  And if an officer is about to use not just deadly

15  force but force, if they are going overboard using force when

16  they are not entitled to use force, and I mentioned, you know

17  earlier, you can't use it just because you're mad at somebody

18  because you're trying to get back at somebody, then you pull

19  them back and you explain to them, you know, that was not the

20  proper time to use force.  And you can get in trouble for using

21  force when you're not supposed to use it.

22  Q.  And is it fair to say that when an officer decides to shoot

23  their weapon, they are required to articulate in their head if

24  there's an imminent threat to themselves; is that accurate?

25  A.  That is accurate.

110

1    Q.  Could you please talk to us a little bit about that process.

2    A.  Again, we go back to imminent or the concept that if I don't

3    use deadly force, it's going to be used against me.  So if you

4    are in a situation where, and I'll just be specific.  If someone

5    has a gun but they are not about to shoot you, you can't -- you

6    can't just shoot them.  So again but if it appears that, you

7    know, that they are going to point the gun at you and shoot you,

8    then it's proper.  But just the presence of a gun or a weapon

9    does not entitle you to use deadly force.

10   Q.  So if someone has a gun and it is in the low ready position,

11   right, you're not trained that you can just walk up to them and

12   shoot them, correct?

13   A.  No, you cannot.

14   Q.  And with regards to DAAT, you've mentioned that in this

15   situation that if a gun is not pointed at Joseph Mensah, he did

16   not have the right to use deadly force, correct?

17           MR. WIRTH:  I object.

18           THE COURT:  Sustained.  We're going into the Court's

19   job of instructing the jury on the law.  So is there anything

20   more?

21           MS. MOTLEY:  Yes.

22   Q.  So Detective Burems, you mentioned that when you pull the

23   trigger, you have to articulate a basis in your head for each

24   shot, right?

25   A.  That is true.

111

1   Q.  And is it accurate to say that before you even pull the

2   trigger once, you have to assess --  you're required, per your

3   training, to assess the situation; is that accurate?

4   A.  Yes.

5   Q.  And what are some things that officers are required to do in

6   that assessment?

7   A.  Again, when you're looking at a situation and when you're in

8   a situation, what you're evaluating or what you're assessing is

9   --  I heard mentioned here the delivery system which is the

10  weapon, the intent and I think isolation or something like that.

11  The weapon was there, but just the --  the fact that Mr. Cole is

12  turned --

13          MR. WIRTH:  Judge, I need to object again.

14          THE COURT:  You got to --  You set a lot of limits on

15  this kind of testimony, and it was basically about the DAAT

16  training.  It wasn't about anything more detailed here.

17          MS. MOTLEY:  No problem, Your Honor.  Thank you.

18          THE WITNESS:  May I continue then?

19          THE COURT:  No.

20  Q.  So just to be clear, with each pull of the trigger when an

21  officer shoots his weapon, he is required for each time he

22  shoots to articulate in his head if there's an imminent threat?

23          THE COURT:  I am going to cut that down.  It is an

24  improper question.  It has already been asked.  I allowed it to

25  be answered, but not for each shot, just getting too much.

1        MS. MOTLEY:  I apologize, Your Honor.  I am going over

2   his DAAT training.  That is what he's taught.  I will move on.

3   Q.  So what I'd like to talk about is you've heard --  You've

4   seen the squad video, correct?

5   A.  Yes, I have.

6   Q.  So I'd like to turn to Exhibit 1.

7        MR. WIRTH:  Judge, I need to object here.  We're

8   supposed to be doing DAAT training.

9        THE COURT:  I don't want comments.

10        MR. WIRTH:  On the video?

11        THE COURT:  I don't want comments on the video and

12   whether some act or not was justified.  That is beyond the

13   scope.

14        MS. MOTLEY:  I will not ask him if it's justified.  As

15   part of the DAAT training and part of this investigation as

16   being an expert witness, he did review the videos and determined

17   whether or not what he saw on the video is consistent.

18        THE COURT:  No, that's not going to be admitted.

19   That's not going to be admitted.  I'm sorry.

20        MS. MOTLEY:  Your Honor, may I ask him -- May I ask

21   for a sidebar to get clarification on this?

22        THE COURT:  Why don't we take a lunch break now and

23   come back at quarter after 1:00.

24        BAILIFF:  All rise.

25        (Jury excused.)

113

1          MR. CADE:  Judge, the issue, at least on our part

2     regarding we have obviously DAAT training.  But as part of the

3     training, what Mr. Burems did obviously having reviewed video is

4     he is not going to go through each shot.  He's not going to

5     articulate those shots.  But what he did do is there are other

6     sounds, there are other things that are on the video.  He's

7     going to comment on those with regards to the DAAT training, so

8     we're not going to go through shot by shot with him.

9          THE COURT:  I'm not going to allow that.  You can talk

10    about DAAT training.  We had an agreement before the trial that,

11    first of all, as I indicated throughout this process, I've been

12    very skeptical of allowing these police practices experts

13    because they get too close to making some kind of an opinion or

14    an inference of an opinion of the merits on what the outcome of

15    the case should be.  I know that's why probably both sides have

16    experts, and I'm sure that's what they are interested in mainly

17    because that is what the issue in the case is.

18          But as I've said, the Judge is the expert on the law,

19    and I'm going to instruct the jury on what the law is, and I

20    don't want either expert for the plaintiff or the defendant

21    suggesting what they think either directly or in some kind of

22    indirect way as to what --  as to whether the defendant complied

23    with the law.

24          So as far as I can tell, you've gone through what DAAT

25    training involves, and I don't really know what more is

1  necessary.  I'm not going to let the defendant do anything

2  either.

3          MR. CADE:  Understood, Judge.

4          THE COURT:  So I don't know where that takes us.

5          MR. WIRTH:  Judge, that was our understanding.  The

6  experts will say this is what DAAT says.  The Judge will

7  instruct on the law.  The witnesses will testify to the facts,

8  and then the jury melds the three.

9          THE COURT:  So the witness said what DAAT says.  I

10 don't want him commenting on some particular thing that is on

11 the video and saying, oh, that that's not the shooting, but that

12 doesn't comply with DAAT, so I'm not going to allow that.

13         MR. CADE:  So okay.  Just so we're understood, Judge.

14 With all due respect to Attorney Wirth, does that also mean that

15 his expert will not be allowed to other than saying here is what

16 DAAT is won't be allowed to give examples of what applies with

17 DAAT and not applies?

18         THE COURT:  Give examples don't have anything to do

19 with this case.

20         MR. CADE:  Understood.

21         THE COURT:  You understand that, Mr. Wirth?

22         MR. WIRTH:  I do, Judge.  Our expert is going to

23 testify about the standards of DAAT and how they are taught to

24 law enforcement and what the various standards are.

25         THE COURT:  That's all.

115

1          MR. CADE:  Well comply with that, Your Honor.

2          THE COURT:  All right.  Anymore questions?

3          MR. CADE:  We'll talk over lunch, Your Honor, and go

4   from there.

5          THE COURT:  All right.  Thank you.

6          BAILIFF:  All rise.

7          (Lunch recess taken.)

8          (Back on the record.)

9          (Jury enters.)

10         THE COURT:  Thanks for being such an important part of

11  this procedure.  What do we got?

12  **CONTINUED DIRECT EXAMINATION BY MS. MOTLEY:**

13  Q.  Detective Burems, good afternoon.

14  A.  Good afternoon.

15  Q.  So just so a few quick questions.  Before lunch, we talked

16  about with regards to your DAAT training about imminent danger,

17  correct?

18  A.  Yes.

19  Q.  So I want to just run through just a couple of examples of

20  imminent danger, and then we'll be done, okay?

21  A.  Very well.

22  Q.  So Detective Burems, you're the police officer, okay?

23  A.  Yes.

24  Q.  So if I have a gun and you're there and it is down to my

25  side, are you in imminent danger?

116

1  A.  No.

2  Q.  If I have a gun and I am pointing it at you, are you in

3  imminent danger?

4  A.  Yes, I am.

5  Q.  If I have my back to you and the gun is down to my side, are

6  you in imminent danger?

7  A.  No.

8  Q.  Last question.  I'd like for you to stop me when you're in

9  imminent danger.  This is the gun, okay.  So I am pointing the

10  gun here.  Please tell me when you're in imminent danger, okay.

11       MR. WIRTH:  Judge, I'm going to object.  We've now

12  gone beyond what's in DAAT training to what's being demonstrated

13  by counsel.

14       MS. MOTLEY:  Your Honor, the Court has allowed me to

15  do examples.  This is my last example.

16       THE COURT:  The question is about the DAAT training.

17  In that situation, I'll allow it, but I think we're getting

18  close to the end.

19       MS. MOTLEY:  Thank you.

20  Q.  So again if my weapon -- Please tell me when you're in

21  imminent danger.

22       MR. WIRTH:  Judge, that's exactly what we just talked

23  about.

24       THE WITNESS:  I am in imminent danger now.

25       MS. MOTLEY:  Thank you.  Nothing further.

117

1          THE COURT:  Okay.

2   **CROSS EXAMINATION BY MR. WIRTH:**

3   Q.  Very good.  Thank you, Judge.  You pronounce your name

4   Burems?

5   A.  That's fine, sir.

6   Q.  I have very little, but I want to go through some of what

7   we've talked about with respect to Defense and Arrest Tactics.

8   You have not been in law enforcement specifically for 11 years,

9   correct?

10  A.  That is correct.

11  Q.  You don't teach police sciences?

12  A.  I have taught at MATC at UW Milwaukee and at Concordia

13  College.

14  Q.  When was the last time you were teaching police sciences?

15  A.  I last taught at MATC last year, spring.

16  Q.  Taught a course?

17  A.  I assisted a professor in teaching a police science course,

18  yes.

19  Q.  A semester long course or seminar?

20  A.  A seminar.

21  Q.  So in an addition to assisting someone who was teaching a

22  seminar, any other teaching experience over the last several

23  years?

24  A.  No.

25  Q.  Do you currently consult with or train with any members of

118

1  law enforcement agencies?

2  A.  No, I do not.

3  Q.  Have you authored any articles on DAAT training?

4  A.  No, I have not.

5  Q.  Your last specific law enforcement employment was as a

6  detective with Milwaukee Police Department?

7  A.  Yes.

8  Q.  And that ended in about 2014?

9  A.  Yes.

10  Q.  In the Milwaukee Police Department, detectives don't

11  generally teach DAAT training, do they?

12  A.  Some do.  I did not.

13  Q.  Generally speaking, that's going to be a law enforcement or

14  specialist sergeant level kind of teacher?

15  A.  You don't have to be a sergeant to teach DAAT.

16  Q.  You've listed in your report of your qualifications that you

17  are a DAAT instructor; is that correct?

18  A.  No, I am not a DAAT instructor.

19         MS. MOTLEY:  Objection, I think that's inaccurate.

20         THE COURT:  He would know.

21         MS. MOTLEY:  Would he?  It seems he would present a

22  document, if he knows.  I don't agree with that.  The report

23  does not say that.

24         THE COURT:  I'm going to overrule your objection.

25  Q.  Have you completed the 32-hour Wisconsin Criminal Justice

119

1  Instructor Development course?

2  A.  Yes, I have.

3  Q.  And when would that have occurred?

4  A.  I can only approximate in the early 2000's, maybe 2006.

5  Q.  After you were a detective?

6  A.  Yes.

7  Q.  Have you in that same timeframe then about 20 years ago

8  successfully completed the DAAT Instructor Program?

9  A.  No, I have not.

10 Q.  Didn't take the exams or evaluation or application process?

11 A.  For DAAT?

12 Q.  Correct.

13 A.  No, I have not.

14 Q.  Do you have a FEMA SID number to apply for the class?

15 A.  No.

16 Q.  You would agree with me that you are not a certified DAAT

17 instructor at the present time?

18 A.  I would agree.

19 Q.  You've talked a little bit about in direct imminent danger

20 and deadly harm, deadly force, correct?

21 A.  Yes.

22 Q.  When you did your report or when you -- your work in this

23 case, what's been marked as an exhibit from the plaintiffs'

24 attorneys is the DAAT manual from 2014.  Is that what you relied

25 upon?

120

1    A.   I believe so, yes.

2    Q.   When the DAAT manual is updated, does it supercede the prior

3    version?

4    A.   I'm not sure.  Can you expound a little?

5    Q.   Sure.  The incident we're here about today occurred in 2020,

6    correct?

7    A.   Yes.

8    Q.   If the Wisconsin Department of Justice and Law Enforcement

9    Standards Board issued an updated DAAT manual in 2017, that

10   would be the DAAT manual applicable in 2020, would it not?

11   A.   I can't say specifically.

12   Q.   In part because you're not a certified DAAT instructor?

13   A.   I think they would incorporate some of the same things in

14   both manuals, but I don't know what would be added or what would

15   be deleted in each manual.

16   Q.   And with respect then to your work in this case, would it

17   help for me to give you the DAAT manual or should I just ask you

18   questions, and you can tell me you agree with what I am reading?

19   A.   You can give it to me.

20   Q.   Okay.

21        MS. MOTLEY:  Your Honor, I apologize.  Just for the

22   record, it is unclear what manual he's giving him, what year.  I

23   think it needs to be clear for the record.

24        MR. WIRTH:  I will have the witness identify

25   Plaintiffs' Exhibit 62.

121

1   Q.  Can you tell the jury what Plaintiffs' Exhibit 62 is.

2   A.  This is Defense and Arrest Tactics or DAAT, and it's dated

3   Wisconsin Department of Justice Law Enforcement Standards Board,

4   and it is dated December of 2014.

5   Q.  I just want to go through a couple of the standards and

6   discussions within that DAAT manual.  If you can turn to

7   page 67.

8   A.  I've got it.

9   Q.  Okay.  Do you see in there there's the definition of subject

10  behavior that justifies an officer's use of deadly force.  Do

11  you see that?

12  A.  Yes, I do.

13  Q.  And the DAAT manual provides behavior which has caused or

14  imminently threatens to cause death or great bodily harm to you

15  or another person or persons.  Did I read that correctly?

16  A.  Yes.

17  Q.  The next paragraph notes that the definition includes

18  behavior likely to cause great bodily harm as well as death.

19  Did I read that correctly?

20        MS. MOTLEY:  Object, Your Honor.  He read sort of half

21  the sentence.  If he could read the whole entire sentence, it

22  would probably be more effective.

23  Q.  Do you see where I'm reading, Mr. Burems?

24  A.  No.

25  Q.  The kind of --

1    A.   The bold.

2    Q.   Right below the bold.  The next sentence.

3    A.   Note this definition.

4    Q.   Is not quite the same as the definition of deadly force.  It

5    includes behavior likely to cause great bodily harm as well as

6    death.  Did I read that correctly?

7    A.   Yes, you did.

8    Q.   Then, the next paragraph defines the word imminent, correct?

9    A.   Yes.

10   Q.   The DAAT manual defines the word imminent as about to

11   happen, correct?

12   A.   Correct.

13   Q.   So if we go to the bold-faced section of the DAAT manual,

14   the bold-face line of the DAAT manual on page 67, behavior which

15   has caused or imminently threatens, that means about to happen,

16   could cause death or great bodily harm, the DAAT manual says an

17   officer is justified in using deadly force, correct?

18   A.   No, I don't see where that says that.  I see behavior which

19   is caused or imminently threatens to cause death or great bodily

20   harm to you or another person or persons.  And what is the rest

21   you were saying?

22   Q.   What I did is I then jumped down to where it defines what

23   the word imminent means?

24   A.   Okay.

25   Q.   Imminent means about to happen?

1   A.   I see that.

2   Q.   So then I moved about to happen to where imminent is in that

3   definition.

4   A.   Where it says an imminent threat is an immediate threat?

5   Q.   Where it says behavior which has caused.  Do you see that?

6   A.   Behavior which has caused or imminently threatens to cause.

7   Q.   Imminently means about to happen?

8   A.   I just saw that.  Where is that again please, counselor?

9   I'm sorry.

10  Q.   Sure.  It's the second paragraph down.  The word imminent is

11  kind of in italics.

12  A.   Yes, I see that.  I'm sorry.

13  Q.   So if I go back to the definition of when deadly force is

14  justified, according to DAAT, it says behavior which has caused

15  or is about to happen?

16  A.   It says behavior which has caused or imminently threatens to

17  cause.

18  Q.   I will move on.  I am substituting what the word imminently

19  means, but you're not tracking with me.

20       MS. MOTLEY:  Your Honor, I object.  If he's going to

21  read from the manual, he can't insert his own words in there.

22       THE COURT:  All right.  Move on.

23       MR. WIRTH:  Right, exactly.

24  Q.   What it says for a threat to be considered imminent, I am

25  going back down to the paragraph that has the definition of

124

1    imminent in it.

2    A.  Stand by.  Let me catch you.  Okay, yes, I see it.

3    Q.  For a subject's threat to be considered imminent, it must

4    meet three criteria, intent, weapon and delivery system?

5    A.  Yes.

6    Q.  I believe you were talking about that earlier, and you said

7    intent and a couple other things.  Those three things are

8    intent, weapon and delivery system, correct?

9    A.  Correct.

10   Q.  Intent is the officer's --  Intent is the intent of the

11   person who poses the threat, correct?

12   A.  I went over this, and I think that in this --  They are

13   talking about the intent of the officer, so intent, weapon and

14   delivery system, but go ahead.

15   Q.  If I go up to the sentence above that that ends with a

16   colon, it says for a subject's threat to be considered imminent.

17   You recognize now that what it's talking about is for the

18   subject's threat for the person whose --  who the officer

19   believes is the danger?

20   A.  Yes, I see it now.

21   Q.  Okay.  For that threat to be considered imminent, it must

22   meet three criteria, intent, weapon and delivery system,

23   correct?

24   A.  Correct.

25   Q.  So what we're talking about is the officer's interpretation

125

1  or the officer's observation or interpretation of the intent of

2  the subject, correct?

3  A.  It's not just a single officer's interpretation.  It's the

4  interpretation of a subjective officer and a similar situation.

5  Q.  It is actually.

6  A.  Not just a single officer.  But if other officers in a

7  similar situation would use deadly force when faced with the

8  same situation.

9  Q.  Then, the next thing the subject, the threatening subject,

10  should have is a weapon, correct?

11  A.  That is correct.

12  Q.  And then the third element to be considered is a delivery

13  system, correct?

14  A.  That is correct.

15  Q.  And in this case, a delivery system could be the ability to

16  pull a trigger?

17  A.  Yes, it could be.

18  Q.  It could be the ability to use a rock or a knife as a

19  weapon?

20  A.  I wouldn't say that a rock because a rock is not usually

21  considered a deadly weapon.  Possibly a knife, I agree.

22  Q.  If you go down to the subject heading that says Weapon, the

23  second sentence begins guns and knives are not the only weapons.

24  Many other common objects can be used as weapons, beer bottles,

25  baseball bats, pieces of broken glass, large rocks or bricks.

126

1   All of these and others can be weapons, correct?

2   A.  It says large rocks.  I agree as opposed to a rock.

3   Q.  The next on page 68.  There's a subject heading within the

4   DAAT manual called Preclusion.  Do you see that?

5   A.  Yes.

6   Q.  You had said earlier that deadly force should be kind of the

7   last option, correct?

8   A.  That is correct.

9   Q.  If you go down a little bit, that concept is called

10  preclusion.  Do you see that definition?

11  A.  Yes, I do.

12  Q.  And then the DAAT manual says, note that in many deadly

13  force situations, you will not have time or the ability to try

14  other options.  If a subject is a few feet away from you -- if a

15  subject a few feet away from you suddenly pulls a gun and

16  threatens to shoot you, generally the only reasonable response

17  is to fire.  Do you see that?

18  A.  Yes, I do.

19  Q.  There is simply not enough time to try alternatives,

20  correct?

21  A.  Correct.

22  Q.  So in the situation of a danger that includes a gun which

23  would be the weapon, intent, intent to shoot you and the

24  delivery system, that would be the trigger and the bullet, the

25  only reasonable response is to fire?

127

1    A.   Yes.  I would say if someone had and to quote you the

2    weapon, the delivery system and the intent, and they surprise

3    you with those three things, I would say yes, I agree.

4    Q.   The officer who is facing a threat that meets the

5    requirements to permit a deadly force response still has to

6    fulfill three target requirements, correct?

7    A.   Okay.  Where are you at now, sir?

8    Q.   The next paragraph down is labeled Target Requirements.  The

9    officer whose prepared to use deadly force has to target

10   acquisition, in other words, pick the target, correct?

11   A.   Yes.

12   Q.   Target identification, know what he's going to shoot at,

13   correct?

14   A.   Correct.

15   Q.   And target isolation, meaning the ability to hit that target

16   without hitting innocent people or something like that?

17   A.   Yes.

18   Q.   Once those three, the officer has now decided that the

19   requirements to permit deadly force have been met, and he's done

20   his target requirements, we get back to the only reasonable

21   response is to fire, correct?

22   A.   Under the circumstances that you speak on, yes.

23   Q.   The DAAT manual also says target acquisition.  Do you see

24   that?

25   A.   Yes.

1  Q.  You cannot fire blindly in the direction of a sound, for

2  example, because you may endanger others, correct?

3  A.  Yes.

4  Q.  So an example of that would be you can't just hear something

5  and start firing in the direction of what you hear?

6  A.  That's true.

7  Q.  If you turn to page 69, the fourth paragraph down begins

8  with your judgment.  Do you see that paragraph?

9  A.  Yes.

10 Q.  Your judgment, and we're talking about the officer in this

11 situation; is that correct?

12 A.  Yes.

13 Q.  Your judgment in a deadly force situation is based on the

14 totality of the circumstances known to you at the time, correct?

15 A.  Correct.

16 Q.  For example, if a suspect points a pistol at you with the

17 clear intent to shoot, you are justified in using deadly force?

18 A.  Correct.

19 Q.  If it turns out later that the suspect's gun was unloaded,

20 that does not make your decision unjustified.  Do you agree with

21 that?

22 A.  I agree 100 percent.

23 Q.  Your perception of the threat was reasonable under the

24 circumstances?

25 A.  Yes, sir, I agree.

129

1    Q.  You would agree with me that under the DAAT training, an

2    officer who has identified a deadly force imminently threatening

3    him or others doesn't have to wait for the subject to fire

4    first, does he?

5    A.  No, you don't have to wait to be fired upon to apply, that's

6    true.

7              MR. WIRTH:  That's all I have, Judge.

8              MS. MOTLEY:  Your Honor, I have a few questions follow

9    up.

10   **REDIRECT EXAMINATION BY MS. MOTLEY:**

11   Q.  Detective Burems, the standard is an objective standard of

12   what a reasonable officer believes whether they are in imminent

13   danger, correct?

14   A.  That is correct.

15   Q.  And just looking at -- You heard Attorney Wirth.  He read

16   from the DAAT manual in front of you.  That's 2014 DAAT manual,

17   correct?

18   A.  Correct.

19   Q.  So we're looking at the 2017 DAAT manual which says exactly

20   the same things.  And so I'm wondering if my back is to you but

21   the gun is not pointed at you, are you in imminent danger?

22   A.  No, I am not.

23   Q.  And Attorney Wirth talked to you about target requirements

24   related to DAAT.  If you look at that again, the 2017 says the

25   same thing.  But when an officer who is in imminent danger,

130

1    right, reasonable officer, they have to have target acquisition,

2    target identification and target isolation, correct?

3    A.  Hold on.  I got you.

4    Q.  Page 68, I apologize.

5    A.  Yes, they do.

6    Q.  And so specifically as it relates to these three target

7    requirements.  When Joseph Mensah shot, isn't it true that a

8    ricochet could have hurt others --

9            MR. WIRTH:  Objection, Your Honor, objection.

10           MS. MOTLEY:  He opened the door.  He opened the door.

11           THE COURT:  Sustained.

12           MR. WIRTH:  Move to strike, Judge.

13           THE COURT:  Yes, so ordered.

14   Q.  Detective Burmes, did you hear the medical examiner talk

15   about ricochet?

16   A.  Yes, I did.

17           MR. WIRTH:  Same objection, Judge.  This is supposed

18   to be DAAT training.

19           MS. MOTLEY:  Your Honor, he's opened the door.

20           THE COURT:  No, he didn't open the door.  Objection is

21   sustained.

22   Q.  Now, last question, Detective Burems.  Did anything that

23   Alvin Cole did suggest that Joseph Mensah was in imminent

24   danger?

25           THE COURT:  Sustained.  That's exactly what the ground

131

1   rules that were laid out excluded.

2           MS. MOTLEY:  I have nothing further, Your Honor.

3           MR. WIRTH:  No recross.

4           THE COURT:  Thank you.  You are excused.

5           THE WITNESS:  Thank you, Your Honor.  Thank you,

6   counselors.

7           (Witness excused.)

8           MS. MOTLEY:  Your Honor, we'd like to call Tracy Cole

9   to the stand.

10          MR. WIRTH:  Judge, can we do a sidebar?

11          (Sidebar discussion in chambers.)

12          THE COURT:  What's this about?

13          MR. WIRTH:  This morning we had the loss of society

14  and companionship dismissed.

15          THE COURT:  That's -- So what's she going to talk

16  about?

17          MS. MOTLEY:  She is going to talk about what she did

18  that day with Alvin Cole and also she saw the injuries after he

19  was shot, so she can speak to that.

20          MR. CADE:  He had no injuries leaving the house,

21  Judge.

22          MS. BAYNARD:  We'll stipulate he didn't have bullet

23  wounds leaving the house.

24          MR. CADE:  Head wounds.  Medical examiner said he had

25  two marks on his head, and we're just clarifying that -- that

132

1    was not there at the time he left.

2              MR. WIRTH:  Have you seen the picture?

3              MS. MOTLEY:  Those are the pictures we didn't receive,

4    remember.

5              MR. WIRTH:  We got them from you.

6              MS. MOTLEY:  You didn't get them from us.

7              MR. WIRTH:  There were 223 disk.

8              MS. BAYNARD:  Maybe we should make a record of this.

9    So I can pull the email.  When the case -- You can say -- I

10   guess you can say your part, but the way we got this entire file

11   was through a subpoena, and I believe Jennifer Williams was the

12   person who maybe helped us at the City of Milwaukee.  And at the

13   beginning of discovery, I believe you're the one that drafted

14   the subpoena, correct?

15             MS. MOTLEY:  Right.

16             MS. BAYNARD:  In response to that subpoena, there was

17   a large amount of documents.  We asked for a copy of whatever

18   they provided to plaintiffs' counsel.  They prepared it.  I

19   don't know if it is 20 or 22, disk A through T.

20             MS. MOTLEY:  They meaning Milwaukee Police Department.

21             MS. BAYNARD:  Milwaukee Police Department provided us

22   a response or duplicate to what they provided you in response to

23   your subpoena.  And we sent our clerk at the time down there to

24   get them, so any documentation that -- I guess the entire case

25   file came from the subpoena to MPD.

133

1          MR. CADE:  That assumes that MPD did not hold back or

2     give yours the entire file, like, that's never ever happened

3     with MPD.

4          MR. WIRTH:  Why would we assume that?

5          MS. MOTLEY:  This is the issue.  No one is accusing

6     anyone of anything.  We went to MPD.  They got disks.  We got

7     disks.  We didn't get the disk with the autopsy photos from the

8     drying room.  They received that.  I mean, the ones that were

9     clean.  I noted this to Jasmine last week that we didn't get all

10    these 13 photos, but it wasn't a big deal.  We weren't objecting

11    to it.  We're like fine, if you want to use that for your

12    exhibits, that's fine.

13         In those photos is where the head wound is which we

14    never saw that before.  And so Tracy Cole is going to be very

15    quick.  She can just talk about that.  That is part of her

16    testimony.

17         MR. WIRTH:  Can we show her the picture?

18         MS. MOTLEY:  Can we show her the picture of the son

19    with his head wound?  Is that what you want me to do?

20         MR. WIRTH:  We can crop it to just the two scratches.

21         MS. MOTLEY:  Really, her son?

22         MS. BAYNARD:  Nobody wants to show her the autopsy

23    photos.  If she's going to get on the stand and say he didn't

24    have those scratches over his eye before.

25         MR. CADE:  She saw the body before the autopsy.

1              MS. MOTLEY:  That's right.

2              MS. BAYNARD:  She says they came on because of the

3    autopsy.

4              THE COURT:  What do you want her to say that she --

5              MS. MOTLEY:  When he left the house, he didn't have

6    any scratches.  He didn't have those injuries above his eyebrow

7    and left eye.

8              THE COURT:  That's all you want?

9              MS. MOTLEY:  And just to talk about her finding --

10             MR. WIRTH:  We'll stipulate to that.

11             MS. MOTLEY:  We asked you to stipulate to certain

12   things.

13             THE COURT:  No, no.  Okay, what else do you want her

14   to say besides these two scratches?

15             MS. MOTLEY:  Her testimony is going to be a lot

16   shorter than her husband.

17             THE COURT:  What is the testimony going to be?

18             MS. MOTLEY:  I am telling you.  Basically what she saw

19   Alvin Cole do that day in terms of she saw him that morning

20   before he went to the mall.

21             THE COURT:  What does that have to do with anything?

22             MS. MOTLEY:  Like you've been saying, we're telling

23   the story.  It will be --

24             THE COURT:  I haven't said that.

25             MS. MOTLEY:  When you're saying we're setting the

1    stage, right.  She's going to be very quick, and she's going to

2    talk about the injuries that she saw of her son.

3              THE COURT:  What beyond these two head scrapes

4    regarding injuries?

5              MS. MOTLEY:  That's it.

6              MR. CADE:  May I have a moment?

7              THE COURT:  Yeah, sure.

8              MS. MOTLEY:  Your Honor, sorry, I didn't mean to get

9    heated.  We will not call her.

10             THE COURT:  That solves that.

11             MS. MOTLEY:  Do you mind, I will whisper to her, and

12   we will be fine.

13             THE COURT:  Okay.  So then what, then you're done?

14             MR. CADE:  We're resting.

15             THE COURT:  What do you have?

16             MS. BAYNARD:  Two people.  We have two fact witnesses

17   and then our expert who will be quick because --

18             THE COURT:  I'm not going allow --

19             MS. BAYNARD:  He flew here, and we paid him.

20             (Back in the courtroom.)

21             MR. CADE:  Your Honor, the plaintiffs rest at this

22   time.

23             THE COURT:  Okay.

24             MS. BAYNARD:  I am going to get our witness.

25             THE COURT:  Okay.

136

1          Sarah Hopkins, being first duly sworn to tell the

2   truth, the whole truth, and nothing but the truth, testified as

3   follows:

4          MS. HOPKINS:  I do.

5          THE COURT:  Have a seat.  State your name for the

6   record.  You have to speak very close to the microphone.

7          THE WITNESS:  Sarah Hopkins.

8          THE COURT:  You can move the mic around but stay close

9   to it.

10  **DIRECT EXAMINATION BY MS. BAYNARD:**

11  Q.  Good afternoon, Ms. Hopkins.

12  A.  Good afternoon.

13  Q.  Ms. Hopkins, were you at the Cheesecake Factory in the early

14  evening of February 2, 2020?

15  A.  I was.

16  Q.  And what were you doing at the Cheesecake Factory?

17  A.  I was --  I placed an order for take out from there for

18  myself and my kids.

19  Q.  And I'm sorry, I am going to go back.  Can you introduce

20  yourself to the jury, your first and last name?

21  A.  My name is Sarah Hopkins.

22  Q.  Ms. Hopkins, when you are at the Cheesecake Factory, can you

23  kind of walk me through what you do there after you order your

24  food?

25  A.  They told me it was about a 15, 20-minute wait, so I went

1  outside to make a phone call to my boyfriend and smoke a

2  cigarette.  I am kind of a closet smoker, so I decided to walk

3  around to the other side of the building, and that's where I had

4  the conversation while I was on the phone.

5  Q.  And I want to --  Ms. Hopkins, while we're waiting, can you

6  just explain for me where you are outside the Cheesecake Factory

7  when you're making this phone call?

8  A.  Yeah.  So Mayfair Road is to the right of me, and I am

9  looking south, and I'm on the south end corner of the building.

10 Q.  And if I showed you an overhead of the location, would you

11 be able to put a mark on it where you were standing when you

12 were on the phone?

13 A.  Yes.

14 Q.  I am handing the witness what's been previously marked as

15 defense exhibit --

16       THE CLERK:  1033.

17       MS. BAYNARD:  Yes, actually it is 1034.

18 Q.  So Ms. Hopkins, if you could for me put an X on that map

19 where you're standing at the time you receive or you're on the

20 phone.

21       MS. BAYNARD:  Permission to publish to the jury, Your

22 Honor.

23       MR. CADE:  No objection.

24       THE COURT:  Okay.

25 Q.  I know it's hard to see, but the X is where you are standing

138

1    when you're on the phone, true?

2    A.   Yes.

3    Q.   Can you describe what the surrounding buildings are.  We see

4    an X next to what looks like a building.  What is that building?

5    A.   So I'm standing -- I just have to explain this.  So I'm

6    standing on the southeast or southwest I guess you could say of

7    the building.  The front of the entrance of the building,

8    obviously, is on the north.  There's actually two entrances.

9    Again, I am in the far back.

10          If you would walk straight, there is -- at the time

11   there was a cement wall.  It looked like they were doing

12   construction.

13   Q.   I'm going to have you step down and show -- You are pointing

14   to the screen.  It is not a touch screen.  Why don't you show

15   me -- Explain to me what your -- from that location not what you

16   observed, describe the surrounding areas.

17   A.   Okay.  So I walked in here, went and grabbed my food order,

18   came out here, walked down here, and I was kind of pacing back

19   and forth on this corner here.  And then looking straight ahead,

20   I saw the brick cement wall, and I believe that's, like, a bank

21   or an apartment, not quite sure.  This is Mayfair Road here and

22   then Mayfair Mall is over here.

23   Q.   Thank you.  And Ms. Hopkins, and this is, obviously, a

24   photo.  This photo is taken, would you agree with me, during the

25   daytime?

139

1    A.   Yes.

2    Q.   When you were in the Cheesecake Factory parking lot on

3    February 2nd, what was the lighting light?

4    A.   It was dark outside.

5    Q.   Okay.  And as you're on the phone, can you explain to me

6    what you see?

7    A.   When I was on the phone?

8    Q.   Yes.

9    A.   From when I first got on the phone?

10   Q.   Yes.

11   A.   Did you want me to show you on there?

12   Q.   Do you think it would be easier to do that?

13   A.   It would be more exact to what I remember.

14   Q.   Perfect.

15   A.   So I was on the phone here.  I was pacing back and forth

16   right here a little bit, and I heard commotion and some

17   screaming.  I didn't know where it was coming from at first, but

18   then I saw people kind of running from this direction and this

19   direction over here.  This is kind of weird because I'm trying

20   to remember.  It was here and then in front of me, and I saw a

21   gentleman run past, and that's when I was on the phone.  I kind

22   of --  I was kind of narrating it over the phone because I

23   couldn't believe that it was happening in front of me.  But as

24   they were running, I saw a gentleman in a yellow vest following

25   behind him.

1    Q.   Okay.  You're saying you've never testified in court before

2    right, Ms. Hopkins?

3    A.   No.

4    Q.   When you're saying they, let's take a step back.  So you're

5    on the phone and you see a group of individuals running.  You

6    have to say yes or no so the court reporter can take it down.

7    A.   Yes.

8    Q.   As you see a group of individuals running, who --  Describe

9    the group of people.

10   A.   So at the time, I saw a younger man, younger gentleman

11   running first.  And then I saw what looked to be, like, a

12   security guard in a yellow vest following behind him.  Shortly

13   after that, I saw the police cars, like, right behind him, like,

14   they were right there within seconds.

15   Q.   Police cars or police officers?

16   A.   Police officers.

17   Q.   Do you know how many police officers you saw?

18   A.   I couldn't tell you to be honest with you.  I wasn't paying

19   attention.  I wasn't counting.

20   Q.   That's okay.  You can sit back down.  So I believe you said

21   there was a gentleman that was kind of at the -- Would you agree

22   they were chasing someone?

23   A.   Yes.

24   Q.   And the individual that was being chased, can you describe

25   them?

141

1   A.   The individual that was running?

2   Q.   Yes.

3   A.   The younger gentleman?

4   Q.   Yes.

5   A.   All I can remember is he had, like, a gray hoodie.  That was

6   all I could remember.  I wasn't paying attention to what he was,

7   you know, his shoes or anything.  I was just kind of there in

8   the moment watching him run by.

9   Q.   When he's running, a security guard in a yellow vest running

10  behind him, right?

11  A.   Yes.

12  Q.   And what do you see happen next?

13  A.   Well, so I saw the younger gentleman.  He was running

14  towards Mayfair Mall.  I was still on the phone.  I remember as

15  I was talking to Paul Hebein on the phone at that time, I

16  remember, oh, he stopped.  But he stopped, but I thought he was

17  just going to kind of quit, but he didn't.  He turned around.

18  Q.   Okay.  When you said that you were describing -- I am going

19  to come back to that.  When you were describing the kind of

20  area, here's Mayfair Road.  This is Mayfair Road down here,

21  right?

22  A.   Yes.

23  Q.   When you see them running, they are running towards Mayfair

24  Road?

25  A.   Yes.

1  Q.  I think you said -- Go from where you said the individual

2  with the gray hoodie was running.  He's being chased, and you

3  thought he was going to -- At some point, does someone catch up

4  to him?

5  A.  I thought he was going to give up, but he didn't.

6  Q.  Instead of giving up, what did he do?

7  A.  It happened pretty fast.  He stopped, and then he turned

8  around, and that's when I reiterated over the phone and said he

9  got caught, and then he -- That's when I kind of saw him

10  fumbling, and he pulled his arms out, and that's when I had

11  mentioned to Paul I said, okay -- This is what I said to Paul on

12  the phone.  I think he has a gun, and --

13  Q.  Why did you think the individual in the gray sweatshirt had

14  a gun?

15  A.  The officers were screaming stop, freeze, show us your

16  hands.  They were screaming all these commands, and it didn't

17  look as if he was really going to listen to any of these

18  commands.  It was happening so fast.  But as they were screaming

19  stop and everything, he wasn't stopping.  You could continue to

20  see him move, and then I saw him, you know, hold his hand up.

21  Q.  When you say hold his hands up, describe what you meant by

22  that or what you mean by that?

23  A.  He held his hands directly in front of him.  I heard a

24  gunshot, and I remember telling Paul over the phone I think he

25  just fired his gun.

1  Q.   When the individual in the --  So I'm going to take a step

2  back.

3  A.   Yep.

4  Q.   We have the individual in the gray sweatshirt.  You say he's

5  running.  The yellow vest officer, security officers catch up to

6  him, and do you think he's going to turn around and stop because

7  he's caught, right?

8  A.   Yes.

9  Q.   But he does not turn around and put his hands up, does he?

10  When I say up, I mean up above his head?

11        MR. CADE:  Your Honor, I am only going to object to

12  the extent she's leading their witness.

13        THE WITNESS:  So I didn't see him throw his --

14        MR. CADE:  Ma'am --

15        THE COURT:  What happened?

16  Q.   Just describe what you saw?

17  A.   Okay.  When he stopped, I did not see him throw his hands up

18  in the air.  I didn't see that.  I saw him stop, turn around

19  from his right side.  He turned around towards me and faced the

20  police officers and the security guard.  That's what I saw.

21  Q.   Did you hear a gunshot at that time?

22  A.   I saw the gentleman hold his arms up.  I heard a gunshot,

23  and then that's when I started yelling on the phone, oh, I think

24  he just shot his gun.  And then very quickly after that I heard

25  a little bit more screaming, but then I heard return shots.

1   Q.  Ms. Hopkins, immediately after this incident took place or

2   when you're in the parking lot of the Cheesecake Factory besides

3   the officers and the individual running, do you see any other

4   people there?

5   A.  I wasn't paying attention to that.  I do know that there was

6   no other cars in front of me or on the right or left side

7   because I am looking around.  Is there anybody else?  I have no

8   idea who is behind me and who is on the side of me.

9   Q.  I'm going to show you -- And at the scene, did you take a

10  photo of the -- of your location at the time that you observed

11  what you just described?

12  A.  Whatever I had on my phone I gave to the police officers at

13  that time.  I can't remember how many pictures I took or

14  anything.

15  Q.  That's okay.  I'm going to show you what's been marked as

16  Defense Exhibit 1055.  Ms. Hopkins, I'm handing you what's been

17  marked as Defense Exhibit 1055.  Can you identify that photo?

18  A.  Yes.

19  Q.  Go ahead if you can identify it.

20  A.  That was the police officers trying to give him CPR.

21  Q.  Okay.

22          MS. BAYNARD:  Your Honor, permission to publish to the

23  jury.

24          MR. CADE:  No objection.

25          THE COURT:  Okay.

145

1  Q.  And Ms. Hopkins, the photo that I have in front of you, you

2  took that photo, right?

3  A.  I did.

4  Q.  That was the location or your view at the time you observed

5  what you've described?

6  A.  Yes.

7  Q.  And just to wrap everything up.  When you observed the

8  individual in the gray sweatshirt, did he appear to do anything

9  to comply with the officers' commands?

10 A.  No.

11 Q.  And you believe that he shot at the officer in the yellow

12 vest?

13 A.  That is what I believe.

14        MS. BAYNARD:  I have nothing further.

15 **CROSS EXAMINATION BY MR. CADE:**

16 Q.  Ms. Hopkins, my name is Attorney Nate Cade.  I just have

17 some questions for you.  How are you currently employed?

18 A.  Full time.

19 Q.  How?

20 A.  How am I?

21 Q.  Yes.  What do you do for a living?

22 A.  I'm a machine operator.

23 Q.  And in 2020 February of 2020, what were you doing?  How were

24 you employed?

25 A.  I was a pipe fitter at WE Energies.

146

1    Q.  Do you have eye glasses on?

2    A.  I do.

3    Q.  Did you have them on then?

4    A.  Yes.

5    Q.  Were you wearing them at the time?

6    A.  Yes.

7    Q.  What is your vision?

8    A.  20/20 with them on.

9    Q.  What is it with them off?

10   A.  I don't know.  I don't take them off.

11   Q.  Okay.  You sleep with them?

12   A.  No.  I don't know what my prescription is.

13   Q.  Are you blind without them is the proverbial saying?

14   A.  I need them.

15   Q.  You're nearsighted, correct?

16   A.  Correct.

17   Q.  You need them to drive, correct?

18   A.  At nighttime.

19   Q.  The photo that we just saw, that one photo -- We'll go

20   through a few of them.  What was the distance between where you

21   were standing and where the officers were?

22   A.  I'm unsure how long the parking lot is.

23   Q.  I understand.  But you are here in front of this jury saying

24   I saw these things.  And whether we are making it, like, you're

25   20 feet away or 200 feet away?

147

1   A.  Maybe the length of this room a little bit.

2   Q.  Okay.  If I told you the length of this room is

3   approximately -- Let me rephrase.  From where you are all the

4   way to the back where that gentleman in the white suit is

5   44 feet.  We measured that on the first day.  Are you with me?

6   A.  Uh-huh.

7   Q.  Yes.  If you'd like, I can measure again with you or do you

8   trust me saying it is 44 feet?

9   A.  It is 44 feet.

10   Q.  I'm going to show you --

11   A.  I think it is a little bit further than that, though.

12   Q.  We'll get there.  Ms. Hopkins, I'm showing you now what is a

13   3D rendering of the parking lot.  If you can zoom in.

14         (Whereupon tape is played.)

15   Q.  Ms. Hopkins, on the far upper right is a building.  Can you

16   see that?

17   A.  Yes.

18   Q.  Is that where you were standing?

19   A.  A little further out though.

20   Q.  Which way?

21   A.  To the left.

22   Q.  Why don't you come down and point to the jury on this screen

23   which direction.  Here is a microphone for you, ma'am.

24   A.  So I'm going to assume this is the Cheesecake Factory.

25   Q.  It is a corner.

148

1    A.  I'm over here.

2    Q.  So you weren't in the parking lot, not on the corner?

3    A.  I wasn't on the sidewalk.

4    Q.  Sorry?

5    A.  I was not on the sidewalk.

6    Q.  Were you in the parking lot?

7    A.  Yes.

8    Q.  So the corner here, you can step back, ma'am.  You see this

9    area right here, the corner?

10   A.  Yes.

11   Q.  And you see over here there appears to be some yellowing

12   where I pointed?

13   A.  Yes.

14   Q.  Do you know the distance because I measured it from this

15   point all the way to this point.

16   A.  I do not.

17   Q.  So you're saying you were somewhere -- We can see some

18   shadows.  You're saying you were somewhere around here?

19          MS. BAYNARD:  Objection.  She marked where she was

20   located at.

21   Q.  Right here.  If I were to tell you that the corner to this

22   location is 217 feet, would you have any reason to dispute me?

23   A.  No, because I haven't measured it.

24   Q.  Right.  You're a little bit off the sidewalk so maybe you're

25   200 feet away?

149

1    A.  Okay.

2    Q.  Now, you also --  I'm going to approach and hand you what's

3    previously marked as Exhibit 42.  Have you seen this document

4    before?

5    A.  Yeah, I wrote that.

6    Q.  This was a drawing that you did, correct?

7    A.  Yes.

8    Q.  Okay.  So why don't we show that.  So Ms. Hopkins, showing

9    you --

10   A.  Actually, go ahead.

11   Q.  Ms. Hopkins, showing you Exhibit 42.  You see that you have

12   a drawing of the Cheesecake Factory, C factory down here,

13   correct?  Do you see that?

14   A.  Yes.

15   Q.  And you put an X there or arrow.  That would be you, right?

16   A.  Yes.

17   Q.  And that's where you were standing when you observed it,

18   correct?

19   A.  No, that's where I was when I took the video.

20   Q.  When you took the video?

21   A.  Of the police officers trying to give him CPR.

22   Q.  So the photo that we saw the defense put up was not where

23   you were standing in your line.  That was an entirely different

24   location?

25   A.  I was further back.

1    Q.  A different location?

2    A.  Slightly, yes.

3    Q.  Well, ma'am, we've got the corner of the Cheesecake Factory.

4    You indicated -- If you want to take a moment and see where I am

5    pointing my pointer.  You were saying you were somewhere in this

6    area on the southern side of the Cheesecake Factory, correct?

7    A.  Over here.

8    Q.  You were over here somewhere, okay.  And then you took the

9    video here.  So you were further back when you took the video?

10   A.  When I took the video.

11   Q.  Thank you.  You can have a seat back.  Looking at this

12   photograph, you've got three police officers all in close

13   proximity.  How far apart were the police officers?

14   A.  From where I was standing?

15   Q.  Yes.

16   A.  I saw three, four police officers.  I don't know how close

17   they were together.

18   Q.  According to the drawing and I know it is not to scale.  It

19   appears as if the police officers are almost all running in

20   tandem together.  They are all running one, two, three as if

21   they are all in a race together.  Is that what you saw?

22   A.  I saw them running as a group, yes.

23   Q.  Okay.  Not one behind the other.  You saw them all running

24   as a group?

25   A.  No.

1   Q.  No?  Which one?

2   A.  I saw them there standing there when they were doing the

3   commands together, yes.  But they did not all run together at

4   the exact same time.  The gentleman in the yellow vest --

5   Q.  Yes.

6   A.  I saw first.

7   Q.  Correct.

8   A.  Then, I saw another police officer quickly after that.

9   Q.  Okay.

10   A.  Within moments or seconds.  And then I saw an additional

11   police officer arrive.

12   Q.  Okay.  Did you see --  You had indicated you heard a shot?

13   A.  Yes.

14   Q.  Afterwards more shots, correct?

15   A.  Correct.

16   Q.  Did you see Mr. Cole, the person who was running, did you

17   see him got shot by bullets?

18   A.  By bullets.

19   Q.  He died.  He got bullets in his body.  Did you see him get

20   shot?

21   A.  Yes.

22   Q.  Where was he when he was shot?  Was he standing up?  Was he

23   turned around and kind of in a crouched position?  Was he down

24   on the ground?

25         MS. BAYNARD:  Object to the form of the question.

152

1    Argumentative.

2            THE COURT:  I'll allow it.

3    Q.  Where was he, ma'am?

4    A.  He was crouched down.

5    Q.  Was he on his hands and knees?

6    A.  No, he was not.

7    Q.  Okay.

8    A.  I did not see him on his hands and knees.

9    Q.  You saw him bent?

10   A.  Yes.

11   Q.  Okay.

12   A.  It happened so fast.  You're asking me these questions, and

13   you're firing them.  I am trying to give you what I remember.

14   Q.  You are here as a witness, ma'am.  We want to make sure

15   we're accurate.  I will show you another exhibit.  I'm going to

16   show you Exhibit 41, and I don't know if you've ever seen this.

17   It is identified as Incident Report Greenfield Police.  Do you

18   see that?

19   A.  Yes.

20   Q.  If you look towards the top underneath the emblem from

21   Greenfield Police, it says Sarah Hopkins, correct?

22   A.  Yes.

23   Q.  And it talks about Sunday, February 2, 2020, on the above

24   date at, approximately, 6:30 p.m. I, whomever is authoring this,

25   received notification, et cetera, et cetera.  Do you see that?

153

1  A.  Yes.

2  Q.  Toward the bottom is Officer Aaron with an A, B-U-S-C-H,

3  correct?

4  A.  Yes.

5  Q.  And you met with Officer Busch, and you told him what you

6  saw, correct?

7  A.  Yes.

8  Q.  As part of telling him what you saw, not only that you saw

9  people running, you said you saw the person in the vest run like

10  a gazelle?

11  A.  Yes.

12  Q.  But you also said as part of that, that you saw Alvin Cole,

13  the individual in the gray hoodie, you said you saw him with his

14  hands, and he turned around?

15  A.  Yes.

16  Q.  And you saw him point with his arms extended as if he had a

17  gun, correct?

18  A.  Yes.

19  Q.  And the reason you knew that is because you've had gun

20  training, correct?

21  A.  Correct.

22  Q.  So he's running, and you literally saw him turning and fully

23  extend, right?

24  A.  He wasn't fully extended.

25  Q.  Partially extended?

154

1   A.  Correct.

2   Q.  But he had his gun pointed in this direction?

3   A.  He had something in his hands.

4   Q.  Pointing back towards the officers?

5   A.  Correct.

6   Q.  So Ms. Hopkins, would you be surprised to find out and he

7   was upright when he did this, right?

8   A.  Correct.

9   Q.  Would you be surprised that we now on day three of a trial

10  and not a single officer has testified, not one.  We've had five

11  of them, that they saw him turn around, extend and point

12  upright.  Would you be surprised to hear that?

13  A.  Yes.

14         MS. BAYNARD:  Object to the form of the question.

15         THE COURT:  Sustained.

16  Q.  Well, wouldn't you agree, Ms. Hopkins, that if a police

17  officer -- The police officers were closer than you were, right?

18  A.  I assume so.

19  Q.  I don't want an assumption.  You're 200 feet away.  They

20  weren't 200 feet away from Mr. Cole, were they?

21  A.  No.

22  Q.  They were ten feet, 20 feet, 30 feet.  They were definitely

23  closer to Mr. Cole than you were, right?

24  A.  Correct.

25  Q.  So would you expect a police officer --

155

1          THE COURT:  Can you just ask what she saw rather than

2    --

3          MR. CADE:  It is cross, Judge.

4          THE COURT:  I understand.  All right.  Go ahead.

5    Q.  Would you expect a police officer with years of training --

6          MS. BAYNARD:  Objection, foundation, form.  She said

7    what her profession was.  How would she have any opinion on what

8    police officers should or should not observe.  She's testifying

9    what she observed.

10          THE COURT:  I'll sustain that objection.  You can

11   rephrase your question.

12   Q.  If police officers who were involved in a chase, you would

13   expect them to get up on the stand and testify if they saw a gun

14   extended in their direction, fair?

15   A.  Fair.

16   Q.  You would expect police officers who are part of the chase

17   that if they thought the gun while he's running was aimed at

18   them, they would have gotten up there and testified?

19          MS. BAYNARD:  Your Honor, same objection.  He can ask

20   her what she saw.  He's asking her what a police officer should

21   do in that situation.

22          THE COURT:  Sustained.

23   Q.  Ms. Hopkins, the parking lot was dark, correct?

24   A.  It was in the evening.  It wasn't completely dark.  It was

25   well lit.

156

1  Q.  Are you suggesting you had a better vantage point of

2  Mr. Cole 200 feet away than any of the police officers?

3  A.  No.

4  Q.  Are you suggesting that with your glasses, your eyesight is

5  better than anyone else 200 feet away?

6          MS. BAYNARD:  Objection, relevancy.  Argumentative.

7          THE COURT:  I'll allow it.

8          THE WITNESS:  No, I don't think my sight is better

9  than anyone else's.

10  Q.  Were you shown any videos prior to coming today?

11  A.  None, no.

12  Q.  Did you see other individuals running away from the police

13  that day?

14  A.  I did not.

15  Q.  Did you see from your vantage point any officers coming from

16  Mayfair Road going from the west to the east?

17  A.  Not before the incident, no.

18  Q.  At what point did you see officers come from the west to the

19  east?

20  A.  After the incident.

21  Q.  Timing wise, ma'am, a minute, five minutes, five seconds?

22  A.  I can only give you an approximate.

23  Q.  That's all I'm asking.

24  A.  A minute to two minutes, three minutes.  I really wasn't

25  paying attention to that.  I just heard the sirens in the

157

1    background.

2    Q.   Okay.  Well, there's also testimony that another officer

3    came from the west to the east and immediately after Mr. Cole

4    was shot came up and kicked a gun away.  Did you see the officer

5    kick the gun away?

6    A.   Yes, I did.

7    Q.   How long did you see him approach before he kicked the gun

8    away?

9    A.   I couldn't tell you.

10   Q.   But you saw it?

11   A.   I did see it.

12   Q.   And you remember all this other stuff.  You don't remember

13   the officer coming and kicking the gun?

14   A.   I said yes, I do remember it.  I don't remember what length

15   of time.  It's been a very long time.  I don't know what length,

16   a minute to two minutes, four or five years ago.  I'm just

17   trying to be as honest as I can.

18   Q.   I appreciate it, ma'am.  Did the officer kick the gun first

19   or did they start CPR first?

20   A.   They kicked the gun away, and then they immediately started

21   CPR.

22   Q.   Okay.  So how long after the shooting did CPR start?

23   A.   Almost right away.  Almost right away.  Seconds.

24   Q.   Five seconds or 50 seconds?

25            MS. BAYNARD:  Objection, Your Honor, argumentative.

1        MR. CADE:  It's not argumentative.

2        THE COURT:  I'll allow it.

3        THE WITNESS:  It was pretty fast.

4   Q.  Okay.

5   A.  A couple of seconds, a few seconds?  I was more in shock

6   just actually seeing what had happened trying to process it.

7   Two, three seconds, maybe five seconds.

8   Q.  Okay.  Did you see other than you saying you saw Mr. Cole

9   running and extending --

10        MS. BAYNARD:  Objection, misstates her testimony.

11   This demonstration of this extending is not what she's testified

12   to.

13   Q.  You saw him put his hands in front of him as if he had a

14   weapon, correct?

15   A.  I saw him fumbling, yes.

16   Q.  He didn't fully extend, right?

17   A.  Correct.

18   Q.  He didn't fully extend, but he was extended?

19   A.  Correct.

20   Q.  So as he's extended even here when he's doing that after he

21   has gone to the ground, did you see him point the gun in any way

22   towards the officers running towards him?

23   A.  I saw something in his hand.

24   Q.  Did you --

25   A.  I cannot tell if you it was a weapon.  I was too far away.

159

1  I can tell you it looked as if his body stance, he was trying to

2  grab for one, yes.

3  Q.  We talked about he's got the gun.  You said he's turned

4  around partially extended?

5  A.  Yes.

6  Q.  What I'm asking is after that point, he's going down to the

7  ground, correct?  Yes?

8  A.  Yes.

9  Q.  Okay.  So when he goes to the ground, is he falling or is he

10  getting down on the ground?

11  A.  It wasn't like he was collapsing to the ground.

12  Q.  So he was taking his time to get down to the ground?

13  A.  Not taking his time.

14  Q.  Well, how did he get down to the ground then?

15  A.  It looked like he was on his knee.

16  Q.  Okay one knee or two?

17  A.  I can't remember.

18  Q.  While he's on his knee, did you see him take whatever is in

19  his hand --

20  A.  No.

21  Q.  -- and turn and point toward the officers?

22  A.  No.  I already said no.

23         MR. CADE:  Those are my questions, Your Honor.

24  **REDIRECT EXAMINATION BY MS. BAYNARD:**

25  Q.  Ms. Hopkins, was there anything obstructing your view of

160

1  what you observed?

2  A.  No.

3  Q.  Did you tell the jury what you saw?

4  A.  Absolutely, yes.

5          MS. BAYNARD:  I have nothing else.

6          THE COURT:  Thank you.  You are excused.

7          (Witness excused.)

8          THE COURT:  Next witness.

9          MS. BAYNARD:  We are going to call Davion Beard.

10          Davion Beard, being first duly sworn to tell the

11  truth, the whole truth, and nothing but the truth, testified as

12  follows:

13          MR. BEARD:  Yes.

14          THE COURT:  Have a seat.  State your name for the

15  record, and you can --  You have to talk close to the

16  microphone.  You can move it around if you want.

17          THE WITNESS:  Davion Beard.

18  **DIRECT EXAMINATION BY MS. BAYNARD:**

19  Q.  Good afternoon, Mr. Beard.  Thank you for being here.  Can

20  you introduce yourself to the jury.

21  A.  Davion Beard.

22  Q.  And in February of 2020, where were you employed?

23  A.  I was employed by Mayfair security under the Andy Frain

24  Company.

25  Q.  And as the security for Mayfair, what were your

161

1  responsibilities?

2  A.  Typically, of course, patrolling the mall, responding to

3  different calls within the mall that happens on Mayfair Mall

4  property.  So anything from as soon as you enter the property

5  until you go out another entrance or leave.  It goes all the way

6  up to the property line.

7  Q.  Are Mayfair Mall security guards armed?

8  A.  No.

9  Q.  And what -- If I can take you back to February 2, 2020, what

10  was your shift that day?

11  A.  I believe I was working 2:00 to 10:00 p.m.

12  Q.  At some point, do you become aware of a situation that

13  prompts you to call Wauwatosa police?

14  A.  Correct.

15  Q.  Can you explain what that situation was?

16  A.  The initial call was just a disturbance or a domestic

17  dispute verbally between two different parties that, of course,

18  took place at, I believe, it was Sephora originally.

19  Q.  And how did you become aware that there was a disturbance in

20  front of Sephora?

21  A.  I believe Sephora --  Sephora's associates called the

22  security department's phone that came through there, and there

23  was also different reports that came through from just the

24  different public that might have, I believe, flagged down some

25  of the security officers that were patrolling through the mall.

1   Q.  Okay.  And when you were working for the -- You currently

2   work for the Mayfair security still?

3   A.  I do not.

4   Q.  When you were working for Mayfair security, did you ever

5   have an opportunity where you would call Wauwatosa Police

6   Department for assistance?

7   A.  Yes.

8   Q.  Okay.  And when you made the calls to Wauwatosa, would you

9   call the nonemergency number?

10  A.  Sometimes, yes.

11  Q.  And calling the nonemergency number, was that programmed in

12  your security phones?

13          MS. MOTLEY:  Objection, Your Honor, irrelevant.  If

14  she wants to ask specifically with regards to this, but general

15  questions about calling the nonemergency number in general, I

16  don't see how it is relevant to this specific situation.

17          THE COURT:  I'll allow it.

18  Q.  So I will take a step back.  When you would have occasion to

19  call -- I will ask about the specific situation.  Were you the

20  individual who --  You didn't call Wauwatosa Police Department

21  in this situation, right?

22  A.  Correct, I was not the one.

23  Q.  If the call went to Wauwatosa's nonemergency line, was that

24  a direct line that the security officers would use to reach

25  Wauwatosa Police Department?

163

1   A.  Correct.  Other than --  Well, the nonemergency number was

2   just able to pick up the phone and hit the button versus, of

3   course, having to dial 911 or something.

4   Q.  So it wouldn't be faster or slower to call 911 or to just

5   hit the button on your phone?

6   A.  Correct.  You typically get the same dispatcher no matter

7   what.  It is not like you have to -- With Wauwatosa, they are

8   one of the departments that you don't have to answer the prompt

9   questions through like the AI system or something.  It was just

10  you call, it rings until someone picks up the phone.

11  Q.  At some point, so there's this disturbance by Sephora.  Do

12  you gather any information about what's going on during this

13  disturbance?

14  A.  Only information that went out, of course, was the dispute.

15  And then once we got there that is, of course, when we were

16  notified by the other party that there was a firearm involved.

17  Q.  Okay.  When you say the other party, I don't know if you

18  know his name or not, but did you at some point make contact

19  with the victim of the disorderly?

20  A.  I did not.

21  Q.  Okay.  But you learned that there was a firearm involved in

22  the situation.  How did you learn this?

23  A.  It was broadcasted from our security supervisor to over the

24  radio to contact Wauwatosa for that initial complaint.

25  Q.  Okay.  Now, at some point, do you make contact with -- Let

1    me go back.  Did you ever learn who the subject of the complaint

2    was?

3    A.  No, it just came through as a group of teenagers.

4    Q.  Okay.  I'm going to --  Strike that.  At some point, do you

5    make contact with -- Wauwatosa Police Department shows up at

6    some point, right?

7    A.  Correct.

8    Q.  And what do you when Wauwatosa Police Department shows up?

9    A.  Wauwatosa Police Department shows up.  Of course by that

10   time, we reviewed CCT of the altercation, and we were able to

11   then see, of course, give out the description of the gray hoodie

12   with the fanny pack.  That was the individual that was armed

13   with a firearm.

14   Q.  Okay.  And you I guess while --  I guess you then look for

15   this individual?

16   A.  We -- At that time, they had vacated out of entrance three.

17   So at that point, it was -- The only reason that we -- Of course

18   at that point, we decided to just review CCT TV to figure out

19   where they had went or to find them to then -- Of course because

20   of the nature of the other party wanted to press charges due to

21   that there was a firearm involved, that's what initiated to

22   continue to have Wauwatosa involved.

23   Q.  Okay.  And the individual you're kind of looking for is an

24   individual in a gray hooded sweatshirt.  That's who is to be

25   armed?

165

1          MS. MOTLEY:  Objection, Your Honor.  She's testifying

2    for him.  He's testified he saw a group of individuals.

3          MS. BAYNARD:  I'm talking about the subject who had --

4    was believed to be armed.  That is who I am asking about, not

5    anyone else.

6          MS. MOTLEY:  Your Honor, he did not witness that.  He

7    said he saw a group of teenagers.

8          THE COURT:  Can you rephrase it?

9    Q.  Mr. Beard, you testified that at some point, did you learn

10   who the subject of the armed disorderly was?

11   A.  Correct.

12   Q.  And what was the description of that individual?

13   A.  Gray hooded sweatshirt with a fanny pack.

14   Q.  Okay.  At some point, do you make --  So I don't re-ask you.

15   You went and looked at CC TV.  Do you learn at some point that

16   someone seen him, put eyes on this individual?

17   A.  Actually, that would --  That would be me, yes.

18   Q.  So you saw him at some point?

19   A.  Well, I didn't see him specifically.  I saw, of course, them

20   outside when they were all in the huddle grouping through the

21   Nordstrom kind of parking lot slash the entrance to Nordstrom.

22   Q.  And when you see the group, do you alert or do you notify

23   anybody else of their location?

24   A.  Correct.  Of course by that time, of course I radio back to

25   our command center.  At that time, of course, Wauwatosa also did

1  respond on our radio frequency that they were also responding to

2  the area.

3  Q.  Okay.  So at some point -- So after you call the location of

4  where the subjects are, you have eyes on the armed individual in

5  the gray hoodie.  What happens next?

6  A.  Then, of course, I'm slowly just following behind.  We got

7  to the intersection, and that's where one of the other -- That's

8  when Wauwatosa squad cars, we all kind of merge and meet at

9  the -- right at the intersection kind of where it starts the

10  Boston Store parking like and, like, the wrap around from

11  Nordstroms.

12  Q.  Are you in a car, or are you on your feet at this time?

13  A.  At that time, I'm in a vehicle.

14  Q.  Is anyone else in the vehicle with you?

15  A.  No.

16  Q.  I'm going to show you -- Would you recognize an overhead map

17  of Mayfair Mall?

18  A.  I would.

19  Q.  Okay.  Is Mayfair Mall a pretty big property?

20  A.  Yes.

21  Q.  Defendant's Exhibit 1033.  Mr. Beard, can you identify this

22  photo?

23  A.  It is a satellite picture view of Mayfair's property.

24  Q.  Is this -- I guess this a general, I guess, depiction of the

25  property as you recall it on February 2, 2020?

167

1    A.   Yes.

2    Q.   Okay.

3             MS. BAYNARD:   Permission to publish to the jury, Your

4    Honor.

5             MS. MOTLEY:   No objection.

6             THE COURT:   Okay.

7    Q.   Mr. Beard, I want you to step down if you can for the jury,

8    and you're going to get a microphone.  And just walk me through

9    where you first encountered the individuals outside of the mall.

10   A.   That would be under here.  There's another -- Of course

11   there's a parking like thing that you can come through where the

12   building is kind of overseeing it, but they were here.  It kind

13   of goes, like, this parking lot where you're able to loop around

14   through here.

15            First seen them here.  Then, of course, they are still

16   heading to where we all intersect.  Wauwatosa squad comes from

17   this way.  We all meet here.  So they start walking this -- No,

18   that's the building.  Never mind, it is this actually.  They are

19   all walking here.  First seen them coming through here.  I am

20   just following slowly behind them as they come and continuing to

21   walk toward the old Boston Store to where we all meet here.

22   Q.   Okay.  When you say -- You can sit down, thank you.  And

23   when you meet in this area, what happens then?

24   A.   They were all -- They were pretty much all content.  Of

25   course, once Wauwatosa pulled up, of course, they initiated I

168

1  guess the red and blue lights, and that's where everyone

2  scattered.

3  Q.  Do you see -- When you talked about this individuals when

4  you make contact with them down here, do you see the individual

5  with the gray hooded sweatshirt and the fanny pack?

6  A.  I don't.  I don't specifically at that time, no.  It's just

7  --  I just noticed the group of them.

8  Q.  And at some point, I think you said did they stop?

9  A.  No, I would say they did not stop.

10  Q.  And there's -- Do you follow after them?

11  A.  Correct.  They were continuing heading across the --  They

12  were continuing heading across the little sidewalk thing.  I was

13  slowly at a crawl following behind them.

14  Q.  At some point, do you start to run fast behind the

15  individual in the gray sweatshirt?

16  A.  Correct.  That's after police pretty much have already

17  chased them across the parking lot, and there's pretty much no

18  where for me to kind of continue.  So then I pretty much hop out

19  the car, and I start to help out with the chase.

20  Q.  Mr. Beard, I want to show you what has been marked as

21  Plaintiffs' Exhibit 1.  I guess I can show it to him outside the

22  presence of the jury if you have an issue.

23          MS. MOTLEY:  No objection.

24          (Whereupon tape is played.)

25  Q.  Mr. Beard, is this generally --  I guess I just froze in

169

1   this video.  I will represent to you it is a video from a police

2   officer dash cam.  Is this a scene that you remember from

3   February 2, 2020?

4   A.  Yes.

5   Q.  I am going to keep playing.

6           (Whereupon tape is played.)

7   Q.  Do you see yourself in this frame?

8   A.  I do.

9   Q.  And are you the individual wearing -- Why don't you describe

10  what you're wearing.

11  A.  Of course on the top part, it's the neon green with the

12  reflective security.  And bottom half is the all black shirt.

13  Q.  Is this -- What are you doing in this frame that we just

14  watched?

15  A.  Running up behind the suspect.

16  Q.  Okay.

17          (Whereupon tape is played.)

18  Q.  At any point when you're running behind the individual in

19  the gray sweatshirt with the fanny pack, again, is this the

20  individual who was you believed to be the subject of the

21  disturbance with the firearm?

22  A.  At the time, no.

23  Q.  You didn't think it was the guy in the gray?

24  A.  Correct.  Actually, between the group of teens, it was two

25  of them that had the same description.

170

1    Q.  You're just running after this kid in the gray?

2    A.  Correct.

3    Q.  At some point, do you catch up to him?

4    A.  Correct.

5    Q.  And when you catch up to him, what happens?

6    A.  He initially -- I'm kind of yelling out, hey, just slow

7    down, stop.  He then initially actually I thought he was

8    actually surrendering because he starts to slow down actually

9    so --

10   Q.  So does he surrender?

11   A.  No.

12   Q.  What did he do?

13   A.  From what I seen, he reached, turned around.  All I seen was

14   a muzzle flash.

15   Q.  Did you believe at that time -- I guess what was your --

16   What was your belief that was happening at that time?

17   A.  I heard the gunshot.  I seen the muzzle flash, questioned

18   honestly -- Well, I questioned was that, like, did he shoot at

19   me or was it the police because then once the gunshot went off,

20   I fell to the ground.  And from behind there was a, hey, and

21   then I turned around and looked.  Of course, it was a Wauwatosa

22   police officer running up.  And then, of course, I turned back.

23   He was still --  He then started to --  Well, he turned around,

24   kind of went off the other end to the other direction but and

25   then, of course, I got up and ran the other way.

171

1    Q.  I will represent to you his name is Alvin Cole.  When you're

2    chasing him, how close do you think you get to him when he

3    turns?

4    A.  Within a couple feet.

5    Q.  I'd like to show you a zoomed-in video of this.  Show it --

6    I will show it to Mr. Beard first.  Were you able to recognize

7    what was depicted in that video?

8    A.  Yes.

9    Q.  And can you describe what that clip was?

10   A.  My chasing behind the subject.  Then, of course, coming

11   within a couple feet of the subject.  And then you kind of

12   see -- I think it stops at the point of him then, of course, the

13   interaction with Wauwatosa.

14          MS. BAYNARD:  Permission to publish it to the jury.

15          THE COURT:  Yes.

16          MS. MOTLEY:  No objection.  Your Honor, stop the

17   video.  I actually do have an objection or at least want to make

18   a record.  We've never seen this enhanced video before.  As the

19   Court recalls, we brought in our IT guy to testify as to the

20   video we've enhanced, and the defense had a big issue with it

21   despite the testimony that he gave, despite him saying we

22   enhanced our video.

23          So we don't know if this is a fair and accurate

24   depiction of this video.  We don't know who enhanced this video,

25   so we have an issue.  This is the first time we're seeing this

1    without the person.

2            MS. BAYNARD:  Your Honor, Davion Beard has identified

3    that this accurately depicts what he observed.  And similar to

4    the plaintiffs showing their video yesterday that we had not

5    seen, it's just a zoomed-in clip of a video we watched a bunch

6    of times in court.

7            MS. MOTLEY:  Your Honor, if I may.  We had our expert

8    testify that he enhanced it.  This gray circle, that's not in

9    any video I have seen.

10           THE COURT:  All right.  I'll allow it.  Let's proceed.

11           (Whereupon tape is played.)

12   Q.  Mr. Beard, in that video, do you observe an individual in

13   the gray sweatshirt whose name is Mr. Cole turn towards you?

14   A.  Yes.

15   Q.  And when Mr. Cole turned towards you and I believe you said

16   you hear a muzzle flash and you see -- you hear a gunshot, and

17   you see a muzzle flash, do you think he had just shot at you?

18   A.  My initial thought questioned whether it was him or whether

19   it Wauwatosa.

20   Q.  You believe someone shot at you?

21   A.  Correct.

22   Q.  After that turn kind of motion, does Mr. Cole or what do you

23   do?

24   A.  From there once he turns, I -- of course the flash, the gun

25   shot goes off, I drop to the ground.  We're pretty much -- We're

173

1    pretty much looking like -- we're pretty much staring at each

2    other.  Then we hear the A.  I turn.  I don't know if he looks

3    or not, but I turn to see what it is or who is yelling.  And

4    then, of course, once I see it's Wauwatosa, that's when I get up

5    and start running the opposite direction for kind of every

6    couple steps looking back kind of seeing what's going on, what's

7    happening still.

8    Q.  After this, that turn motion, the muzzle flash, does

9    Mr. Cole fall to the ground?

10   A.  No.

11   Q.  And when you're pursuing him -- I'm going to show what's

12   been previously marked as Exhibit 201.

13           MS. BAYNARD:  Permission to approach the witness?

14           THE COURT:  Make sure you have a mic though.

15           MS. MOTLEY:  Your Honor, I ask for clarification of

16   this exhibit.

17           MS. BAYNARD:  It is Defense Exhibit 1022.

18   Q.  Mr. Beard, can you identify this photo or what it depicts?

19   A.  The pretty much other half towards the back end of, like,

20   extra parking for the Cheesecake Factory.

21   Q.  And does that area of the parking lot look -- I guess is

22   that where -- I know it is not an entire overview, but does it

23   show where the pursuit of Mr. Cole is occurring?

24   A.  Correct.

25   Q.  And if I gave you --

174

1          MS. BAYNARD:  Your Honor, may I publish the photo to

2    the jury?

3          THE COURT:  Yes.

4    Q.  Mr. Beard, I may have to have you come step down for this.

5    But could you point to where or the path that Mr. Cole is taking

6    when you're pursuing him.  I don't need you to tell me from how

7    far.  But as far as this is how it's just oriented, where in

8    this photo are you pursuing that?

9    A.  Practically this straight line here.

10   Q.  When you're pursuing Mr. Cole, are you running up against

11   the concrete barrier there?

12   A.  No, we were probably -- We were a little bit a ways away

13   from the barrier.

14   Q.  After that first shot goes off, do you hear Mr. Cole say

15   anything?

16   A.  No.

17   Q.  Do you hear him --

18          MS. BAYNARD:  I have nothing further, Your Honor.

19          MS. MOTLEY:  I have a few.

20   **CROSS EXAMINATION BY MS. MOTLEY:**

21   Q.  Good afternoon, Mr. Beard.

22   A.  How are you?

23   Q.  Thank you for your patience.  I know this is a lot.  I first

24   want to ask you, you never saw Alvin Cole point a firearm at

25   you, correct?

1   A.  Correct.

2   Q.  What I'd like to show is Plaintiffs' Exhibit 1.  And just to

3   be clear, you were shown a video by the defense counsel,

4   correct, prior to coming here today?

5   A.  Correct, I've seen one.

6   Q.  What did they show you?

7   A.  The same video that you guys saw.

8   Q.  Was it --  It was a media clip video or what was it?

9   A.  It was --  It was literally the exact same clip with the

10  circle dot thing.  It was literally that one.  It was, like, a

11  minute and 51 seconds.

12  Q.  I see.  Thank you.  And you're here today not under

13  subpoena, right?

14  A.  Correct.

15  Q.  You were told by the defense if you didn't come, they would

16  subpoena you, right?

17  A.  There could be a chance, yes.

18  Q.  So Mr. Beard, sorry, one second.  It is taking a minute.

19  Mr. Beard, we're going to show you the same video.  We're going

20  to play it up until the first shot.

21  A.  Okay.

22  Q.  Then, we're going to go back and talk through it, okay?

23  A.  Got it.

24          (Whereupon tape is played.)

25  Q.  Mr. Beard, just to be clear, that is you running, correct?

176

1   A.  Correct.

2   Q.  Do you see where my green pointer is?

3   A.  Yes.

4   Q.  Okay.  This is irrelevant, I know, but were you in track?

5   A.  Was I in?  I was.

6   Q.  You run, like, you were in track.  Play it please.

7           (Whereupon tape is played.)

8   Q.  After the first shot, you said you went down to the ground,

9   correct?

10  A.  Correct.

11  Q.  And you said that you were -- that Alvin Cole was down to

12  the ground because you were eye to eye, correct?

13  A.  No, he was --  I was on the ground.  He was standing over.

14  Q.  He was standing over.  And then after that first shot, you

15  saw the muzzle flash, correct?

16  A.  Correct.

17  Q.  But you didn't see him pointing a gun at you, correct?

18  A.  Correct.

19  Q.  Did you see him pointing the gun at anyone?

20  A.  No.

21          (Whereupon tape is played.)

22  Q.  So do you see my pointer?

23  A.  Yes.

24  Q.  Okay.  Do you see on the ground is Alvin Cole?

25  A.  I cannot see.

177

1   Q.  Do you see knees on the ground right there.  I know it is

2   hard to see.  Hands, knees, shoes.  Do you see that?

3   A.  Yes.

4   Q.  So I just want to know at this point when he's on the

5   ground, what were you doing, do you recall?

6   A.  That initial standpoint is where that's when I was turned

7   around, started running.

8   Q.  Thank you.  So Mr. Beard, do you see my pointer again?  Is

9   that you where my pointer is?

10  A.  Correct.

11  Q.  And we can see you're wearing the yellow reflector shirt,

12  right?

13  A.  Correct.

14  Q.  Okay.  And you're doing what at this point in time?  This is

15  before Alvin Cole is shot.  What are you doing?

16  A.  That's when, of course, now I'm kind of running forward but

17  also kind of looking over my shoulder a little bit.

18  Q.  Okay.  You're still -- You're looking over your shoulder at

19  what?  Are you looking at Alvin?

20  A.  I'm probably looking in that general area just cause at that

21  point, they pretty much -- There's pretty much a cop at every

22  direction.  He's pretty much from my vantage point, I'm just

23  looking through police officers' backs at this point.

24  Q.  Okay.  Where are you?  You're sort of looking back, and what

25  direction are you traveling?  Are you traveling towards the

1  mall?

2  A.  Correct.  So if that's north in this video, that would be

3  looking west towards the mall.

4  Q.  Okay.  Just one second, please.  Now, Mr. Beard, I'd like to

5  show you what's been marked as Plaintiffs' Exhibit 1A, okay.

6  This is a slower-down version of 29 seconds, okay.

7  A.  Got it.

8  Q.  Would you please come off the stand.  It might be easier for

9  you to look at it from --  Okay.  So just so you are aware, do

10 you see the lower yellow arrow?

11 A.  I do.

12 Q.  So the lower yellow arrow is pointed to?

13         MS. BAYNARD:  Object.  You can ask him if he can

14 identify it.

15         MS. MOTLEY:  Sorry.

16 Q.  Do you see the lower yellow arrow?

17 A.  Yes.

18 Q.  What do you believe that arrow is pointing at?

19 A.  At this point in the video, I can't see a body at all.

20 Q.  Would it be easier if I just played it, and then we sort of

21 went back?

22 A.  Yes.

23 Q.  I will play the whole video for you, and then we'll try to

24 identify the two arrows, okay.

25         (Whereupon tape is played.)

179

1    Q.   Okay.  Now that we've seen the video, can you identify where

2    the lower yellow arrow is pointing at?

3    A.   That would be Alvin.

4    Q.   Can you identify where the upper yellow arrow is pointing

5    at?

6    A.   I cannot.

7    Q.   Okay.  So did you witness Alvin Cole while he was on the

8    ground pointing his gun at anyone?

9    A.   I could not see Alvin Cole to know if he was pointing or not

10   pointing at all.

11   Q.   Why couldn't you see him?

12   A.   The biggest was what I believe -- That is whatever officer

13   from Wauwatosa, of course, that came to Mayfair Road.  From my

14   direction looking back, you mainly seen the flashlight and, of

15   course, at the angle, you then, of course, you could obviously

16   see the reflection from the black or navy blue uniforms that

17   Wauwatosa wears.  But otherwise in that they were between the

18   light and them kind of at the directions of what they were, you

19   really couldn't see -- You couldn't see him, of course, because

20   I was running and just kind of in a back and forth motion.  And

21   then, of course, the next round of shots was, like, okay let me

22   really just start taking off, so I couldn't --  There was a lot

23   of the missed moments if he was or if he wasn't.

24   Q.   Did the flash drive --  Did the flashlight obscure your

25   vision?

1   A.  I guess at what point?

2   Q.  At any point?

3   A.  I would say the point that it did was when after, of course,

4   the in the running-away moments.  That's when the first initial

5   in kind of looking back to kind of determine, like, what was

6   still going on.  Otherwise, the moments leading up to that, me

7   dropping on the ground, him still turning, and then me getting

8   up to run away, I could no longer see after that.

9   Q.  Okay.  You may take a seat.  Did you witness Alvin Cole

10  being shot?

11  A.  I didn't see him being shot.  I heard.  I could hear, of

12  course, hear the gunshots.

13  Q.  Okay.  Did you hear him crying while he was on the ground?

14  A.  I did not.

15  Q.  I'd like to play the video, and then we're -- You heard a

16  lot of things, correct?

17  A.  Correct.

18          MS. BAYNARD:  I want to object.  What are we playing,

19  the video form?

20          MS. MOTLEY:  It's just the same video.

21          MS. BAYNARD:  But you asked if he was on the ground.

22          MS. MOTLEY:  He just said he heard a lot of things, so

23  we're going to go over that.

24  Q.  So I'd like you to --  So I'm going to go from here,

25  starting at the beginning.  This is a 29 second video.  I'm

1   going to stop it at 15 seconds, okay?

2   A.  Okay.

3           (Whereupon tape is played.)

4   Q.  Actually, I'm sorry.  I will play a different video.  We're

5   going to play Plaintiffs' Exhibit 1.  We're going to start it at

6   about two seconds.  We don't need to play the whole thing.  I'm

7   going to slow it down, okay, to half speed.

8           (Whereupon tape is played.)

9   Q.  So I'm going to play it.

10          (Whereupon tape is played.)

11  Q.  Did you hear that gunshot at 15 seconds?

12  A.  Yes.

13  Q.  Okay.  I'm going to continue to play it.  I would really

14  like you to pay attention to about 18 to 21 seconds, okay?

15  A.  Okay.

16          (Whereupon tape is played.)

17  Q.  Do you hear at 20 seconds, do you hear someone saying, I'm

18  shot.  Do you want me to play it again?

19          MS. BAYNARD:  She can play the video and ask if he

20  hears anything or heard anybody say that?

21          MS. MOTLEY:  Your Honor, I am refreshing his memory.

22          MS. BAYNARD:  You're not.

23          THE COURT:  He said he didn't hear it.  Can you ask

24  him what he heard, what you're interested in?  I thought that is

25  what just happened.  You can play it again if you think it will

1    matter but --

2         MS. MOTLEY:  I understand, Your Honor.  I promise, I

3    don't have much time left with Mr. Beard.

4         (Whereupon tape is played.)

5    Q.  Okay.  I am going to play it again.  So again, 20 seconds.

6    Do you hear, I'm shot?

7         MS. BAYNARD:  Same objection.

8         THE COURT:  He can answer.

9         THE WITNESS:  I did not.

10   Q.  At any point in time while you were witnessing what was

11   happening, did you ever see Alvin Cole crawling on his hands and

12   knees?

13   A.  The only part that I did see that I could see was that he

14   was down and kneeling.  But then that's after that initial when

15   he was kind of down on like hands and knees, that's all I could

16   tell from then or anything so I couldn't --  Yeah.

17        MS. MOTLEY:  Thank you, Mr. Beard.  No further

18   questions.

19        MS. BAYNARD:  Very, very briefly.

20   **REDIRECT EXAMINATION BY MS. BAYNARD:**

21   Q.  Mr. Beard, you were asked if you were subpoenaed to be here.

22   Do you know what a subpoena is?

23   A.  I guess a letter forcing you to appear somewhere.

24   Q.  Okay.  Did we give you -- Did we give you a subpoena to be

25   here today?

1  A.  No.

2  Q.  Do you remember coming and getting a piece of paper that

3  told you where to be time and place?

4  A.  Yes.

5  Q.  Okay.  If I represent to you that was a subpoena, would you

6  accept that representation?

7  A.  I was about to say would I have accepted it?

8  Q.  I'm saying, you were asked if we told you if you didn't

9  come, we would subpoena you.  We did provide you a subpoena to

10  come to testify today, a piece of paper that told you when to be

11  here, what time to be here?

12  A.  Got you.  Yes, I did get that paper, yes.

13  Q.  I wanted to clear that up.  Mr. Beard, I want to play you

14  that video we watched.  We are calling it Exhibit 1B, 1027A.

15          (Whereupon tape is played.)

16  Q.  Mr. Beard, is that the muzzle flash you remember?

17  A.  Correct.

18          MS. BAYNARD:  I have nothing further, Your Honor.

19          THE COURT:  Okay.  Thank you.  You are excused.  Next

20  witness.  We should take a break, ten minute break.

21          BAILIFF:  All rise.

22          (Jury excused.)

23          MR. WIRTH:  I was going to ask Judge, Dr. Knetzger

24  would prefer, and it would greatly expedite his testimony if we

25  can do it via PowerPoint.

1          MR. CADE:  Your Honor, we would object.  That is

2     putting something in front of the jury.  If there was a

3     PowerPoint, it should have been provided to counsel.  Now

4     showing up saying now I have a PowerPoint, I'm going to present

5     to you.  The time for reports or anything else you display to

6     the jury is long gone.

7          THE COURT:  Is he here?

8          MR. WIRTH:  Here is here, sure.

9          THE COURT:  What's the problem?

10          MR. WIRTH:  As though he was drawing on a board.

11          THE COURT:  What is the difference?  You get to

12     cross-examine?

13          MR. CADE:  I would have liked to have it.  He didn't

14     do it last night.  They should have provided it earlier so we

15     can be prepared.  You don't just drop it on us and say it's just

16     demonstrative.

17          THE COURT:  Well, I don't know.  Just -- I assume it I

18     will illustrate what he is going to say.

19          MR. CADE:  Judge, I would recall Ricky Burems if he's

20     going to go through and do a highlight.

21          THE COURT:  Then, I'm not going allow it.

22          (Brief recess taken.)

23          (Back on the record.)

24          THE COURT:  I guess we're ready.

25          BAILIFF:  All rise for the jury.

                                                              185

1           (Jury enters.)

2           THE COURT:  Mr. Wirth, are you ready?

3           MR. WIRTH:  Call Michael Knetzger.

4           Michael Knetzger, being first duly sworn to tell the

5    truth, the whole truth, and nothing but the truth, testified as

6    follows:

7           MR. KNETZGER:  I do.

8           THE COURT:  Have a seat.  State your name for the

9    record, and you can move the mic around, but you have to speak

10   close to it.

11          THE WITNESS:  Michael Knetzger.

12   **DIRECT EXAMINATION BY MR. WIRTH:**

13   Q.  Dr. Knetzger, good afternoon.

14   A.  Good afternoon.

15   Q.  What I'd like to do first is introduce you to the jury.  How

16   are you employed, sir?

17   A.  I'm currently employed by Northeast Wisconsin Technical

18   College as an adjunct faculty member and Colorado Technical

19   University also as an adjunct member in their doctoral program.

20   Q.  And in what filed of study are you adjunct processor at the

21   two universities?

22   A.  Criminal justice and law enforcement at NWTC and management

23   at Colorado Tech.

24   Q.  And what form of management at Colorado Tech?

25   A.  It's in the -- a Doctor of Management Program, and that

186

1   program has various concentrations from homeland security to

2   leadership to computer science.

3   Q.  With respect to your education, do you have an undergraduate

4   degree?

5   A.  Yes.  I have an associate degree in police science from

6   Waukesha County Technical College.  I also have a Bachelor's

7   Degree from Concordia University in Justice and Public Policy.

8   Q.  Do you have advanced degrees?

9   A.  I have a Master's Degree in Public Administration from the

10  University of Wisconsin-Oshkosh, and I have a Doctoral Degree in

11  Criminal Justice Management from Colorado Tech.

12  Q.  In your field of study, you are referred to as Dr. Knetzger?

13  A.  Yes.

14  Q.  Do you have teaching certificates?

15  A.  Yes.  I'm a Certified Wisconsin Technical College

16  Instructor, and I'm also a Certified Instructor by the Wisconsin

17  Department of Justice in Defensive and Arrest Tactics

18  Professional Communication.

19  Q.  Is that Defensive and Arrest Tactics the DAAT we've heard

20  talked about?

21  A.  Yes, it is.

22  Q.  So you're a certified DAAT instructor?

23  A.  Yes, I am.

24  Q.  Are you an instructor in firearm use?

25  A.  Yes, I am.

187

1  Q.  Do you have any master level certifications in teaching?

2  A.  I have a Master Instructor Certification in Professional

3  Communication Skills where I certify officers in professional

4  communications.  And I'm also a Master Instructor of Instructor

5  Development, which is the first course all instructor candidates

6  have to go through before they get any of their other instructor

7  disciplines, and I am a Master Instructor in Standard Field

8  Sobriety.

9  Q.  Does that make you a teacher of teachers?

10  A.  In those disciplines, yes.

11  Q.  Do you have professional certifications?

12  A.  The -- Within the profession itself?

13  Q.  With respect to science or police sciences?

14  A.  I'm a Certified Force Science Analyst from the Force Science

15  Institute.

16  Q.  What is that?

17  A.  That is a week-long course that examines the human factors

18  involved in high-stress decision making.

19  Q.  Other certifications?

20  A.  I also have -- The other certification is I am a Certified

21  Law Enforcement Officer retired from the Green Bay Police

22  Department in 2022.  And the other certification I have is my

23  Wisconsin Technical College Instructor Certification.

24  Q.  And does that mean that you have been a police officer in

25  the past?

188

1   A.   Yes.  I spent 29 -- just shy of 30 years actually in law

2   enforcement in Wisconsin.  I began at the Town of Brookfield

3   Police Department in 1993.  And then in 1997, went up to the

4   Green Bay Police Department.  And I served as a Patrol Officer,

5   Field Training Officer, Field Training Supervisor, Training Unit

6   Member, and I was also an Internal Subject Matter Expert.

7   Q.   And then you've also got your adjunct faculty positions?

8   A.   Correct.

9   Q.   Have you published any books or learned treatises?

10  A.   I have 22 published articles and books combined.  My most

11  recent book was published in the last four weeks actually on the

12  evaluation of video reported use of force incidents.

13  Q.   You recognize that you're here today to help the jury

14  understand the details and standards listed in DAAT manuals?

15  A.   Correct.

16  Q.   With respect to that then, we're going to try to focus on

17  DAAT and its factors and standards, okay?

18  A.   Okay.

19  Q.   As we --  Tell me or tell the jury, please, who is kind of

20  responsible in the State of Wisconsin for the administration of

21  the DAAT training?

22  A.   The Wisconsin Department of Justice Division of Training and

23  Standards.

24  Q.   And within the DAAT standards then, what is kind of the

25  primary standard for police activities?

189

1    A.  When it comes to use of force?

2    Q.  Correct.

3    A.  The standard is what is referred to as reasonableness.  And

4    the reasonableness has to be considered from the perspective of

5    the officer at the time and has to also consider the totality of

6    the circumstances that are -- that the officer is faced with.

7    So it is not just one circumstance but a series of circumstances

8    that will help us to ultimately determine whether or not

9    something is reasonable.

10   Q.  And within the DAAT standard, are there factors under the

11   reasonableness heading?

12   A.  Yes, there's typically three of them.

13   Q.  What are those three factors?

14   A.  The first one is the severity of the crime.  And the second

15   one is whether or not the person is actively resisting, and the

16   third one typically is if not only actively resisting but

17   actively resisting by flight.

18   Q.  You indicated that the reasonableness under the DAAT

19   standard is that perspective of an officer.  What did you mean

20   by that?

21   A.  The analogy that I typically give to my students is you have

22   to consider it from the perspective of the officer at the time

23   by putting yourself in their shoes with the information that was

24   available to them at the time and resisting the urge to apply

25   the concept of hindsight bias.

1          No officer ever knows how their scenario is going to

2    end.  When the scenario is over, we all know the ending.  But

3    then, we have to look at it from the beginning, the middle and

4    the end.

5    Q.  In the ordinary circumstances where use of force is

6    evaluated under the DAAT standards, what timing are we talking

7    about?

8    A.  We have to be -- Another thing that we have to allow for is

9    the fact that officers are often times forced to make

10   split-second decisions.  And because officers are forced to make

11   split-second decisions, the decisions that they make are judged

12   from the perspective of reasonableness based upon their

13   perspective at the time.

14   Q.  Under what circumstances can an officer use force?

15   A.  Well, there's various circumstances that they can use.  They

16   can use force to control a situation.  They can use it to make

17   an arrest.  They can use it to detain people that are suspected

18   of criminal activity.  They can use it to defend themselves, and

19   they can also use it to defend others and society at large.

20   Q.  Within the DAAT training then, you've described when force

21   can be used.  Are there levels of force?

22   A.  Yes.

23   Q.  What levels of force does DAAT train on?

24   A.  There are five levels of force.  There's presence, dialogue,

25   protective alternatives, control alternatives and deadly force.

191

1  Q.  What do you mean by presence?  What does DAAT mean by

2  presence?

3  A.  The idea of presence is sometimes the mere presence of a

4  uniform officer or an officer in a squad car may stop a crime

5  from occurring.  Maybe, the officer shows up at a disturbance.

6  And because they show up, the incident resolves itself.

7  Q.  And then the second one you mentioned is dialogue.  What did

8  you mean by dialogue?

9  A.  Dialogue is the use of professional communication skills.

10  That is actually a separate discipline within the Department of

11  Justice training, but it is the use of professional

12  communication skills in order to resolve conflict.

13          The ultimate hope of any contact made by a law

14  enforcement officer is to resolve incidents without force.  In

15  other words, utilizing their communication skills.

16  Q.  I believe the third one you mentioned is control

17  alternatives.  What does that mean?

18  A.  So a control alternative is what an officer may use in order

19  to overcome what is described as passive resistance.  And again,

20  I teach a lot through analogies because that is how people

21  learn.  Passive resistance, for example, might be if an officer

22  grabs onto somebody's arm.  They feel some resistive tension.

23  And the passive counter measure might be a decentralization

24  which means controlling someone's momentum down to the ground.

25  The OC spray, otherwise known as pepper spray, and tasers also

1  fall within the passive-resistance arena.

2  Q.  Okay.  And then I think the fourth one you mentioned is

3  protective alternatives?

4  A.  Yes, and that is to overcome continued or violent

5  resistance.  So in other words, the officer may again, back to

6  the analogy, grab onto the arm or blanket the arm we call it,

7  control it.  They feel the resistance but instead of

8  decentralization happens, the subject turns violently, assaults

9  and now the officer may use hand strikes, knee strikes, baton

10  strikes in order to overcome that assaultive behavior.

11  Q.  And, obviously, the fifth level is deadly force.  Under

12  what -- Give me a generalized definition of deadly force.

13  A.  The justification to use deadly force is behavior which

14  imminently causes or threatens to cause great bodily harm or

15  death to an officer or another person.

16  Q.  Does DAAT recognize a hierarchy of those five things?

17  A.  They no longer refer to it as a hierarchy.  Rather, it is

18  referred to as forced options.  I am assuming you are referring

19  to the five levels we just discussed.

20  Q.  Good point.

21  A.  Because the idea of a hierarchy or a continuum creates this

22  mistaken belief that law enforcement officers must try every

23  level of force before unfortunately they would get to deadly

24  force.  Because there are sometimes instances where things

25  rapidly evolve so quickly that the other force options may not

193

1    be appropriate or may be ineffective or the officer may not have

2    the opportunity to utilize them.  So the officers will select

3    the appropriate force option based upon the fact scenario given

4    to them.

5    Q.  So in layman's terms because that's what I need.  Do you

6    have to go one, two, three, four, five?

7    A.  No.

8    Q.  If you're an officer going to use force?

9    A.  No.

10   Q.  Is force kind of a neutral concept, a 50/50 concept?

11   A.  So force is not a 50/50 proposition.  And what that means is

12   officers have the privilege to be one step above the level of

13   force that is being presented to them.

14          So if somebody, for example, would threaten with their

15   fists to box or fight, the officer doesn't need to engage in

16   that.  They can go to a taser, or they can even go to a baton,

17   so they can always be one step above in order to more

18   effectively control and remain safe.

19   Q.  What about the instance where under the DAAT training where

20   an officer has tried one level of the five, does he have to

21   stick with that?

22   A.  No.  That would fall under the idea of a force option being

23   tried, which is ineffective.  And then it would behoove them to

24   try some other force option that may be available to them.

25   Q.  They can disengage and escalate?

194

1    A.   Absolutely.

2    Q.   Once control is achieved, what is the officer supposed to do

3    with respect to force?

4    A.   So once control is achieved and control again from an

5    analogy perspective would be --

6            MR. CADE:  Your Honor, I'm sorry, I'm going to object.

7    We've gotten far afield of definition of DAAT, and he's actually

8    going into -- giving opinion on other topics.  You know, we were

9    limited to what we could describe what was DAAT.  He's gone

10   above and beyond, and there was a motion in limine with regards

11   to other uses, et cetera, that they had filed.  So we were

12   limited in what we could present.  It should be the same for

13   them.

14           THE COURT:  Well, they are limited, but I didn't

15   perceive this line of questioning to come anywhere close to

16   that, so I'll allow the question.  But be advised, Mr. Wirth,

17   that there are serious limits.

18           MR. WIRTH:  Exactly, Judge.  I'm trying to --

19           THE COURT:  Go ahead.

20           MR. WIRTH:  I'll accept that, Judge.  Thank you.

21   Q.   Are there special circumstances in the use of force?

22   A.   Yes.

23   Q.   What kind of special forces are there?

24   A.   Special circumstances?

25   Q.   Special circumstances, I'm sorry.

195

1   A.  The idea of special circumstances are fact patterns or

2   scenarios that may justify an officer's escalation of force.  So

3   some of those might be the suspect's ability to rapidly escalate

4   force.  It might be officer injury or exhaustion.  It can be

5   relative positioning.

6           An idea of relative positioning again, an analogy I

7   use, is if an officer were about to be shoved into a wall, that

8   might justify some sort of decentralization.  But if that

9   officer's same back was to a bridge and they were about to be

10  pushed off the bridge to their death, a higher level of force

11  would be appropriate.  So that would be an example of a special

12  circumstance.

13          MR. CADE:  Your Honor, now I'd alike a sidebar because

14  we've gone above and beyond.

15          (Sidebar discussion.)

16          (Back on the record.)

17          MR. CADE:  The objection was sustained, Your Honor?

18          THE COURT:  Yes.

19  Q.  Dr. Knetzger, I'm going to show you what's been marked as

20  Exhibit 1066.  It is the 2017 Defense and Arrest Tactics manual.

21  Are you familiar with exhibit -- Defense Exhibit 1066?

22  A.  Yes.

23  Q.  I want to talk about what subject behavior justifies an

24  officer's use of deadly force.

25  A.  You'd like me to explain it?

196

1  Q.  Yes, please.

2  A.  A subject's behavior is behavior which imminently causes or

3  threatens to cause death or great bodily harm to the officer or

4  another person.

5  Q.  What does imminent mean?

6  A.  Imminency means it's just about to happen.

7  Q.  And what determines imminent?

8  A.  Well, from a deadly force perspective?

9  Q.  Correct.

10  A.  I believe you are referring to the target requirements or

11  the --

12  Q.  There are three elements that one -- that a reasonable

13  officer is to consider in determining what is imminent with

14  respect to deadly force.  What are those three?

15  A.  So the first one, and you're referring to weapon, intent,

16  delivery system.

17  Q.  I am, yes.

18  A.  So the first aspect of it is weapon, whether or not the

19  person possesses a weapon.  The second is intent, and that

20  intent can be expressed by voice.  It can be expressed by body

21  language or a combination of both, and the third is delivery

22  system.  In other words, they have the ability to carry out the

23  force.

24  Q.  And when you speak about the elements of intent, whose

25  intent are you talking about?

197

1    A.   The intent of the subject or the suspect.

2    Q.   Once the officer has determined that he faces an imminent

3    threat of great bodily harm, death or great bodily harm, what is

4    his next requirement?

5    A.   Those are the target requirements.  So you have target

6    identification, acquisition, and isolation.  So identification

7    is that's the right individual.  The acquisition is you've

8    acquired the target.  You can see it.  And then isolation is the

9    target is as isolated as possible because law enforcement

10   officers are responsible for every bullet that comes out of

11   their gun, and we don't want bullets to cause unnecessary risk

12   to the general public.

13   Q.   With respect to the use of deadly force, what is the issue

14   of preclusion?

15   A.   So preclusion means that all other force options would

16   either have been tried or would not be effective, and that

17   deadly force was the only reasonable option.

18   Q.   With respect to the use of deadly force, is there an element

19   within DAAT about the officer's perspective in terms of whether

20   it is, in fact, deadly force?

21   A.   Whether it is justified or whether it is deadly force?

22   Q.   Justified under the DAAT standards, yes.

23   A.   Yes.

24   Q.   What is that?

25   A.   That is that standard of reasonableness.

198

1    Q.  And with respect to the officer --  Tell the jury once the

2    officer has gone through the analysis of the imminency of the

3    threat, the three standards of delivery of the threat, and the

4    three standards of the reaction, what then becomes the officer's

5    responsibility?

6    A.  Well, if no other options are available, then deadly force

7    is the only option that's available.

8    Q.  And once deadly force is engaged, are there levels of deadly

9    force?

10   A.  No.

11   Q.  Is there a difference between firing twice and firing five

12   times when you determine deadly force is necessary?

13   A.  No.  Officers are trained to fire until they stop the

14   threat.

15   Q.  And when they believe the threat has stopped, what's their

16   responsibility then?

17   A.  That's when they move to follow-through considerations.

18   Q.  And when you identify the target requirements, you have

19   talked about target acquisition.  What does that mean?

20   A.  Well, that you have acquired the target.  In other words,

21   you can see it because we don't want officers shooting blindly

22   into an area.  There's only one exception to that, and that is

23   called the greater danger theory.

24   Q.  What is the greater danger theory?

25   A.  The greater danger theory essentially means that if the

199

1  officer doesn't take action, more people are going to be put at

2  risk of great bodily harm or death.  So, for example, in an

3  active shooter situation, there may be other people who are

4  around.

5          MR. CADE:  Your Honor, motion in limine on this.

6          MR. WIRTH:  I'll rephrase, Judge.

7          THE COURT:  Okay.

8  Q.  With respect to the use of deadly force after the threat has

9  stopped, the officer's responsibility is what?

10 A.  Follow-through considerations.

11 Q.  And what are the follow-through considerations?

12 A.  So follow-through considerations are appropriately following

13 through and insuring that the officer themselves is okay and

14 that the suspect is receiving the appropriate treatments given

15 the nature of their injuries.

16         So they need to calm themselves, calm others, treat

17 the suspect, take them into safe custody and control, and then

18 appropriately turn them over.  So turn over can be an ambulance,

19 jail, back of a squad car, whatever it might be.

20         MR. WIRTH:  That's all I have.

21 **CROSS EXAMINATION BY MR. CADE:**

22 Q.  It's Dr. Knetzger?

23 A.  Or Mike is fine.

24 Q.  Thank you.  Your degree, I had to look it up.  It is a DM

25 for Doctorate of Management, not a Ph.D., not a medical doctor?

                                                            200

1    A.  Correct.

2    Q.  You previously were a police officer in Brookfield for three

3    or four years and then Green Bay?

4    A.  Correct.

5    Q.  So I'd like to go over first a couple of things.  Your

6    doctorate -- Colorado Technical University, that's a for-profit

7    university, correct?

8    A.  Correct.

9    Q.  That's not a state affiliated -- The State of Colorado is

10   not using tax payer money for that university, right?

11   A.  Correct.

12   Q.  Let's go over a few things first from your file.  Right now

13   at Colorado Tech, you teach three courses -- four, I'm sorry.

14   Management theory, management and ethics, and doctoral

15   symposium, correct?

16   A.  Correct.

17   Q.  Advanced career strategies for the scholar practitioner,

18   right?

19   A.  Correct.

20   Q.  Leadership, theory and development, right?

21   A.  Correct.

22   Q.  Criminal justice organization and management, correct?

23   A.  Correct.

24   Q.  None of that has to do with being a police officer on the

25   streets, fair?

201

1    A.  Correct.

2    Q.  Okay.  And then at Northeast Wisconsin Technical, you teach

3    a bunch of courses that are basically one day or three or four

4    days, correct?

5    A.  It depends upon what I'm teaching.

6    Q.  Yeah.  So your most recent course, according to your

7    curriculum vitae, is September 16th of 2024, instructor

8    development, correct?

9    A.  Correct.

10   Q.  Then you taught in June of 2024, Defense and Arrest Tactics?

11   A.  Correct.

12   Q.  Situation awareness, correct?

13   A.  Correct.

14   Q.  Basic SWAT.

15   A.  Correct.

16   Q.  You've got conflict communications.

17   A.  Yes.

18   Q.  Anduzzi's Sports Bar?

19   A.  Yes.

20   Q.  I don't know Wisconsin Technical College was at a sport's

21   bar.  You got report writing, correct?

22   A.  Yes.

23   Q.  Field sobriety, things of that nature, correct?

24   A.  Yes.

25   Q.  Let's turn for a moment to your -- where you've testified

1   previously.  You've testified previously in September of '22, so

2   this is the most recent time you've testified since today,

3   correct, according to your CV?

4   A.  I think so.

5   Q.  Would you like to see the CV?

6   A.  No, that's okay.

7   Q.  You believe I'm being accurate and fair in representing it?

8   A.  Yes.

9   Q.  The last time that you have been an expert witness was in

10  September of '22, correct?

11  A.  Yes.

12  Q.  And that was a Brown County case where you were an expert

13  witness on proper administration of standard field sobriety

14  tests, correct?

15  A.  Correct.

16  Q.  That has nothing to do with this case, fair?

17  A.  Yes.

18  Q.  June of '21, another Brown County case expert witness on

19  proper administration of standard field sobriety tests, correct?

20  A.  Yes.

21  Q.  September of '20, you testified use of force analysis.

22  Green Bay Police Department consulted on the objectively

23  reasonable application of a "headlock" during a force incident

24  captured on dash cam or video.  Did I read that right?

25  A.  Yes.

203

1    Q.  When you say consulted, you didn't testify in court.  You

2    weren't deposed.  It means the Green Bay Police Department paid

3    you some fee to come in and watch a video and give your

4    analysis, fair?

5    A.  No, I wasn't paid.

6    Q.  You were a volunteer on that one?

7    A.  What was the date of that?

8    Q.  September of 2020?

9    A.  I was still employed.  I was an internal consultant for

10   them.

11   Q.  So you've included in your expert CV while you were a police

12   officer basically doing investigations and things of that

13   nature?

14   A.  In that instance, correct.

15   Q.  Okay, we'll continue.  July of '20, you testified *Tubby v.*

16   *Green Bay*, consulted on the objectionably reasonable application

17   of force in a deadly force incident, provided deposition on

18   behalf of City of Green Bay.  So you were actually a city

19   employee who testified regarding a death case, correct?

20   A.  Correct.

21   Q.  And as I looked that up, that was actually a death case in

22   the garage or sally port area up in Green Bay, right?

23   A.  Yes.

24   Q.  And wasn't Attorney Baynard one of the attorneys on that

25   case?

1    A.   I think so.

2    Q.   Okay.  September of '17, so it's fair to say that all the

3    other dates as I go through them, you're an employee of the City

4    of Green Bay?

5    A.   Not all of them.  I'd have to see them all.

6    Q.   I will go through them.  Use of force analysis, September of

7    '17.  Green Bay Police Department consulted on the objectionable

8    reasonable application of a taser event that was captured on

9    dash cam or a video.  City of Green Bay?

10   A.   Yes.

11   Q.   You were employed.  January of '17.  *State of Wisconsin v.*

12   *McComb*, Brown County case.  Expert witness on the interpretation

13   of standard field sobriety clues related to the certainty of

14   officers making a correct decision.  That has nothing to do with

15   use of force here, correct?

16   A.   Correct.

17   Q.   Okay.  May of '15, critical incident review board, Green Bay

18   Police Department.  Review deadly force incident and made

19   conclusions and training recommendations regarding the actions

20   of officers involved in a deadly force incident.  So it's fair

21   to say that you were after the fact part of a -- was it you

22   individually or, like, a task force trying to figure out

23   something went wrong, and we have to figure out what went wrong?

24   A.   We were part of a panel.

25   Q.   How many people on that panel?

205

1  A.  Four, I believe.

2  Q.  Four, okay.  It wasn't you individually.  It was a group,

3  all of you getting together and doing a mind meld, if you will,

4  of what we should do better?

5  A.  I don't know if mind meld is the right phrase.

6  Q.  March of '15.  Officer Christopher Manney, police and fire

7  commission hearing.  Expert witness in evaluation of crisis

8  interventional skills used during a deadly force incident.  That

9  was actually the shooting that happened in Milwaukee at Red

10  Arrow Park, correct?

11  A.  Yes.

12  Q.  Near the Starbucks?

13  A.  I don't know if it's just near Starbucks.

14  Q.  And that was -- Actually the officer involved had been

15  terminated, Christopher Manney, and you testified that

16  Christopher Manney, what he did was reasonable and correct,

17  true?

18  A.  No.

19  Q.  You didn't testify on his behalf?

20  A.  I did but not to that point.

21  Q.  What do you mean not to that point?

22  A.  I was testifying about crisis intervention skills.

23  Q.  Crisis.  So that's not deadly force.  That's crisis

24  intervention?

25  A.  It wasn't related specifically to the deadly force, correct.

206

1   Q.  And in fact, Christopher Manney, the end result was the

2   termination was upheld, correct?

3   A.  Yes.

4   Q.  Despite you testifying about crisis intervention, they

5   didn't say, we're going to believe Michael Knetzger, they went

6   ahead and fired him anyway, right?

7   A.  Yes.

8   Q.  August of '14, City of Gillett.  Where is City of Gillett

9   Police Department?

10  A.  West of Brown County.

11  Q.  Never heard of it.  City of Gillett Police Department,

12  review of personal performance of mid-level manager,

13  communications and recommendations to mayor and city council.

14  That has nothing to do with deadly force, correct?

15  A.  Correct.

16  Q.  September of '13, *State of Wisconsin v. Steven Angst*, Brown

17  County expert witness on proper administration of standard field

18  sobriety tests.  Again, you were a police officer, and that has

19  nothing to do with deadly force, right?

20  A.  Correct.

21  Q.  Okay.  February '12, Green Bay Professional Police

22  Association.  Consulted regarding officer safety and staffing

23  levels.  That has nothing to do with deadly force as an expert,

24  right?

25  A.  Correct.

207

1    Q.   And you were an employee, correct?

2    A.   Yes, but I wasn't working in my employee capacity.

3    Q.   Okay.  I'm sorry, that was the union hiring you?

4    A.   I was the vice president of the union.

5    Q.   Okay.  So you included your work at the union.  Got it.

6    A.   Yep.

7    Q.   And May of '7, Critical Incident Review Board, reviewed

8    deadly force incident, authored report, Green Bay Police

9    Department.  So that was a deadly force incident that after the

10   fact as a Green Bay Police Officer, you were asked to write a

11   report or you were part of a panel, correct?

12   A.   Correct.

13   Q.   It wasn't just you individually.  It was a group of

14   officers, right?

15   A.   Group of other use of force experts.

16   Q.   Right.  And authored a report means you just happened to

17   draw the short end of the stick and had to draft the report?

18   A.   I volunteered to write it.

19   Q.   You volunteered to write it.  Looking all of this over,

20   other than Jonathan Tubby in Green Bay while you worked there,

21   you have never been hired or testified or retained to provide

22   expert testimony with regards to a deadly force incident, fair?

23   A.   Yes.

24   Q.   Okay.  Let's move slightly.  I want to talk for a moment

25   about -- You gave a lot of impressive things when you're

208

1  mentioning to Mr. Wirth.  It's fair to say that at the end of

2  the day, DAAT and use of deadly force, it's from the perspective

3  of a reasonable officer, right?

4  A.  Yes.

5  Q.  It's not from the perspective of Joseph Mensah.  It's

6  looking at the totality and saying what a reasonable officer

7  would do, correct?

8  A.  Yes.

9  Q.  And you want to say, hey, if another officer was confronted

10 in a similar circumstance, should they have fired a shot or not?

11 That's the analysis, right?

12 A.  That's fair.

13 Q.  Okay.  And actually in this situation, we had other officers

14 who were present, correct?

15 A.  Yes.

16 Q.  None of the other officers shot, correct?

17 A.  Correct.

18 Q.  So in theory, the reasonable officer, you realize when you

19 were doing your report and analysis, you looked at where

20 everybody was, correct?

21 A.  Yes.

22 Q.  You watched video, right?

23 A.  Yes.

24 Q.  Did --

25          MR. WIRTH:  Judge, now the cross examination is

209

1  crossing over into --

2           THE COURT:  Sustained.

3           MR. CADE:  I will rephrase, Judge.  Thank you.

4           THE COURT:  Sustained.

5  Q.  One of the questions -- Were you here Monday or Tuesday?

6  A.  No.

7  Q.  Were you here this morning to hear Officer Mensah testify?

8  A.  I came in late morning around 10:30 a.m.

9  Q.  Okay.  I wasn't watching the clock.  Was he on the stand

10  testifying?

11  A.  Think it might have been near the later part of his

12  testimony.

13  Q.  So I just want to ask you a question that we had asked

14  earlier of our expert, Ricky Burems.  You were here for that,

15  correct?

16  A.  Yes.

17  Q.  And just so if we have -- Just so we're clear, you were here

18  when Attorney Motley had Mr. Burems on the stand, correct?

19  A.  Yes.

20  Q.  Okay.  If you're a police officer and I have the gun down to

21  my side, nothing else.  I haven't said anything to you or

22  anything.  Down to my side, there's no intent to use deadly

23  force available, correct?

24           MR. WIRTH:  Object to foundation and form.

25           THE COURT:  Sustained.

210

1    Q.  Well, let's talk about intent.  You mentioned that there has

2    to be intent on the basis of the subject, correct?

3    A.  Correct.

4    Q.  So if you're a reasonable officer and you confront me and I

5    happen to have in an open carry state, for example, a gun to the

6    side and nothing else, is there enough intent at that point

7    under DAAT to use deadly force?

8    A.  If that's your only fact pattern?

9    Q.  Only fact pattern.

10   A.  No.

11   Q.  Okay.  If I raise the gun up towards you, would you believe

12   under DAAT that intent is present to use deadly force?

13   A.  I think that's reasonable.

14   Q.  Okay.  I now have my back to you.  I apologize I have my

15   back to you.  Gun down to the side.  Nothing else.

16   A.  No other facts?

17   Q.  No other facts.

18   A.  Okay.

19   Q.  Is there intent present to use deadly force?

20   A.  Unlikely not.

21   Q.  If I raise the gun up in front of me so opposite your

22   direction, is there intent present at that moment to use deadly

23   force?

24   A.  What is the gun pointed at?

25   Q.  The gun is pointed in this general direction.  You can't

1   see.  You're just focused on me.  You've testified that you're

2   not concerned about anything else, you're just focused on me.

3   If the gun is up away from you, is it your intent to use deadly

4   force?

5          MR. WIRTH:  Judge, objection.  We are outside DAAT

6   again.  We're now trying to superimpose --

7          THE COURT:  Rephrase the question.

8   Q.  Sure.  I'm just trying to understand intent as you

9   explained, doctor.  We've gone through what intent is.  If the

10  gun is facing away and you are focused just on me and nothing

11  else, no other surroundings, is there enough intent on my part

12  as the subject for you to say in your head under DAAT, deadly

13  force is appropriate?

14  A.  I just want to clarify.  The gun is not pointed at anybody

15  or anything that would potentially get hit by it.

16  Q.  Correct.

17  A.  Then no.

18  Q.  If the gun starts to move at some point, the officer then

19  goes through in their head whether deadly force is appropriate

20  whether there's intent, correct?

21  A.  That's fair.

22  Q.  That's fair.  And the only gray area in all of that is where

23  in the turning that the deadly force is used, fair?

24  A.  Yes.

25  Q.  Because it's not just I start to move.  It's somewhere in

212

1   the movement.  In looking at it afterward, you would say what

2   would a reasonable officer under DAAT do or decide to do and

3   whether to use deadly force, fair?

4   A.  Based upon your motion somewhere within the beginning, the

5   middle, and the end.

6   Q.  Right.

7   A.  The decision is occurring.

8   Q.  Correct?

9   A.  And those decisions take time.

10  Q.  Correct.

11  A.  Yes.

12  Q.  One of the things that you talked about was privilege to use

13  higher force.  You would agree the right to use a weapon and

14  fire at an individual by a police officer is a privilege,

15  correct?

16  A.  Absolutely.

17  Q.  It is not a right.  It is a privilege, fair?

18  A.  Correct.

19  Q.  Okay.  You also mentioned talking about target acquisition.

20  Do you recall that series of exchanges?

21  A.  Yes.

22  Q.  And one of the things for target acquisition is you want to

23  avoid ricochets if at all possible, correct?

24  A.  Yes.

25  Q.  So, for example, if there is a brick wall in front of a

213

1    subject and there are other officers or individuals nearby, you

2    wouldn't just start shooting if you could avoid it because

3    bullets might start ricocheting off the wall.

4             MR. WIRTH:  Judge, we're going way outside.

5             THE COURT:  The ricochet is sustained with respect to

6    that whole line.

7    Q.  Let's discuss -- Have you, Mike, ever been involved in a

8    deadly force situation?

9    A.  Myself?  No.

10   Q.  Up in Green Bay, how long were you up there teaching or

11   working?

12   A.  About 26 years.

13   Q.  In those 26 years, how many homicides does Green Bay have in

14   a given year?

15   A.  Depends upon the year.  I'd say an average anywhere from six

16   to 15.

17   Q.  Six to 15.  And we've identified when I went over the list

18   all the times that you've been hired to do the review of these

19   homicides, correct?

20   A.  The officer-involved shootings.

21   Q.  I went over generally.  We talked about other incidents.

22   Those were the incidents where you were told by Green Bay, we

23   want you to investigate, correct?

24   A.  Yes.

25   Q.  Including the other homicides, correct?  You were never a

1    homicide detective, right?

2    A.  No.

3    Q.  You were never told, hey, we're going to put Michael

4    Knetzger on it because he's an expert and have him investigate

5    the homicide, fair?

6    A.  Correct.

7    Q.  And all of the use of force incidents in Green Bay, whatever

8    that number is, whether it's Green Bay or Brown County, we have

9    identified the totality of circumstances that you were either

10   directly hired as an officer with Green Bay or hired outside as

11   a consultant or something else.  We've identified those,

12   correct?

13   A.  The ones in the vitae.

14   Q.  You testified more about drunk driving as an expert than use

15   of force and death, fair?

16   A.  Yes.

17          MR. CADE:  Those are my questions, Your Honor.

18          MR. WIRTH:  Brief redirect.

19   **REDIRECT EXAMINATION BY MR. WIRTH:**

20   Q.  Dr. Knetzger, you were just walked through a slow motion

21   demonstration where you were questioned on the issue of intent,

22   correct?

23   A.  Yes.

24   Q.  The concept of preclusion, would you tell the jury again

25   what the concept of preclusion is?

215

1    A.   That force options that were attempted were ineffective or

2    would be ineffective and no other option would be reasonable.

3    Q.   In a situation where an attorney is not moving in slow

4    motion, would a sudden pivot with a weapon affect the officer's

5    ability to determine whether deadly force is necessary?

6    A.   Yes.

7    Q.   How so?

8    A.   I'm also trying to be cautious how I answer considering the

9    perspectives here.

10   Q.   Sure.

11   A.   The speed at which an event occurs reduces the amount of

12   time an officer has to make a decision.

13   Q.   Are there circumstances under DAAT where there simply is not

14   enough time to try alternatives?

15   A.   Sudden assault, rapid escalation of force, subject suddenly

16   pulls a weapon and presents would be some valid examples.

17   Q.   What about an example where the subject has a weapon and

18   then turns?

19            THE COURT:  Sustained.  Let's not go into all this

20   again.  We've been over it.

21            MR. WIRTH:  Okay.

22            THE COURT:  As I said earlier, I'm the expert on the

23   law.

24            MR. WIRTH:  Sure, absolutely.  We can wrap it up,

25   Judge.

216

1          MR. CADE:  Judge, I have a couple.  I want to be

2     brief.

3     **RECROSS EXAMINATION BY MR. CADE:**

4     Q.  Mike, you previously -- Indulge me.  You previously had a

5     lawsuit in 2019 while you worked for the City of Green Bay.  Do

6     you recall that?

7     A.  Yes.

8     Q.  And who was your attorney if you recall for that?

9     A.  I think John Muraski.

10    Q.  How about Jonathan Cermele?

11    A.  I'm not sure what lawsuit you are referring to.

12          MR. CADE:  May I approach?

13          THE COURT:  Yeah, sure.

14    Q.  Mike, I'm going to show you the C-Cap entry for *Michael R*

15    *Knetzger v. City of Green Bay*, Brown County, 24-CV-1651.  You

16    see you are the plaintiff?

17    A.  I am one.

18    Q.  Do you see under your name, attorney named Jonathan Cermele?

19    A.  Yes.

20    Q.  Do you know that Jonathan Cermele also represented Joseph

21    Mensah right after the shooting?

22    A.  I don't.

23          MR. WIRTH:  Judge, this is part of the motion in

24    limine about the investigation -- any investigation that

25    occurred.

217

1           THE COURT:  I agree.  Also, I don't see any possible

2    relevance.

3           MR. CADE:  Then, those are -- I'm sorry, briefly.

4    Q.  It would be fair to say when in response to Mr. Wirth's

5    redirect when he was mentioning about time, it's fair to say

6    that three seconds could be more than enough time to make an

7    appropriate decision about use of force or not use of force

8    under DAAT, correct?

9    A.  I don't think you can make that blanket statement.  It would

10   depend upon the fact circumstances.

11   Q.  Right.  All I'm saying is in some scenarios, three seconds

12   may be more than enough time.  And in other scenarios,

13   30 seconds may not be enough time, fair?

14   A.  Yes.

15   Q.  Again, it is a reasonable officer, correct?

16   A.  Correct.

17           MR. CADE:  Thank you, Judge.  No further questions.

18           THE COURT:  Thank you.  You are excused.

19           (Witness excused.)

20           MR. WIRTH:  Defense rests.

21           THE COURT:  Thank you.

22           MR. CADE:  Plaintiff rests, Judge.  No rebuttal.

23       (Excerpt transcript concluded.)

24

25

218

1                  C E R T I F I C A T E

2

3          I, SUSAN ARMBRUSTER, RPR, RMR, FCRR, Official Court

4  Reporter for the United States District Court for the Eastern

5  District of Wisconsin, do hereby certify that the foregoing

6  pages are a true and accurate transcription of my original

7  machine shorthand notes taken in the aforementioned matter to

8  the best of my skill and ability.

9

10  Signed and Certified May 20, 2025.

11  /s/Susan Armbruster

12  Susan Armbruster

13

14                 Susan Armbruster, RPR, RMR, FCRR
                   United States Official Reporter
15                 517 E Wisconsin Ave., Rm 200A,
                   Milwaukee, WI 53202
16                 Susan_Armbruster@wied.uscourts.gov

17

18

19

20

21

22

23

24

25

219