UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| ESTATE OF ALVIN COLE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 22-CV-856 |
| | ) | |
| v. | ) | Milwaukee, WI |
| | ) | |
| JOSEPH ANTHONY MENSAH, | ) | September 10, 2025 |
| | ) | 8:37 a.m. |
| Defendant. | ) | |

TRANSCRIPT OF JURY TRIAL
EXCERPT TESTIMONY OF EVAN OLSON
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:            Cade Law Group, LLC
                               By:  MR. NATHANIEL CADE, JR.
                                    MS. ANNALISA PUSICK
                               PO Box 170887
                               Milwaukee, WI  53217
                               Ph:  414-255-3802
                               nate@cade-law.com
                               annalisa@cade-law.com

                               Motley Legal Services
                               By:  MS. KIMBERLY CHONGYON
                               MOTLEY
                               PO Box 1433 US 28106
                               Matthews, NC  28106
                               Ph:  704-765-4887
                               kcmotley@gmail.com

For the Defendant:            Wirth + Baynard
                               By:  MR. JOSEPH M. WIRTH
                                    MS. JASMYNE M. BAYNARD
                               9898 W. Bluemound Rd., Ste. 2
                               Wauwatosa, WI  53226
                               Ph:  414-291-7979
                               jmw@wbattys.com
                               jmb@wbattys.com

U.S. Official Court Reporter:  JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer-aided transcription.

```
1                           I N D E X

2                           WITNESSES

3    ALL WITNESSES:                                 PAGE:

4    For the Defendant:

5      EVAN OLSON:
         Direct Examination by Ms. Baynard          3
6        Cross-Examination by Mr. Cade              21
         Redirect Examination by Ms. Baynard        46
7
                            EXHIBITS
8
     EXHIBITS RECEIVED:                             PAGE:
9
     For the Defendant:
10
     No. 2010                                        6
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      TRANSCRIPT OF PROCEEDINGS

2              THE COURT:  Okay.  I guess we can bring in the jury.

3      Oh, please, be seated for me anyway.

4              COURT SECURITY OFFICER:  All ready for the jury, your

5      Honor?

6              THE COURT:  Yeah, bring in the jury.

7              COURT SECURITY OFFICER:  All rise for the jury.

8              (The jury entered the courtroom.)

9              THE COURT:  Okay.  Morning.  We're together again.

10     Let's -- let's go.

11                              *  *  *  *  *

12             THE COURT:  Next witness.

13             (The witness is sworn.)

14             THE WITNESS:  Yes, I do.

15             THE COURT:  Have a seat.  State your name for the

16     record, spell your last name.

17             THE WITNESS:  Last name is Olson, O-L-S-O-N, first is

18     Evan, E-V-A-N.

19                              EVAN OLSON,

20     called by the Defendant as a witness herein, having been first

21     duly sworn, was examined and testified as follows:

22                          DIRECT EXAMINATION

23                          BY MS. BAYNARD:

24     Q.  Officer Olson, can you give me a thumbnail sketch of your

25     law enforcement experience.

1    A.   Yes.  I went to MATC, obtained my associate's degree in

2    criminal justice.  And then for approximately three, three and

3    a half years I was a volunteer or reserve officer with the City

4    of South Milwaukee Police Department before being hired at the

5    Wauwatosa Police Department in 2013, where I attended the

6    Waukesha County Technical College Police Academy.  And then in

7    December of 2023, I worked with the West Allis Police

8    Department before returning to the Wauwatosa Police Department

9    in February of this past year.  So in total, approximately 15

10   or so years of law enforcement experience.

11   Q.   Are you currently a field training officer?

12   A.   Yes, I am.

13   Q.   Were you employed by the Wauwatosa Police Department, then,

14   on February 2nd, 2020?

15   A.   Yes.

16   Q.   And at some point did you respond to Mayfair Mall?

17   A.   Yes.

18   Q.   Okay.  Why did you respond to Mayfair Mall?

19   A.   There was a call for service that indicated there was

20   possibly a subject inside of the mall involved in an

21   altercation that may have been in possession of a firearm.

22   Q.   And at the time -- on February 2nd, 2020, what was your

23   assigned squad area?

24   A.   I believe I was 212, which would be -- the city's divided

25   into various sections for patrol.  So that would be Sector 1,

1    which would be the east side of Wauwatosa.

2    Q.   Did your sector include Mayfair Mall?

3    A.   No, it did not.

4    Q.   Then why did you respond to an incident at Mayfair Mall?

5    A.   So as I indicated prior, the call for service was that

6    there was a disorderly subject or some sort of altercation

7    inside the mall involving a firearm.  And the word I tend to

8    use, I guess as an experienced officer, is propensity.  So that

9    type of call has the propensity to end in serious nature,

10   violence or otherwise, in a population-dense area like that.

11   So that is why I responded there eventually.

12   Q.   When you responded, did you -- in your vehicle, did you

13   have your squad camera playing or recording?

14   A.   At some point in time when I activated my emergency lights

15   and siren, the onboard camera system automatically recorded my

16   response.  However, previous to that, I was responding

17   nonemergent from my patrol area, so that would not have been

18   recorded.

19   Q.   I'm going to play for you what's been marked as Defense

20   Exhibit 1020.

21          (Attorneys confer off the record.)

22   BY MS. BAYNARD:

23   Q.   Officer Olson, does this appear from the screen shot to be

24   the view from your squad dash camera?

25   A.   It appears so, yes.

1    Q.   Does it fairly and accurately represent your squad dash cam

2    as you recall on February 2nd, 2020 when you were responding to

3    Mayfair Mall?

4    A.   Yes, it does.

5              (The video recording is played.)

6              MS. BAYNARD:  Your Honor, I would ask that Exhibit

7    1020 be moved into evidence.

8              THE COURT:  No objection, so ordered.

9              (Exhibit No. 1020 was received in evidence.)

10             (The video recording is played.)

11   BY MS. BAYNARD:

12   Q.   Officer Olson, at the end of that video, do you hear

13   someone yell, "Stop, stop"?

14   A.   Yes.

15   Q.   Is that you yelling, "Stop, stop"?

16   A.   Yes.

17   Q.   Are you yelling at Officer Mensah to stop shooting?

18   A.   No.  So the "stop, stop" that you heard from me is kind of

19   an all encompassing reaction, I would say, to what's going on.

20   And I'm sorry, because I'm not sure how many times you've seen

21   this, but the two subjects that I initially encountered that

22   you saw on video here, they were semi compliant, and they were

23   my direct responsibility at the time.  They were getting up,

24   getting down, not fully compliant at the time.

25             I would also say that I've had the unfortunate experience

1    of being shot and in an officer-involved shooting prior to this

2    point, and I would say hearing myself in that video that it was

3    very much a emotional all encompassing all stop.

4        I will add in training, as well, when we're doing firearms

5    training, often times when we --

6            MR. CADE:  Your Honor, move to strike.  He's now going

7    off on a tangent.  He was asked a very specific leading

8    question.

9            THE COURT:  Okay.  Why don't you ask the next

10   question.

11   BY MS. BAYNARD:

12   Q.   Let's start with what you did when you arrived.  So we see

13   your squad car pull up.  Tell the jury what happens next.

14   A.   As I turn northbound onto North Mayfair Road from West

15   North Avenue, as you see here, I extinguish my emergency sirens

16   and lights because of the information that the officers were

17   pursuing these subjects westbound, and I did not want to give

18   up, I guess, my location.  As I exit -- or as I arrive on

19   scene, to the right on the screen here, there's a cement

20   barricade.  And I encounter two subjects that were running

21   westbound.

22   Q.   And when you park your squad, what do you see?

23   A.   When I parked my squad, there's a African American male,

24   dark clothing, carrying or holding some sort of bag or fanny

25   pack or something similar to that.

1    Q.   And what do you tell that individual to do?

2    A.   I tell him to drop the gun based on the information that

3    was provided that a subject was possessing this alleged firearm

4    in a bag similar to that description.

5    Q.   And I believe you said you had two male subjects in front

6    of you at that time?

7    A.   Yes.

8    Q.   Were they compliant?

9    A.   I would say semi compliant.

10   Q.   When you indicated drop the gun, did either of those

11   individuals say anything to you?

12   A.   Yes.  I recall one of the subjects saying something similar

13   to, "No gun, no gun."

14   Q.   Okay.  What did that signify to you?

15           MR. CADE:  Objection, your Honor, speculation.

16           THE COURT:  Overruled.

17   A.   That they were -- the subject was verbally implying that he

18   was not in possession of a firearm.

19   BY MS. BAYNARD:

20   Q.   As a trained officer on a scene like this, did it indicate

21   to you that this individual wanted to tell you he wasn't the

22   threat?

23           MR. CADE:  Judge, this is now hearsay.

24           THE COURT:  It's not hear -- overruled.  And I think

25   you've made your point, Counsel.  You want to move on.

1          MS. BAYNARD:  Can he answer the question?

2          THE COURT:  Well, he -- it's -- he sort of did

3    already, but go ahead.

4    A.   It -- it indicated to me that there was a possibility of

5    some -- somewhat -- sorry -- the possibility of some compliance

6    or stating that he did not have a firearm, therefore, I should

7    possibly interpret that as him not being the threat.

8    BY MS. BAYNARD:

9    Q.   At some point, do you hear a gunshot?

10   A.   Yes, I do.

11   Q.   Okay.  And I'm going to go back in your video a little bit.

12          (The video recording is played.)

13        On February 2nd, 2020, is that the first gunshot you hear

14   in the parking lot?

15   A.   Yes.

16   Q.   Okay.  Where do you believe that gunshot is coming from?

17   A.   Just prior to hearing the gunshot, I'd observed a subject

18   running in the parking lot westbound towards my direction with

19   what would be unknown officers at the time pursuing that

20   subject, which would have been to my east at this point.  And

21   that is the area in which I had heard the single gunshot come

22   from.

23   Q.   And what do you do in response to the gunshot?

24   A.   Just prior to illuminating my gun-mounted flashlight, I

25   begin to kind of analyze where that may have come from as

1    immediately prior to that gunshot, I was giving commands and --

2    to the subjects that I had just encountered.  So I begin to

3    orient myself and try to distinguish -- or determine where

4    exactly that had come from.

5    Q.   Based on your perception, do you know who fired that first

6    gunshot?

7    A.   No.  But I will say that it, again, was -- it sounded like

8    it came from the last known direction or last known location

9    where I'd seen the subject being pursued by officer or

10   officers.

11   Q.   And when you say "the subject being pursued," do we now

12   know that subject to be Alvin Cole?

13   A.   Correct.

14   Q.   When you heard the first gunshot, did you think somebody

15   was shooting at you?

16   A.   Yes.

17   Q.   And did you think that gunshot came from the two males that

18   were direct --

19           MR. CADE:  Objection, leading.

20           THE COURT:  Overruled.

21   BY MS. BAYNARD:

22   Q.   Did you think that gunshot came from the two males that

23   were directly in front of you?

24   A.   No.

25   Q.   After you hear that first gunshot and you've indicated you

1 believed somebody was shooting at you, what do you do?

2 A.   Again, I begin to try my best to observe where individuals

3 are, and then I illuminate my gun-mounted light to, again,

4 illuminate the area further to determine where that suspect now

5 is in relation to officers, civilians, et cetera.

6 Q.   At some point, do you see that subject?

7 A.   Yes.

8 Q.   And where do you -- where do you see the subject?

9     And I'm actually going to show you, so we can orient the

10 jury, what's been previously marked as exhibit -- Defense

11 Exhibit 1000.  Officer Olson, can you show me where --

12         MR. WIRTH:  You have to make sure the court reporter

13 can hear you.

14 Q    -- where you first came and parked your squad vehicle?

15 A.   Yes, I -- approximately right where my laser is here now.

16 BY MS. BAYNARD:

17 Q.   Okay.  And where did you move after you heard the first

18 shot?

19 A.   I had climbed up a berm, if you will, a snow-covered berm.

20 And I believe I ended up right about here.

21 Q.   And at that point, the individual who you believed to have

22 fired the shot, where were they located?

23 A.   I would say approximately three to five car lengths

24 directly east of me, maybe a little bit further at the time of

25 the gunshot.  But I'd say somewhere right in here.

1    Q.   Okay.

2    A.   Yeah, like somewhere in this area maybe.

3    Q.   You can sit down.   Thank you.

4         THE WITNESS:  Does this turn off, or do you --

5         COURT SECURITY OFFICER:  Yeah.   Here.

6    BY MS. BAYNARD:

7    Q.   So after you hear the first gunshot, you're in that

8    location.   What happens next?

9    A.   After I hear the first gunshot and I illuminate my

10   gun-mounted light, the two subjects who I'd just been dealing

11   with, at least one of them began to get up, at which point I

12   went over and instructed him to get down.   And I actually had

13   to place my foot onto his shoulder area to push him back down

14   onto the ground.

15   Q.   As you're scanning, do you observe anyone on the -- as

16   you're scanning, do you observe the -- Cole on the ground, do

17   you see a gun?   That was a bad question.

18        After the gunshot when you're scanning, you observe Cole on

19   the ground; correct?   About four or five car lengths in front

20   of you?

21   A.   I -- no.   I do not observe Mr. Cole on the ground

22   immediately after -- if we're going in chronological order, I

23   do not see him immediately after the gunshot on the ground, no.

24   Q.   Okay.   Explain to me -- then let's go in chronological

25   order.   After the gunshot, what do you observe Mr. Cole do?

1   A.   So after the initial first gunshot, I observed Mr. Cole

2   again approximately three to four car lengths to the east of my

3   location.  He is facing south, if I may?

4   Q.   Go for it.

5   A.   I see him around here, and he's facing south.  There is a

6   large -- not large, but a concrete partition wall.  And he is

7   facing south so the right side of his body would have been

8   facing me.  He would have been perpendicular to me.

9   Q.   And what is he doing?

10  A.   At that point, he's in what I would say a low ready

11  position or almost like a center in football position.  And I

12  cannot see his face or his right lower half of his right arm,

13  lower half of his right arm.  To me was that his upper torso

14  was oriented to the east where it was later determined to be

15  where Officer Johnson had been previously.

16  Q.   At some point, do you observe Mr. Cole with a gun?

17  A.   Correct.

18  Q.   Okay.  At what point do you observe Mr. Cole with a

19  firearm?

20  A.   So immediately after seeing him in the position I just

21  described, Mr. Cole then turned towards me and extended his

22  right arm towards my position with a dark semiautomatic handgun

23  in his right hand.

24  Q.   Are you sure that he had a gun in his hand?

25  A.   Yes.

1  Q.  Okay.  And what do you do when Cole points a gun at you?

2  A.  So I immediately do what we call -- we complete -- it's a

3  threat assessment.  You do something called -- commonly known

4  as the OODA loop.  So you orient yourself.  You decide what

5  action then you will eventually take.  And part of that is to

6  then move off of the X, as we call it, so you -- if you have --

7  if you have a lethal threat displayed towards you, ideally

8  especially where there's no -- there's no cover in your

9  immediate vicinity is to move off of that X, so you're no

10  longer in the location you just were, and you become a

11  difficult target for the suspect.

12  Q.  Okay.  And in that -- in that scenario, the lethal threat

13  that you were facing was Mr. Cole; true?

14  A.  Yes.  The known lethal threat at that time was Mr. Cole.

15  Q.  And -- well, you said you were moving off the X.  Can you

16  describe what happens next or what you do next.

17  A.  Yeah.  So I begin to take a step or two, it would be in a

18  northeastern direction, I believe, to move off of that X.  At

19  which point, I heard a small volley of gunfire somewhere from

20  my left, which would be northeast of my location.

21  Q.  When you're moving off the X, do you have your gun drawn?

22  A.  Yes.

23  Q.  Is it pointed?

24  A.  Yes.

25  Q.  What's it pointed at?

1    A.   So I'm beginning to do what we call isolating -- acquiring

2    and isolating our target or subject. So I'm pointing my

3    firearm, but I'm beginning that sometimes millisecond process

4    of determining what my backdrop is, acquiring my -- I hate to

5    call it, but target area, and going through that process of

6    determining if it is safe or -- to essentially pull the

7    trigger. I guess you're going through that process, albeit

8    sometimes seconds or milliseconds, but that is what's happening

9    in that very moment.

10    Q.   You had decided to use deadly force; true?

11    A.   Yes.

12          MR. CADE:   Objection, your Honor, leading.

13          THE COURT:   Overruled.

14    BY MS. BAYNARD:

15    Q.   Now, I believe you said you were isolating a target and

16    that's your focus. What specifically -- what aspect of the --

17    of the individual are you focusing on?

18    A.   So you tend to move your focus away from the firearm

19    itself, because we've already established -- or I've already

20    established that that is a lethal threat to me at that moment.

21    And you begin to acquire the upper torso area of the threat or

22    the person while also determining what your backdrop is, if

23    there's other officers, civilians, et cetera. And this is all

24    happening in, quite frankly, milliseconds.

25    Q.   As you are -- and you were prepared to shoot Alvin Cole?

1    A.    Yes.

2    Q.    And as you're prepared to shoot Alvin Cole, what happens?

3    A.    As I'm completing that process, as I just described, I

4    heard a small volley of gunfire come from my left or northeast

5    of my location, relatively -- relatively close to me.

6    Q.    At that point, do you know -- when you hear the second

7    volley of shots, do you know who's shooting?

8    A.    No.

9    Q.    After that second volley of shots, what do you do?

10   A.    Well, I observe Mr. Cole then go from that kind of center

11   like stance I described prior to a prone position, which I

12   would say almost flattened to the ground still facing to the

13   south.  And then I begin -- to answer your question, then I

14   begin to start moving in that kind of half-moon movement

15   towards Mr. Cole.

16   Q.    Mr. Cole -- you're focusing on center mass.  Is he on the

17   ground flat at any point before you hear the second volley of

18   shots?

19   A.    No.

20   Q.    Okay.  He only goes flat on the ground after you hear the

21   volley of shots?

22   A.    That is correct.

23   Q.    Do you know how many shots were fired?

24   A.    At the time, it was a small volley of gunfire.  I -- at the

25   time, I would say somewhere between three and seven.  But it's

1    in rapid succession, so it's difficult to determine.

2    Q.   After the shooting, you approach Cole.  What do you do?

3    A.   I give him instructions or commands similar to don't -- I

4    think, "Drop the gun," or something similar to that effect, and

5    letting him know that if he does -- if he does do anything that

6    I will, in fact, shoot him.

7    Q.   This is after he's already been shot, though; correct?

8    A.   Correct.  The gun was still in his right hand at the time,

9    yes.

10   Q.   So even after he's been shot, he still posed a threat?

11   A.   Correct.  Yes.

12   Q.   And I'm going to play a little bit more of your video.

13            (The video recording is played.)

14       Officer Olson, prior to stopping, do you hear somebody

15   yelling, "Do not move, do not move, do not move or I will F'ing

16   shoot you"?

17   A.   Yes.

18   Q.   Is that you?

19   A.   Yes.

20   Q.   And who were you directing that at?

21   A.   Mr. Cole.

22   Q.   And that's because he still had the gun in his hand?

23   A.   That is correct.

24   Q.   How does the gun get out of his hand?

25   A.   So as I approach Officer Robert Peel was in my vicinity.  I

1  remained as what we call the lethal cover, so I maintained that

2  position of my firearm, and we move into an arrest and render

3  aid situation, at which point I walked directly behind Mr.

4  Cole, which is the -- the best point of vantage for me or

5  possession -- or position of advantage for me to walk directly

6  behind him, at which point I kicked the gun out of Mr. Cole's

7  right hand with my right boot.

8  Q.  I'll play back a few seconds.

9          (The video recording is played.)

10          Is that noise we just heard you kicking the gun out of

11  Cole's hand?

12  A.  It sounds to me like a metallic object on the concrete or a

13  similar sound of that, and it would be the correct time in

14  which I kicked the gun out of Mr. Cole's hand, yes.

15  Q.  At any point from the time that you're observing Mr. Cole

16  running in your direction to the point that he's on the ground,

17  does he give you any indication that he's going to surrender?

18  A.  No.

19  Q.  Does he ever put his hands up?

20  A.  Not that I saw, no.

21  Q.  Did he ever say, "No gun, no gun"?

22  A.  No.

23  Q.  Did you hear him say anything?

24  A.  No.

25  Q.  You had decided to use deadly force?

1   A.   Yes.

2   Q.   But you ultimately did not shoot; true?

3   A.   Correct.

4   Q.   Have you been trained on the Wisconsin DAAT Manual?

5   A.   Yes.

6   Q.   And based off of your DAAT training, when are you permitted

7   to use deadly force?

8   A.   When there's an imminent threat of great bodily harm or

9   death to myself or others.

10   Q.   What goes into making that assessment?

11   A.   It -- it's the totality of everything, but the imminency

12   can be -- that criteria can be met by there being a weapon,

13   intent, and delivery system, that's per the manual anyway.  And

14   that criteria had been met at this point.

15   Q.   And when we're talking about intent, obviously you're not a

16   mind reader.  No officer is a mind reader.  How are you -- how

17   do you determine intent from a subject?

18   A.   Well, I can speak to this case or this incident that the

19   knowledge that I had that -- that a firearm was discharged and

20   based on my perception from the last known location of Mr.

21   Cole, I believed that I was shot at at that point and that I

22   had a firearm pointed in my direction, which would indicate the

23   intent to again -- to produce great bodily harm or death to

24   myself or somebody else.

25   Q.   Is an individual -- I guess are you required to have an

1  office -- a gun pointing at you in order to use deadly force?

2  A.  No.

3  Q.  Is a firearm -- the presence of a firearm at all required

4  before you can use deadly force?

5  A.  No.

6  Q.  Back in 2020, do you know how many rounds were in the

7  magazine in the guns that Wauwatosa issued?

8  A.  I believe there was -- there were -- well, we'd say 17 plus

9  one, so I believe there was 17 cartridges that would be in the

10 magazine, and then an additional cartridge that would be in the

11 chamber of the firearm, so in total 18, if I remember

12 correctly.

13 Q.  Are you issued -- are you standard issued additional

14 magazines as well?

15 A.  Yes.

16 Q.  How many did you carry?

17 A.  I -- there was a large period of time where I carried three

18 additional magazines.  I don't recall if at this very moment if

19 I had three or two.  Standard issue is two additional

20 magazines.

21 Q.  Now, after the shooting and after you kicked the gun out of

22 Cole's hand -- or strike that.

23     At some point -- you did not initially know who fired the

24 second volley of shots; true?

25 A.  Correct.

1   Q.   At some point, do you learn who fired those shots?

2   A.   Yes.

3   Q.   And how do you learn that?

4   A.   After -- at some point after rendering aid and securing

5   custody of Mr. Cole, I had observed Officer Mensah in the

6   parking lot would be to my -- to the north I believe, and he

7   was in a state of I would say emotional distress or just -- it

8   was obvious to me that he had clearly gone -- gone through

9   something significant.  And at that time, I presumed that it

10  was him just based on where he was, where I last heard the

11  gunfire, and his state at that time.

12  Q.   Did you talk to him at all?

13  A.   Yes, I did.

14  Q.   Did you talk to him about what happened?

15  A.   No.  I consoled him like a friend and a coworker would and

16  should at that time.  In fact, I gave him a hug.

17           MS. BAYNARD:  I have nothing further, Officer Olson.

18  Thank you.

19                        CROSS-EXAMINATION

20                        BY MR. CADE:

21  Q.   A friend and coworker, you guys are more than just friends

22  and coworkers.

23       We've met before; correct?

24  A.   Yes, sir.

25  Q.   Okay.

1    A.   Hello.

2    Q.   Hello.  I know you're getting sick of seeing me.

3         You and Mr. Mensah are friends -- at least while he worked

4    for Wauwatosa, outside of being on the job; correct?

5    A.   Yes, like most coworkers.

6    Q.   Sure.  But you guys texted each other, did other things

7    with each other; right?

8    A.   Yes, we communicate.

9    Q.   Okay.  So let's back up for a moment.  Other than speaking

10   with Mr. Mensah after shooting, did you have communications

11   with any of the other officers on the scene after Mr. Cole had

12   been taken away in the ambulance?  The officers who were

13   directly involved, and I'm talking -- we know there was a large

14   police presence, so I'm talking solely the officers from

15   Wauwatosa, were you talking with them?

16   A.   I don't recall speaking to -- I don't recall.  I could have

17   briefly, but I, quite frankly, don't recall.

18   Q.   You recall David Shamsi; correct?

19   A.   Yes.

20   Q.   I'm going to play a clip from Exhibit 27.

21        MS. BAYNARD:  Wait.  Your Honor, if this is the same

22   clip that they played at the end of the day yesterday, then we

23   have --

24        MR. CADE:  It's a different one.

25        MS. BAYNARD:  -- the same objection.  Okay.

1          MR. CADE:  Different clip.

2          MS. BAYNARD:  Which clip is this one?

3          MS. MOTLEY:  27.

4          MR. CADE:  We're calling it 27F.

5          MS. BAYNARD:  Your Honor, I don't have a 27F.

6          MR. CADE:  If we -- it's from 27A, and we just took

7   out a clip rather than playing the entire video.  We had that

8   same issue yesterday.

9          MS. BAYNARD:  Yep.  And I had the same issue.  They

10  played a video, and that --

11         THE COURT:  Well, is this in evidence?

12         MS. MOTLEY:  Yes.

13         MR. CADE:  27A is in, and we just took it from 27A,

14  Judge.  That's all we did.

15         MS. BAYNARD:  Your Honor --

16         MR. CADE:  Mr. Kafer already testified that he pulled

17  clips.  That's all we did.

18         MS. BAYNARD:  Your Honor, I don't have an issue with

19  the clip in general.  The issue I have is the same issue I had

20  yesterday playing a clip of audio that does not depict a

21  witness speaking for the jury.  If they want to play the clip,

22  ask him if he can identify himself on it, and if can he attest

23  to what's being said.  That was my issue yesterday as well.

24         THE COURT:  Well, go ahead and play it.

25             (The video recording is played.)

1  BY MR. CADE:

2  Q.  Was that you on audio?

3  A.  I honestly have no idea.  I don't know.  I don't know if

4  it's the speaker or what you're hearing, but it's --

5  Q.  Sure.

6  A.  -- it's very broken up.

7  Q.  Let me -- you said you turned your squad light off because

8  you didn't want the individuals running to know where you were;

9  correct?

10 A.  That is correct.

11 Q.  Is it also fair to say, having heard your audio, having

12 seen the CAD reports and the dispatch, it's fair to say that no

13 one else knew -- none of the other officers knew that you were

14 turning North Avenue at Mayfair Road; correct?

15 A.  I can't speculate to that because we have GPS data on our

16 CAD systems, so it is entirely possible that other officers, I

17 don't know who, or dispatch would know my location at that

18 time.  But I can't speculate as to who.

19 Q.  Right.  But you also know that officers were out of the

20 squad car running; correct?

21 A.  Yes.

22 Q.  Okay.  And if they're out of the squad car running, they

23 don't know there's GPS, because they're not looking at it;

24 right?

25 A.  If we're talking about those officers, you are correct,

1    yes.

2    Q.   Yeah.   So you are driving in.   You turn off your lights, so

3    that also creates a dangerous situation because they don't know

4    there's an officer in front of them; right?

5    A.   At that time, I am more concerned about getting shot by a

6    suspect than my fellow officers, so that's why I extinguished

7    my lights and siren.

8    Q.   Sir, my question is:   That creates a dangerous situation

9    because the other officers don't know where you are at; true?

10   A.   I will say it could.

11   Q.   Okay.   The first gunshot that we hear, that could have been

12   an officer discharging a weapon; right?

13   A.   It technically could.

14   Q.   When you say technically, you -- when you hear the gunshot,

15   you didn't distinguish, oh, that's this particular firearm,

16   that's got to be an officer or it's -- it doesn't sound like

17   our guns, it's got to be a different -- you just heard a shot;

18   right?

19   A.   I heard a single gunshot, correct.

20   Q.   Okay.   So it could have been a police officer discharging a

21   weapon the very first time; true?

22   A.   It could have been, yes.

23   Q.   Okay.   I'm going to come back to describing the scene in a

24   second.

25        With regards to after Mr. Cole -- after Alvin was shot, you

1  were supplying, you said, life-saving measures, CPR?

2  A.  Yes, sir.

3  Q.  How long was Alvin Cole alive after he was shot?

4        MS. BAYNARD:  Objection, calls for a conclusion that

5  this witness cannot render.

6        MR. CADE:  He was present, Judge.

7        THE COURT:  If he knows, he can answer.

8  A.  Mr. Cole had what I had described as agonal breathing at

9  the time that I encountered him.  So, again, I'm not able to

10 testify as to the technical definition of life or death.  But

11 at the time that I encountered Mr. Cole, he had what I would

12 call agonal breathing, which is indicative of the brain not

13 getting enough oxygen, and it's a reflex or it's a -- it's the

14 body going into autopilot to try and obtain oxygen at that

15 time.

16 BY MR. CADE:

17 Q.  And you were --

18       THE COURT:  I have to take this.  Just a second.

19       MR. CADE:  Understood, Judge.

20       (Discussion off the record.)

21       THE COURT:  Excuse me just a minute.  This is

22 important.

23       MR. WIRTH:  Should we go off the record, Judge?  Take

24 a break?

25       THE COURT:  I'm sorry?

1        MS. BAYNARD:  You want to take a ten-minute --

2        MR. WIRTH:  You want to take a break?

3        MS. BAYNARD:  -- our morning break?

4        THE COURT:  Take ten minutes, sure.

5        MR. WIRTH:  Okay.

6        COURT SECURITY OFFICER:  All rise.

7        (The jury left the courtroom.)

8        (A short recess was taken.)

9        THE COURT:  Oh, well, is the jury ready?  If they're

10  ready, we can go.

11        COURT SECURITY OFFICER:  Be one minute, your Honor.

12        THE COURT:  Okay.

13        COURT SECURITY OFFICER:  Please stand for the jury.

14        (The jury entered the courtroom.)

15        THE COURT:  Okay.  Thank you.

16  BY MR. CADE:

17  Q.  Mr. Olson, before we took the break -- and I apologize, I'm

18  going back -- we were discussing Mr. Cole and how long he was

19  alive.  Do you recall that?

20  A.  Yes.

21  Q.  Okay.  You were actually performing CPR; correct?

22  A.  I was, yes.

23  Q.  And there was another officer from Wauwatosa, Officer Wong.

24  Do you know Officer Wong?

25  A.  Yes, sir.

1    Q.   And he was also assisting you; correct?

2    A.   Yes.

3    Q.   And you and Officer Wong were placing an AED, a

4    defibrillator -- defibrillator on Alvin Cole?

5    A.   I believe I assisted with that or orchestrating it or

6    something, yes.

7    Q.   Sure.  And you applied shocks, and you continued --

8    continued until -- CPR measures until the fire department

9    arrived; correct?

10   A.   To my recollection, there was no shock advised, and that's

11   just based on my recollection.

12   Q.   Okay.  You continued working on Mr. Cole until the fire

13   department arrived; correct?

14   A.   That is correct.

15   Q.   Okay.  I meant to ask you this earlier.  Your -- the

16   officers on the Wauwatosa Police Department, I'm going to talk

17   about a couple of them.  Officer Johnson, he's still on the

18   force with you?

19   A.   Yes.

20   Q.   Do you believe him to be a liar?

21   A.   No.

22        MS. BAYNARD:  Objection to the form of the question,

23   argumentative.

24        THE COURT:  I'll allow it.  He answered it.  What's

25   your next question?

1    BY MR. CADE:

2    Q.   Same with -- the same question with regards, you knew David

3    Shamsi?

4    A.   No, I have no reason to.

5    Q.   Well, do you know David Shamsi?

6    A.   I'm sorry?

7    Q.   Do you know David Shamsi?

8    A.   Yes.

9    Q.   Okay.  Did you consider David Shamsi, while he was on the

10   force, to be a liar?

11   A.   No.

12   Q.   You indicated that when you first saw -- when you first saw

13   -- you came over that mound, there was -- it's February, so

14   there's some snow on the ground; correct?

15   A.   Yes.

16   Q.   Okay.  And you encountered two individuals; correct?

17   A.   Yes.

18   Q.   One of the individuals had a sling bag or a fanny-pack-type

19   bag; correct?

20   A.   Yes.

21   Q.   And, in fact, you had heard over the radio a description of

22   an individual with a fanny pack being a potential suspect;

23   correct?

24   A.   Yes.

25   Q.   So when you first come over that mound and you see one of

1    the individuals with a fanny pack, in your head you've already

2    made the assumption that individual is the one with the weapon;

3    true?

4    A.   No, I believed he could be the subject with the weapon.

5    Q.   Well, you said, "Drop the gun."  You were already saying

6    that; correct?

7    A.   Yes, I was.

8    Q.   Okay.  So you weren't talking about -- when you said, "Drop

9    the fucking gun," that was before that very first shot;

10   correct?

11   A.   Yes.  When I made that command, it was, yes, before the

12   initial shot.

13   Q.   Sure.  And the only reason you're saying it, you're not

14   just saying it to anybody who's walking around, "Drop the F'ing

15   gun," you're saying it because you see two individuals, you

16   have made the assumption fanny pack, running, they must -- one

17   of them must have the gun; right?

18   A.   No.

19   Q.   So you just normally tell, "Drop the F'ing gun," to

20   anybody?

21   A.   If I have a group that was identified to possess a firearm

22   running from officers in my direction, the very first heavy

23   control talk command I'm going to give is to, "Drop the gun,"

24   whoever has a gun, drop the gun.

25   Q.   Okay.  But you saw a fanny pack on one of those

1  individuals; correct?

2  A.  Yes.

3  Q.  Okay.  Just so I understand, you are testifying -- and you

4  have in prior deposition -- that you never saw Mr. Cole on his

5  knees; correct?

6  A.  Correct.

7  Q.  You saw him in what you described as -- make sure I

8  understand this -- a low ready; correct?

9  A.  Something similar to that, yes.

10 Q.  Okay.  And so that low ready, there's not a hand on the

11 ground.  And you have indicated previously -- if I'm wrong, let

12 me know -- that it's almost as if his back is flat in front of

13 the knees; correct?

14 A.  I don't know that it would be flat, but I would say the

15 upper torso is oriented forward, not straight up and down.

16 Q.  And that was after you heard the first shot?

17 A.  That is correct.

18 Q.  And that's the first time you perceived Alvin Cole;

19 correct?

20 A.  That's -- the first time I perceived Alvin Cole was when he

21 was initially being foot pursued by officers.

22 Q.  Okay.

23 A.  But I had the two subjects that I was now addressing.  So

24 then after the sound of the gunshot, I then reacquired Mr.

25 Cole, to answer your question, at that point.  So it would be

1    the second time, to answer your question.

2    Q.  You'd agree with me that someone in a low ready, that's

3    clearly not a running position; right?

4    A.  I don't know what --

5    Q.  Well, I mean, that's very difficult to be with your -- your

6    -- your torso over your knees in that low ready.  You're not

7    sprinting in that position; correct?

8    A.  I don't know how to perceive that.  It could have been,

9    couldn't have been.  I don't know what just transpired prior to

10    that, so...

11    Q.  Well, I didn't ask what transpired to that.  When you

12    reacquired him after hearing --

13    A.  Mm-hm.

14    Q  -- that first shot, that's not someone who is sprinting

15    anymore; true?

16    A.  Sure.  Yes.

17    Q.  So when you reacquire him, as you say, you noticed at that

18    point there's a weapon; true?

19    A.  When I initially -- I believe when I initially reacquired

20    him, as I described previously, I believe he was oriented in

21    that eastbound position with his I would call it right lower or

22    below the elbow not visible with his head oriented eastbound in

23    the center-like stance you displayed.

24    Q.  Okay.  And then you saw the weapon pointed at you; correct?

25    A.  The next series of events would -- yes, as far as the

1  series of seeing, observing Mr. Cole, the next position I

2  observed him in was with the firearm pointed my direction with

3  his right arm extended.

4  Q.  You -- let me back up.

5      With his right arm extended.  Would you agree with me that

6  from where you came over that snow hump, there is a wide range

7  in terms of area; correct?  Let me rephrase that.

8      You're familiar -- I've used before with you the -- a clock

9  orientation; true?

10 A.  I believe so, yes.

11 Q.  Okay.  And if you're coming over the snowbank where you're

12 at, we have basically 180 degrees in front of us; correct?

13 A.  Yes.

14 Q.  Right?  Basic -- basic geometry from high school --

15 A.  Uh-huh.

16 Q  -- right?  Yes?

17 A.  Yes.

18 Q.  Okay.  And so if Mr. Cole -- you said 25 feet?

19 A.  No, I believe I'd say like three or four car lengths,

20 somewhere in there.

21 Q.  Tell me --

22 A.  I'm not -- I'll be totally honest with you as far as

23 distance or perception of distance, I couldn't give you an

24 exact, between 30 and 50 feet maybe, somewhere in that

25 vicinity, three to four car lengths maybe.

1  Q.  Let's -- let's get our -- you've used a tape measure

2  before; right?

3  A.  Yes, sir.

4  Q.  Would you hold that for me.  So this is 30 feet where I'm

5  at right here.  This distance or more?

6  A.  I would say more.

7  Q.  More, okay.

8  A.  Yep.

9  Q.  You can let go.

10      So more than 30 feet, and you perceive him.  Would you

11  agree with me, Officer, that if I'm five feet in front of you

12  and I have a gun pointed in your direction, it's a very short

13  area that I'm pointing at; correct?

14  A.  A distance?

15  Q.  In terms of turning?

16  A.  Yes.

17  Q.  I mean, it's -- you know, I'm not pointing at this end, I'm

18  not pointing at this end.  It's a very small dispersion area;

19  correct?

20  A.  Sure, yes.

21  Q.  And if I go 30 feet or more, it's a much wider dispersion

22  area; correct?

23  A.  It could be, yes.  Yes.

24  Q.  And so when you saw Alvin and the gun was in your

25  direction, was it him looking and pointing right at you?

1    A.   Yes, his arm --

2    Q.   -- target is you --

3    A.   Sorry.

4    Q.   -- or just did he have the gun in his hand and it was

5    pointed in that general direction?

6    A.   As you just displayed prior to waving it around, it was

7    pointed directly at my direction.

8    Q.   Okay.  And from you acquiring him and him pointing at you,

9    you never saw it -- the -- you never saw the gun move, he

10   didn't point it in your direction and then turn around and

11   point it to the south or to the north or anything else;

12   correct?

13   A.   Correct.

14   Q.   All right.  And, in fact, you've given multiple statements

15   to various agencies with regards to the shooting; correct?  You

16   were interviewed multiple times?

17   A.   I was interviewed more than once, yes.

18   Q.   So, for example, you were interviewed on February 3rd, the

19   next day; correct?

20   A.   I believe so.

21   Q.   I'm going to show you Exhibit 52.  Now, you never actually

22   did a written report; fair?

23   A.   Correct.

24   Q.   Okay.  You were interviewed, and the detectives who did the

25   interview wrote up a report.  Were you provided that report

1    after they drafted it?

2    A.   At some point, yes.

3    Q.   And you had an opportunity to review it?

4    A.   Yes.

5    Q.   And you had an opportunity to look it over?

6    A.   Yes.

7    Q.   Okay.  So if you would, take a moment and look at 52.  Have

8    you had a chance?

9    A.   I --

10   Q.   Are you familiar with it?

11   A.   I'm familiar.

12   Q.   Okay.  I want you to turn to the third page, 27 of 137.

13   And at this point in time, we have the prior two and a half

14   pages describing you in your vehicle, what you're seeing, what

15   you heard over the video, et cetera.  So on this third page,

16   Page 27 of 137, the middle one, "PO Olson stated," that's

17   actually now your observation of coming over the mound and what

18   you're perceiving; right?

19   A.   It looks to be so, yes.

20   Q.   Okay.  Maybe I've missed it, but could you tell me there

21   where you indicate that Alvin Cole -- that you never saw his

22   upper torso when you first acquired him?

23            MS. BAYNARD:  Your Honor, I'm just going to object on

24   the basis of hearsay.  When he says "you indicate," this is a

25   report written by it appears to be Detective William Schroeder,

1    and it's William Schroeder's --

2           THE COURT:  Sustained.

3    BY MR. CADE:

4    Q.  Well, you had an opportunity to review the report; correct?

5    A.  Yes.

6    Q.  And you had an opportunity, if there were facts missing or

7    not correct, you could have said, "You forgot something";

8    right?

9    A.  Sure, yes.

10   Q.  Did you ever tell them -- did you ever tell Detective

11   Schroeder or Detective Rom or anybody else investigating this,

12   "Hey, I've looked over this report, Exhibit 52, and you've

13   missed out some facts"?

14   A.  I don't believe that type of conversation occurred, no.

15   Q.  Right.  So what I'm asking is nowhere in the report do they

16   have indicated that you've testified to them and given your

17   statement with a lawyer present; true?

18   A.  Yes.

19   Q.  All right.  The next day, nowhere in there does it say that

20   Alvin Cole was pointed away from you when you acquired him,

21   does it?

22          MS. BAYNARD:  I have the same objection, your Honor.

23          MR. CADE:  Your Honor, they don't write reports, so

24   how am I supposed to --

25          THE COURT:  Well, I'll allow it.  Whatever is in the

1    report is in the report.

2    BY MR. CADE:

3    Q.   Am I correct?

4    A.   Could you re-ask the question, please.

5    Q.   Sure.  Nowhere in there does the detective, Schroeder, in

6    writing the report indicate that you've told him, as he's

7    writing it down, that when you hear the shot and you see Alvin

8    Cole and you acquire him for the first time that his head is

9    pointed away from you or that his arm is pointed away from you;

10   correct?

11   A.   Correct.  That is not in this report.

12   Q.   Because, in fact, it says, "PO Olson stated he then

13   observed the officers running behind that subject, so he

14   redirected his attention to the two subjects he had on the

15   ground."  Those are the two guys that you saw when you first

16   showed up; right?

17   A.   Yeah -- yes.

18   Q.   "As he did that, he," meaning you, Officer Olson "heard one

19   loud bang, which he believed to be a gunshot coming from where

20   he just observed the black male subject with the shoulder bag.

21   At this point, PO Olson stated he thought he was being shot at

22   by the subject.  PO Olson then looked back at the subject and

23   observed him to be approximately 20 to 25 feet away from him.

24   PO Olson stated at this time he observed the subject to be in a

25   low ready crouched down position where his torso was past his

1    knees.  The subject's right arm was extended towards PO Olson,

2    and PO Olson observed a firearm in the subject's hand."  Did I

3    read that correctly?

4    A.  I wasn't following along, but I trust you read that

5    correctly.

6    Q.  Okay.  So that was you giving a report.  You subsequently

7    gave -- I'm going to show you 23.  You have that there, sir?

8    A.  Yes, sir.

9    Q.  And this also is a report, again, at your attorney's office

10   -- and I'm trying to pull up the date.

11           MS. BAYNARD:  6/27/23.

12           MR. CADE:  I'm sorry, Counsel?

13           MS. BAYNARD:  6/27/23.

14   BY MR. CADE:

15   Q.  Oh, yeah, 6/27 -- you see that, of 2020?

16           MS. BAYNARD:  2023.

17   BY MR. CADE:

18   Q.  2023, I'm sorry.

19   A.  I don't, but I'm not going to --

20   Q.  Well, that's --

21           MR. CADE:  That was when he gave his deposition?

22   A.  Yeah.

23   Q.  When you give the actual --

24   A.  This is earlier.

25           (Attorneys confer off the record.)

1          MR. CADE:  It is '23.  Give me one second.
2    BY MR. CADE:
3    Q.  This was a report that was prepared with regards to an
4    additional interview; correct?
5    A.  Yes.
6    Q.  Okay.  And in this additional interview, it talks about you
7    performing CPR at the end; correct?
8    A.  I believe so.
9    Q.  And what I'm concentrating on is the -- strike that.  Let
10   me change subjects.  I apologize.
11        At -- I want to play a clip for you, sir.  It's a clip from
12   Officer Shamsi's squad video, 27E.  And we're just going to
13   throw it up there before we play it so we can --
14        MS. BAYNARD:  I'll just have the same objection that I
15   don't have a 27E.
16        MS. MOTLEY:  Already admitted.
17        MS. BAYNARD:  27E is not admitted.  27, the whole
18   video, is admitted.  And my objection would be --
19        MR. CADE:  Do we have him on video?  Do we have him on
20   video?
21   BY MR. CADE:
22   Q.  Do you see that individual?
23        THE COURT:  I'm sorry, are we -- do we have a dispute
24   here?
25        MS. BAYNARD:  If they want to show him and have him

1   identify himself in a video before they play it, I have no

2   issue.

3            MR. CADE:  That's what I'm getting ready to do.

4            THE COURT:  All right.

5   BY MR. CADE:

6   Q.  Do you see the individual on right side, sir?

7   A.  Yes.

8   Q.  With a -- a beard?

9   A.  Yes.

10  Q.  Is that you?

11  A.  I -- quite frankly, I don't know with the image.  I wish I

12  could identify myself in that, but I'm having a hard time.  If

13  you have some additional images.

14  Q.  Is that you with the beard?

15  A.  It resembles me.  I wish I could a hundred percent identify

16  myself in this, but I'm having a -- there's a lot of us that

17  look like that at the police department, to be honest with you,

18  so...

19  Q.  Sure.  But at the police department at the time, neither

20  you, Johnson -- I'm assuming that's not Wong; correct?

21  A.  No.

22  Q.  That's not any of the --

23  A.  He does have a beard, though.

24  Q.  That's not any of the female officers; correct?

25  A.  Correct.

1    Q.   Okay.  So who else at the time of the shooting was present
2    with a beard and bald head?
3    A.   At this moment in time where there's resources on scene, I
4    couldn't tell you.  If you have more, I have no problem.  I'm
5    just being honest with you.  I -- it's hard for me to identify
6    myself with what you have here.
7    Q.   That's you, sir?
8    A.   I'm sorry, I cannot identify myself in what you've provided
9    right now.
10   Q.   Well, why don't we play the sound and tell me --
11   A.   Sure.
12   Q.   -- if that's you; fair?
13   A.   Sure.
14        MS. BAYNARD:  I'll just have an objection to
15   foundation, but --
16        THE COURT:  Well...
17        (The video recording is played.)
18   BY MR. CADE:
19   Q.   That was you, sir?
20   A.   Yes.
21   Q.   And you went and you were asking Shamsi, did you fire;
22   correct?
23   A.   I was asking -- I don't recall who it was; but, yeah, I was
24   asking officers on scene if they had fired their weapon or not.
25   Q.   Sure.  But you're supposed to isolate while you're on

1    scene, correct, after a shooting in terms of who's doing what.

2    You're not supposed to figure out who's firing; right?

3               MS. BAYNARD:  Objection to the form of the question.

4               MR. CADE:  I'll rephrase.

5    BY MR. CADE:

6    Q.  While you're investigate -- or, I'm sorry, not while you're

7    investigating -- after a shooting while resources are on the

8    scene, you know you're supposed to, at some point, isolate and

9    not compare proverbial notes with other officers; right?

10   A.  To answer your question in just that frame of question,

11   yes, when feasible.

12   Q.  Okay.  So the officers -- the resources have been on scene

13   for at least, what, five, six, eight minutes?

14   A.  I have no idea at this point.

15   Q.  Okay.  At this point in time, you shouldn't be talking to

16   other officers about who shot or what they saw; true?  Right?

17              MS. BAYNARD:  I'm going to object just to relevance.

18              THE COURT:  Well, it was just asked and answered, so

19   next question.

20   BY MR. CADE:

21   Q.  Mr. Cole is still in the background; correct?

22   A.  I'm not -- I'm not sure.  I'm not going to dispute if

23   that's -- I haven't seen this whole video, so I don't know.

24   Q.  Right, but that's -- that's an ambulance; correct?

25   A.  That is correct.

1   Q.   There's not two ambulances; correct?

2   A.   Not in this video.

3   Q.   Well, there weren't two ambulances that came on scene?

4        MS. BAYNARD:  Objection, relevance.

5        THE COURT:  Sustained.

6   BY MR. CADE:

7   Q.   Perception, you had talked about how you -- the questions

8   to Attorney Baynard how you can perceive things; correct?

9   A.   I'm not sure what your question is, sir.

10  Q.   She was asking you about DAAT training and you were

11  describing that with regards to threats how you perceive

12  threats; true?

13  A.   Yes, she asked questions regarding that.

14  Q.   And the perception can be wrong.

15  A.   Of course.

16  Q.   Okay.  In fact, you've had situations where your perception

17  has been wrong; true?

18       MS. BAYNARD:  Objection, relevance.

19       THE COURT:  Sustained.

20       MR. CADE:  Your Honor, can I have a sidebar, please?

21       (Discussion off the record at the bench.)

22  BY MR. CADE:

23  Q.   Officer Olson, with regard to perception, you've actually

24  perceived someone to have a gun, shot them, and it turned out

25  it was a cell phone; correct?

1      MS. BAYNARD:  Objection, your Honor.

2      THE COURT:  Sustained.

3      MS. BAYNARD:  Can we have another sidebar?  I think

4  we're going to need a curative instruction.

5      THE COURT:  I'm sorry?

6      MS. BAYNARD:  We can discuss it after wrapping up this

7  witness.

8      THE COURT:  Yeah.  Go ahead.  Let's -- let's try and

9  finish up.

10  BY MR. CADE:

11  Q.  When you said -- or testified you were -- had pulled your

12  weapon and you had acquired Mr. Cole, do you recall that series

13  of questions?

14  A.  Yes.

15  Q.  And you were isolating him, trying to make a decision of

16  one of the things is whether it was safe to fire?

17  A.  Part of that process as described earlier is yes.

18  Q.  And one of the decisions on whether it's safe to fire is

19  whether there's any sort of background or other things that

20  might cause issues, for example, shooting at a concrete barrier

21  could cause a ricochet?

22      MS. BAYNARD:  Objection, relevance.

23      THE COURT:  Sustained.

24  BY MR. CADE:

25  Q.  You never saw Mr. Cole point the firearm at anyone other

1  than yourself; correct?

2  A.  That is correct.

3  Q.  And you never told any of the detectives that you did not

4  -- that you saw the back of Mr. Cole's head; correct?

5  A.  I do not see it in the reports here.  I honestly cannot

6  answer that as we sit here five years later if I mentioned that

7  at any point prior to meeting with you.

8          MR. CADE:  Those are my questions, your Honor.

9          MS. BAYNARD:  I have -- I have a few.

10              REDIRECT EXAMINATION

11               BY MS. BAYNARD:

12  Q.  Officer Olson, I believe the exhibit you have up there is

13  from the report that you gave to Lori Rom; is that accurate?

14  A.  I have two up here, if you're referencing 52.

15  Q.  And you gave other statements during this process; correct?

16  A.  Yes.

17  Q.  And one of those statements was to the district attorney's

18  office?

19  A.  Yes.

20  Q.  I'm going to hand you what's been marked as Exhibit 50 --

21  Plaintiff's Exhibit 57.

22          MR. CADE:  Your Honor, hearsay.

23          MS. BAYNARD:  I haven't asked him anything about it.

24          THE COURT:  What she's asking him to, what, identify

25  it?

1           MR. CADE:  That they gave a --

2           THE COURT:  Well, she hasn't asked a question about

3   content, so what's the question?

4           MS. BAYNARD:  I'm not asking him anything about that.

5   I'm just asking if he gave another a report.  Is that the -- if

6   you -- I'm not going to ask him about the contents of the

7   report.

8           THE COURT:  Okay.  What's the question?  That he

9   did --

10          MS. BAYNARD:  Yes.

11          THE COURT:  -- he did an interview with the DA?

12          MS. BAYNARD:  Yes.

13          THE COURT:  Okay.  What's the next question?

14  BY MS. BAYNARD:

15  Q.  Did you --

16  A.  Yes, this Exhibit 57 appears to be a report from the

17  Milwaukee County District Attorney's Office following a meeting

18  I had -- or interview I had with them.

19  Q.  Okay.  And do you also recall being deposed by Attorney

20  Cade?

21  A.  Yes.

22  Q.  Okay.  And when we're talking about this whether or not you

23  observed Cole facing away from you at all, do you recall

24  telling Mr. Cade that you did see him --

25          MR. CADE:  Objection, your Honor, she -- she doesn't

1    get to turn around and say what was in the deposition.  She has

2    to ask the question.

3            MS. BAYNARD:  I'm asking the question.

4            MR. CADE:  No, you're asking him do you recall saying

5    something in a deposition.  He hasn't said his memory needs to

6    be refreshed.

7            THE COURT:  Do you have the deposition?

8            MS. BAYNARD:  I do.

9            THE COURT:  Okay.  Well, was he asked a question, did

10   he give a certain answer.

11           MS. BAYNARD:  I was going to ask him if he recalls.  I

12   can bring him the deposition if you'd like.

13           THE COURT:  Well, you're in charge of your own case,

14   but as of now, it's -- the objection is sustained.  Next

15   question.

16   BY MS. BAYNARD:

17   Q.  Officer Olson, at some point do you observe Mr. Cole facing

18   in the eastbound direction away from you?

19   A.  Yes.

20   Q.  Okay.  I just have a few more.  When you encountered the

21   individuals in front of you, the first two individuals, you

22   tell them to drop the gun, do either of them do anything to

23   indicate they don't have a gun?

24   A.  So at the time that I yelled out that all encompassing

25   command of, "Drop the gun," one of the individuals said, I

1   believe, "No gun, no gun," or something similar to that.

2   Q.   When you were on scene, you observed Alvin Cole to have a

3   black handgun in his hand; correct?

4   A.   Yes.

5   Q.   Do you think there is any doubt that your perception of

6   that was inaccurate?

7   A.   No.

8            MS. BAYNARD:   That's all I have, your Honor.

9            THE COURT:   Okay.   You're excused.   Next witness.

10           THE WITNESS:   Do you want these?

11           MS. BAYNARD:   You can just leave them up there.   Thank

12   you.

13           (The witness is excused.)

14                          *  *  *  *  *

15           THE COURT:   All right.   So then we'll all be here at

16   9:00.   And then if anything comes up, you can communicate as

17   you have so far.   Okay?

18           JUROR:   Uh-huh.

19           THE COURT:   Okay.   Thanks for your attention.

20           COURT SECURITY OFFICER:   All rise.

21           (The jury left the courtroom.)

22           (At 8:22 p.m. the hearing ended.)

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3                    I, JENNIFER L. STAKE, RDR, CRR, an Official

 4     Court Reporter for the United States District Court for the

 5     Eastern District of Wisconsin, do hereby certify that the

 6     foregoing is a true and correct transcript of the excerpt of

 7     the proceedings had and testimony taken in the above-titled

 8     matter as the same are contained in my original machine

 9     shorthand notes on the said trial or proceeding.

10

11

12     Dated this 29th day of September, 2025.

13     Milwaukee, Wisconsin.

14

15

16                    Jennifer L. Stake, RDR, CRR
                     United States Official Court Reporter
17                   517 East Wisconsin Avenue, Room 324
                           Milwaukee, WI  53202
18

19                    Jennifer_Stake@wied.uscourts.gov

20

21

22     ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
       Official Court Reporter, RDR, CRR
23     _____

24

25
```