UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

| | | |
|---|---|---|
| ESTATE OF ALVIN COLE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 22-CV-856 |
| | ) | |
| v. | ) | Milwaukee, WI |
| | ) | |
| JOSEPH ANTHONY MENSAH, | ) | September 10, 2025 |
| | ) | 8:37 a.m. |
| Defendant. | ) | |

---

TRANSCRIPT OF JURY TRIAL
EXCERPT TESTIMONY OF MIKE KNETZGER
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:               Cade Law Group, LLC
                                  By:  MR. NATHANIEL CADE, JR.
                                       MS. ANNALISA PUSICK
                                  PO Box 170887
                                  Milwaukee, WI  53217
                                  Ph:  414-255-3802
                                  nate@cade-law.com
                                  annalisa@cade-law.com

                                  Motley Legal Services
                                  By:  MS. KIMBERLY CHONGYON
                                  MOTLEY
                                  PO Box 1433 US 28106
                                  Matthews, NC  28106
                                  Ph:  704-765-4887
                                  kcmotley@gmail.com

For the Defendant:                Wirth + Baynard
                                  By:  MR. JOSEPH M. WIRTH
                                       MS. JASMYNE M. BAYNARD
                                  9898 W. Bluemound Rd., Ste. 2
                                  Wauwatosa, WI  53226
                                  Ph:  414-291-7979
                                  jmw@wbattys.com
                                  jmb@wbattys.com

U.S. Official Court Reporter:  JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer-aided transcription.

```
 1                          I N D E X

 2                           WITNESSES

 3
    ALL WITNESSES:                                    PAGE:
 4
    For the Defendant:
 5
      MIKE KNETZGER:
 6       Direct Examination by Mr. Wirth             3
         Cross-Examination by Mr. Cade               22
 7       Redirect Examination by Mr. Wirth           39

 8                           EXHIBITS

 9  EXHIBITS RECEIVED:                               PAGE:

10  For the Defense:

11  No. 1056                                         6

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    TRANSCRIPT OF PROCEEDINGS

2              THE COURT:  Okay.  I guess we can bring in the jury.

3      Oh, please, be seated for me anyway.

4              COURT SECURITY OFFICER:  All ready for the jury, your

5      Honor?

6              THE COURT:  Yeah, bring in the jury.

7              COURT SECURITY OFFICER:  All rise for the jury.

8              (The jury entered the courtroom.)

9              THE COURT:  Okay.  Morning.  We're together again.

10     Let's -- let's go.

11                          *  *  *  *  *

12         MR. WIRTH:  Judge, we're going to call Dr. Michael

13     Knetzger.

14             THE COURT:  Okay.

15             (The witness is sworn.)

16             THE WITNESS:  I do.

17             THE COURT:  Okay.  State your name for the record,

18     spell your last name, and talk into the mike so everyone can

19     hear you.

20             THE WITNESS:  Mike Knetzger, K-N-E-T-Z-G-E-R.

21                          MIKE KNETZGER,

22     called by the Defendant as a witness herein, having been first

23     duly sworn, was examined and testified as follows:

24                      DIRECT EXAMINATION

25                      BY MR. WIRTH:

1  Q.  Dr. Knetzger, good afternoon.

2  A.  Good afternoon.

3  Q.  How are you employed, sir?

4  A.  I am -- I'm currently retired as a law enforcement officer,

5  and I have a variety of employments.  I'm employed by Northeast

6  Wisconsin Technical College as a law enforcement instructor and

7  criminal justice instructor and trainer.

8      I'm also more recently employed by Los Angeles Pacific

9  University in their public administration and criminal justice

10  program and with Colorado Technical University.

11      In addition to that, I do independent consulting and

12  subject matter expert work for various universities and

13  institutions, both public and private.

14  Q.  And at the universities, what do you do?

15  A.  At Colorado Technical University, I'm involved in their

16  doctoral program, so I'm working with doctoral students who are

17  pursuing degrees in doctors of management within various

18  disciplines.

19      At Northeast Wisconsin Technical College, I primarily teach

20  law enforcement and correctional officers in the areas of

21  professional communication skills, instructor development,

22  defense and arrest tactics, and firearms.

23      At Los Angeles Pacific University, I'm currently working in

24  their graduate master's of public administration program, and I

25  do course development for them in their criminal justice

1    program.

2    Q.   Are you a certified DAAT instructor?

3    A.   Yes.  I'm a certified State of Wisconsin Defensive and

4    Arrest Tactics instructor.

5    Q.   Now, you mentioned you do have some background in law

6    enforcement, also?

7    A.   I spent 29.9 years in law enforcement.  I started with the

8    Brookfield Police in 1993, and then I took a position with the

9    City of Green Bay police in 1997, and I served in the capacity

10   of a patrol officer, a detective for a short period of time, a

11   road supervisor, field training officer, and also involved in

12   the department's special weapons and tactics team where I was

13   also a trainer.

14   Q.   Are you a firearms instructor?

15   A.   Yes, I am.

16   Q.   I can -- I'm going to put up Exhibit No. 1056 and just ask

17   you to identify that.  It's just his CV.

18   A.   Okay.

19          MR. WIRTH:  Annalisa, can you switch me over?

20          MS. PUSICK:  I'm sorry, yes.

21          MR. WIRTH:  Thank you.  Taking a little while to warm

22   up lately, so...

23   BY MR. WIRTH:

24   Q.   Here's what I'm going to do.  We've had it marked as

25   Exhibit No. 1056.

1    A.    Okay.

2    Q.    Can you identify what Exhibit No. 1056 is.

3    A.    It's a copy of my curriculum vitae.

4          MR. WIRTH:    Judge, we'd move 1056 into evidence.

5          MR. CADE:    No objection.

6          MR. WIRTH:    Your Honor?

7          THE COURT:    Yeah.

8          MR. WIRTH:    We'd move Mr. -- Dr. Knetzger's curriculum

9    vitae, Defense Exhibit 1056 into evidence.

10          MR. CADE:    No objection.

11          THE COURT:    So ordered.

12          (Exhibit No. 1056 was received in evidence.)

13   BY MR. WIRTH:

14   Q.    In your profession, have you published any books or

15   articles?

16   A.    Yes.    I've written approximately 22 articles or books for

17   the criminal justice industry and for law enforcement or

18   corrections.    My most recent publication was in March on the

19   management and analysis of video recorded use of force

20   incidents.

21   Q.    You recognize that you're here today to help the jury

22   understand the details and standards within the DAAT manual?

23   A.    Correct.

24   Q.    With respect to that, then, we're going to try to focus on

25   DAAT, its factors and standards, okay?

1   A.   Yes.

2   Q.   Who is responsible in the State of Wisconsin for the

3   administration of the DAAT training?

4   A.   The Wisconsin Department of Justice Training and Standards

5   Division.

6   Q.   What I'd like to do is focus on the use of force within the

7   DAAT manual, okay?

8   A.   Yes.

9   Q.   What is the -- essentially the standard basis for use of

10  force in the DAAT manual?

11  A.   Are you referring to the five standards?

12  Q.   First off, with respect to evaluating an officer --

13  A.   Okay.

14  Q    -- in that respect.

15  A.   When it comes to evaluating the actions of a law

16  enforcement officer, the standard is objective reasonableness.

17  And that means we must look at the event from the perspective

18  of the officer based upon what they knew at the moment when

19  they made their decisions.

20  Q.   And when you discuss the reasonable officer in the moment,

21  which moment are you talking about?

22  A.   It is the totality of the circumstances that will

23  ultimately inform us about whether or not the force used was

24  objectively reasonable.  We look at it from the perspective of

25  a beginning, a middle, and an end.

1    Q.  This is going to be an obvious question, but in the field

2    do the officers know how the story ends?

3    A.  No.  That's one thing officers never know is how their

4    event is going to end.

5    Q.  In the ordinary circumstances where use of force is

6    evaluated under DAAT, what kind of timing can we be talking

7    about?

8            MR. CADE:  Your Honor, I'm going to object.  There's

9    no evidence that under the ordinary circumstances he evaluates

10   in the real world.  He's talking about standards.  There's no

11   evidence that he's applied those standards in the field to real

12   world scenarios.

13           THE COURT:  I'll allow him to answer.

14   A.  Can you please repeat the question?

15   BY MR. WIRTH:

16   Q.  Sure.  As we're talking about the use of force evaluation

17   under the DAAT standard, what kinds of timing are we talking

18   about?

19   A.  Well, every situation is unique in and of itself.  But

20   oftentimes officers are required to make decisions in a split

21   second.

22   Q.  Under what circumstances, can an officer use force?

23   A.  Officers can use force in Wisconsin to achieve control of

24   resistive subjects; to arrest people who have been suspected of

25   criminal behavior; to detain people who are considered to be

1    suspicious, if you will; to prevent escape; and to protect

2    themselves or others.

3    Q.  Were you here yesterday for Ricky Burems' testimony?

4    A.  No, I was not.

5    Q.  Mr. Burems mentioned five levels of force.  Can you just

6    give us a thumbnail of those, and then we'll go to deadly

7    force.

8    A.  So the five modes, if you will, are presence, dialogue,

9    control alternatives, protective alternatives, and deadly

10    force.  Presence means the officer being present may -- is

11    considered to be a low level of force because their presence

12    alone may stop whatever is occurring.

13        Dialogue is the officer's ability to use communication

14    skills to resolve conflict.  And in the vast majority of cases,

15    most events are resolved with communication skills.

16        From a control alternatives perspective, that is to

17    overcome what is called passive resistance.  And we also find

18    in that level tasers and OC spray.

19        And then protective alternatives are to overcome continued

20    resistance or violent resistance, and then finally deadly

21    force.

22    Q.  With respect to deadly force, can you tell the jury a

23    generalized definition of deadly force.

24    A.  Deadly force is the intentional use of a firearm, or other

25    instrument, the use of which is likely to cause death.

1   Q.  With respect to the five levels of force, is there anything

2   -- is there any required hierarchy?

3   A.  No.  It used to be called the "use of force hierarchy"

4   because it created this perception that officers were required

5   to go through the levels of force sequentially in order to

6   arrive at deadly force, let's say.  It is now referred to as

7   the "use of force options system."  Because of the dynamic

8   nature of law enforcement, sometimes officers don't have the

9   opportunity or the ability to deliver other force options given

10   their particular scenario.

11   Q.  Is force within police training a 50-50 concept?

12   A.  No.  So force is not a 50-50 proposition.  Officers are

13   trained and have the -- have what is called privilege to

14   utilize a higher level of force in order to control the

15   individual.  Ultimately, the DAAT system is all about control.

16   And DAAT stands for Defensive And Arrest Tactics.  And we

17   typically train officers that they have the ability to always

18   be at least one level above the nature of the threat that is

19   being posed to them.

20   Q.  And in this kind of force option concept, if an officer

21   selects one level of force, is that the one they're stuck with?

22   A.  No.  There may be instances where officers have the

23   opportunity to disengage, and officers have the opportunity to

24   escalate.  And, of course, they could always remain at whatever

25   level they might be.  But the circumstances are going to

1    oftentimes determine, the suspect's actions are going to

2    determine what level of force the officer selects.

3    Q.   And in -- within DAAT training, is there something called

4    special circumstances?

5    A.   Yes.

6    Q.   And what are those?

7    A.   So those are instances where the officer may be justified

8    in using a higher level of force.  So a special circumstance

9    might be the subject's ability to escalate rapidly.  It could

10   also be information that is known to the officer ahead of time,

11   such as the individual's violent history.  It -- relative

12   positioning is a -- is another one.  Where the officer is

13   positioned may determine a higher level of force given their

14   particular scenario.

15   Q.   I believe you have in front of you marked as Exhibit --

16   what is it, 1056?

17   A.   It looks like 10 -- could be a five or a six.  I'm not

18   sure.

19   Q.   Okay.  I think -- I think it's 1056.

20   A.   Okay.

21   Q.   And that -- can you tell the jury what 1056 is?

22   A.   This appears to be a copy of the Defensive and Arrest

23   Tactics Manual Training Guide for Law Enforcement Officers by

24   the Wisconsin Department of Justice.

25   Q.   Okay.  And apparently I misread my own handwriting.  It's

1  1055.

2  A.   Okay.

3  Q.   And that's the 2017 DAAT manual?

4  A.   Correct.

5  Q.   I want to talk now about subject behavior that justifies an

6  officer's use of deadly force, okay?

7  A.   Okay.

8  Q.   What conduct by an individual would justify the use of

9  deadly force?

10  A.   So it's -- it's behavior that causes or imminently

11  threatens to cause great bodily harm or death to an officer or

12  somebody else or society at large.

13  Q.   And what does "imminent" mean?

14  A.   So imminent means that it's about to happen.

15  Q.   And in determining whether to use deadly force, what kind

16  of things is an officer trained to consider?

17  A.   From an imminency perspective, it is referred to as weapon,

18  intent, and delivery system.  So there must be a weapon, and

19  that can be any sort of weapon that has the potential to cause

20  great bodily harm or death, the intent to utilize that

21  particular object or weapon, and then whether or not they have

22  the delivery system, so in other words the ability to carry it

23  out.

24  Q.   And when Mr. Burems was testifying, one of the examples I

25  presented to him was a knife may be a weapon, and he may intend

1  to use that knife, but if he's 50 yards away, there isn't a

2  delivery system; is that accurate?

3  A.  That could be a scenario where the delivery system might be

4  in question.

5  Q.  In a deadly force situation, those three considerations

6  have to be present?

7  A.  Weapon, intent, and delivery system, yes.

8  Q.  And when we speak about intent, whose intent are we talking

9  about?

10  A.  We're talking about the subject with the weapon, so the

11  suspect's intent.  And that intent can be displayed via voice,

12  action, or both.

13  Q.  Once the officer has determined that he faces an imminent

14  threat of great bodily harm, death, what is his next

15  requirement -- or his next analysis?

16  A.  Well, the next thing that officers are trained to consider

17  is target identification, target isolation, and target

18  acquisition.  So they must acquire a target, they must identify

19  it as the right target, and they must isolate it to the

20  greatest extent possible.  The only exception to isolation is

21  what is referred to as the greater danger theory.  And that is

22  when officers may be presented with a scenario where although

23  they may be required to use deadly force and as a result of

24  that might put others at risk, but if they don't do it, more

25  harm is going to be caused.  And those are relatively rare

1   circumstances.

2   Q.   In the training on the use of deadly force, what is the

3   issue of preclusion?

4   A.   So preclusion means that officers have either attempted

5   other force options that weren't successful or they didn't have

6   the opportunity to or it wouldn't be reasonable given their

7   particular circumstance.

8   Q.   What is the standard of reasonableness?

9   A.   The reasonableness is from the officer's perspective at the

10  scene with the information that they knew at the time.

11  Q.   There was some testimony from Mr. Burems that you go

12  through this weapon, intent, delivery system analysis before

13  you use deadly force.  But then he was asked --

14         MR. CADE:   Your Honor, I'm sorry, we had issues

15  earlier where questions were being raised about what other

16  witnesses said.  There was an objection by Attorney Baynard --

17         MR. WIRTH:   I'll rephrase.

18         MR. CADE:   You sustained it.  Thank you.

19         MR. WIRTH:   I'll rephrase.

20  BY MR. WIRTH:

21  Q.   In a training scenario or in a training presentation, when

22  an officer has reached the decision to use deadly force with a

23  firearm, what is the purpose then of the deadly force?

24  A.   To stop the threat.

25  Q.   The officer has gone through that three-part analysis,

1  determined to use deadly force.  Is there a difference between

2  pulling the trigger once and pulling the trigger five times?

3  A.   Not necessarily.

4  Q.   Explain that, please.

5  A.   When an officer makes a decision to fire a weapon, they are

6  trained to use -- utilize that mode or, in this case deadly

7  force, until it stops the threat.  In order for that decision

8  to occur, it requires a process.  It requires a process by

9  which the officer recognizes weapon, intent, delivery system.

10 And then when they believe deadly force is justified, they

11 utilize that force until the threat, from their perspective,

12 has been neutralized or is over.  And then they have to make

13 the decision to stop the action.  It would be unreasonable for

14 officers to be expected to do a weapon, intent, delivery system

15 analysis every time they pull the trigger.

16 Q.   In other words, pull the trigger, stop, analyze; pull the

17 trigger, stop, analyze?

18 A.   That would be unreasonable, yes.

19 Q.   Are there levels of deadly force?

20 A.   No.

21 Q.   Deadly force is the top level of force?

22 A.   That is correct.  It is considered to be a last resort.

23 Q.   But I believe you testified, then, once they've decided to

24 -- determined to use deadly force, now their analysis is when

25 to stop?

1   A.   That's fair, yes.

2   Q.   After the threat has stopped, what are the officers trained

3   is their next responsibility?

4   A.   They then move to what is referred to as follow-through

5   considerations, where they have to debrief themselves and

6   debrief others, so calm self, calm others.  And then move on to

7   subject control.  In cases of deadly force, that may also

8   require some sort of first aid, CPR in order to ultimately do

9   what they can to preserve life.  So it's referred to as

10  follow-through considerations.

11  Q.   And as we talk about a reasonable officer within the

12  concepts of DAAT training, who is the reasonable officer?

13  A.   The reasonable officer in the analysis is the -- from the

14  perspective of the officer who used the force that we're

15  analyzing from their perspective at that particular moment

16  given the totality of the circumstances that they knew at that

17  given moment.

18  Q.   What if there are two or three other officers, does that

19  still -- is the reasonable officer still the officer who used

20  the deadly force?

21  A.   Well, yes.  The -- you -- we would look at the officer who

22  made the deadly force decision, look at it from the standard of

23  reasonableness and totality of the circumstances from their

24  perspective.  And we would also examine from the perspective of

25  other officers why force may not have been used.

1  Q.  Can multiple officers be in different -- be in multiple

2  situations as they analyze these the use of deadly force?

3  A.  When you say "multiple situations," do you mean like

4  multiple perspectives?

5  Q.  Multiple perspectives.

6  A.  Okay.

7  Q.  Multiple positions.

8  A.  Yeah.  Yes, absolutely.  That's very common in use of

9  officer force situations when multiple officers are present

10  that they will have different relative positioning, which will

11  influence their perspective of the event.

12  Q.  Are you familiar with a concept in the DAAT manual that

13  includes the mentions of white, yellow, orange, red, black

14  regarding stress responses of an officer?

15  A.  I am.

16  Q.  Can you tell the jury what that concept or those concepts

17  are?

18  A.  It's a -- it's a very dated concept.  It came out in the

19  1970s by a gentleman named Lieutenant Cooper, who was a member

20  of the military.  He created a conceptual color-coded system

21  that helps to explain what the human experience is, especially

22  when they get involved in a high-risk situation.

23       The color-coded system begins with the color white, and

24  white essentially means that they are clueless to what is going

25  on around them.  And we utilize this system, which has evolved

1  over time, to teach officers that it's never acceptable to be

2  in condition white.  The only time it is essentially is when

3  you're sleeping.

4      Then it moves on to condition yellow, which means a

5  standard of alertness.  And we train officers to be alert.  We

6  train them to be situationally aware of what is going on around

7  them.

8      The next one is condition orange.  And orange is something

9  has occurred within the officer's field of view, within their

10 environment, that has captured their attention.  It becomes,

11 essentially, a warning flag that says you might want to pay

12 attention here, there's a potential risk.

13     Red is the action stage, and that is when officers go into

14 action.  And ideally that's where we want officers to be if

15 they are forced with a -- faced with a use of force decision up

16 to and including deadly force.

17     Condition black is a catastrophic breakdown of the human

18 system.  And what we typically see in condition black is an

19 inability to make decisions, doing nothing to protect self or

20 others, and an inability to speak, an inability to act because

21 the human system is so overwhelmed.

22 Q.  With respect to the perspective and reaction of officers,

23 then, how does that interplay with the decision-making in

24 deadly force or the decision-making to use deadly force?

25 A.  Well, when it come to officers' reactions to deadly force,

1    if they perceive a threat, so they're in orange, and before

2    they go --

3            MR. CADE:  Your Honor, I'm going to object.  Mr.

4    Burems wasn't allowed to go into this aspect of the colors.  I

5    don't know why this witness would be allowed to go into that.

6            THE COURT:  Repeat the question.

7            MR. CADE:  Your Honor, if we can have a side bar, I

8    can explain it.

9            (Discussion off the record at the bench.)

10           MR. CADE:  Sustained, your Honor?

11           THE COURT:  Yes.

12   BY MR. WIRTH:

13   Q.  You -- tell the jury what you reviewed in preparing for

14   your testimony.

15   A.  I reviewed the materials that were provided to me, the case

16   file, deposition materials, the appropriate manuals in order to

17   apply the criteria and standards and ultimately arrive at my

18   conclusions.

19   Q.  You're aware that the circumstances of this case include a

20   foot chase; correct?

21   A.  Yes.

22   Q.  Is an officer behind a subject in some form of tactical

23   advantage?

24   A.  Well, that would depend upon your -- your scenario.  There

25   can be times where when officers are behind a subject that is

1   what is referred to as a Level 3 position.  And a Level 3

2   position can put officers at a position of advantage; but,

3   again, given your -- your fact pattern or your scenario.

4   Q.  What about in a foot chase?

5   A.  Well, a foot chase is also one of those special

6   circumstances.  And the manual also discusses foot chases along

7   with some of the other training manuals that officers and

8   academy students are exposed to.  And foot chases can be

9   especially dangerous because of the ability -- the subject's

10  ability to rapidly turn and pose a particular threat.

11  Q.  What about when an officer is physically above a subject,

12  can that be a tactical advantage?

13  A.  It -- yes, it can be a tactical advantage.  So, for

14  example, it would be a tactical advantage in that circumstance

15  if you were ordering them into three point ground stabilization

16  for handcuffing.  But there may also be instance where that

17  advantage is lost very quickly.

18  Q.  What are some instances where that type of advantage can be

19  lost very quickly?

20  A.  Well, there are scenarios where subjects have the ability

21  to either escalate force rapidly, or they may be in possession

22  of a firearm.  And officers are always at the disadvantage, if

23  you will, because they are reacting to what the subject does.

24  And when they make those decisions, those decisions take time.

25  And because officers are reacting to an action, it actually

1   puts them at a tactical disadvantage.

2   Q.   So just because the officer was behind or perhaps

3   physically above the suspect or the subject, it does not equate

4   to an automatic advantage?

5   A.   No, not necessarily.

6   Q.   It can actually be a disadvantage; correct?

7   A.   Yes, it could be.

8   Q.   Can you take a look at Page 77 of the DAAT manual.

9   A.   I am there.

10  Q.   There is a category called preclusion?

11  A.   Yes.

12  Q.   And within that, there is a discussion of this kind of

13  sudden change of events that you've talked about; correct?

14  A.   Correct.

15  Q.   Would you tell the jury what the DAAT manual instructs with

16  respect to that.

17  A.   Yes.  It says, "Note that in many deadly force situations,

18  you will not have time or the ability to try other options.  If

19  a subject a few feet away from you suddenly pulls a gun and

20  threatens to shoot you, generally the only reasonable response

21  is to fire.  There is simply not enough time to try

22  alternatives."

23            MR. WIRTH:  Those are my questions, Judge.

24            THE COURT:  Okay.

25                     CROSS-EXAMINATION

1                           BY MR. CADE:

2    Q.   We've met previously; correct?

3    A.   Yes.

4    Q.   And in our prior, you said I could call you Mike, if that's

5    okay?

6    A.   That is fine.

7    Q.   Thank you, Mike.

8         I just have a few questions.  First I want to talk, let's

9    deal with your background.  You had indicated that you have a

10   doctor degree; correct?

11   A.   Correct.

12   Q.   That doctor degree is from -- give me one second, I'll pull

13   it up -- Colorado Technical University; correct?

14   A.   Correct.

15   Q.   And that's where you're teaching, as well?

16   A.   Yes.

17   Q.   That's online, though; right?

18   A.   Yes.  And the -- the degree was also -- had a residence

19   component.

20   Q.   Sure.  But that was a doctorate in -- it's a --titled a DM

21   in management; correct?

22   A.   Correct.

23   Q.   Okay.  So you teach online Colorado Technical University;

24   true?

25   A.   Correct.

1    Q.   You also mentioned Los Angeles Pacific University.  That's

2    online as well?

3    A.   Yes.

4    Q.   In fact, it's listed as, on their website, the most

5    affordable online Christian university in -- or California's

6    most affordable online Christian university; correct?

7    A.   I believe so.

8    Q.   Okay.  You also in writing your report and preparing, you

9    did indicate in your report -- and I want to make sure that I'm

10   quoting you correctly -- that there were certain facts that

11   don't appear to be in dispute; true?

12   A.   Correct.

13   Q.   And one of the facts that you said don't appear to be in

14   dispute is that officers pursued on foot, during the foot chase

15   Alvin Cole discharged one round from the pistol which struck

16   his left arm; correct?

17   A.   Correct.

18   Q.   Okay.  Let's turn for a moment -- oh, and I write notes,

19   and I'm just checking them off -- you weren't here when any of

20   the officers testified; correct?

21   A.   I arrived here today at about 10:00 a.m., and there was one

22   officer on the stand at the time.

23   Q.   That was Olson?

24   A.   I'm not sure.

25   Q.   Did you hear all of his testimony or part of his testimony?

1    A.    A very small segment.

2    Q.    Was I asking questions or was Mr. Wirth when you came in?

3    A.    I think you were asking questions.

4    Q.    So I want to ask a few questions with regards to make sure

5    we're on the same page.  Officers are taught to stop the

6    threat; true?

7    A.    Correct.

8    Q.    Okay.  And in order to stop the threat, there has to be

9    some measure or basis of an assessment that the threat has been

10   stopped; right?

11   A.    Yes.

12   Q.    It's not a question of if I fired 20 times, cross my

13   fingers, I hope the threat has been stopped.  You have to

14   actually make certain observations; correct?

15   A.    It is about the officer's perception, yes, you're correct.

16   Q.    So if an officer is perceiving someone's pointing a weapon

17   at them, under your guise, if I'm correct, they can continue

18   shooting until the gun is no longer pointing at them?

19   A.    That might be one factor.

20   Q.    Okay.  Why would they stop shooting if the gun is still

21   pointing at them, Doctor -- Mike?

22   A.    You -- rephrase your statement --

23   Q.    Sure.

24   A.    -- if you would.

25   Q.    If an officer indicates as part of this going through I've

1    used the fifth level of force --

2    A.   Uh-huh.

3    Q   -- deadly force --

4    A.   Uh-huh.

5    Q   -- and they're trained to stop shooting when the threat has

6    been stopped --

7    A.   Correct.

8    Q.   -- that analysis is if someone points a gun at me --

9    A.   Uh-huh.

10    Q.   -- if they stop pointing a gun at me, that is a basis to

11    stop shooting?  Could be a basis, I should say.

12    A.   Yeah, that could be a basis, yes.  I just wanted to make

13    sure I heard you correctly.

14    Q.   Right.  But if the point was I started shooting when they

15    pointed a gun at me --

16    A.   Uh-huh.

17    Q   -- and they're still pointing a gun at me --

18    A.   Uh-huh.

19    Q.   -- theoretically, the officer should continue shooting?

20    A.   That's a individual officer perception.

21    Q.   Right.  And even though that's an individual officer

22    perception, where DAAT looks at things is -- and talks about

23    reasonableness --

24    A.   Uh-huh.

25    Q.   -- it's the reasonableness of an officer, not an individual

1    officer; true?

2    A.   It's the -- when we make the reasonable assessment, we are

3    looking at the reasonableness of that specific officer's

4    performance.

5    Q.   Right.  But we can't turn around and put ourselves in his

6    mind; correct?

7    A.   Correct.

8    Q.   Because if I -- for example, people are perceiving things

9    differently.  What you might say, "I feel a threat," I could

10   turn and say, "I don't feel threatened"; fair?

11   A.   Correct.

12   Q.   Right?  I mean, there could be certain neighborhoods in

13   Milwaukee that I'm not afraid to go to and maybe you are, that

14   doesn't mean necessarily that you're threatened and I'm not,

15   it's just your perception; right?

16   A.   Life experience is part of perception.

17   Q.   Sure.  And so in reverse, when we look at an officer, when

18   we do investigations, right, we're looking at, okay, the

19   totality of the circumstances, do we collectively believe that

20   officer was justified; right?

21   A.   Collectively considering the totality of the circumstances,

22   we try to arrive at a decision --

23   Q.   Right.

24   A.   -- whether or not the actions were reasonable.

25   Q.   Because we can't just turn around and say, well, that

1    officer felt threatened, it's okay.  He may have felt

2    threatened, but we have to after the fact say, "Eh, was it

3    reasonable"; true?

4    A.   Was the perception of the threat reasonable.

5    Q.   Thank you.  I want to clear up a few things.  With regards

6    to deadly force, an officer can use deadly force to protect

7    themselves or someone else who is threatened with either deadly

8    force or great bodily harm; correct?

9    A.   Yes.

10   Q.   If I hear -- if I hear a gunshot, is it fair to say that

11   people within 200 yards are all potential targets; therefore, I

12   can shoot?  I'm protecting people within a 200-yard radius.

13   A.   I -- I just think your scenario's too general to make that

14   conclusion.

15   Q.   Well, you weren't here for testimony, so that's why I'm

16   giving you examples.

17   A.   Okay.

18   Q.   So clearly 200 yards away, that would not be reasonable

19   necessarily, unless someone was particularly aiming that far

20   away; right?

21   A.   Or they had a particular weapon that could reach that

22   distance.

23   Q.   Sure.  But in a general vicinity, within couple dozen feet,

24   it's not we're looking at 200 yards, we're looking at who in

25   the area, who in the general area, is potentially being

1  threatened, whether that's the officer or someone else; fair?

2  A.  In the immediate area, yes.

3  Q.  Sure.  And it's fair to say that under DAAT and these

4  training scenarios, the mere fact that you hear a gunshot --

5  A.  Uh-huh.

6  Q  -- does not mean that an officer can immediately fire and

7  use deadly force without going through the various analysis,

8  weapon, intent, delivery system and identification, isolation,

9  acquisition; fair?

10  A.  I guess I'd have to disagree in premise because -- may I

11  articulate?

12  Q.  Well, let me rephrase.  If I hear a gunshot, as an

13  officer --

14  A.  Uh-huh.

15  Q  -- I'm running, and I hear a shot --

16  A.  Yep.

17  Q  -- I don't know where it came from --

18  A.  Right.

19  Q  -- and I don't know who fired it, at that moment in time, I

20  don't have the right to use deadly force because I don't have

21  facts to tell me who has a weapon, who has the intent, who has

22  the delivery system to begin with; true?

23  A.  Or in your fact pattern, you haven't identified the

24  appropriate target.

25  Q.  Right.

1   A.   And there, therefore, not using force would be the right
2   decision.
3   Q.   Right.  I mean, if I hear a gunshot, it could be an
4   officer, it could be a suspect, it could be somebody -- I don't
5   know at that moment; true?
6   A.   In your fact pattern, yeah.
7   Q.   Okay.  And the same thing is identification, isolation,
8   acquisition, I have to identify who has a weapon, first and
9   foremost; correct?
10  A.   Correct.
11  Q.   I have to isolate that person, and isolation is not only
12  figuring out who they are, I need to make sure that there
13  aren't people in a close proximity that if I start shooting I
14  could hit someone directly or have a ricochet and it's other
15  than the greater danger theory; correct?
16  A.   Correct.  Ideally, you are correct.
17  Q.   And the greater danger theory really, let's break that
18  down, is if there's a crowd of people, but I know there's a guy
19  -- a terrorist with a bomb, I could shoot because I'm trying to
20  stop this huge bomb from going off.  That's, in theory, the
21  greater danger theory; right?
22  A.   Or active shooter events would also probably qualify.
23  Q.   Okay.  And then acquiring means focus directly in on the
24  target; true?
25  A.   Yes.

1    Q.   Okay.  Now, one of the things that you said was intent is

2    both voice or action or both --

3    A.   Uh-huh.

4    Q.   -- correct?

5    A.   Yes.

6    Q.   So voice would be "I'm going to shoot you"?

7    A.   Correct.

8    Q.   That's intent; right?

9    A.   I would agree.

10   Q.   Because when we met previously, I had given you --

11   remember, I gave you a number of scenarios; right?

12   A.   Yes.

13   Q.   Okay.  And one of the scenarios I gave you, if you're

14   behind me and I have a gun, and I'm just standing here, there's

15   no intent at that moment; fair?

16   A.   And I believe I answered this way, if that's your only fact

17   pattern, and you're just standing there holding a gun with no

18   fact pattern, I agree with that statement.

19   Q.   Right, because Wisconsin's an open carry state; right?

20   A.   Yes.

21   Q.   I mean, in theory, can't in the courtroom, but outside

22   someone could have a gun, technically in their hand walking

23   down the street, and a cop can't just come up to them and say,

24   "Gun," shoot, shoot, shoot; right?

25   A.   Correct.

1    Q.  They have to either point it at somebody or do something to

2    the officer for the officer to say, "There is now a threat";

3    right?

4    A.  In that scenario, you're correct.

5    Q.  Okay.  With regards to action, if an individual is on the

6    ground or close to it, whether actually on the ground, on their

7    hands and knees, what someone's called a low ready, if a gun is

8    not pointed at an officer directly -- so the first issue,

9    right, deadly force is aimed at me -- if it's not pointed at an

10   officer, they can't shoot to defend themselves; correct?

11   A.  Not necessarily.

12   Q.  If they're -- if they haven't done anything, they're just

13   holding their gun, same fact pattern other than me standing, if

14   I'm -- whether I'm down or in low ready or anything, if I

15   haven't turned towards you, the first justification for deadly

16   force, protecting the life of the officer, does not exist;

17   correct?

18   A.  If in that particular fact pattern and no movement has

19   occurred that would create a reasonable officer to believe that

20   they'd be exposed to deadly force, I agree at that particular

21   moment in time.

22   Q.  Okay.  It's also fair to say that an officer, if they come

23   upon somebody who has a weapon and it's not pointed at the

24   officer, but it's pointed in a direction away from the officer,

25   if the officer doesn't know anyone's in that direction, so he

1   doesn't know anyone's been threatened or pointed at, the

2   officer also cannot shoot under that scenario.

3   A.   Again, in that very unlikely scenario, that officer's --

4   that I never encountered in my 30 years, I would agree.

5   Q.   Well, we know this occurred at a mall; correct?

6   A.   Yes.

7   Q.   And we know that -- you -- I'm assuming you've never been

8   to the scene of where the incident took place?

9   A.   No.  I've been to Mayfair Mall, but not to the scene.

10  Q.   Okay.  You've been to Mayfair Mall, so you've got Mayfair

11  Road; correct?

12  A.   Uh-huh.

13  Q.   You have to answer for the reporter.

14  A.   Yes.  I'm sorry.

15  Q.   So all I'm asking, Mike, is if someone has a gun, right --

16  remember the same scenario I gave you, my back is to you, I'm

17  either down on my knees or bent or whatever, I've got the gun.

18  The mere fact that I have a gun in my hand, if it's pointed

19  towards Mayfair Road or North Avenue, an officer can't come up

20  and say, "There are cars over there that are going by, that's a

21  danger, I can shoot"; correct?

22  A.   There may be instances where shooting would be completely

23  justified.

24  Q.   But they would have to say, "I shot because there were

25  cars, that's why I did it"; right?

1  A.  Because the person posed a threat -- a deadly force threat

2  to other people.

3  Q.  Right.  All I'm saying is, Mike, the officer at the moment

4  they shoot, we don't know what they think.  We get to interview

5  them and ask questions and things like that; right?

6  A.  Yes.

7  Q.  And the officer says, "Here is the reason why I shot";

8  true?

9  A.  Yes.

10  Q.  And it's not a question of the officer said, "Well, people

11  could have been shot because the gun was maybe pointing toward

12  Mayfair, so even though that's not why I shot, I'm justified,"

13  that's not appropriate, is it?

14  A.  I -- I guess I struggle with the word "could," because

15  there are instances where a firearm could be pointed at a

16  crowded street, such as Mayfair Road, given a fact pattern

17  where the person is fleeing from police with a weapon, and the

18  officer may perceive that society at large is at danger.

19  Q.  Right.  All I'm saying, Mike, is when they're interviewed

20  after the fact --

21  A.  Uh-huh.

22  Q.  -- when they've given that opportunity to say why they

23  shot, if they don't say, "Oh, and by the way, I shot because

24  the gun and there's Mayfair and there's cars," they don't get

25  to later on say --

1     MR. WIRTH:  Oh, no.  I'm going to let you finish.

2  BY MR. CADE:

3  Q.  They don't get to later on say, "Oh, well, because there

4  were cars, I'm justified in shooting."

5     MR. WIRTH:  I'm going to object to the form, Judge.

6  It's both multiple, and it is an incomplete hypothetical.  And

7  it assumes some duty that hasn't been testified to.

8     THE COURT:  Can you rephrase it.

9     MR. CADE:  Sure.

10  BY MR. CADE:

11  Q.  When an officer is interviewed after the fact -- first of

12  all, let's -- let me ask this, Mike:  How many investigations

13  have you been retained for, let's just -- let's make it easy,

14  officer-involved shooting.  I know of one.  Are there any

15  others?

16  A.  No.  This would be my second officer-involved shooting one.

17  Q.  Right.  And you've also testified as an expert two other

18  times, but both -- those were for intoxication, breathalyzers,

19  things like that; correct?

20  A.  OWI cases, yes.

21  Q.  Yeah, okay.  And -- oh, the other case in which you

22  testified with regards to an officer-involved shooting, that

23  was for defense counsel.  They were the officers of record for

24  that; correct?

25  A.  I -- there was a -- and, actually, my memory is coming

1    back, three officer-involved shooting cases.  Yes, one with the

2    same counsel and another that occurred in the City of

3    Milwaukee.

4    Q.   Okay.  When was the one in the City of Milwaukee, sir?

5    A.   The Officer Manney case.

6    Q.   The Officer Manney case, though, that was his employment;

7    correct?

8    A.   Yes.

9    Q.   I mean, that was -- Officer Manney had been terminated, and

10   you testified that he -- he should not have been terminated

11   because he was justified; correct?

12   A.   No.  My primary testimony involved interacting with people

13   in a crisis.

14   Q.   But the decision to terminate him had been upheld, correct,

15   despite your testimony?

16   A.   I believe so, yes.

17   Q.   Okay.  So other than testifying for defense counsel and

18   Officer Manney and a couple OWIs -- well, let me rephrase it.

19        How many officer-involved shootings in the Green Bay area

20   occurred in 2019?

21   A.   In 2019?  I'm not sure.  We had a span where we had a

22   handful, and I'm not sure if that was part of that span.

23   Q.   So if I told you it was just one, would you have any reason

24   to dispute me?

25   A.   No.

1    Q.   2020?

2    A.   I don't know the exact numbers.  You'll have to refresh my

3    memory.

4    Q.   One, from what I can find.

5    A.   Okay.

6    Q.   2021, how many?

7    A.   I don't know.

8    Q.   One.  Any reason to dispute me?

9    A.   No.

10   Q.   2022?

11            MR. WIRTH:   Judge, I'm going to object to relevance.

12   We're talking about other shootings.

13            THE COURT:   Sustained.

14   BY MR. CADE:

15   Q.   With regards to officer-involved shootings in the Green Bay

16   area, do they call you up and hire you to testify?

17   A.   No.

18   Q.   Even though you are teaching and instructing and you've got

19   a very thick CV, you're not the first phone call to

20   investigate; correct?

21            MR. WIRTH:   Object to form.

22            THE COURT:   Sustained.

23   BY MR. CADE:

24   Q.   Were you ever -- other than teaching, were you ever

25   retained while you were a police officer to investigate any

1    shootings?

2            MR. WIRTH:  Object to relevance.  This is a DAAT

3    witness, not an investigative witness.

4            THE COURT:  Well, sustained.

5    BY MR. CADE:

6    Q.  So let's turn back, then, to my question, Mike.  You are

7    familiar that after a shooting, an officer at some point in

8    time is investigated and interviewed; correct?

9    A.  Yes.

10   Q.  And as part of that investigation and interview, they are

11   supposed to articulate the basis or the reasons why they used

12   deadly force; correct?

13   A.  Correct.

14   Q.  And my question that I was asking earlier is:  At the time

15   they used deadly force and they articulated it, they can't six

16   months, a year, two years later say, "I have another reason why

17   I shot, and that's justification"; correct?

18           MR. WIRTH:  Object to form.

19           THE COURT:  Sustained.

20   BY MR. CADE:

21   Q.  Mike, with regards to DAAT, it's fair to say -- let me

22   rephrase.  Even though you are a DAAT instructor, and you are a

23   field training officer, you are not -- when was the last time

24   you were an FTO, field training officer?

25   A.  I did field training supervisory work in 2022, but there

1    were times where I was still a trainer when they needed

2    somebody to fill in.  So I have been consistently training for

3    the last almost 18 years of my career.

4    Q.  Okay.  And that's you doing like a ride along with someone

5    and pointing things out?

6    A.  It's a little -- it's more complex than that.

7    Q.  Okay.  Well, you're not riding around with a squad of

8    police officers in Green Bay pointing things out, fair, as a

9    field training officer?

10   A.  No.  As a field training officer, you're training officers

11   how to perform in the field.

12   Q.  Okay.  I'm talking about actually being in the field with

13   someone of lesser experience.

14   A.  Uh-huh.

15   Q.  You're not training them.  You're talking about in a

16   classroom of officers pointing out what took place or turning

17   out -- explaining to them how they should handle things;

18   correct?

19   A.  Are you asking about my current role?

20   Q.  No.  Let me rephrase.  It was a bad question.

21       While you were a field training officer in Green Bay --

22   A.  Uh-huh.

23   Q   -- the field training that you were conducting was

24   essentially classroom training.  If you encounter this

25   scenario, this is how you should react or things you should

1   consider; fair?

2   A.   No.   When I was conducting field training, I was in the

3   field training.   I spent the vast majority of my career in the

4   field.

5   Q.   That's what I was asking, and you said -- when I said it's

6   a ride along, you're riding with someone you said no.   Then I

7   also asked are you riding along with a bunch of officers in a

8   van or something and you pointing out issues, and you seemed to

9   say that wasn't correct either.

10  A.   It's because you described it as a ride along.

11  Q.   Okay.   You're with someone in the vehicle; correct?

12  A.   Yes.   You are their trainer.   You are responsible for their

13  well-being.

14        MR. CADE:   One moment, your Honor.

15     Those are my questions, your Honor.

16        MR. WIRTH:   Judge, just a couple follow-up, and then

17  I'll be done.

18                  REDIRECT EXAMINATION

19                   BY MR. WIRTH:

20  Q.   Does DAAT train that an officer has to wait until a subject

21  shoots first?

22  A.   No.

23  Q.   Under a totality of the circumstances, does DAAT train that

24  it is even necessary that a gun be pointed at an officer before

25  he can use deadly force?

1    A.   No.

2              MR. WIRTH:  I have nothing further, Judge.

3              THE COURT:  Thank you.  You're excused, Mr. Knetzger.

4              (The witness is excused.)

5                        *  *  *  *  *

6         THE COURT:  All right.  So then we'll all be here at 9:00.

7    And then if anything comes up, you can communicate as you have

8    so far.  Okay?

9              JUROR:  Uh-huh.

10             THE COURT:  Okay.  Thanks for your attention.

11             COURT SECURITY OFFICER:  All rise.

12             (The jury left the courtroom.)

13             (At 8:22 p.m. the hearing ended.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3                    I, JENNIFER L. STAKE, RDR, CRR, an Official

 4    Court Reporter for the United States District Court for the

 5    Eastern District of Wisconsin, do hereby certify that the

 6    foregoing is a true and correct transcript of the excerpt of

 7    the proceedings had and testimony taken in the above-titled

 8    matter as the same are contained in my original machine

 9    shorthand notes on the said trial or proceeding.

10

11

12    Dated this 29th day of September, 2025.

13    Milwaukee, Wisconsin.

14

15

16                    Jennifer L. Stake, RDR, CRR
                 United States Official Court Reporter
17               517 East Wisconsin Avenue, Room 324
                         Milwaukee, WI  53202
18

19               Jennifer_Stake@wied.uscourts.gov

20

21

22    ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
      Official Court Reporter, RDR, CRR
23    _____

24

25
```