UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

| | | |
|---|---|---|
| ESTATE OF ALVIN COLE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 22-CV-856 |
| | ) | |
| v. | ) | Milwaukee, WI |
| | ) | |
| JOSEPH ANTHONY MENSAH, | ) | September 10, 2025 |
| | ) | 8:37 a.m. |
| Defendant. | ) | |

---

TRANSCRIPT OF JURY TRIAL EXCERPT
TESTIMONY OF DAVION BEARD and RULE 50(A) MOTION
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          Cade Law Group, LLC
                             By:  MR. NATHANIEL CADE, JR.
                                  MS. ANNALISA PUSICK
                             PO Box 170887
                             Milwaukee, WI  53217
                             Ph:  414-255-3802
                             nate@cade-law.com
                             annalisa@cade-law.com

                             Motley Legal Services
                             By:  MS. KIMBERLY CHONGYON
                             MOTLEY
                             PO Box 1433 US 28106
                             Matthews, NC  28106
                             Ph:  704-765-4887
                             kcmotley@gmail.com

For the Defendant:           Wirth + Baynard
                             By:  MR. JOSEPH M. WIRTH
                                  MS. JASMYNE M. BAYNARD
                             9898 W. Bluemound Rd., Ste. 2
                             Wauwatosa, WI  53226
                             Ph:  414-291-7979
                             jmw@wbattys.com
                             jmb@wbattys.com

U.S. Official Court Reporter:  JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer-aided transcription.

```
1                       I N D E X

2                        WITNESSES

3   ALL WITNESSES:                              PAGE:

4   For the Defendant:

5     DAVION BEARD:
        Direct Examination by Ms. Baynard         3
6       Cross-Examination by Ms. Motley          16

7                        EXHIBITS

8   None

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    TRANSCRIPT OF PROCEEDINGS

2            THE COURT:  Okay.  I guess we can bring in the jury.

3    Oh, please, be seated for me anyway.

4            COURT SECURITY OFFICER:  All ready for the jury, your

5    Honor?

6            THE COURT:  Yeah, bring in the jury.

7            COURT SECURITY OFFICER:  All rise for the jury.

8            (The jury entered the courtroom.)

9            THE COURT:  Okay.  Morning.  We're together again.

10   Let's -- let's go.

11                        *  *  *  *  *

12           THE COURT:  Raise your right hand.

13           (The witness is sworn.)

14           THE WITNESS:  Yes, sir.

15           THE COURT:  Have a seat.  State your name for the

16   record, spell your last name, and talk close to the mike.

17           THE WITNESS:  Davion Beard.  Beard, B-E-A-R-D.

18                        DAVION BEARD,

19   called by the Defendant as a witness herein, having been first

20   duly sworn, was examined and testified as follows:

21                      DIRECT EXAMINATION

22                      BY MS. BAYNARD:

23   Q.   Mr. Beard, how are you currently employed?

24   A.   I currently work for Chick-fil-A.

25   Q.   And how were you employed in February of 2020?

1    A.   How was I employed?

2    Q.   Yes.

3    A.   At that time, in February of 2020, I was at Mayfair Mall.

4    Q.   Okay.  And what was your job at Mayfair Mall?

5    A.   A security patrol officer.

6    Q.   At some point on February 2nd, 2020, were you alerted to a

7    disturbance at the mall?

8    A.   Correct.

9    Q.   Okay.  Can you tell me how you became aware of a

10   disturbance.

11   A.   Originally came over the radio as a dis -- basic -- a

12   disorderly dispute that had tooken place between two different

13   patrons.

14   Q.   Okay.  And what, I guess, came over the -- you said it came

15   over the radio?

16   A.   Correct, like the walkie-talkie that we all carry.

17   Q.   Okay.  Did you do anything in response to that complaint?

18   A.   Originally, the course then started heading to Sephora for

19   the incident that had took place.

20   Q.   And for those of us who aren't familiar with the layout of

21   the mall, where were you -- can you just describe where you

22   were when you heard the call over the radio and then where the

23   incident was taking place?

24   A.   If I recall correctly, I was -- I was -- I was at the east

25   -- the east side of the mall, which is Macy's, the Macy's end

1    of the mall.  Where Sephora then, of course, is located in the

2    center of the mall, kind of between the east and the west

3    directly in the center.

4    Q.   And at some point, does this disturbance prompt a call to

5    Wauwatosa Police Department?

6    A.   Correct.

7    Q.   Okay.  And why -- why do you call Wauwatosa Police

8    Department, or why was Wauwatosa Police Department called?

9    A.   Once we arrived on scene, we were notified by the patron

10   who notified Sephora and their team and then, of course,

11   Sephora radioed us, but that a gun was brandished.

12   Q.   Okay.  And did you get a description of the individual who

13   brandished the gun?

14   A.   African American male in a gray sweatshirt with a fanny

15   pack.

16   Q.   Okay.  Do you now know -- do you now know that individual

17   to be Alvin Cole?

18           MS. MOTLEY:  Objection hearsay, your Honor.

19           THE COURT:  Overruled.

20   A.   Yes.

21   BY MS. BAYNARD:

22   Q.   So can you kind of walk me through what happens from the

23   time that you make the phone call to Wauwatosa and they arrive.

24           MS. MOTLEY:  Objection, your Honor.  Misstates his

25   testimony.  He did not say he was the one that made the phone

1    call.

2              THE COURT:  He can answer.

3    A.  Correct.  I wasn't the one that called.  Our dispatcher

4    called.

5    BY MS. BAYNARD:

6    Q.  What happens between the time the dispatcher notifies

7    Wauwatosa and officers arrive?

8              MS. MOTLEY:  Objection, leading.  Again, he didn't

9    make the call.  And she's asking him to testify to what the

10   dispatch conversation --

11             THE COURT:  Overruled.

12             MS. MOTLEY:  -- with the Wauwatosa Police Department.

13             THE COURT:  Overruled.

14             MS. BAYNARD:  That wasn't my question, either.

15             THE COURT:  Well, let's get to his testimony.

16   BY MS. BAYNARD:

17   Q.  So Wauwatosa Police Department arrives at some point; true?

18   A.  Correct.

19   Q.  Okay.  When the Wauwatosa Police Department arrives, what

20   are you doing?

21   A.  Currently was patrolling the mall looking -- or -- no, we

22   were -- yeah, we were patrolling the mall looking for the teens

23   to see what their current location was at the time after they

24   -- we were notified they had left out of the entrance.

25   Q.  Okay.  And Mayfair Mall is a pretty large property;

1  correct?

2  A.  Correct.

3  Q.  Would you recognize an overhead of Mayfair Mall?

4  A.  Correct.

5  Q.  Okay.  I am going to show you what's been marked as Exhibit

6  1025A.  Do you see that in front of you, Mr. Beard?

7  A.  Correct.

8  Q.  Okay.

9  A.  Yes.

10  Q.  There's your computer.  Great.  When you first observed the

11  group outside of the mall, where were they?

12  A.  If you're looking at, they're going to be on the -- if this

13  is -- if the front side is kind of where Mayfair Road was is if

14  we're looking at it, consider that to be north, but we're on

15  the -- we're on the south end of the parking lot -- on the

16  south end where kind of the parkway where you go into Nordstrom

17  under that parking structure currently, which on the property

18  that's the east side of the mall, but --

19  Q.  Okay.  Are you referring to -- I have it -- I don't have

20  Nordstrom labeled, but I have the east parking garage labeled.

21  Is that the Nordstrom parking garage?

22  A.  Correct.

23  Q.  Okay.  And that is where you first encounter the group?

24  A.  Correct.

25  Q.  And when you encounter that group, do you also observe the

1    individual who was believed to be armed?

2    A.   Essentially, no.  When I first seen the group, I just

3    radioed that that was the -- it was about five or six teens

4    that we had, so I just initially seen the group of kids.

5    Q.   Okay.  That was not a great question on my part.  I meant

6    when you first get eyes outside of Mayfair on Alvin Cole, where

7    do you first see him?

8    A.   I don't first see him until I'm pretty much made it past

9    the first patrol car chasing him on foot and kind of closing,

10   closing down that gap.

11   Q.   Okay.  So we'll take a -- let me take a step back for you.

12        At some point, do you join a foot pursuit?

13   A.   Correct.

14   Q.   Okay.  And during that foot pursuit, who are you chasing?

15   A.   At that time, believed just to be the fanny pack, gray

16   hoodie and African American male.

17   Q.   What is the route that you chased them?  And I don't know

18   if my -- there might be a laser pointer up there.  Otherwise,

19   you can step down.

20   A.   Ah.

21   Q.   And if you step down, make sure you either speak up or

22   speak into the microphone.

23   A.   So originally, we start here on this pathway kind of right

24   here is where we first seen the interaction of where I first

25   called and noticed to give out their location.  Wauwatosa and I

1    both don't, of course, merge onto the teens until we're here.

2    I continue riding this road here until about here in my patrol

3    car while, of course, Wauwatosa officers and I believe their

4    other -- maybe one other unit rode that same roll around while

5    the other Wauwatosa officers chased them across this old Boston

6    Store parking lot.

7    Q.   Okay.  And so you can sit back down.  Thank you.

8         At some point, do you get out -- whoops -- at some point,

9    do you get out of your -- you're in a patrol squad.  It's not

10   marked like a police cruiser; correct?

11   A.   Correct.

12   Q.   What color is your squad?

13   A.   Ours is white, of course, with the -- the security wrap of

14   the vehicle.

15   Q.   Okay.  As you're pursuing Cole and he's in front of you,

16   tell me what happens.

17   A.   Of course, gets out the vehicle, every -- the kids all then

18   depart in their own kind of separate entities.  I continue

19   behind at this time now believed to be Cole, closing him kind

20   of then yelling out to him, "Hey, just stop, not that big of a

21   deal," kind of a thing, just stop running.  He then, of course,

22   as I start to gain on him.  My -- he slows down to be my

23   assumption that he's surrendering.

24   Q.   When Mr. Cole, as you're chasing him and he slows down,

25   does he put his hands up?

1   A.   No.

2   Q.   You said he was going to surrender.  Did he stop and say,

3   "I'm caught"?

4   A.   No.  The only -- my -- where he -- from my assumption that

5   I thought he was just getting winded, it was like kind of a --

6   he started to go from like this full sprint to kind of jogging

7   almost walking kind of a thing.

8   Q.   Mr. Beard, I'm going to show you what's been marked as

9   Plaintiff's Exhibit 3.

10          MS. MOTLEY:  Objection, your Honor.  Can I have a

11  sidebar, please?

12          THE COURT:  I'm sorry?

13          MS. MOTLEY:  Could -- may we have a sidebar, please?

14          THE COURT:  Is this in evidence?

15          MS. BAYNARD:  Yes.

16          MS. MOTLEY:  The issue is that this exhibit has not

17  been authenticated by anyone.  That's the issue.  And they keep

18  showing this exhibit that no one has --

19          THE COURT:  But it's in evidence, so it's -- for some

20  reason --

21          MS. MOTLEY:  We objected to it, and that's the reason.

22          THE COURT:  Well, I let it in.

23          MS. MOTLEY:  But can we please have a side bar so we

24  can just take care of this.

25          THE COURT:  All right.

1          (Discussion off the record at the bench.)

2          THE COURT:  This video is in evidence.  It's been

3    admitted.  And I have no reason to think that there's been any

4    improper manipulation or any improper changing or modifying of

5    the video, so I'm going to allow it to be played.

6          MS. BAYNARD:  Thank you, your Honor.

7    BY MS. BAYNARD:

8    Q.  Mr. Beard, I'm going to play a video that's been marked as

9    Plaintiff's Exhibit 3.  I'm going to ask you a few questions

10   about it.

11   A.  Okay.

12          (The video recording is played.)

13   Q.  Now, there is an individual in the frame.  Did you see an

14   individual in the gray sweatshirt?

15   A.  Correct.

16   Q.  Okay.  Is that who you believe to be Alvin Cole?

17   A.  Correct.

18          (The video recording is played.)

19   Q.  Do you see yourself coming into frame?

20   A.  Correct.

21   Q.  And what are you wearing?

22   A.  The greenish yellow reflective security shirt.

23          (The video recording is played.)

24   Q.  Mr. Beard, as you were pursuing Alvin Cole that day, did

25   you hear a gunshot?

1  A.  Yes.

2  Q.  And you were describing this turning towards you.  Is that

3  when the gunshot occurred?

4        MS. MOTLEY:  Objection, your Honor, leading.

5        THE COURT:  Overruled.

6  A.  Yes.

7        MS. MOTLEY:  Your Honor, she's --

8        THE COURT:  Go ahead.

9        MS. BAYNARD:  I think he already answered.

10  BY MS. BAYNARD:

11  Q.  When you're chasing Mr. Cole, where are you at in -- I'm

12  going to show you -- actually, I'm going to show you a diagram

13  that's been previously entered into evidence as I believe it's

14  Plaintiff's Exhibit -- one of the exhibits, Defense Exhibit

15  1000.

16        MS. MOTLEY:  Sorry.  It's plaintiff's exhibit or --

17        MS. BAYNARD:  No.  It's the stipulated one.

18        MR. CADE:  It's not plaintiff's, it's defendant's.

19        MS. BAYNARD:  Well, we've marked it as 1000.  You

20  marked it, I think, as one.

21        MS. MOTLEY:  So you're showing defendant's exhibit?

22        MS. BAYNARD:  It's the exact same thing.

23        MS. MOTLEY:  No, that's fine, but which one?

24        MS. BAYNARD:  Defense Exhibit 1000.

25        MS. MOTLEY:  Got it.

1  BY MS. BAYNARD:

2  Q.  Mr. Beard, when you're chasing after Alvin Cole, are you up

3  against the concrete barrier?

4  A.  No.

5  Q.  Okay.  How far -- I guess can you come down and point to --

6  and I'm not going to hold you to exacts -- where Mr. Cole is

7  when you're behind him and he turns towards you.  You'll have

8  to get down, unless you want to use the laser.

9  A.  This is Mayfair Road.  I would say probably coming up from

10  the entrance probably around here-ish.

11  Q.  Okay.

12  A.  Or about through there.

13  Q.  Definitely not up against the concrete barrier when you're

14  chasing him?

15  A.  If you're considering this part the barrier, then no.  We

16  were -- we were about, I'd probably say, ten feet, probably,

17  from where everything I think finalized --

18  Q.  Okay.

19  A.  -- if that's what this is.

20  Q.  Okay.  You can get back.  Thank you.

21      And, Mr. Beard, when Mr. Cole turns towards you, tell me

22  what happens next.

23  A.  He turns, hear the gunshot, see a muzzle flash.  We stare

24  at -- we kind of stare at each other.  Of course, I dropped to

25  the ground.  I'm looking up at him, maybe a couple tenths of a

1    second go by, and then, of course, we hear the yelling from

2    this previous office -- this officer here that was running

3    behind us yells out, "Hey," and then that's where, of course,

4    we break the eye contact, I look back to see who's yelling,

5    "Hey," and he kind of then turns to head from kind of here to

6    over here, to kind of I believe Mayfair Road.

7    Q.  Okay.  I'm going to show you what's been marked as Defense

8    Exhibit 1027A.

9          MS. MOTLEY:  Your Honor, I object to this exhibit for

10    the record.

11          THE COURT:  Same -- same ruling.

12          MS. MOTLEY:  Simply because the IT --

13          THE COURT:  Same ruling.

14          (The video recording is played.)

15    BY MS. BAYNARD:

16    Q.  Mr. Beard, does that video depict the turning and firing

17    that you recall on that night?

18    A.  Yes.

19    Q.  I just have a few more questions.  When Alvin Cole turned

20    and fired towards you or -- I believe --

21          MS. MOTLEY:  Objection, misstates his testimony.  He

22    did not testify to that.

23          THE COURT:  Sustained.

24    BY MS. BAYNARD:

25    Q.  When Alvin Cole turned towards you, I believe you said you

1    -- gunshot, muzzle flash, you dropped to the ground; correct?

2    A.   Correct.

3    Q.   Did Mr. Cole drop to the ground?

4    A.   No.

5    Q.   Did he yell out anything?

6    A.   No.

7    Q.   Did he put his hands up?

8    A.   No.

9    Q.   Did he say, "I have been shot"?

10   A.   No.

11   Q.   Did he say, "I can't believe I just shot, I'm sorry"?

12   A.   No.

13   Q.   He didn't say anything?

14   A.   Correct.

15   Q.   And from the area that you're chasing him ten feet or so

16   off the barrier, he then moves to the barrier; true?

17   A.   Correct.

18   Q.   Do you know how he got to the barrier?

19   A.   No.

20   Q.   Does that video that I just show fairly and accurately

21   depict the scene as you recall it?

22   A.   Correct.

23        MS. BAYNARD:  I ask that 1027A be moved into evidence.

24   I believe it already is.

25        MR. WIRTH:  It already is.

1          MS. BAYNARD:  And then I have nothing further, your

2     Honor.

3          THE COURT:  Okay.  Any questions?

4          MS. MOTLEY:  Yes.

5                    CROSS-EXAMINATION

6                    BY MS. MOTLEY:

7     Q.  Good afternoon, Mr. Beard.

8     A.  Good afternoon.  How are you?

9     Q.  Fine.  Thank you.  I just want to ask you a few questions

10    about what happened on February 2nd of 2020, okay?

11    A.  Yeah.

12    Q.  All right.  So you testified that -- you just testified,

13    rather, so that we can understand, that you heard the gun, and

14    then after that, you saw the turning.  Is that what I'm

15    understanding?  Am I understanding that correctly?

16    A.  We had the reach into the fanny pack, and then the -- he

17    turned to kind of see the -- hear the gunshot, see the muzzle

18    flash, but do not see a gun.

19    Q.  Okay.  And are you aware with that first shot that he

20    actually shot himself in the arm?

21         MS. BAYNARD:  Objection.

22         MS. MOTLEY:  Your Honor --

23         MS. BAYNARD:  States facts that are not in evidence.

24         MS. MOTLEY:  Actually, it is in evidence, your Honor.

25         MS. BAYNARD:  It is not.

1    THE COURT:  Overruled.  You may answer.

2  A.  Sorry, what's the question again?

3  BY MS. MOTLEY:

4  Q.  Are you aware that that was the shot where Alvin shot

5  himself in the arm?

6  A.  I was not.

7  Q.  Okay.  Now, when you were -- and I want to play the video,

8  but only to a certain point.  Okay?

9  A.  Yes.

10  Q.  Okay.  So what I'd like to play is Defense Exhibit 1027A.

11    MR. WIRTH:  I think it might be in there as 1027.

12    MS. MOTLEY:  Oh, 1027, okay.

13    MS. WIRTH:  I might have said A by accident.

14    MS. MOTLEY:  No problem.

15  BY MS. MOTLEY:

16  Q.  So, Mr. Beard, what I'd like to do is play this visit --

17  or, excuse me, this video up until the first shot.  Okay?

18  A.  Yes.

19  Q.  And then I will stop it when we hear that.  Just to be

20  clear, the person in the circle, you know that now to be Alvin;

21  correct?

22  A.  Correct.

23  Q.  Okay.  And just to be clear, at the mall when there was --

24  was there any other kids there with a gray sweatshirt and a

25  black fanny pack?

1  A.   Gray sweatshirt, yes.  To be known as another fanny pack,

2  no.

3  Q.   Okay.  Would it surprise you to know that there actually

4  was other -- another kid there with a black fanny pack?

5           MS. BAYNARD:   Objection to the form and states facts

6  that are not in evidence.

7           MS. MOTLEY:   Your Honor, those -- another witness

8  testified to that.

9           THE COURT:   She can -- he can answer if he knows.

10 A.   No.

11 BY MS. MOTLEY:

12 Q.   So I'm going to play this.

13           (The video recording is played.)

14     That is you in the yellow reflective shirt; correct?

15 A.   Correct.

16 Q.   Okay.  And I -- I know this is irrelevant, but did you run

17 track?

18 A.   Correct.

19 Q.   Okay.  So let me play this.

20           (The video recording is played.)

21     I know it's hard to see, but do you know who this person is

22 that's running behind you?

23 A.   I do not.

24 Q.   If I was to represent that was Wauwatosa officer David

25 Shamsi, would you have any reason to doubt me?

1   A.   No.

2   Q.   Okay.  Let me play it.

3          (The video recording is played.)

4     Now we have on the video another person right here.  Do you

5   see where my green pointer is?

6   A.   Correct.

7   Q.   Okay.  And do you know who that is?

8   A.   I do not.  I just -- of course.  The individual, no.

9   Police officer, yes.

10   Q.   Okay.  Who is that?

11   A.   Oh, I don't know what individual officer it is, no.

12   Q.   I'm sorry.  So if I were to represent to you that that is

13   former Wauwatosa police officer Joseph Mensah, would you have

14   any reason to doubt me?

15   A.   No.

16   Q.   Okay.  Let's play it.

17          (The video recording is played.)

18     Need to go back.  Sorry.

19          (The video recording is played.)

20     Sorry.  I'm trying to get...

21          (The video recording is played.)

22   Q.   Did you hear that pop at 15 seconds?

23   A.   Correct.

24   Q.   Okay.  So that's the first gunshot; correct?

25   A.   Correct.

1    Q.   Okay.  And so you are back here.  It's -- it looks like

2    three in -- and, again, I want to go off your memory and also

3    the video.  When you heard that initial gunshot, right --

4    A.   Right.

5    Q    -- where Alvin shot himself, you were standing there;

6    correct?

7    A.   I was -- at this point, I was sitting -- I was sitting on

8    the ground looking kind of up at him.

9    Q.   Okay.  So you were sitting on -- on the ground.

10   A.   Correct.

11   Q.   Right.  Okay.  And did you -- and there was another officer

12   there that was David Shamsi; correct?

13   A.   He wasn't there.  I would probably say he was still about

14   five to ten feet closing distance in his probably still jog,

15   because I -- when I turned around and looked, he was still at

16   least a solid five feet away, and he was still running up,

17   so...

18   Q.   I see.  And but Officer Shamsi was the closest officer to

19   you and Mr. Cole; is that correct?

20   A.   Correct.

21   Q.   Okay.  And how far away were you from Mr. Cole?

22   A.   At that time, we're probably now maybe no more than a foot

23   from each other.

24   Q.   Okay.  And when you say you were sitting on the ground,

25   were you sitting on your backside?

1    A.   I was sitting literally like I just dropped to the floor,

2    like kind of butt on the ground legs kind of to the side kind

3    of a thing, literally if you were just like sitting up on the

4    ground looking up at someone I would say.

5    Q.   And I apologize to ask you this, but I think it's important

6    for people to see how you were.  Do you mind demonstrating how

7    you were sitting on the ground when you -- after you heard the

8    first gunshot.  And if you'd do it so the jurors can see.

9    Sorry.

10   A.   I was just lunging down here kind of off to the side here

11   like just dropping to the floor.

12   Q.   Okay.  Thank you.

13        So you weren't on your hand and knees; right?

14   A.   Correct.

15   Q.   Okay.  And so after you got up from sitting, then what did

16   you do?

17   A.   You'll kind of see me just kind of spin up and around and

18   then just kind of run off opposite direction from them, of

19   course.

20   Q.   Right.  And you weren't armed that day; right?

21   A.   Correct.

22   Q.   Okay.  And so when Alvin was on the ground, if I were to

23   represent to you that it's been testified to that he was on the

24   ground for ten seconds, do you have any reason to doubt me?

25            MS. BAYNARD:  Objection -- sorry, objection.

1    Misstates the prior testimony.

2              THE COURT:  Yeah, just ask him a question.  Whatever's

3    been in evidence is in evidence.  What's the next question?

4              MS. MOTLEY:  Your Honor, this is the critical time

5    that I'm trying to get into.  So I'd ask that I be allowed to

6    question the witness on that.

7              MS. BAYNARD:  She can ask him if he knows whether he

8    was on the ground for ten seconds or not.

9              THE COURT:  I don't want you going into does he know

10   about prior testimony and that --

11             MS. MOTLEY:  Oh.

12             THE COURT:  -- sort of thing.

13             MS. MOTLEY:  I apologize.  No problem.

14   BY MS. MOTLEY:

15   Q.  So, Mr. Beard, are you aware that Alvin was on the ground

16   at some point after he shot himself?

17   A.  Yes.

18   Q.  Okay.  And so while Alvin was on the ground, did you

19   witness him crawling nine feet?

20   A.  I did not.

21   Q.  Did you witness Alvin pointing his gun at anyone?

22   A.  I did not.

23   Q.  Did you witness Alvin, while he was on the ground, swing

24   his arm across his body to his left side?

25   A.  I did not.

1  Q.  Did you witness Alvin pointing a gun at you?

2  A.  I did not.

3          MS. MOTLEY:  I have nothing further.  Thank you.

4          THE COURT:  Okay.  Thank you, you're excused.  Next

5  witness.

6          (Witness excused.)

7                      *  *  *  *  *

8          MR. WIRTH:  And, Judge, we have a motion that should

9  probably be heard out of the presence of the jury, and we are,

10  our 50(a) motion.

11          THE COURT:  Well, let's hear it.

12          MR. WIRTH:  A 50(a) motion to dismiss on the basis

13  that the evidence in the case dictates that judgment as a

14  matter of law should be awarded to the defendant finding that

15  there is at minimum no evidence of excessive force but,

16  secondarily, at worst, a case of qualified immunity.  So the

17  defendants move under Federal Rule 50(a) for judgment at the

18  close of evidence before tendering to the jury for dismissal of

19  the lawsuit.

20          MR. CADE:  And --

21          THE COURT:  Okay.

22          MR. CADE:  And --

23          THE COURT:  Go ahead.

24          MR. CADE:  -- Judge, obviously, it's an easy motion to

25  deny.  We have multiple officers who all said they never saw

1    the weapon pointed at Joseph Mensah.  We can debate whether
2    Olson -- his belief is enough for Mensah.  As they said, that's
3    for the jury to decide.  And with regards to qualified
4    immunity, you can't shoot somebody unless you actually have a
5    reasonable basis to --
6              THE COURT:  Are you responding to his motion?
7              MR. CADE:  Yes, Judge.
8              THE COURT:  Okay.
9              MR. CADE:  So qualified immunity wouldn't come into
10   play because, you know, it's -- this is not a unique situation
11   that an officer doesn't know about it.  And even though the
12   jury doesn't get to hear about it, Judge, Officer Mensah, of
13   all people, knows you can't just shoot somebody because he's
14   already been a party to other cases where he's used or been
15   accused of excessive force in firing at somebody.  So if
16   anybody knows, it's would be Joseph Mensah.
17       It's not a unique situation.  So qualified immunity is not
18   the basis.  And certainly when other officers said, "I never
19   saw the gun pointed at Joseph Mensah," and his story keeps
20   changing about who he's protecting and what he's doing, that's
21   for the jury to decide.
22             THE COURT:  Okay.  Well, I'm going to reserve decision
23   on the motion, and we'll proceed to the jury.
24                              *  *  *  *  *
25             THE COURT:  All right.  So then we'll all be here at

1   9:00.  And then if anything comes up, you can communicate as

2   you have so far.  Okay?

3           JUROR:  Uh-huh.

4           THE COURT:  Okay.  Thanks for your attention.

5           COURT SECURITY OFFICER:  All rise.

6           (The jury left the courtroom.)

7           (At 8:22 p.m. the hearing ended.)

C E R T I F I C A T E

                        I, JENNIFER L. STAKE, RDR, CRR, an Official

Court Reporter for the United States District Court for the

Eastern District of Wisconsin, do hereby certify that the

foregoing is a true and correct transcript of the excerpt of

proceedings had and testimony taken in the above-titled matter

as the same are contained in my original machine shorthand

notes on the said trial or proceeding.


Dated this 7th day of October, 2025.

Milwaukee, Wisconsin.



                    Jennifer L. Stake, RDR, CRR
                 United States Official Court Reporter
                  517 East Wisconsin Avenue, Room 324
                        Milwaukee, WI  53202


                    Jennifer_Stake@wied.uscourts.gov



ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
Official Court Reporter, RDR, CRR
_____