```
                  UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF WISCONSIN
                       MILWAUKEE DIVISION
_____
ESTATE OF ALVIN COLE, et al.,       )
                                    )
                Plaintiffs,         )   Case No. 22-CV-856
                                    )
     v.                             )   Milwaukee, WI
                                    )
JOSEPH ANTHONY MENSAH,              )   September 10, 2025
                                    )   8:37 a.m.
                Defendant.          )
_____
                 TRANSCRIPT OF JURY TRIAL EXCERPT
                      TESTIMONY OF XAI XIONG
                BEFORE THE HONORABLE LYNN ADELMAN
                   UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:         Cade Law Group, LLC
                            By:  MR. NATHANIEL CADE, JR.
                                 MS. ANNALISA PUSICK
                            PO Box 170887
                            Milwaukee, WI  53217
                            Ph:  414-255-3802
                            nate@cade-law.com
                            annalisa@cade-law.com

                            Motley Legal Services
                            By:  MS. KIMBERLY CHONGYON
                            MOTLEY
                            PO Box 1433 US 28106
                            Matthews, NC  28106
                            Ph:  704-765-4887
                            kcmotley@gmail.com

For the Defendant:          Wirth + Baynard
                            By:  MR. JOSEPH M. WIRTH
                                 MS. JASMYNE M. BAYNARD
                            9898 W. Bluemound Rd., Ste. 2
                            Wauwatosa, WI  53226
                            Ph:  414-291-7979
                            jmw@wbattys.com
                            jmb@wbattys.com

U.S. Official Court Reporter:  JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer-aided transcription.
```

| | | |
|---|---|---|
| 1 | **I N D E X** | |
| 2 | **WITNESSES** | |
| 3 | ALL WITNESSES: | PAGE: |
| 4 | For the Defendant: | |
| 5 | XAI XIONG: Direct Examination by Mr. Wirth | 3 |
| 6 | Cross-Examination by Mr. Cade | 11 |
| 8 | **EXHIBITS** | |
| 9 | EXHIBITS RECEIVED: | PAGE: |
| 10 | For the Defendant: | |
| 11 | No. 1031 | 10 |

1  TRANSCRIPT OF PROCEEDINGS
2  THE COURT: Okay. I guess we can bring in the jury.
3  Oh, please, be seated for me anyway.
4  COURT SECURITY OFFICER: All ready for the jury, your
5  Honor?
6  THE COURT: Yeah, bring in the jury.
7  COURT SECURITY OFFICER: All rise for the jury.
8  (The jury entered the courtroom.)
9  THE COURT: Okay. Morning. We're together again.
10 Let's -- let's go.
11                          * * * * *
12  (The witness is sworn.)
13  THE WITNESS: I do.
14  THE COURT: Okay. State your name for the record,
15 spell your last name.
16  THE WITNESS: So my name is Xai Xiong. First name is
17 X-A-I, last name is X-I-O-N-G.
18                          XAI XIONG,
19 called by the Plaintiff as a witness herein, having been first
20 duly sworn, was examined and testified as follows:
21                     DIRECT EXAMINATION
22                       BY MR. WIRTH:
23 Q.  Good morning, Mr. Xiong.
24 A.  Good morning.
25 Q.  Can you tell the jury how you're employed.

1   A.  Yes.  I am a firearms and tool mark examiner at the
2   Wisconsin State Crime Laboratories.
3   Q.  Where are you located?
4   A.  I'm actually located out of the Wausau location.
5   Q.  And how long have you been employed in that role?
6   A.  I've been with the state crime lab for over 12 -- 12 years
7   now.
8   Q.  And in your profession, professional capacity, what kind of
9   things do you do?
10  A.  So as a firearms and tool mark examiner, we examine
11  firearms and firearms-related evidence like fired cartridge
12  cases and fired bullets to determine if they are fired from a
13  specific firearm.  We also examine clothing, perform serial
14  number restoration, and do tool mark comparisons.
15  Q.  In your professional capacity, were you given an assignment
16  with respect to the Alvin Cole matter?
17  A.  Yes, I was.
18  Q.  And what was your assignment?
19  A.  So I was asked to examine firearms that were submitted to
20  the crime lab along with some fired bullets, cartridge cases,
21  and a sweatshirt.
22  Q.  How were you provided that material?
23  A.  It was submitted to the crime lab by the submitting agency.
24  Q.  Do you recall who that was?
25  A.  Not off the top of my head, no.

1  Q.  Okay.  Besides the evidence that was submitted to you, were
2  you given any kinds of -- or review any police reports,
3  anything like that?
4  A.  No.
5  Q.  Were you instructed to watch any videos?
6  A.  No.
7  Q.  Why not?
8  A.  That is typically information that my discipline or my
9  unit, we do not need that type of information for us to perform
10 our examination.
11 Q.  As a result of that examination, did you prepare a report?
12 A.  Yes.
13 Q.  I'm going to show you what we've had marked as Defense
14 Exhibit No. 1031 and ask if you can identify that for the jury.
15 A.  Thank you.  Correct, I recognize this.
16 Q.  The earliest report, what is the date of the earliest
17 report?
18 A.  So the first report here is dated April 1st of 2020.
19 Q.  And what is the subject matter of the earlier report?
20 A.  The first report here summarizes my findings for examining
21 the two firearms, six fired cartridge cases, three fired
22 bullets, and a sweatshirt.
23 Q.  And with respect to your testing of the firearms, what were
24 your test results?
25 A.  So based off of testing both of the firearms that were

1 submitted to me, I determined that the Smith & Wesson
2 semiautomatic pistol functioned.  I test fired it.  I also
3 examined a Glock semiautomatic pistol, and that was also
4 functional and test fired.  And then I compared the test-fired
5 bullets and cartridge cases to the submitted evidence.  I then
6 also examined a sweatshirt that was submitted to me.
7 Q.  With respect to the firearms, the -- you identified a Smith
8 & Wesson and a Glock 9mm.  Both 9mms?
9 A.  Correct.
10 Q.  And essentially the test results are that they were capable
11 of firing?
12 A.  Correct.
13 Q.  And was there evidence that they had been fired?
14 A.  There was submitted evidence that I was able to identify
15 back to each of the submitted firearms.
16 Q.  And your test results showed what for the Smith & Wesson?
17 A.  So for the Smith & Wesson semiautomatic pistol, I
18 identified that there was one cartridge case that was submitted
19 to me for examination that was, in my opinion, fired in the
20 Smith & Wesson.
21 Q.  And with respect to the Glock?
22 A.  For the Glock, I identified five fired cartridge cases.
23 And it's my opinion that those five fired cartridge cases were
24 fired from the Glock.
25 Q.  In layman's terms, then, one pistol was fired one time, one

1  pistol was fired five times?
2  A.  Correct.
3  Q.  Now, you also examined a sweatshirt?
4  A.  That is correct.
5  Q.  And why did you examine the sweatshirt?
6  A.  The sweatshirt basically per our protocol, if we get any
7  garment in to the crime lab, we then examine it for defects or
8  holes.  And then from there, we can then do further testings if
9  we observe holes or defects in them.
10  Q.  And did the sweatshirt that you examined have these holes
11  in them?
12  A.  Yes, it did.
13  Q.  And how many holes were present?
14  A.  There were six.
15  Q.  And what testing protocol, then, would you perform on the
16  holes in the sweatshirt?
17  A.  So for our protocol for testing garments or in this case
18  the sweatshirt, I would produce test panels with the submitted
19  firearms to compare to the submitted clothing.  And when I am
20  doing this, I am looking for gunpowder residue patterns.  If
21  there are gunpowder residue patterns on the sweatshirt, I can
22  then compare that pattern to the test-fired panels that I
23  create.
24  Q.  What is the significance of gunpowder residue patterns?
25  A.  So if we observe gun -- gunpowder residue patterns on a

1  garment or in this case the sweatshirt, we can then determine
2  approximately how far the muzzle of a firearm was when it was
3  discharged at the sweatshirt.
4  Q.  And what is a gunpowder residue pattern?
5  A.  So that is the gases that are produced when you fire a
6  firearm, these gases and these particles can then leave the
7  muzzle of a firearm and then be deposited onto a sweatshirt.
8  And it's the presence of the patterns and comparing those
9  patterns to test panels that allow us to do a distance
10 estimation.
11 Q.  And what does the gunpowder residue pattern tell you about
12 distance?
13 A.  We can use it for an approximate distance estimation.  So
14 depending on our examination and comparison results, we may be
15 able to bracket a distance.  For example, we can estimate
16 potentially a firearm was three to six inches away at the time
17 it was discharged.
18 Q.  Now, we heard testimony earlier from the medical examiner
19 about something called stippling.  Are you aware of that --
20 A.  Yes.
21 Q.  -- or do you know what stippling is?
22 A.  Yes.
23 Q.  Stippling is kind of a pattern on skin when a muzzle is
24 within close proximity; correct?
25 A.  Correct.

1  Q. But that's not your -- skin isn't your field?
2  A. That is correct.
3  Q. What is your field?
4  A. So my area of expertise lies within clothing. So any
5  pattern or any particle that is observed on a piece of
6  clothing, that is where my area of expertise lies.
7  Q. With respect to the six holes that were tested on the
8  sweatshirt, what were the test results?
9  A. So based off of my examination of the six holes or defects
10 there, I did not observe any gunpowder residue pattern. This
11 was using a stereoscope, and I also chemically processed the
12 piece of clothing for the presence of the gunpowder residues,
13 and the results were all negative.
14 Q. And in your profession, then, does that tell you anything
15 about whether -- or distance between the sweatshirt and the
16 firearm that caused the hole?
17         MR. CADE: Your Honor, we're now getting into expert
18 testimony. He was never designated as an expert.
19         THE COURT: Well, the jury can decide whether he's an
20 expert. I'll allow the question.
21         THE WITNESS: Could you repeat the question.
22 BY MR. WIRTH:
23 Q. Sure. With respect to your test results in this case, did
24 you draw any conclusions about distance from the weapon that
25 fired and the hole in the sweatshirt?

1  A.  So with my test results, I conclude that the firearm was
2  basically far enough where I did not observe any deposit of the
3  gunpowder residue.  And, also, with that, there's also the
4  possibility of intermediate object being in between the muzzle
5  or the actual sweatshirt at the time of firing, so...
6  Q.  And is there a rule of thumb of distance that you would
7  expect to see gunpowder residue pattern?
8  A.  Yes, we have a general rule of thumb in our field.
9  Q.  And what is that?
10 A.  Typically we expect to see some sort of gunpowder residue
11 if a firearm is between zero and 36 inches from the sweatshirt
12 or from a garment.  36 inches and beyond, that is typically
13 where we start to see a drop off of the gunpowder residue and
14 the gunpowder residue pattern.
15 Q.  Is gun power -- gunpowder residue pattern present any time
16 a gun is fired within that distance that you described?
17 A.  Yes.  In my experience, if a firearm is within that
18 distance, I expect to see some sort of powder particles or a
19 pattern.
20         MR. WIRTH:  Judge, we would move Exhibit 1031 into
21 evidence.
22         THE COURT:  Without objection, so ordered.
23         (Exhibit No. 1031 was received in evidence.)
24         MR. WIRTH:  Those are all the questions I have for
25 now, your Honor.

```
1             THE COURT:  Do you have anything?
2             MR. CADE:  I do.
3                     CROSS-EXAMINATION
4                      BY MR. CADE:
5    Q.  Mr. Xiong, few questions.  Is it fair to say that -- I'm
6    sorry, you said that skin is not your field; correct?
7    A.  That is correct.
8    Q.  Can you explain -- let's back up, though.  With regards to
9    stippling, how far away is a weapon in order for stippling to
10   appear?
11   A.  Are you asking for stippling on the skin or --
12   Q.  Yes.
13   A.  -- stippling --
14   Q.  Stippling on the skin.
15   A.  So that is a question I cannot answer because it has to do
16   with stippling on the skin.  That is outside of my area of
17   expertise.
18   Q.  So if the medical examiner and Mr. Cole -- or Mr. Mensah,
19   the defendant, both indicated that's got to be less than three
20   feet, you can't dispute that; correct?
21   A.  That's correct.
22   Q.  Okay.  Can you have stippling on the skin less than three
23   feet and not have gunshot -- or a gunpowder residue?
24   A.  Again, that's questions regarding the skin, and that is
25   beyond my area of expertise.
```

1  Q.  Sure.  But I guess what I'm asking is can you have
2  stippling so that someone has been injured by a gunshot, and
3  it's within three feet, but there is no gunpowder residue that
4  remains.  Is that possible?
5  A.  Yes, that is a possibility.
6  Q.  Okay.
7  A.  Yeah.
8  Q.  And with regards to gunpowder residue, one of the factors
9  that goes into it is time; correct?
10  A.  Yes, time can be a factor.
11  Q.  The longer that gunpowder -- longer it takes for you,
12  someone in your field, to examine it, the more likely it
13  dissipates over time; correct?
14  A.  That is a variable that can cause gunpowder to not be
15  present, so --
16  Q.  Sure.
17  A   -- it's one of the variables, yes.
18  Q.  If we think of it like uranium or something, there's -- I
19  don't want to call it a half-life, but as clothing ages or as
20  an object with gunpowder residue, the longer the time from the
21  firing to your examination, the residue disappears; correct?
22  A.  I wouldn't say the residue disappears because of time.  If
23  the residue is present on there, typically we would be able to
24  observe it.
25  Q.  Other things impact gunpowder residue, like water; true?

1  A.  Correct.
2  Q.  So if someone is shot and it's raining, that would affect
3  your analysis?
4  A.  It can, yes.
5  Q.  If someone is shot and someone goes up and quickly grabs
6  the sleeve to check for wounds, just the mere handling of
7  clothes could affect gunpowder residue; correct?
8  A.  That's correct.
9  Q.  Blood affects gunpowder residue; correct?
10  A.  That is correct.
11  Q.  So if someone is shot in close proximity and there is
12  blood, the blood would get in the way of the examination of you
13  finding gunpowder residue; true?
14  A.  True.  It can.
15  Q.  And you didn't analyze the clothing in terms of whether
16  there was gunshot residue in the blood; true?
17  A.  That's correct.  I did not examine the blood, per se.
18          MR. CADE:  Okay.  One moment, your Honor.
19  BY MR. CADE:
20  Q.  And is it also a fair statement that if there is gunpowder
21  residue present, there is no doubt that a gun was fired;
22  correct?
23  A.  Most of the time that is the case.
24  Q.  Well, if gunpowder residue is present, that means a gun was
25  fired in close proximity; true?

1  A.  Yes, most of the time.
2  Q.  Well, what's -- how would you have gunpowder residue
3  present if a gun has not been fired in close proximity?
4  A.  That is because you can have a transfer of residue, so
5  there could be instances where we see residue, and that is more
6  of a test to say residue is present, but it doesn't necessarily
7  say that it came from a gunshot.  That is why my answer would
8  be most of the time you can assume a gun was fired, but there
9  are slight -- or there are chances where you can have a
10  transfer, so from like one person or from one object to
11  another, so you can you have the transfer of gunpowder.
12  Q.  So if I shot a gun at some point and quickly touched you,
13  you might have it on your arm.  It doesn't mean that you fired
14  it; correct?
15  A.  Correct.
16  Q.  And I want to ask the opposite question.  If someone fires
17  a gun in close proximity, it does not mean there is always
18  gunshot -- or gunpowder residue present; correct?
19  A.  Correct.  From the perspective of the individual holding
20  the firearm; right?
21  Q.  Right.  So the person holding the firearm, if someone
22  accidentally shoots themselves within a certain distance, it is
23  not 100 percent certain that -- you know, if I shot myself,
24  it's not 100 percent certain that I will have gunpowder residue
25  on my clothing after shooting myself; true?

1 A. Correct.

2 MR. CADE: No more questions, your Honor.

3 THE COURT: Okay. Thank you. You're excused. Thank
4 you.

5 THE WITNESS: Am I released from my subpoena?

6 MS. BAYNARD: Oh, yes.

7 MR. WIRTH: You are.

8 THE COURT: You're excused.

9 THE WITNESS: Thank you.

10 (The witness is excused.)

11 * * * * *

12 THE COURT: All right. So then we'll all be here at
13 9:00. And then if anything comes up, you can communicate as
14 you have so far. Okay?

15 JUROR: Uh-huh.

16 THE COURT: Okay. Thanks for your attention.

17 COURT SECURITY OFFICER: All rise.

18 (The jury left the courtroom.)

19 (At 8:22 p.m. the hearing ended.)

C E R T I F I C A T E

I, JENNIFER L. STAKE, RDR, CRR, an Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing is a true and correct transcript of the excerpt of proceedings had and testimony taken in the above-titled matter as the same are contained in my original machine shorthand notes on the said trial or proceeding.

Dated this 8th day of October, 2025.
Milwaukee, Wisconsin.


Jennifer L. Stake, RDR, CRR
United States Official Court Reporter
517 East Wisconsin Avenue, Room 324
Milwaukee, WI  53202

Jennifer_Stake@wied.uscourts.gov


ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
Official Court Reporter, RDR, CRR
_____