UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

---------------------------------------------------------------

ESTATE OF ALVIN COLE,                )
                                     )
                  Plaintiffs,        )      Case No. 22-CV-856
                                     )      Milwaukee, Wisconsin
      vs.                            )
                                     )      September 8, 2025
JOSEPH MENSAH,                       )
                                     )
                  Defendant.         )
---------------------------------------------------------------

**EXCERPT TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:
 For the Plaintiff
  ESTATE OF ALVIN COLE:        Cade Law Group LLC
                               By: Nathaniel Cade, Jr & Annalisa
                               Pusick
                               PO Box 170887
                               Milwaukee, WI 53217
                               Ph: 414-255-3802
                               nate@cade-law.com

                               Motley Legal Services
                               By: Kimberly Chongyon Motley
                               PO Box 1433 US 28106
                               Matthews, NC 28106
                               Ph: 704-765-4887
                               kcmotley@gmail.com
 For the Defendant
  JOSEPH MENSAH:               Wirth & Baynard
                               By: Joseph M Wirth & Jasmyne M
                               Baynard
                               9898 W Bluemound Rd - Ste 2
                               Wauwatosa, WI 53226
                               Ph: 414-291-7979
                               Jmw@wbattys.com


 U.S. Official Reporter:       SUSAN ARMBRUSTER, RPR, RMR, FCRR
 Transcript Orders:            Susan_Armbruster@wied.uscourts.gov
Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription

1

```
1                    T-R-A-N-S-C-R-I-P-T   I-N-D-E-X

2                                                        Page

3                              WITNESSES
    ALL WITNESSES:
4
    For the Plaintiff:
5
        David Shamsi
6
    Direct Examination by Mr. Cade:                3
7   Cross Examination by Mr. Wirth:                34
    Redirect Examination by Mr. Cade:              45
8   Recross Examination by Mr. Wirth:              54
    Re-redirect Examination by Mr. Cade:           54
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               P R O C E E D I N G S

2          (Excerpt transcript.)

3          MR. CADE:  David Shamsi.

4          David Shamsi, being first duly sworn to tell the

5  truth, the whole truth, and nothing but the truth, testified as

6  follows:

7          MR. SHAMSI:  I do.

8          THE COURT:  State your name for the record.  Spell

9  your last name.

10          THE WITNESS:  David Shamsi.  S-H-A-M-S-I.

11          THE COURT:  Go ahead.

12  **DIRECT EXAMINATION BY MR. CADE:**

13  Q.  Agent Shamsi, how are you today?

14  A.  Good.  How about yourself?

15  Q.  Excellent.  Make sure you're talking into the microphone so

16  you can be heard.  I am going to go through some background

17  questions with you first.  First, where are you currently

18  employed?

19  A.  FBI.

20  Q.  The FBI.  And how long have you been employed with the FBI?

21  A.  Since January of 2021.

22  Q.  And prior to employment with the FBI, where were you?

23  A.  Wauwatosa Police Department.

24  Q.  How long were you with the Wauwatosa Police Department?

25  A.  I believe it was just over two years, two, two and-a-half

3

1    years.

2    Q.  Prior to Wauwatosa, where were you employed?

3    A.  The military.

4    Q.  How long were you in the military?

5    A.  Still serving in the reserves would be 25 years.

6         THE COURT:  Get the mic a little closer.

7    Q.  Just so we're clear, you were in the military.  Before you

8    joined Wauwatosa, how much time did you have in the military?

9    A.  It would have been, approximately, 21 years.

10   Q.  Twenty-one?

11   A.  Correct.

12   Q.  Okay.  And what is your current rank?

13   A.  Current rank is major.

14   Q.  Major.  And is there a specific assignment that you have or

15   division that you're assigned to in the military?

16   A.  Right now I'm branched within civil affairs, and I serve as

17   a team chief for a civil liaison team.

18   Q.  Team chief for the civil liaison?

19   A.  Correct.

20   Q.  Nonmilitary speak, what does that mean?

21   A.  In nonmilitary speak, that is when our country kind of works

22   with other countries.  I work with civil leadership within other

23   countries.  So other countries that may be NATO partners or

24   potentially not NATO partners, I will work with those countries

25   and work with their government leaders to either work out

1  negotiations for our troops to go into those countries, our

2  troops to go into and do exercises, things of that nature.

3  Q.  Okay.  Let's talk for a moment.  Do you have any special

4  awards or commendations with regard to the military?  What

5  branch are you in?

6  A.  I am in the army.

7  Q.  In the army?

8  A.  Correct.

9  Q.  Did go to ranger school?

10  A.  I did.

11  Q.  That's pretty tough to get into ranger school?

12  A.  Yes, sir.

13  Q.  You did graduate ranger school?

14  A.  Correct.

15  Q.  Rangers, you've got Rangers, Green Berets, Delta, correct?

16  A.  Correct.

17  Q.  Serve in combat?

18  A.  I did.

19  Q.  Have you heard gunfire in combat?

20  A.  I have.

21  Q.  You're aware of what the difference between a handgun and a

22  rifle sound like?

23  A.  Yes.

24  Q.  So at the time of this incident, February 2nd of 2020, how

25  long had you been with Wauwatosa at that point in time?

1   A.  I think at that point in time, it would have been a little

2   over a year.

3   Q.  A year.  So I want to take you back to February 2nd of 2020.

4   Are you with me?

5   A.  Uh-huh.

6   Q.  What do you recall you were doing prior to Mr. Cole being

7   shot and killed?

8   A.  I was on patrol.  I don't remember what sector I was in, but

9   I had --  I believe I had done a day shift that day, and I had

10  been extended into the evening just due to staffing.

11  Q.  When you say in the evening, what do you mean?

12  A.  I don't remember what time I was supposed to get off that

13  day, but I pushed past my normal time of getting off of work I

14  think four hours, a half a shift of the nighttime shift.

15  Q.  So essentially overtime?

16  A.  Correct.

17  Q.  So if the shooting happened, approximately, a little after

18  6:00 p.m. on February 2nd, does that mean you would have been

19  what 6:00 to 2:00 that day?

20  A.  I believe so, yep.  I think I was supposed to get off at

21  2:00.  I worked until 6 o'clock, would have been around the time

22  I was supposed to get off.

23  Q.  So they call you up or someone tells you for whatever reason

24  we, you know, we need you to stay on longer, and you're driver

25  on the car, okay?

6

1    A.   Correct.

2    Q.   So at some point, how did you end up at Mayfair Mall?

3    A.   I went to Mayfair Mall because there was a call of a subject

4    with a gun at the mall.  They put out a description of the

5    person, and everybody was looking for that subject.  So I went

6    and parked at one of the exits and was watching people exit the

7    mall.

8    Q.   Were you --  Were you specifically instructed to go to the

9    mall?

10   A.   I was not specifically instructed, I just went.

11   Q.   So as you get to the mall and you are near one of the -- Do

12   you recall which exit you were parked near?

13   A.   I think I was -- I don't remember exactly which exit, but I

14   think I was parked over by Barnes & Noble, PF Chang area of the

15   mall.

16   Q.   Okay.  Did you spot the subject?

17   A.   I did not.

18   Q.   Okay.  We've already shown your -- Let me back up.  Your

19   vehicle, your car had dash-cam video with audio?

20   A.   The dash cam I don't think had audio.  The audio would have

21   been on myself, the dash came audio.  And every individual

22   officer had a microphone we would wear on our pockets or

23   somewhere on our vest.

24   Q.   You're either wearing on your vest somewhere or in a pocket?

25   A.   It is in a pocket up near here like your shirt, correct.

7

1   Q.   And that syncs up with the dash cam?

2   A.   Yes.

3   Q.   Do you know if the audio that you're wearing if you're

4   wearing a microphone, does that sync up with any other dash cam,

5   or is it set solely to whatever vehicle you're assigned to?

6   A.   I don't recall exactly how it worked, but I believe it

7   worked with the dash cam that you were assigned to.

8   Q.   So at some point if you're over by PF Chang or the Barnes &

9   Noble at Mayfair Mall, that's not where the shooting took place,

10  right?

11  A.   It was not.

12  Q.   Okay.  Where did the shooting take place?  How did you go

13  from the PF Chang, Barnes & Noble to where the shooting took

14  place?

15  A.   I heard over the radio that Officer Johnson had located a

16  subject that matched the description of the person with the gun

17  from the mall.  So I turned around to where Johnson was, and I

18  drove down by where he was and had -- If I remember correctly,

19  he had four children or four individuals, one of them matching

20  the description of the person with the gun.

21          So when I got down there, he had the individuals.  He

22  was pulling up on the individuals about the same time that I

23  was, so that brought me down toward him.  As I got out of my car

24  and as he was attempting to start talking to them, they took off

25  running, so then he took off running.

8

1          I had forgotten to put my car into park as I was

2   getting out, so I got back in, put my car in reverse, turned

3   around and started driving to where they were running for, and

4   that is how my car and I ended up by the Cheesecake Factory

5   where the shooting was.

6   Q.  Just so I understand for the jury, Officer Johnson is in his

7   vehicle, but he gave chase?

8   A.  He had gotten out of his vehicle.  When I drove over there,

9   he was exiting his vehicle.  And when they started to run, he

10  ran after on foot.

11  Q.  Okay.  And then you get back in your car because you hadn't

12  parked it?

13  A.  Right.

14  Q.  Had you parked it, were you going to run?  Was that your

15  intention?

16  A.  I had not thought that far ahead.

17  Q.  Fair enough.  So then you drive around what, a service road?

18  A.  Whatever yeah, the frontage road in the mall, yeah.

19  Q.  There's a certain point in time where you park your car.

20  Why did you make the decision to park your car there?

21  A.  Because the subject had ran past me, and so I wasn't going

22  to drive any further into the parking lot, so I got out of my

23  car to also chase.

24  Q.  Okay.  And at the time that you gave chase, did you see any

25  police officers in front of you?

9

1    A.  The whole time I was driving I could see other police

2    officers running.  And so when I parked my car if I remember

3    correctly, it was -- Office Schlies ran in front of my car, Cole

4    ran in front.  I think a mall security person ran in front, and

5    then I ran after them.

6    Q.  Sure.  Let's not talk about -- I am just asking police

7    officers.  So you said Mr. Schlies ran in front of the car?

8    A.  I believe so.

9    Q.  Okay.  Other than that, you didn't see any police officers

10   in front of you?

11   A.  No.

12   Q.  Other than Schlies running in front of your car and knowing

13   that Johnson is running somewhere, were you aware of the

14   location of any other police officer?

15   A.  I was not.  I could hear people, and I knew everybody was

16   coming but specifically no.

17   Q.  Right.  I want to make sure.  We're not talking, you know,

18   this person was assigned to go this specific spot or another

19   person was assigned to go to another spot.  You just know people

20   are showing up.  You don't know where they're at?

21   A.  Correct.

22   Q.  Okay.  So you make the decision to park the car at that

23   point once Schlies runs in front of you to get out and give

24   chase?

25   A.  Correct.

1  Q.  How far in front of you was Mr. Cole when you gave chase?

2  A.  I think when I first started running, I don't fully remember

3  but, approximately, 20, 25 feet.

4  Q.  Okay.  And in that 25 feet, were you gaining on him or were

5  you guys staying equal distance apart?

6  A.  That I don't remember.

7  Q.  Okay.  At some point in time -- I'm going to skip and come

8  back.  Mr. Cole ends up on the ground, correct?

9  A.  Correct.

10  Q.  Did you see him go down to the ground?

11  A.  I did not.

12  Q.  Okay.  Because what I'm trying to understand, Agent Shamsi,

13  it was a dark evening, correct?

14  A.  Correct.

15  Q.  And the area where this took place, there were not a ton of

16  lights shining in the parking lot, correct?

17  A.  Correct.

18  Q.  Because you had -- If I'm chasing you, right,

19  you're Mr. Cole.  On your left would be this construction site,

20  right?

21  A.  Correct.

22  Q.  They're actually building -- This is a hotel now, the

23  Renaissance Hotel?

24  A.  Correct.

25  Q.  No lights coming from that direction, fair?

1    A.   Correct.

2    Q.   The only other light would be -- to your right would be the

3    Cheesecake Factory and the lights that it had on it?

4    A.   Yes.

5    Q.   Yes, okay.  So as you're running, I want to get about --

6    Would you call that 25 feet?

7    A.   I'd say so.

8    Q.   So at 25 feet as you're giving chase to Mr. Cole when he

9    goes down at this distance, you couldn't tell what happened,

10   correct?

11   A.   I think everything was moving pretty fast, so I was focusing

12   on not only Mr. Cole but trying to get the mall security guy to

13   get out of the way.  So I think in those moments, I did not see

14   where or how he had gone to the ground, but he was no longer --

15   When he was on the ground, he was no longer in front of me.  He

16   had moved off to my left.

17   Q.   Okay.  So how --  Did you tell the security guard to get out

18   of the way?

19   A.   I think a lot of people were yelling at him to get out of

20   the way.

21   Q.   Okay.  Do you recall what you said to him?

22   A.   I think I said move or get out of the way.  I don't fully

23   recall.

24   Q.   So move.  You were catching up on Mr. Beard?

25   A.   I was catching up on -- It was him and Mr. Cole that were

1  running ahead of me that I was focused on.

2  Q.  I understand that.  I understand that, but Mr. Beard was

3  going pretty fast, correct?

4  A.  He was.

5  Q.  And no offense to you, but it would be fair to say at least

6  on the video I've seen, Mr. Beard is much faster than you are?

7  A.  Correct.

8  Q.  So I'm trying to understand if you're 25 feet away from

9  Mr. Cole and Mr. Beard is somewhere in-between the two of you,

10  correct?

11  A.  Correct.

12  Q.  I'm trying to figure out how you're catching up to them.

13  Let me rephrase.  Okay.  At some point in time, Mr. Cole ends up

14  on the ground, correct?

15  A.  He does.

16  Q.  And when he's on the ground, he's --  You saw him prone,

17  correct?

18  A.  I was focusing on his upper body, and I saw his feet facing

19  toward me, and I saw his hands out to either side of his body.

20  Q.  Hands out meaning hands sticking out both ways, correct?

21  A.  Correct.

22  Q.  Not tucked under?

23  A.  No.

24  Q.  Not reaching or doing anything inside pockets or grabbing or

25  moving anything?

1   A.  Not that I saw.

2   Q.  When you saw him, he's on the ground?

3   A.  Yes, I saw his hands.

4   Q.  And at the time you saw him on the ground, his hands, had

5   Joseph Mensah shot yet?

6   A.  Not at this point.

7   Q.  Okay.  And when you saw him on the ground with his hands

8   out, was he on his -- You said the feet were facing you?

9   A.  Correct.

10  Q.  So feet is facing you, he's got his hands out.  Was he on

11  his feet, or was he completely flat, prone?

12  A.  At the time I couldn't tell, and I started focusing on the

13  right hand.  I was focusing on the gun out at that point is the

14  first time I noticed a gun in his hand.

15  Q.  Okay.  So 25 feet away and he's down.  And whether he's

16  completely flat or on his knees, both hands are on the ground?

17  A.  Correct.

18  Q.  Sorry, your microphone.

19  A.  Correct.

20  Q.  Both hands were on the ground, and you saw a gun in the

21  right hand?

22  A.  Right hand.

23  Q.  Okay.  Was the gun moving?

24  A.  The gun was not moving at the time.

25  Q.  Did the --  What direction was the gun pointing?

1    A.  It was pointing towards Mayfair Road.

2    Q.  Sorry?

3    A.  Pointing towards Mayfair Road.

4    Q.  So again if I'm 25 feet and I'm prone and where the Judge is

5    is Mayfair Road, the gun was pointing towards Mayfair Road and

6    it was not moving?

7    A.  Correct.

8    Q.  Did he raise up the gun?  Did you ever see him raise it up?

9    A.  Not that I saw, not that I noticed.

10   Q.  And by the time he's on the ground prone, how far away are

11   you?

12   A.  I moved close to him.  I think I was probably ten feet

13   behind him.

14   Q.  Okay.  Ten feet?

15   A.  Yes.

16   Q.  And were you the closest police officer to Mr. Cole prior to

17   the shooting by Joseph Mensah?

18   A.  I believe I was, yes.

19   Q.  Well, you know, there's another officer.  We've talked about

20   Evan Olson, right?

21   A.  Correct.

22   Q.  So if I'm ten feet, Mr. Olson is towards Mayfair Road,

23   right?

24   A.  Correct.

25   Q.  But he was more than ten feet away, right?

1    A.   I believe so.

2    Q.   We know you've seen the video a couple of times, correct?

3    A.   I have.

4    Q.   You've seen Johnson running in the video?

5    A.   Correct.

6    Q.   And he's -- kind of looks like he's either hurt or tired or

7    something, but he's not catching up to where you are, right?

8    A.   Once I pass where he was, I was unaware of where Johnson

9    went.

10   Q.   Right.  But I'm saying on the video after you've seen it and

11   everything else and you've had this acclimation, it's fair to

12   say Johnson is not closer to Alvin Cole than you are?

13   A.   Correct.

14   Q.   At the time of the shooting, correct?

15   A.   Correct.

16   Q.   And we know Joseph Mensah is running, and he's behind you

17   running, correct?

18   A.   Correct.

19   Q.   And you're literally ten feet away.  The gun is out, right

20   hand, both hands and he's prone.  That's when you first heard

21   the shot, correct?

22         MR. WIRTH:  I'll object to form.

23         THE COURT:  Can you rephrase?

24   Q.   He used the phrase prone.  He was prone, was he not?

25   A.   I saw his upper body and his hands were out.  I did not know

1   whether or not his feet were prone.  I can tell you if we're

2   referencing the video after watching the video a few times, he's

3   not prone in the video.  While I was --  While I was behind him,

4   it was very hard to see whether or not he was prone or not

5   prone.  I saw the bottom of his feet, and I could see his hands

6   out.  But after reviewing the video that you're referencing,

7   I've seen him not prone.  It looks like he's on his hands and

8   knees with his hands out.

9   Q.  Okay.  You're watching the gun the entire time?

10  A.  Correct.

11  Q.  So prior to Joseph Mensah shooting, you never saw him move

12  that gun, correct?

13  A.  I did not.  I was watching the gun.

14  Q.  You were watching the gun?

15  A.  I was.

16  Q.  So the whole time Joseph Mensah is holding onto the gun --

17  I'm sorry.  Alvin Cole is holding onto the gun the entire time

18  you're watching this hand, the right hand?

19  A.  I was.

20  Q.  Ten feet away?

21  A.  Correct.

22  Q.  Would you agree with me that if someone is on their hands

23  and knees holding a weapon -- I would imagine this is not the

24  first time you've had a suspect with a weapon?

25  A.  It was not.

1  Q.  Plus being in the military having been in combat, you've

2  dealt with people with weapons, correct?

3  A.  I have.

4  Q.  So if he's on his hands and knees and he's holding the

5  weapon, you would have seen him raise up the gun if he had

6  raised it up, correct?

7  A.  I think in that instance had he raised it up, it would have

8  been hard to see in the light and the angle.

9  Q.  But you're only ten feet away?

10 A.  Correct.

11 Q.  You're the closest guy?

12 A.  Correct.

13 Q.  So everybody else, it's harder for them to see than it is

14 for you to see, correct?

15 A.  I would agree.

16 Q.  Okay.  So again ten feet away.  And if Alvin Cole on his

17 hand and knees had made a movement and turned from his right to

18 his left in any fashion, you would have seen it, correct?

19 A.  I would have.

20 Q.  You did not see that, right?

21 A.  I did not.

22 Q.  Prior to Joseph Mensah shooting, did he announce himself?

23 A.  Did Joseph Mensah announce himself?

24 Q.  Yeah, like get out of the way?  Did he say anything to you?

25 A.  He did not tell me to get out of the way.  He did announce

1  that the gun was out.

2  Q.  And just so we're oriented again with you and I'm ten feet

3  away -- You understand the phrase on your six or on my six?

4  A.  I do.

5  Q.  Correct?

6  A.  Yes.

7  Q.  So that would be if we look at a clock if you're right

8  behind me, you're at the 6 o'clock point, correct?

9  A.  Correct.

10  Q.  And as we go around the clock to your left, this is the

11  seven o'clock position, correct?

12  A.  Correct.

13  Q.  And then we go to the 8 o'clock position, right?

14  A.  Correct.

15  Q.  And then I'm 90 degrees.  That's the 9 o'clock position,

16  correct?

17  A.  Correct.

18  Q.  It's just essentially a clock.  So you're at six.  If we go

19  the other way, it is five.  You are four, three, et cetera,

20  right?

21  A.  Correct.

22  Q.  So when Joseph Mensah came up and shot, did he come off your

23  five or off your seven or off your six?

24  A.  From my memory, it was more around my eight or nine.

25  Q.  At your eight or nine?

1   A.   And not necessarily mine.  He was -- I guess if we're

2   talking for me, it would have been more my 10 o'clock.  He was

3   in front of me off to my left.

4   Q.   Your 10 o'clock.  So he would have been coming in this

5   direction?

6   A.   Correct.

7   Q.   Okay.  If he's coming that direction and the gun is over

8   here in the right hand, you would agree that's even harder to

9   see, correct?

10  A.   I can't say.

11  Q.   Were there flashlights?

12  A.   There were.

13  Q.   Who had flashlights?

14  A.   I think most people had flashlights.

15  Q.   Were they being used?

16  A.   Yes.

17  Q.   So you had a flashlight you were using?

18  A.   Correct.

19  Q.   Because on the video, I can show you the clip.  At the

20  moment, there's flashlights all around, right?

21  A.   Correct.

22  Q.   So it's dark, but you now have a flashlight to illuminate

23  the area, right?

24  A.   Right.

25  Q.   And again, I want to make sure I'm understanding.  As

20

1  Mr. Mensah is running, he didn't announce himself, correct?

2  A.  I don't remember him announcing himself.

3  Q.  Is it normal to shoot a suspect when another officer is in

4  close proximity?

5  A.  I wouldn't be able to say whether or not that's normal or

6  not.  I think when multiple officers are on scene, everybody has

7  a different perspective.

8  Q.  Sure.  But you have to be careful as an officer with a

9  weapon when other officers are present because you could miss

10  and hit an officer, right?

11  A.  Yes.

12  Q.  You could miss and hit an innocent bystander, correct?

13  A.  Correct.

14  Q.  And in fact, when you were ten feet behind Mr. Cole, you

15  were stationary, correct?

16  A.  I was.

17  Q.  You had a chance to catch a breath, correct?

18  A.  I don't know if I had enough time to catch my breath, but I

19  was stationary.

20  Q.  You weren't running?

21  A.  Correct, I was not running.

22  Q.  It wasn't the active running and you didn't run and shoot,

23  correct?

24  A.  Correct.

25  Q.  Running and shooting, way more difficult than shooting from

21

1  a stationary position, right?

2  A.  Yes.

3  Q.  Not only difficult, running and shooting is less accurate,

4  correct?

5  A.  Depends on training.

6  Q.  Depends on the training?

7  A.  Correct.

8  Q.  Military training being a ranger.  But if you had just been

9  a police officer, is that something that you go through all the

10  time, running and shooting as part of your training ops?

11  A.  It does depend on the training.  There's a lot of police

12  officers that are on tactical teams that do train that and train

13  that pretty frequently.

14  Q.  When they run tactical, they're using long guns not

15  handguns, correct?

16  A.  They will use both.

17  Q.  They will both use?

18  A.  Correct.

19  Q.  When Alvin Cole was on his hands and knees and the gun --

20  both hands were out, was he moving at all?

21  A.  I did not notice him moving because I was watching the gun.

22  Q.  Sure.

23  A.  And I was giving commands for him to drop the gun which he

24  was not at the time complying, so my focus just became on the

25  gun.

1  Q.  There are lots of reasons why someone may not comply with a

2  command, correct, lots of reasons.  Someone may not comply if

3  they have a handgun, correct?

4  A.  I can't say.  I don't know what you're asking I guess.

5  Q.  Well, what if someone was unconscious or dazed, right?  Let

6  me give you an example.  In combat if an ordinance, a bomb,

7  something, mortar drops, you get that ringing in your ear for a

8  moment, correct?

9  A.  Yes.

10  Q.  So with that ringing in your ear when a gun went off, you're

11  not necessarily hearing everything around you, fair?

12  A.  I would disagree, not from a handgun.

13  Q.  I understand, sir.  I am just -- I am walking through

14  examples.

15  A.  You wouldn't be that dazed from a handgun.

16  Q.  Dazed from a handgun shooting you?

17  A.  Not in my experience.  It depends where the person is shot.

18  Q.  Have you been shot?

19  A.  I have not.

20  Q.  So I'll get to Alvin Cole shooting himself.  I am focused on

21  there are lots of reasons why someone could not respond to

22  commands.  One of them, they are dazed or they are in shock,

23  correct?

24  A.  Sure.

25  Q.  One of them could be they could have lost consciousness for

1    some reason, correct?

2    A.  Yes.

3    Q.  One of them could be something wrong with their hearing, and

4    they can't understand commands, correct?

5    A.  Correct.

6    Q.  Okay.  It could also be you're hearing multiple commands,

7    right?

8    A.  Yes.

9    Q.  Different people barking different things.  What do I do,

10   who do I listen to, correct?

11   A.  Correct.

12   Q.  Right.  One person saying get on the ground, one person

13   saying drop the gun, frozen in time, right?

14   A.  Correct.

15   Q.  And so in that timeframe while you're ten feet away, you

16   hadn't made any determination as to what was going on with Alvin

17   Cole, whether he couldn't hear you, whether he was in shock,

18   whether he was dazed, nothing.  You just knew you had barked out

19   an order to drop the weapon, and he had not dropped the weapon,

20   correct?

21   A.  Correct.

22   Q.  Okay.  Now, let's move forward a few seconds.  As you were

23   giving chase and we see on the video and we hear -- We don't

24   see, we hear on the video, we hear a gunshot, correct?

25   A.  Correct.

1   Q.  So you're 25 feet away giving chase.  You didn't see a

2   muzzle flash, did you?

3   A.  On my recollection when I was running, I did not.  I did not

4   see a muzzle flash, no.

5   Q.  You heard a shot, correct?

6   A.  Correct.

7   Q.  And you knew it was a handgun by the sound, right?

8   A.  Correct.

9   Q.  Your military training, that's definitely not a riffle.

10  That's a handgun, right?

11  A.  Correct.

12  Q.  You don't know which direction it's coming from, fair?

13  A.  I did not.

14  Q.  It could have come from North Avenue, correct?

15  A.  Correct.

16  Q.  It could have come -- I'm sorry, if you were running, could

17  have come from Mayfair Road, correct?

18  A.  Correct.

19  Q.  Could have come from North Avenue, correct?

20  A.  Correct.

21  Q.  Could have come from the Cheesecake Factory, right?

22  A.  I mean, I wouldn't say could have come from any direction.

23  I knew it came from somewhere in front of me.  I didn't

24  necessarily know specifically where it came from.

25  Q.  But you also have buildings, you have construction.  There's

1    reverberation, echoes, correct?

2    A.  Correct.

3    Q.  So you knew it didn't come from behind you?

4    A.  Correct.

5    Q.  You did not see -- In those 25 feet, you didn't see Alvin

6    Cole turn towards you, did you?

7    A.  I did not.

8    Q.  So you didn't see a muzzle flash.  You didn't see him turn

9    towards you.  Did you see him stop and get into some sort of

10   shooter's stance?

11   A.  I did not.

12   Q.  Did you believe that -- Is it fair to say you did not

13   believe that Alvin Cole had fired a weapon when that shot went

14   off at you, correct?

15   A.  I did not know anything about the shot.  As far as I knew

16   when Alvin started running, he did not have a gun out.

17   Q.  Right.  The first time you knew there was a gun is once he

18   was on the ground, correct?

19   A.  Correct.

20   Q.  While you were running when you stopped, okay.  I imagine

21   you're running.  At some point, you made the decision to stop,

22   correct?

23   A.  Correct.

24   Q.  Okay.  So when you're running, you make the decision to

25   stop.  You just didn't stop all of a sudden.  You had to slow

26

1   down even if for a moment to slow your momentum and speed,

2   correct?

3   A.  Correct.

4   Q.  And is it fair to say that you know now it's ten seconds

5   between the shot with Alvin Cole shooting himself and Joseph

6   Mensah firing was, approximately, ten seconds?

7            MR. WIRTH:  Let me object to form.  That assumes facts

8   not in evidence.

9            THE COURT:  Sustained.

10  Q.  Have you seen the video?

11  A.  I have, but I haven't timed that out.  I wouldn't be able to

12  say the exact time.

13  Q.  If I told you it was, approximately, ten seconds, would you

14  have any reason to doubt me?

15  A.  No.

16  Q.  You watched the video.  Hearing the sound, you hear a shot,

17  pause for approximately ten seconds, and then Joseph Mensah

18  firing five times, correct?

19  A.  Correct.

20  Q.  You've seen that video?

21  A.  I have.

22  Q.  The video, it is in evidence, okay.  So after he shoots

23  himself, Alvin Cole didn't --  He wasn't on the ground and shot

24  himself.  You didn't see that, correct?

25  A.  I did not.

1  Q.  Because if he had shot himself, you're aware it is his left

2  arm?

3  A.  I'm not aware that he necessarily shot himself.

4  Q.  Okay.  Well, we have stipulations that he did shoot himself.

5          MR. WIRTH:  No, Judge.  We do not have stipulations.

6  I think we need to do a sidebar.

7          (Sidebar discussion.)

8          (Back on the record.)

9  Q.  I want you to assume for purposes here that Mr. Cole was

10 shot in the left arm, okay?

11 A.  Okay.

12 Q.  While he's running and you're behind him, you didn't see him

13 shoot himself in the left arm, correct?

14 A.  I did not.

15 Q.  While he's on the ground, you did not see him turn around,

16 shoot himself in the arm, correct?

17 A.  I did not.

18 Q.  Do you know what stippling is?

19 A.  I do not.

20 Q.  Gunshot residue?

21 A.  That I know about, yeah.

22 Q.  It is, like, a burn mark.  Do you know anything about that?

23          THE COURT:  Mr. Cade, it would be easier if you talk

24 through the mic.

25 Q.  Part of your military training?

1  A.  That's not part of the military training.

2  Q.  Now, after the shooting, a number of police agencies came on

3  the scene, correct?

4  A.  Correct.

5  Q.  And you gave a statement, an interview that day to some

6  Milwaukee detectives, correct?

7  A.  Correct.

8  Q.  Do you recall specifically what you said to the detectives?

9  A.  I do not.

10  Q.  If we could play 27D.

11       (Whereupon tape is played.)

12  Q.  Did you hear -- Did you state that he was prone?

13  A.  I do.  I heard that.

14  Q.  And to refresh, do you recall Detective Lori Rom?

15  A.  I do.

16  Q.  That was, in fact, you having a discussion with attorney --

17  I'm sorry -- with Detective Rom, correct?

18  A.  I believe so.  I don't fully remember I guess.

19  Q.  She didn't have a microphone in your hand, correct?

20  A.  Correct.

21  Q.  That was your dash cam audio pick up?

22  A.  Must have been, correct.

23  Q.  That's your squad car view, correct?

24  A.  I believe so, yes.

25  Q.  Play another one from you -- that you talked to, 27E.

29

1           (Whereupon tape is played.)

2    Q.  I'm sorry, I think that was the wrong one.

3           (Whereupon tape is played.)

4    Q.  So you recall telling Detective Rom, yeah, he was holding

5    the gun in his hand.  He was prone.  Yes, he was prone.  I told

6    him to put the gun away multiple times.  It was at least me and

7    him or at I thought though I heard the shot from behind and knew

8    it was another officer?

9    A.  I faintly remember that, correct.

10   Q.  I also want to ask you --

11          THE COURT:  Move the mic again.

12   Q.  I apologize, Judge.  I also want to ask, make sure I'm

13   clear.  Do bullets, they have a weight to them, correct?

14   A.  Correct.

15   Q.  It's called grain?

16   A.  Yes.

17   Q.  And is it fair to say that in a standard-issue handgun, you

18   would not have one bullet that's 150-grain and another bullet

19   that's 50.  100 difference, correct?

20   A.  To be honest with you, I wouldn't know.  That's not anything

21   that I'm super intelligent on.

22   Q.  You had to know something about bullets being in the

23   Rangers, correct?

24   A.  Yeah.  When I put them in the gun and I pull the trigger, I

25   know that they will shoot.  I've never known much about grain.

1  That has not been a thing that I'm interested in.

2  Q.  Grain is just weight, how heavy the bullet is?

3  A.  Correct.

4  Q.  You were standing right next to Alvin Cole when Mensah shot,

5  correct?

6  A.  I was positioned to his rear toward his feet.

7  Q.  Right.  But you were --  You were standing right next to

8  him, correct?

9  A.  Next to --

10  Q.  Alvin Cole?

11  A.  I was not standing right next to Alvin Cole.

12  Q.  Okay.  Would you please number two, 27B.  Do you recall an

13  officer by the name of Dexter Schlies?

14  A.  I do.

15  Q.  Do you recall speaking with Dexter Schlies that evening?

16  A.  Faintly.  It was a lot, so I don't remember who I talked to.

17  Q.  I will play a 20-second clip.

18        (Whereupon tape is played.)

19  Q.  Did you hear yourself say I am standing right next to the

20  dude when Mensah shot?

21  A.  I did hear that.

22  Q.  This audio is minutes after the shooting, correct?

23  A.  Correct.

24  Q.  Certainly if ever there was a memory of exactly what took

25  place, it would be right in that moment after the shooting,

1  correct?

2  A.  I don't -- I don't agree.  I think while that happened, it

3  was stressful.  I don't think that's necessarily a memory.  That

4  is just taking.  I can remember where I was -- which I said in

5  multiple testimony -- standing behind him, and it is on video.

6  I was not standing next to.

7  Q.  You admit the video is not -- Because of the distance, the

8  video is not super clear, correct?

9  A.  It is not super clear.  You can see where I'm standing and

10 where I said I've stood.

11 Q.  Okay.  As part of your training with Wauwatosa or training

12 to become an officer after a critical incident, officers are

13 supposed to isolate themselves, correct?

14        MR. WIRTH:  Judge, I'm going to object.  This is the

15 subject of a Motion in Limine.

16        THE COURT:  I don't know what the question is.  So I

17 heard -- Are you done with the question?

18        MR. CADE:  I asked the question.

19        THE COURT:  He can answer that.

20        THE WITNESS:  Do you mind repeating?

21 Q.  Sure.  After a critical incident, officers are supposed to

22 isolate themselves, correct?

23 A.  I think typically management will isolate the officers.  I

24 think after a critical incident, officers tend to start

25 lifesaving measures, start to help out.  I think it is ingrained

1  in everybody to do what they are trained to do until somebody

2  comes along and pulls them and isolates the officers involved.

3  Q.  Sure.  I'm not talking lifesaving measure, right.  If

4  someone is shot and you're right there whether it is CPR,

5  whether it is using a defibrillator, whether it is applying

6  bandages, that is the next thing that you're trained to do is

7  deal with the injured person, correct?

8  A.  Correct.

9  Q.  Putting that aside, officers are supposed to isolate.

10  You're not supposed to exchange information with each other

11  until you've been interviewed or had a chance to tell someone

12  what happened, correct?

13  A.  Correct.

14       MR. WIRTH:  Judge, the investigative protocol is the

15  subject of a Motion in Limine.

16       THE COURT:  Well, so he's answered that question.  I

17  don't see any problem with that.  What's your next question?

18       MR. CADE:  Yes, Judge.

19  Q.  Just so we're clear, the entire time that Alvin Cole was on

20  the ground and he would -- The gun in his right hand, it never

21  moved.  It was always on the ground, correct?

22  A.  I did not see it move.

23       MR. CADE:  Those are my questions, Your Honor.

24       THE COURT:  Okay.

25  **CROSS EXAMINATION BY MR. WIRTH:**

1  Q.  Agent Shamsi, I want to focus on that last question that you

2  were just asked by counsel.  You never saw the gun move.  Is

3  that your answer?

4  A.  Correct.

5  Q.  Is that the same as the gun never moved?

6  A.  That is not the same.

7  Q.  Why is that?

8  A.  I was focused on the gun, but there was a lot happening.

9  And so for me to say that the gun never moved, I wouldn't be

10  able to say that.

11  Q.  Is it possible you were distracted?

12  A.  Yes, possible.

13  Q.  I'm going to show you what has been marked as Defense

14  Exhibit 1019.  It is the squad-cam video.  Before I do that, I

15  should move that into evidence.

16        MR. WIRTH:  Judge, I move Defense Exhibit 1019 into

17  evidence, the squad cam video.

18        THE COURT:  So ordered.

19        MR. CADE:  He hasn't seen it, Judge.  Is it his

20  squad-cam video?

21        THE COURT:  I thought --  There's no objection.  I

22  mean, you didn't object.  I never heard any objection.  Is there

23  some problem with it?

24        MS. MOTLEY:  We don't know what it is.  He hasn't

25  introduced it properly to the witness.  He's just saying --

1    THE COURT:  Do you want to do it?  Go ahead.

2    MR. WIRTH:  Sure.  We have that cleared up.

3  Q.  Agent Shamsi, do you have it on the screen in front of you?

4  A.  I do not, no.  It is up.

5  Q.  I will play it and ask some questions about it, and I will

6  move it into evidence, okay.

7  A.  Okay.

8    (Whereupon tape is played.)

9  Q.  First off, can you identify what that video is?

10  A.  That is the video after there was a call made that Johnson

11  had identified one of the subjects that was described as having

12  a firearm in the mall.

13  Q.  And is that your squad dash-cam video?

14  A.  Yes, I believe so.

15  Q.  Does that fairly and accurately represent what was going on

16  that evening?

17  A.  Yes.

18    MR. WIRTH:  Judge, I move 1019 into evidence.

19    THE COURT:  So ordered.

20    MS. MOTLEY:  Your Honor, we'd like to object to this

21  video.  If we can have a sidebar, please.

22    THE COURT:  I'm sorry?

23    MS. MOTLEY:  Sidebar, please.

24    (Sidebar discussion.)

25    (Back on the record.)

1  Q.  I was telling the witness -- We're going to put a different
2  video on.
3          THE COURT:  Okay.
4  Q.  Is it on your screen?  Let me pause it.
5  A.  It's up.
6  Q.  Okay.
7          (Whereupon tape is played.)
8  Q.  Okay.  This is about where we left off.  This is going to be
9  a little unwieldily because of the size.  Before you got to
10 that, before we got to this point, there was a patrol car off to
11 the right of the screen.  Did you see that?
12 A.  I did.
13 Q.  And who was that?
14 A.  Officer Johnson.
15 Q.  Okay.  Taking a look at this exhibit, does this remain the
16 squad-car video from your squad car?
17 A.  Correct.
18          MR. WIRTH:  Do I understand Exhibit 27 is already
19 moved in?
20 Q.  Yes.  This is the perspective from the forward-facing camera
21 in your squad car, correct?
22 A.  Correct.
23 Q.  At the point of this video, what was your plan that evening?
24 A.  At this point, the plan was just to conduct a field
25 interview or talk to the subjects and try and gain understanding

1    corroborating whatever the call was, identifying there was a

2    problem or anything of that nature.

3    Q.   Backing up Johnson?

4    A.   Correct.

5    Q.   In that video, there's an individual with a gray hoodie and

6    a bag on his shoulder.  Do you know who that is?

7    A.   That was the person identified to be Alvin Cole.

8                (Whereupon tape is played.)

9    Q.   Who is that that goes running by?

10   A.   That's Officer Johnson.

11               (Whereupon tape is played.)

12   Q.   As a police officer, is a foot chase dangerous?

13   A.   Very dangerous.

14   Q.   Would you tell the jury why a foot chase is so dangerous?

15   A.   There's a number of reasons.  First of all, if anybody is

16   running, first of all, in that situation they are running

17   because they have done something wrong or they have a gun

18   because that is what the call was for.

19               And secondly, it's dangerous to officers because

20   you're -- You're in a little bit of a higher-risk situation

21   running after somebody.  They could get away, find a position of

22   advantage to hide and inflict harm on you or others, so it is

23   inherent to catch individuals that are running to figure out why

24   they are running and not let them get to a place where they can

25   do further harm if that's their intent.

1  Q.  What about the concept of just let them go?

2  A.  That's --  I've never in my law-enforcement career, that's

3  not something I've ever seen even for something as retail theft.

4  If somebody is running, you're going to chase after them because

5  you don't want them to again get into a position where they can

6  inflict further harm on anybody.

7  Q.  Once a foot chase begins, are you duty bound to see it

8  through?

9  A.  Yes.

10 Q.  Where is Officer Dexter Schlies at this point?

11 A.  I'm not entirely sure where Schlies was at this point.

12 Q.  All right.

13          (Whereupon tape is played.)

14 Q.  Do you know who that is?

15 A.  I'm not sure who that was.

16          (Whereupon tape is played.)

17 Q.  Do you know who that individual is chasing Mr. Cole?

18 A.  At the time I did not.  I've just been told he's Mr. Beard.

19          (Whereupon tape is played.)

20 Q.  Who is that?

21 A.  That's me.

22          (Whereupon tape is played.)

23 Q.  Who is that?

24 A.  I think that's Dexter Schlies.

25 Q.  On the left, who is that?

1   A.   That would be Johnson.

2          (Whereupon tape is played.)

3   A.   I think running by -- I think I made a mistake.  That was

4   not Officer Schlies.  That was Officer Mensah.

5   Q.   After the shooting had stopped -- Strike that.  Did you hear

6   a single gunshot before Mensah shot?

7   A.   Are we talking video or memory?

8   Q.   By memory.

9   A.   By memory, I knew I heard something.  At the time I did

10  not -- It did not register to me that that necessarily was a

11  gunshot.  It sounded like a gunshot.  But contextually, at the

12  time it did not make sense.  I did not see Cole with a gun, and

13  I wasn't aware of anybody else that would have shot at the time.

14  Q.   In the initial chase sequence that we see in this video, did

15  you have your gun out?

16  A.   I did not.

17  Q.   Did you see any other officers who had their gun out?

18  A.   Initially no.  I think as Officer Mensah was running up, he

19  identified and pulled his gun out.

20  Q.   After you heard the first shot, what happened next?

21  A.   I think we tell Cole to drop his gun, and then -- and then

22  there's multiple other shots.

23  Q.   At any time did Mr. Cole say anything to you?

24  A.   No.

25  Q.   At any time between the first shot and the time Officer

1  Mensah shot, did Alvin Cole express any kind of outcry about

2  pain or anything like that?

3  A.  No.

4  Q.  When is the first time that you realized that Alvin Cole had

5  a gun?

6  A.  When he was on the ground I saw the gun in his right hand.

7  Q.  Your position was to continue monitoring Mr. Cole then?

8  A.  I was watching his right hand with his gun.  I noticed that

9  he had -- his finger was still on the trigger, so I started

10 giving him commands to drop the gun, and I was watching it to

11 move because had he moved, had he pointed the gun where I

12 thought any of the officers were or at me, then I was prepared

13 also to use deadly force.

14 Q.  As this was going on, were you making an analysis of whether

15 this was a deadly situation?

16 A.  Correct.

17 Q.  And what was your analysis?  Was it a deadly situation?

18 A.  It was a deadly situation.

19 Q.  As you come to that conclusion, what were you preparing to

20 do?

21 A.  I was also preparing to shoot and trying to figure out who

22 was around me and where, what I could do to deescalate if that

23 was possible, which is giving the commands, but he was not

24 responding to dropping the gun.

25 Q.  Had you begun any of the physical movements towards firing

1   your weapon?

2   A.  My finger was also on the trigger, and I had depressed the

3   slack out of the trigger.

4   Q.  Before you were actually able to complete pulling the

5   trigger, is that when Officer Mensah arrived?

6   A.  Correct.

7   Q.  After the shooting occurred, what was the next thing that

8   you did?

9   A.  I moved up with Officer Olson to move the gun away from

10  Alvin Cole's hand and then start to do whatever lifesaving

11  measures we could do.

12  Q.  After the shooting had stopped, was the gun still in or near

13  Alvin Cole's possession?

14  A.  It was.

15  Q.  Did anyone move that away?

16  A.  I don't remember exactly what happened to the gun, but we

17  moved it away from his hand so it was out of proximity out of

18  his reach.

19  Q.  Is that standard procedure?

20  A.  Yes.

21  Q.  That evening February 2, 2020, what was your duty

22  assignment?

23  A.  I was --  I don't remember my exact assignment, but I was in

24  the area of Mayfair Road and North Avenue.

25  Q.  And you were getting near the end of your shift?

1   A.  Correct.

2   Q.  Why did you stick around?

3   A.  I stuck around because there was -- Matter of fact, I think

4   I was heading back to the police department when the call came

5   out that someone had flashed a gun inside the mall.

6   Q.  And when that kind of call comes across the dispatch system,

7   how do the officers react?

8   A.  Everybody for the most part starts marking their way to the

9   mall in preparation of that being an amplified event so that way

10  if something like this were to happen, people around, far away

11  on the other side of the city or something like that.  So the

12  minute the call came out, I assume everybody was coming to the

13  mall or getting close to the mall.

14  Q.  And when you heard that call and decided to stick around,

15  what did you do next?

16  A.  I took a position at one of the entrances so that I could

17  watch for people coming out to look for a person who matched the

18  description of the person with the gun.

19  Q.  And then I think you testified that when Johnson radioed

20  that he had located the group, what did you do next?

21  A.  I drove toward Johnson to back him up because I assumed he

22  was going to begin talking to the individuals.

23  Q.  And that's when we see the video pick up?

24  A.  Correct.

25  Q.  With respect to the interviews or the captured audio that

1  counsel played for you and asked you questions about, one of

2  them was apparently words to the effect that at the time of the

3  shooting, dude was right next to me or I was right next to the

4  dude.  Do you recall those questions?

5  A.  I do.

6  Q.  Do you know whether the dude you were speaking about was

7  right next to Mensah or right next to Cole?

8  A.  I don't.  I don't fully recall making those statements.

9  Q.  You've testified where you were, correct?

10 A.  Correct.

11 Q.  And you've seen the videos afterwards?

12 A.  Correct.

13 Q.  Was -- From your review, was Cole prone?

14 A.  To review the videos he was not prone.

15 Q.  Was it dark that night?

16 A.  It was dark.

17 Q.  Was this a stressful situation?

18 A.  Yes.

19 Q.  You had one focus?

20 A.  I did.

21 Q.  You don't know that to be the focus of any other officer, do

22 you?

23 A.  I do not.

24 Q.  With respect to your focus, have you heard the phrase tunnel

25 vision?

1  A.  I have.

2  Q.  Is that what was going on that night?

3          MR. CADE:  Objection, Your Honor.

4          THE COURT:  Sustained.

5  Q.  Your focus was on one element of this dark, stressful

6  situation, correct?

7  A.  Correct.

8  Q.  With respect to determining movement or the shifting of

9  Alvin Cole's gun, is it possible you just missed it?

10  A.  I think it's possible.

11  Q.  In your experience as a police officer after the first

12  gunshot, does that heighten the danger of the foot chase?

13          MR. CADE:  Objection, Your Honor.  I think this gets

14  into expert testimony or his opinion not --

15          THE COURT:  Sustained.

16          MR. WIRTH:  Judge, the question is based on his

17  experience.

18          MR. CADE:  His experience is not the reasonable

19  officer, Judge.  It is not Joseph Mensah.

20          THE COURT:  Sustained.  Next question.

21  Q.  Very good.  When you saw the gun in Alvin Cole's hand,

22  you've described that it was -- his arm was out stretched,

23  correct?

24  A.  From my memory, yes, it was out stretched.

25  Q.  Did you know the position of Officer Olson at the time

1  Mr. Cole's arm was out stretched?

2  A.  Not at first, no.

3  Q.  Did you know that position today?

4  A.  I do.

5  Q.  Is that arm out stretched in the direction of where Officer

6  Olson was?

7  A.  Yes.

8          MR. WIRTH:  That's all I have for now.

9          MR. CADE:  I have a few questions.

10 **REDIRECT EXAMINATION BY MR. CADE:**

11 Q.  You previously testified did you not that you had tunnel

12 vision on the hand?

13 A.  Correct.

14 Q.  And as part of your training as an officer, just because

15 you're under stress does not give you the right to shoot,

16 correct?

17 A.  Correct.

18 Q.  You have to have a basis to shoot, correct?

19 A.  Correct.

20 Q.  So you either have to protect your own life as an officer to

21 shoot or you're protecting someone else, correct?

22 A.  Correct.

23 Q.  And if you don't have protecting someone else or if you

24 don't have protecting your own life, you don't have a right to

25 shoot, correct?

1    A.  Correct.

2    Q.  Okay.  Because running in and of itself from the police is

3    not grounds to shoot, true?

4    A.  True.

5    Q.  You gave -- I'm going to show you what's been marked as

6    Exhibit 53 previously.  That's part of a report.  I know you

7    didn't draft it, but this was part of the statement that you

8    gave to Lori Rom and William Schroeder, correct?

9    A.  Yes.

10   Q.  Okay.  And I would like for you to read on the bottom of the

11   second page.  Actually, I'll read it.  Tell me if I'm wrong.

12   The second to last sentence.  PO Shamsi -- Again, you gave the

13   interview that day, right?

14   A.  Yes.

15   Q.  Right after the shooting when it was fresh in your mind as

16   to what you saw, correct?

17   A.  Fresh in my mind, but I think it was --  To be honest with

18   you at that point, I was not -- I had not had a lot of time on

19   the -- on the department, so I didn't --  I never should have.

20   It's hard to give a statement that night because my heart was

21   still beating.

22   Q.  I get it.  I get it, Agent Shamsi.  All I'm saying is you

23   didn't have a chance to watch video?

24   A.  Correct.

25   Q.  You didn't have a chance to talk to people.  This was what

1    you did see and you recalled what you saw, correct?

2    A.   To the best of my ability.

3    Q.   Bottom of the second page of Exhibit 53.  PO Shamsi stated

4    that he was focused on the firearm and did not see the police

5    officer directly on the other side of the subject with the gun.

6    The police officer directly on the other side of the subject

7    with the gun is Officer Olson, correct?

8    A.   Correct.

9    Q.   PO Shamsi stated that he also did not see the subjects that

10   officer, meaning Olson, was taking into custody as his focus was

11   on the subject with the gun, correct?

12   A.   Correct.

13   Q.   Then you say PO Shamsi.  PO means police officer, correct?

14   A.   Correct.

15   Q.   PO Shamsi stated he hears gunshots from his left rear about

16   a seven or 8 o'clock position.  Do you see that?

17   A.   I do.

18   Q.   So I asked you earlier, we were talking position.  And if --

19   Again if I'm Alvin Cole, you said five to ten feet, correct?

20   A.   Right.

21   Q.   It could be five feet he was, it could have been ten feet,

22   but it was in that range, correct?

23   A.   Correct.

24   Q.   If you're at the 6 o'clock, your seven or 8 o'clock is over

25   here, correct?

1  A.  Correct.

2  Q.  Earlier you said 10 o'clock.  That's a huge difference,

3  right?

4  A.  It is.  I'm going off memory.

5  Q.  Sure.  But that's more than 60 degrees at least off,

6  correct?

7       MR. WIRTH:  I'll object.

8       THE COURT:  Sustained.

9  Q.  360 degrees, correct?

10  A.  Clock?

11  Q.  There's 12 numbers?

12  A.  Yes.

13  Q.  Twelve divided into 360 is 30, correct?

14  A.  Yes.

15  Q.  So if it is not the ten and it is not the nine, that is

16  60 degrees, correct?

17  A.  Correct.

18  Q.  It could be more if he was at the seven, it could be

19  90 degrees off, right?

20  A.  Right.

21  Q.  Okay.  So that night, you clearly indicated that the shots

22  for Mensah came from the seven or 8 o'clock, right?

23  A.  Correct.

24  Q.  You didn't know anything about Olson, where he was on

25  Mayfair Road, correct?

1   A.  After the fact I did, yes.

2   Q.  After the fact.  But in the moment that all this went on,

3   you were, as you said earlier, tunnel focused, tunnel vision on

4   that gun, right?

5   A.  Correct.

6   Q.  Okay.  Now, Mr. Wirth asked you a question.  I have to

7   follow up, I apologize.  I know it sounds like I am beating a

8   dead horse.

9           MR. WIRTH:  Counsel, can we have a sidebar for a

10  second?

11          (Sidebar discussion.)

12          (Back on the record.)

13  Q.  So in order for when you were answering Mr. Wirth's question

14  and you said the gun might have moved, do you recall that series

15  of questions?

16  A.  Yes.

17  Q.  If the gun might have moved, raised up a little bit, you may

18  not have pursued that, fair?

19  A.  Fair.

20  Q.  But if the gun turned like that, that you would have seen,

21  right?

22  A.  I would like to think I would have.  But if I turned away

23  myself, then I wouldn't have seen that.  So I'm looking myself

24  over the possibilities.

25  Q.  Sure, I understand that.  I know that your fellow officers

1  used to be colleagues, but you've been very clear when you've

2  been deposed, when you testified, you never saw the gun turn

3  around, correct?

4  A.  Correct.  I do not remember seeing the gun turn.

5  Q.  And if you had seen that on the day of the shooting -- Lori

6  Rom was there what within two hours of the shooting, hour

7  and-a-half?

8  A.  I don't recollect the time but fast.

9  Q.  Fast.

10 A.  Yeah.

11 Q.  If you had seen Alvin Cole make a move and point a gun in

12 the direction of Joseph Mensah, you would have raised up your

13 hand and said I saw him move, right?

14 A.  Correct.

15 Q.  I mean no doubt about it.  If you had seen it, you would

16 have said something, right?

17 A.  Yes.

18 Q.  But you were adamant, you were clear you never saw the gun

19 move, right?

20 A.  Right, I don't remember seeing it move.

21 Q.  I apologize.  Could you indulge me?  I'm going to --  I'm

22 showing you --

23        MR. CADE:  Put this up on the ELMO.

24 Q.  Could you on this -- I know we don't have it, but I will

25 show it to the jury in a moment.  This is just a screen shot

1   from a video.  There was a 3D rendition that was done by the

2   state patrol.  So they came in and had their little drone.  They

3   kind of mapped out the area.  And to orient you right here, this

4   is Mayfair Road.  Are you oriented?

5   A.  Yes.

6   Q.  If you can look right in this area, you can actually zoom.

7   You can zoom in.  Can you see those evidence cones and things

8   like that?

9   A.  Yes.

10  Q.  All I'd like for you to do Agent Shamsi if you wouldn't

11  mind, indulge me, is draw a circle of where Alvin's body would

12  have been at the moment of the shooting.  Obviously, it has been

13  --  The body was taken away.  He was --  He was given CPR.  They

14  were giving aid.  Ambulance came.  He was taken away, correct?

15  A.  Correct.

16  Q.  So obviously when they came in and did this fly through,

17  he's not there, but we still have evidence cones, correct?

18  A.  Correct.

19  Q.  So if you could just circle where the body was where he was

20  prone on that.  I've given you a red pen, a red magic marker?

21  A.  This is very much going off of memory.

22  Q.  Of course.  Obviously, you've got evidence markers?

23  A.  You said just a circle where --

24  Q.  Right.  I'd also like you to put -- Across the street, you

25  see that white light.  That's kind of a marquee that's up a

51

1  little bit.  Do you see that?

2  A.  I don't.  Yes.

3  Q.  Do you see that there?

4  A.  Yes.

5  Q.  That is US Bank, correct?

6  A.  I believe so.

7  Q.  I have a sticker that says US Bank.  Can you put that there?

8  A.  Yes.

9  Q.  We have a building that is right about here, correct?

10 A.  Yes.

11 Q.  That's the Cheesecake Factory?

12 A.  Yes.

13 Q.  Put a sticker on that one.  Just so we're clear, we've got

14 your red marker right here, correct?

15 A.  Yes.

16 Q.  We've got US Bank and the Cheesecake Factory, right?

17 A.  Correct.

18 Q.  Did you ever see -- Prior to him being shot, did you ever

19 see Alvin Cole crawling?

20 A.  On the --  On the night?

21 Q.  Yes.

22 A.  I did not.

23 Q.  Because not only would --  would having a gun, but I'm a

24 little bit older.  But if he's crawling, that is something you

25 would have noticed, correct?

52

1   A.  I believe I would have.  But from that angle being behind

2   him, it is hard to see movements forward and backward.

3   Q.  Sure.  You did see his hands on the ground, correct?

4   A.  Correct.

5   Q.  And you are watching the gun?

6   A.  Right.

7   Q.  If he's on the ground with the gun and you're watching him,

8   you would have seen it.  If he was crawling, would you have seen

9   it move, correct?

10  A.  Unless he was moving slowly then I might not have.

11  Q.  Three yards.  You know how far three yards is, right?

12  A.  I do.

13  Q.  Three yards.  And ten seconds, would you consider that slow

14  or fast crawling?

15  A.  It is all about the movement.  If you were seeing, I would

16  see it.  If he was moving slowly and it is dark and I am not

17  focusing on this movement but this movement, it is hard to see.

18  Q.  Were you the closest person there?

19  A.  Correct.

20  Q.  Were you the closest witness?

21  A.  Yes.

22  Q.  You did not see him or notice him crawling?

23  A.  I did not see him crawling, correct.

24  Q.  Did you actually --

25          MR. CADE:  Those are my questions, Your Honor.

53

1    THE COURT:  Okay.

2    MR. WIRTH:  One more, Judge.

3  **RECROSS EXAMINATION BY MR. WIRTH:**

4  Q.  I'm going to play for you what's been marked as --  marked

5  and entered into evidence as Exhibit 3.  Can you go to the

6  beginning.  I'd like you to watch this segment of the video.

7    (Whereupon tape is played.)

8  Q.  Did you see that video?

9  A.  I do.

10 Q.  After watching that video, do you see whether Alvin Cole was

11 prone?

12 A.  He was on his hand and knees.

13 Q.  Do you see him crawling in that video?

14 A.  I do.

15 Q.  Did you see him turn toward the direction that Joseph Mensah

16 was coming?

17 A.  It looks like he turns his face toward where Joseph was

18 coming from.

19    MR. WIRTH:  Those are all the questions I have.

20 **RE-REDIRECT EXAMINATION BY MR. CADE:**

21 Q.  Does turning your face give an officer the right to shoot?

22 A.  It does not.

23    THE COURT:  Thank you.  You are excused.  Next

24 witness.

25    (Witness excused.)

54

1          (Excerpt transcript concluded.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, SUSAN ARMBRUSTER, RPR, RMR, FCRR, Official Court

4   Reporter for the United States District Court for the Eastern

5   District of Wisconsin, do hereby certify that the foregoing

6   pages are a true and accurate transcription of my original

7   machine shorthand notes taken in the aforementioned matter to

8   the best of my skill and ability.

9

10  Signed and Certified October 6, 2025.

11  /s/Susan Armbruster

12  Susan Armbruster

13

14                  Susan Armbruster, RPR, RMR, FCRR
                    United States Official Reporter
15                  517 E Wisconsin Ave., Rm 200A,
                    Milwaukee, WI 53202
16                  Susan_Armbruster@wied.uscourts.gov

17

18

19

20

21

22

23

24

25