UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

ESTATE OF ALVIN COLE,　　　　　　　　）
　　　　　　　　　　　　　　　　　　　 ）
　　　　　　　　　　　Plaintiffs,　　　 ）　　Case No. 22-CV-856
　　　　　　　　　　　　　　　　　　　 ）　　Milwaukee, Wisconsin
　　　　vs.　　　　　　　　　　　　　　 ）
　　　　　　　　　　　　　　　　　　　 ）　　September 9, 2025
JOSEPH MENSAH,　　　　　　　　　　　 ）
　　　　　　　　　　　　　　　　　　　 ）
　　　　　　　　　　　Defendant.　　　　）
----------------------------------------------------------------

**EXCERPT TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE, and a jury.


APPEARANCES:
　For the Plaintiff
　ESTATE OF ALVIN COLE:　　　　　Cade Law Group LLC
　　　　　　　　　　　　　　　　　By: Nathaniel Cade, Jr & Annalisa
　　　　　　　　　　　　　　　　　Pusick
　　　　　　　　　　　　　　　　　PO Box 170887
　　　　　　　　　　　　　　　　　Milwaukee, WI 53217
　　　　　　　　　　　　　　　　　Ph: 414-255-3802
　　　　　　　　　　　　　　　　　nate@cade-law.com

　　　　　　　　　　　　　　　　　Motley Legal Services
　　　　　　　　　　　　　　　　　By: Kimberly Chongyon Motley
　　　　　　　　　　　　　　　　　PO Box 1433 US 28106
　　　　　　　　　　　　　　　　　Matthews, NC 28106
　　　　　　　　　　　　　　　　　Ph: 704-765-4887
　　　　　　　　　　　　　　　　　kcmotley@gmail.com
　For the Defendant
　JOSEPH MENSAH:　　　　　　　　Wirth & Baynard
　　　　　　　　　　　　　　　　　By: Joseph M Wirth & Jasmyne M
　　　　　　　　　　　　　　　　　Baynard
　　　　　　　　　　　　　　　　　9898 W Bluemound Rd - Ste 2
　　　　　　　　　　　　　　　　　Wauwatosa, WI 53226
　　　　　　　　　　　　　　　　　Ph: 414-291-7979
　　　　　　　　　　　　　　　　　Jmw@wbattys.com


　U.S. Official Reporter:　　　SUSAN ARMBRUSTER, RPR, RMR, FCRR
　Transcript Orders:　　　　　　Susan_Armbruster@wied.uscourts.gov
Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription

```
 1                  T-R-A-N-S-C-R-I-P-T   I-N-D-E-X

 2                                                    Page
                           WITNESSES
 3     ALL WITNESSES:

 4     For the Plaintiffs:

 5        Dr. Wieslawa Tlomak

 6        Direct Examination by Mr. Cade:             3
          Cross Examination by Mr. Wirth:            34
 7        Redirect Examination by Mr. Cade:          39
          Redirect Examination by Mr. Wirth:         41
 8        Re-redirect Examination by Mr. Cade:       41

 9        Joseph Mensah

10        Direct Examination by Mr. Cade:            42
          Cross Examination by Mr. Baynard:          87
11        Redirect Examination by Mr. Cade:         100

12        Mr. Burems

13        Direct Examination by Mr. Cade:           107
          Cross Examination by Mr. Wirth:           122
14        Redirect Examination by Mr. Cade:         130
          Recross Examination by Mr. Wirth:         135
15        Re-redirect Examination by Mr. Cade:      137

16

17

18

19

20

21

22

23

24

25
```

1

P R O C E E D I N G S

2

3     (Excerpt transcript.)

4          THE COURT:  Good morning.  Thanks for being on time.

5     We weren't.  Stuff always happens in trials, and so we'll try to

6     --  We'll try to be prompt.  Once and a while things happen, so

7     thanks again.  We appreciate it, and I guess we're ready for the

8     next witness.

9          MR. CADE:  Good morning, Your Honor.  The plaintiff

10    calls Dr. Wieslawa Tlomak to the stand.

11         Dr. Tlomak, being first duly sworn to tell the truth,

12    the whole truth, and nothing but the truth, testified as

13    follows:

14         MS. TLOMAK:  Yes, I do.

15         THE COURT:  And state your name for the record.  Spell

16    your last name and talk close to the mic.

17         THE WITNESS:  Dr. Wieslawa Tlomak.  First name

18    W-I-E-S-L-A-W-A, last name T-L-O-M-A-K.

19    **DIRECT EXAMINATION BY MR. CADE:**

20    Q.  Dr. Tlomak, how are you currently employed?

21    A.  I'm the chief medical examiner at the Milwaukee County

22    Medical Examiner's Office.

23    Q.  And how many medical examiners are employed in that office?

24    A.  Seven.

25    Q.  Including yourself?

1    A.  Yes.

2    Q.  So you are in charge of six other medical examiners plus

3    staff?

4    A.  Yes.

5    Q.  If you don't mind, doctor, if you would share with the jury

6    a little bit about your educational background.  Where did you

7    do your undergraduate work, your medical school?

8    A.  I went to a medical school in Poland.  There's no

9    undergraduate degree in Poland.  So after graduating from high

10   school, I went to medical school of W-R-O-C-L-A-W.  After

11   graduation, I completed my doctorate transitional year and then

12   residency in pediatrics.  I was board certified in pediatrics in

13   Poland.

14        Then, I moved to the United States.  I certified my

15   diploma.  I completed residency in pathology at the University

16   of New Mexico in Albuquerque, New Mexico.

17        After my residency, I completed one year of forensic

18   pathology, fellowship at the Office of Medical Investigator in

19   Albuquerque, New Mexico.

20        I'm a board certified in anatomic and forensic

21   pathology and I'm licensed to practice medicine in Wisconsin.

22   Q.  And doctor, how long have you been employed with the medical

23   examiner's office?

24   A.  I have been employed with Milwaukee County Medical

25   Examiner's Office 19 years.

1   Q.  Nineteen years?

2   A.  Yes.

3   Q.  And in those 19 years, how long have you been the chief

4   medical officer?

5   A.  I was appointed the interim chef medical examiner in

6   September 2022 and subsequently the chef medical examiner in

7   March 2023.

8   Q.  Just so we're clear, what are the specific duties of the

9   medical examiner's office?

10  A.  A medical examiner's office investigates sudden and

11  unexplained and violent deaths.

12  Q.  Does it only investigate sudden and violent deaths for

13  Milwaukee County residents or do you do for other counties in

14  Wisconsin?

15  A.  Milwaukee County Medical Examiner's Office has jurisdiction

16  in Milwaukee County.  What it means is that when there is sudden

17  unexplained or violent death in Milwaukee County, our office

18  will conduct independent investigation.  The doctors will

19  determine the cause and manner of death and sign the death

20  certificate.

21          The office also conducts autopsies for a few counties

22  in Wisconsin.  We conduct autopsies for Kenosha, Racine,

23  Jefferson, Outagamie and Ozaukee.  In those cases, the doctors

24  conduct autopsies and determine the manner of --  the cause of

25  death whereas medical examiners or coroners in those counties

1    determine the manner of death.

2    Q.  Okay.  Just so I'm clear, you have jurisdiction over all of

3    the sudden unexplained or violent deaths in Milwaukee County to

4    not only investigate the manner of death but to conduct the

5    autopsy?

6    A.  Yes.

7    Q.  And then with regards to the other counties that you

8    mentioned, Jefferson, Racine, Kenosha, Outagamie and Ozaukee, I

9    think I got all of them?

10   A.  Yes.

11   Q.  Your job is solely conducting the autopsy side of things,

12   and those offices have either medical examiners or coroners who

13   conduct and determine the manner of death?

14   A.  Yes, that's correct.

15   Q.  And is it fair to say that in Wisconsin, you do not need to

16   have a medical degree to be a coroner?

17   A.  Yes.

18   Q.  But in order to be a medical director, to have that title,

19   you need to have a degree?

20   A.  To be a medical examiner in medical examiner's system like

21   Milwaukee, you need to have a medical degree.  However, there

22   are several counties in Wisconsin, but they call it medical

23   examiner's system.  But it is very similar to coroner assistant

24   with one exception that corner is elected, and the medical

25   examiner is appointed.

1        So Racine, Kenosha, Jefferson and Ozaukee, they have

2   this type of medical examiner system.  They have a person who

3   serves as the medical examiner, and this person doesn't have

4   medical degree.  But because the person was appointed, it's

5   called medical examiner.

6   Q.  Correct.  Thank you.  So doctor, what I'd like to do --  I'm

7   sorry, I apologize.  In your 19 years --  I should back up.

8   When you first came to Milwaukee County since you've worked in

9   the medical examiner's office for 19 years now, is that the

10  first time that you started doing medical examinations,

11  autopsies and things like that, or did you start prior to

12  working for Milwaukee County?

13  A.  So I had some autopsy experience in my medical school.  We

14  had subject forensic medicine.  I also was able to conduct

15  autopsies during my third year of medical year, and this was

16  pathology rotation.

17       When I --  During my residency in Albuquerque, New

18  Mexico, I had two autopsy rotations.  Each autopsy lasted three

19  months, and the first one was called hospital autopsy.  I was

20  working in the office of medical investigator.  And at that

21  time, I was conducting natural cases.  And then the second

22  rotation was called forensic autopsy rotation during which I was

23  able to do autopsies --  forensic autopsies.  Then, during my

24  forensic pathology fellowship, I was conducting autopsies for a

25  year.

1  Q.  So doctor, at least working for Milwaukee County for

2  19 years, how many autopsies have you performed in that time

3  period?

4  A.  So I --  I performed -- I don't know the exact number, but

5  it's at that point over 5,000.

6  Q.  So what I'd like to do, doctor, first is with regards to --

7  You're familiar with the reason we're here, the death of Alvin

8  Cole?

9  A.  Yes.

10 Q.  And with regards to Mr. Cole's death, did you prepare a

11 report?

12 A.  Yes, I did.

13 Q.  I'd like to hand you Exhibit 34.  Let me know if this is the

14 report that you prepared.

15 A.  Exhibit 34 consists of a diagram showing entrance and exit

16 gunshot wounds, final cause of death, autopsy protocol on Alvin

17 Cole and toxicology report.

18 Q.  But it is your report doctor, correct?

19 A.  Yes, it is.

20          MR. CADE:  Judge, I'd like to move in Exhibit 34.

21          THE COURT:  Without objection so ordered.

22 Q.  So doctor, what I'm going to do for the jury is I will put

23 up Exhibit 34, and I'd like to go over the entrance wounds and

24 exit wounds if you don't mind.

25          Doctor, at least with regard to the diagram so we can

8

1  orient ourselves, we have this diagram -- There's a penis that

2  would signify that's a male, correct?

3  A.  Yes.

4  Q.  And on the diagram, you would indicate both left and right

5  orientation?

6  A.  Yes.

7  Q.  And what does that signify?

8  A.  I include letters --  letter R for right and L for left on

9  the diagram to show that this is the right side of the deceased

10 and the left side of the deceased.

11 Q.  So if you are looking at --  I have a manikin here.  If one

12 is looking at the manikin, the diagram would indicate looking at

13 that body here is where there is either an entrance or exit

14 wound or other things that should note of importance.

15 A.  Yes.  So when you look at this manikin, I am assuming it is

16 supposed to represent the body of the decedent.  And the left

17 side of this manikin is the left side of the diagram, and the

18 right side of the manikin is the right side.

19 Q.  Okay.  And doctor, we also have on the diagram, that's the

20 first page of Exhibit 34, we have some numbering, Roman letters.

21 So you've got Roman I, II and on the other side III listed

22 twice.  Roman IV and V for Roman V.  Do you see that?

23 A.  Yes.

24 Q.  What does that signify?

25 A.  I completed this autopsy on February 3, 2020.  In January

9

1  this year, I was asked by attorneys representing the defendant

2  to -- to complete this diagram. And what I did, I included the

3  Roman numbers, and those Roman numbers correspond to wounds in

4  the final diagnosis in the autopsy report. Those numbers do not

5  indicate sequence or severity of the wounds.

6  Q. Is it fair to say, doctor -- if I'm wrong, let me know --

7  that the Roman I, II, III, IV, V, you are not in that diagram

8  indicating which wound happened first. It's more of you started

9  on the front side, and you worked your way up from the bottom,

10  turned the body over and worked your way down?

11  A. Yes. This was -- This was arbitrary. The Wound Number I

12  was the most severe wound that caused fatal injuries. And when

13  I described Wound Number II, which was of the anterior chest,

14  front of the chest, wounds III and IV were on the back. And

15  then wound V was on the left forearm.

16  Q. Okay. What I'd like to do, doctor, with your permission is

17  I'd like to go over each of those wounds. But just so I'm

18  clear, doctor, and so there's no confusion for the jury, unlike

19  TV and you watch CSI or any of those shows, you can't -- When

20  you have the body within a few hours of death, you can't say the

21  wound, the Roman I was the first shot. You can't determine the

22  manner of shots, fair?

23  A. That's correct. I cannot determine which one was -- which

24  wound was first and the sequence of the wounds.

25  Q. Sure. It's also fair, doctor, all you can determine in

1  looking at the body is, is there a wound entry point.  Perhaps,

2  there is an exit point, and you can determine if there's any

3  bullet fragments and the angle and trajectory, fair?

4  A.  Yes.

5  Q.  So if we go to Number I.  Actually scroll to the bottom of

6  that exhibit, Kim.  We also have at the bottom of that diagram

7  on January 10th of this year, you've got Roman I, II, III and

8  IV, and you've identified some things.  After Roman I, what does

9  that stand for?

10  A.  So there were three wounds that were penetrating wounds.

11  And what it means is that there were entrance gunshot wounds,

12  and I recovered projectiles.

13        There was one wound that it was perforating wound.

14  There was entrance wound and exit wound, and I did not recover

15  projectile.

16        And the last wound, Wound Number V, it was tangential

17  wound, so it was very superficial wound, and I did not recover a

18  projectile.

19  Q.  So next to Roman I at the bottom of the first page, you have

20  listed as 138.  Is that a GN projectile?

21  A.  Yes.  GN stands for grain, and grain is a weight unit.

22  Q.  Right.  So a grain is, like, a measure of weight for bullets

23  like it would be for wheat or something else?

24  A.  For bullets.  I am not sure about wheat.

25  Q.  So you have a way of weighing it so it's not a question of

1  whether it weighs three grams or eight grams.  You're basing it

2  on the size of the projectile in this case, 138-grain?

3  A.  Yes.

4  Q.  Okay.  The second one you have is 50-grain projectile

5  jacket.  Can you explain that for the jury.

6  A.  So the projectile --  Some projectiles at least consist of

7  lead core that is surrounded by a jacket.  And in Wound Number

8  II, I recovered fragment of jacket which weighed 50 grains.

9  Q.  If I understand correctly, doctor, you have the lead inside

10  the bullet.  You said around that is a jacket, a protective

11  coat?

12  A.  Yes.

13  Q.  Obviously, we have the bullet in a shell when it's fired, so

14  it's both the jacket and then the lead shell?

15  A.  Yes.  The bullet contains also casing.  But when the bullet

16  --  When the bullet is fired only and I recover it from the

17  body, it contains the core and the jacket.

18  Q.  In this case it was just the jacket?

19  A.  In this case it was just the jacket, a fragment of a jacket.

20  Q.  Does that signify anything to you if it is just the jacket?

21  A.  So it means that something happened to this bullet, and it

22  was fragmented and only the jacket entered the body.

23  Q.  So the core of the bullet never entered the body because

24  fair to say, you didn't recover any more of the bullet and you

25  had no corresponding exit wound?

1    A.   That's correct.

2    Q.   And I will imagine, doctor, you've also and I know it is

3    graphic, and I apologize.  But you are literally cutting the

4    body open and checking for bullet fragments, correct?

5    A.   That's correct.  I start the autopsy with X-rays, and I can

6    see bullets on X-rays.  And then as you said, I open the body,

7    and I have to recover the bullets.

8    Q.   So even before you open the body, you've actually done

9    X-rays to locate so it's not a question of you just cutting, oh,

10   I found a fragment.  You already know where to cut and search

11   because you've done the X-ray of the body?

12   A.   That's correct.  We do what is called anterior, posterior

13   X-rays of front to back and then the lateral, so I can -- Based

14   on the X-rays, I know where the bullet is located.

15   Q.   So I understand, doctor, I apologize.  I know you have an

16   accent.  Both for the reporter, you have the anterior and

17   exterior and you have the sides that are performed, the lateral?

18   A.   Yes.

19   Q.   We have a third wound that if I'm reading your handwriting,

20   entrance L or exit R.  Scroll down, please.  What does that

21   signify?

22   A.   So the wound that I numbered Number III was penetrating

23   wound.  And because I used the numbers in final diagnosis, you

24   see two number III's.  And on the left side is an entrance.  On

25   the right side, there is an exit.

1  Q.  Is that the only entrance wound that had an exit wound, the

2  one you've identified as Roman III?

3  A.  Yes.

4  Q.  And finally, we have Roman IV.  Both -- Hold on one second.

5  Both III and IV are in the back, correct?

6  A.  Yes.

7  Q.  Roman IV, can you scroll down, and that indicates that you

8  recovered 146-GN or grain projectile?

9  A.  That's correct.

10  Q.  Scroll back to the diagram for a second.  Doctor, we also

11  have Roman V.  You said that was a superficial wound?

12  A.  This was tangential wound.  What it means is that the

13  projectile was shallow and close to the surface of the body.  It

14  entered the left forearm, caused fracture of the left ulna.

15  However, the projectile wasn't recovered at autopsy.

16  Q.  Okay.  And, doctor, just so we can -- I have the left arm

17  from the manikin.  If you would show and demonstrate to the

18  jury.  I'll show a photograph in a moment.  But you said the

19  left ulna.  For those of us who didn't take anatomy in college

20  or failed to study biology well.

21  A.  So in the upper extremity the arm, there are three major

22  long bones.  So there's humerus in the upper arm.  And in the

23  forearm, there are two bones, ulna and radius.  Ulna is on the

24  side of this fifth finger.  The radius is on the side of the

25  first finger.

1    Q.  And if I understood you correctly, doctor, as the bullet
2    however it was fired, it is essentially piercing bone, but it
3    did not leave any projectile.  So I don't want to put words in
4    your mouth, a grazing wound?
5    A.  Graze wound is very superficial wound.  It causes abrasion.
6    The bullet is also fired at an angle, but it will --  It will
7    just graze the skin and cause abrasion on the skin.
8            With tangential wound, the bullet is also fired at a
9    shallow angle.  However, it will enter the body like in this
10   case.  So with this wound, the bullet went through the skin,
11   through adipose tissue in the skin, the muscle of the forearm,
12   and then I would say struck left ulna and caused it to fracture.
13   The wound was very superficial, and it's not uncommon that
14   because this projectile stopped at the bone, later when the body
15   was moved, the projectile fell, and that's why I haven't seen it
16   at autopsy.
17   Q.  Doctor, also with regards to the diagram for Wound Number V,
18   you have some -- it appears to be dots.  I'm assuming you put
19   those there?
20   A.  Yes, I did.
21   Q.  What does that signify, doctor?
22   A.  On the --  There's the surface of the left hand, there was
23   stippling.  Stippling is described is gun powder particles
24   striking the skin and causing small abrasions.  And in some
25   cases, those gun powder particles are embedded in the skin

1    almost like with tattooing.

2            He had a small area of stippling on the dorsal surface

3    of the left hand, which was below the Wound Number V.

4    Q.  Doctor, with regards to any of the other four wounds, did

5    you see any stippling?

6    A.  No, I did not.

7    Q.  Can stippling take place in your 19 years of experience from

8    a gun fired from ten, 15, 20 feet away, or is it a

9    close-proximity wound?

10   A.  It's called intermediate-range wound.  Based on forensic

11   literature when the muzzle of the gun is very close to the body

12   surface, soot, which is black pigment, will be deposited around

13   the entrance wound.  When the muzzle is further from the surface

14   of the wound, we will see gun powder particles on the --  on the

15   skin, and some of them can be on the surface.  Some can be

16   embedded in the skin.  And we can also see abrasions which are

17   caused by this gun powder particles striking the skin and

18   scraping it.

19   Q.  And doctor, I know terms are scientific.  And so I want to

20   make sure I respect that.  You used the term intermediate wound.

21   I hear intermediate, and it tells me it is kind of in the

22   middle.  It is not small or close, and it is not far.  For your

23   purposes as a medical examiner, what does intermediate mean?

24   A.  So based on appearance of the entrance gunshot wound, we can

25   tell if this was close or intermediate range or indeterminate

1   rage.  When soot is present around the entrance of the gunshot

2   wound, it is a contact or close range.  Soot can be seen.

3   Everything depends on the gun.

4          Each gun has to be tested separately.  But in general,

5   soot can be seen if the muzzle is up to 12 inches from the

6   surface of the skin.  Stippling can be seen if the muzzle is 18

7   to 24 inches from the surface of the skin.  If we don't see soot

8   or stippling, we cannot determine the range of fire and it's

9   called indeterminate range.

10  Q.  But in this case, you did see stippling so that would mean

11  less than 24 inches or less?

12  A.  Yes.  Stippling can be seen when the muzzle is one

13  centimeter away from the surface of the skin, in most firearms

14  up to 18 to 24 inches.

15  Q.  One other thing, doctor, before we move on, I apologize.

16  With regards to stippling if I am understanding you correctly,

17  stippling would be it's not the bullet that's causing the

18  stippling, it is the firing from the gun with the gun powder

19  that causes the stippling like almost like a tattoo if you will?

20  A.  So I'm not firearm expert.  But when the bullet is fired

21  from the firearm, the bullet will exit and exit the muzzle and

22  will be followed by the dark pigment which is soot and gun

23  powder.  And some gun powder particles will be burned, some will

24  be unburned.

25  Q.  And a stippling is essentially almost is it, like, a tattoo

1  almost.  It leaves markings?

2  A.  If --  If gun powder particles are embedded in the skin, it

3  almost -- You can probably use that analogy of tattoo.

4  Q.  In your 5,000 approximate autopsies, doctor, 19 years, have

5  you ever seen stippling from a gunshot wound that first hits an

6  inanimate object, like, a brick wall or concrete, will you see

7  stippling on the ground if the bullet hits the ground and skips

8  up or stippling you have to be in close proximity to the gun?

9  A.  Based on autopsy, I cannot tell where was the person who was

10 shot and where was the person who was firing the gun.  The only

11 thing you know in my opinion if the gun -- the muzzle of the gun

12 is toward some kind of a surface.  I am assuming you're talking

13 about a ricochet bullet so it could be possible when you think

14 everything depends on the distance because the bullet exits the

15 muzzle.  It is followed by a cloud of this black soot, and then

16 it's followed by this gun powder particles.

17        The gun powder particles are not exiting the bullet in

18 a straight line.  It's almost like a fan around the bullet.  So

19 it could be possible if it's close enough.

20 Q.  Close enough meaning 24 inches, two feet?

21 A.  Yes.

22 Q.  If it's five feet, ten feet?

23 A.  You will not see stippling.

24 Q.  Doctor, what I'd like to do is we're going to go over your

25 report, and I'm going to talk about -- Just so we can show with

1    the manikin.  If you don't mind if you turn to the --  It is the

2    third page where it says autopsy protocol.  There you go.  You

3    have autopsy protocol doctor, and you've identified the gun

4    wounds.  First one gunshot wound of the left lateral lower

5    chest, indeterminate range of fire without exit.

6         Doctor, if you wouldn't mind stepping down.  Do you

7    want a drink of water before you come down?  I will bring the

8    manikin closer to the jury.  Do you need your report, doctor?

9    A.  Yes, I do.  Thank you.

10   Q.  Doctor, if you would, show the jury -- Let's describe exit

11   Wound Number I.  I'm sorry, gunshot Wound Number I.

12   A.  So I need to make a comment.

13   Q.  Please.

14   A.  This is a manikin.  Alvin Cole --  Alvin Cole weighed

15   147 pounds and was 70 inches in length.  As you can see, I am

16   taller than this manikin, and I am 5.4, so I am 64 inches.  So

17   all these marks here are not up to scale.  They are just

18   approximately the position where I saw it on the body.

19   Q.  Doctor, 70 inches would be five feet, ten inches?

20   A.  Yes.

21   Q.  Please don't hate us who are small.  If you will, if you

22   start with the first gunshot wound.

23   A.  So the first gunshot wound I described as gunshot wound of

24   the left lateral lower chest.  And I usually use the position

25   of -- anatomical position of the entrance gunshot wound to

1  describe the wound.

2          So the entrance gunshot wound was on the left lateral

3  chest, which means -- which means that it's on the left side of

4  the chest.  I also describe it, but it is in the left middle

5  axillary line.  Axilla is an armpit, so it is an area between

6  the chest and upper arm, and we use anatomic description

7  axillary lines.  There is anterior axillary line, which is in

8  the front of the axilla going down.  There is posterior axillary

9  line, which is a line that goes to the back of the axilla down,

10 and the line between them in the middle is middle axillary line.

11          So the entrance gunshot wound on the left lateral

12 lower chest was in the middle axillary line.

13 Q.  And again, doctor, before we continue, you just started with

14 this and called it I because this was based on your autopsy.

15 This was the fatal shot that killed Mr. Cole?

16 A.  Yes.  As I said, those numbers are arbitrary.

17 Q.  So doctor, let's describe the wound.  We've already talked

18 about where it entered.  Describe what it did when it entered

19 the body.

20 A.  So the projectile perforated.  It means went through the

21 chest wall left eighth rib and entered abdomen and went through

22 the left lobe of the liver.  Then, it went through the

23 diaphragm, which is a muscle separating abdomen and chest.

24 Pericardial sack, heart.  Pericardial sack, left lung, and it

25 penetrated the left anterior second rib.

1   Q.  Doctor, you also described the angle of the wound, correct?

2   A.  Do you mean trajectory?

3   Q.  Trajectory, yes.  My words are not as precise as yours is.

4   A.  Yes, I did.  I described trajectory as from left to right,

5   back to front and upward.

6   Q.  So doctor if --  Would you like -- I can hold your

7   microphone.  If you would just on this drawing of your diagram,

8   just draw starting with entrance Wound I the trajectory that you

9   would have seen it both on X-ray and autopsy.

10  A.  Again, this is not up to scale.

11  Q.  Correct.  Again, it was 138-grain projectile that was

12  recovered?

13  A.  Yes, 138-grain.

14  Q.  There was no exit wound?

15  A.  There was no exit gunshot wound.

16  Q.  Let's describe the second wound using the manikin first.

17  A.  So the second wound was gunshot wound of the left

18  anterolateral upper chest.  The entrance gunshot wound was on

19  the left side of the upper chest.  Lateral means that it's

20  closer to the side, and this wound was in front of the

21  anterolateral axillary line.

22  Q.  Okay.  Tell me about this wound, doctor.  You said it

23  perforated the skin?

24  A.  Yes.  So this wound perforated the skin, adipose tissue, and

25  penetrated muscles under the chest wall.

1   Q.  Is it correct, doctor, that this wound of the chest was

2   simply as you describe it, a jacket?

3   A.  So I recovered a 50-grain projectile jacket.

4   Q.  Doctor, is it possible in your autopsy that that particular

5   wound, Number II, was actually a full bullet that entered the

6   body and somehow existed or you missed it?

7   A.  No, because I would see it on the X-rays.  So there was only

8   a projectile jacket.

9   Q.  And does the wound when it is --  You described it as a

10  perforation of skin?

11  A.  Yes.

12  Q.  Does that wound look different than a bullet wound that has

13  had 146 or 138-grain penetrate?

14  A.  So the entrance gunshot wound had what we call a typical

15  marginal abrasion.  When the bullet enters the body, it spins,

16  and it creates a punched-out defect.  When it enters the skin,

17  it will abrade the skin around this defect.  And this abraded

18  skin is called a marginal abrasion.

19          Marginal abrasion will be nice round ring when the

20  bullet is perpendicular to the skin and spins around.  However,

21  if the bullet starts tumbling or the bullet -- the jacket

22  separates from the core when it enters the body, the marginal

23  abrasion will be irregular.

24          As you can imagine if you --  If you have -- If you

25  have a bullet spinning and going straight, it will cause this

1  nice round ring-shape abrasion.  When the bullet fragmented and

2  it doesn't go straight anymore, it tumbles when it enters the

3  body, the abrasion will be irregular.

4  Q.  Doctor, if you would again -- On our drawing, let me bring

5  it a little bit closer.  If you would on this, I will put it on

6  the other side of the manikin.  If you would, doctor, draw the

7  angle of the trajectory for Wound Number II for the jury.

8  A.  And again, I have to remind this is not up to scale.  So the

9  trajectory was left to right with no front/back or

10 upward/downward deviation.

11 Q.  So it was a very small movement of that fragment?

12 A.  Yes.  Yes, this bullet was recovered close to the second rib

13 and the jacket.  So fragment of a bullet was recovered from the

14 muscles.

15 Q.  Is it fair, doctor, I hope I understand.  You have a very

16 small drawing.  With regards to the wound going left to right,

17 how far did this jacket penetrate into the body?  Are we talking

18 five inches, five centimeters?  What would be the distance if

19 you can recall?

20 A.  I cannot recall.  Actually would be helpful, but I don't

21 have them with me.

22 Q.  Fair enough.  Doctor, let's talk Wound Number III.  Would

23 you describe for the jury the third wound.

24 A.  So we are looking at the back of the body, and this would be

25 the right side.  This would be the left side because we are

1  still looking at the decedent's right and left side.

2       The entrance gunshot wound was on the left lateral

3  upper back.  And what it means that it is upper back close to

4  the shoulder, left side.  And lateral, it means that it is

5  closer to the arm.

6       So this was the entrance gunshot wound, and this

7  projectile went through the skin, subcutaneous tissue, and

8  muscles of the back, and it existed on the right side of the

9  back.  And this time it was lower back, and it was close --  I'm

10  sorry, I'm sorry.  This is the exit.  This is the exit.  I

11  apologize.

12       So the exit gunshot wound was on the right side of the

13  back, and it was close to this posterior axillary line.  And the

14  trajectory was left to right and downward with no significant

15  front/back deviation.

16  Q.  Doctor, if I put a III here, would that be okay?

17  A.  Yes, please.

18  Q.  And IV for the other one.  If you would on the diagram show

19  the jury the trajectory of the bullet as it entered the body.

20  So we have left to right with a downward angle, correct?

21  A.  That's correct.

22  Q.  Just so I'm clear, if the body is -- whether it is on the

23  ground or somewhere else, it's entering from the side and coming

24  out entering on the left side coming out on the right side?

25  A.  That's correct.

1   Q.  And doctor, if you would describe Wound Number IV, please.

2   One second, I apologize.  Wound Number III, it's fair to say, it

3   never entered the chest cavity or, you know, touched any organs

4   or anything.  It essentially almost skimmed across the body?

5   A.  Yes.  So as I said, it went through the skin and

6   subcutaneous tissue, which is under the skin and the muscles on

7   the right side of the chest.  It caused fracture of one of the

8   ribs, but it did not enter the chest cavity and didn't cause any

9   injuries to internal organs.

10  Q.  So it is a shallow wound?

11  A.  Yes, we call it superficial.

12  Q.  Superficial.  Fair enough, doctor.  Finally, Wound Number

13  IV.  If you would describe it, please.

14  A.  So Wound Number IV, this is the wound with the entrance on

15  the right side of the back, and the projectile went through the

16  skin, subcutaneous tissue, muscles of the back and right

17  scapula.  I recovered 146-grain projectile, which was located

18  between the scapula and the ribs in the back, and I also

19  recovered 1-grain projectile fragment from the muscles.

20  Q.  So all in all, is it fair to say, doctor, that Wound Number

21  IV, there's 146-grain and less than 1-grain, so it is,

22  approximately, 147-grain from a bullet that you recovered?

23  A.  So it's, like, 146 plus less than 1-grain, so probably less

24  than 147.

25  Q.  Fair enough, doctor.  And you are sure that those, the 146

1  and the less than 1-grain, those are from the same bullet

2  projectile, correct?

3  A.  Yes.  So first of all, the little fragment was recovered

4  from the muscles close to the entrance gunshot wound.  And

5  second is when you -- when I photographed and I look at the

6  projectile I recovered and the fragment, the projectile was

7  missing this one fragment.

8  Q.  And this, obviously, since you recovered the fragment, the

9  gun did not exit the body?  I'm sorry, the bullet did not exit

10  the body?

11  A.  That's correct.  There was no exit gunshot wound.

12  Q.  And if you would describe the trajectory of that fourth shot

13  for the jury using the easel and your diagram, if you would show

14  the trajectory.

15  A.  So the trajectory was from the left to right, back to front

16  and upward.  Again, this is not up to scale.  The wound was

17  probably closer here, but it still went left to right, back to

18  front and upward.

19  Q.  When you say the wound was not exactly on the diagram, would

20  it help to see a photograph?

21  A.  A photograph would show exactly where the wound was located.

22        MR. CADE:  37-13.  May I show the jury, Judge?

23        MR. WIRTH:  We're going to object.  There are others

24  that show it without that kind of graphic detail.

25        MR. CADE:  Judge, we're going to have an issue.  If we

26

1    can have a moment.  Just to the side, Judge.

2              (Sidebar discussion.)

3              (Back on the record.)

4    Q.  Doctor, it's fair to say while we deal with that, I want to

5    address Wound Number V, the hand.

6    A.  Okay.

7    Q.  If I have on my jacket whether I have on my jacket or a

8    sweatshirt or any form of clothing if the bullet is fired and it

9    would perforate clothing, correct?

10   A.  That's correct.

11   Q.  If it does not go into the arm, is it possible that in

12   perforating and essentially bouncing off it causes an entrance

13   in the clothing and exit in the clothing so you have two holes

14   in close proximity?

15   A.  It is possible.

16   Q.  And the other thing, doctor, while my colleague is still --

17   You had indicated that the ulna, which is obviously we have the

18   forearm.  So we have the two bones, the ulna you said there was

19   a fracture there?

20   A.  Yes, the ulna was fractured.

21   Q.  If your ulna is fractured in that method, can you weight

22   bear on it?  Could an individual put weight on that?

23   A.  I cannot answer this question.  It would be a question

24   probably for a surgeon, orthopedic surgeon.  I don't know.

25   Q.  Let me rephrase that.  How about this.  It is not a hairline

1  fracture that someone might get from running, correct?

2  A.  Yes.

3  Q.  It was a full -- What is the difference between a fracture

4  and a break?

5  A.  Fracture is medical term for broken bone.

6  Q.  So the bone was broken?

7  A.  Yes.

8  Q.  Doctor, behind you is a screen.  Doctor, scroll down.  Move

9  to the left or right.  I'm sorry, doctor.  Would it be fair to

10  say we're looking at the rear of Alvin Cole?

11  A.  Yes.  So on this photograph, Alvin Cole is lying face down

12  on the autopsy table, and this is his right side.  So the top of

13  the screen is his right side.  The bottom of the screen is the

14  left side, and Wound Number IV is located on the right side of

15  the back.

16  Q.  And doctor, this photograph, I am assuming are you taking

17  photographs or someone in your office is taking them?

18  A.  I take photographs.

19  Q.  So you're taking the photograph.  This is not how the body

20  was presented to you.  It has been cleaned, correct?

21  A.  That's correct.

22  Q.  And there's something called the drying room.  How do they

23  go about cleaning?  They wash the body?

24  A.  They wash the body and they dry the body with towels.

25  Q.  So this is not originally presented.  The body has now been

1    cleaned, so we don't see blood and all that, correct?

2    A.  So the body is admitted to the medical examiner's office.

3    The body is placed in a body bag.  And when I begin the autopsy,

4    I will take photographs of the body, how it was received in the

5    medical examiner's office.  And then the body will be washed and

6    dried, and then I do my external exam.

7    Q.  And you had talked earlier, doctor, about when a bullet

8    wound or bullet enters the body, you had mentioned Number II

9    with regards to it spinning and being somewhat irregular.  This

10    is what Number IV is, what a wound looks like when a bullet

11    pierces directly through, correct?

12    A.  So with this one, you can see this nice rim of pink marginal

13    abrasion.  And the marginal abrasion is wider.  I use the clock

14    face.  So it was widest at about the 8 o'clock position, and it

15    was tapering toward the 12 o'clock position.

16    Q.  I want to show an irregular wound.  This would be

17    Exhibit 35-3.  I am going to show you Exhibit 35-3, doctor.

18    A.  So this wound has this atypical marginal abrasion.  So when

19    the projectile goes straight and spins in a line, we would see

20    marginal abrasion what looks like in this area.  So if this is

21    top and this is bottom so between 12 and 3 o'clock position.

22         As you look at this wound, there is this nice marginal

23    abrasion in this area.  And then the area becomes wider and then

24    thinner again and then wider.  And then we have this almost like

25    --  almost like rectangular area of abrasion.

1           So this is something that we called irregular marginal
2    abrasion.  And in this case, it is consistent with recovering
3    the projectile fragment in the tissue.
4    Q.  Thank you.  Doctor, if you wouldn't mind having a seat
5    again.  Thank you.  I have a few more questions for you, doctor.
6    Doctor, you also mention in your report the size of the wounds,
7    that there were blunt force injuries to the face.  Can you
8    describe these, please.
9    A.  Yes.  On the left side of the face near the eye, he had two
10   small abrasions.  I need to refer to the report.  I don't
11   remember the size of those abrasions.  So there was one abrasion
12   that measured 1/8 by 1/8 inch.  The other measured 1/4 by 1/8
13   inch.
14   Q.  Repeat those again.  1/4 by --
15   A.  1/4 by 1/8 inch and 1/8 by 1/8.  So one was almost, like, a
16   punctate abrasion, and the other one was a linear, and the
17   linear measured 1/4 inch in length.
18   Q.  What do the abrasions signify to you with regards to the
19   autopsy?
20   A.  Abrasions are examples of a blunt-force injury.  They can be
21   caused by skin scraping or by being struck with an object or by
22   falling on some kind of a surface or corner.
23   Q.  So the abrasions would signify either falling I would
24   imagine not a soft surface.  It would have to be a somewhat hard
25   surface, fair?

1    A.   Yes.

2    Q.   Blunt force meaning hit with an object or a fist of some

3    source?

4    A.   Yes with an object.  With this type of abrasion, it could

5    be, like, a small object, and it also could be just scratched by

6    a fingernail.

7    Q.   Okay.  Doctor, finally I want to finish on normally in your

8    line of work, you're dealing with the bodies are coming to you

9    fairly recent in time to whatever the unexplained or traumatic

10   cause of death is.  You're seeing it within 24-48 hours.  Is

11   that fair?

12   A.   So the bodies are transported to the medical examiner's

13   office as soon as possible and usually within the first

14   24 hours.  Alvin Cole was pronounced dead on February 2nd at

15   6:30 p.m.  I did --  I started the autopsy on February 3rd at

16   8:30 a.m.

17   Q.   So we're talking, approximately, 14 hours from the time of

18   death to you beginning the autopsy?

19   A.   That's correct.

20   Q.   And so the reason I ask that question, doctor, is are you

21   dealing with bodies -- I'm not talking, you know, the ones that

22   you're finding weeks after or the stuff that's made of TV shows.

23   But after you've done your autopsy, are you coming back to the

24   body?  So once you've done your report and the body has been

25   released to the family or to the funeral home, are you coming

1    back to the body and doing additional work?

2    A.  No, I don't.  However, I had a few cases.  I had some cases

3    that I put the body on hold, and I wanted to examine the body,

4    like, 24 hours after autopsy.  And I actually had a case in my

5    fellowship that I went to the funeral home to take another look

6    at the body.

7    Q.  Okay.  In this case, you did not, correct?

8    A.  No, I did not.

9    Q.  And doctor, is there something with regards to pigmentation

10   where, you know, obviously we have different people, different

11   amounts of melanin, skin color.  Is it fair to say that someone

12   who is darker skinned if they have a bruise or something else,

13   it may not show until several days later whereas someone who is

14   fair skinned, a bruise may show or appear sooner?

15   A.  I would disagree with it.  So first of all, in this case, I

16   did it.  When I am concerned about bruises in people who have

17   darker skin, it's true those bruises may not be easily visible

18   on the skin.  But what I do, I reflect the skin.  And I do it

19   with a front of the body with a chest and abdomen.

20          When I open the body because I use a Y-shape incision

21   and in some cases when indicated, I will do what is called a

22   posterior dissection.  So what I do is I make incisions on the

23   back, and I reflect the skin on the back.  I reflect the skin on

24   the buttocks and on extremities as well.

25          In regards to head when we have to remove the brain,

32

1   we will reflect the skin on the head, so there will be incision

2   that's made on the top of the head, and this incision extends

3   from one ear to the other one.  And then the skin is reflected

4   forward and backward.

5           With contusions, you cannot have contusion happening

6   after death.  It has to happen before the person died.  And even

7   if not visible on the skin surface, I will see -- bleeding

8   internal contusion is bleeding.  The blood vessels get ruptured,

9   and the blood will be within the tissue.  Even if I don't see it

10  on the surface of the skin, I will see it when I reflect the

11  skin.

12  Q.  One second, doctor.

13  A.  In the autopsy report if you go to page 8 under description

14  of head, you can see that reflection of the skull produced no

15  abnormalities.  So it means that I did not see any evidence of

16  injury.

17  Q.  When you say scalp though, that is scalp of the head,

18  correct?

19  A.  So it's head.  So scalp of the head as well as forehead.

20  Q.  What about to the cheeks or underneath the eyes, the orbital

21  of the eyes, anything like that?

22  A.  So on the cheeks, I don't reflect the skin on the cheeks.

23  With the eyes if there is bleeding around the eyes, I will see

24  it when I remove the brain.

25  Q.  So where the I think you called them contusion, one is 1/4.

1    A.  Those were abrasions.  So abrasion is a skin scrape and a

2    contusion is a bruise.

3    Q.  Sure.  Fair enough, doctor.  I appreciate that.  So where

4    the abrasions were, those were on the face?

5    A.  They were on the left side of the face, and they were

6    laterally to the left eyebrow.  When you look on the face and I

7    am pointing to my head and there is eyebrow above the eye.  And

8    next to the eyebrow there were those two abrasions.

9         So when we prepared the head to remove the brain, the

10    skin was reflected, and I was able to see this area if there is

11    anything under it, and I did not see.  So those were superficial

12    abrasions.

13         THE COURT:  Anymore questions, Mr. Cade?

14         MR. CADE:  No, Judge.

15         THE COURT:  Any cross?

16         MR. WIRTH:  I do have some questions, Judge, not much.

17         THE COURT:  All right.

18    **CROSS EXAMINATION BY MR. WIRTH:**

19    Q.  Dr. Tlomak, I want to be brief here.  You indicated Mr. Cole

20    suffered a tangential wound to his left forearm, correct?

21    A.  Yes.

22    Q.  The remaining gunshot wounds about which you testified today

23    note an entry point and in one case an exit point, correct?

24    A.  Yes.

25    Q.  And I believe that you indicated that the wound on the left

1  forearm has no entry and exit point because it's maybe not quite

2  a glancing blow but almost a shot that bounced off the bone,

3  correct?

4  A.   It is very possible because this was --  The wound wasn't

5  very deep.  The projectile went through the skin, the

6  subcutaneous tissue, muscles and then caused a fracture of the

7  bone, and the projectile wasn't recovered.  So in this case, I

8  think what happened, the projectile simply fell out.

9  Q.   You've also described stippling on the dorsal side of Alvin

10  Cole's left hand?

11  A.   That's correct.

12  Q.   And in layman's terms, dorsal means the top?

13  A.   Yes, the top.  So the palm is the bottom and dorsal is the

14  top of the hand.

15  Q.   So what we've got upon your examination is stippling on the

16  top of the hand, correct?

17  A.   Yes.

18  Q.   But then a wound on the kind of front, ulnar side of the

19  forearm, correct?

20  A.   So the wound was I described it on the posteromedial

21  forearm, so it's not completely side of the forearm.  I

22  described this position -- this side when the body is laying

23  face up on the autopsy table with palms up.  So it was on the

24  back of the forearm but close to the side.  That's why I call it

25  back to the forearm and close to the medial side.  That's why I

1  called it posteromedial.

2  Q.  Before I publish anything to the jury, I want to show you

3  what's been marked.  I've shrunk it down.

4  A.  Yes.

5  Q.  Does that represent the wound on the forearm?

6  A.  Yes, it is.

7           MR. CADE:  What is the exhibit number?

8           MR. WIRTH:  Exhibit 1040.  Judge, we move 1040 into

9  evidence.

10          MR. CADE:  No objection.

11          THE COURT:  So ordered.

12  Q.  This is Exhibit 1040 that we talked about?

13  A.  Yes.

14  Q.  And this is the wound on the front upper side of the

15  forearm?

16  A.  Yes.  So this is, yes.

17  Q.  I believe you testified that the stippling on the top of the

18  hand suggests that the gun was fired in what you've described as

19  an intermediate distance from the top of Alvin Cole's hand?

20  A.  Yes.

21  Q.  Do you consider stippling to be a wound?

22  A.  No, it's an injury.

23  Q.  Earlier you testified that soot will enter a wound if the

24  barrel is close enough to the wound.  In that context, were you

25  speaking about the wound on the forearm?

1   A.  I didn't see soot around the entrance wound.

2   Q.  Doctor, can you rule out whether the stippling wound or the

3   stippling injury is from a different gunshot than the gunshot

4   that caused the wound on the forearm?

5   A.  It's possible.

6   Q.  Can you rule out that the wound on Alvin Cole's forearm was

7   caused by one of the shots fired by Joseph Mensah?

8   A.  No, I cannot.

9   Q.  You cannot rule that out?

10  A.  No.

11  Q.  Can you determine the manner in which the fragmented bullet

12  jacket in the front chest wound fragmented?

13  A.  Could you repeat the question?

14  Q.  Sure.  You were asked questions about a fragmented bullet,

15  which you referred to as the jacket part of the bullet was what

16  you removed from the front chest wound, correct?

17  A.  Yes.

18  Q.  Can you determine how that projectile fragmented?

19  A.  No, I cannot.

20  Q.  Other than obviously it must have hit something hard?

21  A.  It could have gone through some intermediary object.  I

22  cannot tell how it fragmented and where.

23  Q.  I believe and correct me if I'm wrong here.  I believe you

24  testified when counsel was questioning you that you cannot say

25  the location or the position of the person who was shooting that

1    created these gunshot wounds, correct?

2    A.  That's correct.

3    Q.  Nor can you render an opinion on the positions or location

4    of the person who was shot, true?

5    A.  That's correct.

6    Q.  You're not testifying that your autopsy results show Alvin

7    Cole was not turning towards Joseph Mensah when he was shot, are

8    you?

9    A.  No.

10   Q.  Is it your role to offer an opinion one way or the other on

11   whether Alvin Cole had turned towards Joseph Mensah before being

12   shot?

13   A.  No.

14   Q.  Now, I want to just finish up with the last several

15   questions that Attorney Cade asked you.  The two small

16   abrasions, 1/4 inch by 1/8 inch, 1/8 inch by 1/8 inch.  Do you

17   know how those were caused?

18   A.  No, I don't.

19   Q.  However, you did in your autopsy protocol reflect which in

20   layman's terms means you kind of cut it away or peeled it away

21   to determine whether there was any tissue injury below those

22   abrasions, correct?

23   A.  That's correct.

24   Q.  And you found none?

25   A.  That's correct.

1   Q.  And then you also did an examination of the brain to see

2   whether there was any obvious trauma to the brain?

3   A.  That's correct.

4   Q.  Did you --  Was it your role or did you investigate the

5   potential that Alvin Cole was somehow rendered unconscious or

6   was concussed in this incident?

7   A.  I cannot determine it at autopsy.  He didn't have any head

8   trauma.

9   Q.  Can you with your medical experience determine whether

10  something like a forearm wound would render someone in shock?

11  A.  This is outside my area of expertise.

12  Q.  That kind of conclusion is not your field of medicine?

13  A.  That's correct.

14          MR. WIRTH:  I have nothing further.

15  **REDIRECT EXAMINATION BY MR. CADE:**

16  Q.  Few questions, doctor.  First of all, so I'm clear, Attorney

17  Wirth asked you about the stippling being caused by a different

18  weapon.  If Joseph Mensah is firing his gun from ten feet away

19  or more, does that cause stippling?

20  A.  No.

21  Q.  Stippling is close proximity, correct?

22  A.  That's correct.

23  Q.  In fact, you said it is 12 to 24 inches?

24  A.  Eighteen to 24.

25  Q.  Eighteen to 24.  Okay.  You see the 24, the two feet,

1    doctor?

2    A.   Yes.

3    Q.   Okay.  So you've got to be this close for stippling,

4    correct?

5    A.   Yes.

6    Q.   With regards to the face, the abrasions, you indicated that

7    could be from the Alvin hitting something hard, correct?

8    A.   It could be.

9    Q.   And the abrasions so we're clear, doctor, the abrasions were

10   to the left side of the face, not the right side, correct?

11   A.   Yes, they were on the left side of the side to the eyebrow.

12   Q.   Around the eyebrow area?

13   A.   It was, like, laterally to the eyebrow right here.

14   Q.   Not the right side, right?

15   A.   No, it was on the left side.

16   Q.   I'm sorry, I said not the right side.  It was the left side?

17   A.   Yes, it was the left side.

18   Q.   Sorry for the double negative.  And finally, doctor, just so

19   we're clear, the fracture for Wound Number V, that was a break,

20   correct?

21   A.   Yes, break of the bone.

22   Q.   Sure.  In medical terminology, fracture means the bone is

23   broken?

24   A.   Yes.

25            MR. CADE:  Thank you.  Those are my questions.

1      MR. WIRTH:  Judge, I have to clear something up.

2  **RECROSS EXAMINATION BY MR. WIRTH:**

3  Q.  The questions you were just asked about the questions that I

4  asked, the stippling could absolutely have been caused by Alvin

5  Cole's own gun, correct?

6  A.  I don't -- I cannot tell which gun caused the stippling.

7  Q.  Similarly, the wound on the forearm could have been caused

8  by a gun other than Alvin Cole's.  You can't rule that out,

9  correct?

10  A.  It is possible.

11      MR. WIRTH:  That's all I have.

12      THE COURT:  Thank you.

13  **RE-REDIRECT EXAMINATION BY MR. CADE:**

14  Q.  It would have to be a gun 18 to 24 inches away?

15  A.  To cause the stippling, yes.

16  Q.  If it is ten feet away, it can't be the gun?

17  A.  That's correct.

18      MR. CADE:  Thank you, Judge.

19      THE COURT:  Thank you.  You are excused.  Let's take a

20  ten-minute bathroom break.

21      BAILIFF:  All rise.

22      (Jury excused.)

23      (Brief recess taken.)

24      (Back on the record.)

25      THE COURT:  Ready.

1          (Jury enters.)

2          (Excerpt concluded.)

3

4          *********************************************

5

6          (Continued excerpt transcript.)

7

8          MR. CADE:  Your Honor, at this time call Joseph Mensah

9    to the stand.

10          THE COURT:  Okay.

11          Joseph Mensah, being first duly sworn to tell the

12    truth, the whole truth, and nothing but the truth, testified as

13    follows:

14          MR. MENSAH:  I do.

15          THE COURT:  Have a seat.  State your name for the

16    record.  Spell your last name.

17          THE WITNESS:  Joseph Mensah.  Last name Mensah,

18    M-E-N-S-A-H.

19    **DIRECT EXAMINATION BY MR. CADE:**

20    Q.  Mr. Mensah, you previously worked for the Wauwatosa Police

21    Department?

22    A.  Correct.

23    Q.  How long had you worked for the police department?

24    A.  About six years.

25    Q.  When did you leave the police department?

42

1    A.  Fall of 2020.

2    Q.  Fall of 2020.  So in February of 2020, you would have been

3    less than six years more than five?

4    A.  About that, yes.

5    Q.  Do you have any military experience?

6    A.  I do not.

7    Q.  Other than Wauwatosa, you worked for Dane County Sheriff?

8    A.  Correct.

9    Q.  For two years?

10   A.  About a year and-a-half.

11   Q.  Okay.  Any other actual law enforcement?  By that, I mean

12   having the ability to carry a weapon?

13   A.  Yes.  After Dane County, I worked for the UW Madison Police

14   Department.

15   Q.  Okay.  For how long?

16   A.  About a year and-a-half.

17   Q.  And then after that?

18   A.  That was Wauwatosa.

19   Q.  After Wauwatosa, you worked for the Waukesha County

20   Sheriff's Department?

21   A.  Correct.

22   Q.  You are no longer there, correct?

23   A.  That's true.

24   Q.  Now, Mr. Mensah, I'd like to take you back in time to

25   February 27th.  Obviously, you've heard all of the testimony.  I

1   don't need to go through a number of things.  But you were not

2   directly assigned to go to the mall, correct?

3   A.  At what point?

4   Q.  At the point that there was an indication of the initial

5   disturbance at the mall?

6   A.  At that point no, I was not assigned.

7   Q.  And then when it was broadcast that subject has -- there

8   might be a gun, you still were not specifically directed to go

9   to the mall, correct?

10  A.  Correct.

11  Q.  You made the decision yourself to go to the mall?

12  A.  Correct.

13  Q.  Once you were at the mall, you had an indication of what the

14  subject, Mr. Cole, you had a description of him, fair?

15  A.  Yes.

16  Q.  So I want to take you back, and we're going to focus at this

17  present movement -- Actually, let me back up.  I am going to

18  skip ahead.  After the shooting, did you have any conversations

19  with officers, other fellow officers before you went to the

20  Wauwatosa Police Station?

21  A.  Yes.

22  Q.  And I'll talk about that in a moment.  I just want to make

23  sure.  Whenever there is a police shooting, there are a number

24  of things that take place after a shooting, correct?

25  A.  Correct.

1  Q.  So one of the things that takes place is your clothing, you

2  are photographed, right?

3  A.  Yes.

4  Q.  They photographed the front, sides and back, true?

5  A.  True.

6  Q.  They are looking for whether there's residue, blood,

7  anything else that could be potential evidence, right?

8  A.  I don't know if you get that from the photographs, but you

9  take pictures, yes.

10  Q.  Blood could show up in a photograph, correct?

11  A.  It could.

12  Q.  Right.  So the first thing they do is photograph you, right?

13  A.  I don't know that's the first thing, but it is part of the

14  process.

15  Q.  They take your weapon.  They photograph your weapon, true?

16  A.  True.

17  Q.  They take the bullets out of the weapon, right?

18  A.  Yes.

19  Q.  They line the bullets and the gun together, and they

20  photograph to see you were supposed to have X number of bullets

21  based on the style of gun and you have Y left, fair?

22  A.  Fair.

23  Q.  So at least an indication based on that how many times they

24  believe you would have shot, true?

25  A.  Yes, true.

1    Q.  That assumes only one clip, that you didn't put in a second

2    clip?

3    A.  It is a magazine, but correct.

4    Q.  They also take the clothes, correct?

5    A.  No.

6    Q.  They don't take the clothes?

7    A.  I don't remember my clothes being taken.

8    Q.  Though don't check for DNA or anything on your clothes?

9    A.  I don't remember.  I don't recall.

10   Q.  They didn't check for gunshot residue on your clothing?

11   A.  I don't recall if they did or not, no.

12   Q.  So after that takes place, obviously we heard that night you

13   do not give a statement, correct?

14   A.  Correct.

15   Q.  You I assume proceed home, yes?

16   A.  Eventually, yes.

17   Q.  At some point in time, it is standard procedure, you consult

18   with an attorney, and then you eventually give a statement,

19   true?

20   A.  True.

21   Q.  As part of your training -- Where did you receive your

22   training to become a police officer?

23   A.  The initial academy was at the Madison College, MATC in

24   Madison.

25   Q.  Madison Area Technical College?

1   A.  It was called Madison College at the time.

2   Q.  They called it MATC?  We have a MATC here for Milwaukee.  It

3   is the Madison Area Technical College, correct?

4   A.  I think it is still called Madison College.

5   Q.  Okay.  While you are were there, you know as part of the

6   investigation as part of your training, you're not supposed to

7   consult and talk with other officers, true?

8   A.  It's not that simple.  But for the most part, yes.

9   Q.  And in theory, it is so you don't get a chance to share

10  stories and have things placed in your heed that maybe you

11  didn't see or change your story based on what someone else told

12  you, right?

13  A.  Right.

14  Q.  Okay.  So that evening immediately after the shooting, which

15  officers did you speak with?

16  A.  I spoke with Sergeant Svatek and at least Evan Olson.  I

17  don't remember anyone else that I spoke to or not.

18  Q.  Okay.  And when you -- Evan Olson actually drove you to the

19  station?

20  A.  I don't recall.

21  Q.  Well, how did you go from your location after the shooting

22  to the station?

23  A.  I don't remember.

24  Q.  The car didn't go itself, right?

25  A.  I don't remember which car I was in.  I don't remember who

47

1    drove.

2    Q.  Is it standard after a shooting for the main officer, the

3    one who has pulled the trigger, to be transporting them self?

4    A.  They don't drive themselves typically, no.

5    Q.  Someone else whether you're in your own car, you're either a

6    passenger or you were transported in someone else's car,

7    correct?

8    A.  Correct.

9    Q.  Again, traumatic event for you.  They don't want you on the

10   road?

11   A.  I'd assume so.

12   Q.  So other than speaking to the sergeant and Olson, how many

13   times did you speak to Olson?

14   A.  That night just the one time that I believe.

15   Q.  The one time.  Where was that?

16   A.  It was --  It was in a squad car.  I'm not sure which car,

17   but it was a squad car.

18   Q.  Okay.  We'll come back.  Let's turn to the shooting.  You've

19   testified that --  Obviously, you've been deposed.  I had a

20   chance to examine you, correct?

21   A.  Correct.

22   Q.  You've seen my face multiple times, yes?

23   A.  I have.

24   Q.  And you testified that you saw the chase when you parked

25   your car, correct?

1   A.  Correct.

2   Q.  And at the time you saw the chase, you didn't know who was

3   running from the police department side, correct?

4   A.  As far as which officers were running?

5   Q.  Yes.

6   A.  I knew at least Johnson was.  I knew other officers were

7   there.  I don't remember specifically.  I have -- Johnson was.

8   I heard him on the radio.

9   Q.  You heard him on the radio.  When you get out of your car,

10  you didn't know where Johnson was?

11  A.  I didn't know where he was.  I assumed he was in the line

12  chasing since he was calling out foot pursuit.

13  Q.  I don't want assumptions.  Again, when you get out of your

14  car.  You don't know.  You know there's an officer.  You don't

15  know if it is Johnson, if it is Smith, whomever.  You don't know

16  anybody other than there's an officer chase, I am going to join

17  in that chase?

18  A.  Correct.

19  Q.  So as you approach, are you gaining on anyone in front of

20  you?

21  A.  It's hard to say initially, but eventually I was.

22  Q.  Well, when you eventually gain, it's because the people in

23  front of you either slowed or stopped, correct?

24  A.  Correct.

25  Q.  Okay.  And I apologize, my words weren't precise.  I will

49

1   make it more precise.  As you were chasing and as an officer,

2   you at least knew there was an officer in front of you, correct?

3   A.  Correct.

4   Q.  Whether there were two or more officers, you have no idea,

5   true?

6   A.  True.

7   Q.  And you know that the suspect was being chased.  Mr. Cole

8   was being chased?

9   A.  Yes.

10  Q.  Okay.  What I mean, did you catch up?  As you were running,

11  you weren't shrinking or decreasing the distance while they were

12  running, correct?

13  A.  I'm not sure.

14  Q.  Okay.  Is it fair to say that with regards to the officers,

15  that other than knowing that Johnson was somewhere nearby, you

16  don't know coming over the radio where each officer is located

17  at the mall?

18  A.  Correct.

19  Q.  So for example, we'll talk about Evan Olson.  You don't know

20  that he's coming westbound on North Avenue making a right-hand

21  turn onto Mayfair Road heading north.  You don't know that he's

22  at that location, correct?

23  A.  Correct.

24  Q.  Because that's a couple hundred feet in front of you, and

25  you're not cognisant or aware, fair?

1   A.  Fair.

2   Q.  Okay.  So as you are running at some point in time, there's

3   a shot.  You hear a boom, correct?

4   A.  Correct.

5   Q.  You do know that shot is the sound of a gun, right?

6   A.  Yes.

7   Q.  You never saw a muzzle flash though, correct?

8   A.  To this day, I still don't know if I saw it or not.

9   Q.  When you eventually did give your first statement, you never

10  said I saw a muzzle flash, correct?

11  A.  That's true.  And again just because I didn't say it doesn't

12  mean I didn't see it.  I just don't remember at the time.

13  Q.  Sure.  When you had a chance to talk to Evan Olson, you

14  didn't tell him you saw a muzzle flash?

15  A.  When I talked to Evan Olson, we did not talk about the case.

16  Q.  So you hear the shot.  You don't know where it's coming

17  from, right?

18  A.  Correct.

19  Q.  And to orient everybody, you are running along the southern

20  border of Mayfair, and there's a construction site with a

21  concrete barrier and a chain-link fence, right?

22  A.  Correct.

23  Q.  You have construction materials.  A hotel that is being

24  built?

25  A.  Yes.

1    Q.  So there's a lot of -- The hotel was, for lack of a better

2    word, open meaning you could peer inside parts of it?

3    A.  I don't remember.

4    Q.  Okay.  Well, would you believe if I told you -- I can show

5    you photos, but that it was still exposed.  You could see the

6    construction lights from the inside.  Would you have any reason

7    to dispute me or doubt me?

8    A.  No.

9    Q.  So you hear the shot as you're running.  There could be

10   echoing coming from the south to your left.  The shot could

11   bounce off somewhere or the sound, true?

12   A.  It could bounce, yes.

13   Q.  As you're running east, the shot could have been coming in

14   that direction or bouncing, correct?

15   A.  Like the shot could have come from the east?

16   Q.  Correct.

17   A.  No.

18   Q.  The shot did not come from the east?

19   A.  No.

20   Q.  How about the west?

21   A.  Yes, it came from the west.

22   Q.  So I apologize, you're correct.  The east is behind you as

23   you're running, correct?

24   A.  Correct.

25   Q.  What about coming somewhere in a more northerly direction?

1   A.  No.

2   Q.  How did you know?

3   A.  I was in the parking lot.  I was there, so I could hear

4   where it came from.

5   Q.  But you did testify both in your deposition and your

6   statement you didn't know where the shot came from, correct?

7   A.  The physical location no, but I knew the area of where it

8   came from.

9   Q.  That's --  You didn't say when you gave a statement the

10  physical location, did you?

11  A.  I don't think so, no.

12  Q.  Did --  Did Lori Rom or her partner, William Schroeder -- Do

13  you remember William Schroeder?

14  A.  I did.

15  Q.  Did either of them ask you if they could record your

16  interview?

17  A.  I don't remember.

18  Q.  That would be -- The recording of your interview would

19  clearly be the by far the best showing of what you recall from

20  that night closest in time, true?

21  A.  Not necessarily.

22  Q.  Well, that would be your first official statement, right?

23  A.  Yes, the first official statement, but that doesn't mean

24  that you are anymore likely to recall something like a day or a

25  date after.  That would be the time that we gave the interview.

1  Q.  Sure.  I'm not talking about days later or weeks later or

2  all of a sudden, you know, things popping in your head and

3  you're like, oh, I remember that or I saw this or, you know,

4  anything like that.

5          I'm talking when you've now had a chance to officially

6  tell the world, the Milwaukee Police Department who is handling

7  it, what happened, you never at that point in time ever said or

8  told them I knew where the shot came from.  You said, I don't

9  remember where it came from, right?

10 A.  I think you're misunderstanding my choice of words.  But

11 when I say I don't know the exact location -- Let's say if

12 you're -- If there's a group of people in front of me, I don't

13 know which specific person or which of that group, but I know it

14 came from that specific area.

15         Where I say I don't know exactly, I don't know the

16 exact person who shot.  I don't know that.  I just know it came

17 from an area.

18 Q.  You said I don't know the location.  You didn't use the word

19 exact.  You said today.  Right now we are five and-a-half years

20 later, so I'm not dealing with five and-a-half years.  I'm

21 dealing with three days after the fact.  That's when you gave

22 your statement, correct?

23         MS. BAYNARD:  Objection, Your Honor, asked and

24 answered.

25         THE COURT:  Sustained.

1   Q.  Mr. Mensah, so once that shot comes, you didn't see the

2   flash, but you also didn't see a gun?

3   A.  At that time I did not see a gun, no.

4   Q.  Did you see other individuals in front of you as you were

5   running?

6   A.  I did.

7   Q.  Did you see other officers in front of you?

8   A.  I did.

9   Q.  So as you --  Let me rephrase.  Coming eastbound heading

10  west heading in a westerly direction, the first time that you

11  saw Alvin Cole, was he standing or was he down on the ground?

12  A.  Honestly I don't remember.  I'd have to look at the report.

13  I don't remember.

14  Q.  I want you to take a moment.  Exhibit 51 is in front of you.

15  A.  Is there a specific page you want me to look at?

16  Q.  I want you to refresh your recollection.  I am going to ask

17  you several questions.  Take a moment.

18  A.  I'm good.

19  Q.  You've had a chance now?

20  A.  Yeah.

21  Q.  As you indicated a couple days after the shooting, you

22  broadcast, and we'll hear that in your audio, shots fired?

23  A.  Correct.

24  Q.  You're wearing a lapel mic of some sort or is it just you

25  talking that picks it up or do you have to depress a microphone?

1   A.  I'm sorry, did you want me to answer the question you asked

2   before or the new question?

3   Q.  I would like my question answered first.

4   A.  You asked two questions.

5   Q.  When you say shots fired, are you -- Is that just picking

6   your microphone up or do you have to click on a button top or

7   something to indicate shots fired?

8   A.  You have to click the microphone button to say shots fired.

9   Q.  Because that by clicking the microphone, you broadcast to

10  everybody and dispatch shots fired, correct?

11  A.  Correct.

12  Q.  You also -- The microphone lapel or whatever that's picking

13  it up on your dash cam, true?

14  A.  Only if it's still attached to me.

15  Q.  Was it still attached at that point?

16  A.  I don't remember.

17  Q.  So you indicate that you saw two subjects after the gunshot.

18  One subject is closest to Mayfair Road, correct?

19  A.  I got to look at this again, sorry.

20  Q.  Sure.  It's the second page of your report towards the

21  bottom, sir.

22  A.  Okay.

23  Q.  Again, I'll repeat my question.  You -- After the gunshot,

24  you see Mr. Cole on his knees, correct?

25  A.  The question slightly changed but --

1   Q.  I'll read it.  PO Mensah stated the subject closest to

2   Mayfair Road is -- Let me back up.  PO Mensah stated after the

3   gunshot is fired, he observes two of the subjects go to the

4   ground.  PO Mensah stated the subject closest to Mayfair Road is

5   in the prone position.  Prone position is being flat out,

6   correct?

7   A.  Correct.

8   Q.  Laying on your stomach, hands out, feet either behind you or

9   spread?

10  A.  Correct.

11  Q.  And the second subject furthest from Mayfair Road was on his

12  knees?

13  A.  Correct.

14  Q.  PO Mensah stated the subject on his knees was the closest

15  subject to him.  PS Mensah stated this subject later identified

16  as Alvin T. Cole has both knees and his left hand on the ground,

17  correct?

18  A.  Correct.

19  Q.  And that's when you said you observed the handgun?

20  A.  Yes.

21  Q.  When you observed the handgun, the minute you observed it,

22  was Mr. Cole, Alvin, his left hand was on the ground?

23  A.  I believe so, but I don't remember.

24  Q.  Okay.  And his right hand, what was he doing with his right

25  hand the minute you first saw him?

1    A.  The minute or second, the exact moment that I saw him, I

2    don't remember.  I just remember seeing the gun.

3    Q.  So when you tell Officer Schroeder and Rom, he has both

4    knees and his left hand on the ground, is that right before or

5    right after you saw the handgun?

6    A.  I don't remember.

7    Q.  Again, we're talking ten seconds, sir, correct?

8    A.  It didn't take ten seconds of looking.  It was -- It is like

9    a second.  You are talking about the exact moment I saw the gun,

10   not the ten seconds surrounding.

11   Q.  I am talking your words.  The interview was not recorded.

12   So all we have is this and you trying to remember what you told

13   the officers, so I'm asking you specifics.  We are here because

14   of you today?

15   A.  I understand, but you said --

16           MS. BAYNARD:  I am going to object to the form of the

17   question.

18           THE COURT:  Well, I think he understood the question.

19   He was answering, so I'll let it stand.

20           THE WITNESS:  You asked the exact minute that I saw

21   the gun.  But then you said well ten seconds, so which one is

22   it?

23   Q.  Well, let's not quibble.

24   A.  Exactly, that is what I know.  Which answer do you want me

25   to give?

1    Q.  The exact moment you saw the gun?

2    A.  Okay.

3    Q.  He had his left hand on the ground, correct?

4    A.  Correct.

5    Q.  And the moment you saw the gun, where was it pointing?  What

6    direction was it?

7    A.  I don't think it was pointed.  I think it was just on the

8    ground.

9    Q.  Okay.  And how far away was Alvin Cole the moment you saw

10   the gun for the first time?

11   A.  The first time I'd say 15, 20 yards, maybe.  I was closing

12   the distance as I was coming up, though.

13   Q.  Fifteen or 20 yards?

14   A.  I'm not sure.  15 yards, it is an approximate.  I am running

15   as I see it, so the exact moment I saw it I'm not sure.  I

16   remember more of when I was right there.  But as I am running, I

17   don't -- I am a fast runner, I am not sure.

18   Q.  That's fine.  Would you like me to do the NFL walk off, or

19   would you like me to get the tape measure?

20   A.  I don't think it will matter.

21   Q.  So 15 yards is here.

22   A.  I was probably closer than that.  I am running.  The exact

23   moment I don't remember.  Fifteen yards, ten yards, I don't

24   know.

25   Q.  At that distance, you've already seen that he's on the

1    ground with his left hand, correct?

2    A.  I don't know if it was that far.  As I am approaching him, I

3    see him on the ground.

4    Q.  Sure.  But you also see -- At that distance, you see there's

5    at least one more officer, correct?

6    A.  There's -- Yes, there's other officers there.

7    Q.  Well, what --  Did you know at this moment that it was

8    Officer Shamsi that was in close proximity?

9    A.  I don't know if I remember who it was exactly.  I don't

10   remember if it was Shamsi or not.  It could have been Johnson at

11   the time.  I didn't know who it was.

12   Q.  Did you know that Officer Olson was another 40 feet or so

13   maybe more on the other side?

14   A.  I don't know which officer was over there.

15   Q.  You said I saw an individual prone already, correct?

16   A.  Correct.

17   Q.  Okay.  So we know because you've already seen the video.

18   We've already shown the video once of Olson coming around North

19   Avenue at Mayfair getting his gun out, and the sound is synched.

20   So when you hear get on the ground -- excuse me Your Honor --

21   get on the fucking ground, that's Olson talking to two

22   individuals who were there with Alvin Cole, correct?

23   A.  Yes.  We know that now.  At the time, I didn't know who it

24   was.

25   Q.  Right.  When you saw prone, again distance and time matter.

1    If Alvin Cole is -- whether he's 15 yards or whether he's ten

2    yards, the point of the matter is Olson is another 30, 40 feet

3    away, correct?

4    A.  Correct.

5    Q.  And you have the visual acuity, the ability to see that far

6    away that there's a guy prone on the ground, correct?

7    A.  Correct.

8    Q.  You can also at that time see a gun, right?

9    A.  Yes.

10   Q.  So you clearly saw Shamsi, right?

11   A.  Now I know it was Shamsi, yes.

12   Q.  You knew it was an officer?

13   A.  Correct.

14   Q.  You knew he was in close proximity to Mr. Cole, Alvin Cole,

15   correct?

16   A.  Correct.

17   Q.  And did you see Shamsi with his gun out?

18   A.  I don't remember.

19   Q.  Well, if you could from that distance see a guy that's prone

20   and ten, 15 see a gun, you mean to tell me that you couldn't see

21   an officer with his gun?

22   A.  I saw the officer.  I don't remember if he had his gun out

23   or not.

24   Q.  Okay.  And while you're closing this distance, you further

25   indicate to Lori Rom and Detective Schroeder that you saw Alvin

1    Cole on his left hands and knees, proceed to move forward about

2    three yards, and she called that essentially a crawl.  Would you

3    call it a crawl?

4    A.  Sure.

5    Q.  I don't want to put words in your mouth, I wasn't there.

6    Again, Lori Rom was -- PO Mensah described a manner of movement

7    that I, William Schroeder who wrote the report, I consider to be

8    a crawl, so I'm trying to get your words.  What would you call

9    it?

10   A.  I'm not sure what I'd call it.  He's moving from one spot to

11   the next.  I am not sure what to call it.

12   Q.  Was he moving with both hands crawling or moving or just the

13   left --

14   A.  I don't remember what his hands were doing.  I remember him

15   moving, approximately, nine feet or so, nine yards.

16   Q.  Nine yards would be 27 feet.

17   A.  I'd say about three yards.

18   Q.  So he's moving, approximately, from when you see him, he

19   wasn't --  If this from where you are is you going from east to

20   west, right?

21   A.  Yes.

22   Q.  He was actually moving more towards the south toward the

23   construction barrier, correct?

24   A.  Correct.

25   Q.  And you saw him at that distance moving three yards towards

1  the barrier, right?

2          MS. BAYNARD:  I am going to object.  It is misstating

3  his testimony.

4          THE COURT:  It's --

5          MS. BAYNARD:  He can ask him questions.

6          THE COURT:  It is getting close to noon.  How much

7  more do you have?

8          MR. CADE:  I have a bit more.  If you want to take a

9  break --

10          THE COURT:  Why don't you keep going a little bit, and

11  we'll break for lunch in ten minutes.

12          MR. CADE:  Great.  Thank you, Your Honor.

13  Q.  So turning again, he was not heading in an east to west

14  direction.  He had literally turned to head more towards the

15  south towards the construction barrier, right?

16  A.  Correct.

17  Q.  You saw him described as a crawl, approximately, three

18  yards, right?

19  A.  Yes.  I remember when I heard the gunshot and I see where it

20  came from, I saw someone that matched Alvin Cole's description,

21  and he was at this position.  Now, he's on his hands and knees

22  at this position.  So the exact movement of how he changed

23  levels from standing right here to kneeling right there, I tried

24  my best to describe he got from this position to that position.

25  Q.  But you didn't say where it came from.  You said you

1    heard -- PS Mensah said I heard "shots fired" is broadcast over

2    the police radio.  Police Mensah stated he was not aware of who

3    fired the shot and did not see any muzzle flash.

4            Were you not aware when you saw Alvin Cole and you saw

5    him down on his hands and knees that he had a weapon, that you

6    didn't know anything?  You just knew there was a gunshot?

7    A.  I knew some stuff.  I knew that the person we were

8    chasing -- who I was chasing.  You see in the report as I am

9    running, I see someone matching Alvin Cole's description.  So

10   Alvin Cole gets to a certain spot.  I hear a gunshot.  I see

11   him, and he's standing.  And now, he's moving about nine feet

12   from this position to that position.  As I come closer, I see a

13   gun so I did --

14   Q.  Mr. Mensah, why don't you take a moment and look again at

15   this report which is --  I don't see anywhere where you say he

16   is standing.  You just used that word.

17   A.  I understand what the report says.  You can clearly see it

18   in the video.  So just because it is not in the report doesn't

19   mean it didn't happen.

20   Q.  No.  Mr. Mensah, we're here because we can't and the video

21   is pixilated, and there is a dispute, and it is for the jury.

22            MS. BAYNARD:  Objection to the form of the question.

23            THE COURT:  Sustained.  You can't --  It is too

24   argumentative.

25   Q.  Your report, no where does it say that he was standing?

1          MS. BAYNARD:  Objection to the form.  Mensah doesn't

2     have a report.  It is a hearsay statement.

3          THE COURT:  Sustained.  If there's some difference

4     between what the testimony is and what's in that report, there's

5     a difference.

6          MR. CADE:  Okay.

7     Q.  Mr. Mensah, did you ever report back to the detectives who

8     investigated this that you saw Alvin Cole standing as he moved?

9     A.  I think you're misrepresenting what I'm saying.  Maybe, I am

10    not explaining it well enough.

11    Q.  I can have the reporter read back.  You said he was standing

12    when he moved.  This report that was your record said he was

13    what I presumed to be or described as a crawl.  I'm trying to

14    understand that.

15    A.  What I am saying is foot pursuit, right.  There is a foot

16    pursuit.  At one point a gunshot goes off.  Now, he was running.

17    So I assume he didn't crawl from the parking lot back at

18    Nordstrom all the way there.  He was running in an upright

19    position.  He is running.  At some point while he's running, a

20    gunshot goes off while he's there.  Whether you want to say

21    standing, crouching, doesn't matter.  He is at this location.

22    Gunshot goes off.  I am seeing a change from this spot to this

23    spot from about nine feet.  If you don't want to use the word

24    standing then don't.  I don't know what else to tell you.

25    Q.  You also indicated, Mr. Mensah, that as part of this, you

1  saw -- after the shots fired observed two subjects go to the

2  ground.  You didn't say one subject went to the ground.  You

3  said two people, so you made an assumption?

4         MS. BAYNARD:  Object to the form of the question.

5  Again, he can ask him what he saw if it is different from the

6  report.

7         MR. CADE:  I haven't finished the question.

8         THE COURT:  Let him finish the question.

9  Q.  I will repeat.  The report which we're --  Did you ever have

10  a chance to review the report?

11  A.  I believe so.

12  Q.  So having had a chance to review --  I mean contemporaneous

13  within a few weeks or months, you had a chance to look at this

14  report, yes?

15  A.  Yes.

16  Q.  Nodding your head.  The reporter can't take that down.  So

17  having read this report, did you ever tell the detectives you

18  got something in here that's wrong?

19  A.  No.

20  Q.  It needs changing?

21  A.  I didn't say that, no.

22  Q.  Now that you've had a chance five years ago to look at it

23  and today, it clearly indicates that as soon as the shots are

24  fired, two people go down, right?

25  A.  Yes.  But the person that I saw that's going down is prone.

1  They are not near -- right next to the person.  The other person

2  I saw is right by Mayfair Road.  The other person I saw go down

3  to the knees is Alvin Cole where -- When the gunshot happened,

4  this is two distances.

5  Q.  I understand, sir.  The shot happened.  One person goes to

6  their knees, another person now is flat out prone, correct?

7  A.  Correct.

8  Q.  Okay.  So at that point in time, you don't know who fired.

9  You have no knowledge if it was an officer who fired, a suspect

10 or a third party, true?

11 A.  That's true.

12 Q.  Okay.  And again, no where in here after having an

13 opportunity to review this report did you indicate that Alvin

14 Cole was standing as he moved towards the barrier, right?

15         MS. BAYNARD:  Objection, asked and answered.

16         THE COURT:  Sustained.

17 Q.  As you approach Alvin Cole and you see the gun -- So you

18 already told me the first time he's not doing anything with the

19 gun, correct?

20 A.  Correct.

21 Q.  What did he do with the gun?

22 A.  What didn't he do?

23 Q.  What did he do with the gun?

24 A.  Eventually?

25 Q.  At some point you saw --  Well, let's --  shot goes off.  We

1  know it is less than ten seconds, right?

2  A.  Yes.

3  Q.  You still are closing the gap, correct?

4  A.  Correct.

5  Q.  So whether that takes you a second, two seconds, three

6  seconds whatever, we've now taken some time off of our ten

7  seconds, true?

8  A.  True.

9  Q.  Okay.  So as you approach, at some point whether it's seven

10  seconds before you decided to shoot, five seconds whatever, you

11  see a gun?

12  A.  Correct.

13  Q.  Right.  When you first saw the gun, you said he wasn't doing

14  anything with the gun, correct?

15  A.  Correct.

16  Q.  Okay.  Now, take me to the point when you saw him do

17  something with the gun.

18  A.  The point I saw him doing something with the gun is when he

19  pointed --  It was in his right hand, and then it was pointed at

20  me.  I don't know if -- I don't know if was over a shoulder,

21  under a shoulder, but I am looking right at the barrel of a gun.

22  Q.  Did he move?  So you've described whether he's got the gun,

23  it was basically whether it is under the arm or over the arm,

24  correct?

25  A.  Correct.

1    Q.  Did he move?  Did his upper not just the arm, did the upper

2    body move?

3    A.  I don't recall.

4    Q.  You saw the gun clearly, correct?

5    A.  Correct.

6    Q.  I mean, you're focused in here on his body, correct?

7    A.  Yes.

8    Q.  You see the hand.  You don't know -- I mean, you've already

9    said you could see someone 25, 30 yards in the distance prone.

10   You can tell there are other officers, and you're in close

11   proximity.  How far away were you when you shot?

12   A.  Three to five yards.

13   Q.  Nine to 15 feet?

14   A.  About, yeah.

15        MS. BAYNARD:  Your Honor, I understand Attorney Cade

16   is getting excited here.  Could we give the witness space?  He

17   is questioning him from the witness stand.

18        MR. CADE:  I move, Judge.  Some people talk with their

19   hands.

20        THE COURT:  Why don't we break for lunch.  We'll come

21   back at 1 o'clock.

22        BAILIFF:  All rise.

23        (Jury excused.)

24        (Lunch recess taken.)

25        (Back on the record.)

1        BAILIFF:  All rise.  Court is in session.

2        THE COURT:  Is everybody ready?

3        BAILIFF:  Remain standing for the jury.

4        (Jury enters.)

5        THE COURT:  Let's continue.

6        MR. CADE:  Thank you, Judge.

7   Q.  Mr. Mensah, before we took the lunch break, I was asking you

8   questions.  I want to pick back up.  And to remind you, we were

9   having discussions about when you first saw the gun, okay.  You

10  indicated that you saw Mr. Cole, Alvin, on his knees at least

11  with his left hand down.  Do you recall that?

12  A.  I do.

13  Q.  Then, I said what was the next moment that, you know,

14  essentially when you first saw the gun.  Do you recall that?

15  A.  Yes.

16  Q.  Okay.  So just so we're clear, and this ten seconds is

17  counting down, correct?

18  A.  Correct.

19  Q.  At some point, you indicated that Alvin made a movement of

20  some sort, whether it was over the shoulder or underneath the

21  arm pointing the weapon, the gun, in your direction?

22  A.  Correct.

23  Q.  And I believe there was an objection.  I want to clear it

24  up.  You indicated that you didn't see body movement.  You just

25  saw him sticking the gun, doing this.  Is that what you're

1  saying?

2  A.  I think it would be easier to say myself, to show you what

3  happened or explain it.  The exact movement, I don't remember

4  whether it was five inches, a foot, I don't know.  Was there

5  some movement?  Yes.  I don't remember the exact movement it

6  was.  I remember when I saw the gun, that's what started the

7  next sequence of events.

8  Q.  Before I continue with the gun, let's be clear.  You at the

9  time --  Let me back up.  You know what a cover officer is.  Do

10  you know that phrase cover?

11  A.  Yes.

12  Q.  What's a cover officer?

13  A.  Essentially a backup officer.

14  Q.  So it's fair to say that a cover officer in a scenario like

15  this could be you approaching Shamsi because he's closest,

16  correct?

17  A.  It could.  I mean, a cover officer it varies depending on

18  the situation.  I can be cover officer one second and literally

19  switch up the next.  Just because I am cover for you does not

20  mean you might be cover for someone else.  It is a very fluid

21  term and position to be in.

22  Q.  Of course.  But a cover officer -- The point is you are

23  covering, essentially the backup to the other officer, right?

24  A.  Not necessarily.

25  Q.  Okay.  You're providing cover, right?

1  A.  Again, it's such a vague term.  You got to --  It depends on

2  the situation.  It really does.

3  Q.  You say a vague term.  That's one of the things you learned

4  in your training, correct?

5  A.  What a vague term is?

6  Q.  No, what cover officer is, sir?

7  A.  Yeah, but again the term changes.

8  Q.  I understand that.  But you learn in the classroom and you

9  go out in the field of what a cover officer is, true?

10  A.  Yes.

11  Q.  You don't go in Wauwatosa say, hey, what do you call a cover

12  officer and you go over to Wauwatosa or some where else, do you

13  guys call it something different?  When you hear the term cover

14  officer, you know what it means, correct?

15  A.  It's not that simple.  It doesn't matter which agency you

16  work for.  What matters is the situation that you're in.

17  Q.  Right.  And in this situation with Shamsi being so much

18  closer to Alvin than you are in that scenario between just the

19  two of you, you're the cover guy, right?

20  A.  I disagree.  Because one, I honestly don't think he was

21  closer.  And two, just because when I'm there he could be my

22  cover officer, doesn't automatically make me cover because I am

23  his second.

24  Q.  You heard him testify.  He didn't know you were there until

25  the shots rang out.

1    A.   True.

2    Q.   He can't be your cover officer.  He can't be literally

3    protecting you if he doesn't know you are there, right?

4    A.   That's incorrect.

5    Q.   So you're -- A cover officer is -- You don't know that

6    you're supposed to be covering somebody else?

7    A.   Once someone else gets there without you realizing it, you

8    could instantly become a cover officer.  Again, it's not --

9    It's hard to explain.  Unless you are in the career field and

10   you're doing it, it's really hard to explain a vague term when

11   we're not showing it, so it's hard to say.

12   Q.   Right.  But at the moment in time you arrived on scene you

13   got close, you were already shooting, right?

14   A.   No.  As soon as I got there?

15   Q.   As soon as you got up to Alvin you were shooting, right?

16   A.   I paused.  I wasn't shooting right away.

17   Q.   Okay.  You paused.  You didn't announce yourself to Shamsi,

18   correct?

19   A.   I didn't say Officer Mensah is here.  What do you mean by

20   that?

21   Q.   You didn't say Joseph Mensah is here, I got your back, bro.

22   You didn't say any words I'm here?

23   A.   I did not say I got your back, bro.  I did not say that.

24   Q.   The point is, you didn't say anything, right?

25   A.   I said the gun was out.

1    Q.   Okay.  You said the gun was out, and you knew where Shamsi

2    was?

3    A.   I knew there was an officer to my right.  I don't remember

4    which specific officer it was.  You have to understand, it is

5    dark.  It is a very fluid situation.  I'm not going to remember

6    exactly every single person.  He could have been looking at me

7    like I am looking at you now.  And to remember three days or

8    even five years after the fact, my brain might still not

9    remember who it is.

10   Q.   Sure.  It was dark, but it wasn't so dark because you

11   already said 15 yards in front you could see ahead of you.  You

12   know as you're running, you saw Alvin Cole 15 yards, and then

13   you could see even further there was another officer, which

14   turns out to be Evan Olson, and there's a suspect prone, so it

15   can't be that dark, right?

16   A.   You also have to understand again it's dark.  It's a

17   stressful situation.  Just because I remember one thing doesn't

18   mean I remember everything else.  Something can be close and I

19   might remember that.  Something can be far, I might not remember

20   that and vice versa.  So you can't use the example that, well,

21   cause you saw that stuff you have to have seen this.  It doesn't

22   work that way.

23   Q.   Would you agree because it is a stressful situation does not

24   give you the right to use deadly force, true?

25   A.   Because it is stressful, you can't use deadly force?

74

1  Q.  A stressful situation does not give you the right to use

2  deadly force?

3  A.  Of course, correct.

4  Q.  And in this particular moment -- You've testified before.

5  You remember when I deposed you, correct?

6  A.  Correct.

7  Q.  And you testified that at the moment you shot, you were not

8  concerned about any other officer.  You were solely concerned

9  about yourself, right?

10          MS. BAYNARD:  Objection, misstates his prior

11  testimony.

12          THE COURT:  Sustained.

13  Q.  While they pull it up, I want to move on.  We'll get back to

14  that.  Did you tell the detectives investigating that you were

15  closer than Shamsi when you shot?

16  A.  I don't remember.

17  Q.  Isn't that an important detail?

18  A.  I don't know if that's important or not.

19  Q.  The moment you decided to pull the trigger, was it when

20  Alvin as you saw turned the gun either underneath or over his

21  shoulder or was he doing something else?

22  A.  The exact millisecond that I pulled the trigger is when the

23  barrel of the gun was pointed directly at me.

24  Q.  So regardless of what Alvin was doing before that

25  millisecond, he clearly had the gun in the right hand, correct?

 1  A.  Correct.

 2  Q.  You say gun is out, correct?

 3  A.  Yes.

 4  Q.  You didn't shoot because the gun was out.  You shot because

 5  you perceived the barrel under or over, right?

 6  A.  Yes.

 7  Q.  And the barrel under or over, that was pointed in your

 8  direction?

 9  A.  Yes.

10          MR. CADE:  One moment, Judge.

11  Q.  Mr. Mensah, I'm going to show you --  I'm going to show you

12  your deposition transcript.  This is your deposition.  June 26,

13  2023, page 224.  Starting at line 9 to the end of the page, sir.

14  A.  Okay.

15  Q.  And in your deposition, sir, you said:

16          Question:  "Okay."  This is me.  "I just want to

17          make sure when you fired, you didn't see any

18          other officers.  This was solely he's got the

19          gun pointed at me, that's why I'm engaging.

20          Answer:  Correct.

21          Question:  Okay, you weren't shooting to say,

22          hey, he's got it pointed at Shamsi, so I'm

23          going to shoot to protect Shamsi?

24          Answer:  I don't know who else he pointed it

25          at.  I just know at one point he pointed at me.

1          Question:  Okay.  So and you said three to

2          five yards in distance?

3          Yes.

4          Question:  Okay.  Was your light on your weapon

5          now active or turned on?

6          Answer:  I don't remember."

7     Did I read that correctly?

8     A.  Yes.

9     Q.  So when you said I don't know who else he pointed at, you

10    are referencing prior to the moment you shot, you didn't know

11    about anything else Mr. Cole may have done with the weapon,

12    correct?

13         MS. BAYNARD:  Objection, form.  Misstates his prior

14    testimony.

15         THE COURT:  Sustained.

16    Q.  When you said you don't know who else he pointed at, the

17    minute you believed it was pointed at you you fire, correct?

18    A.  I did.

19    Q.  So you don't know if he pointed at Shamsi or Olson or

20    anybody else prior to that moment, fair?

21    A.  I don't know.  I don't know.  Correct, I don't know if he

22    pointed at anybody else.

23    Q.  It wasn't because he was pointing the gun at someone else or

24    had pointed the gun at someone else for you to engage him,

25    correct?

1    A.   That's not true.

2    Q.   Well, if you were going to engage him, you don't --  Let me

3    back up.  Are you saying that the moment before you perceived

4    the gun, you believed you had the right to shoot because he had

5    a gun in his hand?

6    A.   No.  I'm saying up until the moment before I shot -- So you

7    have a gunshot that goes off.  Alvin Cole goes down.  You see

8    the gun.  The gun is pointed at me.  There's other officers

9    there.  There's other people there.  There's people in the

10   public there.  I don't know who else his gun is pointed at, but

11   it has clearly been fired already.  I can pretty much infer that

12   it has been fired by this person because I see a gun that's out,

13   and there's a very strong possibility that he could have shot

14   Shamsi.  He could have shot any other officer around me.

15           So at that moment, yes, I was shooting to protect

16   myself but also shooting to protect anyone else that could have

17   been shot.  He could have easily missed me and hit somebody

18   else.  He could have shot someone else before me.  As the

19   movement is coming, there could have been someone else to my

20   left I don't know about.  There is someone to my right he could

21   have missed and hit.  There's other people there, so it's not

22   just me I am protecting.  It is everyone else around me as well.

23   Q.   Again, line --  Let me refresh again.  219.  I'm sorry 224.

24   I specifically asked the question starting at line 9.

25           "Okay.  So I just wanted to make sure when you

1          fired, you didn't see any other officers.

2          This was solely he's got the gun pointed at me.

3          That's why I am engaging.

4          Answer:  Correct.

5          Question:  Okay.  You weren't shooting to

6          say, hey, he's got it pointed at Shamsi, so

7          I'm going to shoot to protect Shamsi.

8          Answer:  I don't know who else he pointed at.

9          I just know at one point he pointed at me."

10  I read that correctly, true?

11  A.  Yes, but you're misstating what I'm saying.

12  Q.  I am not.  Sir, sir --

13  A.  Am I allowed to answer the question?

14  Q.  Your lawyers will have that opportunity.

15          MS. BAYNARD:  Objection, asked and answered.

16          THE COURT:  Sustained.  This is very repetitive,

17  Mr. Cade.

18          MR. CADE:  Yes, Judge.

19  Q.  That's what's on the transcript, correct?

20  A.  The transcript says -- You directly asked me was I shooting

21  to protect Shamsi?  I didn't respond no.  I said, I don't know

22  who else it was pointed at.  I'm answering your questions that

23  you asked me.  It is not painting the picture of what I was

24  saying.  My response was a direct response to your question.

25  You could have worded it differently.  I could have given a

1    different answer.  I answered the question that you gave me.

2            You didn't ask me about the circumstance, hey, did you

3    -- were you protecting this person, that person, what else was

4    going on in your mind?  Did you want to protect anybody else?

5    You didn't ask me if I wanted to protect anyone else.

6    Q.   In Exhibit 51, you didn't say you were protecting anyone

7    else either, did you?

8    A.   Two things can be true at the same time.  Just because I

9    didn't say I don't want to protect somebody else doesn't mean I

10   didn't want to say it.  I didn't feel that way.  I can want to

11   protect other people.  I don't have to say the words to you I

12   want to protect other people.

13   Q.   Let's turn for a moment to when you arrive on scene.

14   Exhibit 30A.  Do you recall seeing this perspective, sir, from

15   your squad video?

16   A.   I do.

17   Q.   Just so we're clear for the jury.  With regards to squad

18   videos at least at that moment, the Wauwatosa police cars, the

19   squad videos turned on either when the car approached 70 miles

20   an hour, they automatically turned on, right?

21   A.   I don't remember the milage.  But, yes, it is a high milage.

22   Q.   At a high rate of speed, they automatically turn on?

23   A.   Correct.

24   Q.   They turn on when you flip a switch, correct?

25   A.   Correct.

1    Q.  They also turn on --  turn on recording.  They record at a

2    high rate of speed, correct?

3    A.  Correct.

4    Q.  They record when you flip a switch in the vehicle, correct?

5    A.  There's a couple switches, but yes.

6    Q.  You have the ability in the squad car to turn on the

7    recording?

8    A.  Correct.

9    Q.  You also have the ability -- It turns on automatically when

10   the lights come on even though --

11   A.  Yes.

12   Q.  So you have lights, high rate of speed, or human

13   intervention, correct?

14   A.  Correct.

15   Q.  Okay.  Go ahead and play.

16            (Whereupon tape is played.)

17   Q.  So the person who is running next to that red strobbing

18   light at the moment that's you, correct?

19   A.  Correct.

20   Q.  You get out of the car.  You're yelling hey, correct?

21   A.  Yes.

22   Q.  Go ahead and play.

23            (Whereupon tape is played.)

24   Q.  After the shots were fired by you, you let out a scream,

25   correct?

1  A.  Yes.

2  Q.  You yelled out the word fuck?

3  A.  Yes, I did.

4  Q.  And you said, I can't believe I shot somebody?

5  A.  I did not say that.  You also forgot a part when I first got

6  out the car too.  I did say something else.

7  Q.  Sir, that is what your lawyers are here for.  I didn't

8  forget anything.

9  A.  You did forget something, but we'll explain that later.  Go

10  ahead.

11  Q.  Remember earlier I asked you, like, who you were talking

12  with and discussing with, et cetera?

13  A.  Yes.

14  Q.  And before I play a video, I want to talk about situations

15  in Wauwatosa that require multiple, you know, multiple people

16  responding not involving you as the primary person, okay?

17  A.  Okay.

18  Q.  So you're a secondary whether it's Shamsi or Olson or

19  whatever, you're not the main person.  Are you with me?

20  A.  Yes.

21  Q.  Okay.  In those scenarios, are you taught or trained to turn

22  off your squad video just because you want to?

23  A.  It's not that simple to answer.  It honestly depends on the

24  situation.

25  Q.  Okay.  Let's -- Showing you Exhibit 30.  So while my

1   colleague is getting it together, your squad video was only

2   14 minutes and, approximately, five seconds.  Are you aware of

3   that?

4   A.  I'm not.

5   Q.  Do you see the bottom portion on the right-hand side 14:05?

6   A.  Yes.

7   Q.  Would you like me to play the beginning to show it is when

8   your squad lights turned on, or do you believe it is the same

9   thing?

10  A.  I believe it.

11  Q.  So I'm showing you at 12:31, so a minute and-a-half left in

12  the video.  Go ahead and hit play.

13          (Whereupon tape is played.)

14  Q.  Hit pause.  That's you, sir?

15  A.  It is.

16  Q.  Walking in front.  And there was another individual with

17  you.  Who is that?

18  A.  I believe that was Evan Olson.

19  Q.  Hit play.

20          (Whereupon tape is played.)

21  Q.  We hear status change.  Do you hear that?

22  A.  I do.

23  Q.  Status change is the -- I'm sorry, the recording turning

24  off, correct?

25  A.  No.

1    Q.   That's not the recording turning off?

2    A.   No. Status change is on the C.A.D.. And if there's an

3    update to the call, you'll -- status change will come across --

4    It's the audio.  It's the audio from the computer.

5    Q.   Okay.  Why did your video stop then?

6    A.   I don't know.  All I know is right up until that moment,

7    Evan Olson had met with me, and I couldn't stop crying.  He was

8    trying to calm me down.  And then you can hear me sniffing in

9    the car.  I was still crying.  He was trying to -- I don't know

10   --  All I remember is I was crying, and then I got in the car.

11   I don't remember much about what I was doing after that.  I was

12   pretty distraught.

13   Q.   But once the recording stops, the microphone that you're

14   wearing also stops, correct?

15   A.   I believe so.

16   Q.   And were you in the front seat or the rear passenger seat?

17   A.   I don't remember.

18   Q.   Okay.  Was Mr. Olson in the front seat or rear passenger

19   seat?

20   A.   I don't remember.

21   Q.   Are the Wauwatosa police cars such that if the door is

22   closed, you can't open the rear door from the inside?

23   A.   Not all of them.  236 is an unmarked.  You can see up at the

24   top left corner it says P236.  236 is an unmarked car.  There is

25   no cage in it.  It is an empty back seat.  I don't know if the

1  back seats can be opened from the inside or not.  I don't

2  remember.

3  Q.  So in a minute and-a-half as you approach, even a minute, I

4  don't hear any audio from you or from Mr. Olson.  Do you hear

5  any audio?

6  A.  No.  Yes.  I mean you can hear the door open and shut, you

7  can hear me sniffing.  I am not saying much if anything at all.

8  Q.  My question, sir, is audio from you.  We hear the background

9  no doubt.  But any audio from you or from Mr. Olson?

10  A.  You wouldn't hear it from Olson.

11  Q.  Your microphone wouldn't pick him up talking?

12  A.  I thought you meant -- I'm sorry the guys were distracting.

13  Can you ask the question again?

14  Q.  Sure.  In that short clip, we don't hear any conversations

15  between you and Evan Olson, correct?

16  A.  Correct.

17  Q.  And then the video stops, correct?

18  A.  You can -- If you want to rewind it, you can.  You can hear

19  Evan talking.  You can rewind it, like, 15 seconds, 30 seconds

20  you'll hear it.

21  Q.  What was he saying?

22  A.  I don't remember.  But I remember hearing words.  If you

23  remind it 30 seconds, you'll hear it.

24  Q.  Go ahead.

25  A.  He said, like, give me a second or something like right

1  before the video goes off.

2          (Whereupon tape is played.)

3  A.  He just said hold on.

4  Q.  At the end of the day when you met with Milwaukee police

5  detectives, did you tell them that you were off in your unmarked

6  squad car P236 with Evan Olson?

7  A.  I did not tell them who I was with, no.  I honestly don't

8  remember.  It's not in the report what I told her.

9  Q.  The report is silent about you being away from someone,

10  correct?

11  A.  Being away from?

12  Q.  I'm sorry.  It doesn't say anything about you being not

13  isolated, correct?

14  A.  It doesn't say anything about it, no.

15  Q.  And if all the Wauwatosa Police Department is there, Evan

16  Olson should be one of the last people with you because he was

17  directly involved in the chase, true?

18          MS. BAYNARD:  Objection, form of the question.

19          THE COURT:  Sustained.

20  Q.  Should Evan Olson have been there with you if there are

21  other officers available who were not involved in the chase?

22          MS. BAYNARD:  Same objection.

23          THE COURT:  Sustained.

24  Q.  You are aware that you're supposed to isolate, correct?

25  A.  It's not so much -- Yes, we're supposed to isolate, yes.

1          MR. CADE:  Judge, the only other thing is I move into

2     evidence Exhibit 30.

3          MS. BAYNARD:  No objection.

4          THE COURT:  So ordered.

5          MR. CADE:  And 30A, 30 alpha.

6          MS. BAYNARD:  What is 30A?

7          MR. CADE:  The short clip we played at the beginning

8     of it.

9          THE COURT:  All right.  Without objection, so ordered.

10    All right, go ahead.  Cross examination.

11         MR. CADE:  Those are my questions, Your Honor.

12    **CROSS EXAMINATION BY MS. BAYNARD:**

13    Q.  Officer Mensah, where did you grow up?

14    A.  I grew up in Wauwatosa and Milwaukee.

15    Q.  You lived in the Milwaukee area your entire live?

16    A.  For the most part, yes.

17    Q.  And I want to go back to February 2, 2020, and I want to

18    work through it in chronological order.  Now, in February of

19    2020, how long had you been a police officer?

20    A.  About eight years.

21    Q.  And what shift were you working?

22    A.  I believe it was second shift.

23    Q.  And at that time, what was your regularly scheduled shift?

24    A.  Approximately 2:00 p.m. to 11:00.  It depends on if you are

25    an earlier car or late car.  Early cars start from 2:00 p.m. end

1    at 10:24.  Late cars start at 3:00 p.m. and end at 11:24.

2    Q.  On February 2, 2020, what area of the city were you

3    responsible for?

4    A.  I was responsible for the southern most part.  I believe my

5    squad number based on the report was 221.  With it being 221, I

6    was most likely an early car.  Because the way it breaks down is

7    two is in second shift.  Two, Sector two, and then one since it

8    is a lower number would signify that it's an early start.

9    Q.  And was Mayfair Mall a part of your assigned sector on

10   February 2, 2020?

11   A.  No, but it bordered my sector.

12   Q.  Why did you respond to Mayfair Mall?

13   A.  I responded twice.  The first time I responded, there was

14   the initial call for service regarding some kind of disorderly

15   conduct or DC or something involving a subject with a gun.  I

16   knew that there was primary and at least one backup officer

17   assigned.  However, Mayfair Mall it's gigantic.  It's pretty

18   big, and you're going to need other officers to assist with

19   looking, checking areas.  And just based on the nature of the

20   call in case things were to go bad to assist other officers.

21   Q.  Would you agree with me that a report of a firearm at a mall

22   is something that would make anyway law enforcement officer kind

23   of pay a little bit more attention to the radio?

24          MR. CADE:  Objection.  Leading, Your Honor.

25          THE COURT:  Sustained.  Can you rephrase it?

1  Q.  Joseph, was one of the reasons that you went to Mayfair Mall

2  because it was a report of a firearm at the mall?

3  A.  Yes.

4  Q.  Okay.  In your years of experience in law enforcement, what

5  is significant or what can be significant about the report of a

6  gun at a mall?

7  A.  The fact that there was a gun involved, it just changes

8  things in the sense that it's a more dangerous call in a sense

9  that things could go bad at any moment.

10        For this particular call, I would have gone,

11  regardless whether there was a gun involved or not, mainly

12  because there was a report of some type of disturbance at the

13  mall.

14        Anything outside of just normal call for service at

15  the mall, you're going to get more officers going.  But once you

16  introduce a gun to it --

17        MR. CADE:  Your Honor, can we be heard on this?  This

18  was a subject of a Motion in Limine.

19        THE COURT:  You need more, Ms. Baynard?

20        MS. BAYNARD:  He's in the middle of answering.  I am

21  not sure what the Motion in Limine was.

22        THE COURT:  Does that answer your question what he

23  said so far?

24        MS. BAYNARD:  I don't think he finished answering.

25        MR. CADE:  I objected because of the Motion in Limine,

1   Your Honor.

2               MS. BAYNARD:  Let's have a sidebar.

3               (Sidebar discussion.)

4               (Back on the record.)

5               MS. BAYNARD:  Madam court reporter, can you read back

6   the last question?

7               MR. CADE:  Just wasn't that the point of our

8   objection?

9               THE COURT:  Do you remember the question?

10              THE WITNESS:  I think for the most part.

11              THE COURT:  Finish your answer if you have anymore.

12              THE WITNESS:  I am trying to remember the question.

13  Pretty much if I hear a call come out on the radio for a call

14  involving a weapon or a gun at the mall, I'm going to go.  I

15  don't know any officers that wouldn't.  Especially being a

16  shopping center, there's a lot of innocent people there.  A lot

17  of things can go bad.  So if there's a call for a weapon, you're

18  going to go.  You don't have to wait to be dispatched.  You're

19  going to go.  You just go.

20  Q.  As you're on February 2nd, where are you getting information

21  about this call of the subject with a gun at the mall?

22  A.  Two ways.  One is in my squad car.  Anything that is relayed

23  from mall security to dispatch, dispatch is typing up on the

24  screen.  At the same time if there's any updates coming on the

25  radio, I'm hearing it on the radio.  Between the two of those,

1  you look and see what's going on and what's the best way to
2  respond and what you should do.
3  Q.  Do you recall any of the --  So the first time you're on
4  scene, what information do you recall coming from dispatch if
5  any?
6  A.  Again, I don't remember if it came directly from dispatch or
7  coming from me reading the screen, but I remember a description
8  of a subject, the basic I guess premise of why we're there
9  involving the disturbance, and I guess the area where they were
10  last seen at.
11         If I remember correctly, I don't remember exact
12  location.  I think it was somewhere on the north end of the
13  mall, and I just stayed in my car.  If I'm needed great.  If
14  not, I'd leave.  The main reason why I'm not going to --  I'll
15  go to the mall, but I'm not going to put myself on the call.  If
16  I put myself on the call and if there's any other call for
17  service, especially if it's an emergency, dispatch is going to
18  look at that screen and see not physically whose available but
19  who on the C.A.D. is listed as available, whose not.  So if I'm
20  not listed as on scene if they need me for anything, they can
21  look and quickly glance and say, hey, this person is available
22  and dispatch me to a call.
23  Q.  So you get a description of the subject over the radio.  Do
24  you learn anything about the subject's conduct?
25  A.  I just remember it being something about brandishing a

1  weapon, displaying a weapon, some type of altercation and a gun

2  was -- Someone saw a gun.

3  Q.  When you returned back to Mayfair Mall the second time, why

4  do you do that?

5  A.  So after some time had passed and the person wasn't located

6  and some time had passed -- So although there was the initial

7  incident, it wasn't an emergency in and there.  Other officers

8  responded.  I floated back to my area.  I didn't start going

9  back until I got another update that they had seen some someone

10  that matched the description.

11      Once I heard over the radio we see someone that

12  matches the description of the person involved in the

13  altercation, I started going back.

14  Q.  Joseph, I'm going to show you what's been marked as

15  Plaintiff's Exhibit 3.

16      MR. CADE:  Judge, this video has not been

17  authenticated.  They showed it to Mr. Kafer.  He did not say it

18  was his video.  They showed it to him.  They did not establish

19  that.

20      MS. BAYNARD:  Your Honor, it is in evidence.

21      THE COURT:  I'm sorry, I didn't hear you.  You can't

22  talk at once.  The defendant, you want to put this in.  It is a

23  plaintiff's exhibit.

24      MS. BAYNARD:  It is already in evidence.  We showed it

25  multiple times.

1          THE COURT:  If it is in evidence, then it is in

2     evidence.  Go ahead.

3     Q.  Officer Mensah, I'm going to play this video, and we can

4     talk about it.

5          (Whereupon tape is played.)

6     Q.  Do you see yourself on that video?

7     A.  I do.

8     Q.  And when you come into frame, can you describe what you're

9     doing right before you come into frame?

10    A.  Right before I come into frame, I'm running, and I'm running

11    fast.  Because right after I got out of my car, I saw a mall

12    security supervisor, and I yelled.  I screamed, and you can hear

13    it in the video that was played earlier.  I yelled, said I was

14    telling him get your guys out of here.

15         It wasn't just -- We're in a foot pursuit.  Now, we're

16    in a foot pursuit, and I didn't know.  I worked at the mall in

17    the past, and you're not supposed to get involved in foot

18    pursuits when you're mall security.  That's not supposed to

19    happen.  When I saw mall security there and we're in the middle

20    of a foot pursuit, it upset me, and I was worried about the

21    person, mall security being there.

22         When I saw that, I screamed and yelled him to get out

23    of there, and I ran fast because I needed to get up there.  I

24    know he is unarmed.  The mall security guard is unarmed.  We're

25    in the middle of a foot pursuit.  It's involving a subject with

1    a gun, and he needed to get out of there.  At the very least, he

2    is an innocent bystander that should not be there.  I was

3    running to get him out of there.

4    Q.  At some point, you hear a gunshot?

5    A.  Correct.

6    Q.  Now, when you hear this gunshot, do you initially know where

7    it came from or who it came from?

8    A.  No, I do not.

9    Q.  At some point, do you start to believe you know who the

10   gunshot came from?

11   A.  Yes, and it's stated in the report before.  When I first

12   started running, I could see someone that matched the

13   description of the person we're looking for.  I did not know it

14   was Alvin Cole.  I did not know his name.  I saw a description

15   of someone.

16          I joined in the foot pursuit, still see the person,

17   gunshot goes off.  It is right where that person was.  That

18   person starts to go down, and he's moving from where he was when

19   I heard the gunshot go off.  Now, he's moving to a different

20   spot.  When I get up to him, I see a gun.  Based on those,

21   circumstances, I can pretty much infer that this is the person

22   who fired the gunshot.  It matches the description for the

23   person that was involved with an incident involving a gun in the

24   mall.  He's right in the direct area where a gunshot went off,

25   and now I see that he has a gun.

1          (Whereupon tape is played.)

2     Q.  When you hear the gunshot, do you pull your firearm?

3     A.  I do.

4     Q.  You didn't pull your firearm before you heard the gunshot,

5     true?

6     A.  That's true.

7     Q.  Why are you pulling your gun in response to the gunshot?

8     A.  When I heard the gunshot, I didn't know if another officer

9     had shot someone or if someone else was shot, but a gunshot went

10    off.

11         Again, this is directly related to involving a call

12    for a subject with a gun, foot pursuit and now a gunshot just

13    went off.  There's someone directly here that matches the

14    description.  I didn't know if another officer -- I didn't know

15    if another officer shot someone, if another officer had been

16    shot, if the security officer was just there had been shot.  I

17    don't know.  Again to protect myself and everyone around, I

18    pulled my gun out.

19    Q.  Do you see other officers pull their gun out in response to

20    the gunshot as well?

21    A.  Eventually I saw the guns were out.  Right away that wasn't

22    my focus who else has their guns out.  It's the -- It was dark.

23    Then, you got flashlights coming out.  There's multiple people,

24    multiple officers, multiple security guards.  I'm trying to

25    assess right after this gunshot is anybody hurt, is everybody

1    okay, am I shot?

2            At the same time, I am seeing someone that matches the

3    description.  There's a lot going on in a small amount of time.

4    Q.  So you pull your gun, and you continue to run, true?

5    A.  True.

6    Q.  And then what happens next?

7    A.  So as I get closer, I see the person who I now know is Alvin

8    Cole.  He was in some kind of crouched, three-point stance.  I

9    saw the gun as I come up and start telling everybody, hey,

10   there's a gun, there's a gun, guns out.  I think that's the

11   exact word I say, guns out.  I said that to pretty much let

12   everybody know.  It's implied, yes, you heard a gunshot.  It's

13   not just the fact that I heard it.  I heard a gunshot.  I'm

14   pretty sure it's a gunshot.  Now, I am letting everyone know I

15   see a gun as well.

16           You combine a physical gun that I'm seeing combined

17   with just hearing a gunshot, let everybody know, hey, there is a

18   gun out right now so everybody around me, not just the officers,

19   security everyone know, hey, there is a gun out right now.

20   Q.  At some point, you observe Cole point the gun at you, right?

21           MR. CADE:  Objection, leading.

22           THE COURT:  Sustained.

23   Q.  What happens next?

24   A.  So as I approached and I see the gun out, again I am still

25   trying to assess.  I see him.  I'm kind of wondering, you know,

1   other officers saying drop the gun, drop the gun.  I see the gun

2   in his hand.  He's not dropping it.  I get a little bit closer,

3   and I have my gun out.  It's pointed directly at him.

4           And at some point, the gun either is -- When I say

5   over the shoulder, it's more of like the arm.  It is either over

6   the arm or under the armpit, and I see it pointed at me.  Now,

7   who it's pointed at before then I don't know, but I see it

8   pointed at me.

9           As it's pointed at me, I can -- At this point, I have

10  been a cop for eight years.  I see the gun pointed at me.  I'm

11  looking at it.  I'm expecting again after I just heard one

12  gunshot go off, there is a gun pointed at me, I am expecting

13  another to come.  What other reason could there possibly be or

14  what else can I infer from a gun being pointed at me after a gun

15  was just fired right after a foot pursuit right after a call for

16  someone at the mall involving a gun.  I'm expecting to get shot.

17          So I'm hesitating.  I'm trying to process what's going

18  on.  I'm going through the whole making sure that I am legally

19  justified in this, processing all this information as I'm

20  literally expecting to get shot.  I am bracing my body to take

21  the first round as I'm moving.

22          I start moving as I'm shooting.  And once the threat

23  was over, I stop shooting.

24  Q.  How long do you think you had to make the decision of

25  whether or not to shoot Mr. Cole?

1    A.   A fraction of a second.

2    Q.   Are you sure that the gun was in Cole's hand when you shot

3    him?

4    A.   I am beyond positive.  There's no mistaking it.  That is not

5    something that you forget.  There's some things, some aspects

6    about the incident that you might not remember everything.  But

7    that fear and that --  that burning sensation that you feel.  I

8    don't know if it's my mind or my body preparing for what's

9    coming next but that almost, like, a sympathetic pain or

10   burning.  I'm expecting I'm about to get shot.  I don't -- I

11   know it is going to hurt.  I don't know if it is going to burn

12   or a punch, but I am expecting that.

13            So I remember that specific thing.  Without a doubt

14   there's a gun pointed at me.  I'm going to get shot.  This is

15   happening, I am going to get hurt.

16   Q.   Do you know how many shots that you fired?

17   A.   I now know there was five.  At the time, no idea, no clue.

18   Q.   And do you know how long it took you to fire those five

19   shots?

20   A.   Again now I know it was 1.7 or 1.5 seconds.  It was really

21   quick.

22   Q.   You didn't shoot until your gun was empty, right?

23   A.   No, not even close.

24   Q.   And how long did you shoot for?  Sorry, why did you shoot

25   five shots?

1    A.   That's how long it took for me to process that the threat

2    was no longer there.

3    Q.   Joseph, did you shoot Alvin Cole for no reason?

4    A.   No.

5    Q.   Why did you shoot Mr. Cole?

6    A.   I didn't want to get shot.  I didn't want to die.  I didn't

7    --  This isn't what I expected.  This isn't what I wanted.  When

8    I was chasing him -- I understand the call for service.  I was

9    expecting him to just stop, to just surrender, for this to be

10   over with.

11           Even when he went to the ground, I am expecting this

12   is going to be done.  A gunshot went off, he's clearly

13   surrounded, this is over and done with.  I wasn't expecting over

14   a disorderly conduct, DC armed at best, for him to shoot his way

15   out of this.  I wasn't expecting that.

16           I also between myself and everyone there, I didn't

17   want anyone else to get hurt.  At that moment, I didn't know if

18   anyone was hurt.  But I know at this point right now at least

19   I'm about to get hurt.  Other people could be hurt as well, and

20   I didn't want to die.  I didn't.

21   Q.   Did you shoot Alvin Cole because he only posed a threat to

22   you?

23   A.   No.

24   Q.   Who else did he pose a threat to?

25   A.   Literally every single person that can be hit by a gunshot

1    round in that area.  People across the street could have been

2    hit.  Anyone in the mall could have been hit.  Anyone in the

3    Cheesecake Factory, driving around in the parking lot.  There's

4    --  If you're within a few hundred yards of this incident, you

5    could have been shot.  Anyone could have been shot.

6    Q.  I want to tell the jury a little bit about you.  I want you

7    to tell the jury a little bit about yourself.  Are you married?

8    A.  I am.

9    Q.  Do you have kids?

10   A.  I have three step daughters, and I have a year and-a-half

11   old son.

12           MS. BAYNARD:  I have nothing further, Your Honor.

13           THE COURT:  Okay.

14           MR. CADE:  May I?

15           THE COURT:  Sorry?

16           MR. CADE:  May I?

17           THE COURT:  Yeah.

18   **REDIRECT EXAMINATION BY MR. CADE:**

19   Q.  Mr. Mensah, you said a moment ago that you heard other

20   officers saying drop the gun, drop the gun, correct?

21   A.  Yes.

22   Q.  Sorry?

23   A.  Yes.

24   Q.  So if other officers were saying drop the gun, drop the gun,

25   you know that you're not the first officer there who sees the

1  gun, correct?

2          MS. BAYNARD:  Objection, calls for speculation.

3          MR. CADE:  That's all he's done.

4          THE COURT:  He can answer.

5          THE WITNESS:  When I'm there, other officers were

6  saying it.  I don't remember if they were saying before or

7  after.  I don't know they are saying drop the gun.  He's not

8  dropping it.  I am not understanding why not drop the gun.  It

9  doesn't make sense.  It doesn't make sense, just drop it.

10 Q.  Correct.  You didn't shoot before they say drop the gun.

11 These other officers -- Because you're shooting to stop the

12 threat.  So the only way in your head that you heard the words

13 drop the gun is other officers saying it before you pulled the

14 trigger, right?

15 A.  Either as I'm doing it or right before, yes.

16 Q.  As you're doing it.  We actually hear officers yell stop,

17 stop, stop, do we not?

18 A.  If you play it, you hear -- They don't say stop until the

19 shooting stops.  You can play it if you want.

20          (Whereupon tape is played.)

21 Q.  After you start shooting, you hear officers yelling stop?

22 A.  Right after, like, the last shot it went off.

23 Q.  They are yelling at you to stop shooting?

24          MS. BAYNARD:  Objection, misstates prior testimony,

25 calls for speculation.

1          THE COURT:  Well, I'll allow him to ask the question,

2     but we've been over this a few time.

3     A.  I didn't say stop.

4     Q.  Let me rephrase the question, Mr. Mensah.  They are yelling

5     at you to stop shooting, correct?

6     A.  No, they never said stop shooting.

7     Q.  Well, they are not yelling at Alvin Cole to stop getting

8     shot at, right?

9     A.  They are not yelling.  One, I don't know who they are

10     yelling at.  They could have been yelling at other people to

11     stop running, they could have been yelling to stop pointing a

12     gun.  I wasn't the person who said stop, so I can't say why one

13     person said it or not.  I don't know.

14     Q.  Right after the fact -- We know that Olson was over towards

15     Mayfair Road, and he had two subjects on the ground, right?  You

16     know this?

17     A.  Correct.

18     Q.  They are not moving, right?

19     A.  I don't know.

20     Q.  You heard Olson testify.  You've seen his deposition?

21          MS. BAYNARD:  Objection, Your Honor.  Olson hasn't

22     testified.  He's here outside waiting to do so.

23     Q.  You've seen his deposition?

24     A.  I have not seen his deposition.

25     Q.  They are not yelling at Shamsi to stop doing something, are

1   they?

2   A.  I do not know.

3           THE COURT:  He's answered the question.  He doesn't

4   know.

5           THE WITNESS:  This is the third time I've said it now.

6           THE COURT:  Anything more?

7           MR. CADE:  One second, Judge.

8   Q.  You also indicated that you were anticipating getting shot

9   at, correct?

10  A.  Not getting shot at, getting shot.

11  Q.  You anticipated the gun pointed in your direction and

12  trigger being pulled, correct?

13  A.  The gun was already pointed.  I was anticipating the bullet

14  coming out next.  That's what I was anticipating.

15  Q.  Just so I'm clear, you didn't see the gun pointed at anybody

16  else other than you when you pulled the trigger, correct?

17  A.  Correct.  Because I didn't see it doesn't mean it didn't

18  happen.

19  Q.  Sorry?

20  A.  I didn't see it pointed at anyone.  Doesn't mean it didn't

21  happen.

22  Q.  You said that Mr. Cole was crouched in a three-point stance.

23  I'm sorry, I just don't see that in Exhibit 51 that he is in a

24  three-point stance.  When did that happen?

25          MS. BAYNARD:  Object to the form of the question.

1          THE COURT:  He can answer.

2          THE WITNESS:  That whole -- You want me to explain

3    what a three-point stance is?  I don't know what you mean.

4    Q.  You had said -- I asked you, we spent a lot of time that you

5    heard the shot.  And then at some point you see Alvin Cole, and

6    you were very clear that he's on his knees with his left hand,

7    correct?

8    A.  At one point, yes.

9    Q.  And the gun at that point is not pointed at you, correct?

10   A.  I can't see.  I need a microphone.

11   Q.  I'm sorry.  Down on hands and knees?

12   A.  I'm not trying to be rude, I'm short.

13   Q.  Why don't you step down.

14          THE COURT:  Go ahead.  Get a microphone.

15   Q.  So Mr. Mensah, you said after the shot, the first shot, he's

16   down on his hands and knees on his left hand, right?

17   A.  Correct.

18   Q.  That's not a three-point stance?

19   A.  Three points of contact is what I was referring to, two

20   knees and a hand.  That's three points.

21   Q.  So when you were referencing Attorney Baynard, the

22   three-point stance was he's down on his knees with his left

23   hand?

24   A.  Could you ask the question again?

25   Q.  When you were referring to the three-point stance, crouched

1    three-point stance, that was on his knees with his left hand

2    down on the ground, correct?

3    A.  Yes.  But what specific point are we talking about, just in

4    general?

5    Q.  You said the words earlier while Attorney Baynard was asking

6    you questions that he was crouched in a three-point stance.  I

7    know three-point stance from football where you're on your feet,

8    and you have your hand down.  I'm trying to make it very clear

9    that you never testified -- You never said that to the

10   detectives or at any point in time that he was in a football

11   three-point stance?

12   A.  Correct.  I do not mean that in anyway.  Not a football

13   three-point stance.  I meant two knees and one hand.  That's the

14   three points.

15   Q.  Do you have any evidence that anybody but Mr. Cole fired the

16   first shot and injured himself?

17   A.  I don't have any evidence.

18   Q.  Right.  Do you have --  That's a no, correct?

19   A.  I don't have any evidence, no.

20   Q.  Do you have any evidence that Mr. Cole was pointing the

21   weapon at you or anyone else with that first shot?

22   A.  I'm sorry, what do you mean by do I have evidence?  Is there

23   evidence presented or what do you mean by do I have evidence?

24   Q.  I think I'm clear, sir.  Do you have any evidence -- You

25   never saw the muzzle flash as if the gun was pointed in your

1  direction, correct?  That very first shot --

2  A.  Correct.

3  Q.  -- by Alvin Cole.  You were here when Dr. Tlomak described

4  the injury and stippling and everything else, yes?

5  A.  Yes.

6  Q.  You're familiar with stippling, correct?

7  A.  Correct.

8  Q.  You're familiar with stippling occurs between close contact

9  and 24 inches as she described, correct?

10 A.  Yes.

11 Q.  Okay.  Stippling is not five yards away, correct?

12 A.  Correct.

13 Q.  So do you have any evidence that someone other than Mr. Cole

14 fired that first shot and injured himself?

15         MS. BAYNARD:  Object to the form of the question.

16         THE WITNESS:  I understand what you're saying.  My

17 attorney is sitting there.

18         THE COURT:  Sustained.  Can you ask him, like, what he

19 saw or something that's not --

20 Q.  You didn't see the gun fired at you, correct?

21 A.  I didn't see a gun fired at me.

22 Q.  You didn't see the gun fired at anyone else, correct?

23 A.  I didn't see it, no.

24 Q.  When the gun fired, you didn't know who had fired the gun,

25 whether it was Mr. Cole or another officer, correct?

106

1    MS. BAYNARD:  Objection, asked and answered.

2    THE COURT:  Sustained.

3  Q.  Other than hearing a shot, you didn't know anything about

4  who fired, correct?

5  A.  Correct.

6    MR. CADE:  Those are my questions, Your Honor.

7    THE COURT:  Thank you.  You are excused.  Next

8  witness.

9    (Witness excused.)

10

11    *********************************************

12

13    (Continued excerpt transcript.)

14

15    MR. CADE:  Plaintiffs call Ricky Burems.

16    THE COURT:  Okay.

17    Ricky Burems, being first duly sworn to tell the

18  truth, the whole truth, and nothing but the truth, testified as

19  follows:

20    MR. BUREMS:  Yes, I do.

21    THE COURT:  Have a seat.  State your name for the

22  record spell your last name.

23    THE WITNESS:  I'm Ricky Burems, B-U-R-E-M-S.

24  **DIRECT EXAMINATION BY MR. CADE:**

25  Q.  Good afternoon, Mr. Burems.

107

1    A.   Good afternoon, sir.

2    Q.   Tell us a little bit about yourself.  Where are you

3    currently employed?

4    A.   I'm currently employed at Milwaukee Area Technical College

5    as an investigator in their public safety department.  I've been

6    there for about 11 and-a-half years.

7    Q.   And although you are a spry chicken, did you have a career

8    prior to MATC?

9    A.   Yes.  Prior to MATC, I was on the Milwaukee Police

10   Department for 32 years.  I was eight years uniform patrol,

11   three years plain clothes drug investigation, and then 21 years

12   as a detective, mostly violent crimes and homicide.  I was a

13   homicide detective for ten years.

14        I would just like to talk a little bit about the

15   evolution of being a police officer.

16   Q.   Please.

17   A.   Thank you.  When you first start, you are kind of a

18   spectator --

19        THE COURT:  It is better to have a back and forth with

20   your lawyer.

21        THE WITNESS:  Okay.

22   Q.   Well, I'm not your lawyer.  You are -- You were retained to

23   be the expert for the plaintiff, correct?

24   A.   That is correct.

25   Q.   First, let's talk about the obvious.  How much are you being

108

1    paid to testify or give testimony?

2    A.  I'm not being paid anything to testify or give testimony.

3    Q.  Nothing?

4    A.  Nothing.

5    Q.  Okay.  Why is that?

6    A.  Well, I am here because I have the training and experience.

7    Even though I am retired, I still care about the police

8    profession.  I have a conscience about what happened, and I

9    would just like to see positive change take place within the

10   police profession, and I think this is an opportunity to --

11            MR. WIRTH:  Object.

12            THE COURT:  Sustained.  Next question.

13   Q.  So Mr. Burems, let's talk for a moment of serving as a

14   detective for 21 years.

15   A.  Yes, sir.

16   Q.  Let's talk first about your background.  Do you have an

17   associate or bachelor's degree?

18   A.  I am nine credits short of a bachelor's degree in criminal

19   justice.

20   Q.  Okay.  Is there a difference as you see it between someone

21   having a degree and not having a degree when it comes to being a

22   detective?  Does that change anything?

23   A.  No.  To me, the important thing is to have experience,

24   repetition investigating various crimes.  For me, I've

25   investigated over 1,000 -- easily over a thousand violent

1    crimes, including shootings and homicides, some sexual assaults,

2    robberies, burglaries.  Primarily violent crimes being shootings

3    and homicide.

4    Q.  And let's talk for a moment.  With regards to serving as a

5    detective, it's been -- the word has been bandied about talked

6    about DAAT, D-A-A-T.  What is DAAT?

7    A.  DAAT, it stands for Defense and Arrest Tactics.  And what it

8    does is that it establishes parameters for police personnel in

9    the use of force, how to use force, under what circumstances to

10   use force.  It started in early 2000, and it kind of gives

11   uniformity across agencies that institute it.  Wisconsin has a

12   DAAT format as do many of the other police agencies across the

13   United States.

14   Q.  And is DAAT at least in Wisconsin, is it consistent in terms

15   of the curriculum that's taught at, the areas where police

16   officers are trained?

17   A.  Yes, it is.  I've been trained in DAAT yearly since the

18   early 2000s.  Even being in public safety at Milwaukee Area

19   Technical College, we receive DAAT training every year, also.

20   Q.  So let's talk about DAAT as a concept.  What does DAAT say

21   with regards to force?

22   A.  Well, in regards to the use of force, there's -- The first

23   thing is uniform presence.  A uniform officer's presence in a

24   situation should cause people to adjust their behavior.

25              The second is dialogue, police officer telling people

1    what to do, giving them certain commands.  If dialogue isn't

2    effective, there are measures, protective measure, defensive

3    measures.  And then the last, of course, is deadly force.

4    Q.  So how many levels of force are there under DAAT?

5    A.  About five.

6    Q.  Deadly force is the fifth level?

7    A.  Deadly force is the fifth level.

8    Q.  Tell us in order to use deadly force, what must an officer

9    do before they literally pull the trigger?  I'm using pull the

10   trigger -- Obviously, an officer in using deadly force, there

11   are other means than using a firearm, correct?

12   A.  That is correct.

13   Q.  So just so we're clear, you can have a situation where an

14   officer has a knife and the only thing they have if they stab

15   somebody and they kill them, that's -- Still DAAT training still

16   has to be involved?

17   A.  That training still has to be justified whether you use a

18   knife, a gun, a baton, even your hand if you're trained to use

19   deadly force with your hands.  But in order to use deadly force,

20   there has to be an imminent threat of death or great bodily harm

21   to yourself or to other citizens.

22          And by imminent, it means that if you don't use deadly

23   force, there's no doubt that deadly force will be used against

24   you, and deadly force is the only way to stop deadly force to be

25   used against you or someone else.

1  Q.  In order to make determinations with regards to an officer

2  who has used deadly force and understanding it from the level of

3  DAAT, is it fair to say that we look at a reasonable officer?

4  A.  Yeah.  It's not just what if I was in a situation where I

5  used deadly force, it's not just what I would do or what I would

6  think.  It would be what other officers with similar training in

7  a similar situation would do.

8         I think that is fair to say that one of the reasons

9  that DAAT was instituted was to create uniformity.  Because I

10  think before that, officers had different ideas as to when to

11  use deadly force, and DAAT kind of establishes those parameters.

12  Q.  So with regards to DAAT, it's a classroom setting.  Let's

13  back up.  Anyone who wants to be a licensed law enforcement

14  officer in the State of Wisconsin has to go through some sort of

15  academy or other training, fair?

16  A.  That is correct.

17  Q.  And it is at least what 16, 20 weeks?

18  A.  I think ours was either five or six months, but that's

19  close.

20  Q.  So but everybody has to go through training.  You can't show

21  up and say I want to be a police officer, they hand you a gun

22  and badge and say you are officially licensed?

23  A.  That is correct.

24  Q.  As part of that training, you are in the classroom learning

25  about Defense and Arrest Tactics?

112

1  A.  Yes.  In addition to that training, the initial police

2  academy, you have 40 to 80 hours of inservice training,

3  including DAAT and police procedures, every year of your career.

4  Q.  So when you say inservice, it is like some sort of

5  continuing education?

6  A.  Yes, you go back to school.

7  Q.  Forty to 80 hours per year?

8  A.  Forty to 80 hours per year.

9  Q.  With regards to DAAT, obviously in the classroom you're

10 learning about it.  Are you actually in real-world scenarios

11 learning about DAAT, like, they put you on the street and chase

12 bad guys and things like that?

13 A.  Well, they don't put you on the street.  But some of the

14 DAAT techniques take place in a gym because they teach you

15 handcuffing techniques, they teach you baton techniques,

16 hand-to-hand techniques.  So there are some physical aspects

17 that you learn again not on the street but in a gym.

18 Q.  Fair.  But I guess my question, and I apologize I'll word it

19 better.  I guess what I'm trying to ask, is the DAAT training

20 that's in the classroom, does that compare to training out on

21 the streets?

22 A.  I would say no.

23 Q.  Why not?

24 A.  Because when you're on the streets, you don't have a DAAT

25 manual with you that when situations occur, you then take out

113

1  the manual and look at it and say does this fit that?  Again,

2  DAAT gives you the parameters.  Situations occur on the street

3  where you have to act, and, you know, based on your training,

4  you try to act within the parameters of Defense and Arrest

5  Tactics.

6  Q.  Is it fair to say Defense and Arrest Tactics are sort of,

7  like, a code of conduct, like, a general parameter, but the

8  actual situation may vary once you're out on the street?

9  A.  That's a good way to put it.  DAAT is one of the tools -- I

10 will say an essential tool in the police officer's tool box.

11 Q.  Let's turn for a moment.  Did you ever -- Have you ever

12 trained other officers with regards to DAAT?

13 A.  Yes, I was a field training officer after my third year on

14 the police department.  And informally with me being a senior

15 officer, I would continuously train other officers within the

16 DAAT parameters.  And even being at MATC when we encounter

17 people who are hostile or uncooperative, I use my training and

18 experience to influence other officers under the DAAT

19 parameters.

20 Q.  Just so we're clear when you say MATC, you are referring to

21 the Milwaukee Area Technical College?

22 A.  That is correct.

23 Q.  So let's turn, Mr. Burems, to your background.  Have you

24 been involved in police shootings?

25 A.  Yes, I have.

114

1    Q.  Have you had to discharge or fire your weapon?

2    A.  I never discharged or fired my weapon.

3    Q.  Have you been shot at?

4    A.  I was.  I've been stabbed.  But when I was stabbed, me and

5    my partner were able to disarm the actor in that so we didn't

6    discharge our weapon.  I was in another incident where we were

7    looking for a homicide suspect who had killed his girlfriend.

8    And when we got there, he pulled out a gun.  Other officers

9    fired twice.  He was neutralized not killed, but neutralized.

10           MR. WIRTH:  I need to object.  We're supposed to be

11   talking about the DAAT standards.

12           MR. CADE:  Just asking background, Judge.

13           THE COURT:  All right.  Sir, go ahead on this, but

14   let's try to get to the point as quick as you can.

15           THE WITNESS:  It is applicable to DAAT because when

16   they talk about eliminating a threat while using deadly force,

17   it does not mean to kill.  It just means to stop the threat.

18   And in a situation I was in where the guy pulled the gun, the

19   threat was stopped so the shooting stopped.

20   Q.  Let's also talk, were you in the courtroom, Mr. Burems, when

21   Mr. Mensah was on the stand testifying?

22   A.  Yes, I was.

23   Q.  And there were some questions that I posed to Mr. Mensah

24   with regards to being a cover officer.  Did you hear that?

25   A.  Yes.

115

1  Q.  What exactly is a cover officer?

2  A.  Well, Defense and Arrest Tactics teaches the concept of

3  contact officers and cover officers.  It's just -- Say if you

4  have a subject that you're dealing with, one officer should be

5  engaged in the dialogue with this person while other officer

6  should be watching or covering you while you're dealing with the

7  person and being aware of danger or escalation.  So they're

8  actually at a position of advantage because the person you're

9  dealing with is concentrating on the contact officer, and the

10  cover officer can be there watching.  A cover officer can even

11  be behind the suspect or to the side of the suspect, but they

12  are at a position of advantage.

13  Q.  When you say -- Just so I'm clear, position of advantage, is

14  that because the cover officer, the individual is engaged with

15  the first officer, and the cover officer can move, can make

16  decisions on how to react, that type of thing?

17  A.  That is true.  The individual doesn't even have to know that

18  the cover officer is there.  So yeah, that's exactly what it is.

19  Q.  So when I asked Mr. Mensah questions about -- I am assuming

20  you, as a field training officer and with 32 years experience,

21  you had trained people and taught people about how to operate

22  correctly as a cover officer?

23  A.  That is correct.

24  Q.  Okay.  And did you hear Mr. Mensah's answer to my questions

25  where when he ran into the situation, he said that he's not

1  necessarily the cover officer even though he's further away from

2  Shamsi or he doesn't know which officer is up there?

3          THE COURT:  Sustained, sustained.  Please get on with

4  it, Mr. Cade.

5          MR. CADE:  Yes, Your Honor.

6  Q.  With regards to DAAT --  With regards to DAAT and the

7  decision to use deadly force --  Let me back up.  Still within

8  DAAT, is there part of the training that talks about not the

9  five levels of force, but is there part of the training that

10  describes essentially the condition of the officer, the mental

11  condition?

12  A.  Yes, there is.

13  Q.  What's that called?

14  A.  In the manual, the manual compares the mental condition of

15  officers to colors.  With the color white being completely

16  unaware.  The color yellow being aware of your surroundings.

17  Orange, you are aware, you have identified a threat.  Red is you

18  are actively engaging and dealing with the threat.  And black is

19  that you are, like, in a panic and basically ineffective because

20  you are too excited.

21  Q.  Have you seen examples in this case of too excited?

22          MR. WIRTH:  I am going to object to that.  This is --

23  This is the subject of a Motion in Limine.

24          THE COURT:  Sustained.  Sustained.

25  Q.  With regards to the five levels of force, did --  Let me

117

1  back up.  In identifying whether you can use deadly force, does

2  the manual describe the training, what an officer must do, the

3  mental calculations if you will before they decide to use deadly

4  force?

5  A.  The key is assessment and exhausting all other means to deal

6  with a threat and just constantly assessing and saying is that

7  threat still there, is there still a possibility that deadly

8  force be used against me, does the person have the means to use

9  deadly force, are they in a position to use deadly force against

10 me?  And even when you use deadly force say if you shoot

11 somebody, after each shot you have to reassess the situation and

12 say is this person still a threat?  After the first shot, you

13 assess if the person is no longer a threat, then there is no

14 second shot, so you're constantly assessing before and during a

15 deadly force incident.

16 Q.  So you said the means, the what?

17 A.  The means, the ability, and is the person in the position to

18 use deadly force against me.

19 Q.  Do you have the right under DAAT to shoot a subject that's

20 running?

21      MR. WIRTH:  Judge, I'll object.

22      THE COURT:  Sustained.  Mr. Cade, I'm going to

23 instruct the jury on what they can infer from evidence.  So the

24 province of what the law governing the case is, mine and mine

25 alone.

118

1      MR. CADE:  Yes, Judge.

2      THE COURT:  So you can ask him about various aspects

3  of DAAT and so forth.  But when it comes to what the law is,

4  that's what I pronounce on, okay.

5      MR. CADE:  Sure.

6  Q.  Let me ask you this.  Can you give some examples with

7  regards to means.  That sounds self explanatory.  With regard to

8  the next decision, you said that's the ability.

9  A.  Is the person able to -- I can give you an example.  The

10  DAAT manual describes positions in which the officer has

11  advantage or an upper hand.  And even when they -- when the

12  manual describes how to deal with a hostile subject, it talks

13  about if you are behind a hostile subject that gives you an

14  advantage because the subject does not see you.  And also, that

15  you want to be higher than the subject, physically higher.

16      That's why when you see officers encounter people and

17  they are about to arrest them, they say turn around, so turn so

18  you're not facing me.  Then, they say get down because those two

19  positions give you a great advantage.  So a person is turned

20  away from you, and they are down.  You are over them.

21      And of course, the next is either to lay flat or put

22  your hands behind your back.  Those are positions of great

23  advantage for an officer, and they take away the threat of

24  imminent deadly force or bodily harm.

25  Q.  Are there other advantages that DAAT talks about that an

119

1  officer should utilize?

2  A.  Yes.  Another great advantage that officers use all of the

3  time is numbers.  You don't want to be one on one with a hostile

4  subject.  If you're -- someone is hostile, you want two or three

5  officers dealing with a hostile subject.  There is, as I say,

6  strength in numbers.  You want to out number the hostile

7  subjects.

8  Q.  Any other advantages?

9  A.  Your weaponry.  If you have, of course, your firearm, you

10  have your baton.  A lot of officers carry tasers but also that

11  emphasizes that your dialogue is really what you want to use to

12  disarm hostile people.  That is the ideal situation is to disarm

13  people with your dialogue to be able to talk to them and resolve

14  the situation.

15  Q.  So is the difference between stop and stop, you know, saying

16  a word and emphasizing or yelling a word?

17  A.  Yeah, and that is referred to as soft control talk, hey stop

18  or heavy control talk.  Stop, stop right now.  So again back to

19  dialogue and the way that you talk to people.

20  Q.  One other thing about DAAT, does it describe scenarios with

21  regards to, for example, is an officer under DAAT training

22  allowed to guess about intentions?

23  A.  You have to -- I would say definitely not.  It's much more

24  than a guess.  There has to be concrete indications.  Again,

25  imminent.  In regard to deadly force, imminent.  Constant

120

1    assessment.  If I don't respond with deadly force, there's no

2    doubt that deadly force is going to be used against me.

3             If there's a chance that you can resolve a situation

4    without using deadly force, then you have to do that.  If you

5    have an opportunity to resolve the situation without using

6    deadly force, you have to do that according to DAAT.  You don't

7    use deadly force because you are afraid, because you guess,

8    because you're excited.  That is not DAAT.

9    Q.  Any other advantages or any other tactical means that DAAT

10   describes to officers when they encounter hostile situations?

11   A.  Well, I would just say that DAAT is used to protect the

12   officer.  It is used to protect citizens, but it is also used to

13   protect the hostile subject, and DAAT talks about that.

14   Q.  What do you mean it talks about that?

15   A.  Well, again, it emphasizes -- The basis of DAAT is to

16   resolve situations without using force or without using deadly

17   force.  That's why there's a continuum that starts with uniform

18   presence, dialogue, controlling a person physically that is

19   resistive and controlling a person that is attacking you, and

20   then deadly force when great bodily harm or death is imminent.

21   Q.  I want to make sure that I don't --  It's fair to say

22   confronted doesn't have to start at Level 1 and go two, three,

23   four, five.  An officer confronted with a situation

24   theoretically could begin at Level 5, deadly force?

25   A.  Earlier when you asked me about DAAT training and whether or

121

1   not it takes place on the street, you know, that's a good

2   example.  You know, that would be hard to replicate in a

3   classroom.  But it is true you might walk in a store to buy a

4   cup of coffee or something and be presented with somebody who is

5   attacking you trying to hurt you, trying to kill you so you

6   won't have time for dialogue.  Then, so you can go straight to

7   five.  You can go straight to deadly force.  Or you might be in

8   a situation say if someone is suicidal or someone is hostile and

9   they have a weapon, you might have the opportunity to talk to

10  them, talk them down, talk them into putting their weapon down.

11          So again, you know, dialogue is what's preferred.

12  But, of course, you can go straight to Level 5.  That can

13  definitely happen.

14  Q.  It's fair to say not every situation on the street rises to

15  Level 5, correct?

16  A.  It's fair to say most situations on the street do not rise

17  to Level 5.

18          MR. CADE:  Those are my questions, Your Honor.

19          THE COURT:  Any cross?

20          MR. WIRTH:  Briefly, Judge.

21  **CROSS EXAMINATION BY MR. WIRTH:**

22  Q.  Mr. Burems, you are not a DAAT instructor, correct?

23  A.  No, I am not a DAAT -- certified DAAT instructor, no.

24  Q.  With respect to the use of deadly force, the purpose of

25  deadly force is to stop the threat, correct?

122

1    A.  You mean from a police officer's standpoint?

2    Q.  Correct.

3    A.  The purpose -- Yes, the purpose of --  and deadly force, and

4    I would guess that you're speaking in terms of using your

5    firearm.  But the purpose, again, is to stop the threat, not to

6    kill, but to stop the threat.

7    Q.  You prefaced that by saying -- You assume I am talking about

8    a firearm, correct?

9    A.  Well, when people talk about deadly force, it does not

10   have -- It can be your baton.  It could be your hands.  You can

11   hit somebody in the throat, but it is to stop the threat.  When

12   ever you do something that could cause somebody death or great

13   bodily harm, you're not doing it to kill them.  As a police

14   officer, you are doing it to stop that threat.

15   Q.  There is no threat higher than deadly force, is there?

16   A.  Not one that I can think of.

17   Q.  Okay.  So the purpose of the use of deadly force under DAAT

18   training is to stop deadly force, correct?

19   A.  That is correct.

20   Q.  Do you have one of the DAAT manuals in front of you?

21   A.  No, I do not.

22   Q.  The DAAT manual.  Mr. Burems, if you will take a look at the

23   2017 DAAT manual marked as Exhibit 1061.

24   A.  I have it here in front of me, sir.

25   Q.  I'm sorry, 1055.  Please turn to page 74.

123

1   A.  I have it.

2   Q.  Do you see in the upper center of the page the section that

3   begins deadly force?

4   A.  Yes.

5   Q.  Can you read that section to yourself?

6   A.  I read it.

7   Q.  The DAAT manual instruction that within the DAAT system,

8   there are -- One trained tactic is classified as deadly force,

9   and that's the firearm, correct?

10  A.  I don't --  Are you -- I don't see that here on this page.

11  Q.  Do you see where it says deadly force?

12  A.  Yes.

13  Q.  Do you see the little blue box to the right?

14  A.  Yes.

15  Q.  There's a paragraph to the left of that blue box.  Do you

16  see that?

17  A.  Deadly force is the fifth mode of intervention.

18  Q.  Correct, so deadly force.

19  A.  Yes, I see that.

20  Q.  The purpose of deadly force is to stop the threat?

21  A.  Yes.

22  Q.  Within the DAAT system, one trained tactic is classified as

23  deadly force, the firearm?

24  A.  Well, other parts of the manual talk about situations.  Say

25  if you were as a police officer if you were involved in a

1    physical confrontation with someone, we have the long wooden

2    batons, and you are not instructed to hit people in the head

3    with the baton because that is considered deadly force according

4    to the DAAT manual.  But say if you are trying to hit someone in

5    the arm with the baton and they duck and you hit them in the

6    head and they die, that is considered deadly force.  But I do

7    understand what you're saying about the firearm, and it does say

8    that here.  But it also mentions other instances where deadly

9    force is used specifically with a baton or even what is

10   called -- I can't think of the name.  There are nerves on either

11   side of your neck.  And if you hit those nerves, it can kill

12   somebody, and they talk about that too, so that can be

13   considered deadly force also.  But I see where it says firearm,

14   yes, sir.  I don't mean to disagree with you on that.

15             THE COURT:  Any other questions, Mr. Wirth?

16             MR. WIRTH:  Yes, Judge.

17   Q.  Go to page 75, Mr. Burems.  You see down toward the bottom

18   when it says deadly force reasonable?

19   A.  When is deadly force reasonable?

20   Q.  Yep.

21   A.  Yes.

22   Q.  That's where you testified earlier that two situations are

23   when it is in defense of yourself or others.  And then there's a

24   second category, far more infrequent category.  Defense of

25   society at large.

1  A.  Yes.

2  Q.  In defense of self or others, DAAT instructs that the

3  officer has an obvious right to protect themselves, correct?

4  A.  That is correct.

5  Q.  And when facing the imminent threat of harm or death or

6  great bodily harm, deadly force is what the officers are

7  instructed to employ, correct?

8  A.  That is correct.

9  Q.  In fact, the DAAT manual, the instruction manual for law

10  enforcement, is you may use deadly force when a subject poses an

11  imminent threat of death or great bodily harm to you or to

12  another person, correct?

13  A.  That is correct.

14  Q.  I believe you were talking about earlier that the kind of

15  three things that the officer has to go through before engaging

16  in deadly force.  And I think I've forgotten what you said.

17  That is actually defined in DAAT, isn't it?

18  A.  Yes, it is, and I said that from memory.  It is not

19  verbatim.

20  Q.  Sure.

21  A.  From what is in the manual, yes.

22  Q.  You didn't have the manual in front of you at the time.  The

23  three things that DAAT instructs an officer who is about to

24  engage in deadly force are intent, weapon and delivery system,

25  correct?

126

1    A.  Yes.

2    Q.  That goes to your earlier testimony where you were talking

3    about a knife or a baton.  If the subject has a knife, they have

4    a weapon, correct?

5    A.  That is correct.

6    Q.  They may even have intent to use it on you, correct?

7    A.  That is correct.

8    Q.  But if they are 50 feet away, they don't have a delivery

9    system.  Is that what you were talking about?

10   A.  That's correct.

11   Q.  Okay.  Whereas someone who is ten feet away from you who has

12   a firearm, they have both a weapon and a delivery system capable

13   of causing you death or great bodily harm?

14   A.  That is correct.

15   Q.  So now what the officer is evaluating is whether the person

16   with the weapon and the delivery system has the intent to use

17   it?

18   A.  Yes.

19   Q.  And when the officer determines from the -- It is the

20   totality of the circumstances, correct?

21   A.  Yes.

22   Q.  So when the officer determines from the totality of the

23   circumstances that the individual has intent, weapon and

24   delivery system, the officer -- deadly force is what the officer

25   is permitted to use?

127

1  A.  I hear what you're saying, but there is an additional

2  component, but I would like to explain that.  But what you're

3  saying is correct, yes.

4  Q.  The officer in that situation is evaluating weapon, delivery

5  system and intent in determining whether he faces death or great

6  bodily harm, correct?

7  A.  Yes.

8  Q.  The officer does not have to wait for the subject to shoot

9  first, does he?

10  A.  No, the officer does not have to wait for that.

11  Q.  The officer does not even have to wait until the gun is

12  pointed directly at him, does he?

13  A.  I would say that if someone has a firearm and they haven't

14  pointed the firearm at you but if they say I'm going to kill

15  you, then the officer can then use deadly force.  So a subject

16  like that has not pointed the gun at you, but they have

17  announced their intent to kill you.

18  Q.  For instance in a great bodily harm situation, is it

19  significant if that individual -- if you are using your commands

20  to tell him put the gun down, put the gun down and he does not

21  put the gun down?

22  A.  What is the question?

23  Q.  That's part of the totality of the circumstances, isn't it?

24  A.  Yeah, it is.  But okay, so someone has a gun and you're

25  telling them to put the gun down, they don't put the gun down.

128

1   Again, you have to determine do they have the intent to kill me

2   or are they just holding a gun?  Are they mentally ill?  Are

3   they hard of hearing?  These things happen, and we are trained

4   officers, and we respond to those situations.  So just because

5   someone is holding -- And I've been in these situations.  Just

6   because someone is holding a gun, you told them to put it down,

7   they don't put it down.  It is a harry situation but intent --

8   You have to be careful, but intent hasn't been established yet.

9   Q.  There are -- The totality of the circumstances include what

10   leads up to that moment too, doesn't it?

11   A.  Absolutely.

12   Q.  If for instance the individual has fired the gun once, that

13   would be part of the totality of the circumstances, wouldn't it?

14   A.  It depends on the circumstances of why they fired the gun.

15   Q.  Sure.  And if they fired the gun once at you while you're

16   chasing them and missed, that's part of the totality of the

17   circumstances.

18   A.  Absolutely.

19   Q.  Now, if he's got the weapon, the delivery system and is

20   ignoring your commands to put it down and turns towards you, the

21   gun doesn't have to be pointed at you, you can use deadly force

22   then?

23   A.  So you're saying someone shoots at me, misses me, and then

24   turns towards me.  Yes, I would say that's a deadly force

25   situation.

129

1   Q.   Part of the way that you infer intent or you determine

2   intent is what lead up to that moment, correct?

3   A.   Yes.

4   Q.   And once you have determined -- Last question.  Once you

5   have determined that there is intent, delivery system and a

6   weapon and have therefore concluded you are in danger of great

7   bodily harm or death, deadly force is the response?

8   A.   Yes.

9   Q.   And part of that totality of the circumstances, according to

10  the DAAT manual, includes behavior which has caused or

11  imminently threatens to cause death or great bodily harm to you

12  or another person or persons?

13  A.   Yes.

14          MR. WIRTH:  That's all I have, Judge.

15          MR. CADE:  A few questions, sir.

16  **REDIRECT EXAMINATION BY MR. CADE:**

17  Q.   First, Mr. Wirth gave you a scenario where someone has

18  turned to fire a weapon at you and missed.  Were you here for

19  Officer Johnson for his testimony?

20  A.   Yes.

21  Q.   And you were here for Mr. Mensah's testimony, correct?

22  A.   Yes.

23  Q.   Did either of them say they witnessed Alvin Cole turning

24  around firing a gun at them?

25  A.   No, neither of them said that.

1  Q.  So the scenario that Mr. Wirth gave you is not applying --

2  Your answer is no to deadly force because no one pointed a gun

3  and fired at you, right?

4  A.  Yes.

5  Q.  Define imminent threat.  Can you do that?

6  A.  Imminent in relation to that and the use of deadly force

7  means that if I don't use deadly force against this person, they

8  are going to use deadly force against me, and it is definitely

9  going to happen.  I have no other choice.  I've exhausted all

10  other options, all other strategies, all other tactics.  It's

11  going to happen unless I use deadly force against them.

12          And again, I want to reiterate that even though it is

13  called deadly force, it is designed to stop the threat, not

14  necessarily to kill.  And the reason it is called deadly force

15  is the use of a firearm can kill.  But again, to stop the

16  threat.

17  Q.  In fact, page 74 of that manual specifically says there's a

18  highlight in blue.  The purpose of deadly force is to stop the

19  threat.

20  A.  That is correct.

21  Q.  Okay.  And, in fact, with regards to you and Mr. Wirth

22  quibbled a little bit with regard to baton strikes.  Does the

23  DAAT manual indicate on page 74 with regards to DAAT, DAAT baton

24  techniques do not target areas that are likely to cause death or

25  great bodily harm.  If you intentionally target the suspect's

1  head, that would be considered deadly force?

2  A.  Yes.

3  Q.  Okay.  Let's talk for a moment about target requirements.

4  Under the DAAT manual, you have to -- Page 77.  It identifies

5  there are three target requirements, acquisition, identification

6  and isolation.

7  A.  Yes.

8  Q.  And let's talk for a moment isolation.  What does target

9  isolation mean?

10  A.  Once you have a target --  Say if your target is --  is

11  standing in a crowd of people, that is not good isolation

12  because there is a chance an errant round can hit another

13  person.  Isolation is to wait until your intended target is

14  isolated or away from other people, and then you have a chance

15  to take the shot so to speak.

16  Q.  Okay.  And target isolation would also indicate not only do

17  you not fire into a crowd, but it would also indicate that you

18  are in firing -- shouldn't potentially hit other people with

19  assuming a firearm bullet or ricochets or anything else?

20  A.  Well, when you fire a firearm, you also have to be aware of

21  the background or what is behind your target because of that

22  possibility.  I've seen rounds pass through one person and hit

23  another person.  A round can ricochet off on object and hit a

24  person that has absolutely nothing to do with the situation.

25          So you have to be aware of what the background is,

132

1    whose around, what's around because you don't want that to

2    happen.  You don't want to have an errant round hit somebody

3    else.

4    Q.  When Mr. Wirth asked you a few questions regarding the

5    totality of the circumstances, under DAAT, totality of the

6    circumstances specifically indicates is based on your reasonable

7    perception of the threat, correct?

8    A.  Yeah.  But again, the other component it's not just my

9    assessment of the threat.  It's what a reasonable other --

10   reasonable officers in the same situation with similar training

11   what they would do because, you know, unfortunately --  I will

12   leave it at that.  It's not just my assessment, it is what other

13   reasonable officers would do in the same situation.

14   Q.  And in this scenario that we had, we've already indicated we

15   had three other officers, Johnson, Shamsi and Olson, none of

16   them fired, correct?

17   A.  That's correct.

18   Q.  And I think actually last one I want to talk about is

19   page 82, facing an armed subject under DAAT.  If you're faced

20   with an armed subject, your best defense, if feasible, is to be

21   armed with a superior weapon, create or maintain distance, use

22   cover if available and attempt to diffuse the situation using

23   verbalization.  Those are the other things that you described,

24   right?

25   A.  Yes.

133

1  Q.  Do you need to be a DAAT certified instructor in order to

2  train others with regards to Defense and Arrest Tactics?

3  A.  No.  I'm not a DAAT certified instructor, but I find that

4  DAAT is a sound strategy in Defense and Arrest Tactics, that it

5  is something that enhances an officer if they follow the tenants

6  that are set forth in that.

7        So I'm not an instructor.  But in my training and

8  experience, I pass this on to other officers that I work with.

9  Q.  And just to be clear in the homicide, hundreds even a

10 thousand with shootings and everything else, some of those have

11 been officer-involved shootings and homicides, correct?

12 A.  Yes, I've investigated situations where officers have killed

13 people.  And unfortunately --  Well, they are all unfortunate

14 situations.  And also situations where officers have been

15 killed.

16        In addition to situations where people, you know, who

17 are not officers kill people.  They are all unfortunate

18 situations.

19 Q.  While you're investigating officer-involved shootings while

20 you did it as a homicide detective, you're also viewing it from

21 the lens of DAAT, correct?

22 A.  Yes, I am.

23 Q.  So you're not -- You know, the Milwaukee Police Department

24 doesn't say Mr. Burems detective, you can't investigate because

25 you're not a certified instructor.  Your job, if I'm correct, as

134

1 a detective is I know what DAAT is, I know how to it operates in

2 the field, you go out and investigate to determine did the

3 officer follow DAAT training?

4 A.   That's another great thing about DAAT is that it gives you

5 objectivity.  It takes your personal opinion or your emotions

6 about it or your allegiance out of the picture because it is

7 objective, and that helps tremendously.

8 Q.   In fact, one of the things with regards to DAAT training is

9 if you heard me earlier ask a question, I believe it was of

10 Officer Johnson.  If I have a gun down to my side but I have not

11 communicated anything to you because we're an open carry state,

12 you can't just shoot because I have a weapon, right?

13 A.   No, you cannot just shoot because someone has a weapon.

14 Q.   And the same, Mr. Burems, is if I am -- If you are behind me

15 or to the side of me if I am -- whether I have the gun on my

16 side or somewhere else, just standing in that situation does not

17 under DAAT give someone permission to use deadly force?

18 A.   No, it does not.

19 Q.   Obviously if I make a turn or a movement then go through the

20 mental calculations about using DAAT, correct?

21 A.   Yes.

22          MR. CADE:  Those are my questions.

23          MR. WIRTH:  Judge, I have one more line.

24 **RECROSS EXAMINATION BY MR. WIRTH:**

25 Q.   Mr. Burems, you were asked questions about the target

1  identification, target isolation, target acquisition.  Do you

2  recall those questions?

3  A.  Yes.

4  Q.  And your response was if you're facing an armed subject,

5  there are certain things you should do and take into account,

6  correct?

7  A.  Yes.

8  Q.  The officer has to know he's facing an armed subject,

9  doesn't he, to do the lesser tactics you are talking about?

10  A.  Yes.

11  Q.  He has to know he's facing an armed subject?

12  A.  Yes.

13  Q.  Take a look at page 77.  If the officer doesn't know or if

14  the fact that the suspect is armed becomes a surprise to him,

15  then that changes the dynamic, doesn't it?

16          MR. CADE:  Counsel, where are you reading from?

17          MR. WIRTH:  I am not there yet.  I am getting him

18  oriented.

19  Q.  My question if the fact that the suspect is armed becomes a

20  surprise to the officer, that changes the dynamic in terms of

21  his options, doesn't it?

22  A.  So you mean if an officer comes upon a person, and then the

23  person suddenly pulls out a weapon?  Yeah.

24  Q.  That would change it?

25  A.  Yes.

136

1  Q.  Take a look at the subsection on page 77 named Titled

2  Preclusion.  What the DAAT manual instructs is in the center of

3  the page.  It says note that in many deadly force situations,

4  you will not have time or the ability to try other options.  If

5  a subject a few feet away from you suddenly pulls a gun and

6  threatens to shoot you, generally the only reasonable response

7  is to fire, correct?

8  A.  That's what this says, yes.

9          MR. WIRTH:  Nothing further, Judge.

10  **RE-REDIRECT EXAMINATION BY MR. CADE:**

11  Q.  With regards to if the officer is not surprised or knows

12  that the individual has a weapon, this portion is no longer a

13  part of it because they are now aware they have the potential of

14  having that weapon, fair?

15  A.  That's fair.

16          MR. CADE:  Thank you.

17          THE COURT:  All right.  You're excused.

18          (Witness excused.)

19          (Excerpt concluded.)

20

21

22

23

24

25

137

C E R T I F I C A T E

I, SUSAN ARMBRUSTER, RPR, RMR, FCRR, Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of my original machine shorthand notes taken in the aforementioned matter to the best of my skill and ability.

Signed and Certified October 6, 2025.

/s/Susan Armbruster

Susan Armbruster

Susan Armbruster, RPR, RMR, FCRR
United States Official Reporter
517 E Wisconsin Ave., Rm 200A,
Milwaukee, WI 53202
Susan_Armbruster@wied.uscourts.gov