UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ESTATE OF ALVIN COLE, et al.,

       Plaintiffs,

v.               Case No. 22-CV-0856

JOSEPH MENSAH,

       Defendant.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MENSAH'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

This case has been tried to a jury – twice. And twice, the Plaintiff, Estate of Alvin Cole, has failed to carry its burden of proof to convince a jury that the Defendant, Joseph Mensah, used excessive force in his encounter with Alvin Cole on the evening of February 2, 2020. The Court has presided over the trial and has heard all evidence that either side has been able to produce. Joseph Mensah now renews his motion for Judgment of Dismissal as a Matter of Law pursuant to Rules 50(a) and 50(b) of the Federal Rules of Civil Procedure and, in the alternative, for summary judgment dismissing all claims and causes of action on their merits or on the basis of qualified immunity.

## PREFACE

Plaintiff, Estate of Alvin Cole, alleges that the Defendant, former Wauwatosa Police Officer Joseph Mensah, used excessive force when he shot Alvin Cole on February 2, 2020, in violation of the Fourth Amendment. The case was tried to a jury between March 17 and March 20, 2025. (ECF 84)[1] After a four-day trial and approximately 5 hours of deliberations, the jury

---

[1] All ECF citations refer to the consolidated docket in Case No. 22CV856 unless noted otherwise.

determined that it was unable to reach a unanimous verdict. (*Id*. at 3) As a result, the Court declared a mistrial, discharged the jury, and scheduled a re-trial. (*Id*.)

The case was tried for the second time to a jury from September 8 through September 11, 2025. (ECF 121) At the close of evidence and before the case was submitted to the jury, the Defense moved for Judgment of Dismissal as a Matter of Law under Rule 50(a) of the Federal Rules of Civil Procedure. (*Id*. at 3) The Court took the Motion under advisement and reserved ruling. *Id*. After approximately 10 hours of deliberation, the second jury communicated that it, too, was unable to come to a unanimous verdict, and the Court—for the second time—declared a mistrial and discharged the jury at 3:52 pm on September 11, 2025. (*Id*. at 4) Defendant advised the court that, pursuant to Rule 50 (b), he would be renewing his motion for judgment as a matter of law, which the court acknowledged. *Id*. Defendant now renews his motion.

## LEGAL STANDARD

Judgments as a matter of law and summary judgments are decided under the same, familiar standard. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). The question is whether, when viewing the evidence as a whole in the light most favorable to the non-moving party, any reasonable jury could return a verdict in favor of the non-moving party. *Id; see also* Fed. R. Civ. P. 50. The only difference is that the relevant evidence for summary judgment comes from the written record, while the relevant evidence for judgment as a matter of law is the evidence the jury heard. *Id.* at 150-152. Thus, to the extent the case or a claim cannot be resolved on the Rule 50(b) motion, it is appropriate to consider summary judgment. *Petit v. City of Chicago*, 239 F. Supp. 2d 761, 766-67 (N.D. Ill. 2002), aff'd, 352 F.3d 1111 (7th Cir. 2003).

As to timing, if a party moves for judgment as a matter of law before the issue is submitted to the jury, and the motion is denied, the party may renew that motion within 28 days of either the

entry of the judgment or the discharge of the jury, depending on whether the jury resolved the issue. Fed. R. Civ. P. 50(a), (b). This is true even in circumstances where the court has declared a mistrial. *Petit,* 239 F. Supp. 2d at 766 (citing *Evanston Hosp. Corp. v. Astra Pharmaceutical Products, Inc.* 1992 WL 220607 *1 (N.D.Ill. Sept.3, 1992)).

Under Rule 50 of the Federal Rules of Civil Procedure, a court should grant judgment as a matter of law when a party has been "fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Winters v. Fru-Con Inc*., 498 F.3d 734, 746 (7th Cir.2007). In the same vein, a court should grant judgment as a matter of law when a verdict could only be based on speculation or conjecture. *McClure v. Cywinski,* 686 F.2d 541, 544 (7th Cir. 1982). Here, two reasonable juries fully heard the Plaintiff's case and did not find for the Plaintiff on its claims. Dismissal as a matter of law is now appropriate.

## ARGUMENT

The jury was tasked with returning a verdict on a singular question: Did Joseph Mensah use excessive force against Alvin Cole on February 2, 2020? The jury was instructed that to return a verdict in favor of the Plaintiff, the Plaintiff was to prove by a preponderance of the evidence that Defendant used unreasonable force against Alvin Cole. (ECF 123 at 20) It was not Mensah's burden to prove that he acted reasonably, it was Plaintiff's burden to prove that Mensah acted *objectively unreasonably*. (*Id.*) Consistent with this burden and the well-settled law in the Seventh Circuit, the jury was instructed:

> In performing his job, an officer can use force that is reasonably necessary under the circumstances.
>
> In deciding whether Defendant used unreasonable force, you should consider all of the circumstances. Circumstances you may consider include the need for the use of force, the relationship between the need for the use of force and the amount of force used, the extent of the plaintiff's injury, any efforts made by the defendant to temper or limit the amount of force, **the severity of the crime at issue, the threat**

**reasonably perceived by the Defendant, and whether the plaintiff was actively resisting arrest or was attempting to evade arrest by fleeing,** but you are not limited to these circumstances.

**An officer may use deadly force when a reasonable officer, under the same circumstances, would believe that Alvin Cole's actions placed him or others in the immediate vicinity in imminent danger of death or serious bodily harm. It is not necessary that this danger actually existed.** An officer is not required to use all practical alternatives to avoid a situation where deadly force is justified.

You must decide whether Defendant's use of force was unreasonable from the perspective of a reasonable officer facing the same circumstances that Defendant faced. You must make this decision based on what the officer knew at the time of the use of force, not based on matters learned after the use of force. In deciding whether Defendant's use of force was unreasonable, you must not consider whether Defendant's intentions were good or bad.

*Id*. at 21 *citing* Seventh Cir. Pattern Instruction 7.10. (emphasis added) Plaintiff has tried and failed to meet its burden twice. The court should now grant judgment as a matter of law because it is clear that there is no legally sufficient evidentiary basis for a reasonable jury to find that Mensah had no reasonable belief that Alvin Cole's actions presented a threat of imminent danger and justified the use of deadly force.

## I.    THE EVIDENCE DEMONSTRATES THAT COLE PRESENTED AN IMMINENT THREAT TO MENSAH AND EVERYONE ELSE IN THE PARKING LOT.

Plaintiff argued throughout the trial that simply having a gun at that mall and running from the police did not merit a death sentence.[2]  But that is not what occurred here.

The court is familiar with the factual record. To summarize, on February 2, 2020, Alvin Cole had a gun at Mayfair Mall and, while there, got into an argument with another patron. Cole threatened the patron by showing the butt-end of a firearm, which prompted Mayfair Mall security to call the Wauwatosa Police Department ("WPD"). The report of disorderly conduct while armed

---

[2] Plaintiff's claim that Wisconsin is an open carry state and therefore Alvin Cole's possession of a firearm under the circumstances was not a threat is a non-starter. The record demonstrates that firearms were prohibited at Mayfair Mall and Alvin Cole could not legally possess a firearm under any circumstance.

4

in a public venue created a dangerous situation and thus prompted a large response from the Wauwatosa police department.

Responding WPD officers confirmed the presence of a firearm and obtained a description of the armed suspect – thin build, black male, grey hoodie, fanny pack. It is undisputed that Cole matched that description, and Cole became the focus of the police response.

Cole and his group were located and confronted by officers in the mall parking lot. The group was approached by officers and ordered to stop. A female in the group stopped and put her hands up, but Cole and three males fled on foot. Officer Johnson, who had approached the group, then alerted all Wauwatosa Officers to the foot pursuit, and all Wauwatosa squads responded.

Cole was the focus of the pursuit, and was both believed to be—and later confirmed to be armed. Over the next few minutes, the other three males stopped running, surrendered, put their hands up, or otherwise complied with officers. Cole did not. Instead, he removed the gun from his fanny pack and fired one shot while being pursued. Officers ordered Cole to surrender the weapon. Cole refused and dropped to his knees or to a crouching position; and with his finger on the trigger, pointed the gun at Officer Olson. When Mensah ran up, Cole quickly turned towards Mensah. In response to Cole's armed movement, Mensah shot him.

On those facts, Defendants moved for summary judgment. (21cv00848 ECF 82) The court denied the motion, citing conflicting testimony from the officers about the movements during the moments immediately before the shooting. (21cv00848ECF 131 at 3-4) The court found that a dispute of fact existed as to whether the gun was pointed at Mensah and, therefore, whether Mensah could use deadly force. (*Id*. at 4) The court denied dismissal upon qualified immunity, citing factual disputes the court felt required jury resolution. (*Id*. at 5) The Defendant filed a Motion for Reconsideration, which the Court denied upon a finding of potential factual disputes stemming

5

from the officer's testimony, and an observation that the "only information on which Mensah justifies his shooting of Cole is that Cole was pointing a gun at him." (21cv00848 ECF 140 at 5)

While the Defendant still contends that the evidence before the court on summary judgment warranted a dismissal of this case upon the merits and/or under the doctrine of qualified immunity, the uncontroverted evidence presented at trial leaves no doubt that dismissal is required.

## II. THE EVIDENCE PRESENTED AT TRIAL SUPPORTS JUDEMENT AS A MATTER OF LAW.

The testimony remained largely unchanged during both trials, and the court now has the full picture of what occurred in the dark parking lot on February 2, 2020.

<u>Video and Pictorial Evidence</u>

The Wauwatosa police department was only equipped with squad cameras in February of 2020, and the only recording of the shooting comes from the front camera in Officer Shamsi's squad car. Unfortunately, Shamsi's squad was parked some distance away, and the original video that the court evaluated was dark and grainy. Plaintiff's video expert, Sean Kafer, produced an enhanced video (ECF 122, Plaintiffs' Trial Exhibit 3) which assisted the viewer with a "zoomed in" view of the shooting and a red circle identifying Cole.[3] That 42-second video clip unequivocally shows:

- Cole running in the middle of the parking lot (00:08-00:11);

- Cole firing his weapon as the officers and Security Guard Beard closed in on him (00:13);

- Cole dropping to a crouch after he fired, and crawling south toward the cement barricade to his south (00:13 – 00:18);

- Officers pulling their firearms in response to Cole shooting (00:16);

---

[3] The court noted several times during trial that Exhibit 3 had been admitted into evidence and that "[the court had] no reason to think that there's been any improper manipulation or any improper changing or modifying of the video…" *See generally* (Beard Trans at 11:2-5)

6

- Cole remaining in a hands and knees position supporting his body weight (00:19);

- Cole making a turn towards Mensah in the second before Mensah fired (00:21); and

- Mensah firing five shots in less than two seconds while moving in an arc (00:23-00:25).

Plaintiff's Exhibit 3 supports Mensah's account of events and confirms the immediacy and severity of the threat. See *Gillis v. Pollard*, 554 F. App'x 502, 506 (7th Cir. 2014)("the appellate court reiterated that "where video evidence contradicts the plaintiff's version of events, the court should not accept the plaintiff's story for purposes of summary judgment.") The video also helps demonstrate the differing vantage points of each officer at the time of the shooting. (*Id.* at 00:20-00:00:25); *see also* (ECF 122, Defendant's Exhibit 1000)[4]



Officer Joseph Mensah's Trial Testimony

Mensah was not assigned to patrol the mall but responded because of the report of a disturbance at the mall, involving a firearm, and the danger that call posed. (ECF 131 Mensah Trial Testimony at 89:1-13) Mensah learned the description of the armed suspect as broadcast over the radio. (*Id*. at 91:23-92:2) Menah arrived on scene and joined the foot pursuit, with his focus being on Cole. While giving chase, Mensah heard a gunshot coming from in front of him, which would have been the direction of the armed subject. (*Id.* at 94) Mensah broadcast shots fired. (*Id*. at 55)

---

[4] This diagram was admitted as an exhibit at trial and used as a demonstrative; the locations are approximate.

At the time he heard the first shot, Cole was approximately 15-20 yards ahead of him, but he was closing the distance. (*Id.* at 59) When Mensah heard the first shot, he did not immediately know who it came from, but realized it was from Cole. Mensah testified:

> When I first started running, I could see someone that matched the description of the person we're looking for. I did not know it was Alvin Cole. I did not know his name. I saw a description of someone. I joined in the foot pursuit, still see the person, gunshot goes off. It is right where that person was. That person starts to go down, and he's moving from where he was when I heard the gunshot go off. Now, he's moving to a different spot. When I get up to him, I see a gun. Based on those, circumstances, I can pretty much infer that this is the person who fired the gunshot. It matches the description for the person that was involved with an incident involving a gun in the mall. He's right in the direct area where a gunshot went off, and now I see that he has a gun.

(*Id.* at 94: 6-25) Mensah described Cole's movement after the first shoot as changing from a standing to a kneeling position. (*Id.* at 63:19-25)

Mensah testified that he drew his firearm in response to Cole shooting "to protect himself and everyone around." (*Id.* 95:2-18) Mensah continued to run toward Cole and approached him from Cole's left. Mensah was aware that there was an officer to his right, but did not remember which specific officer it was. (*Id.* at 74:1-9,16-22) As Mensah got closer to Cole, he saw the gun in Cole's hand and yelled, "The gun is out!" because he wanted to let everyone know that he not only heard a gunshot, but that he was now observing Cole's gun. (*Id.* at 96:7-19)

Mensah testified that the next thing he observed was Cole making a turn and pointing the gun at him. Mensah described that movement as follows:

> And at some point, the gun either is …. over the arm or under the armpit, and I see it pointed at me. […] At this point, I have been a cop for eight years. I see the gun pointed at me. I'm looking at it. I'm expecting again after I just heard one gunshot go off, there is a gun pointed at me, I am expecting another to come. What other reason could there possibly be or what else can I infer from a gun being pointed at me after a gun was just fired right after a foot pursuit right after a call for someone at the mall involving a gun. I'm expecting to get shot.

8

So I'm hesitating. I'm trying to process what's going on. I'm going through the whole making sure that I am legally justified in this, processing all this information as I'm literally expecting to get shot. I am bracing my body to take the first round as I'm moving. I start moving as I'm shooting. And once the threat was over, I stop shooting.

(*Id.* at 97:4-23)

Plaintiff argued that Mensah only saw Cole point a gun at him, not anyone else, and therefore Cole was only a threat to Mensah. In support of this position, Plaintiff cited an exchange during Mensah's 2023 deposition where Attorney Cade asked a compound question, and Mensah's answer confirmed that he did not know if Cole pointed the gun at anyone else. (ECF 131 Mensah Trial Transcript at 76:11-77:22)

During the first time, Mensah rejected the claim that Cole's actions only made him concerned for his own safety. *See* (Mensah First Trial Testimony at 48:4-7)

During the second trial, Mensah was asked if Cole only posed a threat to him and he responded, "no." And when asked who Cole posed a threat to, Mensah responded:

Literally every single person that can be hit by a gunshot round in that area. People across the street could have been hit. Anyone in the mall could have been hit. Anyone in the Cheesecake Factory, driving around in the parking lot. There's -- If you're within a few hundred yards of this incident, you could have been shot. Anyone could have been shot.

(ECF 131 Mensah Testimony at 99:25-100:5)

Mensah testified that he was concerned for the safety of the security guard because he knew he was not armed and would have no way to defend himself against Cole's gun, which is why Mensah yelled at the security supervisor to get his guys out of there. (*Id.* at 93:10-94:3) Mensah testified that he was also concerned for the safety of other officers and yelled "the gun is out" to alert them to the presence of Cole's gun. (*Id.* at 96:7-19)

Mensah described the scene as dark and the event as fluid. (*Id*. at 74:3-5) Mensah testified that a lot was going on in the seconds between Cole shooting and him returning fire. (*Id*. at 96:3) During the foot pursuit, Mensah expected Cole to give up; he never expected Cole to try to shoot his way out of the situation. (*Id*. at 99:11-15) Mensah was aware that officers had yelled at Cole to drop the gun and personally observed that Cole had not done so. (*Id*. at 100:19-21) Mensah testified that he shot Cole because he did not want to get shot. He did not want to die. Mensah testified that based on the situation he had a fraction of a second to confirm the necessity of deadly force. (*Id.* at 97:24-98:1)

<u>Officer David Shamsi's Trial Testimony</u>

Officer Shamsi testified that although he was neither assigned nor dispatched, he responded to the mall based on the dangerousness of the report of a gun at the mall. (ECF 130 Shamsi Trial Testimony at 42:3-5) He joined the foot pursuit, with a focus on the armed subject, Alvin Cole. (*Id. at* 9:21-23) During the pursuit, he heard a gunshot coming from in front of him and soon after observed Cole on the ground. Shamsi did not see how Cole got on the ground but observed him running and then on the ground, no longer in front of him, but to his left. (*Id.* at 12-13) Shamsi was standing behind Cole, and Cole's feet were facing him. (*Id.* at 19:24-20:4) From his vantage point, Shamsi could not see if Cole was completely flat or on his knees. (*Id.* at 13-14) Shamsi observed the gun in Cole's right hand, pointed right towards Mayfair Road. (*Id.* at 14-15) But Shamsi was not aware that Olson was standing there.

Shamsi pulled his gun, pointed it at Cole, and ordered him to drop the gun. (*Id.* at 22:23-25) Shamsi was not aware that Olson was on scene, was not aware that Mensah was on scene, and while he was aware that Johnson was on scene, he was unaware of his location at the time of the

shooting. (*Id.* at 16, 47-48:24) Mensah arrived and was in front of and to Shamsi's left and yelled, "The gun is out," and then there was a volley of shots. (Id. at 18:22-19:1)

Immediately after the shooting, Shamsi, likely still in shock, told Detective Rom that Cole was prone. (*Id.* at 30:4-9) However, Shamsi testified that he could not see Cole's entire body from his vantage point (*id.* at 16:25-17:8), and that it is clear from the video that Cole was not prone but was actually on his hands and knees, and could be seen crawling (*id.* at 43, 54:10-14).

Immediately after the shooting, Shamsi was heard on video telling another person on scene that he was standing next to [him] when Mensah shot. (*Id.* at 31-32) However, Shamsi testified that he did not recall making that statement (*id.* 42:25-43:8); that he was not standing right next to Cole when Mensah shot (*id.* at 31:4-11); and most importantly, it is clear from the video that Shamsi was not standing next to Cole at the time Mensah shot (*id.* at 32:2-11).

Finally, Shamsi was focusing on Cole's gun, and he never saw the gun move. (*Id.* at 34:1-12) Shamsi testified that it is possible that he became distracted by Mensah's arrival (*Id.*); that it was a dark, high stress situation and the gun could have moved (*id.* at 43:11-18); that he may have missed the movement if he had also turned towards Mensah who ran up to him unexpectedly (*id.* at 44:5-10); and most importantly that in viewing the video evidence it looked to him as though Cole turned toward Mensah (*id.* at 54:15-18).

Officer Evan Olson's Trial Testimony

Officer Olson testified that he was not assigned nor dispatched but responded to the mall based on the dangerousness of the report of a gun at the mall and the propensity for escalation. (ECF 126 Olson Trial Testimony at 5) Olson arrived to set up a perimeter and parked on Mayfair Road. (*Id.* at 7:12-25) As he exited his squad car, he heard a gunshot and thought he was being shot at. (*Id.* at 10:14-16) Olson observed two juveniles in front of him (not Cole) and ordered them

11

to the ground. Olson described those two individuals as semi-compliant. He turned his flashlight

on and scanned the parking and observed the armed subject—Alvin Cole—on the ground near the

barricade in a "low ready position." (*Id.* at 13:10-15) Cole had a black handgun in his hand, pointed

in Olson's direction. (*Id.* at 13:20-14:1) Olson testified that he believed Cole posed an imminent

threat and, in response to that threat, Olson determined that deadly force was necessary. (*Id*. at 14-

15) Olson was prepared to shoot Cole and was focusing on Cole's center mass, but before Olson

shot, he heard a volley of shots. (*Id*. at 16)

Olson did not see Cole point the gun at anyone else. (*Id.* at 45:25-46:2) In the seconds

before the shooting, Olson was focused on Cole's center mass and was not looking to see where

the gun was. (*Id.* at 15:18-24) Olson testified that he did see Cole turning east towards where he

last saw Johnson running. (*Id*. at 13, 32-33,45, 48) Olson did not know that Mensah was on scene

until after the shooting. (*Id.* at 21:4-11) Olson testified that Cole still had the gun in his hand after

the shooting and that he approached him and kicked it out of his hand before starting CPR. (*Id.* at

17:22-18:7; 27:21-22)

<u>Officer Jeffrey Johnson's Trial Testimony</u>

Officer Johnson decided to respond because the report of an individual brandishing a

firearm created a potentially dangerous situation. (ECF 132 Johnson Trial Testimony at 4:8-5:4,

23:9-20) Johnson testified that the focus of the police contact was Alvin Cole because he matched

the description of the armed subject. (*Id*. at 23:25-24:11, 26:5-11) Officer Johnson observed Cole

and his group outside of the mall and attempted to make contact. (*Id*. at 5:15-24) Johnson testified

that Cole was not free to leave and was being detained at that point. (*Id*. at 24:12-25, 32-33) Officer

Johnson was unable to make contact with Cole because Cole fled. (*Id*. at 25)

Johnson testified that foot pursuits are dangerous because they put the officer in a position of disadvantage especially if the suspect is armed. (*Id*. at 25:13-24) During the pursuit, Johnson yelled at Cole to stop, but Cole did not stop, did put his hands up, nor take any action to demonstrate that he was going to comply. (*Id*. at 25:25-26:9, 28:17-22) During the pursuit, Johnson fell and lost sight of Cole and he was able create a large distance. (*Id*. at 8:4-8, 11:18-21) When Johnson got back up, he heard a gunshot coming from Cole's direction. (*Id*. at 9, 26) Johnson pulled his firearm out in response " to protect [himself] and others…" (*Id*. at 26: 21-27:11) Johnson did not hear Cole say that he was shot or that he was hurt after the first shot. (*Id*. at 29:22-30:4) Johnson was not clear on how Cole got to the ground, but testified that he heard a gunshot and then as he got closer, saw Cole on his hands and knees now near the barricade. (*Id*. at 20:20-25, 30:5-15)

Johnson was 60 feet away at the time he heard the second volley of shots. (*Id*. at 22:8-12) Officer Johnson testified that he could not see Alvin Cole's hand right before Mensah fired his volley of shots, but could see Cole's body. (*Id.* at18:23-19:4) Johnson testified that he did not see Cole move, but that "there's a lot of information [he] was trying to process, so [he] was not 100 percent focused on Alvin Cole the whole time," (*id*. at 22:21-25) and because it was a fluid situation and he was trying to assess the situation and who shot. (*Id*. at 14:20-15:14) Johnson testified that Olson's light was "disorienting" because it was dark and he was trying to figure out what was going on. (*Id*. at 16:17-21, 19:23-20:3) Johnson was standing 50 feet further away from Cole than Mensah at the time the shooting occurred.

Security Officer Davion Beard's Trial Testimony:

On February 2, 2020, Davion Beard was working as a security officer at Mayfair Mall. (ECF128 Beard Trial Testimony at 3:25-4:5) At some point, he was alerted to a disorderly dispute between two patrons. (*Id*. at 4:6-16) Beard responded to the location of the disturbance and learned

13

that a gun was brandished during the dispute. (*Id*. at 5:4-20) A description of the individual who brandished the gun was an African American male in a grey sweatshirt with a fanny pack. (*Id*.) The armed individual was later identified as Alvin Cole. (*Id*.) The disorderly incident prompted a call to the Wauwatosa Police Department. (*Id*.) Wauwatosa Police responded to the mall, and security assisted them with patrolling to attempt to locate Cole. (*Id.* at 6:17-24)

Beard participated in the foot pursuit and focused on Cole because he matched the description of the armed subject. (*Id*. at 8:12-16) Beard confirmed that during the pursuit, Cole ran through the middle of the lot. Cole began to slow down, and Beard thought he was going to give up. (*Id.* at 9:21-23) Beard testified that Cole did not give up but instead turned, and that is when he heard a gunshot and saw a muzzle flash. (*Id.* at 13:21-25) Beard testified that after the shot was fired, he dropped to the ground, and Cole was standing above him looking down at him. (*Id.* at 13:24-14:1) Beard testified that Cole did not immediately drop to the ground. Beard testified that Cole did not call out in pain, nor did he in any way comment about shooting himself or shooting at all. (*Id*. at 15:5-14)   Beard scrambled away and when he looked back, he saw that Cole had repositioned himself near the concrete parking lot barrier south of the point of the foot chase. (*Id.* at 15:15-17)

<u>Medical Examiner's Trial Testimony</u>

Dr. Wieslawa Tlomak, Milwaukee County Medical Examiner, conducted the autopsy of Alvin Cole. (ECF 131 Tlomak Trial Testimony at 8) Dr. Tlomak also prepared an anatomical diagram to memorialize Cole's injuries. (*Id.* at 8-9; see also Trial Exhibit 34 at 1) While Dr. Tlomak could not testify to the sequence of the shots, she determined that Cole was struck four times, with three entry "perforating" wounds and one tangential wound:

- Entrance gunshot wound of the left lower lateral chest (*id*. at 19:2320:4);

- Entrance gunshot wound of the left anterolateral upper chest (*id*. at 21:16-21);

- Entrance gunshot wound of the left lateral upper back (*id*. at 23:22-24:15); and

- Tangential "very superficial wound" on Cole's left wrist. (*Id*. 11:10-19 24:18-25)

Dr. Tlomak also identified gunpowder stippling on the dorsal side (top) of Cole's left hand, and the superficial wound on the front side of Cole's wrist/forearm. (*Id*. at 35:9-17; see also Trial Exhibit 1040) Dr. Tlomak testified that the forearm wound could have come from Cole's gun, or it could have been caused by another gun. (*Id*. at 41:3-10)

Dr. Tlomak testified that there was no evidence of head trauma, tissue injury, or bruising (*id*. at 32:9-33:16) and that the abrasions she identified above Cole's left eye could have come from something as simple as a fingernail scratch (*id*. at 31:4-6).

<u>Forensic Examiner's Trial Testimony</u>

Xai Xiong, firearm and tool marks examiner for the Wisconsin Crime Lab, testified that he examined three pieces of evidence in this case—Cole's gun (Smith & Wesson), Mensah's gun (Glock), and Cole's grey sweatshirt. Mr. Xiong's testing confirmed that Cole's gun was fired one time and that Mensah's gun was fired five times. (ECF 129 Xiong Trial Testimony at 5:25-7:2); *see also* ECF 122 Trial Exhibit 1031) The bullet defects in Cole's sweatshirt (including the bullet defect in the left wrist) were also tested for the presence of gunpowder residue patterns with no such results found. (*Id*. at 9:7-13) Mr. Xiong testified that gunpowder residue patterns would be expected if a gun was fired within a range of 0-36 inches of the defect. (*Id*. at 9:23-10:14)

<u>Police Practice Experts' Trial Testimony</u>

Although not setting a constitutional standard and therefore not determinative, both parties presented testimony of experts on the training standards received by all law enforcement officers in Wisconsin, outlined in the Defense and Arrest Tactics manual (DAAT). *See generally* (ECF 131

Ricky Burems Trial Testimony at 111-112; ECF 127 Michael Knetzger Trial Testimony at 5-6; see also ECF 122 Trial Exhibit 1055)

The trial testimony of Plaintiff's expert Ricky Burems and Defendant's expert Michael Knetzger was largely duplicative. Both experts testified that under the applicable training standard, law enforcement officers have a right to protect themselves, their fellow officers, and society at large (Burems at 125:17-126:13; Knetzger at 8:22-9:2, 12:8-12), and officers may use force, including deadly force, to achieve that protection. (Burems at 111:17-21; Knetzger at 8:22-9-2)

Both experts testified that the purpose of deadly force is to stop the threat (Burems at 124:20-21; Knetzger at 14:21-24), that deadly force is the only response to deadly force (Burems at 121-122; Knetzger at 13:2-7), and that there are circumstances that may require an officer to rapidly escalate force. (Burems at 121:24-122:22; Knetzger at 10:3-14, 21:8-22; see also Trial Exhibit 1055 at 77)

Both experts agreed that deadly force is appropriate if the subject displays behavior that has caused or imminently threatens to cause death or great bodily harm to an officer or another person. (Burems at 126:9-13, 137:1-8; Knetzger at 12:8-12) For a subject's threat to be considered imminent, it must meet three criteria—Intent, Weapon, and Delivery system. (Trial Exhibit 1055 at 74; Burems at 121:6-15; Knetzger at 12:13-13:15) A delivery system is a means by which a subject can use the weapon to inflict harm. (Trial Exhibit 1055 at 77; Burems at 127:2-14; Knetzger at 11:17-23) The experts agreed that Officers are not mind-readers on the issue of intent, and intent can be inferred by the subjects' behavior and the totality of the circumstances, which includes the events leading up to the moment of the shooting. (Burems at 127:15-129:11; Knetzger at 13:8-12, 16:13-16) Finally, an officer does not have to wait for a subject to shoot first or even to point the firearm at an officer before deadly force can be used. (Burems at 128; Knetzger at 39:20-40:1)

When the present facts are applied to the controlling law as will now be discussed, it is clear that Mensah's use of deadly force in this case was objectively reasonable. Given the absence of any evidence from which a reasonable jury could find in Plaintiff's favor, this Court should enter judgment as a matter of law in favor of the Defendant pursuant to F.R.C.P. 50.

## III. NO PROPERLY INSTRUCTED JURY COULD RENDER A VERDICT IN PLAINTIFFS' FAVOR.

Police officers are tasked with making split-second decisions to use deadly force in dynamic, rapidly evolving, and dangerous situations. For this reason, courts have consistently warned against second-guessing those decisions, with the benefit of hindsight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "This is true even when, judged with the benefit of hindsight, the officers may have made 'some mistakes.'" *City of Cnty. of San Francisco, Cal. v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1775 (2015). The test for reasonableness under the Fourth Amendment requires an analysis of the totality of the circumstances assessed "from the perspective of a reasonable officer, with the same knowledge and facing the same circumstances confronting Defendant Mensah in that dark parking lot on February 2, 2020. This perspective is critical. See *Doxtator v. O'Brien*, 39 F.4th 852, 861 (7th Cir. 2022)("We remain mindful that the opportunity to debate the merits of various law enforcement responses 'in the peace of a judge's chambers' is a privilege unavailable to most officers in real time.").

### A. Recent Supreme Court and Seventh Circuit decisions reinforce that a dismissal decision must evaluate the totality of the circumstances, not merely the moment that a trigger is pulled.

Plaintiff has argued throughout that the only relevant event that determines whether Alvin Cole posed an imminent threat was the moment before Mensah pulled the trigger of his weapon. Plaintiff has sought to exclude the relevant evidence of the circumstances that prompted the

17

officers' response to Mayfair in the first place.  Such an argument was recently flatly rejected by the United States Supreme Court in *Barnes v. Felix*, 605 U.S. 73 (2025).

The *Barnes* case arose from a 2016 traffic stop in Houston, Texas, where a deputy fatally shot 24-year-old Ashtian Barnes. Barnes had been pulled over for unpaid tolls, and during the encounter, the deputy claimed to have smelled marijuana, though no drugs were found. *Id*. at 76. During the stop, Barnes attempted to drive away, and the deputy jumped onto the moving vehicle, firing two shots and killing Barnes. *Id*. at 76-77. Barnes' Estate filed a lawsuit alleging a Fourth excessive force claim. *Id.* at 77.

Finding that the deputy's use of lethal force was reasonable, a federal district court in Texas granted summary judgment in favor of the officer. *Id*. at 77 (citing *Barnes v. Felix*, 532 F. Supp. 3d 463, 466 (S.D. Tex. 2021)). The district court observed that, under applicable circuit precedent, the use of lethal force is reasonable if the officer or other persons were in danger at the moment of the threat that resulted in the officer's use of deadly force. *Id*. at 78.  The court determined that the moment of the threat was two seconds before the officer fired the first shot, at which point the officer reasonably believed that he was in danger. *Id*.  On appeal, the U.S. Court of Appeals for the Fifth Circuit affirmed. *Id*. at 78-79 (citing *Barnes v. Felix*, 91 F.4th 393, 394 (5th Cir. 2024)).

The central legal issue before the Supreme Court was whether courts should apply the "moment of threat" doctrine, which evaluates the appropriateness of lethal force at the precise moment of its use, or the "totality of the circumstances" approach, which considers all events leading up to and including the use of force. The Supreme Court rejected the application of the "moment of threat doctrine" as an improper narrowing of the requisite Fourth Amendment analysis. *Barnes*, 605 U.S. at 76.  Specifically, the Court held:

> "Most notable here, the "totality of the circumstances" inquiry into a use of force has no time limit. Of course, the situation at the precise time of the shooting will

often be what matters most; it is, after all, the officer's choice in that moment that is under review. *But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. Or as the Federal Government puts the point, those later, "in-the-moment" facts "cannot be hermetically sealed off from the context in which they arose."* . . . Taking account of that context may benefit either party in an excessive-force case. Prior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead, they may show why such an officer would have perceived the same conduct as innocuous. The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force."

*Id*. at 80-81 (emphasis added).

The Supreme Court warned that "a court deciding a use-of-force case cannot review the totality of the circumstances if it has put on chronological blinders." *Id*. at 82. *Barnes* reaffirmed the totality of the circumstances standard established in *Graham v. Connor*, requiring a comprehensive evaluation of all relevant factors—the events leading to the use of force, the severity of the crime prompting the police response, the actions of the officer and more importantly the subjects conduct because it indicates the nature level of the threat he poses, either to the officer or to others. *Id*. at 80 (citing *Graham*, 490 U. S., at 396)

In our case, Plaintiff avoided dismissal of his case by arguing that only the moment that Mensah pulled the trigger should be the subject of a summary judgment and/or qualified immunity dismissal. Indeed, at the most recent trial, the case was presented to the jury as one in which the jury needed only to focus on the moment Mensah fired. See (Pltfs Opening Statement Transcript at 3:13-18) Like the Supreme Court's caution about improperly narrowing the totality of the circumstances, the decision to permit Plaintiff's case to go to trial was based upon what we now are able to confirm was an improperly narrow analysis.

This court properly reasoned:

In considering whether use of force was reasonable, I assess the totality of the facts and circumstances, including consideration of the severity of the crime at issue,

19

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

See (21cv00848 ECF 125 at 7-8)(citations omitted)

The case should have been dismissed upon motion but proceeded to trial on the narrow question of whether a jury could reconcile whether Cole turned the gun towards Mensah in the split-second before Mensah fired. Obviously, two juries have *not* been convinced that Mensah's observations and reactions were unreasonable. More importantly, the proper standard for dismissal remains an evaluation of the totality of the circumstances, and requires a re-examination that properly evaluates <u>all</u> of the information Officer Mensah had prior to arriving on scene, his observations once he arrived on scene, and his observations of the entirety of Cole's actions. See *Kingsley v. Hendrickson*, 576 U. S. 389, 397 (2015)("the stopped person's conduct is always relevant because it indicates the nature and level of the threat he poses, either to the officer or to others.)

**B.    The Law Does not Require the Pointing of a Weapon as a prerequisite to an officer's use of deadly force.**

The factual dispute in this case has been argued to be whether Alvin Cole pointed a gun at Mensah. But controlling law imposes no such requirement. Seventh Circuit precedent is replete with situations holding that the use of deadly force is reasonable in circumstances in which the subject had not yet pointed a firearm at the officer. *Henning v. O'Leary*, 477 F.3d 492 (7th Cir. 2007); *Pam v. City of Evansville*, No. 24-2286, 2025 U.S. App. LEXIS 25017 (7th Cir. Sep. 26, 2025); *Reynolds v. Shelton*, No. 24-1363, 2024 U.S. App. LEXIS 26391, at *6 (7th Cir. Oct. 18, 2024).

In *Sherrod v. Berry*, 856 F.2d 802, 803 (7th Cir. 1988), a new trial was ordered because the appellate court found that a use of deadly force could be reasonable based on observations of

a quick movement and placement of a hand into a coat as though reaching for a weapon. There, force was used without the officer ever seeing a weapon. The Court stated:

> When an officer believes that a suspect's actions place him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force. As aptly noted in *Young v. City of Killeen, Tx.*, 775 F.2d 1349, 1353 (5th Cir.1985), "no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." *Id.* at 1353 (emphasis added). *Id.* at 805.

In *Helman v. Duhaime*, 742 F.3d 760 (7th Cir. 2014), the claims against officers who shot the plaintiff while executing a search warrant were dismissed upon summary judgment. The plaintiff had shown officers he was armed with a .45 caliber semi-automatic handgun. There was no evidence that Helman pointed the gun at any officer. Plaintiff argued that officers violated his Fourth Amendment rights because they shot him when they mistakenly believed he was reaching for the handgun. The Court held that plaintiff's claims could not survive summary judgment "because such a response is objectively reasonable." *Id.* at 763.

"Police officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon" before protecting themselves with deadly force. *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007). While mere possession of a firearm alone may not justify the immediate use of deadly force, the case law in this circuit does not require the pointing of a firearm as a prerequisite to the use of deadly force. It is thus unnecessary to decide whether Cole "pointed" the gun at Mensah or whether he had to wait for him to do so before reacting defensively.

### C. The fact that Other Officers with different vantage points did not shoot is not dispositive of the reasonableness of Defendant Mensah's actions.

Officer Mensah was justified in using deadly force if he had a reasonable belief that the armed Cole: (1) posed a threat of serious physical harm, either to himself or to others; or (2) committed a crime involving the infliction or threatened infliction of serious physical harm, and

was about to escape. *Manery v. Lee*, 124 F.4th 1073, 1079 (7th Cir. 2025)(citations and quotations omitted). "Probable cause is gauged from the vantage point of a reasonable officer facing the same situation." *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009). The reasonableness turns on what the officer knew at the time the decision was made, and not on whether he knew the truth, whether his belief was correct, or whether he should have known more. *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007).

As previously noted by this court, "in determining whether Mensah's actions were objectively reasonable, I considered only the circumstances known and information available to Mensah at the time." *See* (21cv01179 ECF 58 at 2)(citations omitted). The full analysis includes the full knowledge of Mensah – not just the moment before he pulled the trigger.

Olson and Shamsi both testified that Cole's actions created a situation in which they determined that deadly force was justified and had begun acting on that determination. (ECF 130 Shamsi Trial Testimony at 40:14-18; ECF 126 Olson Trial Testimony at 18:25-19:1). Both drew their firearms and pointed them at Cole. See, e.g., *Lopez v. Sheriff of Cook County*, 993 F.3d 981, 991 (7th Cir. 2021) ("Putting a gun to someone's head is no doubt a use of force."); *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009) (noting that "gun pointing" is a "use[] of force" that has been held unreasonable under certain circumstances). In the moments before Mensah shot, Shamsi had already begun decompressing the trigger (Shamsi at 41:2-3) and Olson had determined to shoot and was acquiring Cole's center mass as his target (Olson at 15:18-24). Shamsi, Olson, and Mensah all perceived Cole as a deadly threat; Mensah simply shot first.

A reasonable jury cannot base its finding on speculation. Plaintiff needed to come forward with specific evidence, such as contradictory eyewitness accounts, physical evidence, or expert opinions based on proven facts, to impeach defendants' testimony. *Muhammed v. City of Chicago*,

22

316 F.3d 680, 683-84 (7th Cir. 2002) (citing *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988)). As outlined above, no physical evidence or valid testimony contradicted or impeached Mensah's testimony as to his perception. Absent admissible evidence, plaintiff attempts to rest its entire case not on Mensah's totality of circumstances but, instead, on an argument of what other officers did not see.

In a rapidly unfolding confrontation where a firearm is present, the absence of an observation of a specific, split-second action by a collateral officer who was directed or positioned to focus elsewhere does not constitute a genuine dispute of material fact sufficient to overcome the qualified immunity afforded to the shooting officer. To credit a non-shooting officer's testimony of mere lack of recall or differing focus over the direct perception of a lethal threat by the involved officer forced to make a "split-second judgment" would violate the objective reasonableness standard articulated in *Graham v. Connor.* Crediting the observations of a less engaged or differently focused officer over that of the officer who was making the life-or-death decision, improperly utilizes the "20/20 vision of hindsight." See *Graham*, 490 U.S. at 396.

## IV. DEFENDANT MENSAH IS ENTITLED TO QUALIFIED IMMUNITY.

"To strike a balance between addressing constitutional injuries committed by state actors and limiting the costs of section 1983 suits, the Supreme Court has held that the common-law doctrine of 'qualified immunity' applies in most cases against executive officials, including the police." *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982).

While qualified immunity is an affirmative defense, once raised, the burden shifts to the plaintiff to defeat it. *Leiser v. Kloth*, 933 F.3d 696, 701. The Supreme Court has identified two key inquiries for qualified immunity assertions: (1) whether the facts, taken in the light most favorable to the plaintiffs, show that the defendants violated a constitutional right; and (2) whether that

23

constitutional right was clearly established at the time of the alleged violation. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). Both inquiries must be answered in the affirmative to overcome qualified immunity, and if either inquiry is answered in the negative, the defendant is protected by qualified immunity. See *Estate of Davis v. Ortiz*, 987 F.3d 635, 639 (7th Cir. 2021).

Finally, qualified immunity assumes a mistake was made but gives government officials breathing room to make reasonable even if mistaken judgments. When properly applied, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). Moreover, qualified immunity extends not only to reasonable mistakes of law but also to reasonable misperceptions of fact. *Pearson*, 555 U.S. at 231. Translated to this Fourth Amendment claim, Mensah can be mistaken but still have reasonably believed that facts and circumstances he faced justified the force used, and thereby remain entitled to qualified immunity.

Mensah has raised the qualified immunity defense in response to the amended complaint (21cv0848 ECF 126 at 20), at summary judgment (21cv0848 ECF 84 at 10-13), in a motion for reconsideration (21cv0848 ECF 133), and in his Rule 50 (a) motion at the close of evidence (ECF 121 at 3). Mensah is entitled to judgement as a matter of law under the <u>first prong</u> of qualified immunity, because Plaintiff failed to demonstrate by a preponderance of evidence that "no reasonable officer" could have concluded that Alvin Cole's action created an imminent danger even if mistaken; and under the <u>second prong</u> of the qualified immunity because existing law at the time did not put Mensah on notice that he was violating Cole's Fourth amendment rights.

### A. Even assuming Mensah's perception was mistaken, his use of force was objectively reasonable under the totality of the circumstances

Plaintiff produced no evidence or even an alternative theory to explain how Cole's actions were anything but an imminent threat. Instead, Plaintiff relies on a straw man argument that for

24

Mensah to be right about Cole pointing a gun at him, everyone else on the scene had to be wrong. But that is not how qualified immunity operates. Mensah could be wrong but still immune from liability if the mistake was the product of a reasonable assessment of the danger.

Qualified immunity assumes a mistake. In evaluating a dismissal based on qualified immunity, factual disputes are resolved in the plaintiffs' favor and *then* the analysis of immunity begins. Indeed, "while the substantive constitutional standard protects officers' reasonable factual mistakes, qualified immunity protects them from liability where they reasonably misjudge the legal standard." *Catlin v. City of Wheaton*, 574 F.3d 361, 369 (7th Cir. 2009).

Several weeks ago, the Seventh Circuit affirmed summary judgment in favor of two Evansville Police Officers even though there was a dispute about whether a subject was actually holding a gun when they shot him - because the court decided as a matter of law that the officers' perception was reasonable under the circumstances. *Pam v. City of Evansville*, No. 24-2286, 2025 U.S. App. LEXIS 25017 (7th Cir. Sep. 26, 2025).

In *Pam*, officers responded to a 911 call for a report of a Black man (later identified as decedent) in her backyard brandishing a handgun, pointing it at her dog and at her. (*Id*. * 2) Dispatch relayed that the gun had been fired, although one officer stated he had not heard any gunshots, despite being only 100-200 feet away. That officer arrived and encountered the decedent on the complainant's back porch. Standing approximately 50-75 feet away, the officer trained his gun on the decedent and commanded him to show his hands. (*Id*.) Decedent did not comply and instead put his hands in his pocket. The officer yelled at him to remove them, and decedent complied. (*Id*. * 3) At that moment, a second officer "rushed on scene with his gun drawn, shouting 'I'm going to shoot your ass'." Seconds later, decedent raised his left hand towards the officers while his right hand remained at his side. In response, both officers fired multiple times, killing

the decedent on the scene. (*Id*. *4) Both officers justified the shooting because decedent produced a handgun from his pocket and began to raise it towards an officer. *Id*. During the internal investigation, both officers stated that decedent had the gun in his right hand. However, the officer who led the police department investigation into the shooting, testified that he did not see decedent holding a gun in his hand in the body camera video. (*Id*. *4-5)

The event was captured on the officer's body camera, and both parties argued that the video supported their version of events. Decedent's Estate argued that factual disputes precluded summary judgment—i.e., whether decedent was pointing or even holding the gun at the time the officers shot. The Seventh Circuit agreed that there were disputes, but ruled them immaterial:

> After extensive review of the videos, including frame by frame analysis, we find the videos create a dispute over whether Pam raised a weapon before the officers shot him. While Pam definitely raised his left hand just before being shot, it is not clear he held a gun in that hand at the time. When speaking to internal affairs, both Offerman and McQuay said Pam held the weapon in his right hand, and the blurry video cannot put that possibility to rest.

(*Id*. * 7) Even with these factual disputes, though, the Seventh Circuit still affirmed summary judgment, because the undisputed facts showed that Pam behaved in a manner consistent with wielding a firearm. The court noted the poor lighting and low video quality, but nonetheless held that the officers were entitled to summary judgment on the merits. (*Id*. * 9-10)

More relevant to the present case, however, is the Court's additional grant of summary judgment under the doctrine of qualified immunity. (*Id*. * 14) Under qualified immunity's shroud, the officers did not need to have been correct when they identified decedent holding a weapon; they needed only to harbor a reasonable perception that he held one. (*Id*. *14-15)(citing See, e.g., *Gooden v. Howard County*, 954 F.2d 960, 965-66 (4th Cir. 1992)(noting the question is whether officers held mistaken but reasonable misperception of situation); *Pollard v. City of Columbus*, 780 F.3d 395, 403 (6th Cir. 2015) (holding officers reasonably, but mistakenly, believed plaintiff posed

26

deadly threat when he "made gestures suggesting he had a weapon"); *A.K.H. by and through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016). The relevant question for purposes of qualified immunity is whether an officer could reasonably have believed that a suspect posed a threat sufficient to use deadly force. Importantly, even an act that is based upon a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment. (*Pam, * 14)(citations omitted). The Seventh Circuit instructed:

> Regardless of whether Pam actually held his firearm prior to the shooting, a reasonable officer could have thought it so. Even assuming Offerman and McQuay were mistaken that Pam held a gun, the confluence of dangerous circumstances, in conjunction with Pam's furtive movements and the dim lighting, presented the tense, uncertain, and rapidly evolving situation where split-second judgments are a must, and the law allows for reasonable errors.

(*Id*. * 15) The Seventh Circuit anticipated the exact issue that Cole's Estate has demonstrated, twice, in our case – an inability to meet their burden of proof at trial:

> One way to conceptualize this deficiency is to imagine how Plaintiffs would carry their burden of proof if this case reached a jury. What evidence could Plaintiffs present to counter the officers' testimony and explain how the gun rolled a few feet in front of Pam's body? While parts of the videos are too fuzzy to affirmatively confirm the officers' story, they are similarly too inconclusive to contradict it. Without the videos, we would have no choice but to accept the officers' story, which is consistent with the physical evidence. The only question is whether the videos upset that narrative to create a genuine factual dispute. Viewed in Plaintiffs' favor, the footage still does not support a genuine dispute that when Pam removed his hands from his pockets, positioned his right hand behind him, and raised his left hand toward officers, his actions were consistent with an individual holding a handgun.

(*Id*. * 9)(citations omitted)

Cole had no constitutional right to be free from the use of deadly force by arguing that his acts were misinterpreted. The reasonableness of Mensah's actions must be assessed from the perspective of a reasonable officer on the scene, facing the totality of circumstances that Mensah

experienced. The thorough analysis undertaken by the *Pam* court two weeks ago is dispositive of Cole's claims in this case and mandates dismissal under qualified immunity.

**B.      No Existing Law Rendered Deadly Force Unreasonable Under the Circumstances Confronted by Mensah on February 2, 2020.**

The application of the second prong of the qualified immunity analysis requires the court to turn to clearly established law.  Courts in this circuit look to Supreme Court precedent, our own precedent, and surrounding circuits when discerning whether a right was clearly established. *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017). Unless no reasonable officer could have thought they were acting lawfully, immunity warrants dismissal. *Abbott v. Sangamon County, Illinois*, 705 F.3d 706, 724 (7th Cir. 2013).

To place the constitutional question beyond debate, the precedent must be "particularized to the facts of the case." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018)(citing *White v. Paul*y, 580 U.S. 73, 79 (2017). "As applied to a Fourth Amendment excessive-force claim, the qualified-immunity doctrine gives 'enhanced deference to officers' on-scene judgments about the level of necessary force.'" *Dockery*, 911 F.3d at 466 (citing *Abbott*, 705 F.3d at 725).

Framed with the required particularity, the determinative question is whether existing, clearly established law prohibited deadly force against an armed suspect, who, after discharging his gun while fleeing police, ignored repeated instruction and commands to drop the gun, and then intentionally confronted officers in close range with a firearm. To properly frame the question is to answer it.

The defense is unaware of any factually analogous case in which a court in this circuit has held that an officer violated the Fourth Amendment as a matter of law under the circumstances that confronted Mensah. The trial(s) in this case produced evidence of an armed threat in a shopping mall, a foot pursuit in the dark, Cole firing his weapon, Cole refusing to drop his gun, and then

28

while down on his hands and knees, in a dark parking lot, Cole raising the gun towards Olson who –along with Shamsi–decided that deadly force was necessary, and while still holding the gun turning towards Mensah, plus the medical evidence of anterior front entry wounds. In the absence of such a clearly established precedent, the court cannot conclude that the plaintiff has shown that the question of whether Mensah's actions violated the Fourth Amendment is "beyond debate." See *White*, 580 U.S. at 79.

In considering Mensah's motion for summary judgment, this Court, analyzed the "clearly established precedent" prong by relying heavily upon two cases, *Williams v. Indiana State Police Dept.*, 797 F.3d 468, 484 (7th Cir. 2015) and *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015), for the proposition that it was "clearly established" that a person had a right not to be subject to deadly force unless s/he puts the officer or another in imminent danger. (21cv848 ECF140 at 5-6) However, those two cases are more properly viewed as confrontations between officers and suicidal subjects, with a viable argument that the subjects were only a danger to themselves.

Now, with the benefit of two trials, the recent Supreme Court decision in *Barnes v. Felix*, 605 U.S. 73 (2025), and a nearly identical case to ours in the Seventh Circuit decision of *Pam v. City of Evansville*, No. 24-2286, 2025 U.S. App. LEXIS 25017 (7th Cir. Sep. 26, 2025), where qualified immunity was ordered, the evaluation of this matter has evolved. Just as in *Pam*, every officer in this case testified that Cole's decision to flee through a parking lot while armed created an extraordinarily dangerous situation. Even more so than in *Pam,* Cole's discharge of his weapon while being chased through a dark parking lot was an indisputably deadly act. And just as in *Pam*, although the officers each saw things incrementally differently, under every version each officer felt the situation required a deadly response.

The dashcam video is dark and grainy – but nothing in that video plainly contradicts Mensah's testimony of what he perceived. As the *Pam* court asked, what evidence does the Plaintiff present that Mensah *didn't* reasonably perceive – even if mistaken – that an armed and uncooperative Cole, while holding the handgun he had just fired, a gun that two other officers observed in his hand, had turned toward Mensah? The answer, as two jury trials have demonstrated, is that the Plaintiff has no such evidence and cannot satisfy its burden of proof. This lawsuit must be dismissed on its merits.

## CONCLUSION

The fact that two separate juries were unable to reach a unanimous verdict is a powerful, pragmatic and factual justification for the Court to conclude the plaintiff's evidence is legally insufficient to sustain a verdict and end the litigation. The facts are the facts and after two trials are no longer in materials dispute. It was objectively reasonable for Joseph Mensah to perceive a lethal danger when he observed an armed individual, who had already fired once during a foot pursuit, and who had ignored all commands to drop his weapon, turn – or appear to turn – toward him with gun in hand. As a result of Alvin Cole's furtive actions, Joseph Mensah was forced to defend himself with deadly force. That decision was reasonable as a matter of law.

WHEREFORE, Defendant Mensah requests that this Court enter judgment as a matter of law in his favor dismissing this case upon the merits and with prejudice.

Dated this 9th day of October 2025.

WIRTH + BAYNARD
Attorneys for Defendant

*/s/ Jasmyne M. Baynard*
Jasmyne M. Baynard, WI Bar No. 1099898
9898 W. Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
Email: jmb@wbattys.com

30