UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

ESTATE OF ALVIN COLE,                  )
                                       )
                    Plaintiffs,        )     Case No. 22-CV-856
                                       )     Milwaukee, Wisconsin
        vs.                            )
                                       )     September 8, 2025
JOSEPH MENSAH,                         )
                                       )
                    Defendant.         )
----------------------------------------------------------------

**EXCERPT TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:
 For the Plaintiff
  ESTATE OF ALVIN COLE:          Cade Law Group LLC
                                 By: Nathaniel Cade, Jr & Annalisa
                                 Pusick
                                 PO Box 170887
                                 Milwaukee, WI 53217
                                 Ph: 414-255-3802
                                 nate@cade-law.com

                                 Motley Legal Services
                                 By: Kimberly Chongyon Motley
                                 PO Box 1433 US 28106
                                 Matthews, NC 28106
                                 Ph: 704-765-4887
                                 kcmotley@gmail.com
 For the Defendant
  JOSEPH MENSAH:                 Wirth & Baynard
                                 By: Joseph M Wirth & Jasmyne M
                                 Baynard
                                 9898 W Bluemound Rd - Ste 2
                                 Wauwatosa, WI 53226
                                 Ph: 414-291-7979
                                 Jmw@wbattys.com


 U.S. Official Reporter:         SUSAN ARMBRUSTER, RPR, RMR, FCRR
 Transcript Orders:             Susan_Armbruster@wied.uscourts.gov
Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription

```
 1                  T-R-A-N-S-C-R-I-P-T   I-N-D-E-X

 2                                                    Page

 3                        WITNESSES
     ALL WITNESSES:

 4
     For the Plaintiff:

 5
        Jeffrey Johnson

 6
     Direct Examination by Mr. Cade:              3

 7   Cross Examination by Ms. Baynard:           23
     Redirect Examination by Mr. Cade:           32

 8   Recross Examination by Ms. Baynard:         35
     Re-redirect Examination by Mr. Cade:        37

 9   Re-cross Examination by Ms. Baynard:        39

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Excerpt transcript.)

2          THE COURT:  Next witness.

3          MR. CADE:  Officer Johnson, Your Honor.

4          Jeffrey Johnson, being first duly sworn to tell the

5     truth, the whole truth, and nothing but the truth, testified as

6     follows:

7          MR. JOHNSON:  I do.

8          THE COURT:  Have a seat.  State your name for the

9     record.  Spell your last name.

10         THE WITNESS:  Jeffrey Johnson.  J-E-F-F-R-E-Y,

11    J-O-H-N-S-O-N.

12    **DIRECT EXAMINATION BY MR. CADE:**

13    Q.  Officer Johnson, how are you employed?

14    A.  With the City of Wauwatosa Police Department.

15    Q.  How long have you been employed with the Wauwatosa Police

16    Department?

17    A.  I began January of 2019.

18    Q.  2019?

19    A.  2019.

20    Q.  Okay.  So are you familiar with an incident that occurred in

21    February of 2020?

22    A.  Correct, yes.

23    Q.  So that would mean that you were there just over a year?

24    A.  Yes.

25    Q.  What was your shift duty that day?

1   A.   I worked second shift, 3:00 p.m. to 11:24 p.m.

2   Q.   11:24?

3   A.   Correct.

4   Q.   That is very hyper specific.

5   A.   That's how our shifts are, 8.4 hours everyday.

6   Q.   8.4?

7   A.   Correct.

8   Q.   So at some point, were you assigned a specific area of

9   Wauwatosa to patrol?

10   A.   Yes.

11   Q.   What area?

12   A.   It's -- They are in different sectors.  Sector IV, which is

13   the north end of the City.

14   Q.   North end of the City?

15   A.   Correct.

16   Q.   Do you know where the boundaries are?

17   A.   It changed since then.  At that time it was Burleigh Street

18   north.  The west boundary is 124th Street.  North boundary is

19   West Hampton, and east boundary was 92nd Street.

20   Q.   Mayfair Mall be within that?

21   A.   No, it was not.

22   Q.   Mayfair Mall would be to the east?

23   A.   South.

24   Q.   South, I'm sorry.  Okay.  Were you directed to go to Mayfair

25   Mall?

1   A.   Not specifically, no.

2   Q.   Why did you make the decision to go because of --

3   A.   Based on a call for service that came out from inside of the

4   mall.

5   Q.   So let's turn for a moment.  You, obviously know Officer

6   Mensah, correct?

7   A.   Correct.

8   Q.   You worked with him?

9   A.   I did.

10  Q.   Did Officer Mensah ever operate as your field training

11  officer or anything like that to you?

12  A.   He did not.

13  Q.   So turning for a moment to going to the mall.  At some

14  point -- We've seen the video, so I'm not going to keep showing

15  the video, but we've seen the video.  You indicated that you saw

16  the people who were identified as potential subjects?

17  A.   Regarding the incident inside the mall, yes.

18  Q.   And what did you do at that point?

19  A.   I advised our dispatch through my squad video that I

20  observed or have visual of the subjects and request another

21  officer to come meet me to make contact with them.

22  Q.   Who did you say contacted you?

23  A.   I requested another officer to meet me in that location to

24  make contact with the subjects.

25  Q.   Got it.  And did you request Mr. Mensah to show up?

1   A.  Not specifically.  I don't remember if there was a specific

2   officer.  I mentioned it was whoever else was on the property of

3   the mall.

4   Q.  You didn't radio him separately and tell Mr. Mensah to show

5   up, correct?

6   A.  I did not.

7   Q.  So as you approached the individuals, did you go on the loud

8   speaker -- over the loud speaker?  Did you turn on your lights?

9   Did you roll down your window and tell them to stop?

10  A.  At some point I did.  When the officer arrived, I activated

11  my emergency lights and sirens, emergency lights.

12  Q.  And the other officer arrived?

13  A.  Correct.

14  Q.  Do you know who that other officer is?

15  A.  Officer Shamsi.

16  Q.  Before Shamsi showed up, you did not make any sort of

17  tactical decision turning on the lights telling them to stop

18  anything, correct?

19  A.  Not at that point, correct.

20  Q.  When Officer Shamsi shows up, did he put on his lights

21  first, or did you put on yours?

22  A.  I believe I put mine on first.

23  Q.  It's fair to say -- We've seen the video, so you're looking

24  at Shamsi, correct?

25  A.  Correct.

1  Q.  The minute you saw Shamsi, were his lights on?

2  A.  I don't recall specifically when he turned them on if I was

3  first or if he was first.

4  Q.  All we have in his squad video from his perspective, we

5  can't tell if the lights are on, fair?

6  A.  That's fair.

7  Q.  So after you see Officer Shamsi, you then turn on your

8  lights?

9  A.  Correct.

10  Q.  Did you go over the loud speaker?

11  A.  I did not.

12  Q.  Did you roll down your window and tell the individuals to

13  stop?

14  A.  I exited my squad car and told them to stop.

15  Q.  You parked and got out and told them to stop?

16  A.  Yes.

17  Q.  Did they say anything to you?

18  A.  No.

19  Q.  What did they do?

20  A.  They began to run away from myself and Officer Shamsi.

21  Q.  How many individuals were running?

22  A.  Approximately four.

23  Q.  Four individuals?

24  A.  Yes.

25  Q.  And at some point, you continued to chase?

1    A.  Yes.

2    Q.  So we see you on video.  Did you -- You were a bit behind.

3    Was it you were not able to keep up, did you get injured, did

4    you stop and grab somebody else?

5    A.  At what point are we talking?

6    Q.  At some point, you come into view.  We see Officer Shamsi

7    parking.  You've seen that video, correct?

8    A.  Yes.

9    Q.  You see Officer Shamsi parking right before getting to the

10   Cheesecake Factory, fair?

11   A.  Yes.

12   Q.  And then we see a security guard, correct?

13   A.  Correct.

14   Q.  We've already seen who we've identified as Mr. Cole running,

15   correct?

16   A.  Correct.

17   Q.  We see Officer Schlies run in front of the vehicle?

18   A.  Yes.

19   Q.  Then, we see Shamsi exit the vehicle, correct?

20   A.  Correct.

21   Q.  Then, we see Mr. Mensah, correct?

22   A.  Correct.

23   Q.  Then, we see you?

24   A.  Yes.

25   Q.  So I'm trying to figure out from when you first exited your

1   vehicle to when you now show up on Shamsi's video, were you

2   pursuing the whole time?  Did you stop someone?  What took

3   place?

4   A.  Yeah, I continued the foot pursuit.  At some point during

5   the foot pursuit, I did lose my balance and fall, which created

6   that large distance.

7   Q.  Did you fall -- But you were able to get up?

8   A.  Yes.

9   Q.  Moving forward.  I want what you recalled from that specific

10  evening.  You heard a shot go off?

11  A.  Yes, I believe I heard a gunshot go off.

12  Q.  You just said I believe?

13  A.  Yes, I heard a gunshot, and I believed it to be a gunshot

14  what I heard.

15  Q.  So you heard something, and you believe that to be a

16  gunshot?

17  A.  Yes.

18  Q.  Did you know where it came from?

19  A.  It came from the west in the direction where the group or

20  Mr. Mensah were running.

21  Q.  How did you know it came from the west?

22  A.  Based on -- I was outside, and that's where the sound came

23  from.

24  Q.  Okay.  We had construction as you're running?

25  A.  Yes.

1  Q.  To the left of you which would be the south was

2  construction, correct?

3  A.  Correct.

4  Q.  There's barriers there?

5  A.  Yes.

6  Q.  They only go up so high, concrete barriers, correct?

7  A.  I don't recall how high those barriers were.

8  Q.  Whether they were three feet, four feet, they weren't

9  12 feet?

10  A.  Correct.

11  Q.  And it was a chain-link fence either behind it or on top of

12  it?

13  A.  I don't recall specifically.  But if that's what it was,

14  then yes.

15  Q.  I don't want to put words in your mouth.  There was a

16  chain-link fence of some sort?

17  A.  I don't recall if there was a chain-link fence or not.

18  Q.  So you said the sound came from the west.  How do you know

19  it came from the west and not from the south or the north?

20  A.  Just based on my physical positioning, that is where it

21  seemed to be the loudest was to the west.

22  Q.  So you made an assumption this came from the west.  Did you

23  know who fired it?

24  A.  I did not.

25  Q.  You didn't see a muzzle flash, did you?

1    A.   I did not.

2    Q.   How far -- At the time you heard the shot, how far away were

3    you from Mr. Cole, if you know?

4    A.   I would have to approximate 30 yards maybe.

5    Q.   Thirty yards?

6    A.   Approximate.

7    Q.   Okay.  Do you recall testifying that you were 40 yards away

8    in your deposition?

9    A.   That could be accurate.  Again, I am just estimating from

10   what I recall.

11   Q.   Do you recall being deposed?

12   A.   Yes.

13   Q.   Do you recall I took your deposition?

14   A.   Yes.

15   Q.   We were in a conference room, and I asked questions.  I

16   asked you questions I should say, and you answered all of them?

17   A.   Yes.

18   Q.   And when you heard that shot, was that the first time that

19   you were able to see Mr. Cole?

20   A.   I saw him during the initial foot pursuit, and I lost sight

21   of him.

22   Q.   Apologize.  Let me rephrase.  You are absolutely correct.

23   You initially saw the individual who was killed, Mr. Cole, right

24   when you turned on your lights and four individuals ran,

25   correct?

1   A.  Correct.

2   Q.  Lost sight of him for some period of time?

3   A.  Yes.

4   Q.  Then, you come back onto Shamsi's video, and we hear a shot,

5   correct?

6   A.  Correct.

7   Q.  And at that point in time when the shot goes off, you were

8   able to reacquire Mr. Cole, correct?

9   A.  Correct.

10  Q.  And you could see him in the distance?

11  A.  Correct.

12  Q.  Could you see Officer Olson in the distance?

13  A.  I did not know that was Officer Olson at the time.  I just

14  saw a large flashlight turn on.  As I approached later on, I

15  identified him as Officer Olson.

16  Q.  I appreciate that distinction.  We'll get to it.  Before the

17  flashlight from Officer Olson comes on, that's the flashlight

18  that's on his gun, correct?

19  A.  Yes, correct.

20  Q.  You've got a weapon, and there's a mechanism that you can

21  flip a switch for the light to come on for the weapon, correct?

22  A.  Correct.

23  Q.  And you'd agree with me though that between the shot going

24  off and Officer Olson flicking on the light to his weapon, it's,

25  at least, a second, maybe two seconds, correct?

1    A.  Correct.

2    Q.  So before he flips -- I'm over here.  I'm over here.  Before

3    he flips on that light, you didn't know who that was, correct?

4    A.  That's correct, I did not.

5    Q.  Did you see other than who we now know to be Alvin Cole and

6    other than Officer Olson, did you notice any other individuals?

7    A.  I believe there was a mall security officer.

8    Q.  Okay.

9    A.  And I do not recall who else was up there at the time.

10   Q.  Other than seeing who you now know to be Alvin Cole, Officer

11   Olson, you also saw the security officer from the mall, correct?

12   A.  Correct.

13   Q.  But you couldn't see anybody else?

14   A.  I believe there was another officer upfront, but I do not

15   know who he was.

16   Q.  Okay.  When you heard the shot go off, approximately,

17   40 yards away, what did you see Alvin Cole doing?

18   A.  He was running westbound through the Cheesecake parking lot.

19   Q.  Did you see him fall?

20   A.  Eventually I recall him falling to his hands and knees type

21   position.

22   Q.  Okay.  When you say you recall him, you have a recollection

23   of him falling to his hands and knees?

24   A.  Yes.

25   Q.  Did he stop and then get down on his hands and knees, or was

1  he running and then went down to his hands and knees?

2  A.  It was not in the same position where he was running.  It

3  was closer to the concrete barrier.  I don't recall his specific

4  movements from running to going down to his hands and knees.  I

5  recall him running, hearing the gunshot, and then seeing him on

6  his hands and knees closer to the concrete barrier.

7  Q.  You're aware that it's, approximately, ten seconds from that

8  initial gunshot to Mr. Mensah firing, correct?

9  A.  Approximately.

10  Q.  Okay.  So in those ten seconds after you hear the first

11  shot, you saw Mr. Cole running and then you, what, lost sight of

12  him for a couple of seconds until you saw him on the ground?

13  A.  I don't recall what his movements were.  I recall seeing him

14  on his hands and knees closer to the --

15  Q.  When he was on his hands and knees, was he moving?

16  A.  He was facing south.  He was not standing up or he was just

17  on his hands and knees type position.

18  Q.  Correct.  My question was more specific.  Was he moving?

19  A.  I don't recall him moving.

20  Q.  You had a pretty good visual.  Once he was on his hands and

21  knees, you had a pretty good visual of him?

22  A.  For the most part, yes.

23  Q.  When you say for the most part, what part am I not clear on?

24  A.  There's several different factors that I was trying to look

25  at while assessing the scene.  It was a very fluid and dynamic

1  and rapid situation that was unfolding, trying to process what

2  was going on.  Generally, I didn't know where the gunshot came

3  from, just the general direction.  So trying to determine who

4  fired the shot as well as having Officer Olson's light flashing

5  in my direction.

6          It did make some things hard to see.  So just trying

7  to gather all the information and process what was going on,

8  surveilling the area.  So there were some points that I did not

9  have 100 percent visual on Mr. Cole.

10  Q.  Okay.  So I want to break that down if you don't mind.  You

11  indicated that Officer Olson when he flips on his light, that

12  that was disorienting to you?

13  A.  For me based on where I was it was bright, and it was hard

14  to see because it was a dark area.

15  Q.  Sure.  But if I understand correctly, at the time Mr. Cole

16  is on his hands and knees, you said you're 40 yards away or had

17  you broken --

18  A.  I had gotten closer at that time.

19  Q.  So how far away are you at that point?

20  A.  I am lowering the distance from the first gunshot to the

21  second set of gunshots.

22  Q.  Sure.  But I'm talking about you said the light from Olson's

23  gun was disorienting.  I am trying to figure out from hearing

24  that first gunshot, seeing Mr. Cole.  You saw him falling,

25  correct?

1  A.  At some point, yes, I observed him on his hands and knees.

2  Q.  Right.  You actually testified in your deposition that you

3  saw him falling to the ground.

4  A.  To the hands and knees position.

5  Q.  Right.  I'm sorry, officer, it sounds like I am quibbling.

6  I am a bit.  Words are very specific.

7  A.  Yes.

8  Q.  So either you saw him start to fall or you saw him running.

9  Then, you saw him on his hands and knees.  There's a difference.

10  A.  Right.

11  Q.  Which is it?

12  A.  I observed him running, heard the gunshot, and then I don't

13  know a specific movement that he made.  But then at some point

14  yes, he started to fall to his hands and knees.

15  Q.  So you did observe him falling to his hands and knees?

16  A.  Yes.

17  Q.  Okay.  While he's falling to his hands and knees, you now

18  have this light shinning from Olson.  That's disorienting for

19  you, correct?

20  A.  Yes.  It was a shock.  Based on the time of night and the

21  light coming on.

22  Q.  What was the distance between you and Mr. Cole as he's

23  falling to his hands and knees when this light came on?

24  A.  It was again, approximately, a second or two as you stated,

25  basically the light coming on so 35 yards based on the first

16

1    testimony of 40 yards away.

2    Q.  And while Mr. Cole was on his hands and knees, you or he's

3    falling, you saw him on his hands and knees.  You could clearly

4    see him, correct?

5    A.  It isn't like I would see him during the daytime.

6    Q.  Of course, it's winter.  It's dark early.  But with the

7    disorienting light from the flashlight, you could clearly see

8    Mr. Cole, as you said, on his hands and knees, correct?

9    A.  I could see, yes, it was Mr. Cole on his hands and knees.

10   Q.  And he was not moving, right?

11   A.  He was in the same position.  He wasn't that I recall

12   walking or trying to get back up.

13   Q.  He wasn't even crawling, was he?

14   A.  Not that I remember.

15   Q.  And as you see him in this position, you could see his arms,

16   correct?

17   A.  Yes.

18   Q.  You in fact --  Well, let me ask you this.  When he was on

19   his hands and knees as you're running -- I'm assuming you didn't

20   stop running once you saw him on his hands and knees, correct?

21   A.  Correct.

22   Q.  You continued towards him, right?

23   A.  Correct.

24   Q.  As you were running towards him, did you see Officer Mensah?

25   A.  I observed another officer in front of me, and I later

1   identified him as Officer Mensah, yes.

2   Q.  Did you see Officer Shamsi?

3   A.  I knew there was another officer up there.  I did not know

4   it was Officer Shamsi until I got closer.

5   Q.  As you're running, how far away is Mr. Mensah to you?

6   A.  At what point?

7   Q.  When you observed him.

8   A.  When I observed Officer Mensah?

9   Q.  Correct.  So we have the first shot, light, Alvin is on his

10  hands and knees, and we only have a few more seconds between

11  there's a volley of five shots.  When did you notice Mr. Mensah

12  in that time period?

13  A.  I observed him -- When the video starts as I enter the video

14  as before the first gunshot appears, I observe that officer,

15  which is now Officer Mensah, probably ten feet or ten yards in

16  front of me.

17  Q.  Did you know it was Mensah when you first saw him?

18  A.  I did not know.

19  Q.  You just saw someone running in that direction that you --

20  A.  I saw an officer, yes.

21  Q.  Based on dress, that you presumed to be an officer?

22  A.  Yes.

23  Q.  And when you --  As you're running and you hear the gunshots

24  right, you have a distinct memory of the volley of five gunshots

25  by Mr. Mensah, correct?

1   A.  Yes.

2   Q.  Right before those five gunshots, you could see Alvin Cole's

3   hand, correct?

4   A.  No, I could not see his hand.

5   Q.  You could see his body?

6   A.  I could see his body.

7   Q.  You said he was on his hands and knees, correct?

8   A.  Correct.

9   Q.  But he was not crawling, right?

10  A.  I don't recall him crawling, no.

11  Q.  Did you witness him turn in your direction?

12  A.  Based on my position, I did not.

13  Q.  Okay.  Officer, you may have to step down for a moment for

14  this because I can't do both at the same time.  This is exhibit

15  number --

16          MR. CADE:  Your Honor, I'd like to move into evidence

17  Plaintiff's Exhibit Number 1.

18          THE COURT:  So ordered.

19  Q.  Okay.  Officer, this is you right here, correct?

20  A.  Correct.

21  Q.  And this is Mensah right here, correct?

22  A.  Appears so, yes.

23  Q.  And so we already have the light here from Officer Olson,

24  correct?

25  A.  Correct.

1  Q.  And at that distance, you said that was disorienting for

2  you?

3  A.  I'm trying to figure out what was going on, yes.

4  Q.  But you could -- From this position once you saw Mensah and

5  the shot had already gone off, right?

6  A.  Uh-huh.

7  Q.  You have to say yes.

8  A.  Yes, sorry.

9  Q.  Okay.

10 A.  I understand.

11 Q.  You clearly saw at that point in time that Alvin Cole was on

12 his hands and knees, correct?

13 A.  At this specific point in time, it appeared he was as I was

14 moving forward, yes.

15 Q.  Sorry.  You're moving back and forth.  It appears as --

16 A.  You're saying during this position right here I could see

17 Alvin Cole.

18 Q.  That's what I'm asking, yes.

19 A.  No, not at this time.

20 Q.  So after the shot, you said you saw Alvin Cole fall to the

21 ground, correct?

22 A.  Yes, at some point.

23 Q.  Was he failing to the ground before Olson's light or after?

24 A.  I don't recall.  I just remember hearing the shot.  As I got

25 closer, he was on his hands and knees.

1  Q.  Because we now -- We can see Olson's light, so we know the

2  shot has already taken place.

3  A.  Correct.

4  Q.  As you are running there, you could as you approached Alvin

5  Cole, you could see that he was on his hands and knees, right?

6  A.  As I got closer, yes.

7  Q.  Did you see him make any movements?

8  A.  From my position I did not.

9  Q.  And you are familiar with if I use the point on a clock.

10  Like if I'm on someone's six, I am behind them, correct?

11  A.  Correct.

12  Q.  The way Mr. Cole was oriented, you indicated his head was

13  towards the barrier, correct?

14  A.  Correct.

15  Q.  So if you are running along the barrier, right.  Okay,

16  Mr. Cole, his head was facing that barrier, correct?

17  A.  Correct.

18  Q.  I'm sorry, you are running this way, and Mr. Cole's head is

19  facing the barrier, correct?

20  A.  Correct.

21  Q.  You observe him on his hands and knees, correct?

22  A.  Correct.

23  Q.  You would be at the 9 o'clock.  Would that be fair?

24  A.  If 12 o'clock was his head, yes.

25  Q.  We have to orient ourselves somehow.  We'll use him as our

1    base.  So he's the 12 o'clock.  You would be the 9 o'clock,

2    correct?

3    A.  Correct.

4    Q.  And while he was on his hands and knees with you at the

5    9 o'clock, you did not observe anything coming or any movement

6    of Mr. Cole, did you?

7    A.  I did not.

8    Q.  At the time that Mr. Mensah fired five times, how far away

9    were you?

10   A.  I believe 20, 25 yards.

11   Q.  Okay.  So 60 feet?

12   A.  Roughly.

13   Q.  Would you have any reason to disagree with me that from this

14   corner to that corner is, approximately, 60 feet?

15   A.  I would not disagree.

16   Q.  So if -- If I'm over here, you're running and you got that

17   light from Olson coming in, you could see Alvin Cole, right?

18   A.  Yes.

19   Q.  You could see he was on his hands and knees, correct?

20   A.  Yes.

21   Q.  And you did not see any movement at the 9 o'clock with him

22   turning, did you?

23   A.  Not that I observed.  But like I stated earlier, there's a

24   lot of information I was trying to process, so I was not

25   100 percent focused on Alvin Cole the whole time.

1   Q.  Sure, I understand.  But you didn't see him crawl, right?

2   A.  Correct.

3   Q.  You didn't see him move?

4   A.  Correct, I don't recall him moving.

5   Q.  You saw him on the ground, right?

6   A.  On his hands and knees.

7           MR. CADE:  Those are my questions, Your Honor.

8   **CROSS EXAMINATION BY MS. BAYNARD:**

9   Q.  Officer Johnson, you left your sector on the night of the

10  incident to respond to the mall, true?

11  A.  True.

12  Q.  Why did you leave your sector?

13  A.  Based on the type of call that came out inside of the mall.

14  Q.  What type of call came out from inside of the mall?

15  A.  It was dispatched as a possible disorderly conduct or

16  domestic violence incident between patrons inside of the mall,

17  and one of the patrons brandished a firearm.

18  Q.  Does the report of an individual brandishing a firearm, I

19  guess, create a dangerous situation?

20  A.  Yes, potentially.

21  Q.  And when you arrive at the mall, where are you getting

22  information from?

23  A.  I'm getting it through dispatch and other officers who were

24  inside of the mall.

25  Q.  At some point, did you get a description of the armed

1  subject?

2  A.  Yes.

3  Q.  What was that description?

4  A.  A light-skinned black male, skinny build, shorter, with a

5  gray sweatshirt and black fanny pack.

6  Q.  You've seen the video.  Does the description of the armed

7  subject match Alvin Cole?

8  A.  Yes.

9  Q.  Did it match any of the other individuals that were on

10  scene?

11  A.  No.

12  Q.  At some point, you are able to get eyes on Alvin Cole.  Are

13  you able to -- I guess what was your --  What was your plan when

14  you made contact with him?

15       MR. CADE:  Objection, Your Honor.  What his plan was

16  when he made contact is of no moment.

17       THE COURT:  I'll allow it.

18       THE WITNESS:  My plan is I observed them.  I requested

19  a squad to come over to the area, so we could make contact with

20  them together.  Based on that time, there were, approximately,

21  seven to eight individuals.  With the information that the

22  subject, Mr. Cole, that we were trying to identify was armed

23  with a handgun.

24  Q.  Okay.  Was Mr. Cole free to leave at that point?

25  A.  He was not.

1    Q.  And did Mr. Cole stop so you could speak with him?

2    A.  He did not.

3    Q.  And there was a foot pursuit, true?

4    A.  Yes.

5    Q.  Can you explain for -- Are foot pursuits dangerous?

6    A.  Yes.

7    Q.  Can you explain to the jury why.

8            MR. CADE:  Your Honor, I object.  At this point, we've

9    already heard this, and now he's giving testimony about his

10   beliefs.  That's not the issue.

11           THE COURT:  Well, I'll allow him to answer the

12   question.

13           THE WITNESS:  So foot pursuits can be dangerous for a

14   variety of reasons.  When someone takes off on foot and you

15   begin to chase them on foot, behind them you are at a

16   disadvantage especially if they are armed.  There's not a lot of

17   cover or concealment if the suspect decides to turn around and

18   shoot at you.

19           As well as if you do make contact or catch up to that

20   suspect, you could get into a physical altercation with them,

21   and now you're fighting, which creates a probability of injury

22   to yourself, the suspect, as well as it makes it harder for

23   other officers to find where you are.  Now that you are on foot,

24   you don't have a GPS like you would with your squad.

25   Q.  As you're involved in this foot pursuit, are you issuing any

25

1   commands?

2   A.  I am yelling police, stop.

3   Q.  Is Mr. Cole stopping?

4   A.  No.

5   Q.  And during this pursuit, what is your focus?  Who is your

6   focus?

7   A.  Mr. Cole.

8   Q.  And why is he your focus?  There were a couple other

9   individuals there.  Why is Mr. Cole your focus?

10  A.  He matched the description that was given regarding the

11  suspect inside of the mall that brandished a handgun.

12  Q.  As you're running, you hear a gunshot, true?

13  A.  True.

14  Q.  And I'm going to play for you what's been marked as

15  Plaintiff's Exhibit 3.

16          (Whereupon tape is played.)

17  Q.  Is that the gunshot that you heard on February 2, 2020?

18  A.  Yes.

19  Q.  And where are you in the frame at this point?

20  A.  On the left side of the frame.

21  Q.  And what do you do in response to hearing a gunshot?

22  A.  I pulled my firearm.

23  Q.  What do other officers do in response?  What do you observe

24  the other officers do in response to hearing Cole's gunshot?

25  A.  As I get closer to the other officers, I observed them all

1  with their firearms out.

2  Q.  Okay.  Now, Officer Olson -- After of the shooting, you see

3  officers pull their firearms.  Why do you pull your firearm?

4  A.  Because I believed there to be a gunshot, which can be

5  extremely dangerous for myself and others.  I pulled my firearm

6  to protect myself and others if I needed to because I did not

7  know exactly where the gunshot came from.

8  Q.  Do you just pull your gunshot if you don't feel like you're

9  in a dangerous situation -- sorry, pull your firearm, unholster

10  it if it is not a dangerous situation?

11  A.  No.

12  Q.  As you're pursuing Mr. Cole -- And I'm going to show what's

13  been actually -- Strike that.  Is Mayfair Mall a pretty large

14  property?

15  A.  Yes.

16  Q.  Would you recognize an overhead of Mayfair Mall?

17  A.  I would.

18  Q.  Officer Johnson, does this appear to be an accurate

19  representation of Mayfair Mall?

20  A.  Yes.

21  Q.  Obviously, this is taken in the daytime.  But do you believe

22  this accurately depicts the setup of Mayfair Mall on the night

23  of February 2, 2020?

24  A.  Yes.

25         MR. CADE:  Objection, Your Honor.  No foundation.  How

1    is he going to know from an aerial?

2              THE COURT:  I'll allow it.

3    Q.  And I'm going to hand you a pointer.  Could you -- You might

4    have to come down for this.  Could you point out for the jury --

5    Since you're down here, I don't mind if you touch it, but could

6    you point out to the jury where you first encounter the armed

7    subject who we now know to be Mr. Cole.

8    A.  In this area here.

9    Q.  And can you now draw on there.  Take the pointer and

10   demonstrate the path of travel that Mr. Cole had as he fled from

11   you.

12   A.  Started in this area.  Parking lot from the outer ring road

13   towards the construction site, east or westbound.

14   Q.  That's the approximate position through that south parking

15   lot on the outer ring road westbound towards the Cheesecake

16   Factory and westbound into the Cheesecake Factory just north of

17   the construction and the hotel.  At any point during that

18   pursuit, did Alvin Cole stop and put his hands up?

19   A.  No.

20   Q.  Did he do anything to indicate to you that he was going to

21   comply?

22   A.  No.

23   Q.  And when you're initially chasing after Mr. Cole, do you see

24   him with a gun in his hands?

25   A.  I did not.

1   Q.  At some point, does Mr. Cole have a gun in his hands?

2   A.  Yes.

3   Q.  Now, I want to talk a little bit about your training that

4   you get as a law enforcement officer.  Based on your training,

5   when are you permitted to use deadly force?

6   A.  When you face behavior that has caused or imminently

7   threatens to cause death or great bodily harm to yourself or

8   others.

9   Q.  Does your use of force training require that a subject point

10  a gun at you before you can employ deadly force?

11  A.  No.

12  Q.  Is the presence of a firearm at all a requirement to use

13  deadly force?

14  A.  No.

15  Q.  Is the presence of a firearm going to be assessment of

16  whether or not deadly force should be used?

17  A.  Yes.

18  Q.  And why is that?

19  A.  It's the subject's ability to escalate force quickly.  A

20  firearm can escalate force quickly and turn things deadly very

21  quickly.

22  Q.  Now, after the first shot went off, you pull your firearm.

23  You see other officers pull their firearm.  Do you hear Mr. Cole

24  say anything?

25  A.  I did not.

29

1    Q.  Do you hear anybody yell I've shot myself?

2    A.  I did not.

3    Q.  Do you hear anybody yell I'm hurt?

4    A.  I do not.

5    Q.  And when you're chasing Mr. Cole -- I'm going to show you

6    what's been stipulated between the parties and is marked as

7    Defense Exhibit 1000.  I believe it is plaintiff's exhibit as

8    well.  It is an overhead of what the state patrol did of the

9    scene of the incident.

10           Officer Johnson, when you are initially chasing Cole

11   and again you might have to step down.  Are you chasing him up

12   against the barricade of the construction site?

13   A.  Not directly next to it, no.

14   Q.  How far off of the wall would you say he is?

15   A.  Five to ten yards.

16   Q.  And at some point, you see him -- After the gunshot, you see

17   him up against the barricade, true?

18   A.  Yes.

19   Q.  Do you know how he got there?

20   A.  Not specifically, no.

21   Q.  And it was dark that night, right?

22   A.  Correct.

23   Q.  And you had heard a gunshot, isn't that true?

24   A.  Yes.

25   Q.  After hearing that gunshot, are you trying to process what's

1  happening?

2  A.  Yes.

3  Q.  The next time you see Cole, he's on his hands and knees near

4  the barricade, right?

5  A.  Yes.

6  Q.  Do you hear officers yelling things at him?

7  A.  I don't recall.  All I recall is hearing the gunshots.

8  Q.  When you say gunshots, do you mean the second volley of

9  gunshots?

10  A.  The first gunshot and the second volley of gunshots.

11  Q.  Between that time period, do you hear anybody say anything?

12  A.  I don't recall hearing anything.

13  Q.  When you initially make contact with Mr. Cole, you believe

14  him to be armed, true?

15  A.  Yes.

16  Q.  But you don't see a gun, right?

17  A.  That's correct.

18  Q.  At some point, Mr. Cole does have a gun, correct?

19  A.  Correct.

20  Q.  Is there an enhanced -- I guess in your role as a police

21  officer, are you making threat assessments every time you

22  interact with an individual?

23  A.  Yes.

24  Q.  Would an individual taking a gun from a concealed location

25  to an unconcealed location heighten that threat assessment?

31

1          MR. CADE:  Your Honor, I'm going to object.  No

2   evidence of this.

3          MS. BAYNARD:  I'm asking based on his training.

4          THE COURT:  It is a leading question, so I'll sustain

5   the objection.

6   Q.  Based on your training and years of experience as a police

7   officer, do you make threat assessments when you're interacting

8   with individuals?

9   A.  Yes.

10         MR. CADE:  Asked and answered.

11  Q.  What goes into that threat assessment?

12  A.  Several things.  Their size, demeanor, level of cooperation,

13  information if they may or are armed.

14  Q.  And so the information that somebody is armed and then the

15  confirmation that they are armed would create a dangerous and

16  deadly situation, true?

17         MR. CADE:  Objection, leading.

18         THE COURT:  I'll allow it.

19         THE WITNESS:  Yes.

20         MS. BAYNARD:  I have nothing further.

21  **REDIRECT EXAMINATION BY MR. CADE:**

22  Q.  Officer, you indicated in response to Attorney Baynard's

23  question that he was not -- Mr. Cole was not free to go?

24  A.  Correct.

25  Q.  Was he detained?

1  A.  Yes.

2  Q.  How was he detained if you didn't put arms on him and he

3  didn't pay attention, you're saying -- you saying police, he's

4  detained?

5  A.  I attempted to stop him, which he would have been detained

6  with him -- by activating my emergency lights with a marked

7  police car.  At that time, he decided to run away, and I yell

8  police stop, which he disregarded.

9  Q.  Can you as an officer shoot someone for running?

10  A.  The is an open-ended question.  I can't give a yes or no

11  answer.

12  Q.  You answered her questions.  I'm just asking if someone is

13  running away from you, can you shoot them?

14  A.  Depends on the circumstances.

15  Q.  In this video, Mr. Cole is running away from you.  Do you

16  get to shoot him?

17  A.  Again, based on this video without a gun or with a gun?

18  Q.  You don't see a gun at any time until he's on the ground,

19  right?

20  A.  Correct.

21  Q.  So while you're chasing Mr. Cole and then you slipped and

22  fell and gave chase again?

23  A.  Yes.

24  Q.  Do you have the right to shoot him?

25  A.  I did not because I did not see a gun at that time.

1    Q.   Okay.  And can you shoot someone in the State of Wisconsin

2    just for having a gun?

3    A.   Just for simply possessing a firearm?

4    Q.   Right.  I'm here -- Obviously in the courtroom we go through

5    a metal detector.  But if you're there and I am here and I have

6    a gun and you see me with a gun, you can't just shoot, right?

7    A.   Based on those specific circumstances, no.

8    Q.   And you can only shoot if you are actually threatened,

9    right?

10   A.   No.

11   Q.   Well, if I'm standing with a gun, that's not a threat,

12   correct?  If I raise the gun or start to raise, you are a

13   threat, true?

14   A.   It could be, yes.

15   Q.   Okay.  My point is between having a gun and not getting

16   shot, the only way it extends to deadly force, under your

17   Defense and Arrest Tactics, is you have to feel threatened or

18   someone else has threatened their life or potentially bodily

19   injury, right?

20   A.   If you perceive your life or someone else's life is

21   imminently threatened, correct.

22   Q.   Since we are an open-carry state, it has to be more than

23   someone having a gun.  It has to be a movement or pointing or

24   action?

25   A.   You take that into consideration, yes.

1  Q.  Can you shoot someone who is on their hands and knees who

2  has a gun and it's not pointed in your direction?

3  A.  Again, I would need more circumstances or background

4  information to make a sound decision.

5  Q.  Sure.  Someone is on their hands and knees.  Officers Shamsi

6  testified the gun never moved.  Do you get to shoot?

7  A.  Generally -- I don't have a definitive answer for you based

8  on not having full circumstances or full circle of details.  Are

9  we relating this to this specific incident or in general?

10  Q.  Well, I used Officer Shamsi, so we're pretty specific,

11  right?  He's no longer with the department, right?

12  A.  Yes.

13  Q.  So you come across someone on their hands and knees.  Shamsi

14  is there.  The gun has not moved.  Can you run up on somebody if

15  the gun is not moving and just shoot because they have a gun?

16  A.  Not initially, no.

17  Q.  Thank you.

18        MR. CADE:  Those are my questions, Your Honor.

19        MS. BAYNARD:  I have a few just a few.

20  **RECROSS EXAMINATION BY MS. BAYNARD:**

21  Q.  Officer Johnson, did Mr. Cole get shot while he was simply

22  running away from everybody?

23  A.  No.

24  Q.  And based off of your DAAT training, whose behavior dictates

25  whether or not deadly force is justified?

1    A.  The suspect's.

2    Q.  And what is subject behavior that justifies an officer's use

3    of deadly force?

4    A.  The reasonable prescription of threat, that their life or

5    someone else's life is in danger.

6    Q.  Can it be behavior which has caused or threatens to cause

7    death or great bodily harm?

8            MR. CADE:  Your Honor, I think that would move in the

9    field --

10           THE COURT:  Sorry?

11           MR. CADE:  I think we're moving far afield.  She's

12   going from hypothetical to expert opinion.

13           THE COURT:  Can you rephrase it?

14   Q.  I'm not asking for an expert opinion.  Based on your

15   training, the question prior was about subject's behavior.

16   Does a subject's behavior -- Can a subject's behavior justify

17   deadly force if it has caused a threat or imminently threatens

18   to cause a threat?

19           MR. CADE:  Again, Your Honor, this is calling for

20   expert --

21           THE COURT:  I'll allow it.

22           THE WITNESS:  Yes.

23   Q.  And if somebody is on their hands and knees, has fired at

24   officers, is refusing to drop their weapon and in a situation

25   where you're called to an armed person at the mall, could an

36

1  officer use deadly force in that situation?

2         MR. CADE:  Your Honor, I move to strike.  No evidence

3  that he fired at officers.  And now, she's asking for the

4  opinion.

5         MS. BAYNARD:  I asked the same question.  I am filling

6  in the facts.

7         THE COURT:  I'll sustain the objection.

8  Q.  Does somebody being on their hands and knees make them

9  incapable of being a threat?

10  A.  No.

11  Q.  An armed subject who is refusing commands to drop a gun

12  create a dangerous situation?

13  A.  Yes.

14  Q.  And do officers have to wait until that armed subject does

15  something more dangerous to use deadly force?

16  A.  Not necessarily.

17         MS. BAYNARD:  I'm done.

18  **RE-REDIRECT EXAMINATION BY MR. CADE:**

19  Q.  An armed subject who is not pointing a weapon or moving at

20  all with a gun, you cannot use deadly force in that moment,

21  correct?

22         MS. BAYNARD:  Objection.  Asked and answered, calls

23  for an expert opinion.

24         THE COURT:  Sustained.

25  Q.  Let me ask you this.  You didn't shoot that night, right?

37

1    A.  I did not.

2    Q.  And if once a weapon is fired, can an officer ten, 20, 30

3    seconds later decide I'm now going to shoot?

4    A.  If they have justification for it.

5    Q.  They have to justification to shoot, correct?

6    A.  Correct.

7    Q.  It can't be because there was a shot earlier where no one

8    knows about it or where it came from.  It has to be in that

9    moment I am threatened, true?

10   A.  If that officer perceives to be threatened, yes.

11   Q.  Right.  Earlier shot is of no moment.  We're only looking at

12   the time deadly force is used what was -- what would a

13   reasonable officer in that situation do, correct?

14   A.  Yes.

15   Q.  And correct me if I'm wrong, we had Olson was there,

16   correct?

17   A.  Yes.

18   Q.  Shamsi was there?

19   A.  Yes.

20   Q.  You were there?

21   A.  Correct.

22   Q.  Three reasonable people?

23   A.  Yes.

24   Q.  Did any of them shoot?

25           MS. BAYNARD:  Objection, Your Honor, calls for a

1    conclusion on the ultimate issue.

2              THE COURT:  Calls for a conclusion what?

3              MS. BAYNARD:  On the ultimate issue, asking for

4    reasonable people did they shoot.

5              THE COURT:  He can answer the question.

6              THE WITNESS:  Can you repeat the question?

7    Q.  Sure.  You, Shamsi, Olson.  Three of you are reasonable

8    people, correct?

9    A.  Yes, I believe so.

10   Q.  Did not shoot, true?

11   A.  We did not.

12             MR. CADE:  Thank you.  No further questions.

13             MS. BAYNARD:  Your Honor -- Sorry.

14   **RE-RECROSS EXAMINATION BY MS. BAYNARD:**

15   Q.  Your judgment of a deadly force situation is based off the

16   totality of the circumstances, true?

17   A.  Correct.

18   Q.  So whether somebody had fired a gun ten seconds before would

19   go into that evaluation, true?

20   A.  Yes.

21   Q.  And if you were taking the exact situation and you have seen

22   the video and you know what Mensah has said, do you think Mensah

23   was justified in shooting Alvin Cole?

24             MR. CADE:  Objection.  That's an ultimate issue,

25   Judge.

                                                              39

1          THE COURT:  I'm going to --

2          MR. CADE:  Now, we're so far afield.

3          THE COURT:  That is a little bit too far.

4          MS. BAYNARD:  I have nothing further, Your Honor.

5          THE COURT:  Okay.  You are excused.

6          THE WITNESS:  Thank you, Judge.

7          (Witness excused.)

8          (Excerpt concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3              I, SUSAN ARMBRUSTER, RPR, RMR, FCRR, Official Court

4    Reporter for the United States District Court for the Eastern

5    District of Wisconsin, do hereby certify that the foregoing

6    pages are a true and accurate transcription of my original

7    machine shorthand notes taken in the aforementioned matter to

8    the best of my skill and ability.

9

10   Signed and Certified October 9, 2025.

11   /s/Susan Armbruster

12   Susan Armbruster

13

14                    Susan Armbruster, RPR, RMR, FCRR
                      United States Official Reporter
15                    517 E Wisconsin Ave., Rm 200A,
                      Milwaukee, WI 53202
16                    Susan_Armbruster@wied.uscourts.gov

17

18

19

20

21

22

23

24

25

41